# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **HORMEL FOODS CORPORATION** ) | |
| **1 Hormel Place** ) | |
| **Austin, Minnesota 55912,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | Civil Action No. _____ |
| ) | |
| **UNITED STATES DEPARTMENT** ) | |
| **OF AGRICULTURE,** ) | |
| ) | |
| **Defendant.** ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Hormel Foods Corporation seeks declaratory and injunctive relief from the failure by the United States Department of Agriculture to rescind, pursuant to its prior determinations, label approvals for certain meat and poultry products that are marketed under labels that erroneously and unlawfully make a "Natural" claim, when those foods contain the manufactured chemicals sodium lactate or potassium lactate that have the effect of a preservative, in violation of the Federal Meat Inspection Act ("FMIA"), 21 U.S.C.

§§ 601(n) and 610(d), the Poultry Products Inspection Act ("PPIA"), 21 U.S.C. §§ 453(h) and 458(a)(3), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 et seq..

## PARTIES

1.      Plaintiff Hormel Foods Corporation is a Delaware corporation, founded in 1891, which manufactures and sells to consumers in all 50 States prepackaged meat and poultry products, including ham and turkey.

2.      The defendant is the United States Department of Agriculture.

## JURISDICTION AND VENUE

3.    This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. §§ 1331 and 1337, and 5 U.S.C. § 702.  This action arises under the laws of the United States, specifically the FMIA, the PPIA, and the APA.

4.    Venue is proper in this Court because defendant the Department of Agriculture resides in this district.  28 U.S.C. § 1391(e)(1).

## STATEMENT OF THE CASE

### Governing Statutes

5.    The Food Safety and Inspection Service ("FSIS") of the Department of Agriculture administers the FMIA and the PPIA.    These statutes provide that manufacturers of meat and poultry products may not sell products that are "adulterated" – that is, unfit for human consumption; or "misbranded" – that is, marketed under a label which is false, misleading, or fails to provide required information.  The FSIS carries out these responsibilities through continuous government inspection of the foods and a process of pre-marketing approval of the labels under which the manufacturer will sell the products.  This case involves only the "misbranding" aspect of both statutes.

6.    The Federal Meat Inspection Act.  The Federal Meat Inspection Act, 21 U.S.C. § 610(d), prohibits the sale or distribution of any meat product that is "adulterated or misbranded."  21 U.S.C. § 601(n) defines the term "misbranded" as follows:

> The term "misbranded" shall apply to any carcass, part thereof, or meat food product under one or more of the following circumstances:
>
> (1) If its labeling is false or misleading in any particular; . . .
>
> (11) If it bears or contains any artificial flavoring, artificial coloring, or chemical preservative, unless it bears labeling stating that fact: *Provided*, That, to the extent compliance with the requirements of this subparagraph (11) is

2

impracticable, exemption shall be established by regulations promulgated by the
Secretary; or

(12) If it fails to bear, directly thereon or on its container, as the Secretary may by
regulations prescribe, the inspection legend and, unrestricted by any of the
foregoing, such other information as the Secretary may require in such regulations
to assure that it will not have false or misleading labeling and that the public will
be informed of the manner of handling required to maintain the article in a
wholesome condition.

7.      In 1970, the FSIS issued regulations to implement the misbranding
provisions of the FMIA and the PPIA by prohibiting false or misleading labeling.  The
general requirement is set forth in 9 C.F.R. § 317.8(a), which provides:

No product or any of its wrappers, packaging, or other containers shall bear any
false or misleading marking, label, or other labeling, and no statement, word,
picture, design, or device which conveys any false impression or gives any false
indication of origin or quality or is otherwise false or misleading shall appear in
any marking or other labeling.  No product shall be wholly or partly enclosed in
any wrapper, packaging, or other container that is so made, formed, or filled as to
be misleading.

In particular, 9 C.F.R. § 317.2(j) establishes certain mandatory requirements for
information that must be disclosed on the label of a meat or poultry product:

Labels of any products within any of the following paragraphs shall show the
information required by such paragraph for such product: . . . .

(12) Containers of . . . product packed in, bearing, or containing any chemical
preservative shall bear a label stating that fact.

(Emphasis added).

8.      The Poultry Products Inspection Act.  The Poultry Products Inspection Act
("PPIA"), 21 U.S.C. § 458(a)(3), prohibits the sale or distribution of any poultry or
poultry products that are "adulterated or misbranded."  21 U.S.C. § 453(h) defines the
term "misbranded" as follows:

The term "misbranded" shall apply to any poultry product under one or more of
the following circumstances:

3

(1) If its labeling is false or misleading in any particular; . . .

(11) If it bears or contains an artificial flavoring, artificial coloring, or chemical preservative, unless it bears labeling stating that fact: *Provided*, That, to the extent compliance with the requirements of this subparagraph (11) is impracticable, exemption shall be established by regulations promulgated by the Secretary; or

(12) If it fails to bear on its containers . . . as the Secretary may by regulations prescribe . . . unrestricted by any of the foregoing, such other information as the Secretary may require in such regulations to assure that it will not have false or misleading labeling and that the public will be informed of the manner of handling required to maintain the article in a wholesome condition.

9.　　As noted above, the same FSIS regulations implement the misbranding provisions of the PPIA and the FMIA by prohibiting false or misleading labeling. 9 C.F.R. § 317.8(a) imposes a general prohibition on misleading labeling of poultry, and 9 C.F.R. § 317.2(j) imposes a mandatory requirement for label disclosure of the presence of any "chemical preservative" in poultry.

**The Manufactured Chemical Preservatives Sodium and Potassium Lactate**

10.　　Potassium lactate and sodium lactate are chemical compositions that effectively delay the growth of the pathogen *Clostridium botulinum* when added to meat or poultry foodstuffs, as recognized in a number of patents issued by the U.S. Patent and Trademark Office beginning in 1989.　For example, U.S. Patent Nos. 4,798,729, 4,888,729, and 5,017,391 each provide, in pertinent part:

The levels of the lactate salt which delay the toxin formation compared to the control are amounts which are effective for delaying the *Clostridium botulinum* growth.

In general, these amounts range from about 1 to about 7% lactate salt and preferably are in the range from about 1.5 to 3.5 lactate salt.

4

In addition to delaying the growth of *C. botulinum*, these chemical compositions also have been shown to delay the growth of other bacteria in meat and poultry, and other organisms responsible for food spoilage.

11.    The preservative effect of potassium lactate and sodium lactate inhibits the growth of organisms responsible for food spoilage and extends the shelf life of the product that contains them.

12.    The industrial process for producing sodium or potassium lactate from a carbohydrate, such as corn, involves multiple stages and substantial industrial chemistry. For example, sodium lactate is a combination of lactic acid and sodium hydroxide, both of which are generated through industrial processes.  To manufacture lactic acid, the carbohydrate source is subjected to a fermentation stage, followed by biomass separation, followed by a purification process in which the input stream is subject to acidification (with sulfuric acid or another similar chemical), filtration, evaporation, esterification, and hydrolysis.  Esterification and hydrolysis are controlled chemical reactions conducted in a laboratory or chemical refinery and are used to refine, or separate, certain chemicals from each other – that is, to separate the lactic acid from ethanol..  Sulfuric acid is a manufactured industrial product that has no natural source.

The product of these reactions, purified lactic acid, is then exposed to sodium (or potassium) hydroxide, which also has no natural source.  The hydroxide is an industrial product synthesized by the passage of electricity through a sodium (or potassium) chloride solution, which produces the metal hydroxide and chlorine gas.

5

**FSIS Rules Permitting the Limited Inclusion of Sodium or Potassium Lactate in Foods without Making the Product "Adulterated"**

13.    Potassium lactate and sodium lactate have been the subject of two FSIS rulemakings that govern when these substances may safely be added to meat and poultry products, in limited quantities, without making those foods "adulterated" within the meaning of the FMIA and the PPIA.

14.    The 1993 Rulemaking.    In 1993, the FSIS amended its meat and poultry inspection regulations "to permit the use of potassium lactate and sodium lactate as flavor enhancers and flavoring agents in various meat and poultry products."    Final Rule, Use of Potassium Lactate and Sodium Lactate as Flavoring Agents in Various Meat and Poultry Products, 58 Fed. Reg. 4067 (Jan 13, 1993).    The agency noted that in 1987, the U.S. Food and Drug Administration ("FDA") had classified potassium lactate and sodium lactate as Generally Recognized As Safe ("GRAS") for use as direct human food ingredients.    See 21 C.F.R. § 184.1639 (potassium lactate), § 184.1768 (sodium lactate).

15.    Through the GRAS process, the FDA approves chemical additives as safe when used in foods for specific purposes, rather than on a blanket basis.    FDA's GRAS approval of sodium lactate is for its use as an emulsifier, flavor enhancer, flavoring agent, humectant, and pH control agent.    21 C.F.R. § 184.1768.    FDA's GRAS approval of potassium lactate is for its use as a flavor enhancer, flavoring agent, humectant, and pH control agent, but not as a emulsifier.    21 C.F.R. § 184.1639.

16.    Based on the data and the prior FDA decision, the FSIS amended its rule, 9 C.F.R. § 318.7(c)(4), to expand its existing list of 28 substances that may be used as flavor enhancers and flavoring agents in certain foods, by adding potassium lactate and sodium lactate in an amount up to 2.0 percent of the total formulation of the food.    In the

6

preamble to the final rule, the FSIS stated that "meat and poultry products will not become adulterated by the use of potassium lactate and sodium lactate as flavor enhancers and flavoring agents in processing at levels that do not exceed 2.0 percent." 58 Fed. Reg. at 4068.

17.    The 2000 Rulemaking.  In its 1993 final rule, the FSIS also noted that it was considering initiation of a second rulemaking, which would propose the use of potassium lactate and sodium lactate "as secondary barriers to the growth of certain pathogenic microorganisms in refrigerated, ready-to-eat, hermetically packaged, cooked uncured and cured meat and poultry products." 58 Fed. Reg. at 4069.  In 2000, the FSIS further amended its meat and poultry inspection rules to permit "the use of sodium lactate and potassium lactate in meat and poultry products, except for infant formulas and infant food, for purposes of inhibiting the growth of certain pathogens such as *Lm* and *C. botulinum*."  Final Rule, Food Additives for Use in Meat and Poultry Products:  . . . Sodium Lactate and Potassium Lactate, 65 Fed. Reg. 3121 (Jan. 20, 2000) (emphasis added).

18.    In issuing this rule, the FSIS concluded for the first time that it would be consistent with consumer safety to permit three chemical additives that have anti-microbial effects to be included in meat and poultry.  In particular, the agency found that it had sufficient information to permit the use of potassium lactate and sodium lactate "in all fully cooked meat and poultry food products at a level up to 4.8 percent by weight of total formulation for purposes of inhibiting the growth of certain pathogens." Id.  The rule amended 9 C.F.R. § 424.21(c) to provide, in pertinent part:

> (c) The food ingredients specified in the following chart are approved for use in the preparation of meat products, provided they are used for the purposes

7

indicated, within the limit of the amounts stated, and under other conditions specified in this part and Part 317 of this chapter. This chart also contains food ingredients that are acceptable for use in poultry products, provided they are used for the purpose indicated, within the limits of the amounts stated and under other conditions specified in this part. No meat or poultry product shall bear or contain any food ingredient that would render it adulterated or misbranded, or which is not approved in this part, or by the Administrator in specific cases.

| Class of Substance | Substance | Purpose | Products | Amount |
|---|---|---|---|---|
| Antimicrobial Agents | Potassium lactate | To inhibit microbial growth | Various meat and poultry products, except infant formulas and infant food | 4.8% by weight of total formulation. |
| | Sodium diacetate | .........do | ................do | 0.25% by weight of total formulation. |
| | Sodium lactate | .........do | ................do | 4.8% by weight of total formulation. |

19.     The 1993 and 2000 rules determined that limited quantities of potassium lactate and sodium lactate could be included in pre-cooked meat and poultry without rendering those products "adulterated" within the meaning of the FMIA or the PPIA. Nothing in these rules modified or amended the standards governing the labeling of products to which these chemicals were added. In particular, the 1993 and 2000 rules did not amend the requirement in 9 C.F.R. § 317.8(a) that "no product. . . shall bear any false or misleading marking, label, or other labeling" or the directive that "no statement, word, picture, design, or device which conveys any false impression" shall appear on labels. Nor did the 1993 or 2000 rules amend the mandatory labeling requirement in 9 C.F.R. § 317.2(j)(12), which provides that foods "containing any chemical preservative shall bear a label stating that fact."

## The 1982 FSIS Policy Guidance on "Natural" Label Claims

20.     Over the last quarter century, "natural" products have become of increasing interest to many health-conscious consumers, who seek to avoid ingestion of

chemical preservatives, artificial flavorings and ingredients, and highly processed foods. Consumers' increased demand for minimally-processed, additive-free products with nutritional properties similar to fresh products led Hormel and other companies to invest substantial amounts of time and money on research and development of processes for preserving food naturally, without chemical preservatives.

21.    On November 22, 1982, the FSIS issued Food Standards and Labeling Policy Memorandum 055 that set forth the standards by which it would decide whether meat and poultry products could carry the term "Natural" on their labels without being false and misleading, and thus without triggering the misbranding provisions of the FMIA or the PPIA.

22.    The Policy Memorandum stated that the agency would approve a "Natural" product label if:

> (1)    the product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 C.F.R. 101.22); and
>
> (2)    the product and its ingredients are not more than minimally processed.

23.    In adopting this standard, FSIS chose not to devise its own, novel definition of the term "chemical preservative." Rather, it incorporated by reference the definition adopted by the FDA in its sister program under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 et seq., to prevent adulteration and misbranding in all other food products not regulated by the FSIS. In 21 C.F.R. § 101.22(a)(5), the FDA defines "chemical preservative" as follows:

> Any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties."

9

(Emphasis added). The FDA definition, as incorporated into the FSIS standard, defines "chemical preservative" based entirely on the functional effects of the substance, namely whether it "tends to prevent or retard deterioration."

24.     The FSIS did, however, further define the term "minimally processed":

For the purposes of this memorandum, minimal processing may include:
(a) those traditional processes used to make food edible or preserve it or make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting; or (b) those physical processes which do not fundamentally alter the raw product and/or which separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

Relatively severe processes, such as solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing.

25.     From 1982 until mid-2005, the FSIS applied the provisions of Food Safety and Labeling Policy Memorandum 055 in its pre-marketing approval process, to determine whether to grant a producer's application to sell a meat or poultry product under a label that makes a "Natural" claim. The FSIS review and approval process thus involved consideration of whether a food product making a "Natural" label claim contained any "chemical preservative (as defined in 21 C.F.R. 101.22)" and whether it was "minimally processed."

26.     In response to the FSIS definition of "Natural" foods, Hormel successfully developed a method for use of a high-pressure pasteurization process designed to inactivate micro-organisms that may be present in the product, and thus maintain the quality and flavor of its foods, without having to add chemical preservatives to them. This process allows Hormel to market meat and poultry products with the "Natural" label claim through minimal processing, with no chemical preservative added, while having the lengthy shelf life that consumers want and stores demand to stock these products. In

10

mid-2005, Hormel received FSIS pre-marketing approval to sell and distribute under the "Natural" label its Natural Choice® deli meats, which are produced through this high-pressure pasteurization process and without addition of chemical preservatives. Hormel currently uses this technology in the manufacture of various deli meats, including ham, turkey and roast beef.

27.    It is significantly less costly for a manufacturer to use a chemical preservative such as sodium or potassium lactate to produce a pre-packaged deli meat with a given shelf life than it is for Hormel to use its high-pressure pasteurization process to produce the same product, with the same shelf life, without chemical preservatives.

**The August 2005 Revision of the FSIS Policy Guidance on "Natural" Label Claims To Permit the Use of the Chemical Preservative Sodium Lactate**

28.    In August 2005, the FSIS revised its 1982 Food Standards and Labeling Policy Memorandum concerning the "Natural" label claim, without providing prior notice or an opportunity for public comment (the "Revised Memorandum.")  The Revised Memorandum retained the affirmative criteria established by the 1982 Policy.  It stated that an applicant may use the term "Natural" on the label of a meat or poultry product, provided that it can demonstrate:

(1)    the product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic ingredient; and

(2)    the product and its ingredients are not more than minimally processed.

Without explanation, the 2005 Revised Memorandum then added the following exception:

Note:  Sugar, sodium lactate (from a corn source) natural flavorings from oleoresins or extractives are acceptable for "all natural" claims.

11

This exception did not impose any limit upon the amount of sodium lactate that could be added to a food product and still have the product qualify for a "Natural" label.

29.    Under its plain language, this exception applied only to the chemical sodium lactate and did not extend to the chemical potassium lactate. As demonstrated by 9 C.F.R. § 424.21(c) adopted in 2000, the FSIS treats potassium lactate and sodium lactate as distinct chemicals, which are listed separately in its rule permitting their use as chemical preservatives in meats and poultry.

30.    In permitting a "Natural" label claim for products that contain sodium lactate, the Revised Memorandum did not purport to modify the terms of the governing FSIS rule, 9 C.F.R. § 317.8(a), which provides that "[n]o product . . . shall bear any false or misleading marking, label, or other labeling" and that "no statement, word . . . or device which conveys any false impression . . . or is otherwise false or misleading shall appear in any marking or other labeling." The Revised Memorandum also did not modify 9 C.F.R. § 317.12(j)(12), which provides that "[c]ontainers of product . . . containing any chemical preservative shall bear a label stating that fact." Finally, the Revised Memorandum did not purport to modify the definition of "minimally processed."

## FSIS's Unlawful Approval of "Natural" Label Claims for Products Containing the Chemical Preservatives Sodium Lactate and Potassium Lactate

31.    In late September 2006, Hormel discovered that several food products sold by a competitor had been approved by the FSIS for marketing under a "Natural" label claim pursuant to its Revised Memorandum, without label disclosure of the fact that the products contain the added chemical potassium lactate and that this chemical has a preservative effect on the food. Each of these products contained on the front of the package and in large letters a "Natural" label claim, while the back label for each product

disclosed, in small print, that it contained potassium lactate. None of the labels disclosed to consumers that the product contained a chemical preservative.

32.    Hormel suffers substantial harm from the Department's approval of labels allowing its competitors to sell under a "Natural" label claim products that contain sodium or potassium lactate, in which the chemical is having a preservative effect and in which the chemical was manufactured through extensive industrial chemistry, and where the presence of this preservative is not disclosed to consumers on the label. The use of sodium or potassium lactate as a preservative is significantly cheaper than use of a modern technology that does not rely on chemical preservatives, such as Hormel's high-pressure pasteurization process. This cost advantage is particularly significant in the meat industry, which has a low profit margin on retail sales.

33.    Health-conscious consumers who seek to avoid products that contain chemical preservatives, and seek to obtain the additive-free, minimally processed products associated with the "Natural" label claim, are misled by the agency-approved "Natural" label because it does not inform consumers that the meat and poultry products they purchase contain the added chemical sodium lactate or potassium lactate and that the chemical is having a preservative effect.

## USDA's Actions in Response to Hormel's Objection to the Use of "Natural" Labels for Meat and Poultry Products that Contain Chemical Lactate Preservatives

34.    On October 9, 2006, Hormel petitioned the Department of Agriculture to conduct a rulemaking regarding "Natural" label claims, on the ground that the exemption for sodium lactate created by the August 2005 Revised Memorandum permitted sale under a "Natural" label of meat or poultry products that contained chemical preservatives and synthetic ingredients and that were more than minimally processed. Hormel also

13

submitted that the exemption for sodium lactate rendered the definition of "Natural" internally inconsistent, because the exemption conflicted with the general requirement that an applicant for a "Natural" label must demonstrate that its product does not contain "any chemical preservative (as defined in 21 CFR 101.22)."

35.    On October 10, 2006, Hormel requested that FSIS rescind as false and misleading the "Natural" labels under which a competitor sold three meat or poultry products -- smoked ham, turkey breast, and smoked uncured beef franks -- because the products contained the added chemical preservative potassium lactate, without disclosing that fact to consumers.

36.    On November 7, 2006, Hormel submitted to FSIS further information and legal arguments in support of its request for rescission of the false and misleading "Natural" labels under which products containing the chemical preservative potassium lactate were being sold by its competitors.  Hormel provided information relating to patents that had been granted by the U.S. Patent and Trademark Office for use of sodium lactate, potassium lactate, and calcium lactate to inhibit growth of microorganisms in poultry and fish products at levels between 1 and 7 percent of product formulation, as well as information from another manufacturer of lactates which claims that levels of these lactates as low as 1 percent may inhibit microbial growth and extend shelf life.

37.    On December 6, 2006, Under Secretary of Agriculture Richard A. Raymond wrote to counsel for Hormel in response to the company's letters of October 9 and November 7.  (Attachment 1)  Under Secretary Raymond stated that the "Natural" labels for products that contain sodium or potassium lactate had been approved based on "information provided by the applicants indicating that lactate was being used exclusively

as a flavoring agent." He further stated that if the lactates were being "used to control or reduce microorganisms and extend the shelf-life of the treated product, FSIS would not permit the use of the term 'Natural' on the product label under the current labeling policy guidelines."

38.    Under Secretary Raymond further stated that FSIS had taken three actions in response to Hormel's' letters.

a. FSIS had revoked the August 2005 modifications to the Food Standards and Labeling Policy Book relating to sodium lactate under which the "Natural" label claims had been approved for products containing sodium or potassium lactates. (Id.)

b. FSIS had "written to the companies with approved meat and poultry product labels bearing the 'natural' claim and containing lactates at levels of 2 percent or less. These companies were advised to provide FSIS with information demonstrating that the use of lactates in these products does not provide a preservative effect." Under Secretary Raymond further stated that:  "In the absence of such information, FSIS will institute action to rescind its approval of the labels that bear a 'natural' claim." (Id., emphasis added).

On information and belief, on December 5, 2006, FSIS sent identical or nearly identical letters to approximately 30 companies whose products are being sold under a "Natural" label claim and that contain sodium, potassium, or calcium lactates as ingredients at levels that have preservative effects. In these letters, FSIS informed the companies:

> If lactates are used in your company's products bearing the claim "natural" at levels less than 2 percent to increase product shelf-life, improve food safety, and control pathogens, the use of the ingredients is contrary to the meaning of

"natural" stated above. Moreover, such products would be misbranded and the labels would be subject to being rescinded.

Letter dated December 5, 2006 from Robert C. Post, FSIS, to Saag's Products, Inc.

(Attachment 2).

To be assured that "the labels of the products bearing the claim 'natural' in which lactates are used are truthful and not misleading," the agency requested that within 60 days, each company:

> provide data that show, for each product that bears a "natural" claim and that contains lactates, that these ingredients are having only a flavoring effect and are not functioning as a preservative in the product. The data will need to show that the "natural" products containing lactates (1) exhibit the same microbiological characteristics as products formulated without lactates, (2) have the same shelf-life as the same products formulated without lactates, and (3) have the same sell-by/use-by/freeze-by dates applied as the dates that would be applied to products without lactates.

(Id.)

FSIS informed the companies that it would evaluate the data and that:

> if the Agency were to find based on this evaluation that the effect of using lactates at 2 percent or less in formulations of "natural" meat and poultry products is that of an antimicrobial, the Agency will rescind its approval of the labels for these products.

(Id., emphasis added).

c.  FSIS had published in the Federal Register a Notice that requested comments on the Hormel petition to establish by rule a definition of "Natural" on meat and poultry products. See USDA, Product Labeling: Definition of the Term "Natural," 71 Fed. Reg. 70503 (Dec. 5, 2006). The Notice stated that after considering the comments, FSIS would thereafter initiate a rulemaking on the claim "Natural."

In the Federal Register notice, the agency informed the public that "FSIS has removed the reference to sodium lactate" from the August 2005 policy modification. 71

Fed. Reg. at 70504. The Notice further stated that "Natural" claims for foods in which

sodium lactate or potassium lactate is used would be considered "on a case-by-case basis,

in light of facts such as the level used, the claimed technical effect of the sodium lactate,

and the actual effect that it is having on the product." Id. (emphasis added).

## Failure of USDA To Rescind Labels Approved under the Invalidated 2005 FSIS Policy and To Act Consistently with Its Prior Findings and Conclusions

39.    On information and belief, approximately 30 members of the industry

submitted information to FSIS in response to its letters of December 5, 2006 requesting

information concerning their food products that contain lactates and are sold under

"Natural" labels.

40.    On June 28, 2007, Representative Collin C. Peterson, Chairman of the

House Committee on Agriculture, wrote then-Secretary of Agriculture Johanns asking for

a status report on FSIS actions to rescind the "Natural" label claims of meat and poultry

products containing sodium or potassium lactate. (Attachment 3)  Chairman Peterson

noted that in its December 6, 2006 letter, the agency had stated that FSIS would take

action to rescind the approval of labels making "Natural" claims as false and misleading,

unless the manufacturer demonstrated that "the use of lactates in these products does not

provide a preservative effect."  Chairman Peterson asked that the Secretary:

> Please provide a detailed explanation of the actions you have taken to date to
> rescind the approval of "natural" labels for products containing sodium or
> potassium lactates and why FSIS is continuing to allow these products to be sold
> in the marketplace at the present time.

(Id.)

41.    On July 31, 2007, Under Secretary Raymond responded to Chairman

Peterson's June 28 letter to Secretary Johanns.  (Attachment 4)  He informed the

17

Chairman that the Department had decided not to rescind any of the "Natural" labels that had been issued for meat and poultry products that contained sodium or potassium lactates.

> FSIS is considering how best to proceed to ensure that the term "natural," as used in meat and poultry labeling, is truthful and not misleading. While one way to try to achieve this result would be to pursue the actions we described in the letters you reference, we now believe that a more efficient way would be to pursue the process that the Agency began with the December 5, 2006, notice [seeking public comments].

(Id., emphasis added).

42.    In deciding not to pursue "the actions we described in the letters you reference" -- that is, rescinding "Natural" labels for products that contain lactates which are having a preservative effect -- the Department did not purport to overturn the finding in its December 6th letter to Hormel that the "Natural" label for these products had been approved based on "information provided by the applicants indicating that lactate was being used exclusively as a flavoring agent"; or its conclusion that if the lactates were being "used to control or reduce microorganisms and extend the shelf-life of the treated product, FSIS would not permit the use of the term 'natural' on the product label under the current labeling policy guidelines."

In deciding not to pursue label rescissions, the Department did not purport to reinstitute the previously rescinded August 2005 Revised Policy, under which the agency had approved "Natural" label claims for meat and poultry products that contained lactates. Nor did the agency purport to find that lactates were not having a preservative effect at the levels at which they were present in these food products sold under a "Natural" label.

18

Further, in reaching its conclusion, the Department did not assert that it was relying on any information provided by any company in response to its December 5th letters that purported to demonstrate that the use of lactates in these products at levels of 2 percent or less does not have a preservative effect. Rather, the Department relied entirely on considerations of "efficiency," a criterion not recognized in the text of the misbranding provisions of the FMIA and the PPIA.

43.    Despite the presence of sodium or potassium lactates in many meat and poultry products sold under "Natural" labels, despite the scientific evidence in FSIS' possession demonstrating that these lactates have a preservative effect at levels less than 2 percent, despite FSIS' revocation of the provision under which these labels were granted, and despite its prior statements that it would take steps to rescind "Natural" labels issued under the 2005 Policy for products that contain sodium or potassium lactate unless the manufacturer could demonstrate that "the use of lactates in these products does not provide a preservative effect," the Department informed the Chairman of its authorizing Committee that it had decided not to take action to rescind the "Natural" label claims for any of these products.

44.    As a result of the Department's failure to take actions consistent with the conclusions it reached and the statements it made in its December 2006 letters, meat and poultry products containing the chemical preservatives sodium lactate and potassium lactate are continuing to be sold under "Natural" labels in violation of the misbranding provisions of the FMIA and the PPIA, in that: (a) the products contain added chemicals that have "the effect . . . of an antimicrobial," and that fact is not disclosed to consumers

on the label; and (b) the products have been more than "minimally processed" because they contain added chemicals produced as the result of extensive industrial chemistry.

45.    The Department's failure to take actions consistent with its prior conclusions and statements has had the effect of permitting sale of meat and poultry products by companies that compete with Hormel which are misbranded, and thereby mislead consumers, harm the public welfare, and result in harm to Hormel by adversely affecting its ability to sell to consumers meat and poultry products that bear the "Natural" label and that do not contain added chemical preservatives.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### (VIOLATION OF THE FMIA AND PPIA)

46.    Plaintiff repeats and incorporates all previous allegations of this Complaint.

47.    The Department of Agriculture violated the FMIA and the PPIA and its own rules, by its decisions to approve the sale of meat and poultry products that are misbranded, within the meaning of 21 U.S.C. § 610 and § 458, because the products are being sold under a "Natural" label when they contain the added chemicals sodium lactate or potassium lactate that has a preservative effect, and that fact is not disclosed to consumers on the label; and because the products are not "minimally processed."

48.    The Department of Agriculture further violated the FMIA and the PPIA and its own rules by its decision not to rescind the "Natural" label approvals that it had granted to meat and poultry products that contain the added chemical sodium lactate or potassium lactate, and by permitting these products to be sold under labels that violate the misbranding provisions of those statutes, because the products contain added chemicals

20

that have a preservative effect and because products containing these manufactured industrial chemicals have not been "minimally processed."

## SECOND CLAIM FOR RELIEF
## (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)

49.    Plaintiff repeats and incorporates all previous allegations of this Complaint.

50.    The Department of Agriculture violated the Administrative Procedure Act by acting arbitrarily, capriciously, or contrary to law and by acting in a manner inconsistent with the FMIA, the PPIA, and its own prior conclusions, by its decision communicated to the Chairman of its authorizing Committee that it would not rescind the "Natural" label approvals that it had granted to meat and poultry products that contain the added chemicals sodium lactate or potassium lactate under an exception in the August 2005 Revised Memorandum that has since been rescinded. The Department established the standard to be applied in its December 2006 letters, by its finding that a product would be deemed misbranded if its label bears a "Natural" claim but it contains sodium lactate or potassium lactate having an antimicrobial effect; and by its statement that "the Agency will rescind its approval of the labels for these products" unless the manufacturer carried the burden of providing data that show that the added lactate at 2 percent or less does not function as a preservative in the product.

The agency acted inconsistently with its own prior determination when, without modifying the findings and conclusions that it reached in December 2006 and without a rational explanation for its change in position, it decided not to rescind any of the "Natural" labels for these products granted to approximately 30 manufacturers that market meat and poultry products which contain the added chemicals sodium lactate or

potassium lactate and in which those chemicals are having a preservative effect. The Department's decision of general applicability, that it would not rescind "Natural" label approvals for products containing added lactates having a preservative effect, constitutes an abdication of the agency's statutory responsibilities under the FMIA and the PPIA.

### THIRD CLAIM FOR RELIEF
### (VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT)

51.    Plaintiff repeats and incorporates all previous allegations of this Complaint.

52.    The Department of Agriculture violated the Administrative Procedure Act, by acting arbitrarily or capriciously, or contrary to law, by its decision communicated to the Chairman of its authorizing Committee that it would not rescind the "Natural" label approvals that it had granted under the August 2005 policy revision for many meat and poultry products that contain sodium lactate or potassium lactate in which the chemical additive has a preservative effect. By its decision not to rescind these labels, the Department illegally granted a de facto exemption of general applicability from the misbranding provisions of the FMIA and the PPIA to members of the meat packing and poultry industries. The Department's action violates the APA, which requires that the agency must first conduct a notice and comment rulemaking before it may adopt such a change in the substantive standard governing the use of the "Natural" label.

WHEREFORE, Plaintiff Hormel Foods requests the following relief:

1.    For a declaration that the Department of Agriculture violated the FMIA, the PPIA, and its implementing rules by approving "Natural" labels for meat or poultry products that contain the added chemical sodium lactate or potassium lactate which is acting as a preservative, in that (a) the foods contain chemical preservatives without

22

informing the consumer of that fact on the label; and (b) foods that contain these chemicals are not "minimally processed."

     2.     For a declaration that the Department of Agriculture violated the APA, by acting inconsistently with its own prior findings and conclusions announced in its letters of December 2006, and by failing to provide a rational explanation for acting inconsistently with its prior determination, in its final decision not to rescind the "Natural" label approvals it had granted under the since-revoked August 2005 Revised Memorandum for meat and poultry products that contain the added chemicals sodium lactate or potassium lactate which is acting as a preservative; and its decision to act in contravention of its prior determination that it "will rescind its approval of labels for these products" unless the manufacturer of such a product carried the burden of proving that the lactates do not function as a preservative.

     3.     For a declaration that the Department of Agriculture violated the APA by failing to conduct a notice and comment rulemaking before making a final decision of general applicability which granted the members of the meat packing and poultry industries an exemption from the misbranding provisions of the FMIA and the PPIA, by which the agency determined that it will not rescind "Natural" label approvals for products which contain the chemicals sodium lactate and potassium lactate when those additives are acting as a preservative.

     4.     For an Order permanently enjoining the Department of Agriculture from approving the sale and marketing under a "Natural" label of meat and poultry products that contain the added chemicals potassium lactate or sodium lactate having a preservative effect, unless it bears labeling stating that fact.

5.    For an Order directing the Department of Agriculture to rescind its approval of each label for the marketing of a meat or poultry product that makes a "Natural" claim and in which the chemicals sodium lactate and potassium have been added and are having a preservative effect, and the label does not state that fact.

6.    For an Order awarding plaintiffs such other and further relief as this Court deems just and appropriate under the circumstances.

Respectfully submitted,

JOHN F. COONEY
(D.C. Bar No. 936336)
NANCY S. BRYSON
(D.C. Bar No. 913673)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812

September 26, 2007                    Counsel for Plaintiff

24

# Exhibit 1



**USDA**

United States Department of Agriculture

Office of the Secretary
Washington, D.C. 20250

Nancy S. Bryson                                                    DEC   6  2006
Venable
575 7ᵗʰ Street, NW
Washington, DC  20004-1601

Dear Ms. Bryson:

This is in response to your letters dated November 7, 2006, and October 9, 2006, and meetings
with you, your associate, and representatives of your client, Hormel Foods, regarding the use of
sodium lactate and potassium lactate in meat and poultry products.  Specifically, Hormel Foods
requested that FSIS review and reconsider its approval of labels for certain products that bear the
claim "natural" and that contain sodium or potassium lactate.  Hormel Foods believes that there
is substantial evidence to suggest that lactates are being used in these products as a chemical
preservative, and that the products, therefore, do not qualify to bear the "natural" claim pursuant
to the Food Safety and Inspection Service's (FSIS) labeling policy guidelines.  As we explained
in our meeting, lactates are multi-function ingredients, and these labels were approved based on
representations concerning the source and level of the lactate used, and information provided by
the applicants indicating that lactate was being used exclusively as a flavoring agent.

To support the assertion that the lactate was being used as a preservative, Hormel Foods provided
information relating to a patent involving the use of sodium lactate, potassium lactate and
calcium lactate to inhibit microorganisms in poultry and fish products at levels between 1 and 7
percent of product formulation, as well as information from another manufacturer of lactates
claiming that levels as low as 1 percent may inhibit microbial growth and extend shelf life.  The
information Hormel Foods provided indicates that the use of lactates at levels currently allowed
under FSIS regulations as flavoring agents (2 % of product formulation) may actually have a
preservative effect.  If, in fact, the lactates are being used to control or reduce microorganisms
and extend the shelf-life of the treated product, FSIS would not permit the use of the term
"natural" on the product label under the current labeling policy guidelines.

FSIS has initiated several steps to address this issue.  First, we have written to the companies
with approved meat and poultry product labels bearing the "natural" claim and containing
lactates at levels of 2 percent or less.  These companies were advised to provide FSIS with
information demonstrating that the use of lactates in these products does not provide a
preservative effect.  In the absence of such information, FSIS will institute action to rescind its
approval of the labels that bear a "natural" claim.

Secondly, FSIS has removed the August, 2005, modifications to the Food Standards and
Labeling Policy Book relating to sodium lactate as well as the references to the National Organic
Program.  Finally, FSIS has prepared and published in the Federal Register a notice informing the

Ms. Bryson                                                                              2

public of the receipt of the petition from Hormel Foods and requesting comments on the petition. This notice also announces a public meeting to seek input on the issues regarding the use of the term "natural" on labels of meat or poultry products. The public meeting will be held on December 12, 2006. After the comment period closes, FSIS will initiate rulemaking on this issue.

Unfortunately, I will not be able to attend the public meeting because of USDA related international travel commitments that cannot be changed. However, I am very interested in this issue and I have asked Dr. Curt Mann, Deputy Under Secretary, to represent me at the public meeting.

I want to assure you that FSIS makes consistent and science-based decisions when it evaluates labels for products bearing "natural" claims and will continue to review and evaluate such claims for products containing lactates or similar ingredients on a case-by-case basis, focusing on the purpose for which the ingredient is used, the level of the ingredient used in the product, and the function and technical effect of the ingredient.

I appreciate your interest in this issue and look forward to your participation in the public meeting we have scheduled to address this matter. If you have any further questions, please do not hesitate to contact me.

Sincerely,

Richard A. Raymond, M.D.
Under Secretary
Office of Food Safety

# Exhibit 2



| United States Department of Agriculture | Food Safety and Inspection Service | Office of Policy, Program and Employee Development | Washington, D.C. 20250 |

Saag's Products, Inc.
1799 Factor Avenue
San Leandro, CA 94577

DEC  5 2006

Dear Sir/Madam:

This letter is in regard to the meat and poultry products that your company manufactures that bear the claim "natural" and that contain sodium, potassium, or calcium lactate as ingredients.

As you are aware, the policy guidance regarding the use of the claim "natural" is found in an entry in the Food Safety and Inspection Service's (FSIS) Food Standards and Labeling Policy Book. The entry states that the term "natural" may be used on labeling for meat products and poultry products, provided the applicant for such labeling demonstrates that (1) the product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic ingredient; and (2) the product and its ingredients are not more than minimally processed.

As you know, FSIS regulates sodium lactate and potassium lactate for the purpose of an antimicrobial effect in meat and poultry products at up to 4.8 percent of product formulations. Antimicrobial effects include reducing or inhibiting microorganisms to extend shelf-life. At levels of 2 percent or less of meat and poultry formulations, sodium lactate and potassium lactate are regulated for the purpose of providing a flavoring effect, as is calcium lactate at 0.6 percent or less of formulations of certain products.

In recent years, your company received approved labels for "natural" products containing sodium lactate. The basis for the approvals was that the ingredient was from a natural source (e.g., corn or beets), not artificial or synthetic, and was not more than minimally processed. Furthermore, to be consistent with the other aspect of the definition of "natural," the approvals were based on the company's assertion that the purpose of use was strictly for flavoring (i.e., used at less than 2 percent) and not for an antimicrobial effect, which would conflict with the criterion that ingredients in natural products are not serving a preservative function. A preservative function includes those of an antimicrobial, i.e., reducing microorganisms and extending shelf-life of treated products.

Recently, the Agency received information that shows that levels of lactates used below the level regulated for flavoring (i.e., 2 percent of a product formulation) may, in fact, provide an antimicrobial effect. The information provided to the Agency includes a copy of a patent for the use of sodium, potassium, and calcium lactate. The patent claims the delay in *Clostridium botulinum* growth at levels of use as low as 1.5 percent of product formulations, which is lower than the level of use regulated for flavoring effect.

Saag's Products, Inc.
Page 2

Additional information from manufacturers of lactate ingredients claims that lactates increase shelf-life, improve food safety, and control pathogens, in addition to improving flavor.

If lactates are used in your company's products bearing the claim "natural" at levels less than 2 percent to increase product shelf-life, improve food safety, and control pathogens, the use of the ingredients is contrary to the meaning of "natural" stated above. Moreover, such products would be misbranded and the labels would be subject to being rescinded.

In order to be assured that the labels of the products bearing the claim "natural" in which lactates are used are truthful and not misleading, and in compliance with the policy guidance, I am requesting that you provide data that show, for each product that bears a "natural" claim and that contains lactates, that these ingredients are having only a flavoring effect and are not functioning as a preservative in the product. The data will need to show that the "natural" products containing lactates (1) exhibit the same microbiological characteristics as products formulated without lactates, (2) have the same shelf-life as that the same products formulated without lactates, and (3) have the same sell-by/use-by/freeze-by dates applied as the dates that would be applied to products without lactates.

I am requesting that you submit these data no later than 60 days from the date of this letter. On receipt of the data, FSIS will evaluate them, and if the Agency were to find based on this evaluation that the effect of using lactates at 2 percent or less in formulations of "natural" meat and poultry products is that of an antimicrobial, the Agency will rescind its approval of the labels for these products.

If you wish to discuss this matter, please do not hesitate to contact me at (202) 205-0279.

Sincerely,

Robert C. Post, Ph.D., Director
Labeling and Consumer Protection Staff

# Exhibit 3

**U.S. House of Representatives**

Committee on Agriculture

Room 1301, Longworth House Office Building

Washington, DC 20515-6001

June 28, 2007

The Honorable Mike Johanns
United States Department of Agriculture
Washington, DC 20250

Dear Mr. Secretary:

I am writing to ask for a status report on the Food Safety and Inspection Service (FSIS) action to rescind the "natural" label claims of meat and poultry products containing sodium or potassium lactates. As you know, it has been long-standing FSIS policy, reaffirmed as recently as December of 2006, to prohibit the use of chemical preservatives in products carrying a "natural" claim.

In a letter dated December 6, 2006, you stated that in the absence of "information demonstrating that the use of lactates in these products does not provide a preservative effect," FSIS would institute action to rescind the approval of these "natural" claims as false and misleading. However, my understanding is that these products continue to be sold in the marketplace.

I know you share my concern that consumers should not be misled as to the contents of meat and poultry products.

Please provide a detailed explanation of the actions you have taken to date to rescind the approval of "natural" labels for products containing sodium or potassium lactates and why FSIS is continuing to allow these products to be sold in the marketplace at the present time.

I look forward to working with you on this issue and should you have any further questions please do not hesitate to contact Chandler Goule (202-225-8407) in my office.

Sincerely,

Collin C. Peterson
Chairman

# Exhibit 4



United States Department of Agriculture

Office of the Secretary
Washington, D.C. 20250

The Honorable Collin C. Peterson
Chairman, Committee on Agriculture
House of Representatives
1301 Longworth House Office Building
Washington, D.C.  20515

**JUL 3 1 2007**

Dear Chairman Peterson:

Thank you for your June 28, 2007, letter to Department of Agriculture (USDA) Secretary
Mike Johanns regarding action to rescind "natural" label claims on meat and poultry
products containing sodium or potassium lactates.  Secretary Johanns has asked me to
respond to your request.

The Food Safety and Inspection Service (FSIS) is the USDA public health regulatory
agency responsible for ensuring that meat, poultry, and processed egg products are safe,
wholesome, and accurately labeled.  FSIS enforces the Federal Meat Inspection Act, the
Poultry Products Inspection Act, and the Egg Products Inspection Act, which require
Federal inspection and regulation of meat, poultry, and processed egg products prepared
for distribution in commerce for use as human food.

FSIS is currently determining how best to resolve the broad issue of "natural" claims on
meat and poultry labels.  The Agency published a *Federal Register* notice on
December 5, 2006, to seek public comment on the definition of "natural."  The notice
was in response to a petition that the Agency received from Hormel Foods to establish a
definition for the voluntary claim "natural" and to delineate the conditions under which
the claim can be used on the labels of meat and poultry products.  The use of the claim
"natural" is an issue of significant interest to the Agency, to industry, and to the public.
Therefore, FSIS invited comments on the issue generally and on the petition and, to
facilitate the comment process, held a public meeting on December 12, 2006, to discuss
the petition.

The comments submitted to the Agency expressed widely divergent and sometimes
conflicting views on what the claim "natural," as applied to meat and poultry products,
should mean.  Given that fact, FSIS is considering how best to proceed to ensure that the
term "natural," as used in meat and poultry labeling, is truthful and not misleading.
While one way to try to achieve this result would be to pursue the actions we described in
the letters you reference, we now believe that a more efficient way would be to pursue
the process that the Agency began with the December 5, 2006, notice.  Thus, the Agency
is considering further action to narrow the divergence in views, including seeking
additional, but more focused, comments on the issue.  More focused comments could
help to produce a broad consensus that would help to bring about a timely and successful
resolution of the issues surrounding the "natural" label claim.

The Honorable Colin C. Peterson
Page 2

We hope you find this information helpful. If you have further questions or if we can be of additional assistance, please have your staff contact our Congressional and Public Affairs Office at (202) 720-3897.

Sincerely,

Richard A. Raymond, M.D.
Under Secretary
Office of Food Safety

# CIVIL COVER SHEET

JS-44
(Rev.1/05 DC)

## I (a) PLAINTIFFS

Hormel Foods Corporation

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

Kent County, Delaware

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Venable, LLP
575 7th Street, NW
Washington, DC 20004    (202) 344-4812

## DEFENDANTS

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
   Plaintiff

☒ 2 U.S. Government
   Defendant

☐ 3 Federal Question
   (U.S. Government Not a Party)

☐ 4 Diversity
   (Indicate Citizenship of Parties
   in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES (PLACE an x IN ONE BOX
FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) **FOR DIVERSITY CASES ONLY!**

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
(Place a X in one category, A-N, that best represents your cause of action and **one** in a corresponding Nature of Suit)

**☐ A. Antitrust**

☐ 410 Antitrust

**☐ B. Personal Injury/ Malpractice**

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

**☒ C. Administrative Agency Review**

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☒ 890 Other Statutory Actions (If Administrative Agency is Involved)

**☐ D. Temporary Restraining Order/Preliminary Injunction**

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| □ **G.  Habeas Corpus/ 2255** | □ **H.  Employment Discrimination** | □ **I.  FOIA/PRIVACY ACT** | □ **J.  Student Loan** |
|---|---|---|---|
| □ 530 Habeas Corpus-General<br>□ 510 Motion/Vacate Sentence | □ 442 Civil Rights-Employment<br>(criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)<br><br>*(If pro se, select this deck)* | □ 895 Freedom of Information Act<br>□ 890 Other Statutory Actions (if Privacy Act)<br><br><br>*(If pro se, select this deck)* | □ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| □ **K.  Labor/ERISA (non-employment)** | □ **L.  Other Civil Rights (non-employment)** | □ **M.  Contract** | □ **N.  Three-Judge Court** |
|---|---|---|---|
| □ 710 Fair Labor Standards Act<br>□ 720 Labor/Mgmt. Relations<br>□ 730 Labor/Mgmt. Reporting & Disclosure Act<br>□ 740 Labor Railway Act<br>□ 790 Other Labor Litigation<br>□ 791 Empl. Ret. Inc. Security Act | □ 441 Voting (if not Voting Rights Act)<br>□ 443 Housing/Accommodations<br>□ 444 Welfare<br>□ 440 Other Civil Rights<br>□ 445 American w/Disabilities-Employment<br>□ 446 Americans w/Disabilities-Other | □ 110 Insurance<br>□ 120 Marine<br>□ 130 Miller Act<br>□ 140 Negotiable Instrument<br>□ 150 Recovery of Overpayment & Enforcement of Judgment<br>□ 153 Recovery of Overpayment of Veteran's Benefits<br>□ 160 Stockholder's Suits<br>□ 190 Other Contracts<br>□ 195 Contract Product Liability<br>□ 196 Franchise | □ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☒ 1 Original Proceeding    □ 2 Removed from State Court    □ 3 Remanded from Appellate Court    □ 4 Reinstated or Reopened    □ 5 Transferred from another district (specify)    □ Multi district Litigation    □ 7 Appeal to District Judge from Mag. Judge

**VI.  CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

Action for Injunction Relief under 21 U.S.C. 610, 21 U.S.C. 458, 5 U.S.C. 702 from Actions by US Dept. of Agriculture in violation of Federal meat Inspection Act, Poultry Products Inspection Act, and agency's prior decisions.

**VII.  REQUESTED IN COMPLAINT**    CHECK IF THIS IS A CLASS    □    ACTION UNDER F.R.C.P. 23     **DEMAND $**    Check YES only if demanded in complaint

**JURY DEMAND:** □ YES     □ NO

**VIII.  RELATED CASE(S) IF ANY**    (See instruction)    □ YES    ☒ NO    If yes, please complete related case form.

DATE  _Sep. 26, 2007_    **SIGNATURE OF ATTORNEY OF RECORD**    _John F. Cooney_

---

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The **JS-44** civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  Listed below are tips for completing the civil cover sheet.  These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.    CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.    CASE ASSIGNMENT AND NATURE OF SUIT:  The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint.  You may select only one category.  You must also select one corresponding nature of suit found under the category of case.

VI.    CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.    RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.