**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HORMEL FOODS CORPORATION, )<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES DEPARTMENT )<br>OF AGRICULTURE, )<br>)<br>)<br>Defendant. )<br>_____) | Civil Action No.<br>1:07-CV-01724-RBW |

FARMLAND FOODS, INC., )
11500 NW Ambassador Drive, Suite 500 )
Kansas City, MO 64153; )
)
KRAFT FOODS GLOBAL, INC., )
Three Lakes Drive, NF 357 )
Northfield, IL 60093-2753; )
)
PURAC AMERICA, INC., )
111 Barclay Boulevard )
Lincolnshire, IL 60069; )
)
SARA LEE CORPORATION, )
3500 Lacey Road )
Downers Grove, IL 60515; )
)
SMITHFIELD FOODS, INC., )
Ambassador Drive, Suite 500 )
Kansas City, MO 64153; )
)
TYSON FOODS, INC., )
2210 Oaklawn Drive, Mail Code CP004 )
Springdale, Arkansas 72765, )
)
)
Proposed Defendant-Intervenors. )
)
)

## MOTION FOR LEAVE TO INTERVENE AS DEFENDANTS

PURAC America, Inc., Kraft Foods Global, Inc., Smithfield Foods, Inc., Farmland

Foods, Inc., Tyson Foods, Inc., and Sara Lee Corporation (collectively "Proposed Intervenors")

respectfully move this Court for leave to intervene as of right in this action pursuant to Fed. R.

Civ. P. 24(a), or in the alternative, for an order granting permissive intervention pursuant to Fed.

R. Civ. P. 24(b).  The Proposed Intervenors file in support of this motion its Memorandum of

Points and Authorities required by Local Rule 7(a).  The Proposed Intervenors also file with this

motion their proposed Order, their Answer to Plaintiff's Complaint, and their corporate

disclosure as required by Local Rules 7(c), 7(j), and 7.1.

Pursuant to Local Rule 7(m), counsel for the Proposed Intervenors discussed this motion

with counsel for the parties to this case.  Defendant USDA has informed Proposed Intervenors

that while it does not object to the motion to intervene, defendant USDA does not necessarily

accept any of the factual characterizations and/or arguments made in the Proposed Intervenors'

motion.  Plaintiff Hormel Foods Corporation informed Proposed Intervenors that it will not take

a position on the motion to intervene until after the motion is filed.


Dated: December 3, 2007                          Respectfully submitted,


                                                  ____/s/  Kirsten Friedel Roddy_____
                                                  Jonathan L. Abram, D.C. Bar No. 389896
                                                     Jlabram@hhlaw.com
                                                  Kirsten Friedel Roddy, D.C. Bar No. 467805
                                                     kfroddy@hhlaw.com
                                                  HOGAN & HARTSON L.L.P.
                                                  555 Thirteenth Street, N.W.
                                                  Washington, D.C.  20004–1109

Telephone: (202) 637–5600
Facsimile:  (202) 637–5910

*Attorneys for Proposed Intervenors:*
*Farmland Foods, Inc., Kraft Foods Global,*
*Inc., PURAC America, Inc., Sara Lee*
*Corporation, Smithfield Foods, Inc., and*
*Tyson Foods, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| HORMEL FOODS CORPORATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:07-CV-01724-RBW |
| UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| FARMLAND FOODS, INC., | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | |
| PURAC AMERICA, INC., SARA LEE | ) | |
| CORPORATION, SMITHFIELD FOODS, | ) | |
| INC., AND TYSON FOODS, INC. | ) | |
| | ) | |
| | ) | |
| Proposed Defendant-Intervenors. | ) | |
| | ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**MOTION FOR LEAVE TO INTERVENE**

Farmland Foods, Inc. ("Farmland"), Kraft Foods Global, Inc. ("Kraft"), PURAC America, Inc. ("PURAC"), Sara Lee Corporation ("Sara Lee"), Smithfield Foods, Inc. ("Smithfield"), and Tyson Foods, Inc. ("Tyson") (collectively "Proposed Intervenors") move for leave to intervene as defendants in this action, pursuant to Rule 24 of the Federal Rules of Civil Procedure.

## INTRODUCTION

Proposed Intervenors will suffer substantial injury if Hormel is awarded the relief it seeks in this action. Hormel seeks the rescission of all USDA-approved labels that use the word "natural" in describing meat and poultry foods that contain naturally-sourced sodium or potassium lactate (collectively "lactates"). Hormel also seeks to permanently enjoin the USDA from approving any new "natural" labels for these food products. Proposed Intervenors Farmland, Kraft, Sara Lee, Smithfield, and Tyson are either holders of the very labels Hormel aims to take out of the marketplace and/or are manufacturers of food products that may in the future become subject to the injunction sought by Hormel. Proposed Intervenor PURAC is the world's largest producer of lactates and supplies numerous food manufacturers with lactates used in conjunction with the development and marketing of natural meat and poultry products.

Intervention would give Proposed Intervenors an opportunity to show that the use of lactates in meat and poultry foods is completely consistent with a "natural" designation – contrary to Hormel's assertions. Without intervention, the Court would be deprived of Proposed Intervenors' knowledge of the nature of lactates and of their actual use in the manufacture and marketing of food products. Instead, the Court would hear from only one manufacturer or marketer of products, Hormel, a firm that does not use lactates in its "natural"-labeled products and that aims to push products containing lactates out of the "natural" market.

USDA will not adequately represent Proposed Intervenors' interests in maintaining such labels in the market or in fighting Hormel's effort to enjoin future approvals of "natural" labels for products containing lactates. Recently, acting on a petition filed by Hormel, USDA announced it was conducting a rulemaking on the definition of "natural." At the same time, before conducting its announced rulemaking, USDA abruptly reversed its long-standing

policy allowing for lactates in "natural" products. USDA further threatened to revoke existing

"natural" labels for meat and poultry foods containing lactates, an action urged by the Hormel

petition. While USDA has left the previously-approved labels in place, it is now refusing to

approve various new "natural" labels for meat and poultry foods containing lactates – approvals

the USDA granted regularly prior to Hormel's petition. The question of USDA's policy during

the announced rulemaking process directly affects the Proposed Intervenors. As a result, in order

to protect their interests, Proposed Intervenors should be granted leave to intervene in this matter.

## STATEMENT OF FACTS

### A.    Sodium and Potassium Lactate

The lactates at issue are made from corn. PURAC, the world's largest producer

of lactates, derives lactate from corn sugar, which is fermented by bacteria to obtain lactic acid.

This lactic acid is filtered, concentrated, purified, and then neutralized to form sodium or

potassium lactate. The form of lactate derived through this process is identical to lactate

naturally present in foods and the human body.

Lactic acid and lactate salts, as products of fermentation, have been used for food

preservation for thousands of years. Fermentation naturally occurs when foods are not consumed

prior to the development of microbial growth. For example, cheese and yogurt are essentially

fermented preserved milk. That is, the controlled fermentation of milk with lactic acid bacteria,

which produce lactates and lactic acid, has always been used to preserve milk in the form of

cheese and yogurt. Lactates and lactic acid produced by lactic acid bacteria have always been

used to preserve sausages, pickles, and sauerkraut. In short, the role of lactates as a natural

antimicrobial has been both long-standing and an essential part of preserving food throughout

history.

- 3 -

Today, sodium and potassium lactates are commonly used to control growth of pathogens such as *Clostridium botulinum* and *Listeria monocytogenes*, in meat and poultry foods, such as lunchmeat. Lactates, with their inherent antimicrobial properties, offer food processors a valuable food safety tool recognized by USDA, consensus scientific opinion, and the majority of the food industry as playing a vital role in ensuring a broad range of proven, effective, and economical means for maximizing the safety of these foods. Importantly, lactates control cross contamination of products <u>after</u> opening by inhibiting growth of bacteria readily found in residential refrigerators, kitchens, deli slicers, and the like. The antimicrobial effects of lactates have been well-known by USDA for years. *See, e.g.,* Use of Potassium Lactate and Sodium Lactate as Flavoring Agents in Various Meat and Poultry Products, 58 Fed. Reg. 4067, 4069 (Jan. 13, 1993). Like other natural antimicrobials including common salt, sugars, vinegars, spices, and wood smoke, lactates enhance the flavor of meat and poultry products in addition to inhibiting microbial growth. *See id.*

## B.     USDA's Long-Standing Policy of Allowing "Natural" Labeling of Products Containing Lactates

Producers of meat and poultry foods cannot introduce a product into interstate commerce without prior approval of the product's label by USDA's Food Safety and Inspection Service ("FSIS").<u>1/</u> Since 1982, FSIS has allowed the term "natural" to be used in the labeling of meat and poultry foods if: (1) the product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 C.F.R. 101.22), or any other

_____

<u>1/</u> FSIS has been charged with regulating, *inter alia*, the labeling of meat and poultry products. See Federal Meat Inspection Act, 21 U.S.C. § 607; Poultry Products Inspection Act, 21 U.S.C. § 457.

artificial or synthetic ingredient; and (2) the product and its ingredients are not more than

minimally processed. *See* Nov. 22, 1982 Standards and Labeling Policy Memorandum 055, Ex.

A; Product Labeling: Definition of the Term "Natural," 71 Fed. Reg. 70503, 70503-04 (Dec. 5,

2006). The plain meaning of this long-standing policy is not to prohibit ingredients based on

functional effect, *e.g.*, preservation, but rather to prohibit the use of artificial, synthetic, and

chemically-derived ingredients. 2/ FSIS has long exercised its statutory authority to prevent

false or misleading labeling by applying this policy in a manner that protects consumer

expectations as to the nature and characteristics of a "natural" meat or poultry product.

It has been long recognized that lactates derived from corn via fermentation are

not "chemical preservatives" or "synthetic ingredients" and are derived by no more than minimal

processing from a natural, renewable source – corn. For many years under USDA's "natural"

policy, FSIS categorically deemed lactates from a corn source permissible in a product with a

label bearing the "natural" designation because lactates met the criteria of the 1982 policy. In

fact, because of FSIS's long-standing practice of approving "natural" labels for products

containing sodium lactate, FSIS updated its "natural" policy in August 2005, to expressly

enumerate "sodium lactate from a corn source" as an acceptable ingredient for products bearing

---

2/ This is consistent with the Food and Drug Administration's ("FDA") "natural" policy, under
which a food is considered "natural" if it contains no artificial or synthetic ingredient. Food
Labeling, 58 Fed. Reg. 2302, 2407 (Jan. 6, 1993). Indeed, if Hormel's definition of "natural"
prevails, USDA and FDA would have conflicting policies regarding the use of "natural," which
would result in significant marketplace confusion and would be in contravention of a Presidential
directive requiring agencies to avoid guidance inconsistent with that of other Federal agencies.
*See* Exec. Order No. 12,866, § 1(b)(10) (Sept. 30, 1993), as amended by Exec. Orders No.
13,258 (Feb. 26, 2002) and No. 13,422 (Jan. 18, 2007) ("Each agency shall avoid regulations and
guidance documents that are inconsistent, incompatible, or duplicative with its other regulations
and guidance documents or those of other Federal agencies.").

"natural" claims. *See* Food Standards and Labeling Policy Book, *Natural Claims* (Aug. 2005),

Ex. B; *see also* 71 Fed. Reg. at 70504 (stating that FSIS's August 2005 policy updated existing

"natural" policy to "make it consistent with prevailing policies" and "to reflect case-by-case

decisions made by the Agency").

On December 5, 2006, prompted by an October 9, 2006 petition from Hormel to

establish a new definition for "natural," FSIS issued a Notice of Petition and Public Meeting

("2006 Notice") announcing that it had decided to initiate a rulemaking regarding the "natural"

designation on meat and poultry labels. *See* 71 Fed. Reg. 70503. In this 2006 Rulemaking

Notice, FSIS stated:

> The Agency has come to recognize, based on the controversy that has
> arisen about 'natural' in recent months, that there is significant
> disagreement about aspects of the August 2005 policy modification,
> particularly the recognition of sodium lactate as an ingredient that could
> be included in products that bear a 'natural' claim.

*Id.* at 70504. FSIS also referred to information it received "that raises questions about when, and

if, a food to which sodium lactate has been added would be fairly characterized as 'natural.'" *Id.*

This information likely came from the Hormel petition, which erroneously argues that sodium

lactate in a "natural" product "is inconsistent with the Policy's initial prohibition on chemical

preservatives." Hormel Petition, Oct. 9, 2007, Ex. C, at 10; *see also* 71 Fed. Reg. at 70504.

In apparent acquiescence to Hormel's views on sodium lactate, FSIS announced

that even before conducting its "natural" rulemaking, it was overturning its longstanding policy

and its August 2005 decision which expressly included sodium lactate as a permissible

ingredient in meat and poultry foods bearing "natural" labels. 71 Fed. Reg. at 70504. FSIS

stated that "claims for foods in which sodium lactate is used will continue to be considered by

FSIS on a case-by-case basis, in light of factors such as the level used, the claimed technical

- 6 -

effect of the sodium lactate, and the actual effect that it is having on the product." *Id.* As the administrative record now before FSIS makes clear (*i.e.*, comments received in response to its 2006 Notice), many of the fundamental assumptions and assertions in the Hormel petition have proven to be false, suggesting that FSIS would reasonably reconsider its policy change and remain committed to a rulemaking process that would address any issues surrounding appropriate use of "natural" claims.

A few days before FSIS issued its 2006 Notice, FSIS sent letters to producers of meat and poultry foods containing lactates bearing USDA-approved "natural" labels. *See, e.g.,* Nov. 29, 2006 Letter to Kraft Foods, Ex. D. In these letters, FSIS threatened to rescind its "natural" label approvals for these products unless the producers showed that the lactates were used only as a flavoring, *i.e.*, at a level permitted for flavoring, 3/ and that the presence of lactates did <u>not</u> have any antimicrobial or preservative effect on those products. *Id.* FSIS provided no rationale for considering an ingredient "natural" when intended to be used for a flavoring purpose but not "natural" when that <u>same</u> ingredient simultaneously exhibits a preservative or antimicrobial effect. *Id.* FSIS further failed to explain how its new decision to exclude from the definition of "natural" any ingredients that have an antimicrobial or preservative effect would not read out the term "chemical" in the 1982 "chemical preservative" prohibition. *See, e.g., id.*

_____

3/ According to FSIS policy, the level of lactates permitted for flavoring in various meat and poultry foods cannot exceed 2 percent. *See* Use of Potassium Lactate and Sodium Lactate as Flavoring Agents in Various Meat and Poultry Products, 58 Fed. Reg. 4067, 4069-70 (Jan. 13, 1993).

Like salt and various other natural ingredients, lactates have inherent antimicrobial properties – that is, they suppress the growth of microbes that can cause spoilage and illness. As a result of that biological reality, producers of products containing lactates and bearing "natural" claims never attempted to demonstrate to FSIS that lactates have no such effects in these products. And because lactates are a critical food safety tool – in particular because of their ability to control cross contamination once a package is opened – these producers did not want not to remove the lactates from their products. In fact, USDA recognizes the benefits of antimicrobials and encourages their use. *See* 9 C.F.R. 430 (2007). So far, these previously-approved "natural" labels for foods containing lactates remain in the marketplace. Hormel seeks to challenge that.

Despite leaving previously-approved "natural" labels in the market, FSIS has refused to grant various new "natural" labels for products containing lactates. For example, on June 12, 2007, Farmland submitted a request for a new "natural" label for deli meat containing potassium lactate. Farmland Label Application, Ex. E. Consistent with the policy change announced in its 2006 Notice of Rulemaking, FSIS refused to approve the label and made the following notation on the label application: "can't approve for natural yet still evaluating data." *Id.*

Until recently, FSIS had a 24-year track record of maintaining a policy that allows "natural" labeling on products containing ingredients with anti-microbial effects. Because of this, along with the strong consumer interest in natural products in a competitive marketplace with many choices in the supermarket aisle, the Proposed Intervenors have made significant investments in "natural" product lines containing lactates. For food manufacturers, the potential rescission of "natural" labels would mean that affected products would have to be reformulated

- 8 -

or the advantages of "natural" labeling lost, existing label stock would have to be discarded and new labels printed, and the substantial investment made in "natural" products under development would be lost. For PURAC, the production of lactates for use in "natural" products makes up a substantial portion of its U.S. business. PURAC, working with its numerous processor customers, has over the years perfected the use of sodium lactate as a flavoring and antimicrobial ingredient, assisting companies big and small in utilizing a proven, cost-effective food safety tool that is fully consistent with the FSIS "natural" policy and consumer expectation.

### C.    Hormel and Its HPP Technology

Hormel's attempts to force lactates out of "natural" products – first through the regulatory process and now in the courts – are not surprising. Unlike its competitors, Hormel does not use lactates in its "natural"-labeled products. Instead, Hormel uses a preservative technology called High Pressure Processing ("HPP"), a technique that FSIS, to date, has permitted for products bearing a "natural" claim. Hormel, therefore, stands to reap tremendous economic benefits if it is successful in excluding meat and poultry products containing lactates from the "natural" market.

HPP achieves its preservative effect by subjecting food to pressures of 80,000 to 130,000 pounds per square inch – ten times the pressure found at the greatest depths of the ocean – resulting in microbial inactivation. Agricultural Marketing Service, USDA, *Nonthermal Food Processing Is Heating Up*, http://www.ars.usda.gov/is/AR/archive/oct06/ food1006.htm (last viewed 11/20/07). 4/ In the HPP approach, food products are packaged in flexible containers,

_____

4/ This novel process and other issues prompted USDA to include in its 2006 Notice a request for comment as to whether the HPP processing method conforms with consumer expectations of a "natural" product. *See* 71 Fed. Reg. at 70505.

placed into a high pressure chamber, and pressurized for several minutes. *See* Ohio State University Extension Fact Sheet, Food Science and Technology, *High Pressure Processing*, http://ohioline.osu.edu/fse-fact/0001.html (last viewed Nov. 20, 2007). The uniform pressure exerted through a hydraulic fluid allows the product to maintain its form and sensory and nutritional qualities while vegetative bacteria are inactivated. *Id.* Unlike lactates and other natural antimicrobials, HPP does <u>not</u> provide a secondary barrier to cross contamination after a product is opened and exposed to refrigerators, slicers, or other sources of potential contamination. As a result, unlike Hormel, some companies use HPP in conjunction with lactates to achieve complete inactivation of bacteria once the product is packaged as well as to control cross-contamination once the package is opened.

   The capital cost of HPP ranges from $500,000 to $2.5 million or more, depending on capacity, extent of automation, and other infrastructure changes necessary to accommodate the heavy equipment involved. *Id.* While the estimated cost of using lactates is 1.7-2.5 cents per pound of finished product, the estimated cost of using HPP is at least 5-10 cents per pound and as high as 25 cents per pound of finished product – two to ten times the cost of using lactates. *See* Agricultural Marketing Service, USDA. If Hormel is successful in forcing lactates out of "natural" products, producers would face a new food safety and regulatory challenge that USDA itself has identified as largely resolved through the use of lactate ingredients consistent with proper manufacturing practices. Moreover, the high cost of HPP technology would present a formidable economic barrier for some smaller and mid-sized food manufacturers. Expensive technologies inevitably place upward pressure on the prices paid by the consumer. Prohibition of lactates in "natural" products would remove a proven, cost-effective, natural preservative option that promotes safe and wholesome natural products.

## ARGUMENT

This Court should allow the Proposed Intervenors to intervene, either as of right or with permission of the Court. The Proposed Intervenors easily satisfy the requirements for intervention as of right. First, this motion is filed at a preliminary stage of these proceedings and would not cause any prejudice to either Hormel or USDA. Further, the Proposed Intervenors have a legitimate interest in the outcome of this case, which directly attacks use of lactates and the "natural" labels on some Proposed Intervenors' meat and poultry products (namely those of Farmland, Kraft, Smithfield) and seeks to prevent all Proposed Intervenors from using lactates in their "natural" meat and poultry products. This interest is one the USDA may not adequately protect. Proposed Intervenors also have unique knowledge about lactates and the use of lactates in meat and poultry foods. At the very least, the Proposed Intervenors should be permitted to intervene because they present potential defenses involving a question of law or fact in common with these proceedings.

## I.  PROPOSED INTERVENORS SHOULD BE ALLOWED TO INTERVENE AS A MATTER OF RIGHT.

The Proposed Intervenors meet the four requirements for intervention as of right: (1) the motion must be timely; (2) the applicant must claim an interest relating to the property or transaction that is the subject of the suit; (3) disposition in the applicant's absence may as a practical matter impede the applicant's ability to protect that interest; and (4) the applicant's interest must not be adequately represented by existing parties. *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 731 (D.C. Cir. 2003); *Smoke v. Norton*, 252 F.3d 468, 470 (D.C. Cir. 2001). Further, a district court must accept as true Proposed Intervenors' non-conclusory allegations made in support of their motion to intervene. *See Foster v. Gueory*, 655 F.2d 1319, 1324 (D.C.

Cir. 1981) (stating that "motions to intervene are usually evaluated on the basis of well pleaded

matters in the motion, the complaint, and any responses of opponents to intervention"). The

Proposed Intervenors satisfy each of the four requirements and therefore have a right to intervene

as a defendant in this matter as a matter of right.

A.    **This Motion for Intervention is Timely.**

Timeliness is determined by examination of the totality of the circumstances,

including the amount of time that has elapsed since the litigation began, the purpose for which

intervention is sought, the necessity for intervention to preserve the applicant's rights, and the

likelihood of prejudice to existing parties. *United States v. AT&T*, 642 F.2d 1285, 1295 (D.C.

Cir. 1980); *Hodgson v. United Mine Workers*, 473 F.2d 118, 129 (D.C. Cir. 1972). Hormel filed

its lawsuit against the USDA in this Court on or about September 26, 2007. The USDA is not

even required to respond until November 26, 2007. Fed. R. Civ. P. 12(a). The parties to this

case will suffer no prejudice by the Proposed Intervenors' inclusion at this early stage of the

case, nor will any rulings on substantive matters need to be reconsidered as a result of its

intervention. Thus, this motion is timely. *See, e.g., Fund for Animals*, 322 F.3d at 735

(reversing denial of a motion to intervene, which before the defendants filed an answer); *Natural

Res. Def. Council v. Costle*, 561 F.2d 904, 912 (D.C. Cir. 1977) (reversing denial of motions to

intervene, which were filed shortly after court entered settlement agreement, three years after

initial filing of complaint); *Am. Forest Res. Council v. Hall*, No. 07-0484, 2007 WL 1576328, at

*1 (D.D.C. May 29, 2007) (motion to intervene timely when it was filed before defendants'

answer to the complaint, and no briefing schedule had been entered in the case); *Admiral Ins. Co.

v. Nat'l Casualty Co.*, 137 F.R.D. 176, 177 (D.D.C. 1991) (motion to intervene timely where

- 12 -

"[t]he major substantive issues . . . . have not yet been argued or resolved, and the movants filed their motions promptly").

**B.    The Proposed Intervenors Have Protectable Interests Relating to the Subject Matter of This Action.**

The labels Hormel attacks in this case are held by some of the Proposed Intervenors, and Hormel's requested injunction would bar USDA from approving future "natural" labels for any of Proposed Intervenors' meat and poultry products containing lactates. Moreover, one of the Proposed Intervenors, PURAC, is the major manufacturer of the lactate ingredients at issue. It is indisputable that the Proposed Intervenors have a protectable interest relating to the subject matter of this case.

In determining whether an applicant for intervention has the requisite protectable interest, this Court should be "guided by the policies behind the 'interest requirement," which indicate that the test is "primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." *Nuesse v. Camp*, 385 F.2d 694, 700 (D.C. Cir. 1967); *see also, Am. Horse Protection Ass'n v. Veneman*, 200 F.R.D. 153, 157 (D.D.C. 2001) ("interest" standard is "liberal and forgiving").

If Hormel is successful in receiving all the relief it seeks, labels held by Farmland, Kraft, and Smithfield will be pulled from the market, and USDA will be prevented from approving any new "natural" labels for Proposed Intervenors' meat and poultry products containing lactates. It goes without saying that this would cause the Proposed Intervenors serious economic harm. If existing "natural" labels were pulled from the market, affected products would have to be reformulated or lose the benefits of the "natural" label, existing label stock would have to be discarded and new labels printed, and the substantial investment made in

- 13 -

"natural" products under development would be lost. Given the current increased demand for "natural" products in the marketplace, some Proposed Intervenors would be required to use HPP technology without lactates, which is substantially more expensive than using lactates alone and does not offer the post-opening barrier against cross contamination that lactates provide. Those companies that are concerned about losing the cross-contamination benefits of lactates might lose current contracts and future business opportunities. Moreover, if companies are compelled to eliminate lactates from products bearing the "natural" label, the loss of the antimicrobial benefits will likely compel the USDA to subject these products to a more extensive inspection and surveillance process, placing a costly and unnecessary burden on both the companies and the agency. See 9 C.F.R. 430 (2007). And a ruling in Hormel's favor would effectively force PURAC to abandon a significant segment of the market for its lactate ingredients. In sum, this lawsuit squarely attacks the Proposed Intervenors' substantial economic interests.

Courts within this Circuit and elsewhere have recognized that an economic interest of this type is protectable. *See, e.g., Fund for Animals*, 322 F.3d at 735 (granting intervention where Mongolia's financial interest in hunting tourism was at risk); *Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986) (granting intervention where intervenors risked being exposed to expenses that would otherwise have been capped by statute); *Textile Workers Union v. Alendale Co.*, 226 F.2d 765, 767 - 68 (D.C. Cir. 1955) (granting intervention where laborer's union and employer had "real economic stake" in determination of fixed wage rate by Secretary of Labor); *Am. Horse Protection*, 200 F.R.D. at 157; *Huron Environmental Activist League v. United States E.P.A.*, 917 F. Supp. 34, 42-43 (D.D.C. 1996); *see also, e.g., Utahns for Better Transp. v. United States Dep't of Transp.*, 295 F.3d 1111, 1115

- 14 -

(10th Cir. 2002) ("The threat of economic injury from the outcome of litigation undoubtedly gives the [potential intervenor] the requisite interest.").

### C.    The Proposed Intervenors' Interests Will Be Impaired Absent Intervention.

The Rule 24(a) impairment standard is to be construed liberally. *Nuesse*, 385 F.2d at 701. "In determining whether a movant's interests will be impaired by an action, courts in this circuit look to the 'practical consequences' to movant of denying intervention." *Am. Horse Protection*, 200 F.R.D. at 158; *see also Cook v. Boorstin*, Civil Action No. 82-0400, 1983 WL 329, at *4 (D.D.C. Oct. 4, 1983) ("The standard of practical impairment does not necessitate a showing that the applicant for intervention will be legally bound by the judgment of the original action.") (quoting *Nuesse*, 385 F.2d at 701).

In practical terms, denying the right to intervene here would plainly harm the Proposed Intervenors' economic interests. Intervention would give Proposed Intervenors an opportunity to show that the use of lactates is completely consistent with a "natural" designation. Without intervention, the Court would be deprived of the Proposed Intervenors' valuable contributions regarding the nature and actual use of lactates. Instead, it would hear only one manufacturer's views on lactates, those of Hormel – a company that does not use lactates and that aims to force "natural" meat and poultry producers using lactates out of the "natural" market. Thus, Intervenors' interests will be impaired absent intervention.

### D.    The USDA May Not Adequately Represent the Proposed Intervenors' Interests.

"In general, the 'adequate representation' aspect of the intervention standard is met simply by a movant's showing that the representation <u>may</u> be inadequate." *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n.10 (1972); *Natural Res. Def. Council*, 561 F.2d at

912); *see also Dimond v. District of Columbia*, 792 F.2d 179, 192 (D.C. Cir. 1986) (proposed

intervenor "need only show that representation of his interest 'may be' inadequate, not that

representation will in fact be inadequate.").

Inadequate representation may be found where interests that are not wholly

adverse nevertheless differ, despite tactical similarities between an applicant's case and a party's

case. *Nuesse*, 385 F.2d at 703; *see Chiles v. Thornburgh*, 865 F.2d 1197, 1214-15 (11th Cir.

1989). There is a "relatively large class of cases in this circuit recognizing the inadequacy of

governmental representation of the interests of private parties in certain circumstances." *Dimond*,

792 F.2d at 192 (insurance company allowed to intervene as of right to protest invalidation of

regulation because its interests are more narrow than the general public interest of the citizens

the defendant represents), citing *Natural Res. Def. Council*, 561 F.2d at 912, n.41 (rubber and

chemical companies allowed to intervene where EPA's general interest may not coincide with

their more narrow interests) and *Nuesse*, 385 F.2d at 702-4; *see also*, *Nader v. Ray*, 363 F. Supp.

946, 953 (D.D.C. 1973) (utilities entitled to intervene in action where operating licenses could be

revoked or suspended if plaintiffs were to prevail, and that interest would not be adequately

represented by the other parties); *see also Utahns*, 295 F.3d at 1116 ("In this case, [proposed

intervenor] would be relying on governmental entities to represent its interests.  We have

repeatedly pointed out that in such a situation the government's prospective task of protecting

'not only the interest of the public but also the private interest of the petitioners in intervention'

is 'on its face impossible' and creates the kind of conflict that 'satisfies the minimal burden of

showing inadequacy of representation.'"); *Nat'l Farm Lines v. ICC*, 564 F.2d 381, 384 (10th Cir.

1977) ("We have here . . . the familiar situation in which the governmental agency is seeking to

- 16 -

protect not only the interest of the public but also the private interest of the . . . [intervenors], a *task which on its face is impossible*.") (emphasis added).

As in those cases, just so here:  While the USDA will presumably defend its decision to keep previously-approved "natural" labels containing lactates on the market, it is unlikely that the USDA can simultaneously represent the Proposed Intervenors' unique commercial interests.  Indeed, as evidenced by USDA's announcement of its decision to initiate a rulemaking on its "natural" policy, its refusal to approve any new "natural" labels containing lactates, its recent removal of sodium lactate from the list of ingredients explicitly permitted in products bearing "natural" claims, and its letters threatening to revoke existing "natural" labels, the USDA's interests are clearly not fully aligned with those of the Proposed Intervenors. Indeed, according to Hormel, USDA is rethinking its initial December 2006 approach to the issue (*i.e.,* rescinding label approvals) and its interim policy pending the completion of rulemaking.  Compl. at ¶¶ 50.

Moreover, as manufacturers and users of lactates, the Proposed Intervenors have extensive knowledge and expertise regarding the properties of lactates not otherwise known and understood by the USDA.  The D.C. Circuit has recognized the value of this type of knowledge and expertise that an intervenor can provide.  *See Natural Resources*, 561 F.2d at 912-913; *see also, e.g., Utahns*, 295 F.3d at 1116 (finding that the proposed intervenor could "provide expertise the government agencies may be lacking").

Because Proposed Intervenors easily meet this four-part test, the Court should allow them to intervene as a matter of right.

## II.    IF PROPOSED INTERVENORS MAY NOT INTERVENE AS OF RIGHT, THE COURT SHOULD GRANT THEM PERMISSIVE INTERVENTION.

In the event the Court decides that the Proposed Intervenors may not intervene as of right, Proposed Intervenors respectfully request that the Court, in its discretion, grant them permissive intervention under Federal Rule 24(b).  "[C]ourts have been willing to adopt generous interpretations of Rule 24(b) because of the need for 'an effective mechanism for third-party claims of access to information generated through judicial proceedings.'" *Duke Energy Field Servs. Assets, L.L.C. v. Fed. Energy Regulatory Comm'n*, 150 F. Supp. 2d 150, 153 (D.D.C. 2001) (granting permissive intervention) *E.E.O.C. v. Nat'l Children's Ctr.*, 146 F.3d 1042, 1045 (D.C. Cir. 1998) (citation omitted).  To obtain permissive intervention, the movant needs: (1) an independent ground for subject matter jurisdiction; (2) a timely motion; and (3) a claim or defense that has a question of law or fact in common with the main action.  *Id.* at 1046. However, "failure to come within the precise bounds of Rule 24's provisions does not necessarily bar intervention if there is a sound reason to allow it." *Textile Workers Union v. Alendale Co.*, 226 F.2d 765, 768 (D.C. Cir. 1955).

The Proposed Intervenors satisfy each of these requirements.  First, the Proposed Intervenors seek to intervene to defend USDA's decision to leave existing "natural" lactate labels in place pending rulemaking.  This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331.  Second, for the reasons set forth in Part I.A. *supra*, this motion to intervene is timely.

- 18 -

The third requirement of Rule 24(b), that there be a common "claim or defense," is also easily met. 5/ Hormel seeks to remove from the market "natural" labels on meat and poultry foods containing lactates and to enjoin USDA's approval of any such labels in the future. Hormel's request for injunction would immediately undermine any reasonable regulatory policy USDA has the discretion to adopt. If permitted to intervene, the Proposed Intervenors intend to show that lactates are consistent with a "natural" claim and that, pending its planned rulemaking, USDA should maintain its prior policy and leave the existing labels on the market and continue to approve new labels. Such an outcome would do no more than merely reinstate FSIS's well-established policy pending development of a proper administrative record and a reasoned agency decision based on that record.

This defense bears directly on the claims made by Hormel against the USDA. *See, e.g., Duke Energy Field Servs. Assets, L.L.C. v. Fed. Energy Regulatory Comm'n*, 150 F. Supp. 2d 150, 153 (D.D.C. 2001) (granting permissive intervention); *Commack Self-Service Kosher Meats, Inc. v. Rubin*, 170 F.R.D. 93, 106 (E.D.N.Y. 1996) (observing, in grant for permissive intervention, that "[t]he intervenors will bring a different perspective to the case and will contribute relevant factual variations that may assist the court in addressing the

---

5/     This requirement is not read strictly; the D.C. Circuit "eschew[s] strict readings of the phrase 'claims or defense,' allowing intervention even in 'situations where the existence of any nominate "claim or defense" is difficult to find.'" *Id.* (quoting *Nuesse*, 385 F.2d at 704). In fact, the D.C. Circuit has "expressed a willingness to adopt flexible interpretations of Rule 24 in special circumstances." *Id.* at 1045 – 46. The D.C. Appeals Court has explicitly recognized that administrative cases "require other than literal application" of Rule 24, where proposed intervenors are "not parties in a technical sense to the administrative proceeding; nevertheless they are 'bound' by the determinations therein in a very practical sense." *Textile Workers Union*, 226 F.2d at 767–68 (granting permissive intervention where courts review of agency determination would have economic impact on proposed intervenors).

constitutional issue raised . . . . Considerations of fairness weigh in favor of the intervenors in light of their knowledge and strong interest in the subject matter of this action.").

In addition, allowing intervention would avoid multiple lawsuits and thereby serve the interest of judicial economy. *Textile Workers*, 226 F.2d at 769. This Court can achieve that objective by allowing this motion to intervene. If the Proposed Intervenors are not permitted to intervene, the Proposed Intervenors could be forced to protect their interests by filing their own lawsuit. Allowing intervention here could obviate such a subsequent challenge and thereby serve judicial economy.

## CONCLUSION

For the foregoing reasons, the Proposed Intervenors respectfully request that this Court grant them leave to intervene as a matter of right pursuant to Rule 24(a)(2), or in the alternative, grant them permissive intervention under Rule 24(b).

Dated: December 3, 2007

Respectfully submitted,


_____ /s/ Kirsten Friedel Roddy _____

Jonathan L. Abram, D.C. Bar No. 389896
  Jlabram@hhlaw.com
Kirsten Friedel Roddy, D.C. Bar No. 467805
  kfroddy@hhlaw.com
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004–1109
Telephone: (202) 637–5600
Facsimile: (202) 637–5910

Attorneys for Proposed Intervenors:

- 20 -

*Farmland Foods, Inc., Kraft Foods Global, Inc.,*
*PURAC America, Inc., Sara Lee Corporation,*
*Smithfield Foods, Inc., and Tyson Foods, Inc.*

**EXHIBIT A**

To: Branch Chiefs, SLD

Policy Memo *055*

November 22, 1982

From: Robert G. Hibbert, Director, SLD

Subject: Natural Claims

**ISSUE:** Appropriate policy for the approval or denial of labeling for meat products and poultry products bearing the term "natural."

**POLICY:** The term "natural" may be used on labeling for meat products and poultry products, provided the applicant for such labeling demonstrates that:

1) The product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic ingredient; and 2) the product and its ingredients are not more than minimally processed. For the purposes of this memorandum, minimal processing may include: (a) those traditional processes used to make food edible or preserve it or make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting; or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices. Relatively severe processes, such as solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing. Thus, the use of a natural flavor or flavoring in compliance with 21 CFR 101.22 which has undergone more than minimal processing would place a product in which it is used outside the scope of these guidelines. However, the presence of an ingredient which has been more than minimally processed would not necessarily preclude the product from being promoted as natural. Exceptions of this type may be granted on a case by case basis if it can be demonstrated that the use of such an ingredient would not significantly change the character of the product to the point that it could no longer be considered a natural product. In such cases the natural claim must be qualified to clearly and conspicuously identify the ingredient, e.g., contains refined sugar.

All products claiming to be natural or a natural food should be accompanied by a brief statement which explains what is meant by the term natural, i.e., that the product is a natural food because it contains no artificial ingredients and is only minimally processed. This statement should appear directly beneath or beside all natural claims or, if elsewhere on the principal display panel, an asterisk should be used to tie the explanation to the claim. The decision to approve or deny the use of a natural claim may be affected by the specific context in which the claim is made. For example, claims indicating that a product is a natural food, e.g., "Natural chili" or "chili - a natural product" would be unacceptable for a product containing beet powder which artificially colors the finished product. However, "all natural ingredients" might be an acceptable claim for such a product.

**RATIONALE:** A variety of sources, including the Federal Trade Commission's (FTC) rulemaking record on this subject, substantiates the contention that natural terminology, if used indiscriminately, may be misleading to consumers who believe that foods so labeled are intrinsically safer or nutritionally superior to their

"unnatural" counterparts. At one time, this agency took the position that such claims were inherently misleading and should never be allowed. While the general concerns regarding consumer confusion in this area were appropriate, the scope of a general prohibition seems excessive, and this position has been modified through consideration of specific labeling applications. This memo should serve to publicize guidelines which have evolved through this process while still precluding the use of natural claims on meat and poultry labeling where methods of preparation and/or processing or the presence of artificial ingredients would result in a product that is inconsistent with consumer expectations of a natural product as characterized by the FTC's extensive record.

**EXHIBIT B**



Food Safety
And Inspection
Service

Office of Policy, Program and
Employee Development

August 2005

# Food Standards and Labeling Policy Book

Revised for Web Publication August 2005
Replaces Publication Dated May 2003 and Removal of Publication Dated 1996

**NACHO STYLE, NACHO FLAVOR, AND SIMILAR TERMS:**

Acceptable terminology for products possessing the commonly expected flavor characteristics associated with "Nachos," a Mexican hors d'oeurve. The characterizing flavor components generally include, but are not limited to, cheese (Cheddar or Monterey Jack), tomato (tomato solids, tomato powder), spices, or other natural seasonings and flavorings (usually garlic and onion), and chili peppers (mild or hot). Romano and Parmesan cheese are also often present. However, these cheeses may not be used to satisfy the above cheese requirement.

**NATURAL CLAIMS:**

The term "natural" may be used on labeling for meat products and poultry products, provided the applicant for such labeling demonstrates that:

(1)     the product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic ingredient; and (2) the product and its ingredients are not more than minimally processed. Minimal processing may include: (a) those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

Relatively severe processes, e.g., solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing. Thus, the use of a natural flavor or flavoring in compliance with 21 CFR 101.22 which has undergone more than minimal processing would place a product in which it is used outside the scope of these guidelines. However, the presence of an ingredient which has been more than minimally processed would not necessarily preclude the product from being promoted as natural. Exceptions of this type may be granted on a case-by-case basis if it can be demonstrated that the use of such an ingredient would not significantly change the character of the product to the point that it could no longer be considered a natural product. In such cases, the natural claim must be qualified to clearly and conspicuously identify the ingredient, e.g., "all natural or all natural ingredients except dextrose, modified food starch, etc."

All products claiming to be natural or a natural food should be accompanied by a brief statement which explains what is meant by the term natural, i.e., that the product is a natural food because it contains no artificial ingredients and is only minimally processed. This statement should appear directly beneath or beside all natural claims or, if elsewhere on the principal display panel; an asterisk should be used to tie the explanation to the claim.

The decision to approve or deny the use of a natural claim may be affected by the specific context in which the claim is made. For example, claims indicating that a product is

natural food, e.g., "Natural chili" or "chili - a natural product" would be unacceptable for a product containing beet powder which artificially colors the finished product. However, "all natural ingredients" might be an acceptable claim for such a product.

Note: Sugar, sodium lactate (from a corn source), natural flavorings from oleoresins or extractives are acceptable for "all natural" claims.

This entry cancels Policy Memo 055 dated November 22, 1982.

See: 7 CFR NOP Final Report, Part 205.601 through 205.606 for acceptable ingredients allowed for all natural claims.

## NATURAL SMOKED COLOR:

Approval can be properly granted to labels with this statement when the products involved are "Smoked" and not artificially colored. The results of the use of artificial smoke materials can, by means of a number of processing operations, result in a color characteristic being acquired by the frankfurters, bologna, and the like. The term "Natural Smoked Color" can be used to properly identify this point.

## NAVARIN:

Navarin is a stew containing lamb or mutton and vegetables and considered a national dish of France. It must meet the meat stew standard of 25 percent meat. Show true product name, e.g., "Navarin-Lamb Stew."

## NEGATIVE LABELING:

(1)    Negative labeling is allowed if it is unclear from the product name that the ingredient is not present. For example, the use of the term "no beef" on the label of "turkey pastrami" would further clarify that the product does not contain beef.

(2)    Negative labeling is allowed if the statement is beneficial for health, religious preference, or other similar reasons. For example, highlighting the absence of salt in a product would be helpful to those persons on sodium-restricted diets.

(3)    Negative labeling is allowed if the claims are directly linked to the product packaging, as opposed to the product itself. For example, flexible retortable pouches could bear the statement "no preservatives, refrigeration or freezing needed with this new packaging method."

(4)    Negative labeling is allowed if such claims call attention to the absence of ingredients because they are prohibited in a product by regulation or policy. The statement must clearly and prominently indicate this fact, so as not to mislead or create false impressions. For example, "USDA regulations prohibit the use of preservatives in this product" would be an acceptable statement for ground beef.

**EXHIBIT C**

**Phillip L. Minerich, Ph.D.**
*Vice President*
*Research & Development*

*Hormel Foods Corporate Services, LLC*
*Research & Development*
*2 Hormel Place*
*Austin MN 55912-4933*
*Phone 507 434 6372*
*Fax 507 437 5117*

October 9, 2006

Dr. Robert C. Post
Director, Labeling and Consumer Protection Staff
Food Safety and Inspection Service, USDA
1400 Independence Ave. SW
Suite 602, Annex
Washington, DC 20250

RE:    Petition for the Issuance of a Rule Regarding Natural Label Claims

Dear Dr. Post:

The August 2005 change to the USDA Food Safety and Inspection Service (FSIS) Natural Policy renders the policy's guidance internally inconsistent and creates confusion regarding whether a meat or poultry product bearing a Natural claim may yet contain chemical preservatives and synthetic ingredients. Because the interests of consumer protection and confidence require clarity and certainty in the use of the word "natural" on product labeling, Hormel Foods Corporation hereby submits this Petition, under 7 CFR 1.29 and 5 U.S.C. 553(e), for the Issuance of a Rule Regarding Natural Label Claims.

## I.  Action Requested

Hormel Foods Corporation requests the USDA Food Safety and Inspection Service to initiate rulemaking procedures to amend 9 CFR 317 and 9 CFR 381.129 to codify the definition of "natural" and clarify the circumstances under which it may be used on the label of a meat or poultry product. Consistent with current longstanding policy and practice, a meat or poultry product should not bear a "natural" label unless (1) it does not contain artificial flavorings, artificial coloring ingredients, other artificial or synthetic ingredients, or chemical preservatives, and (2) it is not more than minimally processed. Issues of consumer confidence and consistency in labeling dictate that exceptions for specific chemical preservatives and synthetic ingredients should not be allowed.[1]

---

[1] Consistent with 21 CFR 101.100(a)(3), the only exception that should be allowed are specific and unavoidable incidental additives or processing aids.

## II. Background

Consumer interests in natural products are rising. Not surprisingly, manufacturers are seeking to establish marketing presence in this growing niche. Efforts by manufacturers to meet consumer preferences are generally applauded. Recent changes in the USDA FSIS's Natural Policy, however provide inconsistent guidance which may provide loopholes that would allow manufacturers to manipulate exceptions in the Policy to confuse consumers and erode the meaning of the Natural label.

### A. Prior Natural Policy

The original Natural Policy was issued over 23 years ago, on November 22, 1982. This prior Policy was consistent with consumer expectations and was easily understood and applied by industry and regulators alike.

The term "natural" may be used on labeling for meat and poultry products, provided the applicant for such labeling demonstrates that:

(1)    the product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic ingredient; and

(2)    the product and its ingredients are not more than minimally processed.

Minimal processing may include: (a) those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.[2]

### B. Current Natural Policy

In August 2005, the Policy was changed. The basic two-part requirement remains unchanged. It continues to prohibit chemical preservatives, artificial flavorings and colorants, and other artificial or synthetic ingredients and requires that products be

---

[2] Policy Memo 055 (Nov. 22, 1982).

minimally processed. The new Policy further provides additional guidance regarding the use of ingredients that have been more than minimally processed and differentiates "natural product" claims from "natural ingredient" claims.

Two new provisions of the Natural Policy, however, create inconsistency within the Policy and, consequently, the potential for consumer confusion and erosion of the significance of the natural claim. These provisions are (1) the acceptance of sodium lactate from a corn source for "all natural" claims and (2) the reference to the National Organic Policy for acceptable ingredients allowed for "all natural" claims.

The current Natural Policy provides:

The term "natural" may be used on labeling for meat and poultry products, provided the applicant for such labeling demonstrates that:

the product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic ingredient; and

the product and its ingredients are not more than minimally processed.

Minimal processing may include: (a) those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

Relatively severe processes, e.g., solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing. Thus, the use of a natural flavor or flavoring in compliance with 21 CFR 101.22 which has undergone more than minimal processing would place a product in which it is used outside the scope of these guidelines. However, the presence of an ingredient which has been more than minimally processed would not necessarily preclude the product from being promoted as natural. Exceptions of this type may be granted on a case-by-case basis if it can be demonstrated that the use of such an ingredient

3

would not significantly change the character of the product to the point that it could no longer be considered a natural product. In such cases, the natural claim must be qualified to clearly and conspicuously identify the ingredient, e.g., "all natural or all natural ingredients except dextrose, modified food starch, etc."

All products claiming to be natural or a natural food should be accompanied by a brief statement which explains what is meant by the term natural, i.e., that the product is a natural food because it contains no artificial ingredients and is only minimally processed. This statement should appear directly beneath or beside all natural claims or, if elsewhere on the principal display panel; an asterisk should be used to tie the explanation to the claim.

The decision to approve or deny the use of a natural claim may be affected by the specific context in which the claim is made. For example, claims indicating that a product is a natural food, e.g., "Natural chili" or "chili – a natural product" would be unacceptable for a product containing beet powder which artificially colors the finished product. "All natural ingredients" might be an acceptable claim for such a product.

Note: Sugar, sodium lactate (from a corn source), natural flavorings from oleoresins or extractives are acceptable for "all natural" claims.

This entry cancels Policy Memo 055 dated November 22, 1982.

See: 7 CFR NOP Final Report, part 205.601 through 205.606 for acceptable ingredients allowed for all natural claims.[1]

## III. Argument

Agencies and citizens alike have long recognized the necessity of a clear definition of the word "natural" used on labeling claims. Consumers are confused as to the specific meaning, but are consistent in their assumptions that 'natural' products do not contain artificial or synthetic ingredients or preservatives.

The new FSIS Natural Policy does little to solve–and will likely only exacerbate–consumer confusion. Its far-reaching exemptions for certain artificial and synthetic

---

[1] United States Department of Agriculture, Food Safety and Inspection Service, Office of Policy, Program and Employee Development, FOOD STANDARDS AND LABELING POLICY BOOK, Aug. 2005.

ingredients and preservatives swallow its purported prohibitions on such ingredients, rendering the Policy meaningless and eroding the meaning of the Natural claim.

## A. Interests of Consumer Protection and Confidence Dictate Codification of the Natural Claim.

Agency recognition of the need for a clear definition controlling Natural claims and consequent attempts at formal rulemaking date back to the early 1980s. Recent citizens petitions filed with the Food and Drug Administration (FDA) underscore the continued need for codification of the Natural Claim.

### 1. Agencies have long recognized the need for a clear definition of "natural."

The great consumer interest in a clear definition for "natural" label claims is demonstrated by over 20 years of rulemaking history. In the early 1980s, the Federal Trade Commission proposed to define "natural" foods as "those with no artificial ingredients and only minimal processing."[4] When the effort was subsequently abandoned in 1983, the FTC rationalized its inaction by noting its proposal concerned only advertising and trusting the consumer would be properly informed by product labeling.[5] Commissioner Michael Pertschuk's separate statement, however, voiced continued concern for consumer protection:

> This abdication invites a free-for-all for deceptive health claims for food—claims which will cynically exploit and distort growing public concern with diet and health. Advertisers will continue to spend fortunes to promote high fat foods as healthful, highly processed foods as natural, and high calorie foods as "dietetic" or as miracle energy tonics.[6]

The next effort to define the term "natural" came from the Food and Drug Administration in 1989.[7] As the agency noted, "The meaning and use of the term 'natural' on the label are of considerable interest to consumers and industry." It further concluded "that uses of 'natural' claims are confusing and misleading to consumers and frequently breach the public's legitimate expectations about their meaning."[8] Because of the consumer interest and widespread use of the term, FDA concluded that it should define the term. "FDA believes that if the term 'natural' is adequately defined, the

---

[4] See 48 FR 23270-01.

[5] Id. at 3270. "Thus consumers have ready access to much of the information covered in the food rule at the point of sale, where it is of most value to the decision to purchase." Id.

[6] Id. at 3271.

[7] 54 FR 60421.

[8] 56 FR 60421, 60466

5

ambiguity surrounding use of the term that results in misleading claims could be abated."[9]

In response to its advance notice of proposed rulemaking on this issue, FDA received 450 written comments addressing the terms "light", "fresh" and "natural." These comments almost universally agreed the FDA should act as quickly as possible to define these terms.[10]  A common concern noted the unregulated use of such descriptors resulted in consumer confusion.  One comment noted the terms were "meaningless" and "primarily used as marketing tools rather than as guides for the health conscious consumer."[11]  By contrast, food industry representatives requested flexibility in the use of the descriptors.[12]

In 1993, however, citing resource limitations and other priorities, FDA abandoned its efforts to define "natural."  This was in spite of its continued belief that the term should be defined to avoid misleading consumers.[13]

## 2.  A clear definition of "natural" will further consumer and industry interests.

### a)  Consumers continue to report confusion and call for rulemaking to define "natural."

The agencies' earlier acknowledgements of consumer confusion continue to be reaffirmed in consumer research and recent rulemaking petitions.  General consumer interest in eliminating artificial ingredients and preservatives from their diets is on the rise.  In 2001, only 8% of consumers checked food labels to determine the type and presence of preservatives in foods.  By 2003, that number had increased dramatically, to 67%.[14]  On the other side of this interest in food labeling, however, is continued consumer confusion regarding the meaning of "natural."[15]

Businesses and citizens groups have taken up the rulemaking gauntlet where the agencies left off.  On February 28, 2006, the Sugar Association petitioned the FDA to

---

[9] *Id.*

[10] *Id.* at 60421-22.

[11] *Id.* at 60422.

[12] *Id.*

[13] 58 FR 2302, 2407

[14] A. Elizabeth Sloan, Natural Foods Marketing Directions, FOODTECHNOLOGY, 14 (May 2003) [hereinafter "Natural Foods Marketing Directions"].

[15] Care should be taken not to follow the lead of the National Organic Policy's allowance of several different levels of "organic."  One source refers to organic as an "endangered category" as too many roles and different standards are causing consumers to lose trust.  A. Elizabeth Sloan, New Product Showcases Sizzle with Sensational Ideas, FOODTECHNOLOGY 36-44, 40 (Sept. 2005) [hereinafter "New Product Showcases Sizzle"]

define "natural" for labeling claims.[16]  In support of the need for the rulemaking, the petition cites the "steady growth of consumer interest in natural and organic products" and stated that 63% of consumers prefer natural foods and vegetables.[17]  The petition requests the FDA to eliminate consumer confusion and minimize misleading claims by adopting strict regulations defining "natural."  It further proposes that the FDA maintain consistency across the federal agencies by defining "natural" consistent with the current USDA policy.[18]  On March 13, 2006, the Center for Science in the Public Interest wrote in support of the petition.[19]

Consumer research continues to report confusion among consumers as to the meaning of "natural" and underscore the need for a clear definition.  Survey results cited by the National Consumers League state focus group participants "unanimously agreed that there was a need for greater regulation of the "natural" products regarding labeling, advertising, and industry standards. "  Consumers report interest in regulation that would define "natural" and develop standards to control the presence of preservatives, chemicals, additives and the degree of processing.[20]

In the absence of a codified definition, the Center for Science in the Public Interest (CSPI) has resorted to enforcement action requests and threats of lawsuits to protect the integrity of "natural" claims.  In July 2002, CSPI requested the FDA to take enforcement action against Ben & Jerry's Homemade Holdings, Inc. for false and misleading "all natural" claims on its ice creams.  CSPI alleged the ingredients, partially hydrogenated soybean oil, alkalized cocoa powder, corn syrup, and corn syrup solids, were not natural.[21]

In May 2006, CSPI again took on a major food products manufacturer's "natural" claims.  This time, CSPI alleged Cadbury Schweppes Plc d/b/a Cadbury Schweppes

---

[16] Letter from Andrew C. Briscoe III, President and CEO, The Sugar Association to Docket Management Branch, Food and Drug Administration (Feb. 28, 2006) [hereinafter "Sugar Association Petition"].
[17] Id. at 3-4.
[18] Maintenance of consistency in the definition of "natural" across the federal agencies obviously is critical to eliminating consumer confusion.  However, due to the problems with the current USDA Natural Policy described infra, it is respectfully submitted that FDA should not codify the current USDA definition.  The possibility that FDA may act pursuant to the Sugar Association's petition underscores the need for USDA to act quickly to codify a workable definition.
[19] Letter from Stephen Gardner, Director of Litigation, Center for Science in the Public Interest to Docket Management Branch, Food and Drug Administration (Mar. 13, 2006), available at, http://www.cspinet.org/new/pdf/fda_natural.pdf#search=%22natural%22.
[20] National Consumers League, Naturally Misleading: Consumers' Understanding of "Natural" and "Plant-Derived" Labeling Claims, available at http://nclnet.org/naturalsreport.pdf [hereinafter "Naturally Misleading"]
[21] Letter from Michael F. Jacobson, Ph.D., Executive Director to Christine Lewis Taylor , Ph.D., Director of Office of Nutritional Products, Food and Drug Administration (July 30, 2002) available at www.cspinet.org/new/pdf/bj_complaint.pdf; see also Stop Labeling Lies, Ben & Jerry's Fudging the Truth, Says CSPI, available at, http://www.stoplabelinglies.com/complaints/benandjerry.html.

7

Americas Beverages and Dr. Pepper / Seven UP, Inc. (collectively "Cadbury") engaged in unfair and descriptive acts. In a letter to Cadbury executives, CSPI stated its intention to file a lawsuit over Cadbury's marketing of 7Up as "natural" despite the presence, in the beverage, of high fructose corn syrup, which is not considered minimally processed.[22]

### B. The codified definition of "natural" should comport with already-established consumer beliefs regarding "natural" foods.

The proposed codified rule should comport with the consumer's current understanding of "natural." As part of its petition, the Sugar Association commissioned a consumer survey. That survey concluded 83% of respondents thought the agencies should implement rules governing "natural" label claims. When asked what "natural" meant to them, 85% of those surveyed said they would not consider any food containing an artificial or a synthetic ingredient to be natural. Regarding processing, 52% thought the amount of processing and 60% agreed altering of raw materials should disqualify a food from a natural claim.[23]

Other qualitative consumer research indicates the consumer believes the concept of "natural" applies to substances that can be found in nature or are obtained from renewable sources and are not chemically synthesized or modified.[24] The term indicates the absence of artificial colors, artificial fragrances, preservatives and synthetic functional ingredients.[25] Quantitative results indicate that 75% of consumers believe natural products are made without chemical additives.[26]

### C. The New Exceptions Added to the Current Natural Policy Create Internal Inconsistencies in the Definition and Render the National Claim Meaningless.

Consumers want a "Natural" label they can trust. They believe it means the product that bears the label contains no artificial ingredients or preservatives and is

---

[22] Letter from Stephen Gardner, Director of Litigation, to Gilbert M. Cassagne and Todd Stitzer (May 10, 2006, *available at* www.cspinet.org/new/pdf/cadbury_notice.pdf.

[23] Sugar Association Petition, *supra* note 16 at 9.

[24] Lambros Kromidas, Making Natural Claims for Personal Care Products. There are no Regulatory Guidelines but the Industry should Put Aside their Varying Interests and Consider what Consumers Expect from Products that make Various "Natural" claims and Formulate Their Products Accordingly, HOUSEHOLD & PERSONAL PRODUCTS INDUSTRY (Dec. 1, 2004), *available at*, http://w3.nexis.com/new/frame.do?tokenKey=rsh-20.184768.22334044863&target=results. [hereinafter "Making Natural Claims for Personal Care Products"].

[25] *Id.* (citing Duber-Smith, D.C. 2002. Natural Ingredients and Cosmecueticals Collide – First Movers are Seeing Green. Soap & Cosmetics, Oct. 32-33 ).

[26] Naturally Misleading, *supra* note 20.

accomplished with minimal processing. The new FSIS Natural Policy fails to provide for these consumer needs.

Two of the last three paragraphs in the new Natural Policy contain exceptions for (1) ingredients appearing in the National Organic Policy and (2) corn-derived sodium lactate. These exceptions swallow the rule by allowing the presence of artificial ingredients, synthetics and chemical preservatives in "natural" foods. The initial prohibition and subsequent approval of such ingredients renders the Policy internally inconsistent and impracticable, thereby exacerbating consumer confusion and eroding the meaning of Natural claims.

1. **The Reference to the National Organic Policy for Acceptable Ingredients for All Natural Claims is Inconsistent with the initially-stated Prohibition on Artificial or Synthetic Ingredients.**

The reference to the Natural Organic Policy for a list of acceptable ingredients allowed for natural claims runs afoul of the directive that "natural" products cannot contain "any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic ingredient[.]" The National Organic Policy allows ingredients that, even though they may be naturally derived, would, within context, be considered "artificial" within the Natural Policy. For example, compare the allowance, in the Natural Organic Policy, for "colors, nonsynthetic sources only"[27] with the following language in the new Natural Policy:

> The decision to approve or deny the use of a natural claim may be affected by the specific context in which the claim is made. For example, claims indicating that a product is a natural food, e.g., "Natural chili" or "chili – a natural product" would be unacceptable for a product containing beet powder which artificially colors the finished product.

The above-quoted passage would specifically prohibit a Natural claim for chili colored with beet powder. However, the reference to the National Organic Policy appearing a mere five lines below this passage would approve it. This internal inconsistency creates confusion and renders the Natural label meaningless.

Similarly, the Natural Organic Policy allows synthetic ingredients,[28] which, by reference, the new Natural Policy would now also allow for foods for which a Natural claim is made. This, again, creates an inconsistency within the policy as it would again run afoul of the Policy's initially-stated prohibition on synthetic ingredients.

[27] 7 CFR 205.605 (a).
[28] 7 CFR 205.605 (b).

2. **The Exemption for Sodium Lactate is Inconsistent with the "No Chemical Preservatives" Directive.**

The new Natural Policy now also allows the presence of corn-derived sodium lactate in meat and poultry products which would bear a Natural label. This is inconsistent with the Policy's initial prohibition on chemical preservatives.

Under both the prior and new Natural policies, an applicant for a Natural claim has to demonstrate that its product does not contain any "chemical preservative (as defined in 21 CFR 101.22)." By definition, under 21 CFR 101.22, a "chemical preservative is "any chemical that, when added to food, tends to prevent or retard deterioration thereof." The rule specifically exempts the common natural preservatives, "common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties."[29]

Sodium lactate "tends to prevent or retard deterioration" of food products to which it is added – it is a "chemical preservative." This is explicitly recognized in 9 CFR 424.22, which states that sodium lactate is used "to prohibit microbial growth" on "various meat and poultry products."

a) Even naturally-derived sodium lactate is a preservative.

Sodium lactate is a preservative regardless of its derivation. A recent print advertisement by Purac, a leading seller of food ingredients, makes this explicit. It advertises "natural" lactic acid and states its benefits as "increase[d] shelf life", "improved food safety" and "control[ling] pathogens."[30]

b) Sodium lactate is a preservative even at very low amounts.

Even when used in amounts much less than the 4.8% levels cited in 9 CFR 424.22, sodium lactate is an antimicrobial. Whereas 9 CFR 424.21 also states that sodium lactate may be used as a flavoring at levels not to exceed 2% of the product formulation, 9 CFR 424.21 and 9 CFR 424.22 are not mutually exclusive. Section 424.22 provides only the upper limit for sodium lactate used as a preservative. It prescribes no lower limit below which sodium lactate is not considered a preservative. Section 424.21 merely provides the upper concentration of sodium lactate used as a flavoring. Nowhere do these rules state – or even imply – that sodium lactate is not a preservative, even when used at a level that would also qualify it as a flavorant in certain products.

---

[29] 21 CFR 101.22.
[30] See Exhibit B hereto.

In fact, Purac's Opti.Form® *Listeria* Control Model 2005 — the computer model manufacturers use to calculate the antimicrobially effective amount of sodium lactate added to their products — indicates sodium lactate is a preservative even when present at very low levels. The chart below summarizes the Opti.Form model results for differing levels of sodium lactate when added to a cured product.[31]

| Weight % added Sodium Lactate | Time to 2 log Increase in *Listeria* Growth | Difference in Time to 2 log Increase from 0 added Sodium Lactate |
|---|---|---|
| 0% | 31 to 38 days | n/a |
| 0.5% | 37 to 46 days | 6 to 8 days |
| 1.0% | 46 to 58 days | 15 to 20 days |
| 1.5% | 58 to 74 days | 27 to 36 days |
| 2.0% | 75 to 97 days | 44 to 59 days |
| 2.5% | 103 to 134 days | 72 to 96 days |

As the model demonstrates, even when present at only 1% of the product formulation, sodium lactate inhibits microbial growth and confers a two to three week increase in shelf life. At only 2% — the rate up to which some may argue sodium lactate is present as a flavoring — microbial growth is inhibited sufficient to confer a six to eight week increase in shelf life.

These results are further substantiated by reference to the Oscar Mayer patents, which claim antimicrobial effects — specifically a delay in the growth of *Clostridium botulinum* — at lactate levels as low as 1% of the product formulation.[32] "The levels of the lactate salt which delay the toxin formation compared to the control are amounts which are effective for delaying the clostridium botulinum growth. In general these amounts range from about 1 to about 7 percent lactate salt and preferably are in the range from about 1.5% to 3.5% lactate salt."[33]

## IV. Rulemaking is Necessary to Abate the Inconsistencies in the Current Policy, Provide for Customer Confidence and Prevent Erosion of the Natural Claim.

As demonstrated above, the agencies and consumers alike have long recognized and called for a clear, codified definition of "natural" for food labeling purposes. Consumers are confused and mistrustful. If FSIS is to provide for the consumer interest and prevent misleading labeling and the associated erosion of the "natural" claim, it must codify a clear and consistent definition of "natural" that comports with consumers' already-established beliefs. And it must do so in time to prevent FDA from

[31] *See* Exhibit C for actual model results.
[32] *See* Exhibit D for the Oscar Mayer patents, 4,798,729; 4,888,191; 5,017,391
[33] US Patent Nos. 4,798,729 at lines 20-26; 4,888,191 at lines 16-22; 5,017,391 at lines 18-24

11

adopting an inconsistent Policy based on the FSIS new Natural Policy, as is called for in the February 28, 2006 Sugar Association petition.[34]

### A. Proposed Action

### 1. Amend 9 CFR 317.8 and 381.129 to codify the original definition of "natural."

As demonstrated above, the reference to the National Organic Policy for a list of allowable ingredients for meat and poultry products bearing natural label claims is internally inconsistent. It both prohibits and allows the presence of artificial flavorings, artificial colorings, and other artificial or synthetic ingredients. Further, the allowance of the presence of corn-derived sodium lactate in meat and poultry products bearing natural label claims also creates internal inconsistency as chemical preservatives are initially prohibited by the Policy.

To alleviate these inconsistencies and abate the potential for consumer confusion and erosion of the meaning of the Natural claim, Hormel Foods Corporation hereby petitions FSIS to codify language in 9 CFR part 317.8 and 381.129 pertaining specifically to Natural Labeling Claims for meat and poultry products. The new rule should codify the definition of "natural" and clarify the circumstances under which it may be used on the label of a meat or poultry product.

It is important to retain a Natural Label policy that does not allow for the use of ingredients that are more than minimally processed and that are not, by themselves, considered to be natural. This is in keeping with the spirit of the reference to "All", "Pure", and "100%" found in the Food Standards and Labeling Policy Book. Accordingly, the new Natural Label Claims Rule should include the following provisions:

Labeling Claims: "Natural, All, 100%"

Conditions of use: The term — "natural, all, 100%" may be used on labeling for meat products and poultry products, provided the applicant for such labeling demonstrates that:

(1)    the product does not contain any artificial flavor or flavoring, artificial coloring ingredient, or chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic ingredient; and

---

[34] *See supra* notes 16-18 and accompanying discussion

(2)    the product and its ingredients are not more than minimally processed.

Beyond the definition of "chemical preservative" found in 21 CFR 101.22, it is intended that any substance, either natural or chemical, which serves to retard product deterioration as a result of microbial action would not be allowed in products which carry an all natural claim.

Minimal processing may include: (a) those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

Relatively severe processes, e.g., solvent extraction, acid hydrolysis, and chemical bleaching would be considered more than minimal processing. Thus, the use of a natural flavor, flavoring or flavoring agents in compliance with 21 CFR 101.22, 9 CFR 317.2, 381.118 and 424.21 which have undergone more than minimal processing would not be used in products that carry an all natural claim.

Category exceptions: An "all natural" claim will not be invalidated by use of otherwise natural ingredients which contain unavoidable incidental additives or processing aids (as defined in 21 CFR 101.100(a)(3) which may not themselves be considered as natural. Processing aids, such as anticaking or antifoaming agents, have functions in foods that are considered to be physical rather than chemical. Their presence in the final product is insignificant and they have no functional effect in the finished food. Examples include, but are not limited to, calcium silicate, magnesium oxide, calcium carbonate, dimethylpolysiloxane and sodium aluminosilicate.

Labeling requirements: An "all natural" claim may be used in the product name as long as it does not interfere with or alter a standardized name (i.e., All Natural Chili with Beans). An "all natural" claim may also be used as an

13

informative label element either as a standalone feature or to describe some specific aspect of the product (e.g., All Natural Ingredients). The use of the term "all" in conjunction with "natural" must mean that the product as a whole is natural as stated above with no exceptions other than those stated.

All products claiming to be natural or a natural food should be accompanied by a brief statement which explains what is meant by the term natural, i.e., that the product is a natural food because it contains no preservatives, no artificial flavorings or colorings and is only minimally processed. This statement should appear directly beneath or beside all natural claims or, if elsewhere on the principal display panel, an asterisk should be used to tie the explanation to the claim.

Although some consumers or animal raisers may confuse natural products with those that are free of antibiotics or growth stimulants, this proposed action is not intended to address animal raising. Such claims and the verification of such practices, although acceptable in the use of natural claims, will remain independent and outside the scope of this proposal. (ref: FSIS Natural and Organic Claims http://www.fsis.usda.gov/OPPDE/larc/Claims/Organic_Claims.htm)

## 2. Issue Interim Guidance

The rulemaking process can take one or more years from inception of a petition to promulgation of a final rule. Because consumer confidence and protection of the consumer from being mislead is paramount in this instance, the USDA must issue interim guidance. This can be easily and immediately accomplished by issuing a unilateral revision to the current Natural Policy in the same way the August 2005 change to the Policy was issued.

Leaving the new Natural Policy in place during this period will leave the agency and consumers vulnerable to manufacturers attempting to take advantage of its inconsistencies to obtain "natural" labeling for products that contain artificial ingredients or preservatives or that are highly processed. To avoid misleading advertising and further erosion of consumer confidence, the USDA should issue guidance reaffirming the original and continuing two-part "natural" definition that requires the absence of artificial flavors or flavorings, artificial coloring ingredients,

14

chemical preservatives and other artificial or synthetic ingredients and requires minimal processing.

Further, the rescission of the wholesale exemptions for sodium lactate preservatives and ingredients appearing on the National Organic Policy will avoid adverse economic impacts to manufacturers that use the exemptions to gain a market niche, only to have their "natural" status revoked when a new rule is promulgated. It will also protect the investment of those manufacturers that have committed money, time and human resources to development and commercialization of true natural ingredients and minimal processing technologies to produce safe and wholesome products.

## V. Environmental Impact

Neither an environmental assessment nor an environmental impact statement is required.

## VI. Economic Impact

It is clear that consumers are interested in minimally-processed products that do not contain artificial ingredients or preservatives. But confusion and difficulty in conveniently finding such items are barriers to purchasing. A clear, concise definition will benefit consumers by giving them confidence that the "natural" label really means what they expect it to mean, thereby giving them the confidence to purchase such products. Strong consumer interest, in turn, will encourage retailers to devote more shelf space and marketing attention to these products – and further educate the consumer. Finally, increased consumer and retailer demand for natural products will give incentives to manufacturers to invest in natural ingredients and in new minimal processing technologies. These activities in the consumer, manufacturer and retailer ranks will result in wide-ranging positive economic impacts.

### A. Increased Consumer Confidence in the Natural Label will have a Positive Economic Impact.

#### 1. Protection of the integrity of the Natural label will ensure the continued growth and viability of the natural category.

"Health and wellness is no longer a niche – it's mainstream and it's a long-term trend."[35] All reports are that consumers want to eat healthy.[36] 70% of shoppers feel

---

[35] Maryellen Molyneaux, Putting Words into Action: Services of the Natural Marketing Institute, SUPERMARKET NEWS (Feb. 28, 2005) [hereinafter "Putting Words into Action"].
[36] See, e.g., FMI News Release, U.S. Families Taking Charge of Health, But Convenience is Key Driver in Food-Purchasing Decisions, According to New FMI/PREVENTION Study (Aug. 18, 2003), available at http://fmi.org/media/mediatext.cfm?id=365.

their diets could be a lot or somewhat healthier and 51% are making significant efforts to eat healthy. 52% look at the nutrition label when they buy an item for the first time. 26% of consumers have purchased a food item because of information on a food nutrition label and 34% have rejected an item because of nutrition label information or a lack thereof.[37] In 2002, 67% of shoppers checked food labels to determine the type of preservative present in their food — an 8% increase over 2001.[38]

These diet concerns are raising consumer interest in, and demand for, natural and organic products. "All-natural" is the most frequent positive new product category in North America. FoodTechnology magazine reports that traditional recipes are making a comeback as natural ingredients and ideas are becoming paramount.[39] According to a nationwide survey by HealthFocus, "[m]ore consumers are eating foods than ever before as a way of adapting lifestyles with moderation and balance as key elements[.]"[40] As of 2001, almost 75% of the general population reported using natural foods, with a large group reporting their first use of natural and organic products in 2000.[41]

The consumer trend toward natural and organic products is evidenced by the growing number of businesses catering to consumers wishing to purchase natural food products. Food sales in natural product stores reached a reported $11.4 billion in 2003.[42] Natural product sales in all channels reached $42.8 billion in 2003, an 8.1% increase from 2002. Natural product retailers saw sales of $20.5 billion, reflecting a 9.9% increase from 2002.[43] According to Supermarket News:

> "Today's consumers are increasingly concerned with food
> safety and the question of 'where does my food come from?'
> . . . They are seeking natural products — natural product sales
> have topped $34 billion in recent years and are growing —
> and the advancing age of baby boomers is helping to drive
> the category. Consumers will pay 50 to 60 cents more for

---

[37] FMI News Release, U.S. Consumers Buying Fortified Foods, Organic Produce and Prescription Drugs at Nation's Supermarkets, According to Shopping for Health 2001 (Nov. 19, 2001), *available at,* http://fmi.org/media/mediatext.cfm?13=371 [hereinafter "U.S. Consumers Buying Fortified Foods"].
[38] *Supra* note at 14.
[39] A. Elizabeth Sloan, New Product Showcases Sizzle, *supra* note 15 at 40
[40] Study Finds More Americans Eating Natural Foods, NATURAL FOODS MERCHANDISER (May 1997).
[41] Steve French, Statshot of Consumer Trends. Natural Products Channel is no Longer Niche Market as Increasing Number of Consumers are Using These Markets, NATURAL FOODS MERCHANDISER (June 2001) [hereinafter "Statshot of Consumer Trends"].
[42] Sugar Association Petition, *supra* note 16 at 4
[43] A. Elizabeth Sloan, Gourmet & Specialty Food Trends, FoodTechnology 26-38, 28 (July 2004) [hereinafter "Gourmet & Specialty Food Trends"].

premium organic or natural meat because the perceived
health benefits outweigh costs in many consumers' minds.[44]

The demographics of those who generally buy organic foods cut across all
generations:

| Demographic | Regularly Buying Organics |
|---|---|
| Generation Y (18-27) | 51% |
| Generation X (28-41) | 55% |
| Younger Baby Boomers (42-51) | 57% |
| Older Baby Boomers (52-60) | 50% |
| Matures (61+) | 46% |

Interest in organic products correlates strongly with childcare giving.  32% of
buyers reported their first purchase of organic foods was for an infant or newborn. [45]

The natural channel will only continue to grow.  According to NML, in 2004, 63%
of consumers use natural foods and beverages and 40% use organics; 53% want foods
grown without pesticides; 49% want natural foods; and 18% use only natural sugars
such as honey and raw sugar.  Issues of increasing importance are foods free of
antibiotics, hormones and preservatives.[46]  This mainstreaming of natural foods has
drawn major manufacturers into the market.[47]

Mainstreaming has extended to retailers as well.  Once available only in natural
foods and nutrition stores, natural foods are now a growing category with mainstream
retailers.  Research shows consumers prefer to see all their options in one location[48] and
that they are more likely to try a natural or organic counterpart under those
circumstances.[49]  Mainstream retailers, recognizing the trend toward a preference for
natural and organic foods, have begun developing specific strategies for offering them
in their stores. [50]  Many retailers are addressing consumer confusion regarding natural
and organic products by providing specific informational services.  Services include in-
store advertising, cooking demonstrations, and employing resident specialists to
answer questions.[51]  Providing conventional counterpart items and running price

[41] Bobbie Katz, Organic, Natural Meat Sales are Exploding (Feb 28, 2005) (quoting Nicholas D'Agostino
III, vice president, D'Agostino Supermarkets, New York).
[42] FMI Backgrounder Natural and Organic Foods, 3 *available at*,
http://www.fmi.org/media/bg/natural_organic_foods.pdf [hereinafter "FMI Backgrounder"], 5
[43] Gourmet & Specialty Food Trends, *supra* note 43 at 31.
[44] FMI Backgrounder *supra* note 45.
[45] Putting Words into Action, *supra* note 35.
[46] FMI Backgrounder, *supra* note 45 at 6.
[47] FMI Backgrounder, *supra* note 45; Statshot of Consumer Trends, *supra* note at 41.
[48] FMI Backgrounder, *supra* note 45 at 6; Food Marketing Institute Release, Convenience, Cost and
Nutrition are Key Concerns in Health & Self-Care Movement, According to "Shopping for Health 2003"

promotions round out retailer marketing strategies for these products.[52]

Increased availability of natural and products in mainstream channels makes these products visible to a wider range of consumers, many of which would not have otherwise been introduced to such products in a natural foods or nutrition store. This, in turn, brings a new consumer base to manufacturers offering such products. In fact, increased mainstream availability of natural and organic products is driving new consumers into natural products stores.[53]

Consumers blame their lack of success in efforts to eat healthy, in part, on the high costs of healthy foods.[54] Price premiums for organics range around 35-53% for baby food, 72% for frozen broccoli, 94% for spring wheat and 177% for soybeans.[55] However, as major manufacturers begin offering such products, mass production will lead to price competition with conventional products and reduce prices for the consumer.[56]

## 2. Protection of the integrity of the Natural label will open the category to consumers with special health needs.

Consumers also cite health benefits as their motivation to purchase natural and organic foods.[57] Natural foods consumers are statistically more likely to have philosophical or health-related special dietary needs.[58] Approximately five million Americans—2% of adults and 2-8% of children—suffer from some type of food allergy.[59] More common, however, than food allergies are food intolerances. Food intolerance, unlike a food allergy, does not involve the immune system, but instead is a reaction to the chemical composition of the food, such as a preservative or flavoring.[60]

(Nov. 4, 2003), available at, http://fmi.org/media/mediatext.cfm?id=578 ["hereinafter Convenience, Cost and Nutrition"] ("These barriers are areas of opportunity for supermarkets to help consumers manage their health by providing valuable nutrition information and convenient, healthy meal options.").

[52] FMI Backgrounder, *supra* note 45.

[53] Statshot of Consumer Trends, *supra* note 41.

[54] U.S. Consumers Buying Fortified Foods, *supra* note 37.

[55] FMI Backgrounder, *supra* note 45 at 6.

[56] *Id.* at 6.

[57] *Id.* at 3.

[58] Josh Dinar, Food for Thought Why they Buy, NATURAL FOODS MERCHANDISER (Dec. 2000) [hereinafter "Food for Thought"].

[59] Citizen Petition by the Attorneys General of NY, MD, MI, WY, OH, TN CT, VT, and MA to requesting action by the Food and Drug Administration regarding allergenic substances, *available at*, http://www.oag.state.ny.us/press/2000/may/may26a_attach_00.html.

[60] 71 FR 26677-03, 26678.

Food allergies and intolerance are related to a wide range of physical reactions, including respiratory problems, rashes and headaches.[61] More disconcerting are the studies that link food additives with behavioral problems, hyperactivity and brain processing in children.[62] In the 1970's, Dr. Ben Feingold, in *Why Your Child is Hyperactive*, published results claiming a diet free of synthetic colorings, preservatives and salicylates improved behavior in 30-50% of hyperactive children.[63] Sodium lactate, one of the exempted preservatives the new Natural Policy specifically allows, is linked to adverse reactions in lactose intolerant children.[64]

As the FSIS has already recognized, food allergic and intolerant consumers and their caregivers are entitled to accurate information and confidence that "all ingredients will be correctly labeled on products."[65] These consumers want to have confidence that their choices are real.[66] A clear, concise, exception-free definition of "natural" will give them the assurances they need to make health-conscious purchases for themselves and their children.

### 3. Protection of the integrity of the Natural label may help to open international markets.

Finally, a clear, enforceable definition of "natural" has the potential to open foreign markets. There is strong growth in the natural category in Latin America.[67] Without reliable parameters governing the use of the term, the global market remains uncertain. The implementation, by U.S. regulators, of a clear and enforceable definition of "natural" will assist in establishing equivalency of regulation under various free trade agreements and establish trust in product labeling that could potentially open foreign markets.[68]

---

[61] *See* Food Additives, Australian Consumers' Association, Choice (April 2005), *available at,* http://www.choice.com.au/viewarticleasonepage.aspx?id=100241&catId=100545&tid=100008&p=1 [hereinafter "Food Additives"]; Food Issues, *available at,* http://www.understandingfoodadditives.org/pages/Ch5p2-1.htm.

[62] *See* Food Additives, *supra* note 61; Food Issues, *supra* note 61; Natural Health and Longevity Resource Center, Food Additives and Hyperactivity in Children, *available at,* http://www.all-natural.com/hyperactivity.htm; BBC News, Food Additives "Cause Tantrums" (Oct. 25, 2002), *available at,* http://news.bbc.co.uk/1/hi/health/2356163.stm.

[63] Food Issues, *supra* note 61

[64] Food Additives: Acids, Antioxidants, Mineral Salts, *available at,* http://www.lactose.co.uk/milkallergy/foodadditives300.html

[65] 71 FR 26677, 26678.

[66] Food for Thought, *supra* note 58.

[67] A. Elizabeth Sloan, New Product Showcases Sizzle, *supra* note 15 at 40.

[68] *See* PanAfrica: When Ethics Mean Business, AFRICA NEWS (Mar. 15, 2005).

19

**a) A Clear Definition and Use Parameters Governing the Use of Natural Label Claims Will Also Positively Impact Manufacturers.**

Beyond the generation of more sales generally due to increased consumer confidence and trust, a codified definition of "natural" including parameters for making such a claim will benefit manufacturers by providing assurance that the term is consistently used, thereby leveling the playing field among competitors. Further, a definition that eliminates exceptions that encourage more reductions in amounts of certain food safety-enhancing ingredients to an arbitrary level will protect the category, and its players, from a potentially devastating food safety incident.

A clear definition will encourage investment in innovation, especially in new minimal processing technologies, and investment in natural, sustainable ingredient supplies. And it will protect these investments from other manufacturers that would take advantage of the exceptions to use less expensive substitutes for minimal processing techniques and chemical and artificial ingredients and preservatives.

Finally, it must be remembered that "natural" is strictly a voluntary claim. Any negative impact to manufacturers which may have obtained approval of a natural label through use of the exceptions in the new Policy has chosen to exploit the Policy and consumer confidence in this manner to make this voluntary claim. This perceived negative impact is better borne by the manufacturer than by the consumer however, and can be expeditious action by the FSIS in issuing interim guidance and moving through the rulemaking process.

## VI. Conclusion

It is clear that natural products are important to consumers. It is equally clear that consumers are confused about the definition of "natural" and, consequently, are becoming distrustful of the labeling claims. The agencies, consumers and manufacturers have long been aware of these problems and have called for rulemaking. Now is he time for USDA-FSIS to codify a clear, concise definition of "natural" that furthers the consumer interests and reflects the consumer's concepts of the term.

## VII.   Certification

The undersigned certifies that, to the best of their knowledge, this petition includes all information and views on which the petition relies and that it includes representative data and information known to the petitioner which are unfavorable to the petition.

Respectfully submitted,
Hormel Foods Corporation

Phillip L. Minerich
Vice President Research & Development

Mark S. Roberts
Manager, Technical Services and Regulatory Affairs
Research and Development

Lori J. Marco
Corporate Attorney

cc: The Honorable Richard Raymond, Under Secretary of Food Safety
    U.S. Department of Agriculture

21

**EXHIBIT D**



| United States Department of Agriculture | Food Safety and Inspection Service | Office of Policy, Program and Employee Development | Washington, D.C. 20250 |

Ms. Sheryl Marcouiller
Chief Counsel, Food Law
Kraft Foods Global
Three Lakes Drive
Northfield, IL 60093

NOV 29 2006

Dear Ms. Marcouiller:

This letter is in regard to the meat and poultry products that you manufacture under the Oscar Mayer brand that bear the claim "natural" and that contain sodium, potassium, or calcium lactate as ingredients.

As you are aware, the policy guidance regarding the use of the claim "natural" is found in an entry in the Food Safety and Inspection Service's (FSIS) Food Standards and Labeling Policy Book The entry states that the term "natural" may be used on labeling for meat products and poultry products, provided the applicant for such labeling demonstrates that (1) the product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic ingredient; and (2) the product and its ingredients are not more than minimally processed.

As you know, FSIS regulates sodium lactate and potassium lactate for the purpose of an antimicrobial effect in meat and poultry products at up to 4.8 percent of product formulations. Antimicrobial effects include reducing or inhibiting microorganisms to extend shelf-life. At levels 2 percent or less of meat and poultry formulations, sodium lactate and potassium lactate are regulated for the purpose of providing a flavoring effect, as is calcium lactate at 0.6 percent or less of formulations of certain products.

In recent years, your company received approved labels for "natural" Oscar Mayer products containing sodium lactate. The basis for the approvals was that the ingredient was from a natural source (e.g., corn or beets), not artificial or synthetic, and was not more than minimally processed. Furthermore, to be consistent with the other aspect of the definition of "natural," the approvals were based on the company's assertion that the purpose of use was strictly for flavoring (i.e., used at less than 2 percent) and not for an antimicrobial effect, which would conflict with the criterion that ingredients in natural products are not serving a preservative function. A preservative function includes those of an antimicrobial, i.e., reducing-microorganisms and extending shelf-life of treated products.

Recently, the Agency received information that shows that levels of lactates used below the level regulated for flavoring (i.e., 2 percent of a product formulation) may, in fact, provide an antimicrobial effect. The information provided to the Agency includes a copy of the patent that Oscar Mayer holds for the use of sodium, potassium, and calcium lactate. The patent claims the delay in *Clostridium botulinum* growth at levels of use as low as 1.5 percent of product formulations, which is lower than the level of use regulated for flavoring effect.

Ms. Sheryl Marcouiller
Page 2

Additional information from manufacturers of lactate ingredients claims that lactates increase shelf-life, improve food safety, and control pathogens, in addition to improving flavor.

If lactates are used in Oscar Mayer products bearing the claim "natural" at levels less than 2 percent to increase product shelf-life, improve food safety, and control pathogens, the use of the ingredients is contrary to the meaning of "natural" stated above. Moreover, such products would be misbranded and the labels would be subject to being rescinded.

In order to be assured that the labels of the Oscar Mayer products bearing the claim "natural" in which lactates are used are truthful and not misleading, and in compliance with the policy guidance, I am requesting that you provide data that show, for each product that bears a "natural" claim and that contains lactates, that these ingredients are having only a flavoring effect and are not functioning as a preservative in the product. The data will need to show that the "natural" products containing lactates (1) exhibit the same microbiological characteristics as products formulated without lactates, (2) have the same shelf-life as that the same products formulated without lactates, and (3) have the same sell-by/use-by/freeze-by dates applied as the dates that would be applied to products without lactates.

I am requesting that you submit these data no later than 60 days from the date of this letter. On receipt of the data, FSIS will evaluate them, and if the Agency were to find based on this evaluation that the effect of using lactates at 2 percent or less in formulations of "natural" meat and poultry products is that of an antimicrobial, the Agency will rescind its approval of the labels for these products.

If you wish to discuss this matter, please do not hesitate to contact me at (202) 205-0279.

Sincerely,

Robert C. Post, Ph.D., Director
Labeling and Consumer Protection Staff

**EXHIBIT E**

USDA-FSIS (30) MANUAL

*According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0583-0092. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This form has not been approved by OMB for web and distribution.*

6052939373

3a. NAME OF APPLICANT: **See Page 2 for Instructions.**

ima Label Consultants, Inc.
536 Seventh Street SE
PO Box 15240
Washington, DC 20003-0240
(202) 546-3333
FAX (202) 543-4337

2. FOR USDA USE ONLY

AGENT NAME, ADDRESS,
TELEPHONE NO. *(if using an agent)*
*complete this block if different from block 1*

3. FOR USDA USE ONLY

4. ESTABLISHMENT NO. / FOREIGN
COUNTRY *(if applicable)*

P-2122

3a. NAME OF PRODUCT

FARMLAND ALL NATURAL SHAVED TURKEY BREAST & WHITE TURKEY MEAT, 98%FF,
#70247-82000, Net Wt. 10 oz. (284g)

8a. TYPE OF APPROVAL REQUESTED

[X] SKETCH
[ ] EXTENSION OF TEMPORARY
[ ] TEMPORARY

8b. WAS THE
PREVIOUSLY
APPROVED?

[ ] YES
[X] NO

→ Date of approval

Prior approval number

Number of labels on hand:

Number of days requested:

7a. AREA OF PRINCIPAL DISPLAY PANEL *(square inches)*

5b. HACCP PROCESS CATEGORY
Fully cooked--not shelf stable

7b. TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE *(square inches)*

## 7. PRODUCT FORMULA

TURKEY BREAST 90% AND WHITE TURKEY MEAT 10%
TURKEY BROTH
SEA SALT
SUGAR
POTASSIUM LACTATE (DRY BASIS)
CARRAGEENAN
FLAVORINGS (CELERY POWDER)
LACTIC ACID STARTER CULTURE

| | PCT [X] WEIGHT *(No. fractions)* |
|---|---|
| | 100.0000 |
| | 29.3885 |
| | 2.6176 |
| | 2.4213 |
| | 2.3558 |
| | 0.6544 |
| | 0.3000 |
| | 0.0300 |

TOTAL *(Percent must total 100%)*    137.7676

## 9. PROCESSING PROCEDURES
*(Approval of the sketch does not constitute approval of the process procedures)*

GRIND TURKEY BREAST COARSE. GRIND WHITE TURKEY
MEAT FINE.
MIX WITH INGREDIENTS.
STUFF INTO FIBEROUS CASING.
COOK TO 165°F MINIMUM INTERNAL TEMPERATURE.
CHILL, SLICE AND PACKAGE.

10. NAME AND ADDRESS OF FIRM *(Brew and between)*

FARMLAND FOODS, INC
P.O. BOX 13277
WICHITA, KS 67213

12. CONDITIONS OF APPROVAL
ASSURED AS TO SOURCE OF THE PRODUCT.

11. SIGNATURE OF APPLICANT OR AGENT

DATE  6-12-07

APPROVED AS TO FORM AND LABEL APPROVAL



## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HORMEL FOODS CORPORATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:07-CV-01724-RBW |
| UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| FARMLAND FOODS, INC., | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | |
| PURAC AMERICA, INC., SARA LEE | ) | |
| CORPORATION, SMITHFIELD FOODS, | ) | |
| INC., AND TYSON FOODS, INC. | ) | |
| | ) | |
| | ) | |
| Proposed Defendant-Intervenors. | ) | |
| | ) | |

## ORDER

Upon consideration of Farmland Foods, Inc., Kraft Foods Global, Inc., PURAC America, Inc., Sara Lee Corporation, Smithfield Foods, Inc., and Tyson Foods, Inc.'s Motion for Leave to Intervene, the memorandum of points and authorities in support thereof, and any opposition thereto,

It is by this Court this _____ day of _____, 2007, hereby

ORDERED that this foregoing Motion for Leave to Intervene As a Defendant be GRANTED.

_____
HON. REGGIE B. WALTON

## CERTIFICATE OF SERVICE

I hereby certify that true and correct copies of the foregoing Motion for Leave to

Intervene, the Memorandum of Points and Authorities in Support of Motion for Leave to

Intervene, and the Answer of Defendant-Intervenors were served via overnight mail, postage

prepaid on this 3rd day of December 2007, on the following:


John F. Cooney
Venable LLP
575 7th Street, NW
Washington, D.C. 20004


William Jaffe
United States Department of Justice
Civil Division
20 Massachusetts Ave., NW
Washington, D.C. 20035


_/s/  Kirsten Friedel Roddy_____

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HORMEL FOODS CORPORATION,<br><br>        Plaintiff,<br><br>        v.<br><br>UNITED STATES DEPARTMENT<br>OF AGRICULTURE,<br><br><br>        Defendant.<br><br><br>FARMLAND FOODS, INC.,<br>KRAFT FOODS GLOBAL, INC.,<br>PURAC AMERICA, INC., SARA LEE<br>CORPORATION, SMITHFIELD FOODS,<br>INC., AND TYSON FOODS, INC.,<br><br>        Proposed Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    Civil Action No.<br>)    1:07-CV-01724-RBW |

## <u>ANSWER OF DEFENDANT-INTERVENORS</u>

       Defendant-Intervenors Farmland Foods, Inc. ("Farmland"), Kraft Foods Global,

Inc. ("Kraft"), PURAC America, Inc. ("PURAC"), Sara Lee Corporation ("Sara Lee"),

Smithfield Foods, Inc. ("Smithfield"), and Tyson Foods, Inc. ("Tyson") (collectively

"Defendant-Intervenors"), in Answer to each numbered paragraph of Plaintiff Hormel Foods

Corporation's Complaint for Declaratory and Injunctive Relief, state as follows:

1.      Paragraph 1 contains no allegations to which a response is required.  To the extent a response is deemed required, Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 1.

2.      Paragraph 2 contains no allegations to which a response is required.  To the extent a response is deemed required, Defendant-Intervenors admit the allegations in Paragraph 2.

3.      Paragraph 3 contains only jurisdictional allegations and legal conclusions to which no response is required.  To the extent a response is deemed required, Defendant-Intervenors deny the allegations in Paragraph 3

4.      Paragraph 4 contains only legal conclusions to which no response is required.  To the extent a response is deemed required, Defendant-Intervenors admit the allegations in Paragraph 4.

5.      Paragraph 5 contains only Plaintiff's characterization of statutory provisions and legal conclusions to which no response is required.  To the extent a response is deemed required, Defendant-Intervenors admit the statements in Paragraph 5.

6.      Paragraph 6 contains only Plaintiff's characterization of statutory provisions and legal conclusions to which no response is not required.  To the extent a response is deemed required, Defendant-Intervenors admit that the quoted language from 21 U.S.C. § 601(n) in Paragraph 6 is as it appears in 21 U.S.C. § 601(n), except that this quotation omits the

word "meat" after "part thereof," and before "meat food product." Defendant-Intervenors deny the remainder of Paragraph 6.

       7.     Paragraph 7 contains only Plaintiff's characterization of regulatory provisions and legal conclusions to which no response is required. To the extent a response is deemed required, Defendant-Intervenors admit that the quoted language from 9 C.F.R. § 317.8(a) and 9 C.F.R. § 317.2(j) in Paragraph 7 is as it appears in 9 C.F.R. § 317.8(a) and 9 C.F.R. § 317.2(j), except that the paragraph's quotation from 9 C.F.R. § 317.8(a) includes a superfluous comma between the words "other labeling" and "and no statement," and the paragraph's quotation from 9 C.F.R. § 317.2(j) should begin: "Labels of any product." Defendant-Intervenors deny the remainder of Paragraph 7.

       8.     Paragraph 8 contains only Plaintiff's characterization of statutory provisions and legal conclusions to which no response is required. To the extent a response is deemed required, Defendant-Intervenors admit that the quoted language from 21 U.S.C. § 453(h) in Paragraph 8 is as it appears in 21 U.S.C. § 453(h), except that the word "exemption" between "impracticable," and "shall be established" should be "exemptions." Defendant-Intervenors deny the remainder of Paragraph 8.

       9.     Paragraph 9 contains only Plaintiff's characterization of statutory and regulatory provisions and legal conclusions to which no response is required. To the extent a response is deemed required, Defendant-Intervenors admit the first sentence of Paragraph 9 and deny the remainder of Paragraph 9.

- 3 -

10.    Defendant-Intervenors deny the first and last sentences of Paragraph 10 to the extent they characterize lactates as being "chemical" for the purpose of USDA's "natural" policy and admit that the quoted language from U.S. Patent Nos. 4,798,729, 4,888,729 [sic], and 5,017,391 in Paragraph 10 is as it appears in U.S. Patent Nos. 4,798,729, 4,888,191, and 5,017,391.

11.    Defendant-Intervenors admit the allegations in Paragraph 11.

12.    Defendant-Intervenors deny the allegations in Paragraph 12.

13.    Defendant-Intervenors admit the allegations in Paragraph 13.

14.    Paragraph 14 contains only Plaintiff's characterization of regulatory provisions and legal conclusions to which no response is required. To the extent a response is deemed required, Defendant-Intervenors admit the statements in Paragraph 14.

15.    Paragraph 15 contains only Plaintiff's characterization of regulatory provisions and legal conclusions to which no response is required. To the extent a response is deemed required, Defendant-Intervenors admit the statements in the second and third sentences of Paragraph 15 and deny the remainder of Paragraph 15.

16.    Paragraph 16 contains only Plaintiff's characterization of regulatory provisions and legal conclusions to which no response is required. To the extent a response is deemed required, Defendant-Intervenors admit the statements in Paragraph 16.

17.    Paragraph 17 contains only Plaintiff's characterization of regulatory provisions and legal conclusions to which no response is required. To the extent a response is

deemed required, Defendant-Intervenors admit the statements in the first sentence of Paragraph 17 and deny the remainder of Paragraph 17.

18.    Paragraph 18 contains only Plaintiff's characterization of regulatory provisions and legal conclusions to which no response is required.  To the extent a response is deemed required, Defendant-Intervenors admit that the quoted language from 65 Fed. Reg. 3121 and 9 C.F.R. § 424.21(c) in Paragraph 18 is as it appears in 65 Fed. Reg. 3121 and 9 C.F.R. § 424.21(c), except that this paragraph's quotation of 9 C.F.R. § 424.21(c) omits an entire sentence between the words "Part 317 of this chapter" and "This chart also" and fails to reflect omitted entries from the chart.  Defendant-Intervenors deny the remainder of Paragraph 18.

19.    Paragraph 19 contains only Plaintiff's characterization of statutory and regulatory provisions and legal conclusions to which no response is required.  To the extent a response is deemed required, Defendant-Intervenors deny the first sentence of Paragraph 19, deny the second sentence of Paragraph 19 to the extent it characterizes potassium lactate and sodium lactate as "chemicals" for the purpose of USDA's "natural" policy, and admit the remainder of Paragraph 19.

20.    Paragraph 20 contains no allegations to which a response is required.  To the extent a response is deemed required, Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 20.

21.     Paragraph 21 contains only Plaintiff's characterization of regulatory provisions and legal conclusions to which no response is required. To the extent a response is deemed required, Defendant-Intervenors admit the statements in Paragraph 21.

22.     Paragraph 22 contains only Plaintiff's characterization of regulatory provisions and legal conclusions to which no response is required. To the extent a response is deemed required, Defendant-Intervenors deny the statements in Paragraph 22.

23.     Paragraph 23 contains only Plaintiff's characterization of statutory and regulatory provisions and legal conclusions to which no response is required. To the extent a response is deemed required, Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the statements in the first sentence of Paragraph 23, admit the statement in the second sentence of Paragraph 23, and admit that the quoted language from 21 C.F.R. § 101.22(a)(5) in Paragraph 23 is as it appears in 21 C.F.R. § 101.22(a)(5), except that the paragraph's quotation beginning "Any chemical that" should be "[A]ny chemical that." Defendant-Intervenors deny the remainder of Paragraph 23.

24.     Paragraph 24 contains only Plaintiff's characterization of regulatory provisions and legal conclusions to which no response is required. To the extent a response is deemed required, Defendant-Intervenors admit that the quoted language from the November 22, 1982 Food Standards and Labeling Policy Memorandum 055 ("1982 Memorandum") in Paragraph 24 is as it appears in the 1982 Memorandum.

25.     Paragraph 25 contains only Plaintiff's characterization of regulatory provisions and legal conclusions to which no response is required. To the extent a response is

deemed required, Defendant-Intervenors admit the statements in the second sentence of Paragraph 25 and deny the remainder of Paragraph 25.

26.     Paragraph 26 contains no allegations to which a response is required.  To the extent a response is deemed required, Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 26.

27.     Defendant-Intervenors deny the allegations in Paragraph 27 to the extent they characterize potassium lactate and sodium lactate as being "chemical" for the purpose of USDA's "natural" policy and state that they are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 27.

28.     Paragraph 28 contains only Plaintiff's characterization of regulatory provisions and legal conclusions to which no response is required.  To the extent a response is deemed required, Defendant-Intervenors deny the statements in the last two sentences of Paragraph 28 to the extent they characterize FSIS's explicit enumeration (in its August 2005 policy) of sodium lactate in the list of ingredients permitted in "natural" meat and poultry products as an "exception" and admit the remainder of Paragraph 28.

29.     Paragraph 29 contains only Plaintiff's characterization of regulatory provisions and legal conclusions to which no response is required.  To the extent a response is deemed required, Defendant-Intervenors deny the statements in the second sentence of Paragraph 29, deny the statements in the first sentence of Paragraph 29 to the extent they characterize FSIS's explicit enumeration (in its August 2005 policy) of sodium lactate in the list of

ingredients permitted in "natural" meat and poultry products as an "exception," and admit the remainder of Paragraph 29.

30.    Paragraph 30 contains only Plaintiff's characterization of regulatory provisions and legal conclusions to which no response is required.  To the extent a response is deemed required, Defendant-Intervenors admit the allegations in Paragraph 30.

31.    Paragraph 31 contains no allegations to which a response is required.  To the extent a response is deemed required, Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 31.

32.    Defendant-Intervenors deny the allegations in Paragraph 32 to the extent they characterize potassium lactate and sodium lactate as being "chemical" for the purpose of USDA's "natural" policy and as being "manufactured through extensive industrial chemistry." Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the remaining allegations in Paragraph 32.

33.    Defendant-Intervenors state that Paragraph 33 contains no allegations to which a response is required.  To the extent a response is deemed required, Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 33.

34.    Defendant-Intervenors deny the allegations in Paragraph 34 to the extent they suggest that FSIS began allowing lactates in "natural" products only after FSIS's August 2005 policy memorandum and to the extent they characterize FSIS's explicit enumeration (in its

August 2005 policy memorandum) of sodium lactate in the list of ingredients permitted in "natural" meat and poultry products as an "exemption." Defendant-Intervenors admit the remaining allegations of Paragraph 34.

35.     Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 35.

36.     Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 36.

37.     Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 37.

38.     Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 38.

39.     Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 39.

40.     Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 40.

41.     Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 41.

42.     Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 42.

43.     Defendant-Intervenors state that they are without knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 43.

44.     Defendant-Intervenors deny the allegations in Paragraph 44.

45.     Defendant-Intervenors deny the allegations in Paragraph 45.

46.     Paragraph 46 does not contain allegations to which a response is required. To the extent a response is deemed required, Defendant-Intervenors incorporate by reference its answers to Paragraphs 1-45 of the Complaint.

47.     Defendant-Intervenors deny the allegations in Paragraph 47.

48.     Defendant-Intervenors deny the allegations in Paragraph 48.

49.     Paragraph 49 does not contain allegations to which a response is required. To the extent a response is deemed required, Defendant-Intervenors incorporate by reference its answers to Paragraphs 1-48 of the Complaint.

50.     Defendant-Intervenors deny the allegations in Paragraph 50.

51.     Paragraph 51 does not contain allegations to which a response is required. To the extent a response is deemed required, Defendant-Intervenors incorporate by reference its answers to Paragraphs 1-50 of the Complaint.

52.     Defendant-Intervenors deny the allegations in Paragraph 52.

Requested Relief, Paragraphs1-6.     Defendant-Intervenors deny that Plaintiff is entitled to any of the relief requested in its Complaint.

- 10 -

Defendant-Intervenors deny any and all allegations in the Complaint that are not specifically admitted.

FIRST DEFENSE

The Complaint fails to state a claim upon which relief may be granted.

SECOND DEFENSE

The Court lacks jurisdiction over the subject matter of this action.

THIRD DEFENSE

The causes of action asserted in the Complaint are barred by the doctrine of estoppel and/or latches.

WHEREFORE, Defendant-Intervenors respectfully request that this Court deny Plaintiff's request for relief and dismiss this action with prejudice.

Dated: December 3, 2007                            Respectfully submitted,


   /s/  Kirsten Friedel Roddy      
Jonathan L. Abram, D.C. Bar No. 389896
  jlabram@hhlaw.com
Kirsten Friedel Roddy, D.C. Bar No. 467805
  kfroddy@hhlaw.com
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C.  20004–1109
Telephone: (202) 637–5600
Facsimile:  (202) 637–5910

- 11 -

*Attorneys for Proposed Intervenors:*
*Farmland Foods, Inc., Kraft Foods Global,*
*Inc., PURAC America, Inc., Sara Lee*
*Corporation, Smithfield Foods, Inc., and*
*Tyson Foods, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HORMEL FOODS CORPORATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:07-CV-01724-RBW |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| FARMLAND FOODS, INC., | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | |
| PURAC AMERICA, INC., SARA LEE | ) | |
| CORPORATION, SMITHFIELD FOODS, | ) | |
| INC., AND TYSON FOODS, INC., | ) | |
| | ) | |
| | ) | |
| Proposed Defendant-Intervenors. | ) | |
| | ) | |

## CERTIFICATE REQUIRED BY LCvR 7.1 OF THE LOCAL RULES OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

I, the undersigned, counsel of record for Proposed Intervenors Farmland

Foods, Inc., Kraft Foods Global, Inc., PURAC America, Inc., Sara Lee Corporation,

Smithfield Foods, Inc., and Tyson Foods, Inc. (collectively "Proposed Intervenors")

certify that to the best of my knowledge and belief, the following are parent companies,

subsidiaries or affiliates of Proposed Intervenors which have any outstanding securities in the hands of the public:

### Disclosure of Farmland Foods, Inc.

Smithfield Foods, Inc.

### Disclosure of Kraft Foods Global, Inc.

Kraft Foods Inc.

### Disclosure of PURAC America, Inc.

CSM nv.

### Disclosure of Sara Lee Corporation

Sara Lee Corporation discloses that it has no parent companies, subsidiaries or affiliates which have any outstanding securities in the hands of the public.

### Disclosure of Smithfield Foods, Inc.

Smithfield Foods, Inc. discloses that it has no parent companies, subsidiaries or affiliates which have any outstanding securities in the hands of the public.

### Disclosure of Tyson Foods, Inc.

Tyson Foods, Inc. discloses that it has no parent companies, subsidiaries or affiliates which have any outstanding securities in the hands of the public.

These representations are made in order that judges of this court may determine the need for recusal.

Dated: December 3, 2007                    Respectfully submitted,


_____/s/   Kirsten Friedel Roddy___
Jonathan L. Abram, D.C. Bar No. 389896
    jlabram@hhlaw.com
Kirsten Friedel Roddy, D.C. Bar No. 467805
    kfroddy@hhlaw.com
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C.  20004–1109
Telephone: (202) 637–5600
Facsimile:  (202) 637–5910

*Attorneys for Proposed Intervenors:
Farmland Foods, Inc., Kraft Foods Global,
Inc., PURAC America, Inc., Sara Lee
Corporation, Smithfield Foods, Inc., and
Tyson Foods, Inc.*