IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HORMEL FOODS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF AGRICULTURE, <br><br> Defendant. <br><br>——————————————————— <br><br> FARMLAND FOODS, INC., KRAFT FOODS GLOBAL, INC., PURAC AMERICA, INC., SARA LEE CORPORATION, SMITHFIELD FOODS, INC., AND TYSON FOODS, INC. <br><br> Proposed Defendant-Intervenors. | Civil Action No. <br> 1:07-CV-01724-RBW |

**REPLY MEMORANDUM IN SUPPORT OF MOTION FOR
<u>LEAVE TO INTERVENE</u>**

Hormel seeks two remedies in this case: to force the USDA to rescind approval of package labels using the word "natural" on meat and poultry products containing lactates and to enjoin it from approving such labels in the future. Hormel alleges it has standing to do so because it is a food manufacturer and because it uses High Pressure Processing ("HPP") to achieve protection against microbial contamination – a method that it contends is more "natural" than lactates. Now, when other food manufacturers (and the nation's principal manufacturer of lactates) intervene to present the opposing view on both issues – to oppose Hormel's effort to strip package labels from the shelf and to

oppose Hormel's effort to enjoin approval of any new ones – Hormel attacks their standing.

Hormel is wrong. First, it is settled law in the District of Columbia Circuit that manufacturers like PURAC, the manufacturer of lactates, have standing to challenge agency action that affects their products. And there is no doubt that PURAC's lactate products are affected by the agency action at issue here – and would be dramatically affected by the injunction Hormel seeks. Indeed, that is the whole reason for Hormel's suit – to eliminate competition in the "natural" market from foods containing PURAC's lactates, a more comprehensive, less expensive anti-microbial measure than HPP and certainly one that is "natural."

Second, meat and poultry manufacturers are affected by the USDA's rule concerning use of the word "natural" regardless of whether they currently have a "natural" label on the shelf. Certainly, those that now market "natural" products containing lactates have standing to intervene. Hormel does not argue otherwise, nor could it, given that the remedy it seeks here would effectively strip these companies' previously-approved "natural" labels from the shelves. The same is true of companies that do not yet market lactate-containing products labeled "natural." Hormel has made such future labels the subject of this case by seeking to enjoin USDA from approving them. If the injunction Hormel seeks were to be entered, the right of meat and poultry manufacturers, including that of Sara Lee and Tyson, to describe their meat and poultry products containing lactates as "natural" would be infringed. Hormel complains that the prospect that future "natural" labels may be sought for lactate-containing products is "speculative," but that is no more so for purposes of assessing intervenors' standing to

oppose the requested injunction than it is for purposes of assessing Hormel's need for the injunction in the first place. The fact is that meat and poultry manufacturers will seek new "natural" labels for lactate-containing products, and hearing from two who may is entirely appropriate and in no way enlarges the issues Hormel has presented in this litigation.

## I. HORMEL'S STANDING CHALLENGE IS WITHOUT MERIT.

### A. PURAC Has Standing to Intervene.

PURAC is the world's largest producer of lactates. Hormel has made that ingredient (and therefore PURAC's product) the central issue in this case by seeking to forbid use of the word "natural" on foods containing it, thereby eliminating PURAC and lactates from the "natural" foods marketplace. Now, Hormel argues that PURAC is "affected by USDA's actions only in a [sic] indirect manner, because it profits from the sale of lactates to entities that do market meat and poultry under a 'Natural' label" and that PURAC therefore does not fall within the "zone of interests" protected by the Federal Meat Inspection Act ("FMIA") or the Poultry Products Inspection Act ("PPIA"). Opp'n at 4-5.

However, in the D.C. Circuit, manufacturers do have standing to address agency actions affecting their products. *Amgen, Inc. v. Smith*, 357 F.3d 103, 109 (D.C. Cir. 2004) (upholding manufacturer standing and rejecting contrary rule adopted in the Fourth Circuit). In *Amgen*, the Court upheld the standing of a drug manufacturer to challenge the level of reimbursement Medicare pays to hospitals who buy and use its products. Even though the product manufacturer was not directly regulated in the Medicare reimbursement process, the D.C. Circuit recognized that Amgen had a legitimate interest

in the content of regulations relating to its products. Just so here. PURAC may not be directly regulated in the food labeling process, but it has a legitimate interest in the content of USDA regulations that define how its product can be used.

To establish manufacturer standing, the D.C. Circuit held, a manufacturer has standing under the zone of interest test by showing either (1) that it is "the subject of the contested regulatory action," or (2) that its interest in the matter is not "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended suit." *Clarke v. Securities Industry Ass'n*, 479 U.S. 388, 399-400 (1987); *Amgen*, 357 F.3d at 108. "The [zone of interest] test is not meant to be especially demanding." *Amgen*, 357 F.3d at 108. Just as Amgen had standing with respect to regulations affecting hospitals that use its product, so too PURAC has standing with respect to regulations affecting food manufacturers that use lactates.

### 1. PURAC Has Standing Because its Lactate Product is the Subject of the USDA Regulation (and Hormel's Complaint).

There is no question that PURAC's lactate product was "the subject of the contested regulatory action." In August 2005, USDA expressly listed "sodium lactate from a corn source" as an acceptable ingredient for products bearing "natural" claims. *See* Food Standards and Labeling Policy Book, *Natural Claims* (Aug. 2005) (Ex. B to Mem. in Supp. of Mot. to Intervene ("Mot.")). As described in our opening motion papers and proposed answer, the agency's decision to list lactates as a permissible ingredient was consistent with the its longstanding practice of approving "natural" labels for products containing lactates. Mot. at 5-6. A year and a half later, in response to a petition by Hormel, the agency suspended approval of such labels for lactate-containing food products pending a rulemaking. *See* Product Labeling: Definition of the Term

"Natural," 71 Fed. Reg. 70503, 70503-04 (Dec. 5, 2006). And now, Hormel seeks injunctive relief that would forever prohibit use of lactates in food products labeled "natural." Compl., Prayer for Relief ¶ 4.

Clearly, lactates are the issue in this case, and PURAC is the world's largest manufacturer of lactates. As a result, PURAC meets the "zone of interests" test. *See Shays v. F.E.C.*, 337 F.Supp.2d 28, 47 (D.D.C. 2004).

### 2.   PURAC Has Standing Because Its Interests Are Aligned with Those Congress Sought to Protect.

Manufacturers like PURAC also satisfy the zone of interests test if "their interests appear congruent with those of the statute." *Amgen*, 357 F.3d at 109. In applying this part of the "zone of interests" test,

> a court does not ask whether, in enacting the statutory provision at issue, Congress specifically intended to benefit the plaintiff. Instead, the court first discerns the interests arguably to be protected by the statutory provision at issue; the court then inquires whether the plaintiff's interests affected by the agency action in question are among them.

*Shays*, 337 F.Supp.2d at 46-47 (citation omitted). "[C]ongruence of interests, rather than identity of interests, is the benchmark; the zone of interests test serves to exclude only those parties whose interests are not consistent with the purposes of the statute in question." *Chiang v. Kempthorne*, 503 F.Supp.2d 343, 349 (D.D.C. 2007) (plaintiffs had standing to challenge administrative decisions regarding oil and gas royalties collected by agency, where plaintiffs had a financial interest in royalties collected).

PURAC's interests are congruent with the interests addressed by the FMIA and PPIA. The Congressional statement of findings for the FMIA states that:

> Unwholesome, adulterated, or misbranded meat or meat food products impair the effective regulation of meat and meat food

> products in interstate or foreign commerce, are injurious to the
> public welfare, destroy markets for wholesome, not adulterated,
> and properly labeled and packaged meat and meat food products,
> and result in sundry losses to livestock producers and processors of
> meat and meat food products, as well as injury to consumers. The
> unwholesome, adulterated, mislabeled, or deceptively packaged
> articles can be sold at lower prices and compete unfairly with the
> wholesome, not adulterated, and properly labeled and packaged
> articles, to the detriment of consumers and the public generally. It
> is hereby found that . . . regulation . . . [is] appropriate to prevent
> and eliminate burdens upon such commerce, to effectively regulate
> such commerce, and to protect the health and welfare of
> consumers.

21 U.S.C.A. § 602; *see also* 21 U.S.C.A. § 451 (Congressional statement of findings for PPIA substantially similar). 1/

Hormel and PURAC both assert essentially the same interest, to assure that food labeling is done in a way that is consistent with the applicable statutes. Hormel argues that the statute is violated by allowing the word "natural" on food packages containing PURAC's products, sodium and potassium lactate. PURAC argues the contrary – that lactates should continue to be permitted in food labeled "natural" because lactates are derived by no more than minimal processing from a natural, renewable source – corn – and are not "chemical preservatives" or "synthetic ingredients." Their positions are flip

---

1/  Specifically, the Congressional statement of findings for the PPIA state: "[u]nwholesome, adulterated, or misbranded poultry products impair the effective regulation of poultry products in interstate or foreign commerce, are injurious to the public welfare, destroy markets for wholesome, not adulterated, and properly labeled and packaged poultry products, and result in sundry losses to poultry producers and processors of poultry and poultry products, as well as injury to consumers. It is hereby found that . . . regulation . . . [is] appropriate to prevent and eliminate burdens upon such commerce, to effectively regulate such commerce, and to protect the health and welfare of consumers. 21 U.S.C.A. § 451.

sides of the same coin, and if Hormel's side is within the zone of interests protected by the statute, then so is PURAC's.

Further, PURAC advocates continued use of the word "natural" on products containing lactates, an ingredient that provides a secondary barrier to microbial contamination after packages are opened. Mot. at 4. Hormel opposes such labeling, even though "natural" would remain available on Hormel's products using HPP, which provides no secondary barrier to contamination. Safe, effective, and affordable food safety tools like lactates directly advance and guard against known microbial risks that USDA and the food industry have long worked to minimize. Thus, if either side's position is more compatible with the statutory goal of food safety and the health and welfare of consumers, it is PURAC's.

The PURAC profits from the sale of lactates does not change the analysis. First, the irony – Hormel did not bring this case as a public service; it brought this case alleging that it is injured by competition with lactate-containing products in the "natural" food market. Economic motives no more undermine PURAC's standing than it does Hormel's. "Parties motivated by purely commercial interests routinely satisfy the zone of interests test under this court's precedents." *Amgen*, 357 F.3d at 109.

Moreover, manufacturers routinely satisfy the zone of interests tests when their products are affected by the regulation even if they are not directly regulated. *See, e.g., Ethyl Corporation v. EPA*, 306 F.3d 1144, 1148 (D.C. Cir. 2002) (fuel additives manufacturer had standing to challenge EPA's rule concerning automobile manufacturer's compliance with certain emissions standards); *Motor & Equipment Mfrs. Ass'n v. Nichols*, 142 F.3d 449, 458 (D.C. Cir. 1998) (manufacturers of replacement

automobile parts could challenge EPA's order regarding pollution monitors, where manufacturers' commercial interest in selling replacement parts was "congruent" with those of mechanics and ultimately of the statute); *Nat'l Cottonseed Prods. Ass'n v. Brock*, 825 F.2d 482, 492 (D.C. Cir. 1987) (manufacturers of respirators had standing to challenge OSHA regulations "on the basis of the vendor-vendee relationship alone" as their interests were "two sides of the same coin"). Accordingly, PURAC has standing to be an intervenor in this case.

  B.  **Sara Lee And Tyson Have Standing to Intervene.**

  Despite the fact that Sara Lee and Tyson are major producers of pre-packaged meat and poultry products, *see* Ex. 1, Tyson 2006 Annual Report and Ex. 2, Dec. of B. Reinhard at ¶ 2, Hormel claims that they lack Article III standing because they fail to show that they suffer an "actual or imminent" injury, rather than a "conjectural or hypothetical" concern. However, meat and poultry manufacturers are directly affected by USDA's policy regarding the use of the word "natural" on its meat and poultry products regardless of whether they currently have a "natural" label on the shelf. Hormel has made future labels the subject of this case by seeking a permanent injunction to prevent USDA from approving any new "natural" labels for meat and poultry products containing lactates. Compl., Prayer for Relief ¶ 4. As a result, if Hormel's requested relief were to be granted, both Sara Lee and Tyson would be prevented from describing their meat and poultry products containing lactates as "natural." This threat of permanent injunction preventing the use of lactates in "natural" products and USDA's explicit and abrupt change in policy regarding the use of lactates in "natural" products has led to great uncertainty surrounding what can properly be labeled as "natural."

To be sure, given the rise in consumer interest in "natural" meat and poultry products, both Sara Lee and Tyson have necessarily considered developing "natural" meat and poultry products containing lactates. *See, e.g.*, Ex. 2 at ¶¶ 3-6. 2/ The existing uncertainty regarding what will qualify as "natural," however, has affected Sara Lee and Tyson's business decisions regarding whether to expend the resources to develop and take to market "natural" meat and poultry products containing lactates. *See, e.g., id.* at ¶ 6. This is sufficient injury to confer Article III standing. "[P]resent injurious effect on [a petitioner's] business decisions" is sufficient to confer standing. *Constellation Energy Commodities Group, Inc. v. FERC*, 457 F.3d 14, 20 (D.C. Cir. 2006); *see also Rio Grande Pipeline Co. v. FERC*, 178 F.3d 533, 540 (D.C. Cir. 1999) (petitioner had standing to intervene where agency decision on one industry member's rates would create precedent that would competitively and economically affect other industry members).

In fact, Sara Lee currently markets and sells meat and poultry products with FSIS-approved "natural" labels, Ex. 2 at ¶ 7, and has existing projects for "natural" products containing sodium lactate – projects that were put on hold because of USDA's change in policy, *id.* at ¶ 6. Based on the existing "natural" policy at the time, in the spring and summer of 2006, Sara Lee began the research and development process for "natural" meat and poultry products, which included research on consumer expectations, product performance, and expected growth drivers in the "natural" market segment. *Id.* at ¶ 5. When FSIS reversed its "natural" policy regarding lactates in December 2006, Sara Lee's

---

2/     In fact, large food processors have maintained their presence in categories for hot dogs, luncheon meats, and other products by being able to respond through the development of new products in response to such market trends.

research and development efforts regarding "natural" meat and poultry products containing sodium lactate were put on hold because of the uncertainty of whether "natural" labels would be approved for such products. *Id.* ¶ 6.

In sum, there can be no doubt that both Sara Lee and Tyson, as major manufacturers of meat and poultry products, have alleged a sufficient injury to confer Article III standing to address regulations (and oppose injunction requests) that would define the meat and poultry products that can be called "natural." Contrary to Hormel's assertions, this is a far cry from the intention "some day" to visit endangered species halfway around the world, the interest held insufficient to confer standing in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 564 (1992). In fact, Sara Lee and Tyson's injury is much more "actual or imminent" than that alleged in *Friends of the Earth, Inc. v. Laidlaw Environmental Servs. (TOC), Inc.*, 528 U.S. 167, 169 (2000), where the Supreme Court held that there was Article III standing for an association whose members stated that they would like to use a river for recreational purposes but that due to the EPA's improper regulation and resulting discharges, they would not do so. Accordingly, Hormel's challenge to Sara Lee and Tyson's standing must be denied.

## II.   PROPOSED INTERVENORS HAVE NOT ENLARGED THE ISSUES PRESENTED BY HORMEL'S COMPLAINT.

Hormel claims that the issue of whether USDA should continue to approve new "natural" labels for meat and poultry products containing lactates is beyond the scope of its Complaint. However, Hormel specifically asks for "an Order <u>permanently enjoining</u> the Department of Agriculture from <u>approving</u> the sale and marketing under a "Natural" label of meat and poultry products that contain" lactates. Compl., Prayer for Relief ¶ 4 (emphasis added). Moreover, through this action Hormel seeks to have this Court

effectively determine what can be labeled as "natural." *See id.* at ¶¶ 1, 3, 5. Thus, unwilling to await the policy review process already announced by USDA, Hormel has brought the issue of the approval of new labels before this Court. Any such determination by this Court would dictate whether FSIS will be permitted to approve as "natural" new products containing lactates and constrain or preclude FSIS from adopting an interim policy of final rule that would allow for the continued use of lactates in "natural" products. As a result, Hormel's claim of the expansion of the scope of this case is completely without merit.

## CONCLUSION

For the foregoing reasons, and the reasons stated in their Memorandum of Points and Authorities in Support of Motion for Leave to Intervene, all of the Proposed Intervenors should be permitted to intervene in this matter.

Dated: December 21, 2007

                                                   Respectfully submitted,

                                                    /s/ Kirsten Friedel Roddy

Jonathan L. Abram, D.C. Bar No. 389896
    Jlabram@hhlaw.com
Kirsten Friedel Roddy, D.C. Bar No. 467805
    kfroddy@hhlaw.com
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004–1109
Telephone: (202) 637–5600
Facsimile: (202) 637–5910

Attorneys for Proposed Intervenors:
*Farmland Foods, Inc., Kraft Foods Global, Inc., PURAC America, Inc., Sara Lee Corporation, Smithfield Foods, Inc., and Tyson Foods, Inc.*

**EXHIBIT 1**



# Opportunities on the Table

TYSON FOODS, INC. 2006 ANNUAL REPORT



## Contents

1   Letter to Shareholders

2   Food for Thought
    Q&A with Tyson's new President and CEO Dick Bond

4   Appetite for Change
    Tyson Foods is reinventing itself through innovation, creativity and agility.

7   A Taste of What's to Come
    Tyson is creating products to meet consumers' needs and solve their mealtime dilemmas.

9   Financial Contents

Tyson Foods, Inc. (NYSE: TSN), founded in 1935 with headquarters in Springdale, Arkansas, is the world's largest processor and marketer of chicken, beef and pork, the second-largest food production company in the *Fortune* 500 and a member of the S&P 500. The Company produces a wide variety of protein-based and prepared food products, which are marketed under the "Powered by Tyson™" strategy. Tyson is the recognized market leader in the retail and foodservice markets it serves, providing products and service to customers throughout the United States and more than 80 countries. The company has approximately 107,000 Team Members employed at more than 300 facilities and offices in the United States and around the world. Through its Core Values, Code of Conduct and Team Member Bill of Rights, Tyson strives to operate with integrity and trust and is committed to creating value for its shareholders, customers and Team Members. The Company also strives to be faith-friendly, provide a safe work environment and serve as stewards of the animals, land and environment entrusted to it. Our vision is to be the world's first choice for protein solutions while maximizing shareholder value.

### 2006 Financial Highlights
TYSON FOODS, INC 2006 ANNUAL REPORT

| in millions, except per share data | 2006 | 2005 | 2004 |
|---|---|---|---|
| Sales | $25,559 | $26,014 | $26,441 |
| Gross profit | 928 | 1,720 | 1,883 |
| Operating income (loss) | (77) | 745 | 917 |
| Income tax expense (benefit) | (102) | 156 | 232 |
| Cumulative effect of change in accounting principle, net of tax | (5) | – | – |
| Net income (loss) | (196) | 372 | 403 |
| Diluted earnings (loss) per share | (0.58) | 1.04 | 1.13 |
| Shareholders' equity | 4,440 | 4,671 | 4,292 |
| Book value per share | 12.51 | 13.19 | 12.19 |
| Total assets | 11,121 | 10,504 | 10,464 |
| Depreciation and amortization | 517 | 501 | 490 |
| Total debt | 3,979 | 2,995 | 3,362 |
| Cash provided by operating activities | 287 | 999 | 932 |
| Capital expenditures | $ 531 | $ 571 | $ 486 |
| Year end shares outstanding | 355 | 355 | 353 |
| Diluted average shares outstanding | 345 | 357 | 357 |

**EXHIBIT 2**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HORMEL FOODS CORPORATION, )<br>)<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>UNITED STATES DEPARTMENT )<br>OF AGRICULTURE, )<br>)<br>)<br>Defendant. )<br>_____)<br>)<br>FARMLAND FOODS, INC., )<br>KRAFT FOODS GLOBAL, INC., )<br>PURAC AMERICA, INC., SARA LEE )<br>CORPORATION, SMITHFIELD FOODS, )<br>INC., AND SARA LEE FOODS, INC. )<br>)<br>)<br>Proposed Defendant-Intervenors. )<br>_____) | Civil Action No.<br>1:07-CV-01724-RBW |

### DECLARATION OF ROBERT G. REINHARD

I, Robert G. Reinhard, declare and state the following:

1. I am Director Food Safety at Sara Lee Corporation. ("Sara Lee"). This declaration is made on personal knowledge based on information contained in Sara Lee's files, publicly available information, and other factual matters known to me.

2. Sara Lee is a global manufacturer and marketer of high-quality, brand name products for consumers throughout the world. Sara Lee's operations are organized around six business segments – North American Retail Meat being one of those segments.

North American Retail Meats sells a variety of packaged meat products to retail customers in North America. Products include hot dogs and corn dogs, breakfast sausages and sandwiches, smoked and dinner sausages, premium deli and luncheon meats, and cooked and dry hams. North American Retail Meats' significant brands include *Hillshire Farm, Ball Park, Sara Lee, Jimmy Dean, Bryan, State Fair, Kahn's* and *Best's Kosher* in the United States and 89% of the segment's fiscal 2007 sales were generated in U.S. dollars. Sales are made in the retail channel to supermarkets, warehouse clubs, and national chains. In Fiscal Year 2007, the North American Retail Meats segment of Sara Lee had nets sales over $ 2.63 billion.

      3.      Sara Lee routinely uses lactates in certain of its existing pre-packaged meat and poultry products. Lactates are recognized, in part, as a valued food safety tool that advances Sara Lee's long-standing commitment to offer consumers high quality and affordable products. Sara Lee has maintained a strong presence in the meat and poultry industry because it is vigilant in understanding and responding to our customers' needs. Sara Lee is committed to providing safe and wholesome foods that are innovative and delight consumers, while meeting their expectations for convenience and health. Sara Lee has long supported science-based regulation that is transparent to all stakeholders. The rise in consumer interest and demand for "natural" meat and poultry products led Sara Lee to undertake substantial efforts to expand into this product segment.

      5.      Based on the existing "natural" policy at the time, in the spring and summer 2006, Sara Lee began the research and development process for "natural" meat and poultry products including research on customer expectations, product performance, and expected growth drivers in the "natural" market segment.

6.  When FSIS reversed its policy in December 2006, Sara Lee's research and development efforts regarding "natural" meat and poultry products containing sodium lactate were put on hold because of the uncertainty of whether "natural" labels would be approved for such products. Further, through direct correspondence with FSIS officials, it was made clear the Agency intended to initiate the rule making process to define the definition of "natural".

7.  As part of the rule making process and based on our desire and commitment of resources to the development of products for the "natural" market segment, in March and April, 2007 Sara Lee petitioned the U.S. Department of Agriculture's Food Safety and Inspection Service (FSIS) and in the Food and Drug Administration (FDA) to take a uniform approach for defining the term "natural" stating:

> *"A single, uniform "natural" policy that captures the common elements of the current FSIS and FDA policies would provide consistency for consumers and food manufacturers over the large variety of foods that bear a "natural" claim. A uniform policy would meet each Agency's statutory obligation for ensuring that food labeling is neither false nor misleading and represent yet another instance in which the Agencies act in concert to advance the mutual goal of consumer protection. To provide optimal food safety options, a uniform "natural" policy should recognize that natural preservatives are consistent with "natural" claims. Moreover, to adequately address the numerous contexts in which a "natural" claim can be used, the term should be defined in a flexible policy that provides for case-by-case consideration of the term instead of*

*a static, fixed definition adopted through notice-and-comment rulemaking."*

8. Sara Lee currently markets and sells FSIS regulated products that contain a "natural" claim on the label. These products include items marketed and labeled as *Sara Lee, Hillshire Farm, Sara's Special Recipe,* and *Gourmet Selections.*

I declare under penalty of perjury that the foregoing is true and correct. Executed on December 21, 2007.

_____
[Declarant]