## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HORMEL FOODS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:07-cv-1724 (RBW) |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## DEFENDANT'S MOTION TO DISMISS THE COMPLAINT OR,
## IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant United States Department of Agriculture ("USDA") hereby moves, through

undersigned counsel, and pursuant to Federal Rules of Civil Procedure 12(b) and 56(c), for entry of

an order dismissing this action or, in the alternative, granting summary judgment to defendant.

Defendant relies on the attached memorandum in support of its motion.

Dated: January 22, 2008
　　　　Washington, D.C.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

FELIX V. BAXTER
Director, Federal Programs Branch
Civil Division

_s/ William B. Jaffe (Electronic Filing)_

JAMES J. GILLIGAN
Assistant Director
WILLIAM B. JAFFE
Trial Attorney

United States Department of Justice
Civil Division, Federal Programs Branch
<u>Mailing Address</u>
P.O. Box 883
Washington, DC  20044
<u>Delivery Address</u>
20 Massachusetts Avenue, NW, Room 6110
Washington, DC  20530
(202) 353-7633
Fax: (202) 616-8460
Email: william.jaffe@usdoj.gov

Attorneys for Defendant

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HORMEL FOODS CORPORATION, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 1:07-cv-1724  (RBW) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT | ) |
| OF AGRICULTURE, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN
SUPPORT OF DEFENDANT'S MOTION TO DISMISS THE
COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY
JUDGMENT**

<u>**INTRODUCTION**</u>

The United States Department of Agriculture ("defendant" or "USDA"), pursuant to

federal law, must approve labels bearing the claim "natural" on processed meat or poultry

products before such products may be sold to the consumer.  In October 2006, Hormel Foods

Corporation ("plaintiff" or "Hormel"), petitioned USDA to rescind its prior approval of "natural"

labels on processed meat and poultry products produced by approximately twenty-four of

Hormel's competitors.  According to Hormel, these products all contain sodium lactate,

supposedly as a flavor enhancer, but which Hormel maintains (based on its submissions to

USDA) acts as a chemical preservative.  Although USDA regulations, discussed *infra*, allow the

use of sodium lactate in "natural" products as a flavor enhancer,  Hormel alleges that the use of

sodium lactate in its competitors' products violates provisions of the Federal Meat Inspection

Act, 21 U.S.C. §§ 601(n) and 610(d) ("FMIA"), and the Poultry Products Inspection Act, 21

U.S.C. §§ 453(h) and 458(a)(3) ("PPIA"), prohibiting misbranding of products. After receiving Hormel's petition, USDA sought and obtained public comment on the proper standards for "natural" claims on meat and poultry labels. In addition, USDA requested data from twenty-four companies as to whether sodium lactate at certain levels had a preservative effect on their products. When USDA announced that it would seek further public comment before acting on Hormel's petition to rescind approval for its competitors' "natural" labels, plaintiff filed this action seeking declaratory relief and an injunction requiring USDA to rescind its approval of these labels.

Count one of the Complaint asserts that USDA, by not yet rescinding its approval of the "natural" claims made by Hormel's competitors, has violated both the FMIA and the PPIA. Count one should be dismissed because neither statute provides a private right of action to enforce its provisions, much less a right of action *against USDA* to compel particular enforcement action. Rather, the FMIA and PPIA grant authority for enforcement of their terms only to the Secretary of Agriculture ("the Secretary").

In counts two and three of the Complaint, plaintiff maintains that by not yet rescinding approval for its competitors' "natural" labels, USDA has acted arbitrarily and capriciously and engaged in *de facto* rule making without observing notice and comment procedures, in violation of the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"). These claims should be dismissed for numerous reasons. First, whether to take enforcement action against companies whose products may not qualify as "natural," by rescinding approval of labels bearing the "natural" claim, is a decision committed to agency discretion by law, and as such is not subject to APA review. Second, even if a decision not to rescind approval for a product label were

2

reviewable, Hormel would not be entitled to the relief it seeks – an order compelling rescission of USDA's approval for the "natural" labels of more than twenty different companies.  The APA provides no cause of action to compel agency action unless that action is legally required.  The FMIA and the PPIA, however, do not mandate that the Secretary take enforcement action in cases of alleged mislabeling, providing only that he "may" do so.

Third, the APA authorizes judicial review only of "final" agency action.  Here, however, the agency has not yet taken any final action regarding the "natural" claims made by Hormel's competitors.  Rather than having reached a final decision on this issue, the agency has clearly stated that it intends to seek additional public comment on the appropriate standards for processed meat and poultry products bearing the "natural" label.  Since the agency has announced but not yet commenced rulemaking, nor made a final decision as to continued approval of the "natural" claims made by Hormel's competitors, there is no final agency action in this matter.  Hence, counts two and three of the Complaint should be dismissed.

Alternatively, if the Court does not dismiss counts two and three, summary judgment should be entered in defendant's favor on both claims.  Plaintiff's arbitrary and capricious claim fails because USDA has acted reasonably and well within its discretion by not yet rescinding approval of the labels in question.  Although evidence provided to USDA by Hormel includes claims that sodium lactate may have a preservative effect even when used at two percent or less of formulation, the agency requested and obtained data from the companies at issue indicating, to the contrary, that the presence of sodium lactate at that level may not have a preservative effect in their products.  Hence, USDA's Food Safety Inspection Service ("FSIS"), which is responsible for enforcing the FMIA and PPIA, acted reasonably by not rescinding the approvals for these

companies' "natural" labels at this time, and instead waiting to receive additional public comments and initiate rule making on this topic before taking definitive action with respect to the "natural" claims made by these companies. Accordingly, defendant is entitled to summary judgment on count two.

Defendant is also entitled to judgment as a matter of law on count three, because USDA has not yet taken any action that could even reasonably be described here as promulgating a final rule, with or without notice and comment. All the agency has done is to state its current intention not to take action to rescind approval for the "natural" labels of Hormel's competitors, pending consideration of additional public comment on the use of "natural" claims for meat and poultry labels. Thus, Hormel's notice-and-comment claim must also be rejected.

## STATUTORY AND REGULATORY FRAMEWORK

### The Federal Meat Inspection Act and the Poultry Products Inspection Act

The Federal Meat Inspection Act, 21 U.S.C. § 610(d), provides that "[n]o person, firm, or corporation" shall commit "any act . . . which is intended to cause or has the effect of causing" meat products sold or distributed in interstate commerce to be "adulterated or misbranded."

The term "misbranded" is defined as follows:

The term "misbranded" shall apply to any carcass, part thereof, or meat food product under one or more of the following circumstances:

(1) If its labeling is false or misleading in any particular; ...

(11) lf it bears or contains any artificial flavoring, artificial coloring, or chemical preservative, unless it bears labeling stating that fact: *Provided,* That, to the extent compliance with the requirements of this subparagraph (11) is impracticable, exemption shall be established by regulations promulgated by the Secretary; or

(12) If it fails to bear, directly thereon or on its container, as the Secretary may by regulations prescribe, the inspection legend and, unrestricted by any of the foregoing, such other information as the Secretary may require in such regulations to assure that it will not have false or misleading labeling and that the public will be informed of the manner of handling required to maintain the article in a wholesome condition.

21 U.S.C. § 601(n).

Similarly, the Poultry Products Inspection Act, 21 U.S.C. § 458(a)(3), states that "[n]o person" shall sell or distribute in interstate commerce any poultry products that are "adulterated or misbranded."   Like the FMIA, the PPIA defines the term "misbranded" as follows:

The term "misbranded" shall apply to any poultry product under one or more of the following circumstances:

(1) If its labeling is false or misleading in any particular; ...

(11) If it bears or contains an artificial flavoring, artificial coloring, or chemical preservative, unless it bears labeling stating that fact: Provided, That, to the extent compliance with the requirements of this subparagraph (11) is impracticable, exemption shall be established by regulations promulgated by the Secretary; or

(12) If it fails to bear on its containers ... as the Secretary may by regulations prescribe ... unrestricted by any of the foregoing, such other information as the Secretary may require in such regulations to assure that it will not have false or misleading labeling and that the public will be informed of the manner of handling required to maintain the article in a wholesome condition.

21 U.S.C. § 453(h).

With regard to the use of chemical preservatives, USDA regulations require that

"[c]ontainers of other product packed in, bearing, or containing, any chemical preservative shall bear a label stating that fact."

9 C.F.R. 317.2(j)(12).

Similarly, regulations issued under the PPIA state that "Immediate containers of poultry products packed in, bearing, or containing any chemical preservative shall bear a label stating

that fact . . ." 9 C.F.R. § 381.120.

Food and Drug Administration regulations define the term "chemical preservative" as

The term chemical preservative means any chemical that, when added to food, *tends to prevent or retard deterioration thereof*, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties.

21 C.F.R. 101.22(a)(5)(emphasis added).

A like definition, applicable to meat and meat food products, can be found in FSIS

regulations:

Chemical preservative. Any chemical that, when added to a meat or meat food product, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices or substances added to meat and meat food products by exposure to wood smoke.

9 C.F.R. § 301.2.

Regarding enforcement of their respective misbranding provisions, both the FMIA and

the PPIA  provide, without qualification, that if the Secretary has "reason to believe" that any

marking or labeling is false or misleading, then he "*may* direct that such use be withheld unless

the marking, labeling, or container is modified in such a manner as he may prescribe so that it

will not be false or misleading."  21 U.S.C. §§ 457(d), 607(e) (emphasis added).

**USDA Regulations Concerning False or Misleading Labeling of Meat and Poultry Products**

The FSIS is the agency within USDA responsible for carrying out responsibilities of the

Secretary under various statutes including the FMIA and the PPIA.  9 C.F.R. §§ 300.1, 300.2.

To fulfill this mandate, FSIS has issued regulations to implement the misbranding provisions of

the FMIA and the PPIA.  Regarding meat products, the regulations state that "[n]o product or any

of its wrappers, packaging, or other containers shall bear any false or misleading marking, label, or other labeling," 9 C.F.R. § 317.8(a), and that "[n]o final labeling shall be used on any [meat] product" unless it has been submitted for and receives approval by FSIS.  9 C.F.R. § 317.4.

Concerning poultry products, the regulations state likewise that "[n]o poultry product subject to the Act [the PPIA] shall have any false or misleading labeling or any container that is so made, formed, or filled as to be misleading,"  9 C.F.R. § 381.129(a), and that "[n]o final labeling shall be used on any [poultry] product" unless approved by FSIS.  9 C.F.R. § 381.132. So far as enforcement of the misbranding provisions of the FMIA, PPIA, and USDA regulations is concerned, the agency's rules provide, without qualification, that FSIS *"may* rescind or refuse approval of false or misleading marks, labels, or sizes or forms of any container for use with any meat or poultry product under section 7 of the FMIA or under section 8 of the PPIA."  9 C.F.R. § 500.8 (emphasis added).

## STATEMENT OF FACTS

### FSIS Policy on "Natural" Labeling of Meat and Poultry Products

The Labeling and Program Delivery Division (formerly the Labeling and Consumer Protection Staff) within FSIS  provides guidance to manufacturers on how to comply with the labeling provisions of the FMIA, the PPIA, and USDA regulations.  This guidance is offered in the form of policy memoranda and the Food Standards and Labeling Policy Book ("Policy Book"), which is based upon the guidance contained in these policy memoranda.  Among other guidance offered concerning the proper labeling of meat and poultry products, the Policy Book sets out the factors FSIS considers in determining whether products have been appropriately labeled as "natural" (Derfler Decla. ¶ 9).

7

FSIS first published policy guidance concerning products that can bear the "natural" claim on their labels in 1982. Standards and Labeling Policy Memorandum 055 ("Policy Memorandum 055") (Administrative Record ("AR") at AR 2), listed the following factors considered by FSIS when determining if the term "natural" may be used on labels for meat and poultry products:

> (1) The product does not contain any artificial flavor or flavoring, coloring ingredient, or *chemical preservative* (as defined in 21 C.F.R. 101.22), or any other artificial or synthetic ingredient (emphasis added); and

> (2) the product and its ingredients are not more than minimally processed. Minimally processed may include: (a) Those traditional processes used to make food edible or to preserve it to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes that do not fundamentally alter the raw product or that only separate a whole intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

Because neither the FMIA, nor the PPIA, include a definition of the term "chemical preservative," Policy Memorandum 055 incorporated by reference the definition adopted under food safety regulations issued by the Food and Drug Administration, 21 C.F.R. 101.22(a)(5).

**August 2005 Policy Book Modification Concerning "Natural" Label Claims**

In 2005, FSIS revised the entry in the Policy Book and rescinded Policy Memorandum 055 concerning "natural" labels, to reflect its established practice, since 1993 (Derfler Decla. ¶ 15), of approving "natural" label claims for products containing two percent or less sodium lactate ( derived from a corn source) in which the presence of sodium lactate has only a flavoring effect and not a preservative effect. AR 7-8. Specifically, the revised memorandum added a note

to the guidelines for "natural" label claims stating that "sodium lactate (from a corn source),"
among other "natural" flavorings, would be "acceptable for 'all "natural"' claims." *Id.*

Between August 2005 and December 5, 2006, FSIS continued to approve "natural" label
claims for fourteen companies whose products contain sodium or potassium lactate as flavor
enhancers. Derfler Decla. ¶ 19.[1]

**Hormel's October 2006 Petitions to USDA**

On October 9, 2006, Hormel submitted a petition to FSIS requesting that FSIS initiate
rule making to codify the definition of "natural" for meat and poultry labels.  AR 14-54.  Hormel
specifically objected to the inclusion of sodium lactate in products labeled as "natural."   It was
Hormel's contention that sodium lactate serves a dual purpose in the products in question, acting
both as a flavor enhancer and as a preservative.  According to Hormel, permitting these products
to retain the "natural" label would violate USDA policy, and the misbranding provisions of the
FMIA and the PPIA, because of the preservative effect of the sodium lactate.  AR 23.

As evidence that sodium lactate acts as both a preservative and a flavor enhancer, Hormel
provided marketing literature from Purac, a maker of sodium lactate, showing that sodium lactate
may extend the shelf life of processed foods (that is to say, act as a preservative) at levels as low
as one percent. AR 14.  Hormel also submitted certain patents, obtained by the Oscar Mayer
(Kraft) company, which claimed that sodium lactate can have anti-microbial (again to say,
preservative) effects in fish and poultry products at levels as low as one percent (*Id.*).

On October 10, 2006, Hormel submitted a follow-up request that FSIS rescind the

---

[1] Since December 2006, FSIS has approved one additional label based on data from
controlled tests, submitted by the manufacturer, showing that the presence of sodium lactate in its
product has no preservative effect.  Derfler Decla. ¶ 33.

"natural" claim labels that had been previously approved for certain products, because Hormel contended that lactates had been added to those products as a preservative and that therefore, their "natural" label claims were not accurate.  AR 55-64.

On November 7, 2006, Hormel, acting through its counsel, sent a letter to FSIS in further support of its request to rescind the labels in question.  Hormel repeated its argument that sodium lactate acts as a preservative in food at levels as low as one percent.  Hormel claimed that inclusion of sodium lactate thus resulted in misbranding of products that bear the "natural" label, in violation of federal law, because products labeled "natural" are not permitted to include chemical preservatives.  Hormel offered the same evidence as in its petition: the Oscar Mayer Company patents claiming that sodium lactate extended shelf life in poultry and fish, and the marketing literature for Purac, also claiming that sodium lactate may extend shelf  life.  AR 126-155.

**FSIS Response to the Hormel Petition and Requests to Rescind Labels**

In response to Hormel's request for rule making, its request to rescind the "natural" labels in question,  and in response to changing food industry standards for processing and  packing meat and poultry, FSIS took several steps as outlined in a December 6, 2006 letter to Hormel from the Under Secretary for Food Safety.  AR 160-161.  First,  FSIS removed the August 2005 modification to the Policy Book concerning the acceptability of sodium lactate in products claiming on their labels to be "natural."  The current version of the Policy Book states that FSIS will make determinations on new applications for approval of such labels on a case-by- case basis, in each case after assessing the intended use, level of use, and technical functions of "multi-functional" ingredients on the product for which the label under consideration is intended.

Additionally, FSIS sent letters to Hormel's twenty-four competitors with approved "natural" label claims for meat and poultry products containing lactates at levels of two percent or less. AR 611-641. FSIS directed these companies to provide data demonstrating that the use of sodium lactate in these products does not have a preservative effect. FSIS also informed them that the agency may rescind its approval of "natural" labels for products in which it is found that low levels of lactates may have a preservative effect. *Id.*

In response, FSIS received data from four of these twenty-four companies. (AR 0792-0873). Contrary to the assertions made by Hormel, the evidence received from these companies indicated that, at levels of two percent or less, sodium lactate acts only as a flavor enhancer and not as a preservative in their products. *Id.* These data thus supported continued use of the "natural" label on the products sold and distributed by these four companies.[2]

In sum, these data provided evidence that these four companies' products containing sodium lactate do not have an extended shelf life. AR 790-872. Thus, since sodium lactate in these products appears, based on these data, to be only acting as a flavor enhancer, FSIS determined not to take further action with regard to these companies until the rule making process has reached its conclusion and then reevaluate whether they are in compliance with FSIS

---

[2] Specifically, each company performed controlled tests of its product, using samples both with and without sodium lactate, to investigate whether the presence of sodium lactate has a preservative effect over periods corresponding to the stated shelf life of the product. Samples both containing and not containing sodium lactate were tested weekly. Microbiological analysis included tests for aeorbic plate count, yeast, mold, and lactic acid bacteria. At the completion of the tests, the product samples formulated with and without sodium lactate were observed to have very similar microbial growth patterns under the same controlled conditions. Neither sample was found to have distinguishable signs of microbial degradation, or distinct appearance or package-integrity changes. AR 790-872.

11

standards for use of the "natural" label.  (Derfler Decla. at ¶¶ 28-32).

Finally, FSIS published a Notice of Petition and Public Meeting and Request for Comments on December 5, 2006, to announce Hormel's petition for rule making to establish the conditions under which the claim "natural" can be used on the labels of meat and poultry products, and to seek public comment on the subject.  71 Fed. Reg. 70503 (Dec. 5, 2006).  FSIS also announced a public meeting, held on December 12, 2006, to facilitate the comment process. *Id.*  The notice observed that significant disagreement had recently arisen about the August 2005 modification to the Policy Book*,* particularly the recognition of sodium lactate as an ingredient that could be included in products bearing a "natural" claim.  *Id.* at 70504.  Therefore, FSIS requested input at the public hearing and from commenters on the following topics:

> 1.  Is it reasonable to include as part of a definition of "natural" a stipulation that products can be no more than minimally processed to be eligible to bear the claim?  Are there any accommodations necessary to allow for certain operations because food processing and packaging techniques for enhancing safety may disqualify a product as "natural?"
>
> 2.  What are the implications of, and conflicts that arise from, use of the "natural" label claim for meat and poultry products prepared with current and new food processing methods and certain classes of ingredients?
>
> 3.  Are there available data about what the claim "natural" means on the labels of food products, including meat and poultry products?  What do consumers think that the terms "minimal processing," "artificial and synthetic," and "preservatives" mean?
>
> 4.  Do food safety and consumer protection benefits of using what historically may have been considered more than minimal processing techniques and antimicrobial agents outweigh conflicts with the meaning of "natural?"

*Id.* at 70504-05.

Following the December 5, 2006 notice, and the public meeting held thereafter, FSIS

received approximately ninety-four individualized public comments expressing widely divergent and sometimes conflicting views on what the claim "natural" as applied to meat and poultry products should mean.  AR 875-1999.  For instance, there are widely divergent opinions as to whether sodium lactate constitutes a chemical preservative that should not qualify for the "natural" label.  Derfler Decla. at ¶ 36.  The agency also received more than 6,000 form letters, submitted electronically, objecting to the use of added flavorings, tenderizers and seasoning solutions for poultry products bearing the "natural" label claim. Derfler Decla. at ¶ 35.

Given the lack of uniformity in the comments received, FSIS is still considering how best to proceed to ensure that the term "natural," as used in labels for meat and poultry products, is truthful and not misleading.  Thus, the agency decided that, prior to taking any further action, either to settle on a policy concerning the use of sodium lactate in products labeled as "natural," or with respect to Hormel's request to rescind the approvals for Hormel's competitors' "natural" labels, it would be more appropriate to obtain additional focused comments to narrow the divergent views that had already been presented. Derfler Decla. at ¶¶ 38-39.

In June 2007, Representative Collin Peterson, Chairman of the House of Representatives Committee on Agriculture, wrote a letter to then-Secretary of Agriculture Mike Johanns, asking for a "status report on the [FSIS] action" to rescind approval for the "natural" label claims of meat and poultry products containing sodium lactate. AR 778.  On July 31, 2007, the Under Secretary wrote in response that FSIS is currently determining how best to proceed to resolve the broad issue of "natural" label claims on meat and poultry products, AR 779-780, to which end, he explained, the agency had requested comments and held a public meeting on the subject. *Id.* Given the divergent and sometimes contradictory views expressed in the comments on what the

claim "natural" as applied to meat and poultry products should mean, the Under Secretary explained that instead of pursuing the recission actions requested by Hormel, the agency would attempt to forge a "broad consensus" and bring about a timely and successful resolution of the issues surrounding the "natural" label claim by seeking additional, but more focused, comments on the issue. *Id.*

In the interim, FSIS will continue to consider applications for approval of "natural" label claims on meat and poultry products containing sodium lactate on a case-by-case basis. Derfler Decla. at ¶ 26. It will approve such labels where data submitted by the applicant support a finding that sodium lactate is used only as a flavoring, and does not act as a preservative. FSIS will require new data showing that sodium lactate has no preservative effect on their products in order to approve their "natural" label requests. Derfler Decla. at ¶¶ 26-30. USDA currently plans to issue an advance notice of proposed rulemaking, and a request for further public comments, regarding the circumstances under which the claim "natural" may be made on the labels of meat and poultry products. Derfler Decla. at ¶¶ 38-39.

**The Complaint**

Hormel filed its Complaint in this action on September 26, 2007. In count one of the Complaint, Hormel claims that USDA violated the misbranding provisions of the FMIA, the PPIA, and its own rules, by approving "natural" label claims for meat and poultry products in which sodium lactate may act as a preservative (Complaint ¶ 47), and by allegedly refusing to rescind the approvals obtained by Hormel's competitors (*Id.* ¶ 48). In count two, Hormel claims that USDA's failure to rescind these labels is arbitrary and capricious, in violation of the APA (*Id.* ¶ 50). Finally, in count three, Hormel claims that by failing to rescind these labels, USDA

14

engaged in *de facto* rule making without observing the notice and comment procedures the APA requires (Id. ¶ 52).

By way of relief, the Complaint seeks 1) a declaration that the USDA violated the FMIA and PPIA and the APA by not rescinding the approval of "natural" label claims for meat and poultry products in which sodium lactate has a preservative effect; 2) an order directing USDA to rescind its approvals for, and permanently enjoining the USDA from approving in the future, the sale and marketing under a "natural" label of meat and poultry products in which potassium or sodium lactate has a preservative effect, unless they bear labeling stating that fact. Complaint at 23-24 (prayer for relief).

## ARGUMENT

## I.        STANDARD OF REVIEW.

Under Fed. R. Civ. P. 12(b)(6), the court's decision whether to dismiss a complaint for failure to state a claim upon which relief may be granted is based on "the legal sufficiency of the complaint," *Shirk v. Barton,* No. 07-0356, 2007 WL 2570426, at *2 (D.D.C. Sept. 6, 2007), that is, whether the complaint has made "a 'showing' that the pleader is entitled to relief." Aktieselskabet AF 21 v. Fame Jeans, Inc., 511 F. Supp. 2d 1, 5 (D.D.C. 2007) *(quoting Bell Atlantic Corp. v. Twombly,* 127 S. Ct. 1955, 1965 (2007)). The Supreme Court has recently revised the applicable 12(b)(6) standard. *See id.* Following *Twombly,* while the complaint need not provide "detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65. The alleged facts must "state a claim for relief that is plausible on its face" rather than merely "conceivable." *Id.* at 1974.

15

In determining whether dismissal is warranted for failure to state a claim, a court may

consider "'the facts alleged in the complaint, any documents either attached to or incorporated in

the complaint and matters of which [the court] may take judicial notice.'" *Rogers v.*

*Johnson-Norman,* 466 F. Supp. 2d 162, 165 n.3 (D.D.C. 2006) (*quoting EEOC v. St. Francis*

*Xavier Parochial Sch.,* 117 F.3d 621, 624 (D.C. Cir. 1997)). "[T]he court must treat the

complaint's factual allegations . . . as true and draw all reasonable inferences therefrom in the

plaintiff's favor," but "the court need not accept as true inferences unsupported by facts set out in

the complaint or legal conclusions cast as factual allegations." *Shirk,* 2007 WL 2570426, at *2.

"A party is entitled to summary judgment only if there is no genuine issue of material fact

and judgment in the movant's favor is proper as a matter of law." *U.S. ex rel. Bettis v. Odebrecht*

*Contractors,* 393 F.3d 1321, 1325 (D.C. Cir. 2005) (*citing Kaempe v. Myers,* 367 F.3d 958,

965-66 (D.C. Cir. 2004)).  Under the APA, however, whether agency action is arbitrary,

capricious, or contrary to law is a legal issue that a court resolves on the basis of the record made

before the agency, whether presented in the context of a motion under Rule 12(b) or a motion for

summary judgment.  *American Bioscience, Inc. v. Thompson,* 269 F.3d 1077, 1083 (D.C. Cir.

2001); *Commercial Drapery Contractors v. U.S.,* 133 F.3d 1, 7 (D.C. Cir. 1998).  For the reasons

stated *infra,* the Court should dismiss this action or, in the alternative, grant summary judgment

to defendant.

## II.    PLAINTIFF HAS FAILED TO STATE A CAUSE OF ACTION UNDER THE FMIA OR THE PPIA SINCE NEITHER STATUTE CREATES A PRIVATE CAUSE OF ACTION.

Plaintiff's claims under the FMIA and PPIA (Count one of the Complaint) must be

dismissed because neither of these statutes provides for a private cause of action.  It is not

enough for Hormel to allege that the Secretary has allowed Hormel's competitors to label their products as all "natural" in violation of § 610 and § 458.  *See* Complaint ¶ 47.  "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Touche Ross v. Redington,* 442 U.S. 560, 568 (1979).  A would-be plaintiff must show, in addition, that Congress has created both "a private right" and "a private remedy."  *Gonzaga v. Doe,* 536 U.S. 273, 284 (2002).

There is no such private right or remedy under the FMIA or under the PPIA.   Section 610 of the FMIA, 21 U.S.C. § 610, on which plaintiff relies, *see* Complaint ¶¶ 6, 47, states that "[n]o person, firm, or corporation shall, with respect to any [meat or meat food products] . . . (d) do . . . any act [in commerce] which is intended to cause or has the effect of causing such articles to be adulterated or misbranded." There is no language in § 610, however, that permits a private party alleging a violation of its misbranding prohibition to bring an action for any kind of judicial relief.

Nor is such language to be found elsewhere in the FMIA's enforcement provisions. Section 607 provides that "[i]f the Secretary has reason to believe that any . . . labeling . . .  in use . . . with respect to any [meat or meat food product] is false or misleading, he [the Secretary] may direct that such use be withheld," but nothing in § 607 states that a private party may bring suit in its own right to prohibit such use. Section 673 provides that any meat or meat product prepared, sold, transported, or otherwise distributed in violation of the FMIA's prohibitions shall be liable to seizure and condemnation, 21 U.S.C. § 673(a)(1), but the statute specifies that any such proceeding "shall be at the suit of and in the name of the United States." *Id.,* § 673(a)(4). Section 676 sets forth criminal penalties for violations of the Act, but establishes no mechanism

for civil enforcement of the statute by private parties.  Thus, as held in *Pacific Trading Company v. Wilson and Company, Inc.,* 547 F.2d 367, 370 (7th Cir. 1976), the FMIA "is regulatory in character and Congress has vested the power to enforce this regulatory scheme in the government, not private individuals."  *See also  Mario's Butcher Shop and Food Center, Inc. v. Armour and Company,* 574 F.Supp. 653, 654 (N.D. Illinois 1983)("[The FMIA] makes no such provision for suits by private individuals.").   As the Seventh Circuit noted, in *Pacific Trading,* "Congress could have vested powers of enforcement in the private sector but chose, instead, to place such enforcement powers in the Secretary of Agriculture...." *Pacific Trading Company,* 547 F.2d  at 371. The same is true under the PPIA.[3]

Hormel predicates its claim under the PPIA on 21 U.S.C. § 458(a),  *see* Complaint ¶¶ 8, 47, which, analogous to § 610 of the FMIA, states that "[n]o person shall . . . (3) do, with respect to any [poultry products] any act [in commerce] which is intended to cause or has the effect of causing such products to be adulterated or misbranded."  Yet, like § 610, § 458 includes no language allowing a private party to bring suit for an alleged violation of its terms.  While § 457(d) allows the Secretary to prohibit the use of false or misleading labeling on poultry products, nothing in § 457 allows a private party to bring suit for such relief.  Section 461(a) provides that it shall be a criminal offense to violate the PPIA's prohibitions and § 467b(a)(4) authorizes proceedings "at the suit of and in the name of the United States" to seize and condemn poultry products sold, transported or distributed in violation of the Act's misbranding provisions.

_____

[3] Because the language and purpose of the FMIA and PPIA are extremely similar, if not identical, the two statutes should be interpreted to be consistent with each other since Congress is presumed to use the same terms consistently in different statutes. *See Smith v. City of Jackson, Miss.,* 544 U.S. 228, 233 (2005) ("when Congress uses the same language in two statutes having similar purposes . . .  it is appropriate to presume that Congress intended that text to have the same meaning in both statutes").  Thus, these FMIA cases should be applied to the PPIA as well.

But neither statute provides for a private right of action either to enforce the PPIA's terms or to seek relief for a violation.

No language in the FMIA or the PPIA suggests even remotely that either statute provides for a private right of action to enforce its provisions. Since plaintiff does not have a private cause of action under the FMIA or the PPIA, count one of the Complaint must be dismissed.

Count one must also be dismissed because even if § 610 of the FMIA, or § 458 of the PPIA, created private rights of action for violating their terms, no such action would lie *against the Secretary.* Section 610 states that "[n]o person, firm, or corporation" shall commit any act causing meat or meat food products to be misbranded. Section 458 states that "[n]o person" shall commit any act causing poultry products to be misbranded. Neither statute can be taken to include the government, because, as the Supreme Court has repeatedly held, "the word 'person' in a statute" – the Secretary is plainly not a firm or corporation – "does not include a sovereign government absent affirmative evidence of such inclusory intent." *Al Fayed v. CIA*, 229 F.3d 272, 274 (D.C. Cir. 2000). No evidence of such intent can be found in either the FMIA or the PPIA. To the contrary, both statutes consistently distinguish between persons, firms, and corporations subject to the statutes' prohibitions, and the Secretary as the official charged with enforcing these prohibitions. *See id.*, §§ 457, 607. For this reason as well, count one fails to state a viable claim for relief.

III.   **PLAINTIFF'S CLAIMS UNDER THE APA MUST BE DISMISSED FOR LACK OF JURISDICTION BECAUSE THE DECISION AS TO WHETHER TO RESCIND APPROVAL OF THE LABELS IN QUESTION IS COMMITTED TO AGENCY DISCRETION.**

Plaintiff also seeks review of the Secretary's failure to rescind approval of its

competitors' all "natural" labels under the APA, in its second and third claims for relief.

Complaint   ¶¶ 49-52.  These claims must be dismissed for lack of jurisdiction, however, because

while the FMIA and the PPIA provide for enforcement of their mislabeling provisions by

authorizing the Secretary to prohibit the use of any false or misleading label on a meat or poultry

product, 21 U.S.C. §§ 457(d), 607(e), the decision to take such action or not is committed to the

Secretary's discretion by law.

Section 10 of the APA, codified at 5 U.S.C. §§ 701-706 "embod[ies] a basic presumption

of judicial review," but, under § 701(a)(2), agency action is not subject to review to the extent it

"is committed to agency discretion by law."  *Lincoln v. Vogel,* 508 U.S. 182, 190-191 (1993);

*Heckler v. Chaney*, 470 U.S. 821,828 (1985) ("before any review at all may be had [under the

APA], a party must first clear the hurdle of § 701(a)");  *Steenholdt v. FAA,* 314 F.3d 633, 638

(D.C. Cir. 2003); *Drake v. FAA,* 291 F.3d 59, 70 (D.C. Cir. 2002).  If a challenged decision is

committed to agency discretion by law, then a court has "no jurisdiction to review the substance

of the [agency's] decision."  *Steenholdt,* 314 F.3d at 634; *Baltimore Gas & Elec. Co. v. FERC,*

252 F.3d 456, 458 (D.C. Cir. 2001).

As held in *Chaney,* "an agency's decision not to prosecute or enforce [statutory

provisions] whether through civil or criminal process,  is a decision generally committed to an

agency's absolute discretion,"  470 U.S. at 831, because a decision whether to take enforcement

action "often involves a complicated balancing of a number of factors which are peculiarly

within [the agency's] expertise," *id.,* and consequently, "a court would have no meaningful

standard against which to judge the agency's exercise of discretion' in deciding how to enforce

the statutory provisions." *Ass'n of Irritated Residents v. EPA,* 494 F.3d 1027, 1030 (D.C. Cir.

2007)(*quoting Chaney,* 470 U.S. at 830); *Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d 166, 171 (D.D.C. 2000).

*Chaney* observed further that a decision whether to take enforcement action "is only presumptively unreviewable," 470 U.S. at 832, and the presumption may be rebutted if in the substantive statute Congress "has indicated an intent to circumscribe the agency's discretion, and has provided meaningful standards for defining the limits of that discretion." *Id.* at 832-833, 834; *see Drake,* 291 F.3d at 71 ("we may review the [agency's enforcement decision] only if the operative statute provides clear guidelines by which to do so."); *see also Irritated Residents,* 494 F.3d at 1033 (citing *Chaney* for same proposition).

Here, under the FMIA and the PPIA, the Secretary has total discretion as to whether and when to rescind agency approval of labels applied to meat and poultry products.  The FMIA states that if the Secretary has reason to believe that the labeling on any meat or meat food product is false or misleading, he "*may* direct that the use of such false labeling "be withheld unless . . . modified in such manner as he may  prescribe."  21 U.S.C. § 607(e)(emphasis added). Similarly, the PPIA states that if the Secretary has reason to believe that the labeling on any poultry product is false or misleading, then "he *may* direct" the use of such false labeling "be withheld unless modified in such manner as he may prescribe" 21 U.S.C. § 457(d) (emphasis added).

Like the statute at issue in *Chaney,* which "authorized" the Secretary of Health and Human Services to initiate enforcement action for violations of its prohibitions, the FMIA and PPIA are "framed in the permissive."  470 U.S. at 855.  They set no "substantive priorities . . . discriminate among issues or causes [the Secretary should] pursue," *id.* at 833, or otherwise

21

"indicat[e] . . . when enforcement action should be taken," or when "one particular enforcement strategy [should] be chosen over another." *Irritated Citizens,* 494 F.3d at 1033.   As in *Irritated Citizens,* 494 F.3d at 1032-33, and *Baltimore Gas*, 252 F.3d at 461, the statutes here simply say, without more, that the Secretary "may" take enforcement action if he has reason to believe it is warranted, and, that the being the case, the decision whether to do so is committed to his discretion by law.   Consequently, counts two and three of the Complaint must be dismissed for lack of subject matter jurisdiction.  *Steenholdt,* 314 F.3d at 634; *Baltimore Gas,* 252 F.3d at 458.[4]

    Even if the decision whether to rescind approval for labels used on meat or poultry products were not a matter committed to the Secretary's unreviewable discretion, counts two and three of the Complaint would still have to be dismissed because only action that is legally *required* may be compelled under the APA.   Under circumstances where judicial review is available, the APA provides a cause of action to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).   The Supreme Court explained, however, in *Norton v. So. Utah Wilderness Alliance,* 542 U.S. 55, 63 (2004) "that the only agency action that can be compelled under the APA is action legally *required."   See also Biovail Corp. v. FDA,* 448 F. Supp. 2d 154, 161, 162-63 (D.D.C. 2006).   Here, if the Secretary has reason to believe that the labeling for a meat or poultry product is false or misleading, he is not legally required to forbid

---

    [4]  The D.C. Circuit has noted that "judicially manageable standards" making it possible to review an agency's exercise of its enforcement discretion "may be found in formal and informal policy statements and regulations as well as in statutes." Steenholdt, 314 F.3d at 638 (internal quotation marks and citation omitted). As noted above, however, USDA regulations, like the FMIA and the PPIA, merely state that FSIS "may rescind . . . approval of false or misleading . . . labels" for meat or poultry products, 9 C.F.R. § 500.8 (emphasis added), without providing any standards against which to judge a decision to exercise that authority or not.

its use. The FMIA and the PPIA both state that he "may" do so, not that he "must" or "shall" do

so. 21 U.S.C. §§ 457(d), 607(e). Accordingly, plaintiff has no cause of action under the APA to

compel the Secretary to rescind approval for its competitors' labels.

**IV.      THE COURT SHOULD ALSO DISMISS COUNTS TWO
           AND THREE BECAUSE PLAINTIFF HAS NOT
           CHALLENGED A "FINAL AGENCY ACTION" WITHIN
           THE MEANING OF THE APA.**

Plaintiff's APA claims should also be dismissed because plaintiff has not challenged a

"final agency action" within the meaning of the APA.  5 U.S.C. § 704. The APA defines

"agency action" as "the whole or a part of an agency rule, order, license, sanction, relief or the

equivalent or denial thereof . . ." 5 U.S.C. § 551(13). Agency action is generally "final" and

reviewable when it marks the consummation of the agency's decision making process and either

determines "rights or obligations" or results in "legal consequences." *Center for Auto Safety v.

National Highway Traffic Safety Administration,* 452 F.3d 798, 807 (D.C. Cir. 2006) *quoting

Bennett v. Spear,* 520 U.S. 154, 178 (1997). Thus, if an agency's action is not "final," plaintiff

does not have a cause of action pursuant to the APA to challenge that action. *Reliable Automatic

Sprinkler Co. v. Consumer Product Safety Comm'n,* 324 F.3d 726, 731 (D.C. Cir. 2003) ("If

there was no final agency action here, there is no doubt that appellant would lack a cause of

action under the APA").

Plaintiff argues that the USDA's letter to Congressman Peterson, dated July 31, 2007,

constitutes final agency action that the Court may review under the APA (Complaint ¶¶ 41-44).

However, this letter does not represent the consummation of the agency's decision making

process. *Center for Auto Safety,* 452 F.3d at 807. Although plaintiff alleges that defendant has

already decided not to rescind the "natural" labels for the twenty-four companies at issue

(Complaint ¶ 43), the fact of the matter is that defendant has not come to any such conclusion.

FSIS has written to all twenty-four companies with products containing lactates for which FSIS has approved "natural" labels, and required them to show, by means of chemical analysis, that sodium lactate is not having a preservative effect on these products.  To date, *four* companies have responded with data indicating that lactates may not have a preservative effect on their products.  Derfler Decla. ¶ 30.  In light of these data, and the divergent comments USDA has received on the proper meaning of the "natural" claim, whether USDA ultimately rescinds approval for any "natural" label based on the presence of sodium lactate is a decision that simply has not yet been made (*Id.* ¶¶ 38-40).

Indeed, the agency has clearly stated that it intends to complete the rule making process concerning products bearing the "natural" label prior to making any final decision on rescission of the label approvals at issue (*Id.*  ¶¶ 38-40).   In response to FSIS' Notice of Petition and Public Meeting, as well as a Request for Comments issued on December 5, 2006, the agency received at times conflicting input from industry, trade associations, and law firms representing industry, consumers, and consumer advocacy organizations  as to the meaning of "natural" when used on labels for processed meat and poultry products.  (*Id.*  ¶ 36).   Consequently, the agency intends to file an Advanced Notice of Proposed Rule Making ("ANPR"), on this subject in early 2008.  After it has received responses to the ANPR, the agency plans to draft and publish a proposed rule to define the term "natural" for purposes of labeling meat and poultry products.  (*Id.*  ¶ 38).  Furthermore, along with the ANPR, the agency is preparing to publish an update to the Policy Book entry  on "natural" claims to minimize uncertainty as to the circumstances in which the labels of meat and poultry products that bear "natural" claims will likely be approved.  (*Id.*  ¶ 40).

Since these steps have not yet been taken, there is clearly not even a proposed rule at this time,

much less a final one.  Consequently, counts two and three must be dismissed since USDA's

actions are not reviewable by the Court until there is final agency action,  *Bennett v. Spear,* 520

U.S. at 178.

**V.        ALTERNATIVELY, SUMMARY JUDGMENT SHOULD BE
          GRANTED IN FAVOR OF DEFENDANT ON COUNT TWO
          BECAUSE, IN KEEPING WITH DEFENDANT'S LONG
          STANDING POLICY, IT ACTED REASONABLY IN LIGHT
          OF EVIDENCE THAT SODIUM LACTATE AT TWO
          PERCENT OR LESS DOES NOT EXTEND SHELF LIFE.**

This Court should dismiss counts two and three for the reasons described above.

Alternatively, if the Court does not dismiss this action, summary judgment should be granted in

favor of defendant on count two because defendant has not acted arbitrarily or capriciously.  "A

party seeking to have a court declare an agency action to be arbitrary and capricious carries a

heavy burden indeed." *Wis. Valley Improvement Co. v. FERC,* 236 F.3d 738, 745 (D.C. Cir.

2001).  The arbitrary and capricious standard of review is a narrow and deferential standard that

presumes the validity of agency action.  *Worldcom, Inc. v. FCC,* 238 F.3d 449, 457 (D.C. Cir.

2001).  *See also March v. Oregon Natural Resources Council,* 490 U.S. 360, 378 (1989).

When reviewing agency action under this deferential standard, a court "[does] not

substitute [its] judgment for that of the agency, but . . . examines only whether there has been a

clear error of judgment, whether the agency's policy choice . . . is supported by substantial

evidence, and whether there is a rational connection between the facts and the choice made." *Wis.*

*Valley Improvement Co.,* 236 F.3d at 745 (*citing Citizens to Preserve Overton Park, Inc. v.*

*Volpe,* 401 U.S. 402, 416 (1971)) ( internal quotation marks omitted).

The only direct evidence before the agency at this time, from the four companies that

25

have responded to the agency's requests for laboratory-certified scientific analysis, supports the claim that sodium lactate does *not* appear to extend shelf life *on the particular products in question* at two percent or less of product formulation.   AR 790-874; Derfler Decla. ¶¶ 30-32. Since the sodium lactate in these products has not been shown to extend shelf life, it has not been shown to have a preservative effect on the products in question.   21 C.F.R. 101.22. Consequently, at least based on the laboratory-certified scientific analyses before the agency at this time,  these products do not appear to be misbranded pursuant to the FMIA, 21 U.S.C. § 610(d), or the PPIA, 21 U.S.C. § 458(a)(2).

Further, the result suggested by the four  laboratory-certified scientific analyses submitted to the agency (that sodium lactate does not have a preservative effect at two percent or less of product formulation) is in keeping with the agency's long standing practice, at least since 1993, to permit the use of sodium or potassium lactate in products bearing the "natural" label claim, at levels of two percent or less of product formulation.  Derfler Decla. ¶ 15.  That this evidence is in keeping with the agency's policy is further confirmation that the agency has not acted arbitrarily or capriciously here.

By way of contrast, the only evidence offered by plaintiff that sodium lactate may act as a chemical preservative -- and does not therefore meet the standards for a "natural" product -- are the patent claims that sodium lactate, potassium lactate and calcium lactate "inhibit the growth of microorganisms in *poultry and fish*" of an unspecified nature (Complaint ¶ 36) (emphasis added), and a claim from a manufacturer, Purac, that sodium lactate *may* increase shelf life at levels below two percent.   *Id.*  Plaintiff has offered no evidence whatsoever of the effect, if any, of sodium lactate on the actual processed meat and poultry products in question, concerning whose

"natural" label claims this suit was brought.  Most importantly, plaintiff has not shown how

defendant acted arbitrarily or capriciously by declining to abandon its longstanding policy

regarding products containing lactates at two percent or less in light of evidence it received that

lactates at that level have only a flavoring effect and not a preservative effect.  *See Center for*

*Science in the Public Interest v. Dep't of the Treasury,* 797 F.2d 997, 1000-1001 (D.C. Cir. 1986)

(holding that record supported agency's action even if  some contrary evidence supported the

opposite conclusion).  Consequently, based on the evidence before the agency, plaintiff has not

shown that the agency acted in an arbitrary or capricious manner.  Derfler Decla. ¶ 15.  Hence,

the Court should grant summary judgment in favor of defendant.

**VI.        THE COURT SHOULD GRANT SUMMARY JUDGMENT
             IN FAVOR OF DEFENDANT AS TO COUNT THREE
             BECAUSE THE AGENCY'S LETTER TO CONGRESSMAN
             PETERSON DOES NOT CONSTITUTE AGENCY RULE
             MAKING.**

Plaintiff claims in count three of the Complaint that defendant violated the APA by

granting "a de facto exemption of general applicability from the misbranding provisions of the

FMIA and the PPIA" for the labels in question.  Complaint ¶ 52.  However,  defendant is also

entitled to judgment as a matter of law on count three because USDA has not yet taken *any*

*action* that could be described here as promulgating a final rule, with or without notice and

comment.

Pursuant to the APA, "'rule making' means agency process for formulating, amending, or

repealing a rule."  5 U.S.C. § 551(5).  The APA defines a "rule" as "the whole or a part of an

agency statement of general or particular applicability and future effect designed to implement,

interpret, or prescribe law or policy" or "describing the organization, procedure, or practice

requirements of an agency . . ." 5 U.S.C. § 551(4). Here, the letter to the Congressman has not

in any way set forth "a de facto exemption of general applicability from the misbranding

provisions of the FMIA and the PPIA" for the labels in question. Neither has it described what

action the agency will take in the future with regard to these labels. Complaint ¶ 52. Rather, all

the agency has done is to state its current intention *not to take action* to rescind approval for

"natural" labels of Hormel's competitors *for the time being,* pending consideration of additional

public comment and rulemaking on the use of "natural" claims for meat and poultry labels.

Hence the agency has not issued a rule here. AR 779; *See Goodman v. FCC,* 182 F.3d 987, 994

(D.C. Cir. 1999) (explaining that a rule is defined in the APA as an "agency statement of . . .

future effect"). Hormel's notice-and-comment claim must be rejected because the agency did not

promulgate a rule by simply stating that it will defer a decision on rescission of approval for the

"natural" label claims in question until after it has sought and received further focused comments

on the issue and completed the rule making process.

CONCLUSION

For the foregoing reasons, the Complaint must be dismissed. In the alternative, if the

Court does not dismiss the Complaint, the Court should grant summary judgment in favor of

defendant.

Dated: January 22, 2008

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

FELIX V. BAXTER
Director, Federal Programs Branch
Civil Division

28

 s/ William B. Jaffe (Electronic Filing)
JAMES J. GILLIGAN
Assistant Director
WILLIAM B. JAFFE
Trial Attorney

United States Department of Justice
Civil Division, Federal Programs Branch
<u>Mailing Address</u>
P.O. Box 883
Washington, DC  20044
<u>Delivery Address</u>
20 Massachusetts Avenue, NW, Room 6110
Washington, DC  20530
(202) 353-7633
Fax: (202) 616-8460
Email: <u>william.jaffe@usdoj.gov</u>

Attorneys for Defendant

29

## TABLE OF CONTENTS

**PAGE**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY FRAMEWORK. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    The Federal Meat Inspection Act and the Poultry Products
    Inspection Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    USDA Regulations Concerning False or Misleading Labeling of
    Meat and Poultry Products. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    FSIS Policy on "Natural" Labeling of Meat and Poultry Products. . . . . . . . . . . . . . . . 7

    August 2005 Policy Book Modification Concerning"Natural" Label Claims. . . . . . . . . . 8

    Hormel's October 9, 2006 Petition to USDA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    FSIS Response to the Hormel Petition and Requests to Rescind Labels. . . . . . . . . . . . 10

    The Complaint. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

I.      STANDARD OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

II.    PLAINTIFF HAS FAILED TO STATE A CAUSE OF ACTION UNDER
      THE FMIA OR THE PPIA SINCE NEITHER STATUTE CREATES A
      PRIVATE CAUSE OF ACTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.   PLAINTIFF'S CLAIMS UNDER THE APA MUST BE DISMISSED
      FOR LACK OF JURISDICTION BECAUSE THE DECISION AS TO
      WHETHER TO RESCIND APPROVAL OF THE LABELS IN
      QUESTION IS COMMITTED TO AGENCY DISCRETION. . . . . . . . . . . . . . . . . . . . 19

IV.   THE COURT SHOULD ALSO DISMISS COUNTS TWO AND
      THREE BECAUSE PLAINTIFF HAS NOT CHALLENGED A
      "FINAL AGENCY ACTION" WITHIN THE MEANING OF THE APA. . . . . . . . . . . 23

V.    ALTERNATIVELY, SUMMARY JUDGMENT SHOULD BE
      GRANTED IN FAVOR OF DEFENDANT ON COUNT TWO
      BECAUSE, IN KEEPING WITH DEFENDANT'S LONG STANDING
      POLICY, IT ACTED REASONABLY IN LIGHT OF EVIDENCE THAT
      SODIUM LACTATE AT TWO PERCENT OR LESS DOES NOT
      EXTEND SHELF LIFE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VI.   THE COURT SHOULD GRANT SUMMARY JUDGMENT IN
      FAVOR OF DEFENDANT AS TO COUNT THREE BECAUSE
      THE AGENCY'S LETTER TO CONGRESSMAN PETERSON
      DOES NOT CONSTITUTE AGENCY RULE MAKING. . . . . . . . . . . . . . . . . . . . . . . 27

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

# TABLE OF AUTHORITIES

**CASES**                                                                                                      **PAGE(S)**

*Aktieselskabet AF 21 v. Fame Jeans, Inc.*, 511 F. Supp. 2d 1 (D.D.C. 2007). . . . . . . . . . . . . . . .  15

*Al Fayed v. CIA*, 229 F.3d 272 (D.C. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18, 19

*Alliance for Bio-Integrity v. Shalala*, 116 F. Supp. 2d  166 (D.D.C. 2000). . . . . . . . . . . . . . . .  20

*American Bioscience, Inc. v. Thompson*, 269 F.3d 1077 (D.C. Cir. 2001). . . . . . . . . . . . . . . .  16

*Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027 (D.C. Cir. 2007). . . . . . . . . . . . . .  20, 21, 22

*Baltimore Gas & Elec. Co. v. FERC*, 252 F.3d 456 (D.C. Cir. 2001). . . . . . . . . . . . . . . .  20, 22

*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

*Bennett v. Spear*, 520 U.S. at 178. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23, 25

*Biovail Corp. v. FDA*, 448 F. Supp. 2d 154 (D.D.C. 2006).. . . . . . . . . . . . . . . . . . . . . . . . . . .  22

*Center for Auto Safety v. National Highway Traffic Safety Administration*,
    452 F.3d 798 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Center for Science in the Public Interest v. Dep't of the Treasury*,
    797 F.2d 997 (D.C. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

*Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402 (1971). . . . . . . . . . . . . . . . . .  *25*

*Commercial Drapery Contractors v. U.S.*, 133 F.3d 1 (D.C. Cir. 1998).. . . . . . . . . . . . . . . . .  16

*Drake v. FAA*, 291 F.3d 59 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20, 21

*EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621 (D.C. Cir. 1997). . . . . . . . . . . . . . .  16

*Gonzaga v. Doe*, 536 U.S. 273 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*Goodman v. FCC*, 182 F.3d 987 (D.C. Cir. 1999).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  28

*Heckler v. Chaney*, 470 U.S. 821 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20, 21

*Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  16

*Lincoln v. Vogel*, 508 U.S. 182 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

*March v. Oregon Natural Resources Council*, 490 U.S. 360 (1989)..................... 25

*Mario's Butcher Shop and Food Center, Inc. v. Armour and Company*,
      574 F.Supp. 653 (N.D. Illinois 1983). ....................................... 18

*Norton v. So. Utah Wilderness Alliance*, 542 U.S. 55 (2004). ......................... 22

*Pacific Trading Company  v. Wilson and Company, Inc.*, 547 F.2d 367
      (7th Cir. 1976)        ............................................... 17, 18

*Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n*,
      324 F.3d 726 (D.C. Cir. 2003)............................................. 23

*Rogers v. Johnson-Norman*, 466 F. Supp. 2d 162 (D.D.C. 2006)....................... 16

*Shirk v. Barton*, No. 07-0356, 2007 WL 2570426 (D.D.C. Sept. 6, 2007). ............ 15, 16

*Smith v. City of Jackson, Miss.*, 544 U.S. 228 (2005). ................................ 18

*Steenholdt v. FAA*, 314 F.3d 633 (D.C. Cir. 2003). .............................. 20, 22

*Touche Ross v. Redington*, 442 U.S. 560 (1979)................................... 17

*U.S. ex rel. Bettis v. Odebrecht Contractors*, 393 F.3d 1321 (D.C. Cir. 2005)............. 16

*Wis. Valley Improvement Co. v. FERC*, 236 F.3d 738 (D.C. Cir. 2001). ................. 25

*Worldcom, Inc. v. FCC*, 238 F.3d 449 (D.C. Cir. 2001). .............................. 25

## STATUTES

5 U.S.C. § 551(13)................................................... 23, 27

5 U.S.C. § 551, *et seq.*................................................... 2

5 U.S.C. §§ 701-706. ................................................ 20

5 U.S.C. § 704 ..................................................... 23

5 U.S.C. § 706(1)................................................... 22

21 U.S.C. § 453(h)................................................... 1, 5

21 U.S.C. §§ 457(d), 607(e)......................................... <u>passim</u>

21 U.S.C. § 458(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

21 U.S.C. § 458(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

21 U.S.C. § 458(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

21 U.S.C. § 601(n). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5

21 U.S.C. § 607(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

21 U.S.C. § 610. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19

21 U.S.C. § 610(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 26

21 U.S.C. § 673(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## RULES AND REGULATIONS

9 C.F.R. §§ 300.1, 300.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

9 C.F.R. § 301.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

9 C.F.R. § 317.2(j)(12). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

9 C.F.R. § 317.4. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

9 C.F.R. § 317.8(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

9 C.F.R. § 381.120. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

9 C.F.R. § 381.129(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

9 C.F.R. § 381.132. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

9 C.F.R. §500.8. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 22

21 C.F.R. 101.22(a)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 8, 26

71 Fed. Reg. 70503 (Dec. 5, 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Fed. R. Civ. P. 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

## CERTIFICATE OF SERVICE

I hereby certify that on January 22, 2008, a true and correct copy of the foregoing Motion

for Dismissal/Summary Judgment was served via ECF upon counsel of record at the address

listed below:

John F. Cooney, Esq.
Venable, LLP
575 7th Street, NW
Washington, DC 20004
202-344-4812
jfcooney@venable.com

Kirsten Friedel Roddy, Esq
Hogan & Hartson, LLP
555 13th Street, NW
Washington, DC 20004-1109
202-637-5600
kfroddy@hhlaw.com

Dated: January 22, 2008

_____          s/ William B. Jaffe
                                 WILLIAM B. JAFFE

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HORMEL FOODS CORPORATION<br>1 Hormel Place<br>Austin, Minnesota 55912, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 1:07-cv-1724 |
| v. | ) ) | |
| UNITED STATES DEPARTMENT<br>OF AGRICULTURE, | ) ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF PHILIP S. DERFLER

I, Philip S. Derfler, declare the following:

1.    I am the Assistant Administrator, Office of Policy, Program, and Employee Development, of the United States Department of Agriculture ("USDA"), Food Safety and Inspection Service ("FSIS"). I have held this position since 1999. I make the following representations based upon my knowledge, upon facts made known to me in my capacity as an official at FSIS, and upon my review of relevant files at FSIS.

2.    In my present position, I am responsible for overseeing all of the work performed by FSIS' Office of Policy, Program, and Employee Development ("the Office"). The Office is charged with developing FSIS regulations, FSIS directives and notices, which provide guidance to FSIS inspection personnel.

1

3.      In addition, the Office develops compliance guides to advise industry and consumers how to comply with FSIS requirements. The Office also responds to regulatory questions from FSIS personnel, the industry, and others.

4.      FSIS is the public health regulatory agency within USDA that is responsible for ensuring that the nation's commercial supply of meat, poultry, and egg products is safe, wholesome, and accurately labeled and packaged.

5.      Among the various federal statutes that USDA, FSIS, is charged with implementing and enforcing are the Federal Meat Inspection Act ("FMIA") and the Poultry Products Inspection Act ("PPIA"). 21 U.S.C. 621 and 451. FSIS is delegated authority to implement and administer the FMIA and the PPIA. 9 C.F.R. §§ 300.1, 300.2.

6.      Pursuant to its authority under the FMIA and PPIA, FSIS has established a framework of regulations and policies within which to judge whether labels of meat and poultry products are truthful and not misleading. Title 9 Part 300 *et seq.* of the Code of Federal Regulations.

## FSIS Policy on Labeling

7.      Manufacturers must submit all labels with claims and special statements for evaluation and approval to the FSIS Labeling and Program Delivery Division (LPDD)(formally known as the Labeling and Consumer Protection Staff) before the products can be offered to consumers. The LPDD evaluation process includes reviews by at least four members of the division, including chemists, certified nutritionists, food technologists and program analysts.

2

8.    The LPDD provides guidance to industry and the public on how to draft labels that will not mislead the consumer in the form of its Standards and Labeling Policy Book ("Policy Book"). See

http://www.fsis.usda.gov/OPPDE/larc/Policies/PolicyBook.pdf.

9.    The Policy Book is derived from the Standards and Labeling Policy Memoranda compiled as FSIS Directive 7220.1. The Policy Book consolidates labeling policies and standards used in individual Standards and Labeling memoranda. The Policy Book sets out factors FSIS considers in reaching its labeling determinations. The LPDD makes the final decisions on label applications on a case-by-case basis.

## 1982 Policy Memorandum 055

10.    FSIS published Policy Memorandum 055, dated November 22, 1982, (AR 0002), to guide manufacturers in the development of labeling that FSIS was likely to determine to be truthful and not misleading with regard to the labeling claim that a meat or poultry product contains "natural" or "all natural" ingredients. Policy Memo 055 stated that a meat or poultry product can be labeled "natural" if the applicant for such labeling demonstrated:

> (1) The product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative [emphasis added] (as defined in 21 C.F.R. 101.22), or any other artificial or synthetic ingredient; and
>
> (2) The product and its ingredients are not more than minimally processed. Minimally processed may include: (a) Those traditional processes used to make food edible or to preserve it to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and

3

> fermenting, or (b) those physical
> processes that do not fundamentally
> alter the raw product or that only
> separate a whole intact food into
> component parts, e.g., grinding meat,
> separating eggs into albumen and yolk,
> and pressing fruits to produce juices.

11.    FSIS cites the Food and Drug Administration, Specific Food Labeling
Requirements, definition of "chemical preservative" in memorandum 055.  21 C.F.R.
101.22.  The regulation defines a chemical preservative as: "any chemical that, when
added to food, tends to prevent or retard deterioration thereof, but does not include
common salt, sugars, vinegars, spices, or oils extracted from spices . . . ."  21 C.F.R.
101.22(a)(5) (The same definition can be found in the FSIS regulations at 9 C.F.R.
301.2).

12.    The memorandum also stated that manufacturers who wished to label
their products as "natural" would be expected to include a statement that explained
what was meant by the term "natural," e.g. that the product was "natural" because it
contains no artificial ingredients and was only minimally processed.  (AR 0003).

13.    The policy memorandum also discussed the fact that a product that
contained an ingredient that had been "more than minimally processed" would not
necessarily preclude the product from being labeled as "natural."  The policy
memorandum explained that exceptions for products with such ingredients would be
made on a case-by-case basis.  (AR 0002).

14.    Since 1982, FSIS has modified the policy described in Policy
Memorandum 055 on occasion to make it consistent with prevailing policies, to reflect

4

case-by-case decisions made by the Agency, and to update references to regulations. These modifications appear in the corresponding pages of the Policy Book.

## August 2005 Food Standards and Labeling Policy Book Modification Concerning the Use of the "Natural"

15.    Since 1993, the Food and Drug Administration has considered sodium and potassium lactate to be acceptable ingredients in human food for "natural" label claims when used as flavor enhancers and flavoring agents in the amount of two percent or less of the total product formulation.  See 58 Federal Register 4067 (Jan. 13, 1993).  In deciding to add sodium and potassium lactate as acceptable ingredients in meat and poultry products, FSIS noted that these ingredients were generally recognized as safe (GRAS) by the FDA in 1987.  See 21 C.F.R. 184.1639.

16.    In 2000 and 2001 FSIS received several requests to approve the labeling as "natural" for several products containing sodium or potassium lactate as an ingredient at two percent or less.  FSIS made the decision to allow the "natural" labeling of products containing two percent or less of sodium lactate, because sodium lactate is derived from a natural source, corn and beets,  and the two percent  level sodium lactate was understood to only enhance flavor and not to act as a chemical preservative as proscribed by Policy Memorandum 055.  FSIS formed this opinion after reviewing data submitted by Shenandoah Products, Inc. for a raw poultry product. 58 FR 4067. FSIS only recognized an anti-microbial effect for sodium and potassium lactate at 4.8 percent.  See 9 C.F.R. 424.21.

17.    Further support for FSIS' decision to allow sodium and potassium lactate as a flavoring agent in natural products can be found in USDA's Agricultural Marketing

5

Service National Organic Program (NOP)regulations and a letter it issued to Applegate Farms. The NOP develops national standards for organically produced agricultural products to assure consumers that agricultural products marketed as organic meet consistent uniform standards. In 2005, a reference to the NOP's Final Report, found at 7 C.F.R. 205.601 – 205.606, was placed in the Policy Book's entry for Natural Products. The purpose for this entry was to provide manufacturers with a list of acceptable ingredients and to provide a source to support the claims that the ingredients they use in natural products are not artificial or synthetic and do not act to preserve products. This entry was later removed because it confused users of the Policy Book who thought that any ingredient that was considered "organic" could be used in a natural product, which was not the case.

18. On January 5, 2004, Applegate Farms, a meat product manufacturer, requested that sodium and potassium lactate be added to NOP's list of allowed substances. In a letter dated January 22, 2004, the NOP stated that sodium and potassium lactates were acceptable ingredients in organic products because they were derived from substances that were already present on the National List of acceptable ingredients for organic handling. This was significant because the criteria that the NOP uses in determining whether a product is acceptable for its National List is in some respects similar to the criteria used by FSIS in determining whether a product would qualify as natural. For example, the NOP looks at whether products considered for the National List are derived from a natural source. (AR 0873) .

6

19.    In August 2005, FSIS revised Policy Memorandum 055 originally published in 1982, and updated the Food Standards and Labeling Policy Book, to take into account the Agency's decision to approve the "natural" label of products containing, among other things, sodium lactate (from a corn or beet source) when the amount of sodium lactate did not exceed two percent of the product's formulation. (AR 0008). Between August 2005 and December 5, 2006, FSIS approved fourteen "natural" labels for products containing sodium or potassium lactate. (AR 2000-2060).

**Hormel's October 2006 Petition for Rulemaking**

20.    On October 9, 2006, Hormel Foods Corporation ("Hormel") submitted a petition to FSIS requesting that FSIS initiate the rule making process to amend the labeling regulations for meat and poultry products in order to codify the definition of "natural" for meat and poultry products. The petition requests that, consistent with FSIS' longstanding policy on "natural" label claims as stated in FSIS Policy Memorandum 055, a meat or poultry product should not be labeled as "natural" unless (1) it does not contain artificial flavorings, artificial coloring ingredients, other artificial or synthetic ingredients, or chemical preservatives; and (2) it is not more than minimally processed. The petition further states that exceptions for specific chemical preservatives and synthetic ingredients should not be allowed. (AR 0014).

21.    Hormel specifically took issue with the approval of "natural" labels for products that include sodium lactate. It was Hormel's contention that sodium lactate served as a chemical preservative, on the ground that it assertedly extends the shelf-life of products in which sodium lactate is an ingredient. (AR 0023).

7

22.    As evidence, for the proposition that sodium lactate has a preservative effect in food, even at two percent or less of formulation, Hormel offered marketing literature from Purac, a maker of sodium lactate, showing that sodium lactate may extend shelf life at levels as low as one percent. (AR 0024).  Hormel also referenced patents secured by the Oscar Mayer (Kraft) company which claim anti-microbial  (that is, Hormel asserted, preservative) effects for sodium lactate at levels as low as one percent. *Id.*

23.    On October 10, 2006, Hormel requested that FSIS rescind the "natural" claim labels that had been previously granted to certain products because Hormel contended that  lactates had been added to those products as a preservative and that therefore, their "natural" label claims were not accurate.  (AR 55-64).

24.    On November 7, 2006, Hormel, through its counsel, sent a letter to the FSIS in further support of its October 9, 2006 petition.  This letter reiterated the arguments offered in the October 9, 2006 petition that sodium lactate should not be included in products labeled "natural" because sodium lactate has a preservative effect. Hormel again cited the same evidence for this proposition as before: the Oscar Mayer patents claiming that sodium lactate, even at two percent or less of formulation, extends shelf life, and the marketing literature for Purac, which also claims that sodium lactate extends shelf life.  (AR 0126).

**FSIS Response to the Hormel Petition**

25.    In response to the Hormel petition, and in order to respond to changing industry standards for processing and packing meat and poultry, FSIS took the following steps:

26.    First, FSIS removed the note to the August 2005 Policy Book update that approved sodium lactate as an ingredient in "natural" products.  (AR 0010).  Furthermore, FSIS stated, in the current version of its Policy Book, that it will continue to make determinations on any new applications for a natural label on a case-by case-basis.  (AR 11).  FSIS will approve "natural" labeling of products that include sodium or potassium lactate only if data indicate that the lactates contained in the products do not have a preservative effect.  *Id.*

27.    Second, in November, 2006, FSIS sent letters to twenty-four companies with approved meat and poultry labels bearing the claim "natural" for products containing lactates at levels of two percent or less.  The letters explained that FSIS will only approve "natural" label applications for products containing two percent or less of sodium or potassium lactate after the manufacturers provide scientific data proving that these products (1) exhibit the same microbiological characteristics (i.e. rate of spoilage) as products formulated without lactates; (2) have the same shelf-life as that of the same products formulated without lactates; and (3) have the same sell-by/use-by/freeze-by dates applied as the dates that would be applied to products without lactates.  (AR 0611-0640).

28.    Additionally, the letters directed the manufacturers to provide FSIS with data demonstrating that the use of sodium or potassium lactate in their products with

9

currently approved "natural" labels does not have a preservative effect. The companies were also informed that the agency may rescind labels where it is found that lactates at levels of two percent or less have a preservative effect. *Id.*

29.    On January 11, 2007, FSIS sent a second letter to the manufacturers which clarified the data FSIS required. This letter informed the manufacturers that FSIS only required data concerning shelf-life, and "use-by" dates of the products containing sodium lactate. (AR 0760-0776).

30.    Of the twenty-four manufacturers which were sent letters requesting data, four companies have provided results from tests analyzing the effects of sodium or potassium lactate in their products at levels of two percent or lower in accordance with 9 C.F.R. § 424.21. (AR 0792-0873).

31.    Each company performed microbiological analysis of products by comparing products with and without sodium lactate included as a flavoring agent. For example, one manufacturer provided test data showing that its product containing sodium lactate and the same product without sodium lactate had very similar microbial growth. The manufacturer conducted an eight week microbiological analysis in which all samples were stored in a controlled, isolated environment at 3.3 to 4.4 degrees Celsius and were tested weekly. The analysis included tests for aerobic plate count, yeast, mold, and lactic acid bacteria. The analysis indicated that: (1) both products exhibited very similar microbial growth patters; (2) neither product was found to have distinguishable signs of microbial degradation or distinct appearance or package integrity changes, which indicates that both products have the same shelf-life; and (3)

both products were shown to share the same specified and anticipated expiration date of 56 days. (AR 0847).

32.    All four manufacturers' data submitted to date indicate that comparison of two or more similar products with, and without, sodium lactate were observed to have very similar microbial and bacterial growth patterns, and identical shelf-lives while exposed to the same controlled conditions. (AR 0792-0873). In consideration of the evidence provided by the four companies that responded to FSIS' request, FSIS decided to postpone any decision on Hormel's request to rescind USDA approval of current "natural" labels for such products pending completion of the rulemaking process.

33.    Since December 2006, FSIS has approved one label for a product containing sodium lactate. FSIS approved the label, submitted by Pedersons Natural Farms (for the Maverick Ranch label) for an all natural smoked uncured bacon, on October 31, 2007. (AR 2057). FSIS approved the label after Pedersons Natural Farms submitted data proving that sodium lactate in their products did not extend shelf life or expiration date. (AR 0790).

34.    Finally, FSIS published a Notice of Petition and Public Meeting, as well as a Request for Comments on December 5, 2006. 71 Fed. Reg. 70503-70505 (Dec. 5, 2006). FSIS held a public meeting to discuss this issue on December 12, 2006. In addition, FSIS accepted comments until January 11, 2007. FSIS requested that the public hearing and the comments focus on the following topics:

11

1.    Is it reasonable to include as part of a definition of "natural" a stipulation that products can be no more than minimally processed to be eligible to bear the claim?

2.    Are there any accommodations necessary to allow for certain operations because food processing and packaging techniques for enhancing safety may disqualify a product as "natural?"

3.    What are the implications and conflicts that exist with regard to using current and new food processing methods and certain classes of ingredients, and the meaning of the claim "natural" on the labels of meat and poultry products?

4.    Are there available data from consumer studies about what the claim "natural" means on the labels of food products, including meat and poultry products?

5.    What do consumers think that the terms "minimal processing," "artificial and synthetic," and "preservatives" mean?

6.    Do food safety and consumer protection benefits of using what historically may have been considered more than minimal processing techniques and antimicrobial agents outweigh conflicts with the meaning of "natural?"

35.    FSIS received over 6,000 comments in response to the December 2005 Federal Register notice and the December 2006 public meeting.  Most of the comments were identical letters submitted electronically by individuals who objected to the use of flavoring, tenderizing, and seasoning solutions to enhance poultry products bearing the "natural" claim.  (*See* example at AR 2125).  In addition FSIS received comments from

industry, trade associations, and law firms representing industry, consumers, and consumer advocacy organizations concerning only meat products. (AR Ex. I, 0875-1998).

36.    The comments expressed widely divergent and sometimes conflicting views about what the claim "natural" as applied to meat and poultry products should mean. For example, Oregon State University Professor Daniel F. Farkas argued that "natural" products should be free of artificial flavors, colors, and preservatives, such as sodium lactate. (AR 1645). Kraft Foods, on the other hand, submitted a comment which argued that sodium lactate is a natural preservative and therefore is permissible in "natural" meat and poultry products. (AR 1770).

37.    The comments discussed subjects such as particular ingredients, processing methods, and animal production practices that individual commenters felt should or should not be permitted for meat or poultry products labeled as "natural." Rather than providing consensus for a regulation on "natural" claims that reflects a general understanding of what the claim means to the public, the comments submitted to FSIS indicate that there is no consensus on this issue.

38.    Because of the controversy and lack of public consensus on the use of the "natural" claim, FSIS is presently unprepared to issue a proposed rule (much less to issue a final rule), to establish a regulatory definition for the claim. Instead, the Agency has decided that it is more appropriate to issue an Advanced Notice of Proposed Rulemaking and Request for Comments (ANPR) in order to gather more specific information so that FSIS can make a more fully informed decision to ensure that the

13

term "natural," as used on the labels of meat and poultry products, is truthful and not misleading. The ANPR's purpose it to solicit additional comments, focussed by a defined set of alternatives that address the use of he "natural" claim. The Agency believes this process will clarify and resolve emerging issues surrounding the "natural" label. The ANPR will be published by early 2008.

39. After consideration of the comments received in response to the forthcoming notice, the agency's current plan is to draft and publish a proposed rule to define the term "natural" for purposes of labeling meat and poultry products.

40. Furthermore, along with the ANPR, the agency is preparing to publish an update to the policy guidance on "natural" claims to minimize uncertainty as to the circumstances in which the labels of meat and poultry products that bear "natural" claims will likely be approved.

41. In a letter dated October 29, 2007, Under Secretary of the Office of Food Safety, Richard A. Raymond, responded to a letter from Collin C. Peterson, Chairman of the Committee on Agriculture in the U.S. House of Representatives that requested information on actions taken by the USDA with regard to "natural" label claims on meat and poultry products containing sodium or potassium lactates. Dr. Raymond explained that USDA is taking the necessary time to carefully consider the issues, to decide upon the most appropriate course of action, and to develop a regulatory strategy. Dr. Raymond explained that the USDA intends to initiate rulemaking, and that, in the interim, labels are still being considered on a case-by-case basis. (AR 0783).

14

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 21, 2008, at Washington, D.C.

*[signature]*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

---

|  |  |  |
|---|---|---|
| HORMEL FOODS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:07-cv-1724 |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

---

**DEFENDANT'S STATEMENT OF MATERIAL FACTS AS TO WHICH
THERE IS NO GENUINE ISSUE IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Pursuant to LCvR 7(h) and 56.1, defendant, United States Department of Agriculture, submits this statement of material facts as to which there is no genuine issue in support of Defendant's Motion for Summary Judgment.

1.       Manufacturers must submit all labels for meat and poultry products with claims and special statements for evaluation and approval to the USDA Food Safety and Inspection Service's ("FSIS") Labeling and Program Delivery Division (LPDD)(formally known as the Labeling and Consumer Protection Staff) before the products can be offered to consumers.  The LPDD evaluation process includes reviews by at least four members of the division, including chemists, certified nutritionists, food technologists and program analysts. (Derfler Decl. ¶¶6,  7).

2.       The LPDD provides guidance to industry and the public on how to draft labels that will not mislead the consumer in the form of its  Standards and Labeling Policy Book ("Policy Book").  (Derfler Decl. ¶ 8).

1

3.     The Policy Book is derived from the Standards and Labeling Policy Memoranda compiled as FSIS Directive 7220.1.  The Policy Book consolidates labeling policies and standards used in individual Standards and Labeling memoranda.  The Policy Book sets out factors FSIS considers in reaching its labeling determinations.  The LPDD makes the final decisions on label applications on a case-by-case basis. (Derfler Decl. ¶ 9).

4.     FSIS published Policy Memorandum 055, dated November 22, 1982, (AR 0002), to guide manufacturers in the development of labeling that FSIS was likely to determine to be truthful and not misleading with regard to the labeling claim that a meat or poultry product contains "natural" or "all natural" ingredients.   Policy Memo 055 stated that a meat or poultry product can be labeled "natural" if the applicant for such labeling demonstrated:

> (1) The product does not contain any artificial flavor or flavoring, coloring ingredient, <u>or chemical preservative</u> [emphasis added] (as defined in 21 C.F.R. 101.22), or any other artificial or synthetic ingredient; and

> (2) The product and its ingredients are not more than minimally processed.  Minimally processed may include: (a) Those traditional processes used to make food edible or to preserve it to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes that do not fundamentally alter the raw product or that only separate a whole intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

(Derfler Decl. ¶ 10).

5.     The memorandum also stated that manufacturers who wished to label their products as "natural" would be expected to include a statement that explained what was meant by the term "natural," e.g. that the product was "natural" because it contains no artificial ingredients and was only minimally processed.  (Derfler Decl. ¶ 12; AR 0003).

6.    The policy memorandum also discussed the fact that a product that contained an ingredient that had been "more than minimally processed" would not necessarily preclude the product from being labeled as "natural." The policy memorandum explained that exceptions for products with such ingredients would be made on a case-by-case basis. (Derfler Decl. ¶ 13; AR 0002).

7.    Since 1982, FSIS has modified the policy described in Policy Memorandum 055 on occasion to make it consistent with prevailing policies, to reflect case-by-case decisions made by the Agency, and to update references to regulations. These modifications appear in the corresponding pages of the Policy Book. (Derfler Decl. ¶ 14).

8.    Since 1993, the Food and Drug Administration has considered sodium and potassium lactate to be acceptable ingredients in human food for "natural" label claims when used as flavor enhancers and flavoring agents in the amount of two percent or less of the total product formulation. See 58 Federal Register 4067 (Jan. 13, 1993). In deciding to add sodium and potassium lactate as acceptable ingredients in meat and poultry products, FSIS noted that these ingredients were generally recognized as safe (GRAS) by the FDA in 1987. See 21 C.F.R. 184.1639. (Derfler Decl. ¶ 15).

9.    In 2000 and 2001 FSIS received several requests to approve the labeling as "natural" for several products containing sodium or potassium lactate as an ingredient at two percent or less. FSIS made the decision to allow the "natural" labeling of products containing two percent or less of sodium lactate, because sodium lactate is derived from a natural source, corn and beets, and the two percent level sodium lactate was understood to only enhance flavor and not to act as a chemical preservative as proscribed by Policy Memorandum 055. FSIS formed this opinion after reviewing data submitted by Shenandoah Products, Inc. for a raw

3

poultry product. 58 FR 4067.  FSIS only recognized an anti-microbial effect for sodium and

potassium lactate at 4.8 percent. <u>See</u> 9 C.F.R. 424.21.  (Derfler Decl. ¶ 16).

10.    In August 2005, FSIS revised Policy Memorandum 055 originally published in

1982, and updated the Food Standards and Labeling Policy Book, to take into account the

Agency's decision to approve the "natural" label of products containing, among other things,

sodium lactate (from a corn or beet source) when the amount of sodium lactate did not exceed

two percent of the product's formulation.  (AR 0008).  Between August 2005 and December 5,

2006, FSIS approved fourteen "natural" labels for products containing sodium or potassium

lactate.  (Derfler Decl. ¶ 19; AR 2000-2060).

11.    On October 9, 2006, Hormel Foods Corporation ("Hormel") submitted a petition

to FSIS requesting that FSIS initiate the rule making process to amend the labeling regulations

for meat and poultry products in order to codify the definition of "natural" for meat and poultry

products.  The petition requests that, consistent with FSIS' longstanding policy on "natural"

label claims as stated in FSIS Policy Memorandum 055, a meat or poultry product should not be

labeled as "natural" unless (1) it does not contain artificial flavorings, artificial coloring

ingredients, other artificial or synthetic ingredients, or chemical preservatives; and (2) it is not

more than minimally processed.  The petition further states that exceptions for specific chemical

preservatives and synthetic ingredients should not be allowed.   (Derfler Decl. ¶ 20; AR 0014).

12.    Hormel specifically took issue with the approval of  "natural" labels for products

that include sodium lactate.  It was Hormel's contention that sodium lactate served as a chemical

preservative, on the ground that it assertedly extends the shelf-life of products in which sodium

lactate is an ingredient.  (Derfler Decl. ¶ 21; AR 0023).

4

13.     On October 10, 2006, Hormel requested that FSIS rescind the "natural" claim labels that had been previously granted to certain products because Hormel contended that lactates had been added to those products as a preservative and that therefore, their "natural" label claims were not accurate.  (Derfler Decl. ¶ 23; AR 55-64).

14.     On November 7, 2006, Hormel, through its counsel, sent a letter to the FSIS in further support of its October 9, 2006 petition.  This letter reiterated the arguments offered in the October 9, 2006 petition that sodium lactate should not be included in products labeled "natural" because sodium lactate has a preservative effect. Hormel again cited the same evidence for this proposition as before: the Oscar Mayer patents claiming that sodium lactate, even at two percent or less of formulation, extends shelf life, and the marketing literature for Purac, which also claims that sodium lactate extends shelf life.  (Derfler Decl. ¶ 24; AR 0126).

15.     In response to the Hormel petition, and in order to respond to changing  industry standards for processing and packing meat and poultry, FSIS took the following steps:

16.     First, FSIS removed the note to the August 2005 Policy Book update that approved sodium lactate as an ingredient in "natural" products.  (AR 0010).  Furthermore, FSIS stated, in the current version of its Policy Book, that it will continue to make determinations on any new applications for a natural label on a case-by case-basis.  (AR 11).  FSIS will approve "natural" labeling of products that include sodium or potassium lactate only if data indicate that the lactates contained in the products do not have a preservative effect.  (Derfler Decl. ¶ 26).

17.     Second, in November, 2006, FSIS sent letters to twenty-four companies with approved meat and poultry labels bearing the claim "natural" for products containing lactates at levels of two percent or less.  The letters explained that FSIS will only approve "natural"  label applications for products containing two percent or less of sodium or potassium lactate after the

manufacturers provide scientific data proving that these products (1) exhibit the same microbiological characteristics (i.e. rate of spoilage) as products formulated without lactates; (2) have the same shelf-life as that of the same products formulated without lactates; and (3) have the same sell-by/use-by/freeze-by dates applied as the dates that would be applied to products without lactates. (Derfler Decl. ¶ 27; AR 0611-0640).

18.    Additionally, the letters directed the manufacturers to provide FSIS with data demonstrating that the use of sodium or potassium lactate in their products with currently approved "natural" labels does not have a preservative effect. The companies were also informed that the agency may rescind labels where it is found that lactates at levels of two percent or less have a preservative effect. (Derfler Decl. ¶ 28).

19.    On January 11, 2007, FSIS sent a second letter to the manufacturers which clarified the data FSIS required. This letter informed the manufacturers that FSIS only required data concerning shelf-life, and "use-by" dates of the products containing sodium lactate. (Derfler Decl. ¶ 29; AR 0760-0776).

20.    Of the twenty-four manufacturers which were sent letters requesting data, four companies have provided results from tests analyzing the effects of sodium or potassium lactate in their products at levels of two percent or lower in accordance with 9 C.F.R. § 424.21. (Derfler Decl. ¶ 30; AR 0792-0873).

21.    All four manufacturers' data submitted to date indicate that comparison of two or more similar products with, and without, sodium lactate were observed to have very similar microbial and bacterial growth patterns, and identical shelf-lives while exposed to the same controlled conditions. (AR 0792-0873). In consideration of the evidence provided by the four companies that responded to FSIS' request, FSIS decided to postpone any decision on Hormel's

request to rescind USDA approval of current "natural" labels for such products pending completion of the rulemaking process. (Derfler Decl. ¶ 32).

22.     Since December 2006, FSIS has approved one label for a product containing sodium lactate. FSIS approved the label, submitted by Pedersons Natural Farms (for the Maverick Ranch label) for an all natural smoked uncured bacon, on October 31, 2007. (AR 2057). FSIS approved the label after Pedersons Natural Farms submitted data proving that sodium lactate in their products did not extend shelf life or expiration date. (Derfler Decl. ¶ 33).

23.     Finally, FSIS published a Notice of Petition and Public Meeting, as well as a Request for Comments on December 5, 2006. 71 Fed. Reg. 70503-70505 (Dec. 5, 2006). FSIS held a public meeting to discuss this issue on December 12, 2006. In addition, FSIS accepted comments until January 11, 2007. FSIS requested that the public hearing and the comments focus on the following topics:

1.     Is it reasonable to include as part of a definition of "natural" a stipulation that products can be no more than minimally processed to be eligible to bear the claim?

2.     Are there any accommodations necessary to allow for certain operations because food processing and packaging techniques for enhancing safety may disqualify a product as "natural?"

3.     What are the implications and conflicts that exist with regard to using current and new food processing methods and certain classes of ingredients, and the meaning of the claim "natural" on the labels of meat and poultry products?

4.     Are there available data from consumer studies about what the claim "natural" means on the labels of food products, including meat and poultry products?

5.    What do consumers think that the terms "minimal processing," "artificial and synthetic," and "preservatives" mean?

6.    Do food safety and consumer protection benefits of using what historically may have been considered more than minimal processing techniques and antimicrobial agents outweigh conflicts with the meaning of "natural?"  (Derfler Decl. ¶ 34).

24.    FSIS received over 6,000 comments in response to the December 2005 Federal Register notice and the December 2006 public meeting.  Most of the comments were identical letters submitted electronically by individuals who objected to the use of flavoring, tenderizing, and seasoning solutions to enhance poultry products bearing the "natural" claim.  (*See* example at AR 2125).  In addition FSIS received comments from industry, trade associations, and law firms representing industry, consumers, and consumer advocacy organizations concerning only meat products.  (Derfler Decl. ¶ 35; AR Ex. I, 0875-1998).

25.    The comments expressed widely divergent and sometimes conflicting views about what the claim "natural" as applied to meat and poultry products should mean. For example, Oregon State University Professor Daniel F. Farkas argued that "natural" products should be free of artificial flavors, colors, and preservatives, such as sodium lactate.  (AR 1645). Kraft Foods, on the other hand, submitted a comment which argued that sodium lactate is a natural preservative and therefore is permissible in "natural" meat and poultry products.  (Derfler Decl. ¶ 36; AR 1770).

26.    FSIS has decided to issue an Advanced Notice of Proposed Rulemaking and Request for Comments (ANPR) in order to gather more specific information so that FSIS can make a more fully informed decision to ensure that the term "natural," as used on the labels of meat and poultry products, is truthful and not misleading.  The ANPR's purpose it to solicit

additional comments, focussed by a defined set of alternatives that address the use of he "natural" claim.  The Agency believes this process will clarify and resolve emerging issues surrounding the "natural" label.  The ANPR will be published by early 2008. (Derfler Decl. ¶ 38).

27.    After consideration of the comments received in response to the forthcoming notice, the agency's current plan is to draft and publish a proposed rule to define the term "natural" for purposes of labeling meat and poultry products.  (Derfler Decl. ¶ 39).

28.    Furthermore, along with the ANPR, the agency is preparing to publish an update to the policy guidance on "natural" claims to minimize uncertainty as to the circumstances in which the labels of meat and poultry products that bear "natural" claims will likely be approved. (Derfler Decl. ¶ 40).

29.    In a letter dated October 29, 2007, Under Secretary of the Office of Food Safety, Richard A. Raymond, responded to a letter from Collin C. Peterson, Chairman of the Committee on Agriculture in the U.S. House of Representatives that requested information on actions taken by the USDA with regard to "natural" label claims on meat and poultry products containing sodium or potassium lactates.  Dr. Raymond explained that USDA is taking the necessary time to carefully consider the issues, to decide upon the most appropriate course of action, and to develop a regulatory strategy.  Dr. Raymond explained that the USDA intends to initiate rulemaking, and that, in the interim, labels are still being considered on a case-by-case basis. (Derfler Decl. ¶ 41; AR 0783).

Dated: January 22, 2008

> Respectfully submitted,
> JEFFREY S. BUCHOLTZ
> Acting Assistant Attorney General

9

JEFFREY A. TAYLOR
United States Attorney

FELIX V. BAXTER
Director, Federal Programs Branch
Civil Division
 s/ William B. Jaffe (Electronic Filing)
JAMES J. GILLIGAN
Assistant Director
WILLIAM B. JAFFE
Trial Attorney

United States Department of Justice
Civil Division, Federal Programs Branch
Mailing Address
P.O. Box 883
Washington, DC  20044
Delivery Address
20 Massachusetts Avenue, NW, Room 6110
Washington, DC  20530
(202) 353-7633
Fax: (202) 616-8460
Email: william.jaffe@usdoj.gov

Attorneys for Defendant

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| HORMEL FOODS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:07-cv-1724 |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | [Proposed] ORDER |
| OF AGRICULTURE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

Defendant's Motion to Dismiss/Motion for Summary Judgment is GRANTED.

So Ordered.

Dated: January ___, 2008

_____
Hon. Reggie B. Walton
United States District Judge