UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

| | |
|---|---|
| **HORMEL FOODS CORPORATION** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | ) **Civil Action No. 1:07-cv-1724 (RBW)** |
| | ) |
| **UNITED STATES DEPARTMENT** | ) |
| **OF AGRICULTURE,** | ) |
| | ) |
| **Defendant.** | ) |

---

**OPPOSITION OF PLAINTIFF HORMEL FOODS CORPORATION
TO MOTION TO DISMISS THE COMPLAINT OR, IN
THE ALTERNATIVE, FOR SUMMARY JUDGMENT [REDACTED]**

NANCY S. BRYSON                    JOHN F. COONEY
(D.C. Bar No. 913673)             (D.C. Bar No. 936336)
The Bryson Group PLLC             Venable LLP
575 7th Street, N.W.              575 7th Street, N.W.
Washington, D.C. 20004            Washington, D.C. 20004
(202) 344-4731                     (202) 344-4812

March 7, 2008                      Counsel for Plaintiff
                                   Hormel Foods Corporation

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................2

    I.    GOVERNING STATUTES AND REGULATIONS........................................2

    II.   THE CHEMICAL PRESERVATIVES SODIUM LACTATE AND
         POTASSIUM LACTATE.................................................................................3

    III..  USDA RULES PERMITTING INCLUSION OF LIMITED QUANTITIES
         OF SODIUM LACTATE AND POTASSIUM LACTATE IN FOODS .........4

    IV.  THE USDA STANDARD GOVERNING "NATURAL" LABEL CLAIMS....5

        A. *The Original 1982 Definition*..................................................................5

        B. *The 2005 Revised Definition* ..................................................................6

    V.  HORMEL'S REQUESTS FOR USDA ACTION TO ADDRESS FALSE
        AND MISLEADING "NATURAL" LABEL CLAIMS....................................7

        A. *The First Request for Relief* ...................................................................7

        B. *The Second Request for Relief*................................................................8

    VI.   THE AGENCY'S ACTIONS IN RESPONSE TO HORMEL'S TWO
        REQUESTS FOR RELIEF..............................................................................9

    VII.   JULY 2007 DECISION BY USDA NOT TO INITIATE RESCISSION
        PROCEEDINGS FOR ANY LACTATE-CONTAINING PRODUCT SOLD
        UNDER A "NATURAL" LABEL.................................................................12

SUMMARY OF ARGUMENT ...........................................................................14

    I.    THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE
        USDA'S DENIAL OF HORMEL'S REQUEST FOR INTERIM
        RELIEF BY INITIATION OF LABEL REVOCATION
        PROCEEDINGS IS SUBJECT TO JUDICIAL REVIEW...........................16

        A. *The Administrative Procedure Act Provides Hormel*
        *with a Cause of Action against USDA for its Violations*
        *of the FMIA and the PPIA* ...................................................................16

        B. *There Is "Law To Apply" under the APA Because USDA*

*Limited its Own Discretion by Establishing a Binding, Judicially Manageable Standard for Initiating Label Rescission Proceedings* .......18

    1.  USDA Failed To Follow the Standard for Label Rescissions It Established in Initially Granting Hormel's Request for Relief ........................................................18

        a.  USDA's December Letters Bind its Future Enforcement Discretion ........................................................20

        b.  USDA's Current Position Ignores its Own Use of of Binding Language ........................................................21

        c.  The Context of USDA's Response to Hormel Shows that It Intended To Limit its Discretion on Institution of Enforcement Actions ........................................................22

    2.  USDA's Refusal to Enforce its Decision Applies to an Entire Class of Cases ........................................................23

    3.  USDA Has Abdicated its Statutory Responsibilities ...................24

  C.  *USDA Has Taken "Final Agency Action" on Hormel's Request for Interim Relief, and that Decision Is Subject To Judicial Review* ........................................................25

    1.  The Rejection of Hormel's Request for Label Rescission Was the Consummation of the Agency's Decisionmaking on that Issue ........................................................27

    2.  USDA's Decision Affects Legal Rights and Has Legal Effects by Allowing Misbranded Products To Remain on the Market ........................................................29

II.    USDA'S MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THE ADMINISTRATIVE RECORD SHOWS THAT ITS DENIAL OF LABEL RESCISSIONS WAS CONTRARY TO LAW, ARBITRARY AND CAPRICIOUS ............30

  A.  *The Standard of Review* .....................................................................32

  B.  *The Administrative Record Does Not Support USDA's Claim That It Acted Lawfully and Rationally in Denying Hormel's Request* ........................................................33

1. The Administrative Records Contains Overwhelming
   Evidence that Lactates Have a Preservative Effect
   At Levels of Less than Two Percent ............................................34

   a. The Evidence of Preservative Effect......................................34

   b. The Shelf Life Studies Are Scientifically Flawed and
      Do Not Justify USDA's Disregard of the Peer-Reviewed
      Science or Extrapolation of Their Results to Other
      Products................................................................................37

2. The Record Does Not Support USDA's Claim of a
   "Long-Standing Policy" of Approving "Natural" Labels for
   Lactates at Levels Below 2% ......................................................40

   a. USDA Had No "Long-standing" Policy ...............................41

   b. USDA's Actions Are Inconsistent with the Alleged
      2% Policy............................................................................42

C. *USDA Has Failed To Show that Its Decision Not To Initiate
   Any Label Rescissions Did Not Constitute a De Facto Rule
   of General Applicability*..........................................................43

CONCLUSION...................................................................................................45

# TABLE OF AUTHORITIES

## CASES

*Alliance for Bio-Integrity v. Shalala*, 116 F. Supp.2d 166 (D.D.C. 2000) ...........................24

*Appalachian Power Co. v. EPA*, 208 F.3d 1015 (D.C. Cir. 2000) ....................24, 29, 44, 45

*Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027 (D.C. Cir. 2007) ..................................24

*Bennett v. Spear*, 502 U.S. 154 (1997) ........................................................14, 17, 27, 28, 29

*Ciba-Geigy Corp. v. EPA*, 810 F.2d 430 (D.C. Cir. 1986)......................................27, 29, 30

*City of Tacoma, Washington v. FERC*, 331 F.3d 106 (D.C. Cir. 2003) ...............................29

*Community Nutrition Institute v. Block*, 749 F.2d 50 (D.C. Cir. 1984)................................17

*CropLife America v. EPA*, 329 F.3d 876 (D.C. Cir. 2003)........................................28, 44, 45

*Doe v. DEA*, 484 F.3d 561 (D.C. Cir. 2007)...................................................................19, 27

*Dunlop v. Bachowski*; 421 U.S. 560 (1975).........................................................................21

*General Electric Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ...................... 15, 29, 30, 44, 45

*Gonzaga University v. Doe*, 536 U.S. 273 (2002) ................................................................17

*Heckler v. Chaney*, 470 U.S. 821 (1984) ......................................................................18, 24

*Her Majesty the Queen ex rel. Ontario v. EPA*, 912 F.2d 1525 (D.C. Cir. 1986)................28

*Kansas City v. Hud*, 923 F.2d 188 (D.C. Cir. 1991)............................................................33

*Mario's Butcher Shop v. Armour & Co.*, 574 F. Supp. 653 (N.D. Ill. 1983) ........................18

*McLouth Steel Products Corp. v.Thomas*, 838 F.2d 1317 (D.C. Cir. 1988)..........................44

*Motor Veh. Mfrs.*, 463 U.S. at 43...........................................................................32, 33, 45

*Natural Resources Defense Council v. EPA*, 22 F.3d 1125 (D.C. Cir. 1994) ......................27

*Pacific Trading Co. v. Wilson & Co., Inc.*, 547 F.2d 367 (7th Cir. 1976).............................17

*Padula v. Webster*, 822 F.2d 97 (D.C. Cir. 1987)................................................................19

*Point Park Univ. v. NLRB*, 457 F.3d 42 (D.C. Cir. 2006) ....................................................33

*Robbins v. Reagan*, 780 F.2d 37 (D.C. Cir. 1985).................................................................33

*SEC v. Chenery Corp.* 318 U.S. 80 (1943) .........................................................................42

*Shell Oil Co. v. EPA*, 950 F.2d 741 (D.C. Cir. 1991) .....................................................21, 24

*Steenholdt v. FAA*, 314 F.3d 633 (D.C. Cir. 2003) .........................................................14, 19

*Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979) ......................................................17

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ...............................................................17

*Williams Gas Processing – Gulf Coast Co.  v. FERC*,
        475 F.3d 319 (D.C. Cir. 2006) ......................................................................33, 37, 42

# STATUTES

5 U.S.C. § 551(4) (2005) ........................................................................ 44, 45

5 U.S.C. § 701 (2005) ................................................................................. 17

5 U.S.C. § 702 (2005) ........................................................................2, 14, 17

5 U.S.C. § 704 (2005) ........................................................................2, 14, 17

21 U.S.C. § 453 (2005) ................................................................................1

21 U.S.C. § 453(h) (2005) ............................................................................2

21 U.S.C. § 453(h)(11) (2005)........................................................................9

21 U.S.C. § 458(a)(3) (2005) ........................................................................2

21 U.S.C. § 601(2005) ................................................................................1

21 U.S.C. § 601(n) (2005) ............................................................................2

21 U.S.C. § 601(n)(11) (2005)........................................................................9

21 U.S.C. § 610(d) (2005) ............................................................................2

21 U.S.C. § 301 (2005) ................................................................................6

# ADMINISTRATIVE MATERIALS

9 C.F.R. § 317.2(j) (2008)............................................................................2

9 C.F.R. § 317.2(j)(12) (2008) ......................................................................9

9 C.F.R. § 317.8(a) (2008) ............................................................................3

9 C.F.R. § 424.21(c) (2008) .......................................................................  4, 42

21 C.F.R. § 101.22 (2007) ........................................................................ 7, 8

21 C.F.R. § 101.22(a)(5) (2007) ..............................................................5, 6, 9

58 Fed. Reg. 4067 (Jan. 13, 1993) ................................................................4

65 Fed. Reg. 3121 (Jan. 20, 2000) ........................................................ 3, 5, 34, 42

71 Fed. Reg. 70503 (Dec. 5, 2006) ................................................................... 12

## OTHER

Cegielska-Radziejewska, R. and Pikul, J., Sodium Lactate Addition
on the Quality and Shelf Life of Refrigerated Sliced Poultry Sausage
Packaged in Air or Nitrogen Atmosphere, Journal of Food Protection,
67(3), 601-06 (2004) AR 258-262 ................................................................ 34

Fed. R. Civ. P. 56(c) ................................................................................ 20

Meyer, J.D., Cerveny, J.G. and Luchansky, J.B., *Inhibition of nonproteolytic, psychotro-
pic Clostridia and anaerobic sporeformers by sodium diacetate and sodium lactate in
cook-in-bag turkey breast*, Journel of Food Protection 66(8), 1474-78 (2003)
 AR 166 (not reprinted in AR, copy attached to Minerich Dec.)......................... 26

Shelef, Leora A. *Antimicrobial Effects of lactates*:  A Review, Journal
of Food Protection, Vol. 57, May 1994. AR 232-237 ...................................... 34

Selef, L.A. and Yang, Q., *Growth Suppression of Listeria Monocytogenes
by Lactates in Broth, Chicken and Beef*, Journal of Food Protection 54(4),
283-87 (1991) AR 211-215.......................................................................... 25, 26

Stillmunkes, A.A. et al., *Microbiological Safety of Cooked Beef Roasts
Treated with Lactate, Monolaurin or Gluconate*, Journal of Food Science
58(5), 953-58 (1993)................................................................................. 26

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HORMEL FOODS CORPORATION | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:07-cv-1724 (RBW) |
| | ) |
| UNITED STATES DEPARTMENT | ) |
| OF AGRICULTURE | ) |
| Defendant. | ) |

## OPPOSITION OF PLAINTIFF HORMEL FOODS CORPORATION
## TO MOTION TO DISMISS THE COMPLAINT OR, IN
## THE ALTERNATIVE, FOR SUMMARY JUDGMENT [REDACTED]

### INTRODUCTION

Plaintiff Hormel Foods Corporation ("Hormel") submits this Opposition to the Motion of

the U.S. Department of Agriculture ("USDA") to Dismiss the Complaint or, in the Alter-

native, for Summary Judgment.

The Complaint presents (1) a direct challenge under the Federal Meat Inspection

Act ("FMIA"), 21 U.S.C. § 601 *et seq*., and the Poultry Products Inspection Act

("PPIA"), 21 U.S.C. § 453 *et seq*., to USDA's approval of multiple false and misleading

"natural" labels for meat and poultry products which contain sodium lactate or potassium

lactate, substances that are not "minimally processed" and that are "chemical preserva-

tives." (Complaint, Claim 1, ¶ 47); and (2) a challenge under the Administrative Proce-

dure Act ("APA") to USDA's decision of July 31, 2007 that denied Hormel's specific

request for relief through rescission of these false and misleading "natural" labels (Com-

plaint, Claims 2-3).

1

Virtually all of USDA's Motion to Dismiss and the entirety of its Motion for Summary Judgment address the second challenge under the APA. Its only attack on Hormel's direct challenge under the FMIA and the PPIA is a jurisdictional argument that those statutes do not create a private right of action, an assertion that is irrelevant to Hormel's lawsuit against a government agency under 5 U.S.C. §§ 702, 704.

## BACKGROUND

## I. STATUTORY AND REGULATORY FRAMEWORK

The FMIA, 21 U.S.C. § 610(d), prohibits the sale or distribution of "adulterated or misbranded" meat products. The term "misbranded" is defined as follows:

> The term "misbranded" shall apply to any carcass, part thereof, or meat food product under one or more of the following circumstances:
> (1) If its labeling is false or misleading in any particular; . . .[or]
> (11) If it bears or contains any artificial flavoring, artificial coloring, or *chemical preservative, unless it bears labeling stating that fact*: *Provided*, That, to the extent compliance with the requirements of this subparagraph (11) is impracticable, exemption shall be established by regulations promulgated by the Secretary; . . . .

21 U.S.C. § 601(n) (emphasis added).

The PPIA, 21 U.S.C. § 458(a)(3), prohibits the sale or distribution of "adulterated or misbranded" poultry or poultry products in nearly identical terms. The term "mis-branded" is defined as follows:

> The term "misbranded" shall apply to any poultry product under one or more of the following circumstances:
> (1) If its labeling is false or misleading in any particular; . . .[or]
>
> (11) If it bears or contains an artificial flavoring, artificial coloring, or *chemical preservative, unless it bears labeling stating that fact*: *Provided*, That, to the extent compliance with the requirements of this subparagraph (11) is impracticable, exemption shall be established by regulations promulgated by the Secretary; . . . .

21 U.S.C. § 453(h) (emphasis added).

2

The misbranding provisions of the FMIA and the PPIA are implemented by 9 C.F.R. § 317.8(a), which provides that "[n]o product or any of its wrappers, packaging, or other containers shall bear any false or misleading marking, [or] label . . . ."  9 C.F.R. § 317.2(j) further requires that specific information must be disclosed on the label:

> Labels of any products within any of the following paragraphs shall show the information required by such paragraph for such product: . . . .
>
> (12) Containers of . . . product packed in, bearing, or containing *any chemical preservative* shall bear a label stating that fact.

(emphasis added).

## II.  THE CHEMICAL PRESERVATIVES SODIUM LACTATE AND POTAS-SIUM LACTATE

Sodium lactate and potassium lactate are chemical compositions that effectively inhibit the growth of the pathogens *Listeria* and *Clostridium botulinum* when added to meat or poultry foodstuffs.  For example, U.S. Patent Nos. 4,798,729, 4,888,729, and 5,017,391 each provide, in pertinent part:

> The levels of the lactate salt which delay the toxin formation compared to the control are amounts which are effective for delaying the *Clostridium botulinum* growth.
>
> In general, these amounts range from about 1 to about 7% lactate salt and preferably are in the range from about 1.5 to 3.5 lactate salt.

Administrative Record ("AR") at 292-313.

The antimicrobial or preservative effects of sodium lactate and potassium lactate are recognized by the scientific literature and by a USDA rule adopted in 2000. *See* Final Rule, *Food Additives for Use in Meat and Poultry Products: . . . Sodium Lactate and Po-tassium Lactate*, 65 Fed. Reg. 3,121 (January. 20, 2000).  *Listeria monocytones* ("*Lm*") is a gram-positive bacterium that can cause such diseases as encephalitis and meningitis; *C.*

3

*Botulinum* is an anaerobic bacterium that produces botulinal-toxin, the toxin that causes

botulism. AR 184.

In food manufacturing, sodium or potassium lactate is added to products in a puri-

fied, concentrated form. Neither chemical occurs naturally in the purity or concentrations

in which it is added to manufactured foods.  Rather, in their commercial form used in

food processing, both of these chemicals are produced through substantial industrial

chemistry that requires multiple stages of processing.

### III. USDA RULES PERMITTING INCLUSION OF LIMITED QUANTITIES OF SODIUM LACTATE AND POTASSIUM LACTATE IN FOODS

USDA has determined that the chemical preservatives potassium sodium lactate

are safe for human consumption and may be added to meat and poultry products, in lim-

ited quantities, without making those foods "adulterated" within the meaning of the

FMIA and the PPIA.

In 1993, USDA amended its meat and poultry inspection regulations to provide

that "meat and poultry products will not become adulterated by the use of potassium lac-

tate and sodium lactate as flavor enhancers and flavoring agents in processing at levels

that do not exceed 2.0 percent."  Final Rule, *Use of Potassium Lactate and Sodium Lac-*

*tate as Flavoring Agents in Various Meat and Poultry Products*, 58 Fed. Reg. 4,067,

4,068 (Jan. 13, 1993).  In the preamble to that rule, USDA noted that it was considering

initiation of a second rulemaking, which would propose the use of potassium lactate and

sodium lactate "as secondary barriers to the growth of certain pathogenic microorganisms

in certain meat and poultry products."  *Id*. at 4,069.

In 2000, USDA amended 9 C.F.R. § 424.21(c) to permit "the use of sodium lac-

tate and potassium lactate in meat and poultry products" at a level *up to* 4.8 percent by

4

weight of total formulation "for purposes of inhibiting the growth of certain pathogens such as *Lm* and *C. botulinum*." 65 Fed. Reg. at 3,121.

The 1993 and 2000 rules determined only that addition of limited quantities of these chemicals to human food was safe and would not render the resulting products "adulterated" within the meaning of the FMIA or the PPIA. Nothing in these rules modified or amended the separate set of USDA rules that govern the labeling of products to which these chemicals are added. In particular, the 1993 and 2000 rules did not amend the USDA regulatory definition of what constitutes a food for which a "natural" label claim may be made under the FMIA or the PPIA.

## IV. THE USDA STANDARD GOVERNING "NATURAL" LABEL CLAIMS

Over the last quarter century, "natural" products have become of increasing interest to many health-conscious consumers, who seek to avoid ingestion of chemical preservatives, artificial flavorings and ingredients, and highly processed foods.

### A. *The Original 1982 Definition*

On November 22, 1982, USDA issued Food Standards and Labeling Policy Memorandum 055, which defined for the first time the standards under which the agency would determine whether meat and poultry labels could carry the term "natural" without being false and misleading, and thereby triggering the misbranding provisions of the FMIA or the PPIA. AR 2-3.

The Memorandum stated that USDA would approve a "natural" product label if two independent tests were satisfied:

> (1) the product does not contain any artificial flavor or flavoring, coloring ingredient, or *chemical preservative* (as defined in 21 C.F.R. 101.22); *and*
> (2) the product and its ingredients are not more than *minimally processed*.

(emphasis added).

To define the term "chemical preservative," the USDA Memorandum incorporated by reference in subsection (1) the definition adopted by the Food and Drug Administration under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, to prevent adulteration and misbranding in all other food products not regulated by USDA. In 21 C.F.R. § 101.22(a)(5), the FDA defines "chemical preservative" as:

> *Any chemical that*, when added to food, *tends to prevent or retard deterioration* thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties.

(emphasis added). The FDA definition, as incorporated into the USDA standard, defines "chemical preservative" based exclusively on the functional effects of the substance – that is, whether it "tends to prevent or retard deterioration."

The USDA Memorandum further defined the term "minimally processed":

> For the purposes of this memorandum, minimal processing may include: (a) those traditional processes used to make food edible or preserve it or make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting; or (b) those physical processes which do not fundamentally alter the raw product and/or which separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

> Relatively severe processes, such as solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing.

The 1982 Memorandum did not authorize marketing under a "natural" label of foods containing sodium lactate or potassium lactate at any level. As noted above, USDA did not permit addition of lactates to meat or poultry products until 1993.

**B.** *The 2005 Revised Definition*

In August 2005, USDA revised the "chemical preservative" provision of its 1982 definition of "natural." The Revised Memorandum retained the basic criterion established in 1982, that the product must not contain any "chemical preservative (as defined in 21 CFR 101.22)." Without explanation, the 2005 Revised Memorandum added the following exemption:

> Note: Sugar, sodium lactate (from a corn source) natural flavorings from oleoresins or extractives are acceptable for all "natural" claims.

The Revised Memorandum did not establish a permissible percentage, at two percent or any other level, of the amount of sodium lactate a product could contain and still qualify for a "natural" label. It also did not modify the definition of "minimally processed."

USDA represents that, between August 2005 and December 2006, applying the exception added by the Revised Memorandum it approved applications to market under a "natural" label fourteen meat and poultry products that contained sodium lactate or potassium lactate at various formulation levels. Derfler Dec. ¶ 19; USDA's Statement of Undisputed Facts ¶ 10. The Administrative Record, however, contains only twelve label approval documents within that time period. AR 2063-2123. In particular, the Record is obviously incomplete because it does not contain the label approvals for the three lactate-containing Oscar Mayer® products that prompted Hormel's requests for relief.

**V. HORMEL'S REQUESTS FOR USDA ACTION TO ADDRESS FALSE AND MISLEADING "NATURAL" LABEL CLAIMS**

**A.** *The First Request for Relief*

On October 9, 2006, Hormel petitioned USDA to conduct a rulemaking to resolve an internal inconsistency in the standard governing "natural" label claims created by the

2005 Revised Memorandum. *Petition for the Issuance of a Rule Regarding Natural Label Claims*, AR 14-54.  The inconsistency arose from the fact that the definition maintained the general requirement, established in 1982, that an applicant for a "natural" label must demonstrate that its product does not contain "any chemical preservative (as defined in 21 CFR 101.22)."  However, it simultaneously contained the exemption added in 2005 that permitted sale under a "natural" label of products containing sodium lactate derived from corn.  Hormel submitted that the creation of this exemption for products containing this chemical preservative rendered the definition of "natural" meaningless.  Hormel supported its petition with information from Purac, the grantee of the patents for manufacturing sodium lactate, which showed that the chemical acts as a preservative by inhibiting the growth of the *Listeria* bacterium in certain foods even when present at levels as low as one percent of product formulation.  AR 38; *see also Patents,* AR 40-54.

Hormel requested that USDA institute a rulemaking to restore the original definition of "natural."

## B.  *The Second Request for Relief*

On October 10, 2006, Hormel submitted to USDA a second request for interim relief, which sought rescission of the false and misleading "natural" labels for three products that recently had been introduced to the market by Oscar Mayer, an affiliate of Kraft Foods.  *Request for Rescission of Label Approval*, AR 55-64.  Hormel noted that the definition of "natural" required that a product must contain no "chemical preservatives" and must be "minimally processed."  These three products, however, contained the added chemical potassium lactate which had a preservative effect, but the presence of the preservative was not disclosed to consumers, as required by the FMIA and the PPIA. Hormel

requested that USDA act promptly, before the rulemaking was completed, to rescind its approval of these three labels because they made false and misleading claims to consumers.

On November 7, 2006, counsel for Hormel submitted to USDA further information and a legal analysis in support of the company's request for rescission of the three false and misleading "natural" labels for the lactate-containing Oscar Mayer products. AR 126-155.  Hormel showed that three patents issued by the U.S. Patent and Trademark Office stated that sodium lactate and potassium lactate inhibited the growth of microorganisms in poultry and fish products at levels between 1 and 7 percent of product formulation.  AR 127, 128, 142, 148, 151.  Hormel submitted that the sale under a "natural" labels of meat and poultry that contained *any* added chemical that had a preservative effect was prohibited by the governing laws and regulations, 21 U.S.C. §§ 601(n)(11) (2005)(FMIA), 453(h)(11) (2005)(PPIA), and 9 C.F.R. § 317.2(j)(12) (2008).

Hormel also submitted that USDA's approval under the 2005 exemption of three "natural" labels without requiring disclosure of the presence of a particular class of preservative derived from plant material (potassium lactate and sodium lactate) constituted an invalid amendment of the definition of "chemical preservative," for which USDA had adopted the FDA definition in 21 C.F.R.§ 101.22(a)(5).  The FDA rule considers only the functional effects of the added ingredient and defines a "chemical preservative" as any substance that "tends to prevent or retard deterioration" in food.

## VI.  THE AGENCY'S ACTIONS IN RESPONSE TO HORMEL'S TWO REQUESTS FOR RELIEF

On December 6, 2006, under threat of litigation, Under Secretary of Agriculture Richard A. Raymond informed Hormel of the actions that USDA had taken in response

to Hormel's requests for relief.  AR 160-161.  In explaining the agency's decision to take

these actions, the Under Secretary stated that:

> As we explained in our meeting, lactates are multi-function ingredients, and these labels were approved based on the representations concerning the source and level of the lactate used, and information provided by the applicants that lactate was being used exclusively as a flavoring agent.

AR 160.  He further informed Hormel that if lactates were being "used to control or re-

duce microorganisms and extend the shelf-life of the treated product, FSIS *would not*

*permit* the use of the term 'Natural' on the product label under the current labeling policy

guidelines."  *Id*. (emphasis added).

The Under Secretary announced that USDA had taken three actions in response to

Hormel's requests:

(a) It had "written to the companies with approved meat and poultry product la-

bels bearing the 'natural' claim and containing lactates at levels of 2 percent or less.

These companies were advised to provide FSIS with information demonstrating that the

use of lactates in their products does not provide a preservative effect."  *Id*.  USDA fur-

ther committed that:  "[i]n the absence of such information, FSIS *will institute action to*

*rescind its approval* of the labels that bear a 'natural' claim."  (*Id*., emphasis added).

(b) It had "removed" -- that is, revoked -- the exemption adopted in August 2005

relating to sodium lactate under which "natural" label claims had been approved for

products containing sodium or potassium lactates.  *Id*.

(c)  It had published in the Federal Register a Notice that requested comments on

the Hormel petition to establish by rule a definition of "natural" for meat and poultry la-

bels.  The Under Secretary stated that "[a]fter the comment period closes, FSIS will initi-

ate rulemaking on this issue."  AR 160-161.

Through the first two actions, USDA granted Hormel both types of interim relief that it had requested in its October 9 and 10, 2006 submissions. The Administrative Record shows that shortly before Under Secretary Raymond wrote to Hormel, USDA had taken action to implement all three of these decisions.

First, on November 30, December 1, and December 5, 2006, USDA sent nearly identical letters to twenty-four companies whose products are being sold under a "natural" label claim and that contain sodium, potassium, or calcium lactates as ingredients at formulation levels of two percent or less. AR 611-640.[1]  In these letters, USDA informed the companies that:

> If lactates are used in your company's products bearing the claim "natural" at levels less than 2 percent to increase product shelf-life, improve food safety, and control pathogens, the use of the ingredients is contrary to the meaning of "natural" stated above.  Moreover, such products would be misbranded and the labels would be subject to being rescinded.

*Id*. To be assured that "the labels of the products bearing the claim 'natural' in which lactates are used are truthful and not misleading," the agency requested that within 60 days, each manufacturer receiving the letter:

> provide data that show, for each product that bears a "natural" claim and that contains lactates, that these ingredients are having only a flavoring effect and are not functioning as a preservative in the product.  The data will need to show that the "natural" products containing lactates (1) exhibit the same microbiological characteristics as products formulated without lactates, (2) have the same shelf-life as the same products formulated without lactates, and (3) have the same sell-by/use-by/freeze-by dates applied as the dates that would be applied to products without lactates.

*Id*. USDA expressly noted that a preservative function includes an antimicrobial function, *i.e.,* reducing the number of microorganisms and extending shelf-life. *Id*.

USDA informed the companies that it would evaluate the data and that:

---

[1] Only fifteen of these letters have been produced in the Administrative Record, despite the representation in the Derfler Declaration (¶ 27) that letters were sent to twenty-four companies.

if the Agency were to find based on this evaluation that the effect of using lactates at 2 percent or less in formulations of "natural" meat and poultry products is that of an antimicrobial, *the Agency will rescind its approval* of the labels for these products.

*Id*. (emphasis added).

Second, on December 5, 2006, USDA published in the Federal Register a Notice announcing receipt of the Hormel Petition; requesting comment on the general issue of the appropriate use of the "natural" claim on meat and poultry labels; and announcing that the agency "will initiate rulemaking on the claim 'natural.'" Notice, *Product Label-ing: Definition of the Term "Natural*," 71 Fed. Reg. 70,503 (Dec. 5, 2006).

Third, in the Notice, USDA informed the public that "FSIS has removed the ref-erence to sodium lactate from the [August] 2005 modification" of the definition of "natu-ral." 71 Fed. Reg. at 70,504. The Notice further stated that "natural" claims for foods in which sodium lactate or potassium lactate is used would be considered "on a case-by-case basis, in light of facts such as the level used, the claimed technical effect of the so-dium lactate, and the actual effect that it is having on the product." *Id*.

USDA subsequently informed manufacturers on January 11, 2007 that its concern with the microbiological characteristics of lactate-containing products could be satisfied by submission of data concerning the shelf-life of the product. AR 760-776.

**VII. JULY 2007 DECISION BY USDA NOT TO INITIATE RESCISSION PRO-CEEDINGS FOR ANY LACTATE-CONTAINING PRODUCT SOLD UNDER A "NATURAL" LABEL**

Only four of the twenty-four manufacturers to whom USDA sent letters in De-cember 2006 demanding data ultimately submitted information concerning the effect of lactates in "natural" products. AR 790-828. USDA took no further action to compel the other manufacturers to respond to its request for information.

On June 28, 2007, Rep. Collin C. Peterson, Chairman of the House Committee on

Agriculture, wrote the Secretary of Agriculture asking for a status report on the agency's

actions to rescind the "natural" labels for lactate-containing meat and poultry products,

pursuant to its December 6, 2006 letter to Hormel which had stated that it would initiate

enforcement actions to rescind the approval of labels making "natural" claims unless the

manufacturer demonstrated that "the use of lactates in these products does not provide a

preservative effect."  AR 778.  On July 31, 2007, Under Secretary Raymond informed the

Chairman that USDA had decided not to rescind any of the "natural" labels that had been

issued for meat and poultry products that contained sodium or potassium lactates.

> FSIS is considering how best to proceed to ensure that the term "natural," as used
> in meat and poultry labeling, is truthful and not misleading.  While one way to try
> to achieve this result would be to pursue the actions we described in the letters
> you reference, we now believe that *a more efficient way* would be to pursue the
> process that the Agency began with the December 5, 2006, notice [seeking public
> comments].

AR 779-780 (emphasis added).

In announcing to Congress that it had decided not to pursue "the actions we de-

scribed in the letters you reference," USDA denied Hormel the interim relief it had re-

quested in its October 10, 2006 letter: rescission, pending the resolution of the rulemak-

ing, of "natural" labels for products containing lactates that have a preservative effect.  In

reaching this conclusion, USDA did not reconsider or rescind any of the findings or

statements in its letters to manufacturers or its December 6, 2006 letter to Hormel.

USDA also did not formally revive the exemption for sodium lactate that it had rescinded

in December 2006 and under which it had approved multiple "natural" label claims for

lactate-containing products.  Further, in denying Hormel relief, USDA did not purport to

act on information submitted by the four companies that did respond to its demand for information.  Rather, it relied only on considerations of efficiency.

## SUMMARY OF ARGUMENT

The Motion to Dismiss should be denied. The Court has jurisdiction under 5 U.S.C. §§ 702, 704 to review Hormel's challenge to USDA's approval of "natural" labels for products that contain lactates.  This is the USDA's only challenge to Claim 1, the direct challenge against the original decision to issue these labels.

With respect to Hormel's APA challenges in Claims 2 and 3  to the July 31, 2007 decision, the Motion to Dismiss should be denied because there is "law to apply" in the Court's review of the agency's determination not to institute label rescissions, through the substantive standards and procedural framework that USDA itself established in December 2006, when it initially granted Hormel's request for relief and required twenty-four manufacturers that have "natural" labels for lactate-containing foods to submit information demonstrating that the lactates do not have a preservative effect in their products. *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003), *citing Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987).

The July 31, 2007 letter constitutes "final agency action" on Hormel's request for relief, because it is the culmination of USDA's decision-making process on that request and has immediate legal and practical consequences. *Bennett v. Spear*, 502 U.S. 154, 177-78 (1997).  The agency's suggestion that it has merely "postponed" consideration of the request for interim relief, and may in its discretion revisit the issue many years from now after the completion of a rulemaking that it has yet to initiate, does not affect the na-

ture of this decision as "final agency action" that is "subject to judicial review at the moment." *General Electric Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002).

The Motion for Summary Judgment should be denied, because USDA does not even discuss the second aspect of Hormel's challenge that the "natural" labels are illegal because the lactates are not "minimally processed" within the meaning of the governing definition.

Further, with respect to the "chemical preservative" aspect of the challenge, the Administrative Record refutes the arguments USDA offers for declining to rescind labels for the many lactate-containing products that it approved from August 2005 to December 2006 under a global exemption that permitted inclusion of the preservative sodium lactate in "natural" products. That exemption was illegal, and USDA revoked it in December 2006 upon review of a separate Hormel petition for relief. The Administrative Record contains overwhelming evidence, in the form of peer-reviewed science, that lactates have an antimicrobial or preservative effect in meat and poultry products even at low formulation levels, and that USDA has been repeatedly informed of this antimicrobial effect.

In its July 2007 decision, USDA relied entirely on considerations of "efficiency" in denying relief. In this Court, it relies on *post hoc* rationalizations of counsel to suggest that it acted based on scientific considerations. The agency defends its decision not to institute label rescission proceedings against *any* lactate-containing product based on non-peer-reviewed studies of the shelf-life of their foods submitted by the only four of the twenty-four manufacturers who responded to USDA's demand for information. Those studies are scientifically flawed and cannot overcome the peer-reviewed science. In any event they cannot justify the agency's extrapolation of their results to justify its determi-

nation not to rescind labels for any member of the industry, including the twenty companies that ignored its data demand.  USDA also argues that it has followed a longstanding, unwritten policy of assuming that lactates do not have a preservative effect at levels of 2% or less.  The Record does not support the existence of this policy, and the Confidential part of the Record (filed under seal) shows that the agency has approved "natural" labels for several products in which lactates exceed the 2% level.

In the final analysis, USDA's July 2007 decision not to institute label rescission proceedings for any lactate-containing "natural" product approved under the August 2005 global exemption for sodium lactate constituted an illegal, *de facto* change in agency policy, not adopted through notice and comment rulemaking. This *de facto* rule had the effect of restoring on a retroactive basis the unlawful amendment of the Natural Policy that USDA revoked in December 2006.  That agency action was illegal, arbitrary, and capricious, and should be overturned.

## ARGUMENT

### I.  THE MOTION TO DISMISS SHOULD BE DENIED BECAUSE USDA'S DENIAL OF HORMEL'S REQUEST FOR INTERIM RELIEF BY INITIATION OF LABEL RESCISSION PROCEEDINGS IS SUBJECT TO JUDICIAL REVIEW

#### A.  *The Administrative Procedure Act Provides Hormel with a Cause of Action against USDA for its Violations of the FMIA and the PPIA*

USDA asserts that Count 1 should be dismissed for failure to state a claim because neither the FMIA nor the PPIA provides a private right of action to enforce its provisions. USDA Memorandum of Points and Authorities ("Gov't Mem.") at 16-19.  The Administrative Procedure Act, however, explicitly provides Hormel with a right of action against USDA for the agency's violation of these statutes by permitting products to be marketed under false and misleading labels.

Two provisions of the APA provide Hormel with a cause of action against USDA.

First, 5 U.S.C. § 702 provides:

> A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute is entitled to judicial review thereof. . . . .

5 U.S.C. § 704 further provides:

> Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. . . .

In *Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006), the D.C. Circuit reaffirmed its prior holdings that the judicial review provisions of the APA provide "a generic cause of action in favor of persons aggrieved by agency action," which applies if the particular law that the agency is accused of violating does not itself contain a specific judicial review provision. 456 F.3d at 185-86, 189. *See also*, *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (Section 704 provides a cause of action for all "final agency action for which there is no other adequate remedy in a court"). Federal courts have routinely exercised jurisdiction over suits by adversely affected parties against USDA under the FMIA and the PPIA. *See, e.g.*, *Community Nutrition Institute v. Block*, 749 F.2d 50 (D.C. Cir. 1984) (resolution of lawsuit by an adversely affected party alleging that USDA violated the FMIA by permitting the sale of misbranded food products).

The cases upon which USDA relies are irrelevant. They involve a claim by one private party against another for violation of a federal statute.[2] In no case did an aggrieved party challenge an agency action under the APA.

---

[2] Gov't Mem. at 17-19. *See Touche Ross & Co. v. Redington*, 442 U.S. 560 (1979) (customers of brokerage firms do not have an implied cause of action under the Securities Exchange Act for money damages against accountants who audit certain reports); *Gonzaga University v. Doe*, 536 U.S. 273 (2002) (student does not have a private right of action for money damages against a private university for release of educational records in violation of a federal statute); *Pacific Trading Co. v. Wilson & Co., Inc.*, 547 F.2d 367 (7th Cir.

**B.  *There Is "Law To Apply" under the APA Because USDA Limited its Own Discre-tion by Establishing a Binding, Judicially Manageable Standard for Initiating Label Rescission Proceedings.***

Although there is a strong presumption of reviewability of agency actions under the APA, judicial review is precluded for actions "committed to agency discretion by law."  5 U.S.C. § 701(a)(2).  An action is "committed to agency discretion" when "the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion."  *Heckler v. Chaney*, 470 U.S. 821, 830 (1984).

USDA argues that Counts 2 and 3 should be dismissed for lack of subject matter jurisdiction, based on the Supreme Court's statement in *Chaney* that a decision not to ini-tiate an enforcement proceeding "is a decision *generally committed* to an agency's abso-lute discretion" and that the absence of such standards precludes review of its actions here.  470 U.S. at 831.  Gov't Mem. at 20.  This general rule, however, gives way in three circumstances, each of which is present in this case.  The Court has jurisdiction because in acting upon Hormel's request for interim relief, USDA limited its own enforcement discretion.  It established a binding, judicially manageable standard when it committed that it "*will institute action to rescind* its approval of the labels that bear a 'natural' claim" if a manufacturer failed to provide it "with information demonstrating that the use of lactates in their products does not have a preservative effect." AR 160.

**1.  USDA Failed To Follow the Standard for Label Rescissions It Established in Initially Granting Hormel's Request for Relief**

*Chaney* itself states that an agency's decision not to take enforcement action "is only presumptively unreviewable; the presumption may be rebutted" where there are

---

1976) (sellers of meat do not have an implied private right of action for money damages against a meat packer under the FMIA); *Mario's Butcher Shop v. Armour & Co.*, 574 F. Supp. 653 (N.D. Ill. 1983) (same as above).

guidelines for the agency to follow in exercising its enforcement discretion. 470 U.S. at 832-33. The D.C. Circuit has held that "judicially manageable standards," giving a court jurisdiction under the APA to review an agency's exercise of its enforcement discretion, "'may be found in formal and informal policy statements and regulations as well as in statutes.'" *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003), *quoting Padula v. Webster*, 822 F.2d 97, 100 (D.C. Cir. 1987); *see also Robbins v. Reagan*, 780 F.2d 37, 46 (D.C. Cir. 1985) ("[t]he agency itself can often provide a basis for judicial review through the promulgation of regulations or the announcement of policies."). USDA itself admits the continuing validity of the *Steenholdt* principle. Gov't Mem. at 22 n.4.

In determining whether agency statements limit its enforcement discretion and create "law to apply," the court "inquires whether the statements create binding norms by imposing rights or obligations on the respective parties." *Steenholdt*, 314 F.3d at 638. In *Padula*, the D.C. Circuit held that whether an agency statement created a binding norm – and thus "law to apply" under the APA – is to be determined by the language that the agency used and the context in which the statement was made.

> Pronouncements that impose no significant restraints on the agency's discretion are not regarded as binding norms. As a general rule, an agency pronouncement is transformed into a binding norm if so intended by the agency, . . . and agency intent, in turn, is "ascertained by an examination of the statement's language, the context, and any available extrinsic evidence."

*Padula*, 822 F.2d at 100, *quoting Doe v. Hampton*, 566 F.2d 265, 281 (D.C. Cir. 1977).

The *Chaney* presumption is rebutted here because USDA, in granting Hormel's request for relief, established "binding norms" that it would follow to initiate label rescission proceedings. That standard is judicially manageable, and the Court accordingly has jurisdiction to consider these two claims under the APA.

19

### a. USDA's December Letters Bind its Future Enforcement Discretion

As part of its resolution of Hormel's request for interim relief, in December 2006 USDA sent nearly identical letters to twenty-four manufacturers who sold under a "natural" label products that contain lactates at levels of two percent or less. AR 611-640. They stated:

> If lactates are used in your company's products bearing the claim "natural" at levels less than 2 percent to increase product shelf-life, improve food safety, and control pathogens, the use of the ingredients is contrary to the meaning of "natural" . . . . Moreover, such products would be misbranded and the labels would be subject to being rescinded.

The agency required that within 60 days, each company "provide data that show, for each product that bears a 'natural' claim and that contains lactates, that these ingredients are having only a flavoring effect and are not functioning as a preservative in the product." *Id*. USDA thereby imposed on each manufacturer a separate burden of coming forward with evidence demonstrating that the lactates in its products did not have a preservative effect. USDA further informed the manufacturers that it would evaluate the data they submitted and that:

> [I]f the Agency were to find based on this evaluation that the effect of using lactates at 2 percent or less in formulations of "natural" meat and poultry products is that of an antimicrobial, *the Agency will rescind its approval of the labels for these products*.

*Id*. (emphasis added).

On December 6, 2006, USDA informed Hormel that, in response to its request for interim relief, the agency had:

> written to the companies with approved meat and poultry product labels bearing the "natural" claim and containing lactates at levels of 2 percent or less. These companies were advised to provide FSIS with information demonstrating that the use of lactates in their products does not provide a preservative effect.

20

AR 160-161. USDA further committed to Hormel that "[i]n the absence of such information, FSIS *will institute action to rescind its approval* of the labels that bear a natural claim." *Id.* (emphasis added).

Under D.C. Circuit decisions, particular importance attaches to the actual language that USDA used in these letters. The plain language of the letters shows that USDA intended to create a "binding norm" that would govern its future actions and the rights of manufacturers. *E.g.*, AR 612. The repeated and deliberate use of the word "will" demonstrates that USDA had cabined its discretion and made a definitive commitment with regard to enforcement under the conditions specified. *See Hewitt v. Helms*, 459 U.S. 460, 473 (1983) (The use of the word "will" is "unmistakably mandatory [in] character.") USDA did not reserve to itself the discretion to decide whether or not it would initiate a label rescission proceeding if the manufacturer did not submit information or if the data showed that lactates at levels below two percent did have a preservative effect. Rather, the agency categorically stated that it "will" act if it concluded, based on scientific analysis, that a lactate had a preservative effect. Use of the term "may" generally does not establish "law to apply," because the agency thereby reserves its discretion whether or not to institute an action. *See e.g., Shell Oil Co. v. EPA*, 950 F.2d 741, 763 (D.C. Cir. 1991) (EPA's use of the permissive word "may" gives it discretion in the enforcement arena.). Here, by contrast, USDA's use of the term "will" in its December 2006 letters to manufacturers and its December 6, 2006 letter to Hormel established an unambiguous standard about the circumstances in which it would use its enforcement authority. *Cf. Dunlop v. Bachowski*; 421 U.S. 560, 567 n.7 (1975).

21

**b. USDA's Current Position Ignores its Own Use of Binding Language**

In its Motion, USDA does not confront directly the consequences of its creation of "law to apply" by its articulation in its December 2006 letters of standards limiting the future exercise of its enforcement authority. Rather, the agency seeks to avoid the consequences of its actions by misquoting its own letters in a manner that suggests it did preserve its discretion. The litigation Declaration submitted in support of the Motion describes USDA's December 2006 letters as follows:

> Additionally, the letters directed the manufacturers to provide FSIS with data demonstrating that the use of sodium or potassium lactate in their products with currently approved "natural" labels does not have a preservative effect. The companies were also informed that the agency *may rescind* labels where it is found that lactates at levels of two percent or less have a preservative effect.

Derfler Declaration at ¶ 28; *see* USDA's Statement of Undisputed Facts at ¶ 18.

The Administrative Record shows, however, that the agency did not inform each of the twenty-four manufacturers that it "may rescind" labels if the manufacturer did not come forward with information showing that the lactates in its "natural" products did not have a preservative effect. To the contrary, the Record demonstrates that USDA actually warned the manufacturers that it "*will rescind* its approval of the labels" if its analysis of the required data showed a preservative effect.[3]

The fact that USDA's jurisdictional argument hinges on after-the-fact substitution of the permissive verb "may" for the mandatory verb "will" actually used in the letters squarely demonstrates that the agency's position is baseless. Under *Steenholdt* and *Padula*, USDA's imposition of these obligations on regulated entities demonstrates that the

---

[3] AR 612, 614, 616, 618, 620, 622, 624, 626, 628, 630, 632, 634, 636, 638, 640 (emphasis added).

agency has limited its enforcement discretion and that judicial review is permitted to con-

sider challenges to the agency's failure to follow its own standards.

### c. The Context of USDA's Response to Hormel Shows that It Intended To Limit its Discretion on Institution of Rescission Actions.

The context in which USDA made its commitments to Hormel confirms that it in-

tended to create a "binding norm." At the same time that it informed manufacturers that

it "will" rescind their labels if they failed to provide the required data, the agency granted

Hormel's request that USDA revoke the August 2005 exemption for sodium lactate in the

definition of "natural." The agency also established a requirement that future applicants

must demonstrate that lactates do not have a preservative effect in their products to obtain

label approvals. Derfler Dec. ¶ 33. The permanent elimination of this permissive rule

removed the legal basis on which many labels had been approved, had binding effects on

the agency and on manufacturers, and has had substantive effects on subsequent USDA

label decisions. Fourteen "natural" labels for lactate-containing products were approved

in the 16 months the exemption was in place; since its revocation, only two "natural" la-

bels have been approved. [REDACTED].[4]

The standard that USDA adopted in the letters to manufacturers and the Decem-

ber 6, 2006 Hormel letter for exercise of its enforcement authority is 'judicially manage-

able." Each manufacturer was required to submit scientific information concerning the

preservative effect of lactates in its "natural" products. The courts can properly review

the rationality of the agency's decision under the arbitrary and capricious standard.

---

[4] Hormel recently discovered that another new lactate-containing "natural" product has entered the market (Attachment 3). USDA did not produce the label approval documents for this product in the Administrative Record.

2. **USDA's Refusal to Follow its Decision Applies to an Entire Class of Cases**

The D.C. Circuit has held that the statement in *Chaney* on which USDA relies applies only to an agency decision not to take enforcement action *in a single case*, and does not apply to an agency decision "that it will not take enforcement actions in a whole class of cases." *Shell Oil Co.* 950 F.2d at 764. As the Court stated in *Alliance for Bio-Integrity v. Shalala*, 116 F. Supp.2d 166, 171 (D.D.C. 2000):

> This Circuit has recognized a distinction between agency decisions not to regulate an entire class of conduct, which are essentially policy choices, and individual nonenforcement decisions.

The agency action challenged here is a USDA policy decision not to initiate any label rescission proceedings for the entire class of lactate-containing foods that were approved under the illegal -- and since revoked -- August 2005 exemption. Complaint, ¶¶ 41, 43, 47, 50, 53. On its face, this was a policy decision "not to regulate an entire class of conduct," within the meaning of *Alliance for Bio-Integrity*, 116 F. Supp.2d at 171. Under these circumstances, the rule concerning the unreviewability of *individual* enforcement actions does not apply. The Court has jurisdiction under the APA to review USDA's policy decision not to bring rescission proceedings against any product approved under the August 2005 exemption.

3. **USDA Has Abdicated its Statutory Responsibilities**

In *Chaney*, the Supreme Court recognized that judicial review under the APA is proper when the agency "consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *Chaney*, 470 U.S. at 833 n.4; *see Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1035 (D.C. Cir. 2007). This doctrine is fully applicable here.

As noted, USDA has determined not to institute label rescission proceedings against any product approved under the illegal August 2005 exemption. This action includes a policy decision not to initiate action even against products sold by the 20 manufacturers who failed to respond to the agency's demand for information showing that lactates do not have preservative effects in their products. Indeed, the agency has decided not to institute label rescission proceedings even against the products in which the lactate levels exceed 2%. *See infra* discussion, pages 42-43.

This class-wide policy decision has the effect of doing indirectly what USDA is prohibited from doing directly. By first revoking the illegal exemption and demanding information about the absence of preservative effects, and then deciding to take no action against any manufacturer -- including those who deliberately ignored its information demand -- USDA has reinstituted *de facto* the illegal exemption and has permitted the manufacturers who benefitted from the illegal practice to keep their products on the market indefinitely. Taken together, these agency actions constitute a clear-cut case of a situation in which an agency has "adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities."

## C. *USDA Has Taken "Final Agency Action" on Hormel's Request for Interim Relief, and that Decision Is Subject To Judicial Review*

USDA claims that the decision announced in its July 31, 2007 letter to Chairman Peterson does not constitute "final agency action" subject to review under the APA, because it has not completed its decision-making process about whether to revise its definition of "natural." It asserts that it has merely postponed action and might revisit the question whether to rescind labels after the rulemaking. Gov't Mem. at 23-25.

USDA's argument ignores the critical fact that Hormel submitted three separate requests for relief.  First, it sought initiation of a rulemaking  to permanently modify the definition of "natural."  That rulemaking may be instituted in the future and is still pending, it is not at issue in this case. Second, in the same document, Hormel requested interim relief while the rulemaking proceeding was pending; that the agency revoke the August 2005 exemption to the definition of "natural" that allowed the use of sodium lactate.  Third, in a separate request filed the next day, Hormel sought rescission of several labels that the agency had approved under the illegal exemption.  Only USDA's action on this separate request for relief is at issue in this lawsuit.

In addition to ignoring the separate nature of the requests Hormel submitted, USDA's argument also rests on conflating the relief granted in these three separate requests.  The agency has not taken final action on one type of relief Hormel requested – it has not yet instituted a rulemaking.  But USDA has taken "final agency action" on Hormel's other two requests for relief.

In December 2006, USDA took final action to rescind the illegal exemption.  At the same time, it informed Hormel that it had sent letters requiring companies that held "natural" labels for lactate-containing products to submit evidence demonstrating that the chemicals were not acting as preservatives, and that "[i]n the absence of such information, FSIS *will institute action to rescind its approval* of the natural labels.  (Emphasis added).  The agency thus took action to establish a policy and to create a defined legal framework within which it would determine whether individual labels were illegal under the FMIA and the PPIA.  Eight months later, the agency informed Chairman Peterson that it had decided not to rescind any of the labels.

It is this specific action--the abandonment of its December 2006 decision and its denial of Hormel's request for relief through rescission of illegal labels--that Hormel challenges in this case. That action constitutes "final agency action" under the APA because it is the culmination of USDA's decision-making process on the issue and because it has legal consequences and effects on the rights of Hormel and the producers.

## 1. The Rejection of Hormel's Request for Label Rescissions Was the Consummation of <u>the Agency's Decision-Making on That Issue</u>

The Supreme Court has held that:

> As a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the "consummation" of the agency's decision-making process . . . – it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which "rights or obligations have been determined," or from which "legal consequences will flow," . . . .

*Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations omitted).

Whether a decision constitutes "final agency action" does not depend upon the form in which the determination is issued, but whether it is a definitive resolution of the issue and whether as a practical matter it has a "direct and immediate effect on the day-to-day business of the parties challenging the action." *Doe v. DEA*, 484 F.3d 561, 566 (D.C. Cir. 2007), *quoting Ciba-Geigy Corp. v. EPA*, 810 F.2d 430, 436 (D.C. Cir. 1986)). Decisions announced in letters, rather than in formal rules, have been repeatedly held to constitute "final agency action." *See, e.g.*, *Ciba-Geigy*, 810 F.2d at 431-32 (letters advising manufacturers of required changes in labeling held to constitute "final agency action.") As the D.C. Circuit stated in *Natural Resources Defense Council v. EPA*, 22 F.3d 1125, 1132-33 (D.C. Cir. 1994):

> [T]he absence of a formal statement of the agency's position, as here, is not dispositive: An agency may not, for example, avoid judicial review

> "merely by choosing the form of a letter to express its definitive position on a general question of statutory interpretation."

*Id*. at 1132-33, quoting *Her Majesty the Queen ex rel. Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1986).

Further, in *CropLife America v. EPA*, 329 F.3d 876 (D.C. Cir. 2003), the agency issued a press release announcing that it would no longer consider a certain kind of evidence pending conclusion of a review by the National Academy of Sciences of the ethical issues presented by that evidence. The D.C. Circuit held that the statement set forth in the press release was subject to judicial review under the APA, because its language showed that the agency was changing its position and the statement finally resolved the issue to which it was addressed. 329 F.3d at 881.

The denial in the July 31, 2006 letter of Hormel's request for relief through label rescissions constitutes "final agency action" under *Bennett* and *CropLife*. USDA's decision is "final" in that it explicitly marks the consummation of its decision-making process on Hormel's request for relief by rescission of labels pending the completion of the rulemaking. The agency's decision was not tentative or preliminary; it conclusively rejected Hormel's request. There is no suggestion in the Petersen letter or in USDA's submission to this Court that it is continuing to consider Hormel's request for relief.

The agency claims that it has "decided to *postpone* any decision on Hormel's request to rescind USDA approval of current "natural" labels for such products pending completion of the rulemaking process." (Derfler Dec. ¶ 32; *see* USDA's Statement of Material Facts ¶ 21) By its own admission, USDA will not return to that question until after the rulemaking is over. By that time the request for interim relief by label cancellations will have long since become moot. Moreover, that decision allowing manufacturers

to continue selling lactate-containing "natural" products indefinitely has profound legal and practical consequences for Hormel and its competitors.

The D.C. Circuit has specifically rejected arguments similar to USDA's that an agency decision is not "final agency action" because it might some day in the distant future, in the exercise of its discretion, choose to revisit the issue. In *General Electric Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002), the court stated:

> The fact that a law may be altered in the future has nothing to do with whether it is subject to judicial review at the moment." If the possibility ... of future revision in fact could make agency action non-final as a matter of law, then it would be hard to imagine when any agency rule . . . would ever be final as a matter of law.

290 F.3d at 380, *quoting Appalachian Power Co. v. EPA*, 208 F.3d 1015,1022 (D.C. Cir. 2000). Thus, USDA's indefinite "postponement," until after the end of a future rulemaking, of a request for relief before that rulemaking occurs is a final denial of that petition in any meaningful sense.

**2. USDA's Decision Affects Legal Rights and Has Legal Effects by Allowing Misbranded Products To Remain on the Market**

A "final agency action" is one by which "'rights or obligations have been determined,' or from which 'legal consequences will flow' . . . ." *Bennett*, 520 U.S. at 178. An action is "final" if, "[a]s a practical matter, [the] rulings in the orders represent a 'definitive [position that] has a direct and immediate…effect on the day-today business of the parties challenging the action,' manifesting that the orders are sufficiently final for judicial review." *City of Tacoma, Washington v. FERC*, 331 F.3d 106, 113 (D.C. Cir. 2003) (*quoting Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986)).

As a practical matter, USDA's decision not to rescind labels for the lactate-containing "natural" products it approved under the illegal exemption for sodium lactate

determines the legal rights of Hormel, its competitors, and the public. The twenty-four manufacturers will be able to continue selling their products indefinitely. Hormel's request for relief from the unfair competition presented by these misbranded products has been denied. Consumers also have lost their right to truthful product labeling and accurate disclosure of the presence of chemical preservatives. For these reasons, the USDA decision announced in the July 31, 2006 letter is "final agency action" and is subject to judicial review at this time. *General Electric Co. v. EPA*, 290 F.3d 377, 380 (D.C. Cir. 2002).

## II. USDA'S MOTION FOR PARTIAL SUMMARY JUDGMENT SHOULD BE DENIED BECAUSE THE ADMINISTRATIVE RECORD SHOWS THAT ITS DENIAL OF LABEL RESCISSIONS WAS CONTRARY TO LAW, ARBITRARY AND CAPRICIOUS

USDA moves for summary judgment on Claims 2 and 3 only. Three preliminary points are critical to the Court's consideration of that Motion.

First, Claim 1 challenges directly under the FMIA and the PPIA two types of actions by USDA: the legality of the agency's pre-marketing approvals of "natural" labels granted to companies whose products contain lactates (Complaint ¶ 47); and the legality of its decision not to rescind those labels (Complaint ¶ 48). Claims 2 and 3 challenge under the APA the legality and the rationality of USDA's denial of relief through label rescissions in response to Hormel's October 10, 2006 request. Hormel's claim that USDA violated the law in approving these labels in the first instance, is not affected by the agency's arguments concerning its disposition of the request for interim relief. Accordingly, the agency has moved for summary judgment on Counts 2 and 3 only. Its only legal objection to Hormel's challenge to the issuance of the labels is its Motion to Dismiss on private right of action grounds, which is groundless for the reasons discussed above.

Thus, Claim 1 must be adjudicated on the merits even if the Court were to accept USDA's position on the denial of the petition for relief.

Second, as a threshold matter, the Motion for Summary Judgment must fail because USDA does not even address Hormel's independent challenge that sodium and potassium lactate may not be included in "natural" foods because they are not "minimally processed." The Complaint challenges USDA's actions on two independent grounds: that (a) the sodium and potassium lactates are "chemical preservatives" that may not be included in products sold under a "natural" label (Complaint ¶¶ 10, 11, 47); and (b) sodium and potassium lactate are not "minimally processed" but are the product of substantial industrial chemistry, and thus may not be included in "natural" products for this separate reason. (Complaint ¶¶ 12, 28). The Motion for Summary Judgment does not discuss the "minimally processed" challenge but addresses only the "chemical preservative" issue. The Motion therefore should be denied.

Third, the Administrative Record is incomplete and does not at this time include documents essential to resolution of the Motion. Among other defects, it does not include the label approval documents for the three Oscar Mayer products whose sale prompted Hormel to request USDA relief in October 2006. Hormel will submit a separate Motion requiring USDA to supplement the Administrative Record. The Court should order the Record supplemented before considering the summary judgment motion.

Finally, and in any event, the Motion should be denied because the Administrative Records fails to demonstrate that USDA has a rational basis for denying Hormel relief

through label rescissions.[5]  The Record flatly contradicts the agency's position on the most critical issue.  Peer-reviewed scientific studies in the Record prove that lactates have a preservative effect in foods, even at levels well below two percent.  AR 168-313.  The Record also shows that Kraft repeatedly informed USDA of the science showing that lactates have a preservative effect at levels below 2%, by inhibiting the growth of the pathogenic bacterium *Lm*.  AR 811-812.

In the face of this overwhelming Record evidence that lactates are "chemical preservatives" and are more than "minimally processed," USDA has failed to show that it acted rationally and consistently with the FMIA and the PPIA in abandoning its December 2006 position and denying Hormel relief through label rescissions.  The Record also shows that USDA's decision not to institute label rescission proceedings for any "natural" label for any lactate-containing product approved under the global exemption for sodium lactate adopted in August 2005 constituted a *de facto* change in agency policy, not adopted through notice and comment rulemaking. That *de facto* rule had the effect of restoring on a retroactive basis the unlawful exemption from the definition of "natural" that USDA revoked in December 2006.

## A.  *The Standard of Review*

An agency decision is arbitrary and capricious under the APA it if violates the governing legal standard or if it has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the

---

[5] Pursuant to LCvR56.1, a Statement of Genuine Issues of Material Facts is attached which identifies the parts of the Administrative Record that contradict USDA's Statement of Material Facts and demonstrates the issues that are in dispute.

product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43

(1983).

Further, the APA requires the agency to articulate a rational basis for its decision,

and its determination can be defended only on that basis, and not on the *post hoc* ration-

alizations of counsel.  The law in the D.C. Circuit is well-settled:

> Arbitrary and capricious review "demands evidence of reasoned decisionmaking *at the agency* level; agency rationales developed for the first time during litigation do not serve as adequate substitutes." . . . "We can only look to the 'agency's' stated rationale. We cannot sustain its action on some other basis the [agency] did not mention."

*Williams Gas Processing – Gulf Coast Co.  v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006),

quoting *Kansas City v. HUD*, 923 F.2d 188, 192 (D.C. Cir. 1991), and *Point Park Univ.

v. NLRB*, 457 F.3d 42, 50 (D.C. Cir. 2006) (emphasis in original).

An agency may change its policy position concerning the appropriate manner of

addressing a problem after it has initially announced how it intends to proceed.  But un-

der *Motor Vehicle Mfrs.* and its progeny, the agency must meet the APA requirement of

articulating a rational basis for its change in position which is consistent with the evi-

dence before it when it decides.  463 U.S. at 40-44.  *See Robbins v. Reagan*, 780 F.2d 37,

45 (D.C. Cir. 1985) (declaring in determining if there is "law to apply," "[o]nce an

agency has declared that a given course is the most effective way of implementing the

statutory scheme, the courts are entitled to closely examine agency action that departs

from this stated policy.")

**B.  *The Administrative Record Does Not Support USDA's Claim That It Acted Law-
fully and Rationally in Denying Hormel's Request***

Claim 2 alleges that USDA acted irrationally and contrary to law in denying

Hormel's request for relief by label rescissions.  The agency's Motion for Summary

Judgment on this Claim fails because the Administrative Record shows that USDA acted irrationally and contrary to the FMIA and the PPIA in abandoning its December 2006 position, denying Hormel relief, and declining to rescind any "natural" labels for products approved under the August 2005 exemption. The Record shows that USDA ignored important aspects of the facts which demonstrate that lactates are more than "minimally processed" and are "chemical preservatives" that inhibit the growth of *Lm* even at levels well below 2%. The rationales USDA offers in this Court are *post hoc* generalizations, and they are contradicted by the Record in critical respects.

1. **The Administrative Record Contains Overwhelming Evidence that Lactates Have a Preservative Effect at Levels of Less than Two Percent**

a. **The Evidence of Preservative Effect**

USDA claims that it acted rationally in denying Hormel's request for interim relief on the ground that "[t]he only direct evidence before the agency at this time" are studies from four companies that allegedly support the claim that "sodium lactate does *not* appear to extend shelf life *on the particular products in question* at two percent or less of formulation." Gov't Mem. at 25-26 (emphasis in original). The Administrative Record, however, contains extensive evidence that lactates have a preservative effect in foods at levels below two percent.

USDA concluded in 2000 that sodium and potassium lactates are chemicals that have preservative effects in meat and poultry products by "inhibiting the growth of certain pathogens such as [*Lm*] and *C. botulinum*." 65 Fed. Reg. at 3121. The question in here is whether these chemicals have preservative effects at formulation levels below two percent. The peer-reviewed scientific evidence in the Administrative Record provides that lactates have antimicrobial effects at those levels. AR 168-313.

34

- Shelef, L., *Antimicrobial Effects of Lactates: A Review*, Journal of Food Science: 57 (5), 445-450 (1994) reports lactate control of both spoilage and pathogenic bacteria in fresh and processed meat. AR 232-237.
- Cegielska-Radziejewksa, R. and Pikul, J., *Sodium lactate addition on the quality and shelf life of refrigerated sliced poultry sausage packaged in air or nitrogen atmosphere*, Journal of Food Protection: 67(3), 601-606 (2004) reports the inhibition of growth of aerobic psychotropic bacteria and lactic acid bacteria during refrigerated storage by the addition of both 1% and 2% sodium lactate and extension of shelf life by three to four times. AR 258-262.

The Administrative Record also shows that Hormel submitted evidence from U.S. patents that sodium lactate had a preservative effect at a one percent level and a statement by the patentee Purac that sodium lactate may have preservative effects at levels below two percent.  AR 127, 128, 142, 148, 151.  Moreover, Kraft also submitted scientific studies to USDA which showed that lactates have antimicrobial effects by inhibiting the growth of *Listeria* at levels less that two percent.  AR 812 (note 18).

On March 20, 2007, Kraft responded to USDA's letter requiring it to submit evidence on whether lactates had a preservative effect in the Oscar Meyer products sold under the "natural" labels whose rescission Hormel had sought.  Kraft noted that the letter "cautions us that [FSIS] will rescind the approvals for these labels" of products containing sodium or potassium lactate "unless Kraft shows that the natural lactate ingredients do not have an antimicrobial effect in the products."  AR 806.  Kraft stated that USDA's letter "came as a surprise because, like salt, lactate ingredients inherently have well-known antimicrobial as well as flavoring effects in meat and poultry."  *Id.*

> There is no threshold, 2% or any other number, under which the antimicrobial properties of lactate ingredients vanish and over which antimicrobial efficacy suddenly appears.  The antimicrobial effects of lactate ingredients, even at low levels, *have been well-known for years and are reflected* in numerous documents readily available to FSIS as well as *in numerous communications between Kraft and FSIS.*

AR 807.  Kraft then summarized several prior occasions when it had informed USDA of

the preservative properties of lactates, even at low concentration levels.

- On November 15, 2002, Kraft presented data to the U.S. Department of Agri-
  culture (USDA) officials (including representatives of FSIS) regarding the use
  of lactate salts and sodium diacetate to limit the growth of *Listeria monocyto-
  genes (LM)* in ready-to-eat meat and poultry products.  The presentation in-
  cluded a validation study for Cotto salami in which potassium lactate and so-
  dium diacetate combinations were shown to be effective at levels as low as
  1.5% potassium lactate and 0.15% sodium diacetate.
- In February of 2003, Kraft shared with the agency a published scientific arti-
  cle regarding another study demonstrating the antimicrobial efficacy of potas-
  sium lactate.  This study showed that 1.5% potassium lactate and 0.15% so-
  dium diacetate, among other combinations, could be sued to limit growth of
  *Lm*.
- Your November 29th letter also describes a patent held by Oscar Mayer, which
  states that the use of lactates at levels as low as 1.5% of the product formula-
  tion has an antimicrobial effect.  Respectfully, the Oscar Meyer patent is also
  not new to the agency.  This publicly available document was provided to
  FSIS officials in a July 15, 2005 letter from Kraft expressing concern about a
  competitor's use of "fresh" and "no preservatives" claims on a product with
  lactate ingredients.  In that letter, we objected to these claims precisely be-
  cause of the known antimicrobial effects of the added lactate ingredients.

AR 811-812.  Kraft also noted that "the antimicrobial and flavoring functions of lactates

are inherent properties of the ingredients and cannot be readily separated."  AR 807.  This

statement is of great significance in light of USDA's statement in its December 6, 2006

letter to Hormel that "natural" labels for lactate-containing products "were approved

based on . . . information provided by the applicants that lactate was being used exclu-

sively as a flavoring agent."  AR 160.

Thus, the Record shows that scientific evidence submitted to USDA over a period

of years demonstrated that lactates have a preservative effect at formulation levels of less

than two percent and that there is no rational basis for differentiating between the antim-

icrobial and flavoring functions of these additives.  The agency's motion is plainly incor-

rect in asserting that there was no direct evidence before it that lactates have a preserva-

36

tive effect at two percent or below.  USDA acted arbitrarily and capriciously because it

"entirely failed to consider an important aspect of the problem," by failing to take this

Record evidence into account, but instead "offered an explanation for its decision that

runs counter to the evidence. *Motor Vehicle Mfrs.*, 463 U.S. at 43.

### b.  The Shelf Life Studies Are Scientifically Flawed and Do Not Justify USDA's Disregard of the Peer-Reviewed Science or Extrapolation of Their Results to Other Products

USDA seeks to defend its action on the ground that four manufacturers submitted

studies that allegedly demonstrate that "the comparison of two or more similar products

with, and without, sodium lactate were observed to have very similar microbial and bac-

terial growth patterns, and identical shelf-lives while exposed to the same controlled con-

ditions."  The agency asserts that these four studies provided a rational basis for its deci-

sion to deny Hormel's request to rescind "natural" labels for any of the lactate-containing

products approved under the August 2005 exemption.  Derfler Dec.¶ 32; USDA's State-

ment of Undisputed Facts ¶ 21.

USDA's current argument is a *post hoc* rationalization of counsel, and the agency

action may not be defended on this basis.  *E.g., Williams Gas*, 475 F.3d at 326.  There is

no suggestion in the July 31, 2007 Peterson letter that scientific justification now ad-

vanced by USDA was the basis of its decision.  The agency relied exclusively on grounds

of "efficiency."  In any event, the agency's *post hoc* rationalization is itself arbitrary and

capricious.

*Improper Conversion of a Case-by-Case Study into an Industry-Wide Exemption*

The studies submitted by these four manufacturers, even if valid, provide no justi-

fication for USDA's extrapolation of their results to apply to the products of all twenty-

four manufacturers. Under the law, the agency's pre-marketing label approval program operates on a case-by-case basis. USDA requires applicants for new "natural" labels to demonstrate that lactates do not have a preservative effect in their products. Derfler Dec. ¶ 33. In its original decision granting Hormel relief, the agency required the twenty-four holders of "natural" products containing lactates to come forward and demonstrate, on a product-by-product basis, that the lactates did not have a preservative effect. In its Motion, USDA asserts that four companies submitted studies which purportedly show that "sodium lactate does *not* appear to extend shelf life *on the particular products in question* at two percent or less of product formulation. . . ." Gov't Mem. at 26 (emphasis added).

Thus, USDA's overall label approval program, as well as its inquiry into products approved under the August 2005 exemption, operated on a case-by-case basis. USDA's *post hoc* litigation rationale uses these four studies to justify keeping all products approved under the exemption on the market indefinitely, without further consideration of whether the lactates actually had a preservative effect in the products of the other twenty manufacturers. This action was arbitrary and capricious, because the agency provided no explanation for its change in position, which converted a case-by-case inquiry into a *de facto* restoration of an industry-wide exemption from the prohibition on inclusion of preservatives. There can be no doubt that its action is arbitrary for Kraft's products, where the manufacturer has admitted that lactates have a preservative effect (AR 807), and for products where the lactate level exceeds 2% (*see infra* discussion, pages 42-43). In sum, USDA has rewarded the twenty companies that ignored its demand for information, by authorizing them to continue to mislead consumers and sell their products under misbranded labels.

*The Four Shelf-Life Studies Are Scientifically Flawed*

A cursory examination of the shelf-life studies submitted by the manufacturers shows that they do not support USDA's decision and cannot overcome the strong contrary proof in the peer-reviewed scientific evidence.[6]

The Plumrose "eight week microbiological analysis," on which USDA primarily relied, was not included in the Administrative Record.[7]  What the Record does contain is a two page letter from Plumrose characterizing the results of an Aerobic Plate Count and Analysis of Yeast and Mold studies using the Petri-Film method of analysis.[8]  The description of the study in the letter demonstrates that Plumrose did not use either the incubation times or temperatures prescribed by these methods.[9] Thus, the reported results do not provide scientifically reliable information, and certainly do not rebut the clear scientific evidence of lactate preservative activity below 2%.[10]

The data submitted by Fresherized Foods demonstrate a clear preservative effect at both 1% and 1.5% sodium lactate solutions, and fails to provide any direct scientifically valid comparison of lactate and non-lactate containing product.[11]

---

[6] To assist the Court in understanding the contents of these studies, Hormel has attached a Declaration from Richard J. Christianson, its Manager of Chemistry and Microbiology Laboratories ("Christianson Dec.")(Attachment 1).

[7] Derfler Dec.¶ 31; USDA's Statement of Material Facts ¶ 21.

[8] AR 847-848.  The AOAC has Official Methods of Petri-Film analysis for Aerobic Plate Counts in Food (Official Method 990.12) and for Yeast and Mold Counts in Food (Official Method 997.02). These are analytical methods recognized by USDA as acceptable for such studies. *See*, FSIS Microbiology Laboratory Guidebook, 3rd Ed., vol. 1 & 2 (1998), at *Chapter 3: Examination of Fresh, Refrigerated and Frozen Prepared Meat, Poultry and Pasturized Egg Products, available at* http://www.fsis.usda.gov/ophs/Microlab/Mlgchp3.pdf.

[9] Paragraph two of the letter indicates that the APC analyses were conducted on Petrifilm at 30 degrees Centigrade for 48 hours, rather than the 35 degree Centigrade required under the method. Similarly, the Yeast and Mold samples were held in incubation at 30 degrees Centigrade for a total of 72 hours, rather than the 20-25 degree temperatures for five days required by the method. AR 847.

[10] Christianson Dec. ¶ 8.

[11] Christianson Dec.¶¶ 9-10; AR 795 – 805.

The data accompanying the Peterson's Natural Farms Life Study demonstrate that the product evaluated in this shelf-life study had already reached bacterial counts consistent with spoilage at the outset of the study; the starting bacteria counts exceeded the level at which the scientific analysis should be terminated.[12]  Therefore, this fundamentally flawed study cannot support a scientific conclusion.

In the letter accompanying its study, Kraft admits that its lactates have an "antimicrobial effect," which USDA has recognized as a preservative function.[13]  The Kraft letter further demonstrated why USDA's focus on shelf-life, rather than the antimicrobial effect of lactates, was arbitrary and capricious from the outset. "Shelf-life" is not a scientific concept, but a mixture of marketplace and scientific considerations. As Kraft stated:

> it is not scientifically sound to assume that the shelf life and date codes for a product reveal whether the product contains an antimicrobial ingredient. . . . . As a result of these variables [type of product, moisture content, fat content, salt content, processing methods, and sanitation] two products may have a different shelf life, but this difference cannot be used to predict whether one contains an antimicrobial ingredient while the other does not. . . . Significantly, the lactate ingredients in our natural products are added to address *lm* [*Listeria*], not spoilage organisms.[14]

In sum, USDA acted irrationally in concluding that the results of these flawed studies could overcome the conclusions of the peer-reviewed studies and Kraft's showing that lactates have a preservative effect at levels less than two percent.

## 2. The Record Does Not Support USDA's Claim of a "Long-Standing Policy" of Approving "Natural" Labels for Lactates at Levels Below 2%

USDA suggests that its decision not to institute rescission proceedings against any lactate-containing products on an industry-wide basis "is in keeping with the agency's

---

[12] AR 864-869; Christianson Dec. ¶ 13.
[13] AR 611-640 (Letters from USDA to Companies).
[14] AR 813.

long-standing practice, at least since 1993, to permit the use of sodium or potassium lactate in products bearing the 'natural' label claim, at levels of two percent or less of product formulation." Gov't Mem. at 26.  There is no support in the Administrative Record for the assertion in its litigation Declaration (¶ 15) that USDA had such a policy.   In any event, even if USDA had once had such a policy, that practice would not provide a rational basis for the July 31, 2007 decision in light of the scientific evidence in the Administrative Record that lactates have a preservative at levels below two percent.

### a.  USDA Had No "Long-Standing" Policy

Contrary to the assertions in the Derfler Declaration (¶ 19) and USDA's Statement of Undisputed Facts (¶ 16), the August 2005 exemption did *not* provide that USDA would approve "natural" labels "only if data indicated that the lactates contained in the products do not have a preservative effect."  To the contrary, the revised definition provided that "sodium lactate (from a corn source) . . . [is] acceptable for 'all natural' claims."  AR 8.  That definition does not impose any percentage limitation on the level of lactates that may be included in a product that qualifies for a "natural" label.

USDA attempts to introduce such an unwritten limitation into the definition by claiming that it had followed a "two percent" limit for many years.  The Record refutes that claim.  The Derfler Declaration (¶ 15) and USDA's Statement of Undisputed Facts (¶ 8) assert that a "two percent" limit for "natural" labels dates back to 1993.

> Since 1993, the Food and Drug Administration has considered sodium and potassium lactate to be acceptable ingredients in human food *for 'natural' label claims* when used as flavor enhancers and flavoring agents in the   amount of two percent or less of the total product formulation.  See 58    Federal Register 4067 (Jan. 13, 1993).

(emphasis added).  This assertion is plainly wrong.  On its face, this 1993 USDA rule did

not address the propriety of "natural" label claims.  It addressed the separate question

whether a meat or poultry product would be deemed "adulterated" by the addition of so-

dium or potassium lactate as a flavor enhancer.  USDA concluded that their inclusion up

to this level would not render the products "adulterated," because the FDA had deter-

mined that these chemicals were safe for human consumption in limited quantities.  In

amending its rule, the agency did not refer to "natural" label claims.

    The Derfler Declaration (¶ 16) and USDA's Statement of Undisputed Facts (¶ 9)

also assert that USDA made the decision to allow "natural" labeling for products contain-

ing two percent or less of sodium lactate in response to requests received in 2000 and

2001, on the alleged ground that "at the two percent level sodium lactate was understood

to only enhance flavor and not to act as a chemical preservative."  USDA did not include

the documents relevant to these label approvals in the Administrative Record.  Accord-

ingly, it may not rely on these alleged decisions to justify the existence of the alleged pol-

icy.  *E.g., Williams Gas Processing – Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C.

Cir. 2006); *SEC v. Chenery Corp.* 318 U.S. 80, 95 (1943).

    In the same paragraphs, USDA asserts that at the time of these approvals, USDA

"only recognized an anti-microbial effect for sodium and potassium lactate at 4.8 percent.

*See* 9 C.F.R. 424.21."  Derfler Declaration ¶ 16; USDA's Statement of Undisputed Facts

¶ 9.  The agency has it backwards.  It amended Section 424.21(c) on January 20, 2000 to

recognize that these lactates have a preservative effect and established a *maximum* level

of 4.8% that could be added to foods without rendering the product adulterated.  65 Fed.

42

Reg. 3121 (January 20, 2000).  The 2000 rule, however, did not address the question when a "natural" label may be granted for a lactate-containing product.

### b.  USDA's Actions Are Inconsistent with the Alleged 2% Policy

USDA's actual decisions refute the suggestion that it followed a 2% policy. [REDACTED]  [REDACTED].  [REDACTED].

As noted, the text of the August 2005 exemption did not impose a 2% limit on sodium lactate in "natural" products.  The Administrative Record shows that between August 2005 and its December 5, 2006 revocation of that exemption, USDA claims to have approved "natural" labels for 14 lactate containing products.  AR 2063-2123.[15]  Of these 14 products, at least two had lactate levels in excess of 2%.

| Administrative Record | Lactate Level |
| --- | --- |
| 1. [REDACTED] | |
| 2. [REDACTED] | |

Based on its claim to have followed a policy of allowing lactates up to 2%, maximum level, USDA should have initiated label rescission proceedings [REDACTED]. The agency's failure to take such action undermines the credibility of its litigating position.

In sum, the Administrative Record refutes USDA's claim that it acted rationally and consistently with prior policy in deciding not to cancel any "natural" labels for lactate-containing products.

### C.  *USDA Has Failed To Show that Its Decision Not To Initiate Any Label Rescissions Did Not Constitute a* **De Facto** *Rule of General Applicability*

---

[15] As noted, the Administrative Record is incomplete on this point, because it includes only twelve label approvals and does not include the three Oscar Mayer products that prompted Hormel's request for relief.

Claim 3 alleges that the July 31, 2006 letter illegally granted a *de facto* industry-wide exemption from the misbranding provisions of the FMIA and the PPIA for the "natural" labels of existing lactate-containing products, without providing notice and comment.  USDA argues that it "has not yet taken *any* action" that could be described as promulgating a general rule; and that all it has done "is to state its current intention *not to take action* to rescind approval for 'natural' labels of Hormel's competitors" pending completion of the rulemaking.  Gov't Mem. at 27-28 (emphasis in original).

A "rule" is defined as "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy . . . ."  5 U.S.C. § 551(4) (2005).  An agency statement constitutes a rule that must be issued through a notice and comment process if it is deemed binding – that is, if it "imposes any rights or obligations" and "denies the decisionmaker discretion in the areas of its cover-age, so that [the agency] will automatically decline to entertain challenges to the state-ment's position . . . ." *General Electric Co. v. EPA*, 290 F.3d 377, 382 (D.C. Cir. 1982), quoting *McLouth Steel Products Corp. v.Thomas*, 838 F.2d 1317, 1320 (D.C. Cir. 1988). *See Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1021-22 (D.C. Cir. 2000) (guidance document that reflects a settled agency position that has legal consequences for regulated entities constitutes a "rule" that must be issued through notice and comment procedures); *CropLife*, 329 F.3d at 881 (same).

Here, the July 31, 2006 letter announced a USDA policy decision not to require *any* member of the meatpacking industry to submit information showing that lactates do not have a preservative effect in *any* product that currently is sold under a "natural" label. It thereby established a policy to permit the sale, for an indefinite period of time, of

44

"natural" products without obtaining or analyzing information on a case-by-case basis whether the lactates are having a preservative effect.  The agency has treated this policy as binding for the twenty manufacturers that did not submit the required information about the effects of lactates in their products and to the manufacturers of the fourteen lactate-containing products that were granted "natural" labels while the August 2005 exemption was in effect.

Through this action, USDA has codified the August 2005 exemption, which did not impose any limits on the level of sodium lactate in foods sold under the "natural" label, and grandfathered in all lactate-containing products previously approved, even those in which the lactate level exceeded two percent.  This industry-wide determination that all such foods would not be considered "misbranded" for the indefinite future, and specifically for the duration of a rulemaking that will take many years to conduct and may never be successfully completed, constitutes a "rule" that may not be issued without notice and comment under *General Electric*, *Appalachian Power*, and *Croplife*.  Accordingly, the Motion for Summary Judgment on Claim 3 should be denied.

## CONCLUSION

For the reasons set forth above, USDA's motion to dismiss or, in the alternative, for summary judgment should be denied.

Respectfully submitted,

<table>
<tr><td>   /s/ Nancy S. Bryson     </td><td>   /s/ John F. Cooney       </td></tr>
<tr><td>NANCY S. BRYSON</td><td>JOHN F. COONEY</td></tr>
<tr><td>(D.C. Bar No. 913673)</td><td>(D.C. Bar No. 936336)</td></tr>
<tr><td>The Bryson Group PLLC</td><td>Venable LLP</td></tr>
<tr><td>575 7th Street, N.W.</td><td>575 7th Street, N.W.</td></tr>
<tr><td>Washington, D.C. 20004</td><td>Washington, D.C. 20004</td></tr>
<tr><td>(202) 344-4731</td><td>(202) 344-4812</td></tr>
<tr><td> </td><td> </td></tr>
<tr><td>March 7, 2008</td><td>Counsel for Plaintiff</td></tr>
</table>

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

**HORMEL FOODS CORPORATION**        )
                                    )
                        **Plaintiff,**   )
        **v.**                       )        **Civil Action No.**
                                    )        **1:07-cv-1724 (RBW)**
**UNITED STATES DEPARTMENT**         )
  **OF AGRICULTURE,**                )
                                    )
                        **Defendant.**   )
_____

## PLAINTIFF'S STATEMENT OF MATERIAL FACTS THAT ARE IN DISPUTE
## [REDACTED]

Pursuant to LCvR 7(h), in support of its Opposition to the Motion for Summary

Judgment submitted by defendant U.S. Department of Agriculture ("USDA"), plaintiff

Hormel Foods Corporation ("Hormel") submits this Statement of Material Facts that Are

in Dispute.

This document recites each paragraph of the Statement of allegedly undisputed

facts presented by USDA in support of its Motion for Summary Judgment and then states

for each paragraph when the asserted fact is disputed and, if so, on what grounds.

1.      Manufacturers must submit all labels for meat and poultry products
with claims and special statements for evaluation and approval to the USDA Food
Safety and Inspection Service's ("FSIS") Labeling and Program Delivery Division
(LPDD)(formally known as the Labeling and Consumer Protection Staff) before the
products can be offered to consumers.  The LPDD evaluation process includes
reviews by at least four members of the division, including chemists, certified
nutritionists, food technologists and program analysts. (Derfler Decl. ¶¶6, 7).

Response:  Undisputed.

2.      The LPDD provides guidance to industry and the public on how to
draft labels that will not mislead the consumer in the form of its  Standards and
Labeling Policy Book ("Policy Book").  (Derfler Decl. ¶ 8).

Response:  Undisputed

3.    The Policy Book is derived from the Standards and Labeling Policy Memoranda compiled as FSIS Directive 7220.1.  The Policy Book consolidates labeling policies and standards used in individual Standards and Labeling memoranda.  The Policy Book sets out factors FSIS considers in reaching its labeling determinations.  The LPDD makes the final decisions on label applications on a case-by-case basis. (Derfler Decl. ¶ 9).

Response:  The statements in the first two sentences are undisputed.  The statement in the third sentence is disputed to the following extent:  Hormel asserts that on July 31, 2007, USDA announced a blanket determination not to institute label rescission proceedings for any lactate-containing product for which a "natural" label had been approved by USDA under the since-revoked August 2005 decision that created an exemption from the definition of "natural" for the chemical preservative "sodium lactate (derived from a corn source)."  This decision was made on a global basis, not on a case-by-case basis.

Source:  Administrative Record ("AR") 779-780.

4.    FSIS published Policy Memorandum 055, dated November 22, 1982, (AR 0002), to guide manufacturers in the development of labeling that FSIS was likely to determine to be truthful and not misleading with regard to the labeling claim that a meat or poultry product contains "natural" or "all natural" ingredients. Policy Memo 055 stated that a meat or poultry product can be labeled "natural" if the applicant for such labeling demonstrated:

> (1) The product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative [emphasis added] (as defined in 21 C.F.R. 101.22), or any other artificial or synthetic ingredient; and

> (2) The product and its ingredients are not more than minimally processed. Minimally processed may include: (a) Those traditional processes used to make food edible or to preserve it to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes that do not fundamentally alter the raw product or that only separate a whole intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

2

(Derfler Decl. ¶ 10).

      Response:  Undisputed.

      5.     The memorandum also stated that manufacturers who wished to label their products as "natural" would be expected to include a statement that explained what was meant by the term "natural," e.g. that the product was "natural" because it contains no artificial ingredients and was only minimally processed.  (Derfler Decl. ¶ 12; AR 0003).

      Response:  Undisputed.

      6.     The policy memorandum also discussed the fact that a product that contained an ingredient that had been "more than minimally processed" would not necessarily preclude the product from being labeled as "natural."  The policy memorandum explained that exceptions for products with such ingredients would be made on a case-by-case basis.  (Derfler Decl. ¶ 13; AR 0002).

      Response:  Undisputed.

      7.     Since 1982, FSIS has modified the policy described in Policy Memorandum 055 on occasion to make it consistent with prevailing policies, to reflect case-by-case decisions made by the Agency, and to update references to regulations. These modifications appear in the corresponding pages of the Policy Book.  (Derfler Decl. ¶ 14).

      Response:  Disputed.  In August 2005, USDA amended the Policy

Memorandum by adding the following exemption to the definition of "natural":

      Note:  Sugar, sodium lactate (from a corn source), natural flavorings from oleoresins or extractives are acceptable for "all natural" claims.

The is no evidence in the Administrative Record to support the assertion that the

2005 amendment reflected case-by-case decisions or prevailing policies.  The

Administrative Record contains only one label approved for a product containing

sodium lactate prior to the August 2005 policy change.  After the August 2005

amendment, USDA adopted a class based approval policy for products containing

both sodium and potassium lactate, at formulation levels both above and below 2%.

On December 5, 2006, USDA revoked the August 2005 exemption.

Sources:  AR 11, 2063-2123 (filed under seal); 71 Fed. Reg. 70,503, 70,504 (Dec. 5, 2006).

8.      Since 1993, the Food and Drug Administration has considered sodium and potassium lactate to be acceptable ingredients in human food for "natural" label claims when used as flavor enhancers and flavoring agents in the amount of two percent or less of the total product formulation.  See 58 Federal Register 4067 (Jan. 13, 1993).  In deciding to add sodium and potassium lactate as acceptable ingredients in meat and poultry products, FSIS noted that these ingredients were generally recognized as safe (GRAS) by the FDA in 1987.  See 21 C.F.R. 184.1639. (Derfler Decl. ¶ 15).

Response.  The first sentence is disputed.  (a)  The January 13, 1993 Federal Register citation is to a USDA rule, not a rule of the Food and Drug Administration ("FDA").

(b)  The 1993 rule does not address whether products containing sodium or potassium lactate may carry a "natural" label, consistent with the FMIA and the PPIA.  The rule addressed a different, human safety-related issue – whether potassium lactate and sodium lactate could safely be used as flavoring agents in cooked meat and poultry products.  The rule provided that use of these substances would not render the resulting meat and poultry products adulterated.  The preamble to the rule noted that these lactates had been affirmed as Generally Recognized As Safe by the FDA on April 6, 1987, for direct human food ingredients, as flavor enhancers, flavoring agents, adjuvants, humectants, and ph control agents.  21 C.F.R. § 184.1639 and 21 C.F.R. § 184.1768.  52 Fed. Reg. 10,884.

Source:  58 Fed. Reg. 4,067, 4,068 (Jan. 13, 1993).

9.      In 2000 and 2001 FSIS received several requests to approve the labeling as "natural" for several products containing sodium or potassium lactate as

4

an ingredient at two percent or less.  FSIS made the decision to allow the "natural" labeling of products containing two percent or less of sodium lactate, because sodium lactate is derived from a natural source, corn and beets, and the two percent level sodium lactate was understood to only enhance flavor and not to act as a chemical preservative as proscribed by Policy Memorandum 055.  FSIS formed this opinion after reviewing data submitted by Shenandoah Products, Inc. for a raw poultry product. 58 FR 4067.  FSIS only recognized an anti-microbial effect for sodium and potassium lactate at 4.8 percent.  See 9 C.F.R. 424.21.  (Derfler Decl. ¶ 16).

Response:  Disputed.  Sentence one:  There is no evidence in the Administrative Record to support the assertion that USDA received requests in 2000-2001 to approve "natural" labeling for products with sodium or potassium lactate as an ingredient at a level of two percent or less.

Sentence two:  Disputed.  USDA's letter of December 6, 2006 to Hormel states that "natural" labels were approved for products containing sodium or potassium lactate "based on the representations concerning the source and level of the lactate used, and information provided by the applicants that lactate was being used exclusively as a flavoring agent."  This statement establishes a product-by-product approval process.  Sentence two, on the other hand, appears to describe a single "decision" by USDA to permit inclusion of these products on a class-wide basis, without product-by-product review.  The only "natural" label approval in the Administrative Record for a lactate-containing product prior to August 2005 is from June 2005 and involves a product [REDACTED].

Sentence three:  The Administrative Record contains no labeling documents for Shenandoah Products, Inc.  The Federal Register notice cited ("58 Fed. Reg. 4067") is a 1993 regulation that approved as safe for human consumption the use of lactates as flavoring agents in meat and poultry products up to a maximum level of

2%. The Federal Register notice does not discuss whether products containing

sodium or potassium lactate may carry a "natural" label, consistent with the FMIA

and the PPIA.

Sentence four. The USDA rule cited, 9 C.F.R. § 424.21, addresses a human

safety-related issue and determines that sodium and potassium lactates may safely be

used in meat and poultry products up to a maximum level of 4.8% without rendering

the products adulterated. See 65 Fed. Reg. 3121 (Jan. 20, 2000). Neither the rule

nor the Federal Register notice addresses whether products containing sodium or

potassium lactate may carry a "natural" label, consistent with the FMIA and the

PPIA. The Administrative Record confirms that that sodium and potassium lactate

have antimicrobial effects at levels below the 4.8% maximum.

Sources: AR 168-169; 58 Fed. Reg. 4,067, 4,068 (Jan. 13, 1993); AR 811
(statement by Kraft Foods that the USDA "regulation authorizing the use of lactate
ingredients for an antimicrobial purpose sets no lower limit); AR 611-640 (USDA
letters to manufacturers of November 30 and December 5, 2006, requiring them to
submit data demonstrating that lactates do not function as a preservative in a meat or
poultry product "at levels less than 2 percent.")

10.    In August 2005, FSIS revised Policy Memorandum 055 originally
published in 1982, and updated the Food Standards and Labeling Policy Book, to
take into account the Agency's decision to approve the "natural" label of products
containing, among other things, sodium lactate (from a corn or beet source) when the
amount of sodium lactate did not exceed two percent of the product's formulation.
(AR 0008). Between August 2005 and December 5, 2006, FSIS approved fourteen
"natural" labels for products containing sodium or potassium lactate. (Derfler Decl.
¶ 19; AR 2000-2060).

Response: Disputed. The August 2005 revision adopted an exemption from

the definition of "natural" that did not impose a 2% limit on the amount of lactate

that may be included in a product labeled "natural." The exemption provided:

Note: Sugar, sodium lactate (from a corn source), natural flavorings
from oleoresins or extractives are acceptable for "all natural" claims.

The Administrative Record does not contain the label approvals for 14 products, as asserted by USDA, but contains label approvals for only 12 products. The Administrative Record does not contain the label approvals for the Oscar Meyer products cited in Hormel's request for relief.

Of the 12 label approvals produced in the Administrative Record, three approvals were for products that contained lactates at levels greater than two percent (filed under seal); three other approvals were for lactate products for which no percentage concentration was given (AR [REDACTED]) (filed under seal): two others contain potassium lactate concentrations by weight that would appear to exceed 2% of the product weight.

Sources:  AR 8 (exemption from definition of "natural"); AR [REDACTED] (label applications filed under seal).

11.     On October 9, 2006, Hormel Foods Corporation ("Hormel") submitted a petition to FSIS requesting that FSIS initiate the rule making process to amend the labeling regulations for meat and poultry products in order to codify the definition of "natural" for meat and poultry products.  The petition requests that, consistent with FSIS' longstanding policy on "natural" label claims as stated in FSIS Policy Memorandum 055, a meat or poultry product should not be labeled as "natural" unless (1) it does not contain artificial flavorings, artificial coloring ingredients, other artificial or synthetic ingredients, or chemical preservatives; and (2) it is not more than minimally processed.  The petition further states that exceptions for specific chemical preservatives and synthetic ingredients should not be allowed.   (Derfler Decl. ¶ 20; AR 0014).

Response:  Disputed.  The statement is incomplete.  In addition, Hormel requested interim relief, while the rulemaking was pending, in the form of the revocation of the exemption to the definition of "natural" for sodium lactate that had been adopted in the August 2005 amendment.

Source:  AR 27-28.

12.     Hormel specifically took issue with the approval of "natural" labels for products that include sodium lactate.  It was Hormel's contention that sodium lactate served as a chemical preservative; on the ground that it assertedly extends the shelf-life of products in which sodium lactate is an ingredient.  (Derfler Decl. ¶ 21; AR 0023).

Source:  Disputed.  Hormel also asserted that sodium lactate was not

"minimally processed" within the meaning of the Natural Policy.

13.     On October 10, 2006, Hormel requested that FSIS rescind the "natural" claim labels that had been previously granted to certain products because Hormel contended that lactates had been added to those products as a preservative and that therefore, their "natural" label claims were not accurate.  (Derfler Decl. ¶ 23; AR 55-64).

Response:  Disputed.  Hormel requested that USDA act promptly to cancel

the labels for three lactate-containing products sold by Oscar Meyer.  The label

approvals for these products are not in the Administrative Record.

Hormel did not "contend" that lactates had been added to those products but

submitted evidence, in the form of three Oscar Meyer labels which state that the

products contained potassium lactate; and in the form of the Purac patents, assigned

to the parent of Oscar Meyer, which state that lactates have preservative effects at

levels above and below the 2% level, and advertising literature issued by Purac to

promote commercial sale of the lactates it produces.  The Administrative Record

also contains substantial evidence submitted by Kraft, the parent of Oscar Meyer,

that lactates have an inherent preservative effect and that this effect occurs at levels

well below 2%.

Sources:  AR 55-58; AR 127, 128, 142, 148, 151, 806, 807, 812.

14.     On November 7, 2006, Hormel, through its counsel, sent a letter to the FSIS in further support of its October 9, 2006 petition.  This letter reiterated the arguments offered in the October 9, 2006 petition that sodium lactate should not be included in products labeled "natural" because sodium lactate has a preservative

effect. Hormel again cited the same evidence for this proposition as before: the Oscar Mayer patents claiming that sodium lactate, even at two percent or less of formulation, extends shelf life, and the marketing literature for Purac, which also claims that sodium lactate extends shelf life.  (Derfler Decl. ¶ 24; AR 0126).

Response:  Disputed.  The November 7, 2006 letter supported the October 10, 2006 request for "rescission of false and misleading labeling of products containing the chemical preservative, potassium lactate."  In addition to presenting the arguments noted by USDA's Statement, the letter also argued that, as a matter of law, USDA had amended its Natural Policy in violation of the express provisions of the FMIA, the PPIA, its implementing regulations, and the rulemaking requirements of the APA based on the factual materials provided, including the Purac patents, the Purac marketing literature, and the Oscar Mayer labels.

Source:  AR 126.

15.    In response to the Hormel petition, and in order to respond to changing  industry standards for processing and packing meat and poultry, FSIS took the following steps:

Response:  Disputed.  The following position applies to paragraphs 15-18.

The Statement is incomplete.  The Statement does not recognize that USDA sent a letter to Hormel on December 6, 2006, in which the agency granted Hormel's request for relief, pending the outcome of a rulemaking that it committed to initiate. That relief took several forms, including:  (a) revocation of the August 2005 exemption for sodium lactate from the definition of "natural"; (b) establishment of substantive standards and procedural framework that USDA would follow to determine the permissibility of lactates in products that were currently being sold under a "natural" label, i.e, whether the lactates have an antimicrobial effect; and (c) a commitment that USDA would require manufacturers of lactate-containing

9

products sold under a "natural" label to submit data demonstrating that the lactates

did not have a preservative effect in their products, and that "[i]n the absence of such

information, FSIS will institute action to rescind its approval of the labels that bear a

'natural' claim."

Source:  AR 168-169 (emphasis added).

16.    First, FSIS removed the note to the August 2005 Policy Book update
that approved sodium lactate as an ingredient in "natural" products.  (AR 0010).
Furthermore, FSIS stated, in the current version of its Policy Book, that it will
continue to make determinations on any new applications for a natural label on a
case-by case-basis.  (AR 11). FSIS will approve "natural" labeling of products that
include sodium or potassium lactate only if data indicate that the lactates contained
in the products do not have a preservative effect.  (Derfler Decl. ¶ 26).

Response:  Disputed.  The actual language of the Policy, as revised in

December 2006, provides that USDA "has removed the reference to sodium lactate

from this guidance but will judge claims that foods to which a lactate has been added

can be characterized as "natural" on a case-by-case basis, pending the outcome of a

rulemaking on the use of "natural" that the Agency intends to initiate in the near

future."

This Paragraph incorrectly characterizes the actual language of the revised

Policy to suggest that the agency action had only a prospective effect.

Source:  AR 11.

17.    Second, in November, 2006, FSIS sent letters to twenty-four
companies with approved meat and poultry labels bearing the claim "natural" for
products containing lactates at levels of two percent or less.  The letters explained
that FSIS will only approve "natural" label applications for products containing two
percent or less of sodium or potassium lactate after the manufacturers provide
scientific data proving that these products (1) exhibit the same microbiological
characteristics (i.e. rate of spoilage) as products formulated without lactates; (2) have
the same shelf-life as that of the same products formulated without lactates; and (3)
have the same sell-by/use-by/freeze-by dates applied as the dates that would be
applied to products without lactates. (Derfler Decl. ¶ 27; AR 0611-0640).

Response:  Disputed.  The Administrative Record contains only 15 of these 24 letters.  Of the 15 letters produced, one letter is dated November 30, seven are dated December 1, and seven are dated December 5.  The letters also confirm that FSIS permits sodium lactate and potassium lactate for the purpose of an antimicrobial effect in meat and poultry products at a level of up to 4.8% of product formulation and that "a preservative function includes those of an antimicrobial, i.e. reducing microorganisms and extending shelf-life of treated products."

This Paragraph of USDA's Statement of Undisputed Facts mischaracterizes the actual language the agency included in its letters to the 24 manufacturers of the revised Policy to suggest incorrectly that the agency's standard governing determination of the permissibility of the inclusion of lactates would have had only a prospective effect on future label approvals.  The actual language of the letters demonstrates that USDA informed the manufacturers that the standards it was establishing would apply to lactate-containing products currently being sold under a "natural" label.

> If lactates are used in your company's products bearing the claim "natural" at levels less than 2 percent to increase product shelf-life, improve food safety, and control pathogens, the use of the ingredients is contrary to the meaning of "natural" stated above.  Moreover, such products would be misbranded and the labels would be subject to being rescinded.

Source:  AR 611 – 640.

18.    Additionally, the letters directed the manufacturers to provide FSIS with data demonstrating that the use of sodium or potassium lactate in their products with currently approved "natural" labels does not have a preservative effect.  The companies were also informed that the agency may rescind labels where it is found that lactates at levels of two percent or less have a preservative effect.  (Derfler Decl. ¶ 28).

11

Response: Disputed. This Paragraph of USDA's Statement of Undisputed Facts misquotes the letters sent to manufacturers to suggest that the agency stated that it might rescind labels if lactates had a preservative effect in products sold under a "natural" label. The letters actually state that USDA "will" rescind labels under these circumstances. The actual text of the letters provides:

> On receipt of the data, FSIS will evaluate them, and if the Agency were to find based on this evaluation that the effect of using lactates at 2 percent or less in formulations of "natural" meat and poultry products is that of an antimicrobial, the Agency will rescind its approval of the labels for these products.

Source: AR 612 and even-numbered pages through 640.

19.    On January 11, 2007, FSIS sent a second letter to the manufacturers which clarified the data FSIS required. This letter informed the manufacturers that FSIS only required data concerning shelf-life, and "use-by" dates of the products containing sodium lactate. (Derfler Decl. ¶ 29; AR 0760-0776).

Response: Undisputed.

20.    Of the twenty-four manufacturers which were sent letters requesting data, four companies have provided results from tests analyzing the effects of sodium or potassium lactate in their products at levels of two percent or lower in accordance with 9 C.F.R. § 424.21. (Derfler Decl. ¶ 30; AR 0792-0873).

Response: Disputed insofar as the verb "have provided" suggests that other manufacturers might hereafter submit data. USDA has decided not to initiate label cancellation proceedings, so no manufacturer will hereafter submit data beyond the four of the 24 manufacturers that actually submitted data in response to USDA's request. The Administrative Record contains no such submissions after the July 31, 2007 letter to Chairman Peterson announcing USDA's decision.

Source: AR 792-873, 779-780

21.    All four manufacturers' data submitted to date indicate that comparison of two or more similar products with, and without, sodium lactate were

observed to have very similar microbial and bacterial growth patterns, and identical shelf-lives while exposed to the same controlled conditions. (AR 0792-0873). In consideration of the evidence provided by the four companies that responded to FSIS' request, FSIS decided to postpone any decision on Hormel's request to rescind USDA approval of current "natural" labels for such products pending completion of the rulemaking process. (Derfler Decl. ¶ 32).

Response: Denied. (a) The shelf life studies contained numerous scientific flaws that made them an inappropriate basis for decision on the antimicrobial effects of lactates, especially in light of the peer-reviewed scientific studies in the Administrative Record that lactates have antimicrobial effects at levels well under 2%.

(b) USDA's Statement of Undisputed Facts does not recognize the existence of the document in which the agency announced its final decision not to grant Hormel relief through initiation of label rescission proceedings, the July 31, 2007 letter to Chairman Peterson. In that document, in announcing its decision to deny Hormel relief, USDA did not rely upon the shelf life studies submitted by the four manufacturers or any scientific information to justify the agency's change in position and its determination not to institute any label rescission proceedings based on a product-by-product review of the preservative effect of lactates in specific products, even for the 20 manufacturers that did not submit information. The Peterson letter relied exclusively on grounds of "efficiency." It stated:

> FSIS is considering how best to proceed to ensure that the term "natural," as used in meat and poultry labeling, is truthful and not misleading. While one way to try to achieve this result would be to pursue the actions we described in the letters you reference, we now believe that a more efficient way would be to pursue the process that the Agency began with the December 5, 2006, notice . . . .

(c) USDA did not "postpone" decision on Hormel's request for interim relief

pending the conduct of the rulemaking.  USDA conclusively denied that request and

will not further consider Hormel's request for interim relief.

Source:  AR 779-780 (emphasis added).  Christianson Declaration attached to the
Opposition.

22.    Since December 2006, FSIS has approved one label for a product
containing sodium lactate. FSIS approved the label, submitted by Pedersons Natural
Farms (for the Maverick Ranch label) for an all natural smoked uncured bacon, on
October 31, 2007. (AR 2057). FSIS approved the label after Pedersons Natural
Farms submitted data proving that sodium lactate in their products did not extend
shelf life or expiration date.  (Derfler Decl. ¶ 33).

Response:  Disputed.  A showing that sodium lactate does not extend shelf

life or expiration date, even if the study were scientifically valid, does not

demonstrate the absence of an antimicrobial effect, and thus a preservative, effect.

Source:  AR 807-815.

23.    Finally, FSIS published a Notice of Petition and Public Meeting, as
well as a Request for Comments on December 5, 2006.  71 Fed. Reg. 70503-70505
(Dec. 5, 2006).  FSIS held a public meeting to discuss this issue on December 12,
2006.  In addition, FSIS accepted comments until January 11, 2007.  FSIS requested
that the public hearing and the comments focus on the following topics:

1.    Is it reasonable to include as part of a definition of "natural" a
stipulation that products can be no more than minimally processed to be eligible to
bear the claim?
2.    Are there any accommodations necessary to allow for certain
operations because food processing and packaging techniques for enhancing safety
may disqualify a product as "natural?"
3.    What are the implications and conflicts that exist with regard
to using current and new food processing methods and certain classes of
ingredients, and the meaning of the claim "natural" on the labels of meat and
poultry products?
4.    Are there available data from consumer studies about what the
claim "natural" means on the labels of food products, including meat and poultry
products?
5.    What do consumers think that the terms "minimal
processing," "artificial and synthetic," and "preservatives" mean?
6.    Do food safety and consumer protection benefits of using
what historically may have been considered more than minimal processing

techniques and antimicrobial agents outweigh conflicts with the meaning of "natural?"  (Derfler Decl. ¶ 34).

      Response:  Undisputed

24.    FSIS received over 6,000 comments in response to the December 2005 Federal Register notice and the December 2006 public meeting.  Most of the comments were identical letters submitted electronically by individuals who objected to the use of flavoring, tenderizing, and seasoning solutions to enhance poultry products bearing the "natural" claim.  (*See* example at AR 2125). In addition FSIS received comments from industry, trade associations, and law firms representing industry, consumers, and consumer advocacy organizations concerning only meat products.  (Derfler Decl. ¶ 35; AR Ex. I, 0875-1998).

      Response:  Undisputed.

25.    The comments expressed widely divergent and sometimes conflicting views about what the claim "natural" as applied to meat and poultry products should mean. For example, Oregon State University Professor Daniel F. Farkas argued that "natural" products should be free of artificial flavors, colors, and preservatives, such as sodium lactate.  (AR 1645). Kraft Foods, on the other hand, submitted a comment which argued that sodium lactate is a natural preservative and therefore is permissible in "natural" meat and poultry products.  (Derfler Decl. ¶ 36; AR 1770).

      Response:  Disputed.  The statements in this Paragraph omit critical information in the Kraft comments, including that lactates have an inherent antimicrobial effect even at levels below 2% and that Kraft repeatedly had informed USDA of that antimicrobial effect over the years.

      Further, the definition of "chemical preservative" incorporated in the definition of "natural" contains narrow exceptions for natural preservatives.  The Kraft submission does not address the question whether the highly refined and concentrated form of lactate that it produces after substantial industrial chemistry would fit within these longstanding, narrow exemptions from "chemical preservative."

Source:  AR 806-815.

26.    FSIS has decided to issue an Advanced Notice of Proposed Rulemaking and Request for Comments (ANPR) in order to gather more specific information so that FSIS can make a more fully informed decision to ensure that the term "natural," as used on the labels of meat and poultry products, is truthful and not misleading.  The ANPR's purpose it to solicit additional comments, focused by a defined set of alternatives that address the use of he "natural" claim.  The Agency believes this process will clarify and resolve emerging issues surrounding the "natural" label.  The ANPR will be published by early 2008. (Derfler Decl. ¶ 38).

Response:  These are assertions of the agency's current intentions.  They are

not supported by any documents in the Administrative Record.

27.    After consideration of the comments received in response to the forthcoming notice, the agency's current plan is to draft and publish a proposed rule to define the term "natural" for purposes of labeling meat and poultry products. (Derfler Decl. ¶ 39).

Response:  These are assertions of the agency's current intentions.  They are

not supported by any documents in the Administrative Record, and they may or may

not ever occur.

28.    Furthermore, along with the ANPR, the agency is preparing to publish an update to the policy guidance on "natural" claims to minimize uncertainty as to the circumstances in which the labels of meat and poultry products that bear "natural" claims will likely be approved. (Derfler Decl. ¶ 40).

Response:  These are assertions of the agency's current intentions.  They are

not supported by any documents in the Administrative Record, and they may or may

not ever occur.

29.  In a letter dated October 29, 2007, Under Secretary of the Office of Food Safety, Richard A. Raymond, responded to a letter from Collin C. Peterson, Chairman of the Committee on Agriculture in the U.S. House of Representatives that requested information on actions taken by the USDA with regard to "natural" label claims on meat and poultry products containing sodium or potassium lactates.  Dr. Raymond explained that USDA is taking the necessary time to carefully consider the issues, to decide upon the most appropriate course of action, and to develop a regulatory strategy.  Dr. Raymond explained that the USDA intends to initiate rulemaking, and that, in the interim, labels are still being considered on a case-by-case basis. (Derfler Decl. ¶ 41; AR 0783).

Response:  Undisputed.

Respectfully submitted,

___*/s/ Nancy S. Bryson*___          ___*/s/ John F. Cooney*___
NANCY S. BRYSON                    JOHN F. COONEY
(D.C. Bar No. 913673)              (D.C. Bar No. 936336)
Bryson Law Group PLLC              Venable LLP
575 7th Street, N.W.               575 7th Street, N.W.
Washington, D.C. 20004             Washington, D.C. 20004
(202) 344-4731                     (202) 344-4812


March 7, 2008                       Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of March 2008, copies of *Opposition of Plaintiff Hormel Foods Corporation to Motion to Dismiss the Complaint Or, In The Alternative, For Summary Judgment [REDACTED], Statement of Material Facts That Are In Dispute, and Declaration of Richard J. Christianson* were served by the Court's ECF filing system on the following:

William B. Jaffe, Esquire
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W.
Washington, D.C. 20530


Kristin F. Roddy, Esquire
Hogan & Hartson
555 Thirteenth Street, N.W.
Washington, D.C. 20004


*/s/ John F. Cooney*
John F. Cooney

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

HORMEL FOODS CORPORATION )
                                             )
                                             )
                          Plaintiff, )
           v.                             )      Civil Action No. 1:07-cv-1724
                                             )
UNITED STATES DEPARTMENT )
  OF AGRICULTURE, )
                                             )
                                 Defendant. )

## DECLARATION OF RICHARD J. CHRISTIANSON

I, Richard J. Christianson, declare the following:

1.      I am Manager of Chemistry and Microbiology Laboratories for the Hormel Foods Corporation, where I have been employed since 1981. I have over 28 years of experience in the food industry working extensively on the development and implementation of food safety and quality. Prior to this position, I spent my career working for Hormel as a Microbiology Lab Supervisor, Food Technologist, and Senior Thermal Processing Technologist. I received my B.A. in Biology from The University of Minnesota. I am a member of the American Society For Microbiology, the International Association For Food Protection, and the Institute For Thermal Process Specialists.

2.      In my current position, I am responsible for Chemistry and Microbiology Laboratory services within the Hormel Foods Research and Development, microbiological challenge studies, evaluation of intervention technologies, and new method evaluation and development. I manage Supervisors, Scientists, and Technicians in the Chemistry and Microbiology Laboratories, ensuring company policies and

applicable state and federal laws are followed. I am responsible for the conduct of

scientific research submitted to regulatory agencies to meet various program

requirements.

3.    A microbiological challenge study assesses the growth characteristics of

bacteria under a variety of conditions, and the lethal effects of various intervention

technologies.

4.    There is no single standard method of analysis to determine shelf life, but

where microbiological spoilage data is used as the primary indicator of shelf life,

recognized methods of microbiological analysis must be used.

5.    There are several standard sources for recognized methods for the

microbiological analysis of food products.  These include the FDA Bacteriological

Analytical Manual (*available at* http://www.cfsan.fda.gov/~ebam/bam-toc.html) the FSIS

Microbiology Laboratory Guidebook (3rd Ed., vol. 1 & 2, 1998, *available at*

http://www.fsis.usda.gov/Science/Microbiological_Lab_Guidebook/index.asp) and the

Compendium of Methods for the Microbiological Examination of Foods (Health and

Welfare Canada, *available at* http://www.hc-sc.gc.ca/fn-an/res-rech/anly-

meth/microbio/index_e.html), International Standards Organization ("ISO")(*available at*

http://www.iso.org/iso/searcj.htm?qt=Microbiological+Methods&sort=rel&type+simple

&published=on) and/or AOAC Official Methods (*available at* http://eoma.aoac.org/).

6.    I have reviewed the four shelf studies contained in the administrative

record of this matter that were submitted by Plumrose (AR 000847 – 000848),

Fresherized Foods (AR 000795 – 000805); Kraft Foods (AR 000820 – 000828) and

Peterson's Farms (AR 000863 – 000869).

7.    There are three essential components within a microbiological challenge study. The first is the study's protocol, or design. The second is the method of microbiological analysis. The third is the manner in which the study data is analyzed, or interpreted. All four studies fail standard assessment criteria under one or more of the above essential components.

8.    The Plumrose study was not conducted consistent with officially recognized microbiological analytical methods, and is therefore unacceptable for regulatory decision making. The Study was conducted using a Petri-film method of analysis, but not in compliance with AOAC Official Methods of Petri-film analysis for either Aerobic Plate Count in Foods (AOAC Official Method 990.12), or Yeast and Mold Counts In Foods (AOAC Official Method 997.02). These AOAC Official Methods are those recognized by the USDA in its FSIS Microbiology Laboratory Guidebook (*Chapter 3, Examination of Fresh, Refrigerated and Frozen Prepared Meat, Poultry and Pasturized Egg Products, available at* http://www.fsis.usda.gov/ophs/Microlab/Mlgchp3.pdf). The AOAC's Official Method for Aerobic Plate Count in Foods ("APC") specifies incubation of the Petri-film at 35 degrees Centigrade for 48 hours.  The Plumrose study incubated the Petri-film at 30 degrees Centigrade for 48 hours. AR 000847. The AOAC Official Method for Yeast and Mold Counts indicates that the Petri-film must be incubated at 20 – 25 degrees Centigrade for 5 days.  The Plumrose study incubated the Petri-film at 30 degrees Centigrade for 72 hours. *Id* Microorganisms have optimum growth conditions (time and temperature).  The AOAC Official Methods specify the temperature and a corresponding incubation time for the microorganism being studied.  Deviation from either the specified

incubation time or temperature can negatively affect the growth characteristics of the microorganisms, and render the test unreliable.

9.    The Fresherized Foods shelf-life study actually demonstrates a preservative effect of lactate solutions at both 1% and 1.5%. The 1% solution provided up to a 2.1 log reduction in beef, and the 1.5% solution inhibited bacterial growth in chicken.. AR 796. Therefore, the conclusion that lactate solutions below 2% had no preservative effect is simply scientifically incorrect. AR 795.

10.    In addition, the study fails on both protocol and data analysis components. Figures 1 through 10 of the study indicate a preservative effect in the lactate samples during the shelf life, but there is no comparison to a control not containing the preservative.  AR 000800 – 000805.  To serve its essential purpose, a control must be run under the same conditions as the product being tested. Figures 11-18 do provide data on non-lactate containing products, but the study of lactate-containing samples in Figures 1 through 10 was a 60 day study; while the study of non-lactate containing products in Figures 11 – 18 was a seven day study.  In addition, the study in Figures 11-18 cannot provide a comparison because at a temperature of 4 degrees Centigrade, the test organism, *L. monocytogenes* would likely still be in the lag phase of the growth curve at 7 days, and a 7 day study would provide no useful information on the growth kinetics of the organism in this product.

11.    The actual results of the Kraft Foods study also demonstrate that sodium and potassium lactate at levels below 2% are preservatives.  The study consistently shows "more growth in the treatment with no antimicrobial ingredients." AR 000822, Figure 1, Figure 2 and Figure 3.  In addition, the study fails to provide the temperature at which the

products were held during the spoilage studies, an essential data point for interpretation. AR 000823 – 000826. The rate of bacterial growth and subsequent product spoilage is directly related to the temperature profile of the product over its shelf-life. As a general rule, fresh meat will spoil at least twice as fast at 5 degrees Centigrade as at 0 degrees Centigrade, and at least four times as fast at 10 degrees Centigrade. *See, e.g.* Price, THE SCIENCE OF MEAT AND MEAT PRODUCTS, 1987.

12.     The Kraft study's protocols are also inadequate. The study does not include a non-preservative control product in the opened package spoilage component of its study, AR 000827, and does not disclose what level of bacteria was contained in the inoculum at the initiation of the study or what happened during the first week of testing. Kraft's first sampling point in this study was at 1 week. Thus, the study only describes what happened on weeks 1, 2 and 3. It indicates that the product was held at 40° F. for 60 days prior to the start of the test, then the products were inoculated with an unspecified level of *Listeria* and held at an unspecified temperature for 3 weeks. Figure 1. shows the total plate count of two products, one containing Lactate and the second containing Benz/Prop. There is no indication whether the product illustrated in Figure 1 is the Beef Franks, Ham or Bologna.

13.     The bacterial counts for the Pederson Farm's study demonstrate that the product used in this study was already spoiled at the outset of the study. As noted under the Results and Discussion text of the study, "Generally, the end of shelf-life is defined as 10,000,000 bacteria per gram, 100,000 yeast per gram, or visible mold, however, spoilage in some products (especially raw meats) may not be evident based on high levels of naturally occurring organisms in product. In these cases, organoleptic evaluation of the

product is recommended." AR 865.  Starting counts for the product tested were

30,000,000 lactic acid bacteria per gram, 61,000,000 lactic acid bacteria per gram and

17,000,000 lactic acid bacteria per gram respectively. AR 867-868.  A shelf life study

using product already exceeding the microbiological levels required to cause spoilage is

meaningless.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March _6_, 2008 at Austin, Minnesota.

Richard J. Christianson