# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

HORMEL FOODS CORPORATION )
                           Plaintiff, )
        v. ) Civil Action No. 1:07-cv-1724 (RBW)
                              )
UNITED STATES DEPARTMENT )
 OF AGRICULTURE, )
                              )
                   Defendant. )
_____

## PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT [REDACTED]

Plaintiff Hormel Foods Corporation ("Hormel") hereby moves, pursuant to

Federal Rule of Civil Procedure 56(c), for entry of an order granting it summary

judgment. Plaintiff relies on the attached memorandum in support of its motion.

Plaintiff requests oral argument on this Motion.


                                          Respectfully submitted,


   _/s/ Nancy S. Bryson_                 _/s/ John F. Cooney_      
NANCY S. BRYSON                      JOHN F. COONEY
(D.C. Bar No. 913673)               (D.C. Bar No. 936336)
The Bryson Group PLLC              Venable LLP
575 7th Street, N.W.                  575 7th Street, N.W.
Washington, D.C. 20004             Washington, D.C. 20004
(202) 344-4731                       (202) 344-4812


March 7, 2008                            Counsel for Plaintiff

**TABLE OF CONTENTS**

BACKGROUND ...........................................................................................................4

    I.  STATUTORY AND REGULATORY FRAMEWORK.....................................4

    II.  THE USDA NATURAL POLICY.................................................................5

    III.  THE CHEMICAL PRESERVATIVES SODIUM AND POTASSIUM
        LACTATE ..............................................................................................8

        A.    *Anti-Microbial Effects*........................................................................8

        B.    *Chemical Processes for Manufacturing*
               *Lactates* ..............................................................................11

    IV.  USDA'S APPROVAL OF MULTIPLE "NATURAL" LABELS FOR
        PRODUCTS CONTAINING SODIUM AND POTASSIUM LACTATES. .......13

    V.  HORMEL'S PETITIONS FOR RELIEF ..........................................................14

    VI.  USDA'S DECISIONS ON HORMEL'S REQUEST .........................................16

        A.    *December 6, 2006 Letter to Hormel* ..................................................16

        B.    *USDA Letter to Label Holders Requiring*
               *Submission of Information Demonstrating*
               *an Absence of Preservative Effect*......................................................17

    VII.  USDA'S SUBSEQUENT DENIAL OF RELIEF............................................18

STANDARD OF REVIEW ..........................................................................................20

SUMMARY OF ARGUMENT .....................................................................................21

ARGUMENT................................................................................................................24

    I.       USDA ACTED ILLEGALLY BY FAILING TO
           RESCIND "NATURAL" LABELS FOR PRODUCTS
           CONTAINING THE "CHEMICAL PRESERVATIVE"
           SODIUM AND POTASSIUM LACTATE ..................................................24

A.    *The Administrative Record Conclusively Shows that Lactates Are "Chemical Preservatives" at Levels Below 2% and Therefore Cannot Be used in Products Sold Under "Natural" Labels* ............................................. 24

B.    *Lactates Do Not Meet the Regulatory Criteria For Exemption from the Definition of "Chemical Preservative."* ............................. 26

C.    *Lactate-Containing Products Also Are Misbranded for a Second Reason Because Lactates Are More Than "Minimally Processed"* ..................................................................... 30

II.    USDA's DECISION TO DENY HORMEL INTERIM RELIEF AND NOT TO RESCIND ANY "NATURAL" LABELS FOR LACTATE-CONTAINING PRODUCTS IS ARBITRARY AND CAPRICIOUS ...................................................................... 32

A.    *USDA's Failure To Revoke Labels For The Twenty Companies Who Failed To Provide Data Was Arbitrary and Capricious* ..................................................................... 33

B.    *USDA's Denial of Relief through Label Recission Proceedings Was Based on Reasons of "Efficiency", Not on Scientific Data* ..................................................... 34

C.    *USDA's Post Hoc Rationalization Based on the Shelf-Life Data Provided by Four Manufacturers Does Not Support its Decision.* ........................................ 37

III.    THE USDA DECISION NOT TO INSTITUTE LABEL RESCISSION PROCEEDINGS CONSTITUTED A *DE FACTO* EXEMPTION OF GENERAL APPLICABILITY FROM THE MISBRANDING PROVISIONS OF THE FMIA AND THE PPIA ISSUED WITHOUT PRIOR NOTICE AND COMMENT ...................................................................... 41

CONCLUSION ...................................................................... 45

# TABLE OF AUTHORITIES

## CASES

*Air Transport Ass'n v. FAA,* 281 F.3d 49 ............................................................................41

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ........................................................21

*Appalachian Power Co. v. EPA,* 208 F.3d 1015 (D.C. Cir. 2000) .......................................41

*AT&T, Inc. v. FCC,* 452 F.3d 830 (D.C. Cir. 2006) ............................................................34

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................21

*Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971).......................................20

*CropLife America v. EPA,* 329 F.3d 876 (D.C. Cir. 2003)...................................................41

*General Electric Co. v. EPA,* 290 F.3d 377 (D.C. Cir. 2002) ..............................................41

*Kansas City v. HUD,* 923 F.2d 188 (D.C. Cir. 1991) ...........................................................37

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983)..........................................................................................................21, 34

*Padula v. Webster,* 822 F.2d 97 (D.C. Cir. 1987)................................................................32

*Point Park Univ. v. NLRB,* 457 F.3d 42 (D.C. Cir. 2006) ...................................................37

*Steenholdt v. FAA*, 314 F.3d 633 (D.C. Cir. 2003) ..............................................................32

*Williams Gas Processing-Gulf Coast Co. v. FERC,*
475 F.3d 319 (D.C. Cir. 2006)........................................................................................34, 37

**STATUTES**

5 U.S.C. § 551(4)(2005) ..................................................................................41

5 U.S.C. § 706(2)(a) (2005) ............................................................................20

21 U.S.C. § 101.22(a)(5(2005) .......................................................................24

21 U.S.C. § 453(h) (2005) ............................................................................1, 4

21 U.S.C. § 453(h)(1) (2005) ............................................................................4

21 U.S.C. § 453(h)(11) (2005) ................................................................4, 24, 26

21 U.S.C. § 453(h)(12) (2005) ..........................................................................4

21 U.S.C. § 458(a)(3) (2005) ............................................................................1

21 U.S.C. § 459(2005) (2005) ..........................................................................6

21 U.S.C. § 601(n) (2005) ................................................................................1

21 U.S.C. § 601(n)(1) (2005) ......................................................................4, 26

21 U.S.C. § 601(n)(11) (2005) ....................................................................4, 24

21 U.S.C. § 601(n)(12) (2005) ..........................................................................4

21 U.S.C. § 603(2005) (2005) ..........................................................................6

21 U.S.C. § 610(d) (2005) ................................................................................1

# ADMINISTRATIVE MATERIALS

9 C.F.R. § 301.2 (2008) ................................................................................5

9 C.F.R. § 301.2 (2008) ................................................................................9

9 C.F.R. § 424.1(2008) ................................................................................7

9 C.F.R. § 424.21(2008) ...............................................................................6

9 C.F.R. § 424.21(c) (2008) ..................................................................7, 10, 26

21 C.F.R. § 101.22 (2007) ...................................................................5, 22, 26

21 C.F.R. § 101.22(a)(5) (2007) .................................................... 5, 9, 24, 26, 30

21 C.F.R. § 184.1(d)(2007)..............................................................................8

21 C.F.R. § 184.1639(2007) ............................................................................7

21 C.F.R. § 184.1768(2007) ............................................................................7

40 C.F.R. § 152.25(f)(2007) ...........................................................................26

58 Fed. Reg. 4067 (Jan. 13, 1993) .....................................................................7

65 Fed. Reg. 3121 (Jan. 20, 2000) .........................................................8, 9, 10, 24

67 Fed. Reg. 8452 (Feb, 2002) .......................................................................15

**OTHER**

Cegielska-Radziejewska, R. and Pikul, J., *Sodium Lactate Addition
on the Quality and Shelf Life of Refrigerated Sliced Poultry Sausage
Packaged in Air or Nitrogen Atmosphere*, Journal of Food Protection,
67(3), 601-06 (2004) ………………………………………………………...10, 15, 25, 36

Fed. R. Civ. P. 56(c) ..........................................................................................21

Meyer, J.D., Cerveny, J.G. and Luchansky, J.B., Inhibition of nonproteolytic,
psychotropic Clostridia and anaerobic sporeformers by sodium diacetate and sodium
lactate in cook-in-bag turkey breast, Journal of Food Protection 66(8), 1474-78 (2003)
AR 166 (not reprinted in AR, copy included with
Minerich Dec.) ..........................................................................................................25

*Shelef, Leora A. Antimicrobial Effects of lactates*:  A Review, Journal
of Food Protection, Vol. 57, May 1994. AR 232-237  …………………….……10, 15, 36

Self, L.A. and Yang, Q., *Growth Suppression of Listeria Monocytogenes
by Lactates in Broth, Chicken and Beef*, Journal of Food Protection 54(4),
283-87 (1991). AR 211-215..................................................................................25

Stillmunkes, A.A. et al., *Microbiological Safety of Cooked Beef Roasts
Treated with Lactate, Monolaurin or Gluconate*, Journal of Food Science
58(5), 953-58 (1993). AR 220-225. ......................................................................25

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

HORMEL FOODS CORPORATION )
                         )
            Plaintiff,   )
                         )
      v.                 ) Civil Action No. 1:07-cv-1724 (RBW)
                         )
UNITED STATES DEPARTMENT )
OF AGRICULTURE           )
_____Defendant._____)

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT [REDACTED]

## INTRODUCTION

Hormel Foods Corporation ("Hormel") should be granted summary judgment against defendant U.S. Department of Agriculture ("USDA") because the agency violated the Federal Meat Inspection Act, 21 U.S.C. §§ 601(n), 610(d) ("FMIA"), and the Poultry Products Inspection Act, 21 U.S.C. §§ 453(h), 458(a)(3) ("PPIA"), and acted arbitrarily and capriciously, in approving "natural" labels for meat and poultry products containing sodium and potassium lactates. Both substances are "chemical preservatives" within the meaning of the statutes and the agency's implementing regulations. Accordingly, under the FMIA and the PPIA, products containing these lactates must disclose that fact, and may not be labeled as "natural" products under longstanding USDA policy prohibiting the use of "chemical preservatives" in such foods. In addition, the lactates are highly manufactured chemicals added to foods in a purified, concentrated form not found in nature. These ingredients thus are more than "minimally processed" under the USDA policy, which provides a second basis on which products containing these chemicals may not be sold under a "natural" label.

1

Starting in August 2005, USDA approved many "natural" labels for lactate-containing products pursuant to an illegal change in its definition of "natural," adopted without notice and comment, that categorically exempted sodium lactate from the definition of "chemical preservative," regardless of the formulation level at which it was added to foods. In October 2006, Hormel sought relief from this agency action and submitted scientific evidence that lactates are chemicals that have an inherent preservative effect even at low formulation levels. In December 2006, faced with the threat of litigation, USDA granted Hormel's request for relief by revoking the August 2005 exemption and by committing that "it will institute action to rescind its approval" of "natural" labels for lactate-containing products unless the manufacturer submitted scientific evidence demonstrating, on a case-by-case basis, that the added chemical lactate did not have a preservative effect in its product. Administrative Record ("AR") 160-161 (emphasis added).

USDA began to implement this decision by sending letters to twenty-four manufacturers that held "natural" labels for lactate-containing products, notifying them of their obligation to submit this information. AR 611-640. Twenty of the twenty-four manufacturers failed to submit the required data; the studies provided by the four who did respond were flawed and failed to demonstrate the absence of a preservative effect.

In July 2007, again without providing notice and comment, USDA abandoned its prior decision and announced that it would not initiate *any* label rescission proceedings for *any* lactate-containing "natural" products, even though it had no evidence showing that these known chemical preservatives were not having a preservative effect in these products. AR 779-780. The agency did not formally restore the categorical exemption

for sodium lactate that it had revoked in December 2006. Under its current policy, the USDA does require applicants for new "natural" labels to demonstrate that a lactate does not have a preservative effect (Derfler Dec. ¶ 26), but does not require them to show that the lactate is "minimally processed."

Through this decision, USDA has permitted all products whose labels were approved under the prior illegal exception to remain on the market for the indefinite future, without regard to whether the chemical lactates have a preservative effect in these foods. In essence, USDA has sought to accomplish indirectly, through this two step process of decision and abandonment, what it could not do directly – change its long-standing policy dating to 1982, that "natural" meant no "chemical preservative," and permit inclusion of lactates in "natural" products, in violation of the FMIA, the PPIA, and the Administrative Procedure Act.

The agency has created, without providing notice and comment, a *de facto*, industry-wide rule that restores on a retroactive basis the unlawful amendment of the definition of "natural" that the agency revoked in December 2006. This agency action permits manufacturers to continue misleading consumers by claiming that they are selling "natural" products that contain no chemical preservatives and that contain only ingredients that are minimally processed. The agency has permitted the addition of a chemical the preservative effect of which is established by the peer-reviewed science. USDA now only looks at shelf life and the expiration date. It has abandoned its effort to require processors to demonstrate that the chemical does not have a preservative effect in their products, and does not require them to show that the added chemical is minimally processed.

Accordingly, the Court should grant Hormel summary judgment on its claims.

## BACKGROUND

## I. STATUTORY AND REGULATORY FRAMEWORK

Both the FMIA and the PPIA provide that manufacturers of meat and poultry products may not sell products that are "misbranded" – that is, if "its labeling is false or misleading in any particular."[1]  The USDA implements these requirements through pre-marketing approval of the labels under which the manufacturer will sell the products.

The FMIA and PPIA contain identical provisions respecting the required label disclosure of chemical preservatives. A meat or poultry food product is *per se* misbranded "if it bears or contains *any* artificial flavoring, artificial coloring, or *chemical preservative*, unless it bears labeling stating that fact."[2]  The FMIA and the PPIA also authorize USDA to adopt regulations identifying "such other information as the Secretary may require . . . to assure that [product] will not have false or misleading labeling."[3] Pursuant to this authority, USDA has adopted the following regulatory definition of the term "chemical preservative" for its misbranding standards:

> Any chemical that, when added to a meat or meat food product, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices or substances added to meat and meat food products by exposure to wood smoke.

9 C.F.R. § 301.2 (2008). This regulatory definition is virtually identical to the definition of "chemical preservative" adopted by the Food and Drug Administration ("FDA") at 21

---

[1] 21 U.S.C. § 601(n)(1)(2005)(FMIA); 21 U.S.C. § 453(h)(1)(2005)(PPIA). The relevant statutory authorities are set forth at greater length in Plaintiff's Opposition to Defendant's Motion to Dismiss, or in the Alternative Motion for Summary Judgment, filed simultaneously with this Motion.
[2] 21 U.S.C. § 601(n)(11)(FMIA); 21 U.S.C. § 453(h)(11)(PPIA) (emphasis added).
[3] 21 U.S.C. § 601(n)(12); 21 U.S.C. § 453(h)(12).

C.F.R. § 101.22(a)(5) (2007), referenced in the 1982 Natural Policy which extended the definition to "food" generally.[4]

USDA also has adopted regulations implementing the false and misleading labeling prohibitions.[5]  They provide, in pertinent part:

> No product or any of its wrappers, packaging, or other containers shall bear any false or misleading marking, label, or other labeling and no statement, word, picture, design, or device which conveys any false impression or gives any false indication of origin or quality or is otherwise false or misleading shall appear in any marking or other labeling.[6]

## II. THE USDA NATURAL POLICY

USDA has issued and from time to time updates a Food Standards and Policy Labeling Manual, a compilation of its "labeling policies and standards" for approval or denial of various specific labeling claims. [7]  Policy Memo 055, initially issued on Nov. 22, 1982, defines the requirements for approval of a "natural" label for meat and poultry products.[8]  In order to qualify for this desirable marketing claim, Policy Memo 055 requires the label applicant to demonstrate that:

- "[t]he product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic ingredient; and
- "[t]he product and its ingredients are not more than minimally processed."

Policy Memo 055 defines "minimally processed" as:

- "[t]hose traditional processes used to make food edible or preserve it or make it safe for human consumption, e.g., smoking, roasting, freezing, drying and fermenting; or

---

[4] The FDA definition also exempts "chemicals applied for their insecticidal or herbicidal properties" from the definition of a "chemical preservative." 21 C.F.R. § 101.22(a)(5)(2007).

[5] 9 C.F.R. § 317.8 (2008).

[6] 9 C.F.R. § 317.8(a) (2008).

[7] Derfler Dec. ¶ 9; Defendant's Statement of Material Facts ¶ 3. *See* AR 6. *See also* www.fsis.usda.gov/OPPDE/larc/Policies/Labeling_Policy_Book_082005_2.pdf.; see., e.g. AR 006.

[8] AR 2-3.

- "[t]hose physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices."

USDA applied this definition of "natural" in making labeling decisions for 23 years without making significant changes, until August 2005.

The "natural" claim has nothing to do with food safety, which is governed by a separate set of USDA rules. *See* 9 C.F.R. § 424.21 *et seq.* (2008). All meat and poultry products regulated by USDA must meet the same food safety standard in order to be passed for human consumption under the inspection system.[9] The "natural" claim is designed to provide consumers with information that will permit them to purchase meat and poultry products that do not have artificial ingredients or synthetic ingredients, including chemical preservatives, and are no more than minimally processed. Policy Memo 055, as originally issued, stated that the USDA definition "preclude[s] the use of natural claims on meat and poultry labeling where methods of preparation and/or processing or the presence of artificial ingredients would result in a product that is inconsistent with consumer expectations of a natural product."[10]  This USDA policy has come to be recognized in consumer literature as a reliable indicator of this precise information.[11]

---

[9] 21 U.S.C. §§ 603 (2005) (FMIA), § 459(2005) (PPIA).
[10] AR 2-3.
[11] AR 463- 466.

The Natural Policy remained essentially unchanged from November 22, 1982 until August 2005.[12] In August 2005, USDA amended the policy without notice or opportunity for comment, by revising the definition of "natural" to add an exception:

> Note: Sugar, *sodium lactate (from a corn source)*, natural flavorings from oleoresins or extractives are acceptable for all natural claims.

(emphasis supplied).[13]

In separate regulations adopted under the FMIA and the PPIA, USDA has approved as safe for human consumption the use of sodium and potassium lactate as a flavoring agent at levels up to 2% and as antimicrobial agents at levels up to 4.8%.[14] These regulations do not authorize use of these chemicals for "natural" products but rather establish that they may be used for the stated purposes and within the prescribed limits without causing the resulting meat and poultry products to be deemed adulterated.[15]

The 2% flavoring limit was adopted by USDA in 1993.[16]  It relies upon a 1987 FDA rule affirming that sodium and potassium lactate when used at this concentration for this purpose are Generally Recognized as Safe ("GRAS").[17]  A GRAS determination simply confirms that the presence of these ingredients will not cause food to be

---

[12] The Administrative Record contains one interim update from July 2002. AR 4. The "Policy" section of this update is identical to November 22, 1982 policy. The descriptive and explanatory  "Issue" and "Rationale" sections are deleted. *See* AR 2-4.

[13] AR 8.

[14] 9 C.F.R. § 424.21 (c) (2008); AR 611-640 (November 30th, December 1st, December 5th, letters to companies)

[15] *Id.*; *see*  9 C.F.R. §424.1 (2008).

[16] 58 Fed. Reg. 4,067 (Jan. 13, 1993). USDA incorrectly describes this as an FDA rule. *See* Derfler Dec.¶ 15; Defendant's Statement of Material Facts ¶ 8.

[17] 21 C.F.R. § 184.1639 (2007); 21 C.F.R. § 184.1768 (2007).

considered adulterated. It is not a determination that the ingredients are appropriate for use in USDA regulated "natural" products.[18]

In 2000, USDA expanded its list of permissible food additives that would not render meat and poultry products adulterated to include the preservatives sodium and potassium lactates at levels of *up to* 4.8%.[19]

The Administrative Record shows that there is no threshold, at 2% or any other level, under which the antimicrobial properties of these chemical lactate ingredients vanish and over which antimicrobial efficacy suddenly appears.[20]  Further, the Record includes no documents which suggest that prior to August 2005, USDA ever interpreted the 2% flavoring ceiling as an authorization to include chemical lactates in foods sold under a "natural" label.

### III.  THE CHEMICAL PRESERVATIVES SODIUM AND POTASSIUM LACTATE

**A.** ***Anti-Microbial Effects*** Chemical preservatives in food serve two purposes – to inhibit the growth of pathogenic bacteria that can cause human diseases and to retard the growth of non-pathogenic bacteria that may cause food spoilage and thus render a product unpalatable.

Meat and poultry products deteriorate and become spoiled – that is, unpalatable for human consumption – due to the growth of bacteria. Aerobic psychotropic bacteria and lactic acid bacteria are the primary spoilage organisms.[21]  They are present in all food that is not delivered to consumers in a sterile condition – *i.e.,* virtually all meat and poultry products. Depending on conditions of time, temperature and handling of the

---

[18] *See* 21 C.F.R. § 184.1(d) (2007); 58 Fed. Reg. 4,067-2 (Jan. 13, 1993).
[19] 65 Fed. Reg. 3,121 (Jan. 20, 2000).
[20] *See., e.g.*, AR 807.
[21] AR 283

product, they will cause the food to spoil. Controlling the growth of such bacteria and extending the shelf life during which a product is palatable for human consumption is an important and challenging aspect of food production and distribution. Preservatives are used for this purpose, including both "chemical preservatives" and natural preservatives that are excluded from the definition of "chemical preservative" in 9 C.F.R. § 301.2 (USDA) and 21 C.F.R. § 101.22(a)(5) (FDA). Other methods of controlling bacterial growth are also available, such as high-pressure pasteurization ("HPP") in which a physical process, rather than a chemical ingredient, is used to kill bacteria and thus extend product life.

Food products also may become unsafe for human consumption due to the presence and growth of pathogenic bacteria that cause human illness. For example, the anaerobic bacterium *Clostridium botulinum* produces botulinal-toxin, the toxin that causes botulism.[22] *Listeria monocytogenes* ("*Lm*") is a species of gram-positive bacteria widely distributed in nature associated with encephalitis, meningitis, endocarditis and abortion.[23] Ingredients that are capable of destroying or inhibiting the growth of such disease causing microorganisms are identified as "antimicrobial." [24] Under USDA's rules, a substance that has an antimicrobial effect is deemed to be a preservative.[25] Again, both "chemical preservatives" and natural preservatives, which are excluded from the definition of "chemical preservative," may serve that function.

---

[22] AR 184.

[23] *See*, FDA Foodborne Pathogenic Microorganisms and Natural Toxins Handbook, *Listeria Monocytegenes*, *available at* http://www.cfsan.fda.gov/~mow/chap6.html.

[24] *See* Webster's II New Riverside University Dictionary 113 (1984) ("antimicrobial. *Adj.* Destroying or suppressing the growth of microorganisms." AR 611-640.

[25] 9 C.F.R. § 424. 21(c) (2008). 65 Fed. Reg. 3,121 (Jan. 20, 2000).

Both sodium lactate (CH$_3$CHOHCOONa) and potassium lactate

(CH$_3$CHOHCOOK) are chemicals that are well-known anti-microbial agents that control

the growth of *pathogenic* bacteria in food.[26]  *See., e.g.*, U.S. Patent Nos. 4,798,729

4,888,729 and 5,017,391 (confirming that sodium and potassium lactates are effective

against *Clostridium botulinum*, an anaerobic bacterium, at levels ranging from 1 to 7%

lactate salt and preferably in the range from about 1.5 to 3.5% lactate salt).[27]  Lactates are

also recognized as inhibiting the growth of *Listeria monocytogenes* ("*Lm*") and an

accepted inhibitory treatment for ready-to-eat food products.[28]  Both lactates are approved

by USDA as safe for use in meat and poultry products as a preservative at levels up to

4.8%.[29]

Thus, USDA recognizes lactates as antimicrobial agents and therefore, by

definition, as "preservatives."[30]  The peer-reviewed scientific literature in the

Administrative Record demonstrates that both lactates also inhibit the growth of aerobic

psychotropic bacteria and lactic acid bacteria.[31]  As Kraft Foods acknowledges: (a)

lactates are used in its products for their antimicrobial effects, and (b) the antimicrobial

and flavoring functions of lactates are inherent properties that cannot readily be

---

[26] *See*, Shelef, Leora A., *Antimicrobial Effects of Lactates: A Review*, Journal of Food Protection, Vol. 57, May 1994, AR 232-237; Cegielska-Radzieqewska, Renata, and Pikul, Jan., *Sodium Lactate Addition on the Quality and Shelf Life of Refrigerated Sliced Poultry Sausage Packages in Air or Nitrogen Atmosphere*, Journal of Food Protection, Vol. 67, 2004, AR 258-262.

[27] AR 292-313.

[28] AR 263-272.

[29] 9 C.F.R. § 424.21(c). Contrary to the government's assertion (Derfler Dec. ¶ 16; Defendant's Statement of Material Facts at ¶ 9), it is plain from the face of the regulation that this preservative effect is approved not simply at the 4.8% level, but at levels up to and including 4.8%. *See* 65 Fed. Reg. at 3,121,

[30] AR 611, 613, 615, 617, 619, 621, 623, 625, 627, 629, 631, 633, 635, 637, 639 (Letters to Companies).

[31] As set forth in the attached Declaration of Phillip L. Minerich, (¶ 3) (Attachment 3), the peer-reviewed studies in the Administrative Record include *Shelf, Leora A., Antimicrobial Effects of lactates: A Review*, Journal of Food Protection, Vol. 57, May 1994, AR 232-237; Cegielska-Radzieqewska, Renata, and Pikul, Jan., *Sodium Lactate Addition on the Quality and Shelf Life of Refrigerated Sliced Poultry Sausage Packages in Air or Nitrogen Atmosphere,* Journal of Food Protection, Vol. 67, 2004, AR 258 – 262.

separated.[32] There is no threshold, at 2% or any other level, at which the antimicrobial properties of lactate first appears.[33]

**B. *Chemical Processes for Manufacturing Lactates*.** In food manufacturing, lactates are added to products in a purified, concentrated form. Neither sodium lactate nor potassium lactate is a naturally occurring substance in the purity or at the concentrations in which it is sold commercially to manufacturers of foods. Rather, in their commercial form, both chemicals are the products of several processes that involve substantial industrial chemistry.[34] Sodium lactate is a combination of two highly processed substances, lactic acid and sodium hydroxide. Potassium lactate is a combination of highly processed lactic acid and potassium hydroxide.[35]

As demonstrated in the process flow diagram in the Administrative Record,[36] lactic acid is one of a number of products of the fermentation of carbohydrates (including beet or corn-based carbohydrates) and is produced in the following manner. First, the source material is fermented. Second, the resulting biomass is separated and purified through a series of chemical refining processes, including acidification (through the addition of sulfuric acid or another similar chemical), filtration, evaporation, and purification by means such as esterification and hydrolysis or by high vacuum distillation and crystallization. Esterification and hydrolysis are controlled chemical refinery reactions used to separate the lactic acid from other components of the input stream,

---

[32] AR 807.
[33] AR 807.
[34] Herreid Dec. ¶ 6; AR 314.
[35] Herreid Dec. ¶ 7; AR 314.
[36] AR 314.

including ethanol. High vacuum distillation and crystallization are industrial chemical processes for producing highly purified and concentrated lactic acid.[37]

The substance resulting from these chemical processes, purified lactic acid, is then mixed with sodium (or potassium) hydroxide to form a sodium (or potassium) lactate solution. The source materials for the hydroxides are not carbohydrates, but a liquid brine solution, the primary ingredients of which are sodium (or potassium) chloride. These hydroxides are industrial products synthesized by the passage of a high voltage electric current through a sodium (or potassium) chloride solution, which creates chlorine gas and sodium or potassium hydroxide. The resulting solution is mixed with the purified, concentrated lactic acid solution to create either sodium or potassium lactate. There are no natural sources of the industrial quality sodium or potassium hydroxide chemicals created in this process.[38] Sodium hydroxide, for example, is the active ingredient in Drano™.

In sum, while part of the raw material for sodium and potassium lactate is a product of fermentation at the first step of the process, other chemicals are added to the raw materials, which are subjected to substantial additional chemical processes, including addition of acids. Further, the resulting purified and concentrated lactic acid is mixed with a metal hydroxide that itself is the result of substantial chemical processing.

---

[37] Herreid Dec. ¶ 8.
[38] Herreid Dec. ¶ 9.

### IV. USDA'S APPROVAL OF MULTIPLE "NATURAL" LABELS FOR PRODUCTS CONTAINING SODIUM AND POTASSIUM LACTATES.[39]

The Administrative Record demonstrates that USDA first approved a "natural" label for a product containing sodium lactate on June 15, 2005. [40] As noted above, in August 2005, USDA amended the "chemical preservative" branch of the definition of "natural" to create a general exemption that authorized inclusion of "sodium lactate (from a corn source)," without regard to the level of the chemical that was included. Between August 2005 and the revocation of the exemption in December 2006, USDA approved fourteen more labels for "natural" products containing lactates in varying concentrations.[41] Most of the labels and formulations granted by USDA were for products that contain potassium lactate. USDA's contemporaneous actions and its pleadings in this Court do not explain why or on what basis the global exemption for sodium lactate was extended to include potassium lactate. Further, on information and belief, Hormel believes that USDA approved at least three other "natural" labels for lactate-containing products sold by Oscar Mayer® that have not been included in the Administrative Record. These three labels formed the basis for Hormel's October 10, 2006 request for relief through rescission of labels.[42]

The products for which USDA approved "natural" labels under the exemption contained a range of lactate concentrations. Two of the approved labels were for products

---

[39] The material contained in this section refers in general terms to information in documents that were filed under seal. The information is cited only by reference to the page numbers of the documents in the sealed portion of the Administrative Record. No identifying information about the companies involved is provided.

[40] AR [REDACTED].

[41] AR 2066, 2071, 2075, 2084, 2091, 2095, 2098, 2101, 2105, 2110, 2115. USDA states that it approved 14 natural labels for products containing sodium or potassium lactate between August 2005 and December 5, 2006. Derfler Dec. ¶ 19; Gov't Statement of Material Facts ¶ 10. The Administrative Record contains only 12 of these labels. For this and other similar instances in which the Administrative Record is incomplete, Hormel will submit a Motion to Compel USDA to supplement the Record.

[42] AR 59-60, 61-62, 63-64.

in which the lactate level exceeded the 2% maximum level for flavoring.[43]   The label approval documents for three other products fail to disclose the specific percentage of lactate included in the product.[44] USDA also approved labels for two other products in which lactate concentrations are described on a substantial and significant dry weight basis, rather than as a percent of formula. These documents are difficult to interpret but appear to involve lactates in excess of the 2% level.[45]

### V. HORMEL'S PETITIONS FOR RELIEF

In the fall of 2006, Hormel discovered in the marketplace three products sold by Oscar Mayer under a "natural" label that contained potassium lactate. Hormel filed two petitions with USDA for relief. The first was a petition for rulemaking on the "natural" claim filed on October 9, 2006.[46]   The petition used the example of the newly approved products to illustrate the fundamental change created by USDA in its August 2005 unilateral amendment to its Natural Policy. The petition included advertising literature for Purac, a patented "natural solution" for extension of shelf life, pH regulation, flavor improvement and improved food safety;[47] and the Oscar Mayer patents for the solution claiming inhibition of the growth of *C. botulinum* at levels between 1 and 7%.[48]

The second petition was a request for interim relief pending resolution of the rulemaking, specifically rescission of label approvals for the three Oscar Mayer products filed on October 10, 2006. The rescission request was based on the prohibitions in the FMIA and PPIA regarding inclusion of chemical preservatives in meat and poultry

---

[43] AR [REDACTED] (Appendix J filed under seal); Derfler Dec.¶ 19.
[44] AR [REDACTED]  (Appendix J filed under seal); Derfler Dec. ¶ 19.
[45] AR [REDACTED] (Appendix J filed under seal); Derfler Dec. ¶ 19.
[46] AR 14-54.
[47] AR 38.
[48] AR 40–54.

products without label disclosure of that fact, and the false and misleading nature of these

"natural" claims under the longstanding USDA Natural Policy prohibiting such claims

for products containing "chemical preservatives" or that are more than "minimally

processed."[49]

  The October 10 request for interim relief was supplemented with two additional

filings. On November 7, 2006, Hormel's counsel submitted a legal and factual analysis in

support of the request for label rescission.[50] On December 22, 2006, Dr. Philip L.

Minerich, Hormel's Vice President for Research and Development, submitted technical

reference material in support of that request and a summary of that material.[51]  Part I of

the Appendix to that filing contains several scientific studies published in authoritative

peer-reviewed journals, including Applied and Environmental Microbiology, Journal of

Food Science, Journal of Food Protection, and Journal of Food Safety and Poultry

Science.[52] These peer-reviewed studies meet the Office of Management and Budget

Information Quality Guidelines as a basis for agency decision on scientific issues. They

demonstrate that sodium and potassium lactate inhibit the growth of the primary food

spoilage bacteria at levels below 2%.[53]  Part II of the Appendix contains a process flow

diagram for the production of sodium and potassium lactate and multiple technical

articles detailing the complex chemical engineering process used to produce these

ingredients, thus demonstrating that the chemicals are not minimally processed.[54]

---

[49] AR 55–64. These petitions are described in greater detail in the Plaintiff's Opposition to the Defendant's Motion to Dismiss being filed simultaneously and will not be further discussed here.
[50] AR 126–155.
[51] AR 162–164; Minerich Dec. ¶ 3.
[52] AR 168–314.
[53] OMB Information Quality Guidelines, 67 Fed. Reg. 8,452 (Feb. 2, 2002). *See also Shelef, Lenora*, *supra*, note 33 (AR 232-237); and *Cegielska-Radzieqewska*, *supra* note 33. (AR 258-262).
[54] AR 314-451.

## VI. USDA'S DECISIONS ON HORMEL'S REQUESTS

**A. *December 6, 2006 Letter to Hormel*.** On December 6, 2006, Under Secretary

Raymond informed Hormel of USDA's decisions on its petitions. The letter stated that:

- While lactates are regarded by USDA as "multi-function ingredients", the labels approved under the 2005 policy change "were approved based on representations concerning the source and level of the lactate used, and information provided by the applicants that lactate was being used exclusively as a flavoring agent;"
- If lactates are being used to control or reduce microorganisms and extend the shelf-life of the treated product, USDA would not permit the use of the term "natural" on the product label under the current labeling policy guidelines;
- USDA had advised companies with approved labels to provide information that lactates in the products do not provide a preservative effect;
- In the absence of such information, USDA "will institute action to rescind its approval of the labels that bear a "natural" claim."
- USDA was removing the 2005 natural policy modification relating to sodium lactate and issuing a Federal Register notice requesting comments on the Hormel rulemaking petition.[55]

*Id.* Finally, the Raymond letter affirmed that:

USDA makes consistent and science-based decisions when it evaluates labels for products bearing "natural" claims and will continue to review and evaluate such claims for products containing lactates or similar ingredients on a case-by-case basis, focusing on the purpose for which the ingredient is used, the level of the ingredient used in the product, and the function and technical effect of the ingredient. [56]

On December 5, 2006, USDA revoked the prior global exemption for use of

sodium lactate (from a corn source) in "natural" products that it had adopted in August

2005. USDA acknowledged that the information available to it:

indicates that sodium lactate, potassium lactate, and calcium lactate provide an antimicrobial effect at levels that have been regulated as providing a flavoring effect. . . . . Whether there should ever be a blanket acceptance of any ingredient that has multiple functions, including an antimicrobial or preservative function, in products labeled "natural" is a complicated issue that is best addressed through notice and comment rulemaking.[57]

---

[55] AR 160-161.
[56] AR 161.
[57] AR 11.

16

B. *USDA Letters to Label Holders Requiring Submission of Information*

*Demonstrating an Absence of Preservative Effect.* Between November 30 and December

5, 2006, USDA sent letters to 24 companies with approved "natural" labels for lactate-

containing products.[58]  The letters advised the companies of the following USDA

decisions:

- The sodium or potassium lactate containing "natural" product label had been approved by USDA based on the company's assertion that the ingredient was from a natural source, not more than minimally processed, and used strictly for flavoring (at a level of less than 2%);
- A preservative function includes those of an antimicrobial, i.e. reducing microorganisms and extending shelf-life;
- The Oscar Mayer patents provided to USDA with the Hormel petition claim delay in *Clostridium botulinum* growth at levels of use as low as 1.5%, a level lower than the 2% maximum permitted for flavoring effect;
- If lactates are used in products bearing the claim "natural" at levels less than 2% to increase product shelf-life, improve food safety, and control pathogens, the use of  the ingredients is contrary to the meaning of "natural."
- Such products would be misbranded and labels would be subject to being rescinded.

USDA squarely placed the burden of proof on the individual manufacturers to

demonstrate for their individual products that the lactate ingredient had no preservative

effect. USDA directed each company to provide data showing that the lactate containing

"natural" products:

- exhibit the same microbiological characteristics as products formulated without lactates;
- have the same shelf-life as the same products formulated without lactates, and
- have the same sell-by/use-by/freeze-by dates applied as the dates that would be applied to products without lactates.

---

[58] In this respect as well, the Administrative Record filed by the government is incomplete. USDA asserts that it sent letters to twenty-four companies (Derfler Dec. ¶ 27; Government's Statement of Material Facts ¶ 17). The Administrative Record contains only fifteen such letters. AR 000611 – 000639.

The letters further advised recipients that such data was due within 60 days, that USDA would evaluate the data, and that:

> if the Agency were to find based on this evaluation that the effect of using lactates at 2 percent or less in formulations of "natural meat and poultry products is that of an antimicrobial, the Agency will rescind its approval of the labels for these products. [59]

Based on subsequent discussions with manufacturers that are not disclosed in the Administrative Record, USDA decided in January 2007 to drop its requirement for data comparing the microbiological characteristics of treated and untreated products. The record contains letters sent to seventeen companies stating that:

> We are aware that determining shelf-life and product dating entails assessing the microbiological quality of the product. Given this fact and the questions that USDA has received as to what type of showing would be necessary to address [the comparative microbiological characteristics of treated and untreated products], we have come to recognize that the submission of valid data showing that the same shelf-life and product dating parameters apply to products in which lactates have been used as compared to products in which they have not been used would satisfy our first concern about the microbial characteristics of the products.[60]

## VII.  USDA'S SUBSEQUENT DENIAL OF RELIEF

Only four of the twenty-four manufacturers that received a letters from USDA ever submitted data in response to the agency's demand for information about the preservative effect of lactates in their products. None of the data submitted met the criteria originally specified by the agency. No study countered the fact that sodium and potassium lactates are antimicrobial agents at levels below 2% and therefore "chemical preservatives" under the USDA and FDA rules, as extensively documented in the Administrative Record by peer-reviewed scientific articles, patents, USDA's own regulations and the *Listeria monocytogenes* guidance for ready-to-eat products. The

---

[59] AR 612, 614, 616, 618, 620, 622, 624, 626,628, 630, 632, 634, 636, 638,640.
[60] AR 761–776.

18

submission by Kraft Foods in fact confirms that sodium lactate and potassium lactate are preservatives.[61] Kraft further admitted that these lactates are used in its products at levels below 2% to inhibit the growth of *Listeria monocytogenes*.[62]

None of the four shelf-life studies that was submitted provided the requested direct comparison between product that was untreated and product that had been treated with lactates. Each of the four studies contained an obvious flaw in protocol design, data analysis, or under recognized methods for the microbiological analysis of food products specified in the FDA Bacteriological Analytical Manual, the USDA Microbiology Laboratory Guidebook, Compendium of Methods for the Microbiological Examination of Foods and/or AOAC Official Methods.[63]  For example, the Peterson Farms shelf life study examined product that already was spoiled at the outset of the study under the relevant microbiological indicia.[64]  The Fresherized Foods study did not compare product containing lactates with non-lactate product under standard conditions.[65] The Kraft study lacked key relevant scientific information – the temperature at which the products were held during the spoilage studies, as well as a comparison to a control product which did not contain added preservative on its visual spoilage test.[66]  The Plumrose response described data generated under AOAC methods that do not conform to official AOAC test method time and temperature specifications. [67]

Nonetheless, USDA made a final determination that it would not initiate any label rescission proceedings for any lactate-containing product, contrary to the December 6,

---

[61] AR 822, 792-793; Christianson Dec.¶ 11.
[62] AR 813.
[63] Christianson Dec.¶ 5.
[64] AR 792; Christianson Dec.¶ 13.
[65] AR 796; Christianson Dec.¶ 10.
[66] AR 821-822; Christianson Dec. ¶ 11-12.
[67] AR 847-848; Christianson Dec. ¶ 8.

2006 Raymond letter. On July 31, 2007, USDA advised the Chairman of the House

Agriculture Committee, Collin Peterson, that it had changed its position and had

determined not to institute any label rescission proceedings.

> FSIS is considering how best to proceed to ensure that the term "natural," as used in meat and poultry labeling, is truthful and not misleading. *While one way to try to achieve this result would be to pursue the actions we described in the letters you reference* [the letters to manufacturers and the December 6, 2006 letter to Hormel], we now believe that a more efficient way would be to pursue the process that the Agency began with the Dec. 5, 2006 notice. Thus, the Agency is considering further action to narrow the divergence in views, including seeking additional, but more focused, comments on the issue. [68]

In a follow-up response to Chairman Peterson on October 29, 2007, USDA

observed that with regard to its continuing evaluation of the "natural" label claim,

> there are some very significant issues, including issues of public health, presented by the 'natural' claim and the use of this ingredient in certain processed products. We are taking the necessary time to carefully consider these issues and to decide upon the most appropriate course of action…It is still our intent to initiate rulemaking.[69]

## STANDARD OF REVIEW

The APA requires that the Court "hold unlawful and set aside agency action,

findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law."  5 U.S.C. § 706(2)(A) (2005). "Review is to be

based on the full administrative record that was before the Secretary at the time he made

his decision."  *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971). The

court may not set aside a decision that is rational, based on consideration of the relevant

factors, and within the scope of the statutory authority delegated to the agency.

> Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, the court must

---

[68] AR 779.
[69] AR 783.

consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. The reviewing court may not supply a reasoned basis for the agency's action that the agency itself has not given.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983).

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). While the moving party bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact, the non-moving party must establish more than the "mere existence of a scintilla of evidence" in support of its position. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986*).* "If [such] evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986).

## SUMMARY OF ARGUMENT

Starting in August 2005, USDA approved "natural" claims for meat and poultry products containing lactates, based on a categorical exemption of sodium lactate from the definition of "natural" issued without notice and comment, without regard to the level of lactate involved, and without requiring manufacturers to show that the lactate was not minimally processed and either had no preservative effect or qualified as one of the enumerated exempt preservatives.  In December 2006, based on evidence submitted by Hormel, USDA revoked the illegal exemption, acknowledged that lactates could be "chemical preservatives" in foods even at levels below 2%, and stated that unless manufacturers could demonstrate that lactates had no preservative effects in their products, it would institute label rescission proceedings. USDA notified each of the

manufacturers holding such a label of the need to submit data demonstrating that the lactates in its product did not have a preservative effect and informed them that, in the absence of such data, USDA "will rescind the label." AR 611-640.

Notwithstanding the subsequent submission of additional peer-reviewed scientific studies demonstrating that lactates have inherent antimicrobial effects at levels below 2%, and notwithstanding the failure of twenty of twenty-four companies to submit any data, USDA reversed its position and decided in July 2007 "for reasons of efficiency" to deny Hormel relief and not to institute any label rescission proceedings. USDA thereby reinstated the illegal amendment to its longstanding policy, without notice and comment, and permitted the entire class of lactate-containing "natural" products that it had approved under the illegal exemption to remain on sale indefinitely, pending possible development of a "consensus" on the meaning of "natural" through a rulemaking that will take many years to conduct and may never reach a conclusion.

USDA's decision not to rescind any of these false and misleading labels was unlawful under the express provisions of the FMIA, and the PPIA, was arbitrary and capricious under the APA, and has permitted manufacturers to continue misleading consumers into thinking the "natural" products they purchase do not contain any chemical preservatives. The Administrative Record demonstrates the following:

- Sodium lactate and potassium lactate are manufactured chemicals, not found in nature at the purity levels and concentrations at which they are sold commercially and included in products by food manufacturers. As such, they do not qualify for the exception for certain defined types of natural preservatives set forth in 21 C.F.R. § 101.22 and incorporated in the definition of "natural."
- These lactates are chemicals that inhibit the growth of bacterial pathogens and tend to prevent or retard deterioration. They therefore constitute "chemical preservatives" ineligible for use in "natural" products.

22

- This preservative effect is a well-known and inherent function of these chemicals that is established by conclusive, peer-reviewed scientific evidence to exist at levels below 2%.
- USDA initially erred in approving "natural" labels for products containing 2% or less lactates based on an unwritten staff assumption that lactates did not have preservative effects at levels below 2%, the maximum level of lactates permitted for flavoring purposes under a separate agency safety rule. It later compounded that error by granting a global exemption from the definition of "natural" for sodium lactate, without regard to the level at which it was used.
- Only four of the 24 companies submitted the data required by FSIS, which purported to show that lactates in their products did not have a preservative effect. Nonetheless, USDA has allowed *all* manufacturers of *all* lactate-containing products with previously approved "natural" labels  to continue selling their products for the indefinite future.
- The information and shelf-life data that were submitted by these four companies do not, contrary to the *post hoc* rationalization of counsel, provide a rational basis for a finding that lactates below 2% in the products studied have only a flavoring effect. The studies are either scientifically flawed or show that the lactate does have an antimicrobial effect.

In December 2006, USDA stated that "[w]hether there should ever be a blanket acceptance of any ingredient that has multiple functions, including an antimicrobial or preservative function, in products labeled "natural" is a complicated issue that is best addressed through notice and comment rulemaking." AR 160-161.  In July 2007, the agency illegally adopted an industry-wide rule that resolved this issue, without providing prior notice and comment, and that indirectly restored the unlawful August 2005 exemption under which an entire class of lactate-containing "natural" products was approved. In this Court, USDA attempts to defend its action through *post hoc* rationalizations of counsel which suggest that the agency had a scientific basis for its July 2007 action. The rationales it offers are either illegal, or contradicted by the Administrative Record, and scientifically flawed.

**ARGUMENT**

## I.  USDA ACTED ILLEGALLY BY FAILING TO RESCIND "NATURAL" LABELS FOR PRODUCTS CONTAINING THE "CHEMICAL PRESERVATIVES" SODIUM AND POTASSIUM LACTATE

### A. *The Administrative Record Conclusively Shows that Lactates Are "Chemical Preservatives" at Levels Below 2% and Therefore Cannot Be Used in Products Sold Under "Natural" Labels.*

The FMIA, 21 U.S.C.§ 601(n)(11), and the PPIA, 21 U.S.C. § 453(h)(11), provide

that a meat or poultry product is *per se* misbranded unless the label discloses the presence

of a "chemical preservative."  In its definition of "natural," USDA has defined the term

"chemical preservative" by incorporating the FDA definition in 21 C.F.R. § 101.22(a)(5),

as "[a]ny chemical, that, when added to a food product, tends to prevent or retard

deterioration thereof."  The regulation contains two exemptions for:  (1) common salt,

sugars, vinegars, spices, or oils extracted from spices; or (2) substances added to food by

direct exposure thereof to wood smoke. The Natural Policy – which USDA admits is a

"policy and standard" of the agency -- expressly prohibits the use of "chemical

preservatives" in products labeled "natural."[70]

The scientific evidence in the Administrative Record demonstrates that sodium

and potassium lactates are chemicals that, "when added to a meat or meat food product,

tend to prevent or retard deterioration thereof" at formulation levels of 2% and below.[71]

First, these chemicals unquestionably are "preservatives."  In a 2000 regulation, USDA

concluded that they have an antimicrobial effect and has approved their use in meat and

poultry as a preservative up to a maximum level of 4.8%.[72]

---

[70] Derfler Dec.¶ 9; Defendant's Statement of Material Facts at ¶ 3.

[71] AR 168-313.

[72] 9 C.F.R. § 424. 21(c) (2008). 65 Fed. Reg. 3,121 (Jan. 20, 2000).

Second, the Purac patents for the form of sodium and potassium lactate that it sells commercially demonstrate that these chemicals have preservative effects at levels below 2%. Moreover, the submission by Kraft produced in the Administrative Record confirms that the lactates have an inherent preservative effect:

> there is no threshold, 2% or any other number, under which the antimicrobial properties of lactate ingredients vanish and over which antimicrobial efficacy suddenly appears. The antimicrobial effects of lactate ingredients, even at low levels, have been well-known for years and are reflected in numerous documents readily available to FSIS as well as in numerous communications between Kraft and FSIS.[73]

Third, the Administrative Record contains many scientific studies that have been published in authoritative peer-reviewed journals, including Applied and Environmental Microbiology, Journal of Food Science, Journal of Food Protection, and Journal of Food Safety and Poultry Science, which consistently report and validate the chemical preservative effect of sodium and potassium lactates at levels below 2%.[74] They include:

- Sodium lactate at concentrations between 1% and 2% has an inhibitory influence on the growth of both meat spoilage bacteria and pathogens such as *Salmonella, Listeria monocytogenes, Clostridium botulinum and Escherichia coli*.[75]
- Sodium lactate was the most effective compound for the "sustained" control over all the bacteria that had been tested.[76]
- Sodium lactate at concentrations between 1% and 2% extends shelf life of products significantly.[77]

---

[73] AR 850.

[74] Cegielska-Radziejewska, R. and Pikul, J., *Sodium Lactate Addition on the Quality and Shelf Life of Refrigerated Sliced Poultry Sausage Packaged in Air or Nitrogen Atmosphere*, Journal of Food Protection, 67(3), 601-06 (2004); Shelef, L.A. and Yang, Q., *Growth Suppression of Listeria Monocytogenes by Lactates in Broth, Chicken and Beef*, Journal of Food Protection 54(4), 283 – 87 (1991). AR 258-262; 232-237.

[75] *Id*.

[76] Stillmunkes, A.A. et al., *Microbiological Safety of Cooked Beef Roasts Treated with Lactate, Monolaurin or Gluconate*, Journal of Food Science 58(5), 953-58 (1993). AR 220-225.

[77] Papadopoulis, L.S. et al., *Consumer and trained Sensory Comparison of Cooked Beef Top Rounds Treated with Sodium lactate*, Journal of Food Science 56 (5), 1141-46, 1153 (1991)("shelf life of ham was doubled by addition of 2% sodium lactate"); Shelef, L.A. and Yang, Q., Supra; Meyer, J.D., Cerveny, J.G. and Luchansky, J.B., *Inhibition of nonproteolytic, psychotropic Clostridia and anaerobic sporeformers by sodium diacetate and sodium lactate in cook-in-bag turkey breast*, Journal of Food Protection 66(8), 1474-78 (2003). AR 192-199; 211-215; 166 (article not reprinted in AR, copy attached to Christianson Dec.).

**B.** *Lactates Do Not Meet the Regulatory Criteria For Exemption from the Definition of "Chemical Preservative"*

The USDA Natural Policy prohibits the inclusion in food of any "chemical preservative (as defined in 21 C.F.R. 101.22)."  The FDA rule, 21 C.F.R. § 101.22(a)(5), defines "chemical preservative" as "*any chemical, that, when added to a food, tends to prevent or retard deterioration thereof*."  The sole criterion that defines a "chemical preservative" for purposes of the FDA rule, and thus the definition of "natural," is how the chemical functions. If a chemical "tends to prevent or retard deterioration," it is a "chemical preservative" whose presence must be disclosed on the label under 21 U.S.C. §§ 601(n)(1)), 453(h)(11), unless it meets one of the two exemptions from this broad definition that are set forth in the regulations. USDA has determined that lactates are chemicals that have a preservative effect, and they do not qualify for the exemptions:

(ii) The lactates are not "common salt, sugars, vinegars, spices, or oils extracted from spices."  USDA rules establish that references to "common salt" are to the familiar and traditional sodium chloride salt used in food preparation and found in that form in nature.[78]  As described above, in the form that these substances are added to foods in commercial manufacturing, they are the product of extensive chemical refining.[79]

(ii) The lactates are also not "substances added to meat and meat food products by direct exposure thereof to wood smoke . . . ."  They are refined and concentrated chemicals added to the food in the processing plant and consumed by purchasers.

---

[78] 9 C.F.R. § 424.21(c) (2008). *See, e.g*, 40 C.F.R. § 152.25(f) (2007).
[79] AR 162-164.

The lactates do not fall within either of the exemptions in the FDA definition of "chemical preservative," and their presence in a food must therefore be disclosed on the label. Under the USDA's approach, however, not only is the presence of the chemical preservative not affirmatively disclosed, but the "natural" label deceptively states that products sold under that label *do not* contain "chemical preservatives." Accordingly, "natural" labels of lactate-containing products are misbranded in violation of the FMIA and the PPIA.

In comments submitted to USDA in response to a November 30, 2006 letter issued as part of the relief granted Hormel, Kraft admitted that lactates have preservative effects, even at levels well below 2%, and that this is an inherent characteristic of the additive that cannot be separated from the flavoring effect, as USDA staff had improperly attempted to do.[80] Kraft's response also showed that on many occasions between November 15, 2002 and May 2006, the company had provided USDA with evidence of the preservative effect of lactates at levels below 2%.[81] For example, on November 15, 2002, Kraft presented data to USDA on use of lactate salts and sodium diacetate as a preservative to limit growth of *Listeria* in ready-to-eat meat and poultry product. This included a validation study for a meat product in which potassium lactate at levels as low as 1.5% produced this antimicrobial effect.[82] In February 2003, Kraft provided USDA with a published scientific article regarding another study demonstrating a similar preservative effect at a 1.5% potassium lactate concentration.[83] In March 2003, Kraft

---

[80] AR 807.
[81] AR 811-812.
[82] AR 811-812.
[83] AR 812.

provided USDA with another formal briefing on antimicrobial properties of lactates.[84] On

July 15, 2005, Kraft submitted the Purac patents to USDA which claimed an

antimicrobial effect at levels well below 2%.[85] The information submitted by Kraft

confirmed the conclusions of the peer-reviewed studies in the Administrative Record

submitted by Hormel.

> Finally, the Kraft comments explain the origin of this entire dispute:

> [I]n April through May 2006, the FSIS Labeling and Consumer Protection staff
> and counsel for Kraft engaged in a series of discussions leading up to the
> "natural" label approvals now in question. Kraft's perspective that lactate
> ingredients possess antimicrobial properties was unchanged. At that time,
> however, we understood that the approvals were granted based on a staff-
> generated policy that any use below 2% would be deemed a flavor regardless of
> the known antimicrobial policies.[86]

In this admission, Kraft acknowledged that it presented USDA with evidence, later

confirmed by the scientific studies submitted by Hormel, that lactates do have an

antimicrobial effect. The agency disregarded this science and proceeded on the basis of

an informal, staff-generated policy that any use below 2% would be deemed not to have

an antimicrobial effect regardless of that evidence.

USDA's submission (Derfler Dec. ¶ 16, Statement of Undisputed Facts ¶ 9)

confirms the accuracy of the Kraft statement that USDA staff applied a *de facto* policy

which presumed that lactates do not have a preservative effect at levels below 2%. The

Administrative Record contains no information that explains the basis on which it "was

understood" by USDA that "two percent sodium lactate [did not] act as a chemical

preservative as proscribed by Policy Memorandum 055," especially in light of the

extensive Administrative Record evidence that they do have that precise effect. *Id*. As

---

[84] *Id.*
[85] *Id*.
[86] AR 854-855 (emphasis added).

noted, the rule on which USDA relies to justify the staff's selection of a 2% level involved the safety of lactates and, by its own terms, did not concern "natural" label determinations.

USDA has never formally amended its rules or the definition of "natural" to adopt the position that lactates at levels below 2% would be deemed *not* to have an antimicrobial effect in a food, regardless of their known antimicrobial properties, or to dispense with the requirement that the burden is on the applicant to demonstrate that these added chemicals are not "chemical preservatives" in a particular product. USDA could not lawfully adopt such an official position, consistent with the plain language of the FMIA, the PPIA, the USDA implementing regulations, and the definition of "natural" that governed from 1982 to August 2005 and again since December 2006. The staff application of an informal, off-the-books presumption that lactates do not have a preservative effect below the 2% level therefore was and is illegal.

The Kraft comments are instructive in another sense. Having admitted the facts on preservative effect necessary to preclude inclusion of lactates in "natural" foods, Kraft argues to USDA that lactates should nonetheless be permissible in "natural products" because "[w]hether an ingredient may be used in a "natural" product depends upon whether the ingredient is synthetic or artificial, not its function."[87]  While Kraft asserts that lactates should be deemed permissible because they are not "chemical preservatives" but rather are "natural preservatives,"[88] the highly purified and concentrated form of lactates that Purac sells and that Kraft includes in its foods are not found in nature and do

---

[87] AR 850.
[88] AR 809.

not satisfy the narrow exceptions to the definition of "chemical preservative" in 21 C.F.R.

§ 101.22(a)(5) and incorporated in the definition of "natural."

In sum, the Administrative Record shows that sodium and potassium lactates are "chemical preservatives" at levels below 2% and therefore may not, under the FMIA and PPIA, be included in foods sold under a "natural" label.

### C. Lactate-Containing Products Also Are Misbranded for a Second Reason. Lactates Are More Than "Minimally Processed"

The USDA Natural Policy independently prohibits the use of more than "minimally processed" ingredients.[89] Sodium and potassium lactates, in the form they are sold commercially and incorporated in foods, exceed any reasonable interpretation of that term. The industrial process flow diagram and the supporting technical materials[90] in the Administrative Record demonstrate the extensive industrial chemical processes used at several stages for the production of sodium and potassium lactate.[91] These processes do not remotely resemble the "minimal processing" examples listed in the USDA Natural Policy. They are not:

> a traditional process used to make food edible or preserve it or make it safe for human consumption, *e.g.*, smoking, roasting, freezing, drying and fermenting, or (b) a physical process which does not fundamentally alter the raw product and/or which only separates a whole, intact food into component parts, e.g, grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.[92]

As discussed above, the production of lactates involves "relatively severe processes" that are substantially more complicated. The raw material from which lactates are made may originally be obtained by fermentation of a carbohydrate source, such as

---

[89] AR 2.
[90] AR 315-451
[91] AR 314.
[92] AR 2.

corn. From that point forward, however, the fermentation products are biomass separated and purified through a series of chemical refining processes, including acidification which involves the addition of sulfuric acid or another similar chemical and filtration. Thereafter, the material is purified by means such as esterification (formation of inorganic salts from an acid by the replacement of hydrogen by an alkyl radical)[93] or hydrolysis (decomposition of a chemical compound by reaction with water),[94] controlled chemical reactions that separate the lactic acid from other components of the input stream, such as ethanol; or by high vacuum distillation, ultimately producing lactic acid.

Through separate industrial processes, sodium or potassium hydroxide is prepared by passing a high voltage electrical current through a sodium or potassium chloride solution, which produces both the metal hydroxide and chlorine gas, which must be separated. Once these two sets of chemical processes have been completed, their respective outputs are combined to form the concentrated from of the chemicals sodium or potassium lactate that are included in foods. Under any reasonable interpretation of "minimally processed," the lactates resulting from these processes cannot qualify as a "natural" product. Indeed, USDA never asserts in its papers that the lactates qualify as "minimally processed."

Accordingly, the presence of sodium and potassium lactate in "natural" labels also constitutes misbranding, within the meaning of the FMIA and the PPIA. For these reasons, Hormel is entitled to summary judgment on Claim One.

---

[93] Webster's II New College Dictionary at 392.
[94] Webster's II New College Dictionary at 554.

## II. USDA's DECISION TO DENY HORMEL INTERIM RELIEF AND NOT TO RESCIND ANY "NATURAL" LABELS FOR PRODUCTS CONTAINING LACTATE IS ARBITRARY AND CAPRICIOUS

On July 31, 2007, USDA reversed its December 2006 decision that it would initiate label rescission proceedings for "natural" labels for which the manufacturer had failed to submit data demonstrating that the lactate did not have a preservative effect in that particular product but rather that its sole function was a flavoring effect. The agency announced instead a final decision squarely denying Hormel's request for this form of relief, based on a determination that it would be "more efficient" to pursue policy questions involving the "natural" claims through a rulemaking process. [95]

The denial of relief announced in the Peterson letter constituted "final agency action" subject to judicial review under the APA, because it represented the culmination of the agency's decision-making process on that request for relief and because the decision determined the ability of manufacturers of lactate-containing products to continue sales under "natural" labels, to Hormel's detriment. As demonstrated in the Opposition to Defendant's Motion to Dismiss, the December 6, 2006 letter also cabined the discretion of USDA and established the law for the court to apply on review. *See, e.g.*, *Steenholdt v. FAA*, 314 F.3d 633, 638 (D.C. Cir. 2003); *Padula v. Webster*, 822, F.2d 97, 100 (D.C. Cir. 1987). The standard to be applied is the one USDA announced in December 2006 – in the absence of data showing that lactates do not have a preservative effect on a product-by-product basis, USDA will institute proceedings to cancel its "natural" label. The reason for the standard is equally simple -- unless and until amended in accordance with law, the Natural Policy does not authorize use of lactates or any other

---

[95] AR 779.

"chemical preservative" in "natural" products and does not permit inclusion of substances that are more than "minimally processed."

In addition to its violation of law, the agency action is arbitrary and capricious. USDA primarily seeks to defend its action based on *post hoc* rationalizations of counsel that USDA did not rely upon in its July 2007 decision. In any event, these *post hoc* rationalizations are refuted by the Administrative Record, including in particular, USDA's reliance on defective shelf-life studies received from the only four manufacturers that responded to its November-December letters. As explained in the attached Christianson Declaration (Attachment 1), those studies contain obvious methodological, protocol design, and data analysis flaws that deprive their conclusions of any value.[96]

### A. USDA's Failure To Revoke Labels For The Twenty Companies Who Failed To Provide Data Was Arbitrary and Capricious

USDA states as a matter of undisputed material fact that it reviews and makes decisions on product labels on a case-by-case basis.[97] The December letters to the 24 manufacturers required each company to "provide data that show, for each product that bears a "natural" claim and that contains lactates, that these ingredients are having only a flavoring effect and are not functioning as a preservative in the product."[98] The agency further stated that "[i]n the absence of such information FSIS will institute action to rescind its approval of the labels." USDA admits that 20 of the 24 companies who were required to submit data did not do so.[99] There is accordingly no rational basis for the agency's failure to rescind the "natural" labels held by those companies, especially in the

---

[96] Christianson Dec. ¶¶ 7-13.
[97] Derfler Dec. ¶ 9.
[98] *See e.g*,. AR 612, and identical letters, *supra* note 60.
[99] Derfler Dec. ¶ ¶ 27, 30.

face of the extensive factual information in the Administrative Record that lactates do have an inherent preservative effect in foods even at levels below 2%.

USDA's failure to institute rescission proceedings is particularly arbitrary and capricious for the products sold under "natural" labels for which the lactate levels exceed 2%.[100] In addition, Kraft admitted that lactates have a preservative effect in foods at levels below 2%, but USDA failed to include the label approval papers for the three Oscar Meyer products in the Administrative Record.

**B.** ***USDA's Denial of Relief through Label Rescission Proceedings Was Based on Reasons of "Efficiency", Not on Scientific Data***

An agency decision may be sustained only upon the rationale it provided. *Williams Gas Processing—Gulf Coast Co. v. FERC*, 475 F.3d 319, 326 (D.C. Cir. 2006); *AT&T, Inc. v. FCC*, 452 F.3d 830, 837 (D.C. Cir. 2006). USDA received comments from manufacturers and considered the issue for nearly eight months before announcing its decision to Chairman Peterson. The sole reason it articulated for denying relief through label cancellations was that the agency "now believes that a more efficient way [to ensure that the term "natural," as used in meat and poultry labeling, is truthful and not misleading] would be to pursue the process that the Agency began with the December 5, 2006, notice."[101] In articulating its decision, USDA did not refer to the four shelf-life studies or any other scientific studies.

An agency is entitled to change its initial position upon further review, provided that its new position is consistent with the law and that it can articulate a rational basis for reaching a different conclusion. *Motor Vehicles Mfrs.*, 463 U.S. at 40-44. USDA's change of position fails both tests. First, lactate-containing "natural" foods are

---

[100] *See* AR [REDACTED]  (sealed records).
[101] AR 779.

misbranded under the FMIA and the PPIA, because the label does not disclose to consumers the presence of a "chemical preservative." Second, the agency's decision failed to take into account its prior determinations in December 2006, which it has never rescinded, that lactates are chemical preservatives; this effect is an inherent property of these ingredients; and manufacturers cannot retain "natural" labels in the absence of a demonstration that these ingredients do not have a preservative effect in their products, but have only a flavoring effect. The agency failed to consider that even if lactates had only flavoring effects, they are still not "minimally processed" under the second branch of the definition of "natural."

The Administrative Record shows that throughout the period in which USDA pursued the course of action set forth in the December 6, 2006 letter to Hormel, not a single manufacturer actually defended its "natural" label on ground that sodium or potassium lactate functioned solely as a flavoring agent in its products. Several alternative arguments were presented. First, Kraft argued that its commercially-produced lactates should be considered acceptable for a "natural" product because they are "natural preservatives."[102]  As shown above, the highly refined and purified lactates Kraft uses do not qualify for the exemptions from "chemical preservatives," and USDA appropriately did not rely upon the Kraft argument.

Second, Kraft argued that lactates should be considered acceptable because they are used for antimicrobial purposes, not for controlling food spoilage bacteria.[103] However, the peer-reviewed scientific reports in the Record demonstrate that at the levels at which lactates have antimicrobial effects against pathogenic bacteria, such as *Listeria*,

---

[102] AR 806.
[103] AR 813.

they also inhibit the growth of the primary food spoilage bacteria.[104]  Accordingly, there

is no scientific support in the Record for the distinction that the other responding

manufacturers attempted to draw.

Further, there is no basis in the Record for the suggestion in USDA's October 29,

2007 follow up letter to Chairman Peterson that proceeding with label rescissions would

raise questions of public health. AR 783. All food inspected and passed by USDA must

be safe for human consumption, and the agency has provided by rule that foods

containing lactates are safe up to a maximum level of 4.8%. The question whether a

product may be sold under a "natural" label is completely separate from the issue of food

safety and involves a different statutory consideration -- the consumer's right to know

whether the food he or she is ingesting contains a "chemical preservative."  Compliance

with the existing law concerning when a safe product may also be labeled "natural"

without misleading consumers – i.e., when it is free from chemical preservatives and is

made of ingredients that are not more than minimally processed – does not present public

health issues. This is particularly true when there are "minimal processing" methods

available that qualify for a "natural" claim without added chemical preservatives. Under

the relief Hormel sought, foods containing lactates still could be sold; all existing

products would remain on the market. The only change from the *status quo* – the illegally

established *status quo* -- would be that these products could not be sold under labels that

mislead consumers into believing they are purchasing products that do not contain added

"chemical preservative."  In this Court, USDA has not adopted the "public health"

rationale suggested in the October 29 letter.

---

[104]*See* Shelef, *supra* note 75; Cegielska-Radzieqewska, *supra* note 75.

**C.  *USDA's Post Hoc Rationalization Based on the Shelf-Life Data Provided by Four Manufacturers Does Not Support its Decision***

USDA seeks to defend its action on the ground that four manufacturers submitted studies that allegedly demonstrate that "the comparison of two or more similar products with, and without, sodium lactate were observed to have very similar microbial and bacterial growth patterns, and identical shelf-lives while exposed to the same controlled conditions."[105]  The agency now asserts for the first time that these four studies provided a rational basis for its decision to "postpone any decision on Hormel's request to rescind USDA approval of current "natural" labels for such products pending completion of the rulemaking process." [106]

The law in the D.C. Circuit is well-settled:

> Arbitrary and capricious review "demands evidence of reasoned decisionmaking *at the agency* level; agency rationales developed for the first time during litigation do not serve as adequate substitutes." . . . "We can only look to the 'agency's] stated rationale. We cannot sustain its action on some other basis the [agency] did not mention."

*Williams Gas*, 475 F.3d at 326, quoting *Kansas City v.* HUD, 923 F.2d 188, 192 (D.C. Cir. 1991), and *Point Park Univ. v. NLRB*, 457 F.3d 42, 50 (D.C. Cir. 2006) (emphasis in original). There is no suggestion in the July 31, 2007 Peterson letter that scientific justification now advanced by USDA was the basis of its decision. The agency therefore cannot defend its action based on this *post hoc* argument.

In any event, the *post hoc* argument fails on its own terms. USDA erroneously asserts that "[t]he only direct evidence before the agency at this time" are the studies from the four manufacturers who responded to its demand for information. Gov't Mem. at 25-26. However, that statement is palpably incorrect. The Administrative Record

---

[105] Derfler Dec.¶ 32.
[106] *Id.*; Statement of Undisputed Facts ¶ 21.

before USDA contains a significant number of peer-reviewed scientific studies in the Administrative Record which demonstrate that sodium and potassium lactates have the effect of preservatives at levels below 2%. Two of the responding manufacturers, Kraft and Sugar Creek, expressly confirmed in the letters submitting their shelf-life studies that they use lactates as preservatives in their products. Kraft recited at length the number of prior occasions on which it had informed USDA that lactates had preservative effects.[107]

Even a cursory examination of the shelf-life studies submitted by the manufacturers shows that they do not support USDA's *post hoc* rationalization and cannot overcome the strong, contrary case made by the peer-reviewed scientific evidence. To assist the Court in understanding the contents of these studies, Hormel has attached the Declaration from Richard J. Christianson, its Manager of Chemistry and Microbiology Laboratories (Attachment 1).

The Plumrose "eight week microbiological analysis," on which USDA primarily relied, was not included in the Administrative Record that the agency produced.[108]  What the Record does contain is a two page letter from Plumrose characterizing the results of an Aerobic Plate Count and Analysis of Yeast and Mold studies using the Petri-Film method of analysis.[109] AOAC Methods 990.12 for Aerobic Plate Count and Method 997.02 for Yeast and Mold Counts are the analytical methods recognized by USDA as acceptable for such studies.[110]  The description of the study in the letter demonstrates that Plumrose did not use either the incubation times or temperatures prescribed by these

---

[107] AR 792, 854-855.
[108] Derfler Dec.¶ 31; Defendant's Statement of Material Facts ¶ 21.
[109] AR 847-848.
[110] Christianson Dec. ¶ 8

methods.[111] Paragraph two of the letter indicates that the APC analyses were conducted on Petri-film at 30 degrees Centigrade for 48 hours rather than the 35 degree Centigrade required under the method. Similarly, the Yeast and Mold samples were held in incubation at 30 degrees Centigrade for a total of 72 hours, rather than the 20-25 degree temperatures for 5 days required by the method. Thus, the reported results do not provide scientifically reliable information, and certainly do not rebut the clear scientific evidence of lactate preservative activity below 2%.[112]

The remaining studies are equally defective. The data accompanying the Peterson's Natural Farms Life Study demonstrate that the product evaluated in this shelf-life study had already reached bacterial counts consistent with spoilage at the outset of the study; the starting bacteria counts exceeded the level at which the scientific analysis should be terminated.[113]  Therefore, this fundamentally flawed study cannot support a scientific conclusion. Finally, the data submitted by Fresherized Foods demonstrate a clear preservative effect at both 1% and 1.5% sodium lactate solutions. Figures 1 through 10 of that study evaluate only the lactate-containing product; there is no comparison to non-lactate containing products.[114]

In the cover letter to its study, Kraft admits that its lactates have an "antimicrobial effect," which USDA has recognized as a preservative function.[115]  Indeed, the Kraft letter demonstrated why USDA's focus on shelf-life, rather than the antimicrobial effect

---

[111] Paragraph two of the letter indicates that the APC analyses were conducted on Petrifilm at 30 degrees Centigrade for 48 hours, rather than the 35 degree Centigrade required under the method. Similarly, the Yeast and Mold samples were held in incubation at 30 degrees Centigrade for a total of 72 hours, rather than the 20-25 degree temperatures for five days required by the method.
[112] Christianson Dec. ¶¶ 9, 11.
[113] AR 864-869. Christianson Dec. ¶ 13.
[114] Christianson Dec.¶ 10; AR 795–805.
[115] AR 611-640 (Letters from USDA to Companies)

of lactates, was arbitrary and capricious from the outset. "Shelf-life" is not a scientific

concept, but a mixture of marketplace and scientific considerations. As Kraft stated:

> it is not scientifically sound to assume that the shelf life and date codes for a
> product reveal whether the product contains an antimicrobial ingredient. The
> shelf-life for Oscar Mayer products is based upon a number of factors, the most
> important being the potential presence of spoilage organisms that can affect
> product taste, odor, texture, and similar indicators of quality. Presence of
> spoilage organisms, in turn, is affected by the type of product, moisture content,
> fat content, salt content, processing methods, and sanitation. As a result of these
> variables, two products may have a different shelf life, but this difference cannot
> be used to predict whether one contains an antimicrobial ingredient while the
> other does not. Such a narrow focus does not account for the realities of food
> technology and science. Significantly, the lactate ingredients in our natural
> products are added to address *lm* [*Listeria*], not spoilage organisms.[116]

The study attached to this letter was conducted for a different purpose – to support

the addition of two other preservative ingredients to the accepted USDA list.[117]  The

study lacks key relevant information essential to any serious scientific evaluation of its

results – including the temperature at which the products were held during the spoilage

studies. Nonetheless, Part I of the study (effects on spoilage) consistently demonstrates

"more growth in the treatment with no antimicrobial ingredients."[118]  This is direct

evidence that the lactates have an antimicrobial effect. Further, the study fails to include

and evaluate a control product that does not contain added preservatives in the visual

spoilage assessment.[119]

Accordingly, USDA's denial of Hormel's request for relief through label

rescissions was contrary to law, and arbitrary and capricious. Hormel is entitled to

summary judgment on Claim 2.

---

[116] AR 813.
[117] AR 820-828.
[118] AR 822.
[119] AR 827–828.

### III.    USDA'S DECISION NOT TO INSTITUTE LABEL RESCISSION PROCEEDINGS CONSTITUTED A *DE FACTO* EXEMPTION OF GENERAL APPLICABILITY FROM THE MISBRANDING PROVISIONS OF THE FMIA AND THE PPIA ISSUED WITHOUT PRIOR NOTICE AND COMMENT.

Under the APA, federal agencies may only adopt substantive rules affecting the rights and obligations of the public through notice and comment rulemaking.  A "rule" is defined as "the whole or a part of any agency statement of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy. . ." 5 U.S.C. § 551(4) (2005).

While the APA does provide exemptions from notice and comment rulemaking for interpretive rules and general statements of policy, those exemptions are narrowly construed. An agency cannot avoid the notice and comment rulemaking requirements by labeling a legislative rule as an interpretation, guidance, advisory statement or policy statement. *Air Transport Ass'n v. FAA*, 281 F. 3d 49, 55 (D.C. Cir. 2002); *Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1024 (D.C. Cir. 2000). The general test that distinguishes substantive rules from interpretive rules or policy statements is whether the agency action has the force and effect of law. An obvious change in agency practice that creates a binding norm is "determinative of the issues or rights to which it is addressed" meets this test. *CropLife America v. EPA*, 329 F. 3d 876, 883-84 (D.C. Cir. 2003). *See General Electric Co. v. EPA,* 290 F.3d 377, 384-85 (D.C. Cir. 2002); *Appalachian Power*, 208 F.3d at 1022.

Here, USDA's decision not to institute label rescission proceedings for any "natural" label for any lactate-containing product approved under the global exemption for sodium lactate adopted in August 2005 constituted a *de facto* change in agency policy, not adopted through notice and comment rulemaking. This *de facto* rule had the

effect of restoring on a retroactive basis the unlawful amendment of the Natural Policy that USDA revoked in December 2006. The inclusion of "sodium lactate (from a corn source)" as an acceptable ingredient in a product sold under a "natural" label, regardless of its status as a chemical preservative and as highly processed, was a substantive change in the established agency interpretation dating back to 1982 that the term "natural" meant "minimally processed" and no "chemical preservatives."  The Administrative Record clearly shows that during the time the 2005 exemption was in effect, the agency applied it as a general rule and approved multiple "natural" labels for lactate-containing products.

USDA defends its July 2007 decision to permit the continued sale of lactate-containing product under "natural" labels on the grounds that (1) their inclusion was limited to 2% or less, based on the agency's understanding that sodium and potassium lactates at these levels did not have preservative effects but functioned only as flavorings and that label applicants were required to demonstrate that this was the case; (2) the decision simply codified long-standing USDA policy; and (3) it is prospectively requiring applicants for new "natural" labels to demonstrate that lactates are not having preservative effects in their products. Gov't Mem. at 25-26. The Administrative Record does not support these arguments and demonstrates that this policy is a new standard of broad application and with binding legal consequences.

First, the Administrative Record demonstrates that USDA was well aware of the antimicrobial preservative effects of these two chemicals prior to the August 2005 change in policy. Kraft repeatedly briefed USDA staff on the Purac patents and the antimicrobial properties of sodium and potassium lactate in 2002 and 2003. AR 854-855. The Record suggests a USDA staff decision in the spring of 2006 to nonetheless adopt a general

"don't ask, don't tell" policy permitting use of lactates up to 2%, without regard to their preservative effects or their processing.

Second, there is no evidence in the Administrative Record of any "long-standing" agency policy of approving sodium and potassium lactates at less than 2% in "natural" products. The Record does not contain any document supporting USDA's claim that the staff adapted an informal policy in 2000-2001 of assuming that lactates do not have a preservative effect at levels under 2%. The first such label included in the Record dates from June 2005 and involves a product whose lactate level exceeds 2%. [REDACTED] As noted in the Opposition to the Motion to Dismiss, the Federal Register provisions on which USDA purports to rely (Defler Dec. ¶ 15, 16) do permit the inclusion of lactates in foods, but do not address the separate question whether lactate containing foods may be sold under a "natural" label. Further, the August 2005 revision of the definition of "natural" does not impose a 2% limit on the level of lactates that may be included, as USDA claims (Derfler Dec. ¶ 19) but granted a global exemption for sodium lactate.

Finally, there is no evidence that the USDA decision to change the rules and permit use of sodium and potassium lactates as chemical preservatives in natural products was either a 'case-by-case' determination or limited to concentrations of 2% or less. As noted above, label applications in the "Confidential" part of the Administrative Record show that the agency approved "natural" labels for products with concentrations of sodium and potassium lactate above 2% (at least three), without any specification of sodium or potassium lactate concentration (another three), and on an inconsistent basis for large quantities of potassium lactate by weight.

Accordingly, USDA violated the APA when, without notice and comment, it reinstituted on a retroactive basis the global exemption for sodium lactate permitting continued sale of all lactate-containing products that had been illegally approved under that since revoked exception. In December 2006, USDA had rescinded that global exemption noting that:

> Whether there should ever be a blanket acceptance of any ingredient that has multiple functions, including an antimicrobial or preservative function, in products labeled "natural" is a complicated issue that is best addressed through notice and comment rulemaking.[120]

In July 2007, however, USDA adopted a *de facto* rule of general applicability that resolved the question that supposedly will be considered in this future rulemaking, by changing its policy to permit continued sale of these lactate-containing products under a "natural" label. That rule was unlawfully adopted without the required notice and comment procedures for such a change in the substantive labeling requirements.

The July 31, 2007 decision should be held invalid for this violation of the APA, and the agency should be ordered to follow the standards it adopted in December 2006 and to initiate label rescission proceedings for every lactate-containing product for which the manufacturer has failed to show that the lactates do not have a preservative effect.

---

[120] AR 11

**CONCLUSION**

Hormel's Cross-Motion for Summary Judgment should be granted.

Respectfully submitted,


___*/s/ Nancy S. Bryson*___                    ___*/s/ John F. Cooney*_____
NANCY S. BRYSON                        JOHN F. COONEY
(D.C. Bar No. 913673)                    (D.C. Bar No. 936336)
The Bryson Group PLLC                    Venable LLP
575 7th Street, N.W.                       575 7th Street, N.W.
Washington, D.C. 20004                   Washington, D.C. 20004
(202) 344-4731                          (202) 344-4812


                                    Counsel for Plaintiff
March 7, 2008                          Hormel Foods Corporation

45

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

HORMEL FOODS CORPORATION )
)
**Plaintiff,** )
v. ) **Civil Action No. 1:07-cv-1724 (RBW)**
UNITED STATES DEPARTMENT )
 OF AGRICULTURE, )
)
**Defendant.** )
_____

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS NO GENUINE ISSUE IN SUPPORT
OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to LCvR 7(h), plaintiff Hormel Foods Corporation ("Hormel") submits

this Statement of Material Facts as to which There Is No Genuine Issue in support of

Plaintiff's Motion for Summary Judgment.

1.      USDA issued Policy Memorandum 055 in 1982.  It prohibits, <u>inter alia</u>,

the use of "chemical preservatives (as defined in 21 C.F.R. 101.22)" in products carrying

the "natural" label, as well as products and ingredients that are "more than minimally

processed."   AR 2-3.

2.      In the definition of "natural," the term "chemical preservative" was

defined by reference to the Food and Drug Administration ("FDA") regulation  21 C.F.R.

§ 101.22, which provides that the term includes:

> any chemical that, when added to food, tends to prevent or retard deterioration
> thereof, but does not include common salt, sugars, vinegars, spices, or oils
> extracted from spices, substances added to food by direct exposure thereof to
> wood smoke, or chemicals applied for their insecticidal or herbicidal properties.

3.  In the definition of "natural," the term "minimal processing" was defined as:

(a) those traditional processes used to make food edible or preserve it or make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting; or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

AR 2.

4.  USDA issued an update of the Policy Memorandum in May 2003.  This update deleted two sections of the original 1982 policy entitled "Issue" and "Rationale" but otherwise left the terms of the policy unchanged.  AR 4.

5.  The antimicrobial properties of lactates when used in meat and poultry products are well known, as is their ability to inhibit the growth of meat spoilage bacteria. Both preservative effects, even at low levels, have been well-known for years and are reflected in numerous documents provided to USDA and included in the Administrative Record, including U.S. Patents 4,798,729, 4,888,729 and 5,017,391 which provide that sodium and potassium lactate have antimicrobials effects at levels from 1% to 7% of product formulation.  AR 127, 128, 142, 148, 151.  The Administrative Record also includes a submission by Kraft Foods, which demonstrated that lactates have preservatives effects, even at levels below 2%, and that this is an inherent characteristic that cannot be separated from the flavoring effect.  AR 806.

6.  The Administrative Record also contains multiple peer reviewed scientific articles in the administrative record.  These studies consistently report and validate the chemical preservative effect of sodium and potassium lactate at levels below 2%.  For example, the studies establish that:

- Sodium lactate at concentrations between 1% and 2% has an inhibitory influence on the growth of both meat spoilage bacteria and pathogens such as Salmonella, Listeria monocytogenes, clostridium botulinum and Escherichia coli. Cegielska-Radziejewska, R. and Pikul, J., Sodium Lactate Addition on the Quality and Shelf Life of Refrigerated Sliced Poultry Sausage Packaged in Air or Nitrogen Atmosphere, Journal of Food Protection, 67(3), 601-06 (2004); Shelef, L.A. and Yang, Q., Growth Suppression of Listeria Monocytogenes by Lactates in Broth, Chicken and Beef, Journal of Food Protection 54(4), 283 – 87 (1991). AR 211 – 215, 258 – 262.

- Sodium lactate was the most effective compound for the "sustained" control over all the bacteria that had been tested.  Stillmunkes, A.A. et al., Microbiological Safety of Cooked Beef Roasts Treated with Lactate, Monolaurin or Gluconate, Journal of Food Science 58(5), 953-58 (1993); AR 220 – 225.

- Sodium lactate at concentrations between 1% and 2% extends shelf life of products significantly; Papadopoulis, L.S. et al., Consumer and trained Sensory Comparison of Cooked Beef Top Rounds Treated with Sodium lactate, Journal of Food Science 56 (5), 1141-46, 1153 (1991)("shelf life of ham was doubled by addition of 2% sodium lactate") AR 000200 - 000206; Shelef, L.A. and Yang, Q., Supra; Meyer, J.D., Cerveny, J.G. and Luchansky, J.B., Inhibition of nonproteolytic, psychotropic Clostridia and anaerobic sporeformers by sodium diacetate and sodium lactate in cook-in-bag turkey breast, Journal of Food Protection 66(8), 1474-78 (2003).;

Minerich Dec. ¶ 3.

7.    The antimicrobial and flavoring effects are inherent properties of sodium and potassium lactate and cannot be readily separated.  There is no threshold, either at 2% or any other number, under which the antimicrobial properties of lactate chemicals vanish and over which antimicrobial efficacy suddenly appears.  AR 807.

8.  In August 2005, without providing prior notice or an opportunity for comment, USDA substantively amended the definition of "natural" to include the following note:

Note:  Sugar, sodium lactate (from a corn source), natural flavorings from oleoresins or extractives are acceptable for "all natural" claims.

3

AR 8.  The text of the Note permitted the inclusion of sodium lactate in products sold

under a "natural" label without imposing any limit on the percentage of lactate that could

be included.  *Id*.

9.  On October 9, 2006, Hormel filed a petition with USDA arguing that the

August 2005 change to Policy Memorandum 055 rendered it internally inconsistent and

misleading.  Hormel requested that USDA conduct a rulemaking proceeding to define

"natural."  Hormel further requested that USDA immediately rescind the August 2005

amendment including the Note that exempted sodium lactate from the scope of the

definition.  AR 14 – 33.   The petition included marketing literature, three Oscar Mayer

patents and model results for a proprietary "Opti-Form" sodium lactate solution used for

preservative effects.  AR 35-53.

10.     On October 10, 2006, Hormel filed with USDA a second request for relief.

The second request sought rescission of label approvals of the three Oscar Mayer

products containing potassium lactate that had appeared in the market during the month

of September 2006.  AR 55–58.  The petition cited the presence of potassium lactate as a

chemical preservative in the products as per se evidence that the "natural" label was false

and misleading.  *Id*.

11.     On November 7, Hormel's counsel provided a supplemental analysis in

support of the October 10, 2006 request for label rescission.  This analysis noted that to

the extent USDA interpreted its 2005 revised "natural" policy as authorizing the use of

potassium lactate (from a corn source) as a chemical preservative exempt from label

disclosure in natural products, it had exceeded its authority under the FMIA, the PPIA,

and the Administrative Procedure Act by changing a 23-year old labeling policy and

standard without notice and comment rulemaking.  AR 126–140.  This supplemental

analysis requested elimination of the "note" from the 2005 Policy and rescission of the

illegally approved labels as false and misleading.  *Id*.

12.  On December 6, 2007, Dr. Richard Raymond, USDA Under Secretary for

Food Safety, responded to Hormel's request for label rescissions.  AR 160.  Dr. Raymond

stated that:

> lactates are multi-function ingredients, and [the potassium lactate] labels were
> approved based on representations concerning the source and level of the lactate
> used, and information provided by the applicants indicating that the lactate was
> being used exclusively as a flavoring agent. . .  if, in fact the lactates are being
> used to control or reduce microorganisms and extend the shelf-life of the treated
> product, FSIS would not permit the use of the term "natural" on the product label
> under the current labeling policy guidelines.

> FSIS has … written to the companies with approved meat and poultry product
> labels bearing the "natural" claim and containing lactates at levels of 2 percent or
> less.  These companies were advised to provide FSIS with information
> demonstrating that the use of lactates in these products does not provide a
> preservative effect.  In the absence of such information, FSIS will institute action
> to rescind its approval of labels that bear a "natural" claim.

*Id*.

13.  On December 5, 2006, USDA published in the Federal Register a notice of

the receipt of the Hormel petition for rulemaking and requested public comment.  71 Fed.

Reg. 70,503; AR 642 – 644.  In that notice, USDA stated that it was removing the

reference to sodium lactate from the 2005 modification.  USDA further stated that:

> As the agency moves through the stages of rulemaking on "natural," "natural"
> claims for foods in which sodium lactate is used will continue to be considered by
> FSIS on a case-by-case basis, in light of factors such as the level used, the
> claimed technical effect of the sodium lactate, and the actual effect that it is
> having on the product.

AR 643.

14.    On November 20, December 1, and December 5, 2006, USDA sent letters to twenty-four companies that held "natural" labels for lactate-containing products that. AR 611–640; Derfler Decl. ¶ 27.  All of the companies were required to submit data showing that for each of the products involved, the lactate ingredients are having only a flavoring effect and are not functioning as a preservative in the product.  AR 612, 614, 616 and even numbered pages through 000640.   The letters further stated that "a preservative function includes those of an antimicrobial, i.e., reducing microorganisms and extending shelf-life of treated products.  AR 611, 613, 615 and odd numbered pages through 639.

15.    Twenty of these companies did not submit data in response to USDA's letter.  Derfler Dec. ¶ 30.

16.    Four companies did submit data, but none of this data met the test specified by USDA in the letters of demonstrating that the lactates were not having a preservative effect in these specific products at a formulation level below 2%.  AR 847-848, 795-805; 806–828; 863-869.

17.    On July 31, 2007 in a letter from Under Secretary Raymond to Chairman Peterson of the House Agriculture Committee, USDA announced that it had denied Hormel's request for rescissions of false and misleading labels approved under the now-rescinded global exemption to the Policy Memorandum 055 for sodium lactate containing products.  The letter stated that:

> The comments submitted to the Agency expressed widely divergent and sometimes conflicting views on what the claim, "natural," as applied to meat and poultry products, should mean.  Given that fact, FSIS is considering how best to proceed to ensure that the term "natural," as used in meat and poultry labeling, is truthful and not misleading.  While one way to try to achieve this result would be to pursue the actions we described in the process that the Agency began with the

December 5, 2006 notice, we now believe that a more efficient way would be to
pursue the process that the Agency began with the December 5, 2006, notice.

AR 779-780. USDA thereby abandoned its decision to re-evaluate the product labels

approved under the 2005 Policy 055 revision authorizing lactates for use in "natural"

products on a case-by-case basis altogether and instead created a de facto rule of general

applicability – every label approved under the illegal policy change could continue on the

market indefinitely. *Id.*

18. In the July 31, 2007 letter, in denying Hormel relief, USDA stated that it had

based its decision on the ground that "we now believe that a more efficient way [to

ensure that the term "natural" is used in a truthful and not misleading manner] would be

to pursue the process that the Agency began with the Dec. 5, 2006 notice." AR 779-780.

In that letter, in announcing its decision, USDA did not cite any scientific evidence. *Id.*

19. In reaching this conclusion, USDA did not conduct a product-by-product

review of whether sodium or potassium lactate had a preservative effect in lactate-

containing products held by the 20 companies that did not submit data in response to the

USDA letters. AR 779-780.

20. Both sodium lactate and potassium lactate are chemicals that have a

preservative effect in meat and poultry products. 65 Fed. Reg. 3,121 (Jan. 20, 2000).

21. Neither sodium lactate nor potassium lactate is common salt, sugar,

vinegar, spice, or oil extracted from a spice. Herreid Dec. ¶ 8-9.

22. Neither sodium lactate nor potassium lactate is a substance added to meat

and meat food products by exposure to wood smoke. Herreid Dec. ¶ 8-9.

23. Neither sodium lactate nor potassium lactate is a naturally occurring

substance in the form in which they are added to food products. Both lactates can occur

in nature but not in the purified, concentrated form sold commercially as food

ingredients.  The lactates added to food products are manufactured made through a

process involving substantial industrial chemistry.   Herreid Dec. ¶ 8-9.

24.    The biomass of lactates that is fermented from a corn source is processed

through several substantial chemical processes before being transformed into the purified

and concentrated form of sodium lactate or potassium lactate that is added to foods.  *Id.*

Respectfully submitted,

_/s/ Nancy S. Bryson_
NANCY S. BRYSON
(D.C. Bar No. 913673)
The Bryson Group PLLC
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4731

_/s/ John F. Cooney_
JOHN F. COONEY
(D.C. Bar No. 936336)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812

Counsel for Plaintiff
March 7, 2008                                    Hormel Foods Corporation

8

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 7th day of March 2008, copies of *Plaintiff's Cross Motion for Summary Judgment [REDACTED], Memorandum of Points and Authorities in Support thereof [REDACTED], Statement of Material Facts As To Which There Is No Genuine Issue, Declaration of Richard J. Christianson, Declaration of Richard M. Herreid, Declaration of Phillip L. Minerich, and proposed Order* were served by the Court's ECF filing system on the following:

> William B. Jaffe, Esquire
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Avenue, N.W.
> Washington, D.C. 20530
>
> Kristin F. Roddy, Esquire
> Hogan & Hartson
> 555 Thirteenth Street, N.W.
> Washington, D.C. 20004

> _____*/s/ John F. Cooney*_____
> John F. Cooney

46

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HORMEL FOODS CORPORATION ) | |
| ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. 1:07-cv-1724 |
| ) | |
| UNITED STATES DEPARTMENT ) | |
| OF AGRICULTURE, ) | |
| ) | |
| Defendant. ) | |

DECLARATION OF RICHARD J. CHRISTIANSON

I, Richard J. Christianson, declare the following:

1.      I am Manager of Chemistry and Microbiology Laboratories for the

Hormel Foods Corporation, where I have been employed since 1981.  I have over 28

years of experience in the food industry working extensively on the development and

implementation of food safety and quality.  Prior to this position, I spent my career

working for Hormel as a Microbiology Lab Supervisor, Food Technologist, and Senior

Thermal Processing Technologist.  I received my B.A. in Biology from The University of

Minnesota. I am a member of the American Society For Microbiology, the International

Association For Food Protection, and the Institute For Thermal Process Specialists.

2.      In my current position, I am responsible for Chemistry and Microbiology

Laboratory services within the Hormel Foods Research and Development,

microbiological challenge studies, evaluation of intervention technologies, and new

method evaluation and development. I manage Supervisors, Scientists, and Technicians

in the Chemistry and Microbiology Laboratories, ensuring company policies and

applicable state and federal laws are followed. I am responsible for the conduct of scientific research submitted to regulatory agencies to meet various program requirements.

3.     A microbiological challenge study assesses the growth characteristics of bacteria under a variety of conditions, and the lethal effects of various intervention technologies.

4.     There is no single standard method of analysis to determine shelf life, but where microbiological spoilage data is used as the primary indicator of shelf life, recognized methods of microbiological analysis must be used.

5.     There are several standard sources for recognized methods for the microbiological analysis of food products.  These include the FDA Bacteriological Analytical Manual (*available at* http://www.cfsan.fda.gov/~ebam/bam-toc.html) the FSIS Microbiology Laboratory Guidebook (3rd Ed., vol. 1 & 2, 1998, *available at* http://www.fsis.usda.gov/Science/Microbiological_Lab_Guidebook/index.asp) and the Compendium of Methods for the Microbiological Examination of Foods (Health and Welfare Canada, *available at* http://www.hc-sc.gc.ca/fn-an/res-rech/anly-meth/microbio/index_e.html), International Standards Organization ("ISO")(*available at* http://www.iso.org/iso/searcj.htm?qt=Microbiological+Methods&sort=rel&type+simple&published=on) and/or AOAC Official Methods (*available at* http://eoma.aoac.org/).

6.     I have reviewed the four shelf studies contained in the administrative record of this matter that were submitted by Plumrose (AR 000847 – 000848), Fresherized Foods (AR 000795 – 000805); Kraft Foods (AR 000820 – 000828) and Peterson's Farms (AR 000863 – 000869).

7.      There are three essential components within a microbiological challenge study. The first is the study's protocol, or design. The second is the method of microbiological analysis. The third is the manner in which the study data is analyzed, or interpreted. All four studies fail standard assessment criteria under one or more of the above essential components.

8.      The Plumrose study was not conducted consistent with officially recognized microbiological analytical methods, and is therefore unacceptable for regulatory decision making. The Study was conducted using a Petri-film method of analysis, but not in compliance with AOAC Official Methods of Petri-film analysis for either Aerobic Plate Count in Foods (AOAC Official Method 990.12), or Yeast and Mold Counts In Foods (AOAC Official Method 997.02). These AOAC Official Methods are those recognized by the USDA in its FSIS Microbiology Laboratory Guidebook (*Chapter 3, Examination of Fresh, Refrigerated and Frozen Prepared Meat, Poultry and Pasturized Egg Products, available at* http://www.fsis.usda.gov/ophs/Microlab/Mlgchp3.pdf). The AOAC's Official Method for Aerobic Plate Count in Foods ("APC") specifies incubation of the Petri-film at 35 degrees Centigrade for 48 hours.  The Plumrose study incubated the Petri-film at 30 degrees Centigrade for 48 hours. AR 000847. The AOAC Official Method for Yeast and Mold Counts indicates that the Petri-film must be incubated at 20 – 25 degrees Centigrade for 5 days.  The Plumrose study incubated the Petri-film at 30 degrees Centigrade for 72 hours. *Id* Microorganisms have optimum growth conditions (time and temperature).  The AOAC Official Methods specify the temperature and a corresponding incubation time for the microorganism being studied.  Deviation from either the specified

incubation time or temperature can negatively affect the growth characteristics of the microorganisms, and render the test unreliable.

9.      The Fresherized Foods shelf-life study actually demonstrates a preservative effect of lactate solutions at both 1% and 1.5%. The 1% solution provided up to a 2.1 log reduction in beef, and the 1.5% solution inhibited bacterial growth in chicken.. AR 796. Therefore, the conclusion that lactate solutions below 2% had no preservative effect is simply scientifically incorrect. AR 795.

10.     In addition, the study fails on both protocol and data analysis components. Figures 1 through 10 of the study indicate a preservative effect in the lactate samples during the shelf life, but there is no comparison to a control not containing the preservative. AR 000800 – 000805. To serve its essential purpose, a control must be run under the same conditions as the product being tested. Figures 11-18 do provide data on non-lactate containing products, but the study of lactate-containing samples in Figures 1 through 10 was a 60 day study; while the study of non-lactate containing products in Figures 11 – 18 was a seven day study. In addition, the study in Figures 11-18 cannot provide a comparison because at a temperature of 4 degrees Centigrade, the test organism, *L. monocytogenes* would likely still be in the lag phase of the growth curve at 7 days, and a 7 day study would provide no useful information on the growth kinetics of the organism in this product.

11.     The actual results of the Kraft Foods study also demonstrate that sodium and potassium lactate at levels below 2% are preservatives. The study consistently shows "more growth in the treatment with no antimicrobial ingredients." AR 000822, Figure 1, Figure 2 and Figure 3. In addition, the study fails to provide the temperature at which the

products were held during the spoilage studies, an essential data point for interpretation. AR 000823 – 000826. The rate of bacterial growth and subsequent product spoilage is directly related to the temperature profile of the product over its shelf-life. As a general rule, fresh meat will spoil at least twice as fast at 5 degrees Centigrade as at 0 degrees Centigrade, and at least four times as fast at 10 degrees Centigrade. *See, e.g.* Price, THE SCIENCE OF MEAT AND MEAT PRODUCTS, 1987.

12.     The Kraft study's protocols are also inadequate. The study does not include a non-preservative control product in the opened package spoilage component of its study, AR 000827, and does not disclose what level of bacteria was contained in the inoculum at the initiation of the study or what happened during the first week of testing. Kraft's first sampling point in this study was at 1 week. Thus, the study only describes what happened on weeks 1, 2 and 3. It indicates that the product was held at 40° F. for 60 days prior to the start of the test, then the products were inoculated with an unspecified level of *Listeria* and held at an unspecified temperature for 3 weeks. Figure 1. shows the total plate count of two products, one containing Lactate and the second containing Benz/Prop. There is no indication whether the product illustrated in Figure 1 is the Beef Franks, Ham or Bologna.

13.     The bacterial counts for the Pederson Farm's study demonstrate that the product used in this study was already spoiled at the outset of the study. As noted under the Results and Discussion text of the study, "Generally, the end of shelf-life is defined as 10,000,000 bacteria per gram, 100,000 yeast per gram, or visible mold, however, spoilage in some products (especially raw meats) may not be evident based on high levels of naturally occurring organisms in product. In these cases, organoleptic evaluation of the

product is recommended." AR 865. Starting counts for the product tested were

30,000,000 lactic acid bacteria per gram, 61,000,000 lactic acid bacteria per gram and

17,000,000 lactic acid bacteria per gram respectively. AR 867-868. A shelf life study

using product already exceeding the microbiological levels required to cause spoilage is

meaningless.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 6 , 2008 at Austin, Minnesota.

Richard J. Christianson

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HORMEL FOODS CORPORATION )<br>)<br>)<br>Plaintiff, )<br>v. )<br>)<br>UNITED STATES DEPARTMENT )<br>OF AGRICULTURE, )<br>)<br>Defendant. ) | Civil Action No. 1:07-cv-1724 |

## DECLARATION OF RICHARD M. HERREID

I, Richard M. Herreid, declare the following:

      1.    I am the Manager of Applied Research at Hormel Foods Corporation. I previously served as Development Leader – Applied Research and a Senior Chemist at Hormel. I earned by BA degrees in 1973 from St. Olaf College, Northfield, Minnesota, and an MS in Organic Chemistry from the University of Wisconsin, Madison in 1976. I have been a Member of American Chemical Society since 1978.

      2.    In my present position, I am responsible for evaluation and development of new technology, ingredients and processes that can be used in producing new or improved food products.

      3.    Both sodium lactate and potassium lactates are chemicals with the respective chemical nomenclatures of $CH_3CHOHCOONa$ and $CH_3CHOHCOOK$. AR 233.

      4.    Neither sodium lactate nor potassium lactate is common salt, sugar, vinegar, spice, or oil extracted from a spice.

5.      Neither sodium lactate nor potassium lactate is a substance added to meat and meat food products by exposure to wood smoke.

6.      Neither sodium lactate nor potassium lactate is a naturally occurring substance in the form in which they are added to food products. Both lactates can occur in nature but not in the purified, concentrated form sold commercially as food ingredients. The lactates added to food products are made through a process involving substantial industrial chemistry. AR 314; AR 315-451.

7.      Sodium lactate is a combination of lactic acid and sodium hydroxide. Potassium lactate is a combination of lactic acid and potassium hydroxide. AR 314.

8.      Lactic acid is one of a number of products of the fermentation of carbohydrates (including corn-based carbohydrates) and is produced in the following manner. First, the source material is fermented.  Second, the resulting biomass is separated and purified through a series of chemical refining processes, including acidification (through the addition of sulfuric acid or another similar chemical(, filtration, evaporation, and purification by means such as esterification and hydrolysis or high vacuum distillation and crystallization.  Esterification and hydrolysis are controlled chemical refinery reactions used to separate the lactic acid from other components of the input stream, including ethanol.  High vacuum distillation and crystallization are industrial chemical processes for producing highly purified and concentrated lactic acid. *See, e.g.*, AR 319-324; 347-350.

9.  The product of these processes, purified lactic acid, is then mixed with sodium (or potassasium) hydroxide to form sodium (or potassium) lactate solution.  The source materials for the hydroxides are not carbohydrates, but a liquid brine solution, the

primary ingredients of which are sodium (or potassium) chloride.  The hydroxides are industrial products, synthesized by the passage of electricity through a sodium (or potassium) chloride solution, which produces the sodium (or potassium) hydroxide and chlorine gas.  There are no natural sources of the industrial quality sodium or potassium hydroxide chemicals used in this process. AR 314; 326-340; 365-384.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March _6_ , 2008 at Austin, Minnesota.

Richard M. Herreid

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HORMEL FOODS CORPORATION | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| v. | )    Civil Action No. 1:07-cv-1724 |
| | ) |
| UNITED STATES DEPARTMENT | ) |
| OF AGRICULTURE, | ) |
| | ) |
| Defendant. | ) |

### DECLARATION OF PHILLIP L. MINERICH

I, Phillip L. Minerich, declare the following:

1.      I am the Vice President for Research and Development of the Hormel
Foods Corporate Services, LLC ("Hormel").  I have held this position since January 1,
2006.  I earned my BS degree in Food Technology in 1976 from The Ohio State
University; and MS and PhD degrees in Food Science respectively in 1990 and 2002
from the University of Minnesota.

2.      On December 22, 2006, I submitted to Dr. Robert Post of USDA a series
of technical reference materials relevant to FSIS' case-by-case evaluation of the use of
sodium and potassium lactate in products carrying the "natural" label claim. These
materials were provided in an Appendix that is included in the Administrative Record
("AR") at 000162 – 000451.  Part 1 of the Appendix contains a series of scientific studies
that have been published in authoritative peer-reviewed journals, including Applied and
Environmental Microbiology, Journal of Food Science, Journal of Food Protection, and
Journal of Food Safety and Poultry Science.

3.    These studies consistently report and validate the chemical preservative effect of sodium and potassium lactate at levels below 2%.  For example:

- Sodium lactate at concentrations between 1% and 2% has an inhibitory influence on the growth of both meat spoilage bacteria and pathogens such as *Salmonella, Listeria monocytogenes, clostridium botulinum and Escherichia coli.* Cegielska-Radziejewska, R. and Pikul, J., *Sodium Lactate Addition on the Quality and Shelf Life of Refrigerated Sliced Poultry Sausage Packaged in Air or Nitrogen Atmosphere*, Journal of Food Protection, 67(3), 601-06 (2004); Shelef, L.A. and Yang, Q., *Growth Suppression of Listeria Monocytogenes by Lactates in Broth, Chicken and Beef*, Journal of Food Protection 54(4), 283 – 87 (1991). AR 258-262; 211-215.

- Sodium lactate was the most effective compound for the "sustained" control over all the bacteria that had been tested.  Stillmunkes, A.A. et al., *Microbiological Safety of Cooked Beef Roasts Treated with Lactate, Monolaurin or Gluconate*, Journal of Food Science 58(5), 953-58 (1993). AR 220-225.

- Sodium lactate at concentrations between 1% and 2% extends shelf life of products significantly; Papadopoulis, L.S. et al*., Consumer and trained Sensory Comparison of Cooked Beef Top Rounds Treated with Sodium lactate, Journal* of Food Science 56 (5), 1141-46, 1153 (1991)("shelf life of ham was doubled by addition of 2% sodium lactate"); Shelef, L.A. and Yang, Q., *supra*; Meyer, J.D., Cerveny, J.G. and Luchansky, J.B., *Inhibition of nonproteolytic, psychotropic Clostridia and anaerobic sporeformers by sodium diacetate and sodium lactate in cook-in-bag turkey breast,* Journal of Food Protection 66(8), 1474-78 (2003). AR 200-206; 211-215; 166 (article not reprinted in AR, copy attached).

4.    Part Two of the Appendix provides an explanation of the process for synthesis of sodium and/or potassium lactate, AR 000162-000164, a flow diagram, AR 314, and supporting materials, AR 315-451.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on March 6, 2008, at Austin, Minnesota.

Phillip L. Minerich

*Journal of Food Protection, Vol. 66, No. 8, 2003, Pages 1474–1478*

**Research Note**

# Inhibition of Nonproteolytic, Psychrotrophic Clostridia and Anaerobic Sporeformers by Sodium Diacetate and Sodium Lactate in Cook-in-Bag Turkey Breast[†‡]

**J. D. MEYER,[1,2] J. G. CERVENY,[2] AND J. B. LUCHANSKY[1,3]\***

[1]*Department of Food Microbiology and Toxicology and* [3]*Department of Food Science, University of Wisconsin–Madison, Madison, Wisconsin; and* [2]*Kraft Foods, Oscar Mayer Foods Division, Madison, Wisconsin, USA*

MS 02-382: Received 24 October 2002/Accepted 18 March 2003

## ABSTRACT

A nonproteolytic, psychrotrophic *Clostridium* isolate, designated strain OMFRI1, was recovered from cook-in-bag turkey breasts (CIBTB) that displayed an intense pink discoloration and an off-odor following extended refrigerated storage. The viability of strain OMFRI1 in CIBTB containing sodium diacetate (at 0, 0.25, and 0.5%) and/or sodium lactate (at 0, 1.25, and 2.5%) was subsequently evaluated. Raw CIBTB batter was inoculated with 9 to 30 spores of strain OMFRI1 per g, vacuum packaged, cooked to an instantaneous internal temperature of $71.1^\circ C$, chilled, and incubated at $4^\circ C$ for up to 22 weeks. In the absence of food-grade antimicrobial agents, spoilage (i.e., an off-odor) occurred within 6 weeks, and anaerobic plate counts reached 6.6 $\log_{10}$ CFU/g. The CIBTB containing sodium diacetate (0.25%) and that containing sodium lactate (1.25%) required 12 weeks for spoilage to occur and for anaerobic plate counts to reach 7.0 and 6.0 $\log_{10}$ CFU/g, respectively. When sodium diacetate (0.25%) and sodium lactate (1.25%) were used in combination, no off-odor was detected and anaerobic plate counts did not exceed 2.3 $\log_{10}$ CFU/g over 22 weeks of storage at $4^\circ C$. In related experiments, sodium diacetate (at 0, 0.25, and 0.5%), sodium lactate (at 0, 1.25, and 2.5%), and combinations of both ingredients were evaluated in uninoculated CIBTB incubated at $25^\circ C$ for up to 22 days. In the absence of antimicrobial agents and in CIBTB containing sodium diacetate (0.5%), spoilage occurred within 8 days and anaerobic plate counts reached 6.8 and 6.6 $\log_{10}$ CFU/g, respectively. Samples of CIBTB containing sodium lactate (2.5%) showed signs of spoilage within 22 days, and anaerobic plate counts for these samples ranged from $\leq 1.0$ to 6.3 $\log_{10}$ CFU/g. In CIBTB containing both sodium lactate (2.5%) and sodium diacetate (0.25%), spoilage was not evident and anaerobic plate counts were $\leq 1.0$ $\log_{10}$ CFU/g within 22 days. These data validate the efficacy of sodium lactate and sodium diacetate in extending the shelf life of CIBTB.

---

Cook-in-bag refrigerated turkey breast (CIBTB) products are fully cooked in gas- and moisture-impermeable bags and sold in these packages to food service and retail establishments. A CIBTB is manufactured from whole or ground turkey breast muscles and receives an instantaneous heat treatment of $71.1^\circ C$ to inactivate vegetative cells of spoilage and pathogenic bacteria. The cooking process is not designed to destroy bacterial spores or to bring about commercial sterility; thus, spores survive and persist in the final product. Since CIBTB are low in salt ($\sim 1.5\%$) and have a near-neutral pH, refrigeration is the sole barrier to the outgrowth of surviving spores of anaerobic bacteria. A CIBTB has a minimum expected shelf life of 90 days when it is properly stored at $\leq 4^\circ C$. Occasionally, however, this 90-day shelf life is not realized because of spoilage, as manifested by a strong off-odor and an intense pink discoloration in the interior when the product is cut or sliced. We isolated nonpathogenic, nonproteolytic, psychrotrophic clostridia (prototype designated strain OMFRI1) from "spoiled" CIBTB reportedly stored at the proper temperature. As summarized by Kalinowski and Tompkin *(9)*, psychrotrophic *Clostridium* spp. have been isolated from vacuum-packaged beef, pork, and lamb, as well as from pasteurized crab meat *(4, 5, 7, 9, 10)*.

The repeated isolation of psychrotrophic spoilage organisms like *Clostridium* strain OMFRI1 prompted our interest in identifying interventions to control spoilage anaerobes in CIBTB products. The germination and outgrowth of proteolytic *Clostridium botulinum* spores and the subsequent toxin production of these spores is an additional concern associated with temperature-abused CIBTB products. There have been several reports on the efficacy of sodium diacetate and sodium lactate in inhibiting facultative bacteria and anaerobic spore-forming bacteria *(6, 11, 15, 17)*. Although sodium nitrite or sodium lactate could be added to CIBTB as a secondary barrier, these antimicrobial agents impact the product's flavor and/or appearance. Thus,

\* Author for correspondence. Present address: Eastern Regional Research Center, U.S. Department of Agriculture, Agricultural Research Service, 600 East Mermaid Lane, Wyndmoor, PA 19038, USA. Tel: 215-233-6620; Fax 215-233-6568; E-mail: jluchansky@errc.ars.usda.gov.

† Mention of a brand or firm name does not constitute an endorsement by the U.S. Department of Agriculture over others of a similar nature not mentioned.

‡ Portions of this work were presented at the 82nd Annual Meeting of the International Association of Milk, Food and Environmental Sanitarians, Pittsburgh, Pennsylvania, 30 July to 2 August 1995.

J. Food Prot., Vol. 66, No. 8

TABLE 1. *Analytical values for cook-in-bag turkey batters used in the inoculation studies[a]*

| Treatment no. | Moisture (%) | Protein (%) | Fat (%) | Sodium chloride (%) | Phosphate (%) | Sodium lactate (%) | Sodium diacetate (%) |
|---|---|---|---|---|---|---|---|
| 1 (control) | 78.7 | 17.0 | 1.2 | 1.56 | 0.26 | 0.00 | 0.00 |
| 2 | 78.9 | 16.5 | 1.6 | 1.54 | 0.26 | 0.00 | 0.24 |
| 3 | 78.5 | 16.6 | 2.1 | 1.51 | 0.27 | 0.00 | 0.50 |
| 4 | 77.8 | 16.5 | 0.8 | 1.56 | 0.26 | 1.23 | 0.00 |
| 5 | 77.7 | 16.2 | 1.3 | 1.51 | 0.26 | 1.20 | 0.23 |
| 6 | 77.4 | 16.4 | 2.3 | 1.50 | 0.26 | 1.07 | 0.44 |
| 7 | 76.8 | 15.8 | 0.7 | 1.50 | 0.26 | 2.50 | 0.00 |
| 8 | 76.5 | 15.9 | 1.0 | 1.53 | 0.25 | 2.28 | 0.21 |
| 9 | 76.6 | 15.7 | 2.4 | 1.53 | 0.25 | 2.37 | 0.45 |

[a] Values presented are mean values for two trials.

sodium diacetate may be an acceptable alternative to sodium nitrite or sodium lactate if this compound proves to be more inhibitory to anaerobic spore-forming bacteria at abusive temperatures and does not have an impact on flavor and/or appearance.

Sodium diacetate is approved for use in certain foods (at levels of 0.05 to 0.4%) as an antimicrobial agent, a flavorant, and a pH control agent *(2)*. At a level of 0.25%, sodium diacetate inhibited the growth of *Listeria monocytogenes* in turkey slurries during storage at 5°C *(17)*. Schlyter et al. *(15, 16)* also established the efficacy of sodium diacetate with nitrite, lactate, and/or pediocin in controlling *L. monocytogenes* in turkey slurries during storage at 4 and 25°C. Likewise, sodium lactate is a generally-recognized-as-safe substance approved (with no limitation) for use in certain foods as an emulsifier, a flavorant, a humectant, and a pH control agent *(3)*. The antibotulinal activity of sodium lactate has also been well established. For example, in temperature-abused CIBTB, sodium lactate (at 2.0 to 3.5%) delayed toxin formation by proteolytic strains of *C. botulinum* by 1 to 4 days *(11)*. Also, sodium lactate (2.0%) and/or sodium diacetate (0.1%) showed potential for delaying the growth of psychrotrophic clostridia in a cooked turkey meat product *(9)*. The U.S. Department of Agriculture's Food Safety and Inspection Service has issued a final rule increasing the permissible levels of sodium lactate and potassium lactate to 4.8% and that of sodium diacetate to 0.25% for the inhibition of the growth of *L. monocytogenes* and *C. botulinum* in meat and poultry products *(1)*. The purpose of this study was to determine whether sodium diacetate, sodium lactate, and/or a combination of these ingredients can delay CIBTB spoilage caused by strain OMFRI1 during refrigerated storage. In addition, these compounds were also evaluated in uninoculated CIBTB subjected to temperature abuse conditions for the potential to delay spoilage caused by anaerobic sporeformers.

## MATERIALS AND METHODS

**Bacterial strain and spores.** *Clostridium* strain OMFRI1 was isolated from a spoiled CIBTB product. Subcultures of strain OMFRI1 were sent to the Anaerobe Laboratory at Virginia Polytechnic Institute and State University (Blacksburg, Va.) for fatty acid analyses and biochemical characterization. Strain OMFRI1

was identified as a nonproteolytic isolate that is closely related to *Clostridium subterminale* and is capable of growing at 4°C. The spore crop for the inoculation of CIBTB was prepared by the National Food Processors Association (Washington, D.C.) with the use of previously described methods *(7, 8)*. The spores were washed several times with sterile deionized water, resuspended, and stored on glass beads at −65°C until they were used.

**Preparation of CIBTB batter.** A CIBTB product was developed from breast halves (73.5%), tenderloins (14.7%), and trimmings (11.8%) from turkeys to mimic a commercial food service product. The breast halves and tenderloins were ground to 2.5 cm and the trimmings were ground to 0.16 cm with a Hobart grinder (Model 4056, Hobart Manufacturing Co., Troy, Ohio). Sodium chloride (1.4%; HG Blending Salt, Morton International, Inc., Chicago, Ill.), sodium tripolyphosphate (0.5%; Rhone-Poulenc Inc., Cranbury, N.J.), kappa carrageenan (0.25%; FMC Corp., Rockland, Maine), 60% aqueous sodium lactate (0, 2.1, or 4.2%; Purac America, Wood Dale, Ill.), and/or sodium diacetate (0, 0.25, or 0.5%; American International Chemicals Inc., Natick, Mass.) were added to the ground turkey with a sufficient amount of water to achieve a target moisture level of about 76%. The sodium lactate levels were calculated on an anhydrous basis from 60% sodium L-lactate. The ground turkey and nonmeat ingredients were mixed under vacuum in a twin-paddle mixer. The CIBTB batter was held overnight at about 1°C to allow the ingredients to equilibrate before it was reground to 0.64 cm and samples were collected for chemical analyses. As shown in Table 1, the CIBTB batter was analyzed for moisture, protein, fat, sodium chloride, phosphate, sodium lactate, and sodium diacetate by the procedures of the Association of Official Analytical Chemists *(12)*.

**Preparation and sampling of inoculated CIBTB stored at 4°C.** The CIBTB batter (4.5 kg) was inoculated with spores (9 to 30 spores per g) of strain OMFRI1 suspended in 10 ml of Butterfield's phosphate buffer (Hardy Diagnostics, Santa Maria, Calif.) and mixed in a Hobart mixer (Model A-0200) for 5 min. Portions (100 g each) of inoculated raw CIBTB batter were vacuum packaged in Curwood pouches (layered nylon and linear low-density polyethylene, with an $O_2$ transmission rate of 0.08 cm³ of $O_2$ per 645 cm² per 24 h at 7.2°C; Curwood Inc., New London, Wis.) with a Multivac packaging machine (Model AG800, Multivac Inc., Sepp Haggenmüller, Germany). The packaged CIBTB batter was submerged in a 72.2°C steam-injected water cook tank until it achieved an internal temperature of 71.1°C to ensure the inactivation of any vegetative bacterial cells present in the CIBTB batter. It took 15 to 20 min of heating for the batter to reach

J. Food Prot., Vol. 66, No. 8

TABLE 2. *Analytical values for cook-in-bag turkey used in temperature abuse studies* (n = 2)[a]

| Treatment no. | Moisture (%) | Sodium chloride (%) | Sodium lactate (%) | Sodium diacetate (%) | pH |
|---|---|---|---|---|---|
| 1 (control) | 77.5 | 1.50 | 0.00 | 0.00 | 6.52 |
| 2 | 77.3 | 1.50 | 0.00 | 0.22 | 6.33 |
| 3 | 76.2 | 1.45 | 0.00 | 0.44 | 6.06 |
| 4 | 76.7 | 1.50 | 1.17 | 0.00 | 6.55 |
| 5 | 76.5 | 1.52 | 1.04 | 0.23 | 6.30 |
| 6 | 75.1 | 1.49 | 1.13 | 0.45 | 5.95 |
| 7 | 75.2 | 1.50 | 2.69 | 0.00 | 6.45 |
| 8 | 74.9 | 1.55 | 2.50 | 0.22 | 6.25 |
| 9 | 74.6 | 1.49 | 2.34 | 0.44 | 6.02 |

[a] Values presented are mean values for duplicate samples.

71.1°C internally. The water cook tank was aerated to provide even heating of the packages. The heated packages were rapidly chilled in ice water and then moved to a 4°C cooler for storage.

Packages of CIBTB were sampled for strain OMFRI1 0 and 4 weeks after processing and every 2 weeks thereafter. When the packages were opened, they were evaluated subjectively, by sniffing, for the development of any obvious off-odors. A 30- to 40-g sample was aseptically removed and diluted (1:10) with Butterfield's phosphate buffer in a stomacher bag (Seward Ltd., London, UK). The diluted sample was macerated for 2 min in a stomacher blender (Model 400; Seward). Additional dilutions in Butterfield's phosphate buffer were prepared as necessary. For each sample, a total aerobic plate count was obtained with APT (all purpose Tween) Agar (BD Diagnostic Systems, Sparks, Md.) supplemented with 2% sucrose and 0.0032% bromcresol purple (BD Diagnostic Systems), and a total anaerobic plate count was obtained with Brewer Anaerobic Agar (BD Diagnostic Systems) in conjunction with anaerobe jars (BD Diagnostic Systems) and $H_2/CO_2$ gas-generating envelopes (BD Diagnostic Systems). The APT plates were incubated for 72 h at 25°C, and the Brewer plates were incubated for 72 h at 30°C prior to the enumeration of colonies. This study was replicated twice with three packages at each sampling interval for each treatment and duplicate platings from each dilution therefrom.

**Preparation and sampling of uninoculated CIBTB stored at 25°C.** The CIBTB batter (4.5 kg) was vacuum packaged in 0.7- to 0.8-kg portions with a Multivac packaging machine (Model R7000) and with forming and nonforming films (layered nylon and linear low-density polyethylene, with an $O_2$ transmission rate of 2.0 to 3.0 cm³ of $O_2$ per 645 cm² per 24 h at 22.8°C; Curwood). The packaged CIBTB batter was heat processed in a stationary smokehouse (Model Rondair, Maurer and Sohne GmbH and Co., K.G., Reichenau, Germany) to an instantaneous internal temperature of 71.1°C, showered with cold water to an internal temperature of ≤32°C, and chilled in a 0°C cooler overnight. After chilling, two packages per treatment were analyzed for moisture, sodium chloride, sodium lactate, sodium diacetate, and pH (see Table 2) by the procedures of the Association of Official Analytical Chemists *(12).*

The internal temperature of one package of CIBTB was monitored for the first 24 h with the use of a data squirrel (Model 6200 LTFN06, Data Trace, Littleton, Colo.) to determine the time required for the CIBTB to reach 25°C. Total aerobic and total anaerobic plate counts were determined for packages as described above after 0, 1, and 2 days of temperature abuse and at several

additional times until the CIBTB was visually spoiled (i.e., gassy with an off-odor). Treatments that did not result in visual spoilage after 22 days of temperature abuse were discontinued. Tryptic soy agar (BD Diagnostic Systems) pour plates were used for the determination of total aerobic plate counts. The anaerobic plate count was determined as described above. All plates were incubated at 25°C for 72 h prior to the enumeration of colonies. This study was replicated twice with three packages at each sampling interval for each treatment and duplicate platings from each dilution therefrom.

## RESULTS AND DISCUSSION

**Viability of strain OMFRI1 inoculated into CIBTB containing sodium lactate and/or sodium diacetate during storage at 4°C.** Biochemical characterization and fatty acid profiling identified strain OMFRI1 as nonproteolytic, psychrotrophic, and related to *C. subterminale.* As detailed below, both sodium diacetate and sodium lactate effectively inhibited strain OMFRI1 and delayed the development of off-odors in CIBTB. In control CIBTB containing neither sodium diacetate nor sodium lactate, strain OMFRI1 grew and produced off-odors within 6 weeks at 4°C. The anaerobic plate count increased from 1.3 $\log_{10}$ to 6.6 $\log_{10}$ CFU/g within this period. Aerobic plate counts for the control and experimental treatments were negligible ($\leq 1.5$ $\log_{10}$ CFU/g) and are not reported herein.

The CIBTB containing 0.25% sodium diacetate did not develop off-odors until it had been stored for 12 weeks at 4°C; the anaerobic plate count increased from 1.3 to 7.0 $\log_{10}$ CFU/g (Fig. 1A). The effect of sodium lactate was similar to that of sodium diacetate. The CIBTB containing 1.25% sodium lactate did not develop off-odors until it had been stored for 12 weeks at 4°C (Fig. 1B); the anaerobic plate count increased by 4.7 $\log_{10}$ CFU/g. At levels of 2.5% sodium lactate, CIBTB did not develop off-odors for 22 weeks, and the anaerobic plate count increased by <0.5 $\log_{10}$ CFU/g from the initial level of 1.3 $\log_{10}$ CFU/g. The combination of sodium diacetate and sodium lactate had an additive effect. The inhibition of strain OMFRI1 was more extensive for CIBTB containing both 0.25% sodium diacetate and 1.25% sodium lactate than for CIBTB containing sodium diacetate or sodium lactate alone at these levels. Off-odors did not develop with these treatments, and the anaerobic plate count increased by <2 $\log_{10}$ CFU/g over 22 weeks at 4°C (Fig. 1C).

The cook-in-bag manufacturing process results in products with a shelf life of ≥90 days owing to a combination of vacuum packaging, heating to 71.1°C to eliminate vegetative cells of spoilage and pathogenic bacteria, rapid chilling, and refrigerated storage. Postprocessing recontamination by non–spore-forming psychrotrophs such as lactic acid bacteria, *Enterobacteriaceae,* and *L. monocytogenes* is prevented, since the cook-in-bag package remains intact after processing. The outgrowth of most heat-resistant spores is controlled by the anaerobic environment and/or subsequent refrigerated storage. However, heat-resistant spores of psychrotrophic anaerobes have the potential to raise concerns about CIBTB.

The addition of sodium diacetate alone or in combi-

CONTROL OF CLOSTRIDIA IN TURKEY    1477



FIGURE 1. *Viability of* Clostridium *strain OMFRI1 in CIBTB formulated with and without sodium lactate and/or sodium diacetate during storage at 4°C (n = 2). (A) ■, control; ▲, 1.25% sodium lactate; ●, 2.5% sodium lactate. (B) ■, control; ▲, 0.25% sodium diacetate; ●, 0.5% sodium diacetate. (C) ■, control; ▲, 1.25% sodium lactate + 0.25% sodium diacetate; ●, 1.25% sodium lactate + 0.5% sodium diacetate; △, 2.5% sodium lactate + 0.25% sodium diacetate; ○, 2.5% sodium lactate + 0.5% sodium diacetate.*

nation with sodium lactate can delay CIBTB spoilage caused by strain OMFRI1. A combination of both agents is also effective and may have less of an impact on the organoleptic properties of CIBTB because the required level of each compound is decreased with this approach. Sodium diacetate at 0.25% was detectable in CIBTB, and at 0.5% it was judged to be unacceptable in informal taste tests (data not shown). Some individuals also detected an off-flavor in CIBTB containing 2.5% sodium lactate. Presumably, although the possibility was not tested in this study, the addition of sodium lactate to CIBTB would have the added benefit of delaying the production of proteolytic *C. botulinum* toxin under temperature abuse conditions as reported previously *(6, 11, 13, 14)*. The results of the present study are in agreement with results of a similar study conducted by Kalinowski and Tompkin *(9)*. These investigators isolated several psychrotrophic clostridia strains

from CIBTB, and three of these strains multiplied and spoiled the product by causing off-odors and a pink discoloration in an inoculated cooked turkey product within 70 days during storage at 3.3°C. In a second inoculated-product study, these same three strains displayed various behaviors in the presence of sodium lactate and/or sodium diacetate at levels of 2.0 and 0.1%, respectively. More specifically, one of the isolates was inhibited, another showed delayed growth, and the third grew rapidly. Kalinowski and Tompkin *(9)* also reported that different products typically harbor different species of clostridia. Beef products typically contain *Clostridium laramie,* whereas poultry products typically contain *Clostridium ctm,* a heretofore uncharacterized species. *C. laramie* tends to cause a strong odor and package swelling, and *C. ctm* tends to cause odor and pink discoloration without swelling. Further studies should be conducted to determine whether there is a species-specific correlation and/or whether discoloration is associated only with poultry.

**Viability of anaerobic sporeformers in CIBTB containing sodium lactate and/or sodium diacetate during storage at 25°C.** In related studies, we evaluated the efficacy of sodium lactate and sodium diacetate in delaying CIBTB spoilage caused by anaerobic spore-forming bacteria during storage at 25°C for up to 22 days. The internal temperature of CIBTB in both test groups increased from 0 to 25°C within 12 h after the samples were placed under abuse conditions (data not shown). Aerobic plate counts were negligible for the nine treatments tested and are not reported. The intention of the determination of aerobic plate counts was to differentiate between the growth of facultative organisms and that of obligate anaerobes. There was no difference between the control treatment (involving no sodium lactate or sodium diacetate) and the experimental treatments involving 0.25 and 0.5% sodium diacetate with respect to the rate of spoilage. Packages of CIBTB for these three treatments showed signs of spoilage (i.e., gas and off-odor) and contained approximately $10^7$ anaerobic organisms per g after 8 days at 25°C (Fig. 2A). The CIBTB containing 1.25% sodium lactate, with or without sodium diacetate, showed signs of spoilage after 10 days at 25°C and contained approximately $10^5$ anaerobic organisms per g at that time (Fig. 2B and 2C). The treatment involving a combination of 2.5% sodium lactate and 0.5% sodium diacetate was the most inhibitory treatment. Packages of CIBTB treated with this combination contained <10 anaerobic organisms per g after 22 days at 25°C. Anaerobic organisms grew in CIBTB containing 2.5% sodium lactate alone or 2.5% sodium lactate in combination with 0.25% sodium diacetate within 7 days at 25°C. By day 22, one of three packages of CIBTB containing 2.5% sodium lactate alone showed signs of spoilage, whereas all packages of CIBTB containing 2.5% sodium lactate in combination with 0.25% sodium diacetate remained visually acceptable for up to 22 days.

The antobutulinal activity of sodium lactate has already been documented. The objective of this study was to determine whether sodium diacetate could be used alone or



Log$_{10}$ CFU/g

FIGURE 2. *Growth of indigenous anaerobic bacteria in CIBTB formulated with and without sodium lactate and/or sodium diacetate during storage at 25°C (n = 2). (A) ■, control; ▲, 1.25% sodium lactate; ●, 2.5% sodium lactate. (B) ■, control; ▲, 0.25% sodium diacetate; ●, 0.5% sodium diacetate. (C) ■, control; ▲, 1.25% sodium lactate + 0.25% sodium diacetate; ●, 1.25% sodium lactate + 0.5% sodium diacetate; △, 2.5% sodium lactate + 0.25% sodium diacetate; ○, 2.5% sodium lactate + 0.5% sodium diacetate.*

in combination with sodium lactate to inhibit the germination and outgrowth of spores of anaerobic bacteria that occur naturally in temperature-abused CIBTB. Although 2.5% sodium lactate in combination with 0.5% sodium diacetate was more inhibitory to such germination and outgrowth than was 2.5% sodium lactate alone; CIBTB formulated with this combination would probably be organoleptically unacceptable to many consumers. Other combinations of these two ingredients were not more inhibitory than sodium lactate alone. On the basis of these data, sodium diacetate would presumably be ineffective as an antibotulinal agent. Regardless, the results of this study demonstrate the effectiveness of sodium diacetate and sodium lactate as food-grade antimicrobial agents for the prevention of CIBTB spoilage caused by anaerobic sporeformers, including nonproteolytic, psychrotrophic isolates such as strain OMFRI1. Further studies are warranted to address

strain-to-strain variations in the effectiveness of sodium lactate and sodium diacetate, particularly for strains isolated from sources other than poultry. Further studies are also needed to optimize formulations to achieve the desired taste and the optimal anticlostridial activity level.

## ACKNOWLEDGMENTS

We gratefully acknowledge the insight and assistance of Larry Borchert, Al Degnan, Nan Faith, and Vijay Juneja. We also thank Oscar Mayer Foods Corporation and International Sourcing, Inc. for donating some of the materials for this project. This work was supported in part by the College of Agricultural and Life Sciences of the University of Wisconsin—Madison and by contributions to the Food Research Institute from the Food Industry.

## REFERENCES

1. Anonymous. 2000. Federal register, vol. 65, no. 63. Office of the Federal Register, Washington, D.C.
2. Anonymous. 2002. Code of federal regulations. Title 21, 184.1754. Office of the Federal Register, Washington, D.C.
3. Anonymous. 2002. Code of federal regulations. Title 21, 184.1768. Office of the Federal Register, Washington, D.C.
4. Collins, M. D., U. M. Rodrigues, R. H. Dainty, R. A. Edwards, and T. A. Roberts. 1992. Taxonomic studies on a psychrophilic *Clostridium* from vacuum-packed beef: description of *Clostridium estertheticum* sp. nov. *FEMS Microbiol. Lett.* 96:235–240.
5. Dainty, R. H., R. A. Edwards, and C. M. Hibbard. 1989. Spoilage of vacuum-packed beef by a *Clostridium* sp. *J. Sci. Food Agric.* 49: 473–486.
6. Houtsma, P. C., A. Heuvelink, J. Dufrenne, and S. Notermans. 1994. Effect of sodium lactate on toxin production, spore germination and heat resistance of proteolytic *Clostridium botulinum* strains. *J. Food Prot.* 57:327–330.
7. Kalchayanand, N., B. Ray, and R. A. Field. 1993. Characteristics of psychrotrophic *Clostridium laramie* causing spoilage of vacuum-packed refrigerated fresh and roasted beef. *J. Food Prot.* 56:13–17.
8. Kalchayanand, N., B. Ray, R. A. Field, and M. C. Johnson. 1989. Spoilage of vacuum-packaged refrigerated beef by *Clostridium. J. Food Prot.* 52:424–426.
9. Kalinowski, R. M., and R. B. Tompkin. 1999. Psychrotrophic clostridia causing spoilage in cooked meat and poultry products. *J. Food Prot.* 62:766–772.
10. Lawlor, K. A., M. D. Pierson, C. R. Hackney, J. R. Claus, and J. E. Marcy. 2000. Nonproteolytic *Clostridium botulinum* toxigenesis in cooked turkey stored under modified atmospheres. *J. Food Prot.* 63: 1511–1516.
11. Maas, M. R., K. A. Glass, and M. P. Doyle. 1989. Sodium lactate delays toxin production by *Clostridium botulinum* in cook-in-bag turkey products. *Appl. Environ. Microbiol.* 55:2226–2229.
12. McNeal, J. E. 1990. Meat and meat products, p. 931–938. *In* K. Herlich (ed.), Official methods of analyses, 15th ed. Association of Official Analytical Chemists, Arlington, Va.
13. Miller, A. J., J. E. Call, and R. C. Whiting. 1993. Comparison of organic acid salts for *Clostridium botulinum* control in an uncured turkey product. *J. Food Prot.* 56:958–962.
14. Notermans, S., J. Dufrenne, and B. M. Lund. 1990. Botulism risk of refrigerated, processed foods of extended durability. *J. Food Prot.* 53:1020–1024.
15. Schlyter, J. H., A. J. Degnan, J. Loeffelholz, K. A. Glass, and J. B. Luchansky. 1993. Evaluation of sodium diacetate and ALTA$^{tm}$ 2341 on viability of *Listeria monocytogenes* in turkey slurries. *J. Food Prot.* 56:808–810.
16. Schlyter, J. H., K. A. Glass, J. Loeffelholz, A. J. Degnan, and J. B. Luchansky. 1993. The effects of diacetate with nitrite, lactate, or pediocin on the viability of *Listeria monocytogenes* in turkey slurries. *Int. J. Food Microbiol.* 19:271–281.
17. Shelef, L. A., and L. Addala. 1994. Inhibition of *Listeria monocytogenes* and other bacteria by sodium diacetate. *J. Food Saf.* 14:103–115.

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HORMEL FOODS CORPORATION | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 1:07-cv-1724 (RBW) |
| | ) |
| UNITED STATES DEPARTMENT | ) |
| OF AGRICULTURE, | )        [Proposed] ORDER |
| | ) |
| Defendant. | ) |

Plaintiff's Motion for Summary Judgment is GRANTED.

So Ordered.

Date: _____          _____
                                       Hon. Reggie B. Walton
                                       United States District Judge