## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HORMEL FOODS CORPORATION,    )
    )
    )
    Plaintiff,    )
    )
    v.    )    Civil Action No.
    )    1:07-CV-01724-RBW
UNITED STATES DEPARTMENT    )
OF AGRICULTURE,    )
    )
    )
    Defendant.    )
    )
    )
FARMLAND FOODS, INC.,    )
KRAFT FOODS GLOBAL, INC.,    )
PURAC AMERICA, INC., SARA LEE    )
CORPORATION, SMITHFIELD FOODS,    )
INC., AND TYSON FOODS, INC.,    )
    )
    )
    Putative Defendant-Intervenors.    )

## [PROPOSED] OPPOSITION BY PUTATIVE INTERVENORS
## TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT

Jonathan L. Abram
Kirsten Friedel Roddy

HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C.  20004–1109
Telephone: (202) 637–5600
Facsimile:  (202) 637–5910

*Attorneys for Putative Defendant-Intervenors:*

Farmland Foods, Inc., Kraft Foods Global, Inc., PURAC America, Inc., Sara Lee Corporation, Smithfield Foods, Inc., and Tyson Foods, Inc.

# TABLE OF CONTENTS

Page

**BACKGROUND** ................................................................................................ **3**
    A.  FSIS Approval of Labels ................................................................... 3
    B.  Misbranding Provisions and USDA's FSIS "Natural" Policy...................... 4
    C.  Hormel's Petition and USDA/FSIS Response.......................................... 6
    D.  USDA Correspondence with Congressman Peterson.................................. 11
**ARGUMENT** .................................................................................................... **12**
I.    The Agency Has Discretion to Conduct Notice and Comment Rulemaking Before Changing Its Policy or Rescinding Other Companies' Approved Labels. ........................ 14
    A.  This Court Should Allow FSIS to Complete Its Rulemaking Process. ..................... 14
    B.  USDA's Statements to Congressman Peterson Did Not Constitute Final Agency Action, and Statements Made to Hormel's Counsel Did Not Bind the Agency. ....... 15
    C.  USDA's FSIS Engaged In Reasoned Decision-Making in Withholding Judgment Regarding the Rescission of Labels Pending the Outcome of Rulemaking............... 16
        1.  Public Comments Showed FSIS That Hormel's Petition Did Not Reflect Consensus among Meat and Poultry Manufacturers. ........................................... 18
        2.  Studies Showed that Shelf Life Was Not Substantially Affected by Presence of Lactates.................................................................................................... 20
            a.  Extrapolation.................................................................................... 22
            b.  AOAC Methodology.......................................................................... 22
            c.  Specific Shelf Life Studies............................................................... 23
        3.  FSIS Did Not Engage in *Post-Hoc* Rationalization in Justifying Its Withholding of Judgment Regarding the Rescission of Labels Pending the Outcome of Rulemaking................................................................................................ 28
        4.  FSIS Reasonably Considered Public Health Concerns in Withholding Decision to Rescind Labels.......................................................................................... 30
        5.  FSIS's Actions Must Keep with Its Existing Policy of Approving "Natural" Labels for Products Containing Lactates. .................................................... 30
II.  The Agency's Approval of "Natural" Labels for Products Containing Lactates Does Not Violate Misbranding Provisions of FMIA or PPIA. ......................................... 33
    A.  Only Chemical Preservatives and Other Artificial or Synthetic Ingredients are Prohibited; Natural Preservatives Are Not. ............................................... 34
    B.  Lactates Are Natural Ingredients. ............................................................ 36
    C.  Lactates Are "Not More Than Minimally Processed."................................ 37
**CONCLUSION** ................................................................................................ **42**

i

**[PROPOSED] OPPOSITION BY PUTATIVE INTERVENORS**
**TO PLAINTIFF'S CROSS MOTION FOR SUMMARY JUDGMENT**

Hormel's case is in effect an Administrative Procedure Act case in reverse. While most APA complaints challenge an agency's <u>failure</u> to engage in notice-and-comment rulemaking, Hormel essentially challenges USDA's decision to <u>proceed</u> with such a process – a process for which Hormel itself petitioned the agency. Based on a public hearing and comments it received in response to a December 5, 2006 Notice of Petition and Public Meeting and Request for Comments ("2006 Notice"), USDA has announced that it has embarked upon an administrative review of its "natural" food labeling policy, which will address the degree to which food producers can use the word "natural" to describe products containing corn-based lactates. That is as it should be.

Instead of submitting its views to the agency as part of the usual rulemaking process, Hormel seeks nothing less than to bypass notice-and-comment rulemaking and go straight to judicial review. Thus, it has filed suit to stop the agency's rulemaking process in its tracks. It has done so for a simple reason. Hormel does not use lactates in its "natural"-labeled products. Instead, it uses High Pressure Processing ("HPP") to kill microbes at the packaging stage and nothing to provide a secondary barrier against microbial growth after its food packages are opened. By suing to dictate the outcome of the agency's rulemaking process, Hormel aims to push products containing corn-based lactates out of the "natural" market and thereby gain a competitive advantage.

To be sure, Intervenors are not completely satisfied with USDA's action. For years, the agency has had a policy of allowing corn-based lactates in "natural"-labeled meat and poultry products, and it approved many "natural" food labels for such products. There was, and remains, a solid basis for that policy and series of label approvals, and USDA has wisely left its label

- 1 -

approval decisions undisturbed. However, as set forth in the 2006 Notice, USDA removed from its "natural" policy the specific enumeration of corn-based sodium lactate as an ingredient always permitted in "natural" products and announced that it will instead review products containing lactates on a case-by-case basis evaluating the preservative effect of the ingredient as measured by shelf-life. USDA also initiated an administrative process that allows for comment on the Hormel petition, advised that an Advance Notice of Proposed Rulemaking will be issued in the near future as a continuation of the process it has set forth, and indicated that it is reviewing its interim policy, which will remain in effect until the rulemaking process is completed. Intervenors await the outcome of this process.

Hormel's demand that the agency change policy before completing the rulemaking process puts the proverbial cart before the horse. There is absolutely no basis for Hormel's effort to force the agency to rescind all its prior label approval decisions now, before it has completed the rulemaking process. In fact, settled principles of administrative law weigh decidedly in favor of the agency's decision to conduct a rulemaking and, in the meantime, to continue its established policy of approving "natural" claims for products making use of corn-based lactates.

For these reasons, Intervenors urge this Court to deny Hormel's cross motion for summary judgment and allow the agency to consider the matter as it has announced it will, through notice-and-comment rulemaking.1/

---

1/      Intervenors are Farmland Foods, Inc. ("Farmland"), Kraft Foods Global, Inc. ("Kraft"), PURAC America, Inc. ("PURAC"), Sara Lee Corporation ("Sara Lee"), Smithfield Foods, Inc. ("Smithfield"), and Tyson Foods, Inc. ("Tyson"). Intervenors' motion to intervene was filed on December 3, 2007 and was fully briefed by December 21, 2007. The Government does not oppose intervention. While Hormel has disputed the standing of three Intervenors, it has not contested the standing of Farmland, Kraft, and Smithfield to intervene, since all three companies have existing label approvals that could be rescinded if Hormel were successful in persuading

- 2 -

## BACKGROUND

### A.    FSIS Approval of Labels

The Food Safety and Inspection Service ("FSIS") is the public health regulatory agency within USDA charged with implementing and enforcing the Federal Meat Inspection Action ("FMIA") and the Poultry Products Inspection Act ("PPIA").  9 C.F.R. §§ 300.1-300.2; *see also* Derfler Decl., Ex. to Def.'s Memo. in Support of Mot. to Dismiss the Compl. or, in the Alternative, for Summ. J. ("Def.'s Memo."), ¶¶ 4-5.  Pursuant to FSIS's authority under the FMIA and PPIA, FSIS's Labeling and Program Delivery Division ("LPDD") evaluates and approves all labels on meat and poultry products with claims and special statements to determine whether they are truthful and not misleading before the products can be offered to consumers. *Id.* ¶¶ 7-8.  The LPDD makes decisions on label applications on a case-by-case basis, reviewing thousands of labels a year for approval.  *See id.* ¶¶ 7, 9.

USDA's FSIS and its LPDD have established a framework of regulations and policies to provide guidance to manufacturers regarding compliance with its labeling provisions.  *Id.* ¶¶  6, 8-9.  This guidance comes in the form of its Standards and Labeling Policy Book ("Policy Book"), which is derived from FSIS Policy Memoranda and sets out factors FSIS considers in reaching its labeling determinations.  *Id.* ¶¶ 8-9.  The written policies contained in the Policy Book and Policy Memoranda typically are not adopted through notice and comment rulemaking

---

this Court to rule on the agency's policy before it has conducted its rulemaking.  Hormel challenged the standing of Sara Lee, Tyson, and PURAC and argued that the future approval of "natural" labels was not properly part of this case.  As set forth in their reply in support of the motion to intervene, all proposed Intervenors have standing, and Hormel's position would preclude any future agency approvals of natural labeling for products containing corn-based lactates.  Regardless, there is no dispute that, at the very least, Smithfield, Farmland, and Kraft are proper intervenors in this action.

\\\DC - 028652/000002 - 2717522 v1

but change from time-to-time to reflect LPDD's individualized case-by-case label

determinations, current market trends, and consumer expectations. *See* AR 643, 71 Fed. Reg.

70,503, 70,504 (Dec. 5, 2006); *see also* Derfler Decl. ¶ 14.

In reviewing labels prior to their introduction into the market, the LPDD places a

premium on crafting flexible policies that take account of changes in food technology, food

safety, understanding of diet and health, and consumer interest and preference in how foods are

prepared and what ingredients are used. *See* Policy Book, preface,

http://www.fsis.usda.gov/OPPDE/larc/Policies/Labeling_Policy_Book_082005.pdf (last visited

Apr. 24, 2008). FSIS's foremost responsibility is to devise and apply these policies in a fashion

that advances its statutory responsibilities to protect consumers from food labels that contain

false or misleading information. *See*

http://www.fsis.usda.gov/Regulations_&_Policies/Labeling_Guidance/index.asp (last visited on

Apr. 24, 2008);

http://www.fsis.usda.gov/About_FSIS/Labeling_&_Consumer_Protection/index.asp (last visited

Apr. 24, 2008); Derfler Decl. ¶ 6.

B.    **Misbranding Provisions and USDA's FSIS "Natural" Policy**

Under the misbranding provisions of FMIA and PPIA, a meat or poultry product is

misbranded if its labeling "is false or misleading in any particular," if the product "contains any

artificial flavoring, artificial coloring, or chemical preservative unless it bears labeling stating

that fact," or if the labeling fails to include other required information. 21 U.S.C. § 601(n); 21

U.S.C. § 453(h). In 1982, USDA's FSIS exercised its broad authority to establish food labeling

regulations and policies by issuing a Policy Memorandum describing the circumstances in which

it would approve use of the word "natural" on labels for meat and poultry products. Such

- 4 -

labeling was permissible, FSIS announced, if (1) "The product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 C.F.R. § 101.22), or any other artificial or synthetic ingredient"; and (2) "[T]he product and its ingredients are not more than minimally processed."  AR 2-3; *see also* Derfler Decl. ¶ 10.  FSIS explained that this standard was to "guide manufacturers in the development of labeling that FSIS was likely to determine to be truthful and not misleading" in use of the voluntary "natural" claim.  AR 642, 71 Fed. Reg. at 70,503; *see also* Derfler Decl. ¶ 10.  FSIS's 1982 Policy Memorandum made clear that "[t]he decision to approve or deny the use of a natural claim may be affected by the specific context in which the claim is made." AR 2-3.  FSIS has consistently applied this two-prong policy and continues to do so now, nearly 25 years later, with modest changes over time in the explanatory portion of its policy.  *See* AR 2-12.

Under this "natural" policy, in 2000 and 2001, FSIS decided to allow the "natural" labeling of products containing corn-based lactates.  Derfler Decl. ¶ 16.  The agency approved natural labels for products containing corn-based lactates.  *E.g.*, AR 2063-66.  In August 2005, FSIS memorialized its prior interpretation of the 1982 policy to permit natural labels on products with a corn-based lactate ingredient, revising the explanatory portion of the 1982 policy as follows:  "Note:  Sugar, sodium lactate (from a corn source), natural flavorings from oleoresins or extractives are acceptable for 'all natural' claims."  AR 6-8; *see also* AR 643, 71 Fed. Reg. at 70,504 (stating that FSIS modified its "natural" guidance in 2005 "to make it consistent with prevailing policies, to reflect case-by-case decisions made by the Agency"); Derfler Decl. ¶ 19 (stating that in August 2005, FSIS revised its "natural" policy to take into account the Agency's decision to approve the "natural" label of products containing sodium lactate from a corn or beet source).  Other than this explanatory note, the "natural" policy in the 2005 Memorandum is

- 5 -

identical in all material respects to that of the 1982 Policy Memorandum.  *Compare* AR 2-3 *with* AR 6-8.  Between August 2005 and December 5, 2006, FSIS continued to approve "natural" labels for products containing corn-based lactate.  Derfler Decl. ¶ 19; *see also* AR 2063-2123. These approvals were consistent with the original 1982 Policy Memorandum and with agency policy and label approvals prior to the August 2005 update.  *See* Derfler Decl. ¶¶ 16-19.

C.     **Hormel's Petition and USDA/FSIS Response**

Over a year later, on October 9, 2006, Hormel – a meat and poultry producer that does not use lactates in its "natural" products, using instead only the HPP process – filed a petition with FSIS asking it to conduct a rulemaking to consider the definition of "natural" for meat and poultry product labels and to revoke the explanatory note included in the August 2005 policy update memorializing existing agency policy and practice of permitting corn-based lactates in natural products.  AR 14-34.  Hormel contended that sodium lactate is a "chemical preservative," based almost entirely on the biological fact that – like salt, vinegar, and other added ingredients – corn-based lactates have known antimicrobial properties.  AR 23-24.

The next day, on October 19, 2006, Hormel submitted a follow-up request asking that FSIS retroactively rescind all the "natural" labels it had previously approved for products containing corn-based lactates.  AR 55-58; *see also* AR 126-140 (Nov. 7, 2006 Hormel letter to FSIS arguing that it should retrospectively rescind its approval of other companies' labels on the ground that lactates extend shelf-life in the products).

On December 5, 2006, prompted by Hormel's petition, FSIS published in the Federal Register a Notice of Petition and Public Meeting and Request for Comments (2006 Notice).  AR 642-44; *see also* AR 160-61.  This 2006 Notice announced and sought public comment on Hormel's petition for rulemaking regarding the use of "natural" on labels of meat and poultry

- 6 -

products and announced a public meeting the following week to begin the process.  AR 642-44.

FSIS sought input on the following four questions:

1.  Considering the types of food processing methods that are commonplace today, as opposed to 24 years ago when the policy on "natural" claims was established, is it reasonable to include as part of the definition of "natural" a stipulation that products, to be eligible to bear the claim, can be no more than minimally processed?  Are there any accommodations necessary to allow for certain operations because food processing and packaging techniques for enhancing safety may disqualify a product as "natural?"

2.  What are the implications and conflicts that exist with regard to using current and new food processing methods, e.g., chlorine in poultry chillers; steam pasteurization of carcasses; high pressure processing; and modified atmosphere packaging and uses of certain classes of ingredients, e.g., antimicrobial agents, and the meaning of the claim "natural" on the labels of meat and poultry products?

3.  Are there available data, in addition to the data provided in the petition, from consumer studies on views, perceptions, and beliefs about what the claim "natural" means on the labels of food products, including meat and poultry products?  What do consumers think that the terms "minimal processing," "artificial and synthetic," and "preservatives" mean?

4.  Do food safety and consumer protection benefits of using what historically may have been considered more than minimal processing techniques and antimicrobial agents outweigh conflicts with the meaning of "natural?"  In recent years, FSIS has put a great deal of emphasis on improving food safety.  In some ways, however, some definitions of "natural" might unnecessarily undercut this objective.  For example, some definitions of "natural" could discourage the use of antimicrobials, which are used to reduce and prevent the growth of Listeria monocytogenes in foods.  The Agency seeks comment on how it best determines an appropriate and rational balance between the need to ensure the safety of the food supply and the need to ensure that labels are truthful and not misleading.

AR 643-44.

In the meantime, FSIS removed from its August 2005 policy the express enumeration of

sodium lactate as always acceptable in "natural" meat and poultry products.  AR 160-61; AR 10-

11; AR 643.  The two-prong "natural" policy itself was unchanged.  AR 10-11.  FSIS explained

that it had "come to recognize, based on the controversy that has arisen about 'natural' in recent

months, that there is significant disagreement about aspects of the August 2005 policy modification, particularly the recognition of sodium lactate as an ingredient that could be included in products that bear a 'natural' claim" and therefore it "has removed the reference to sodium lactate from the 2005 modification" believing that this issue "is best resolved through the rulemaking process."  AR 643.

The day after commencing this rulemaking process, on December 6, 2005, USDA wrote Hormel the letter on which Hormel now relies.  *See* 160-61.  In that letter, USDA told Hormel that FSIS had decided  to conduct a rulemaking to consider appropriate standards for "natural" labeling and particularly its use on products containing corn-based lactates.  *Id.*  USDA explained that FSIS was writing to companies with approved "natural" labels for products containing lactates and asking for information demonstrating that the use of lactates in the products "does not provide a preservative effect."  *Id.* at 160; *see also* AR 611-39, 760-76.  With respect to preservative effect, USDA requested data "showing that the same shelf-life and product dating parameters [*i.e.*, "use-by" dates] apply to products in which lactates have been used as compared to products in which they have not been used."  AR 760-776.  And USDA stated that in the absence of such data, FSIS would rescind approval of the labels that bear a "natural" claim.  AR 160-61.

FSIS received nearly 100 separate public comments in response to the 2006 Notice, and they expressed widely divergent and sometimes conflicting views on what the claim "natural" should mean, including whether products containing corn-based lactates can properly be labeled "natural."  Derfler Decl. ¶¶ 35-37.  The comments reflected a chasm within the food industry over the notion that corn-based lactates might suddenly no longer be considered "natural." *Compare, e.g.,* comments asserting that lactates should be permitted:  AR 1814-17, Coleman

Natural Foods; AR 1738-40, Dietz & Watson; AR 1859-77, Farmland Foods, Inc.; AR 1811-13,

Jones Dairy Farm; AR 913-14, Kalsec; AR 1770-1806, Kraft Foods; AR 1766-69, Premium

Standards Farms; AR 1657-88, PURAC; AR 1884-1922, Sara Lee Food & Beverage; AR 1807-

08, American Meat Science Ass'n *with* comments stating that lactates should not be permitted:

AR 1645-46, Daniel Farkas, Oregon State University; AR 921-34, Hormel Foods Corp.; AR

1878-80, North American Natural Casings Ass'n; AR 888-94, The Sugar Ass'n; AR 1711-1718,

Sanderson Farms.  Not surprisingly, Hormel was in the minority, with makers of relevant

"natural"-labeled meat and poultry products favoring the existing position of FSIS that permitted

natural labels on products containing corn-based lactates.  *See id.*  In short, the comments

received indicated that Hormel's view of "natural" claims as presented to FSIS was not widely

shared, either within the industry or by the public in general.  *See id.*; Derfler Decl. ¶¶ 35-38.

Further, the commenters recommended that FSIS consider a wide variety of other

subjects, including particular ingredients, processing methods, and animal production practices

that individual commenters thought should or should not be permitted for meat or poultry

products labeled as "natural."  Derfler Decl. ¶ 37; *see also, e.g.,* AR 1708-09, Bell & Evans

("natural" should be tied to livestock raising practices); AR 915-916, Food Animal Concerns

Trust (same); AR 1814-17, Coleman Natural Foods (HPP should be acceptable;); AR 1818-24,

Corn Refiners Ass'n ("natural" claims should be permitted for nutritive sweeteners, starches, and

fermentation products derived from natural sources); AR 886-87, Ecolab (ingredients present in

insignificant levels should be exempt from "natural" requirements); AR 1711-18, Sanderson

Farms ("natural" for poultry products should mean single ingredient, *i.e.*, poultry only); AR

1728-30, Dakota Beef LLC ("natural" should be prohibited on meat from genetically modified

animals or animal raised with growth hormones or subtherapeutic antibiotics; items permitted on

- 9 -

organic list should be allowed in "natural" products); AR 1936-37, American Bakers Ass'n

("organic" and "natural" should have different standards; FSIS should clarify minimal

processing or eliminate that element); AR 1884-1922, Sara Lee Food & Beverage (FSIS and

FDA should develop harmonized approach to "natural").  Rather than providing consensus for a

regulation on "natural" claims that reflects a general understanding of what the claim means to

the public, the comments submitted to FSIS indicated that there was no consensus on this issue.

*See* Derfler Decl. ¶¶ 35-38.

        In addition to these numerous and varied comments, FSIS also received responses to its

request that companies provide data showing that lactates had no effect on shelf-life or use-by

dates.  *See* AR 0790-0873.  Each company providing such data had performed a microbiological

analysis by comparing products with and without lactate ingredients.  *See* AR 0792-73, 795-805,

820-28, 847-48, 863-69; Derfler Decl. ¶ 31; *see also* Milkowski Decl., Ex. 1 to Intervenors'

Opp'n, ¶¶ 4-12.  The manufacturers' data indicated comparisons showing that similar products

with and without lactate have very similar microbial and bacterial growth patterns and identical

shelf-lives while exposed to the same controlled conditions.  Derfler Decl. ¶ 32; AR 0792-73,

795-805, 820-28, 847-48, 863-69; *see also* Milkowski Decl., Ex. 1, ¶¶ 4-12.

        After considering the numerous, varied, and sometimes conflicting comments it received

and the data provided by the four companies, FSIS decided to conduct a further rulemaking

process and issue an Advanced Notice of Proposed Rulemaking and Request for Comments

("ANPR") "in order to gather more specific information so that FSIS can make a more fully

informed decision to ensure that the term 'natural,' as used on the labels of meat and poultry

products, is truthful and not misleading."  Derfler Decl. ¶ 38.  The purpose of the ANPR is "to

solicit additional comments, focused by a defined set of alternatives that address the use of the

'natural' claim." *Id.* This process "will clarify and resolve emerging issues surrounding the 'natural' label." *Id.* FSIS's current plan is to draft and publish a proposed rule to define the term "natural" for purposes of labeling meat and poultry products. *Id.* ¶ 39. Along with the ANPR, the agency is preparing to publish an update to the policy guidance on "natural" claims to minimize uncertainty as to the circumstances in which the labels of meat and poultry products that bear "natural" claims will likely be approved. *Id.* ¶ 40.

Pending the outcome of its rulemaking, FSIS stated that it will continue to make determinations on any new "natural" label applications on a case-by-case basis. AR 11; Derfler Decl. ¶ 41; AR 11. Since December 2006 when the Notice was issued, FSIS has approved one label for a product containing lactate. Derfler Decl. ¶ 33. FSIS approved the label, submitted by Pedersons Natural Farms (for the Maverick Ranch label) after Pedersons submitted data showing that the lactate in its product did not extend shelf-life or expiration date. Derfler Decl. ¶ 33; AR 863-69, 2057-58, 2120-21. With respect to existing FSIS-approved natural labels, FSIS determined to postpone any decision on Hormel's request to rescind past approvals (including those of several Intervenors) pending completion of the rulemaking process. *See* Derfler Decl. ¶¶ 32, 38-39.

**D.      USDA Correspondence with Congressman Peterson**

In June 2007, after FSIS had received the comments and shelf-life studies discussed above, Representative Collin Peterson, Chairman of the House Committee on Agriculture and Hormel's congressman, wrote a letter to then-Secretary of Agriculture Mike Johanns, asking for a "status report on the [FSIS] action" to rescind approval for "natural" labels of meat and poultry products containing lactates. AR 778. On July 31, 2007, USDA Under Secretary Richard

Raymond responded that FSIS is "currently determining how best to resolve the broad issue of 'natural' claims on meat and poultry labels."  AR 779.  He explained:

> The comments submitted to the Agency expressed widely divergent and sometimes conflicting views on what the claim 'natural,' as applied to meat and poultry products, should mean.  Given that fact, FSIS is considering how best to proceed to ensure that the term "natural," as used in meat and poultry labeling, is truthful and not misleading.  While one way to try to achieve this result would be to pursue the actions as we described in the letters you reference, we now believe that a more efficient way would be to pursue the process that the Agency began with the December 5, 2006, notice.  Thus, the Agency is considering further action to narrow the divergence in views, including seeking additional, but more focused, comments on the issue.  More focused comments could help to produce a broad consensus that would help to bring about a timely and successful resolution of the issues surrounding the 'natural' label claim.

*Id.*  Thus, once again, USDA made clear its intent to pursue further notice-and-comment rulemaking, a process that was begun in direct response to Hormel's petition seeking a formal administrative process to ensure appropriate use of the claim "natural."

That was apparently unacceptable to Hormel, which filed this Complaint two months later, on September 26, 2007.

## ARGUMENT

Hormel's challenge to USDA and FSIS's actions should be rejected for two reasons:  It is premature and it is wrong.  It is premature because the agency's actions amount to a determination to conduct notice and comment rulemaking on the very issues Hormel presents to this Court.  In case after case, this and other federal courts have recognized that agencies should be given the first opportunity to interpret and apply the statutes they administer and the regulations they issue.  *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994).  Even Hormel does not claim that this is a case in which Congress has spoken in clear and unmistakable terms – no statute says that corn-based lactates are "unnatural," or that products

- 12 -

containing them cannot be called "natural" on their labels.  The issue Hormel presents is one for FSIS to determine in the first instance.

That is all the more so here, where neither USDA nor FSIS has taken any final agency action on Hormel's petition at all.  To be sure, the agency has decided to conduct its rulemaking first and then decide on Hormel's demand that all existing label approvals be rescinded.  That is reasoned decision-making at the very least, and Intervenors submit it is the required way to proceed before retroactively rescinding other companies' label approvals.  Hormel's case comes down to a complaint that the Court should strike all existing labels from the shelves because the agency somehow promised in a letter to Hormel that it would rescind its approval of all those labels and then reneged.  But that is just not so; FSIS has decided to <u>postpone</u> decision until after its rulemaking.  There is no APA violation in conducting notice and comment first, before reversing prior decisions or when its interim decisions are the product of reasoned analysis. Intervenors are not completely satisfied with FSIS's approach to handling label approvals pending its rulemaking, but in Section I we give the reasons why this Court should allow the rulemaking process to unfold before stepping in.

And Hormel's claim is wrong for the simple reason that the law permits exactly what the agency has found repeatedly – that products containing corn-based lactates can be labeled "natural."  Hormel complains that no such interpretation is possible because a process is required before corn-based lactates can be made pure and concentrated to the extent required for use in foods.  So too with salt, which is processed to achieve the purity and concentrations found in a table shaker.  Vinegar is distilled, among other processes.  All these are perfectly natural products; lactates are distinct only because their name (sodium or potassium lactate) is not as commonplace as "salt" (sodium chloride) or "vinegar" (acetic acid) are.  In Section II, we will

- 13 -

provide a description of lactates and their production – just as we will provide to FSIS in the course of its planned rulemaking – showing that lactates in fact meet FSIS's definition of "natural."

**I.      The Agency Has Discretion to Conduct Notice and Comment Rulemaking Before Changing Its Policy or Rescinding Other Companies' Approved Labels.**

**A.    This Court Should Allow FSIS to Complete Its Rulemaking Process.**

The entire thrust of Hormel's lawsuit is that this Court should decide what the agency's policy on "natural" should be before the Department does.  Given FSIS's decision to perform a rulemaking with respect to its "natural" policy, this Court should decline to intervene until the completion of that process.  *See In re Permanent Surface Mining Regulation Litig.*, 620 F. Supp. 1519, 1525-26 (D.D.C. 1985), *aff'd in part, rev'd in part on other grounds sub nom. Nat'l Wildlife Fed'n v. Hodal,* 839 F.2d 694 (D.C. Cir. 1988) ("Given the Secretary's decision to perform a new rulemaking on this issue, the court concludes that this issue is not now properly before the court and any challenge will be better framed upon completion of the new rulemaking.").

Hormel complains specifically that USDA has determined not to retroactively rescind existing labels pending the rulemaking, but "[s]ubstantial deference must be accorded an agency when it acts to maintain the status quo so that the objectives of a pending rulemaking proceeding will not be frustrated."  *MCI Telecomms. Corp. v. FCC*, 750 F.2d 135, 141 (D.C. Cir. 1984); *cf. Lopez v. Davis,* 531 U.S. 230, 244 (U.S. 2001) (holding that an agency is not required to revisit "issues that may be established fairly and efficiently in a single rulemaking proceeding").  Here, in the face of conflicting comments and input, it was the height of reasoned decision-making for FSIS to maintain the *status quo* regarding the "natural" labels at issue pending the resolution of

- 14 -

its rulemaking.  Having failed to convince USDA to revoke approved labels on the basis of

considerations now committed to rulemaking, this Court should not allow Hormel to circumvent

the rulemaking process through this lawsuit.

### B.  USDA's Statements to Congressman Peterson Did Not Constitute Final Agency Action, and Statements Made to Hormel's Counsel Did Not Bind the Agency.

Hormel's APA claim is based on a contention that in USDA's July 2007 letter to

Congressman Peterson, USDA reversed its December 6, 2006 decision (memorialized in a letter

to Hormel's counsel) to rescind "natural" labels for products containing lactates.  Pl.'s Memo. in

Support of Mot. for Summ. J. ("Pl.'s Memo.") at 32.  We need not repeat the Government's

showing that there was no final agency action in withholding any decision on the rescission of

approved labels pending the outcome of rulemaking.  *See* Def.'s Memo. at 23-25 and reply in

support thereof.  In addition, statements made in correspondence to Hormel's counsel regarding

the rescission of other company's labels did not bind the agency to those actions.  *See Amoco*

*Prod. Co. v. Baca*  300 F. Supp. 2d 1, 8 (D.D.C. 2003), *aff'd*, 410 F.3d 722 (D.C. Cir. 2005),

*cert. granted in part*, 547 U.S. 1068 (2006), *aff'd*, __ U.S.__, 1275 S. Ct. 638 (2006) (holding

that statements made in a letter to a private party did not bind the agency because nothing vested

authority in the letter's author to bind the agency); *see also Indep. Petroleum Ass'n of Am. v.*

*Babbitt*, Nos. Civ.A. 93-2544(RCL), 94-2123 (RCL), 1995 WL 431305, at *5 (D.D.C. June 14,

1995) (rejecting argument that Secretary of the Interior's statements made in a letter to

Wyoming's governor was binding agency action as "not every pronouncement, by letter, speech

or other written or verbal communication, can reasonably be construed as binding agency

rulemaking" and the statement – not disseminated to the general public – was not designed "to

implement, interpret, or prescribe law or policy"), *rev'd on other grounds*, *Indep. Petroleum*

*Ass'n of Am. v. Babbitt*, 92 F.3d 1248 (D.C. Cir. 1996).

Moreover, the letter to Hormel's counsel belies the certainty suggested by Hormel.  The Under Secretary was careful to point out to Hormel that "FSIS makes consistent and science-based decisions when it evaluates labels for products bearing 'natural' claims and will continue to review and evaluate such claims for products containing lactates or similar ingredients on a case-by-case basis" and that the agency will initiate rulemaking on the issue.  AR 160-61.  In fact, the December 5, 2006 Notice requesting public comment on the Hormel petition states that as the agency "moves through the stages of rulemaking on 'natural,' natural claims for foods in which sodium lactate is used will continue to be considered by FSIS on a case-by-case basis," citing the factors it will apply.  AR 642-44.

Thus, Hormel cannot base an APA action on these non-final, non-binding statements.

### C.  USDA's FSIS Engaged In Reasoned Decision-Making in Withholding Judgment Regarding the Rescission of Labels Pending the Outcome of Rulemaking.

Even if the letter to Hormel's counsel had stated the policy of the agency, FSIS engaged in reasoned decision-making in its decision to reconsider and withhold judgment regarding the rescission of existing labels pending a rulemaking.  *See Arent v. Shalala*, 70 F.3d 610, 617 (D.C. Cir. 1995) (upholding FDA regulations because "[t]he FDA also has articulated an explanation for its decision that demonstrates its reliance on a variety of relevant factors and represents a reasonable accommodation in light of the facts before the agency"); *Natural Res. Def. Council, Inc. v. EPA*, 822 F.2d 104, 112 (D.C. Cir. 1987) ("An agency's change of course with respect to a particular policy does not in itself suggest a lack of reasoned decisionmaking. To the contrary, an agency *volte face* may evidence careful and thorough evaluation of the policy at issue."); *cf. Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, __U.S. __, 127 S. Ct. 2518, 2530 (2007) (overruling conclusion that EPA's decision was arbitrary and capricious because its decision was internally inconsistent with its statement during the review process and stating:  "the only

- 16 -

'inconsistency' respondents can point to is the fact that the agencies changed their minds – something that, as long as the proper procedures were followed, they were fully entitled to do").

After receiving Hormel's petition, FSIS invited public comment and received widely divergent, and sometimes conflicting, views regarding the proper use of the "natural" claim for products containing lactates.  It also received studies showing, contrary to Hormel's assertion otherwise, that lactates do not substantially affect the shelf-life of products.  And, although Hormel decries any consideration of food safety issues, the agency quite properly considered the possibility that its decision might affect food safety.  Further, FSIS received these comments in the context of an existing policy approving of "natural" labels for meat and poultry products containing lactates – actions directly supported by the 1982 policy, far more established and long-standing than any statement made in a single letter to Hormel.

Further, whether a product or ingredient is "chemical" or "natural" is an inherently difficult determination that depends on an estimation of consumer expectation, long-standing practices in the food industry, the existence of similar ingredients that may be more or less processed, the degree of processing necessary to produce the recognized ingredient or food bearing the claim, the context in which the claim is used, the category of products, and a host of other factors.  These determinations call upon the expertise of the very agency to which Hormel originally turned – and properly so.  USDA and its FSIS have extensive experience in the field, having established literally hundreds of regulatory definitions, ranging from "organic" (adopted via notice-and-comment rulemaking by USDA's Agricultural Marketing Service and enforced on food labels by FSIS, see 7 C.F.R. § 205.2) to a definition of "pepperoni," an informal policy (i.e., not the subject of notice-and-comment rulemaking) where USDA dictates a maximum moisture content to address food safety concerns identified by FSIS, see Policy Book entry for

- 17 -

"pepperoni," http://www.fsis.usda.gov/OPPDE/larc/Policies/Labeling_Policy_Book_082005.pdf

(last visited on Apr. 16, 2006).

At the very least, FSIS has discretion to determine that the rulemaking process is the appropriate vehicle for resolving the issue, especially given the conflicting evidence and differing views presented to it. *See Thomas Jefferson Univ.*, 512 U.S. at 512 (stating that deference is particularly appropriate in contexts that "require significant expertise and entail the exercise of judgment grounded in policy concerns") (internal quotations omitted); *see also Prof'l Drivers Council v. Bureau of Motor Carrier Safety*, 706 F.2d 1216, 1221 (D.C. Cir. 1983) ("[R]ulemaking is an inherently policy-oriented process and the agency must be accorded considerable deference in evaluating information presented and reaching decisions based upon its expertise.").

> **1.    Public Comments Showed FSIS That Hormel's Petition Did Not Reflect Consensus among Meat and Poultry Manufacturers.**

In response to its December 5, 2006 Notice, the agency received nearly 100 separate public comments expressing divergent and sometimes conflicting views on what the claim "natural" should mean and whether (and when) it should be used to describe products containing lactates. Derfler Decl. ¶¶ 35-37. The comments reflected a chasm within the food industry over the notion that corn-based lactates might suddenly no longer be considered "natural." *Compare, e.g.,* comments asserting that lactates should be permitted: AR 1814-17, Coleman Natural Foods; AR 1738-40, Dietz & Watson; AR 1859-77, Farmland Foods, Inc.; AR 1811-1813, Jones Dairy Farm; AR 913-14, Kalsec; AR 1770-1806, Kraft Foods; AR 1766-69, Premium Standards Farms; AR 1657-88, PURAC; AR 1884-1922, Sara Lee Food & Beverage; AR 1807-08, American Meat Science Ass'n *with* comments stating that lactates should not be permitted: AR 1645-46, Daniel Farkas, Oregon State University; AR 921-34, Hormel Foods Corp.; AR 1878-

- 18 -

80, North American Natural Casings Ass'n; AR 888-94, The Sugar Ass'n.; AR 1711-18,

Sanderson Farms.  Not surprisingly, Hormel was in the minority, with makers of relevant

"natural"-labeled meat and poultry products favoring the existing position of FSIS that permitted

natural labels on products containing corn-based lactates.  *See id.*  In other words, the comments

received indicated that Hormel's view of "natural" claims as presented to FSIS was not widely

shared, either within the industry or by the public in general.  *See id.*; Derfler Decl. ¶¶ 35-38.

     Further, the commenters recommended that FSIS consider a wide variety of other

subjects, including particular ingredients, processing methods, and animal production practices

that individual commenters thought should or should not be permitted for meat or poultry

products labeled as "natural."  Derfler Decl. ¶ 37; *see also, e.g.,* AR 1708-09, Bell & Evans

("natural" should be tied to livestock raising practices); AR 915-16, Food Animal Concerns

Trust (same); AR 1814-17, Coleman Natural Foods (HPP should be acceptable; ); AR 1818-24,

Corn Refiners Ass'n ("natural" claims should be permitted for nutritive sweeteners, starches, and

fermentation products derived from natural sources); AR 886-87, Ecolab (ingredients present in

insignificant levels should be exempt from "natural" requirements); AR 1711-1718, Sanderson

Farms ("natural" for poultry products should mean single ingredient, *i.e.*, poultry only); AR

1728-1730, Dakota Beef LLC ("natural" should be prohibited on meat from genetically modified

animals or animal raised with growth hormones or subtherapeutic antibiotics; items permitted on

organic list should be allowed in "natural" products); AR 1936-37, American Bakers Ass'n

("organic" and "natural" should have different standards; FSIS should clarify minimal

processing or eliminate that element); AR 1884-1922, Sara Lee Food & Beverage (FSIS and

FDA should develop harmonized approach to "natural").  Rather than providing consensus for a

regulation on "natural" claims that reflects a general understanding of what the claim means to

\\\DC - 028652/000002 - 2717522 v1

the public, the comments submitted to FSIS indicated that there was no consensus on this issue.

*See* Derfler Decl. ¶¶ 35-38.  Faced with this record, no matter how Hormel may have threatened

the agency, it was perfectly rational for the agency to decide it needed more information and

analysis and to embark on a rulemaking for that purpose.  Indeed, the December 2006 Notice and

the outpouring of comments it produced demonstrate the precise value of the process to which

the agency is committed.

### 2.    Studies Showed That Shelf-Life Was Not Substantially Affected by Presence of Lactates.

Under its 1982 natural policy, USDA's FSIS takes the position that its case-by-case

review of products containing lactates will be guided by whether or not corn-based lactates

exhibit a preservative effect in these products by considering the ingredient's effect, if any, on

shelf-life.  To make this determination, FSIS requested shelf-life and product-dating data from

manufacturers who hold approved labels.  AR 760-76. [2/]  In response to this request, the agency

received data from five manufacturers. [3/]  AR 792-93, 795-805, 820-28, 847-48, 863-69; *see*

*also* Milkowski Decl., Ex. 1, ¶¶ 4-12.  FSIS applied its scientific and regulatory expertise in

reviewing these data and concluded that " manufacturers' data submitted to date indicate that

comparison of two or more similar products with, and without, sodium lactate were observed to

---

[2/]    A number of commenters, including some of the Intervenors, questioned whether
demonstrating that lactates do not affect shelf-life was a necessary inquiry because lactates are
not chemical preservatives.  As discussed previously, it is the basic nature of an ingredient (*i.e.*,
natural v. artificial/synthetic) that determines its natural status; its function is not relevant.  In
addition, shelf-life is based on a number of factors, including the presence of spoilage organisms,
moisture content, fat content, salt content, processing methods, and sanitation.  *See* AR 813.

[3/]    Although USDA references four studies and Hormel only addresses the Plumrose, Kraft,
Fresherized, and Pederson studies, the Administrative Record indicates that there were five
studies providing shelf-life data, including the Sugar Creek Study.  *See* AR 790-874.

- 20 -

have very similar microbial and bacterial growth patterns, and identical shelf-lives while exposed to the same controlled conditions."  Derfler Decl. ¶ 32.  As a result, FSIS found that these data support the decision not to rescind agency approval of any currently marketed "natural" labels pending completion of the rulemaking process.  *Id.*

The scientific complexities and underlying consumer protection and food safety considerations are in the first instance reserved to the Department through an appropriate administrative process.  *See Thomas Jefferson Univ. v. Shalala*, 512 U.S. at 512; *see also Baptist Mem'l Hosp.-Golden Triangle v. Leavitt*, 536 F. Supp. 2d 25, 33-34 (D.D.C. 2008).  Hormel claims to know better and goes to great lengths to discredit the shelf life studies submitted to USDA based on a series of purported scientific objections.  *See* Pl.'s Memo. at 37-40 and Christianson Decl., Attach. 1 thereto.  The agency can address Hormel's effort to raise every imaginable objection to the data when it conducts the coming rulemaking, but from a reasoned scientific perspective, the studies support FSIS's determination of corn-based lactates' absence of impact on shelf-life.  The following brief comments on the submitted studies underscore the reasonable nature of agency findings disputed by Hormel. 4/

---

4/       Hormel further claims that the Administrative Record contains other scientific studies "which consistently report and validate the chemical preservative effect of sodium and potassium lactates at levels below 2%."  Pl.'s Memo. at 25.  This is not so.  None of these cited studies establish that lactates, at levels below 2%, extend shelf life or expiration dates of the meat and poultry products tested, which is FSIS's measure of preservative effect.  Milkowski Decl., Ex. 1, ¶¶ 23-29; AR 760-76 (In order to verify that an ingredient was not being used as a preservative, FSIS requested from manufacturers' data "showing that the same shelf-life and product dating parameters [*i.e.*, "use-by" dates] apply to products in which lactates have been used as compared to products in which they have not been used.");  Derfler Decl. ¶ 33 (FSIS is approving new labels if the manufacturer submits data showing that lactates in the products do not extend shelf life or expiration date).  Further, the studies do not show any "chemical" preservative effect of

a.    **Extrapolation.**  Hormel complains that the agency erred by relying on only four studies and determined to proceed with further rulemaking without having studies from every single maker of products with lactates.  *See* Pl.'s Memo. at 33-34.  It was reasonable, however, for FSIS to conclude, based on the review of the data under its shelf-life standard, that corn-based lactates are not "chemical preservatives."  First, of course, there is no reason to expect that lactates used by manufacturers who did not submit data result in substantially different effects on shelf-life or expiration dates than lactates used by those who did submit data.  *See* Milkowski Decl., Ex. 1, ¶ 14.  Second, and in any event, collecting more data is one of the purposes of a rulemaking, and that is just what the agency has decided  to do.  As a result, USDA had a reasonable basis for extrapolating the data submitted from the manufacturers to all other "natural" products containing lactates and, on that basis, to seek additional comment and information in a rulemaking proceeding.

b.    **AOAC Methodology.**  Hormel attempts to discredit the shelf life studies submitted to FSIS because they do not conform to the AOAC test methods.  *See* Pl.'s Memo. at 38-39.  However, USDA did not require that AOAC methods be used in conducting shelf-life studies, *see* AR 760-76, and manufacturers employ a wide variety of internal procedures to satisfy their specific process control and quality needs.  *See* Milkowski Decl., Ex. 1, ¶ 5.  The test methods outlined by AOAC do serve as reference test methods, but these are commonly adapted to address specific test conditions, test products, and outcomes as needed.  *Id.*  As a result, a skilled professional can do valid and often better work via a number of microbiological test methods outside of the AOAC methods.  *Id.*  Therefore, strict compliance to AOAC methods

---

sodium and potassium lactate as "chemical" is defined by FSIS's "natural" policy.  *See infra* Section II.A.

should not be used as an indicator of the validity of the shelf life studies submitted to USDA in response to the agency's request for this data.  *Id.*

c.    **Specific Shelf Life Studies.**

**Plumrose Study:**  The Plumrose study evaluated the growth of microbes over an eight-week period on similar products, one of which contained sodium lactate and one that did not. AR 847-48; *see also* Milkowski Decl., Ex. 1, ¶ 6.  The data show that the products had similar growth patterns of microorganisms and neither product had distinguishable signs of microbial degradation, changes in appearance, or changes in package integrity.  *Id.*  Based on these data, the company concluded that both products exhibit the same shelf-life capabilities and expiration dates.  *Id.*

Hormel complains that the study did not strictly follow the AOAC method for Petri-film analysis of aerobic plate counts because an incubation temperature of 30C was used instead of the 35C prescribed by the AOAC Official Method 990.12.  Pl.'s Memo. at 38-39.  However, the change in incubation temperature likely is due to the company following an internal, validated modified AOAC method for assessing growth of spoilage organisms.  Milkowski Decl., Ex. 1, ¶ 7.  In fact, it is appropriate to conduct Petri-film studies at a temperature less than the 35C incubation temperature specified in the AOAC method because the optimal temperature for the growth of most meat spoilage organisms is 25-35C. 5/  *Id.*  Further, Hormel has shown no reason to question that Plumrose used its own an internal, validated modified AOAC method for

_____

5/        For example, three of the most common genera of spoilage bacteria for ready-to-eat meats and their corresponding optimal growth temperatures are:  Lactobacillus (30-35C), Leuconostoc (20-30C), and Carnobacterium (30C).  John G. Holt, Noel R. Krieg, Peter H. A. Sneath, James T. Staley and Stanley T. Williams, *Bergey's Manual of Determinative Bacteriology* 529, 565-66 (9th ed.); *see also* Milkowski Decl., Ex. 1, ¶ 7.

- 23 -

assessing growth of yeast and mold.  *See id.*  As a result, the Plumrose study properly supports

the conclusions drawn by the company that sodium lactate does not affect the microbial

characteristics, shelf-lives, or expiration dates of the products.  *Id.*

**Kraft Foods Study:**  Kraft Foods submitted data from an inoculation shelf-life study and

an open package study.  AR 806-46.  In the Kraft inoculation shelf-life study, bologna, hot dogs,

ham, and turkey breast were inoculated with spoilage organisms and assessed for spoilage by

measuring total plate count and sensory-related signs of spoilage (*i.e.,* appearance and odor).

Milkowski Decl., Ex. 1, ¶ 8.  Hormel mischaracterizes the conclusion of the study by stating that

the study consistently shows "more growth in the treatment with no antimicrobial ingredients."

*See* Pl.'s Memo. at 40.  In the study report, however, this statement reads "only slightly more

growth in the treatment with no antimicrobial ingredients."  AR 822 (emphasis added).  The

mention of only slight differences in growth between samples of products treated with sodium

lactate-containing antimicrobial ingredients and those without any antimicrobial ingredients is

accurate:  for hot dogs and bologna, the difference between the antimicrobial and no

antimicrobial treatments was within one log, which is considered in microbial testing to be the

typical "noise" level, *i.e.,* an accepted variability in results that reflects no significant difference

in measured values.  Milkowski Decl., Ex. 1, ¶ 8.  In the case of turkey breast, the samples with

no antimicrobial ingredients actually had less growth but were again within the one log accepted

error.  *Id.*  Although ham did show significantly more growth in the samples with no

antimicrobial ingredients, overall, these study results support the conclusion reached by Kraft

that "the data reflect little to no difference in spoilage as measured by total plate count or sensory

(appearance and odor) spoilage of ready-to-eat processed meat products" when comparing

- 24 -

products with no added antimicrobial ingredients and those with antimicrobial ingredients, including sodium lactate.  *Id.*

      With regard to the Kraft open package study, in which spoilage was evaluated after packages were opened and were inoculated with *Listeria monocytogenes* ("*Lm*"), Hormel is correct in stating that the study did not include a no-antimicrobial control, did not indicate the level of inoculum, or show what happened during the first week of testing.  *See* Christianson Decl., ¶ 12, Attach. 1 to Pl.'s Memo.; *see also* Milkowski Decl., Ex. 1, ¶ 9.  But these are not flaws at all.  The purpose of this study was to assess the <u>relative</u> growth of *Lm* in opened packages between a lactate antimicrobial system and a benzoate/propionate antimicrobial system.  Milkowski Decl., Ex. 1, ¶ 9.  As a result, no control without an antimicrobial is needed, the level of the inoculum is immaterial, and the results from the last three weeks of the study are of greatest significance. 6/  *Id.*  In sum, the total plate count and sensory data in this study show "no difference in spoilage of ready-to-eat processed meat products when using sodium lactate as compared to sodium benzoate and/or sodium propionate," and no differences between these products when inoculated with *Lm*.  Milkowski Decl., Ex. 1, ¶ 9, citing AR 827.

      **<u>Fresherized Foods Study</u>:**  The Fresherized Foods study evaluated the effects on *Lm* survival and potential regrowth of high pressure processing (HPP) treatment alone or in combination with 1% or 1.5% sodium lactate in ready-to-eat beef and chicken strips, respectively.  Milkowski Decl., Ex. 1, ¶ 10.  The study included control samples that contained sodium lactate but were not treated with HPP, and, although spoilage organisms were not

---

6/    Hormel also complains that the study's Figure 1 provides no indication as to whether the results shown are the total plate counts from beef franks, ham, or bologna.  Christianson Decl. ¶ 12, Attach. 1 to Pl.'s Memo.  But the first sentence of the Results section makes it clear that this graph displays an <u>average</u> of these three.  *See* AR 827.

studied, these samples provide some insight as to the effect of sodium lactate on *Lm* growth. *Id.* Given the limited effects of sodium lactate on *Lm* growth observed by Fresherized Foods, AR 796, it was reasonable for the company to conclude that it "would not consider using sodium lactate at the levels tested as an antimicrobial to control the presence of *Listeria monocytogenes* in our products." Milkowski Decl., Ex. 1, ¶ 10, citing AR 795-96.

**Pederson Natural Farms Study:** The Pederson Natural Farms studies evaluated the effect of sodium lactate on the shelf-life of natural bacon that is "cured" through the addition of celery juice and a lactic acid starter culture during the manufacturing process. Milkowski Decl., Ex. 1, ¶ 11. Hormel notes the high initial bacterial count measured at the outset of the studies, but, in contrast to the ready-to-eat products studied by Plumrose, Kraft, and Fresherized Foods, bacon is a raw product for which high microbial counts are neither unusual nor indicative of spoilage. *Id.* Moreover, the lactic acid starter culture, which does not get killed off completely in the smoking and processing of the bacon, is included as part of the bacterial counts measured in the study. *Id.* Therefore, the high bacterial counts measured at the outset of the Pederson studies merely reflect the inherent nature of the bacon tested and do <u>not</u> indicate that the product was already spoiled and the study invalid as Hormel contends. *Id.* These studies showed there were no appreciable differences in the microbial changes and sensory characteristics over time between the samples containing sodium lactate and those without, demonstrating that sodium lactate had no effect on the shelf life of the product. *Id.*

**Sugar Creek Study:** The Sugar Creek Packaging Company study evaluated the effect of sodium lactate on the shelf-life of natural bacon products. Milkowski Decl., Ex. 1, ¶ 12. Sodium lactate was added to these products at levels of 0% (control), 0.59%, 0.60%, and 1.18% of the finished products by weight. *Id.* The products are smoked, chilled, pressed into shape, sliced,

\\\DC - 028652/000002 - 2717522 v1

and then stored refrigerated for the course of the shelf-life. *Id.* Samples were taken of all of these products at the beginning, middle, and end of slicing runs, and all samples were found to contain similar bacterial counts. *Id.* Similar shelf-lives of around 65 days were found for products with and without sodium lactate. *Id.* The studies support the company's conclusion that the "data indicates no advantage in shelf-life or in an antimicrobial effect with the use of these levels of sodium lactate." *Id.*

In view of these responses and of the variety of other comments, 7/ FSIS reasonably decided not to rescind labels until the rulemaking process has reached its conclusion, and then to reevaluate whether those labels are in compliance with FSIS standards for use of the "natural" label. *See* Derfler Decl. ¶¶ 31-32; *see also* Milkowski Decl., Ex. 1, ¶ 13 (stating that based these shelf-life studies, it was reasonable to conclude that lactates do not affect the shelf-lives of the products tested).

_____

7/      Hormel attempts to undercut USDA's reliance on the shelf-life studies by emphasizing Kraft's comment that shelf-life and date codes, in and of themselves, do not reveal whether a food contains an  ingredient having an antimicrobial effect on the product. Pl.'s Memo. at 40. The point in that very targeted observation was simply that shelf life is based on a number of factors, such as product composition, quality, and processing, such that a focus on shelf life (*i.e.*, a particular number of days and the corresponding date codes) underline alone cannot predict whether an ingredient has an antimicrobial effect.  AR 813.  However, the shelf-life studies presented to USDA showed "very similar microbial and bacterial growth patterns and identical shelf lives while exposed to the same controlled conditions." Derfler Decl. ¶ 32 (emphasis added).  In other words, Kraft's comment is not inconsistent with USDA's review of, and reliance upon, those studies.  Comments by Kraft and others point to the complexity of the underlying issues from a scientific and policy perspective, and this complexity in turn warrants the case-by-case approach favored by FSIS.  Moreover, the diversity of comments presented to USDA on this and every other aspect of the agency's "natural" policy only serve to support USDA's decision to resolve the issue in rulemaking.

3.     **FSIS Did Not Engage in *Post-Hoc* Rationalization in Justifying Its Withholding of Judgment Regarding the Rescission of Labels Pending the Outcome of Rulemaking.**

Incredibly, Hormel claims that USDA's July 31, 2007 letter to a Congressman defines the evidence the agency can rely on in supporting its decision to conduct a rulemaking and to leave existing labels on the shelf in the meantime.  Pl.'s Memo. at 33, 36-37.  As discussed above, FSIS asked for studies on the impact of lactates on shelf-life, and it received five studies showing little or no impact on shelf-life.  Now, Hormel says that the agency must ignore those studies because it did not specifically mention them in Under Secretary Raymond's July 31, 2007 letter to Congressman Peterson stating the agency's decision to conduct further rulemaking.  Pl.'s Memo. at 33, 36-37.  Presumably, Hormel would also have the agency ignore the other substantial and substantive comments it received and the testimony given at its public meeting.

The argument is so misplaced it is hard to know where to begin.  First, neither the letter to Congressman Peterson nor the earlier letter to Hormel's lawyer amounted to any sort of binding, final agency action, but only a statement about the agency's decision to conduct a rulemaking and evaluate products containing lactates on a case-by-case basis.  *See supra*, Section I.B.  Second, both letters made clear that the agency had determined it needed more information before making a final determination about how its "natural" labeling policy should apply to products containing lactates –  saying that can hardly disable an agency from relying on the additional information it later receives.  *See* AR 779-80; AR 160-61.

And even if the letter to the Congressman was final agency action (and it plainly is not), it still would be more than sufficient to state the agency's rationale for proceeding as it has.  An agency statement of its grounds for its final decision need only be sufficient to advise the party of the general basis of the denial.  *Baker v. England*, 397 F. Supp. 2d 18, 26 (D.D.C. 2005), *aff'd*,

- 28 -

210 Fed. Appx. 16 (D.C. Cir. 2006) (citations and internal quotes omitted) ("This requirement is not particularly demanding, however.  Nothing more than a brief statement is necessary, as long as the agency explains why it chose to do what it did.  If the court can reasonably discern the agency's path, it will uphold the agency's decision.") (internal citation and quotations omitted); *Theodus v. Brock*,  No. 86-2467, 1987 WL 14599, at *5 (D.D.C. July 17, 1987), *aff'd*, 852 F.2d 1380 (D.C. Cir. 1988) (holding that "the agency was only required by statute to issue a brief statement of the grounds for denial" and that the agency satisfied this requirement "by briefly sketching some of the considerations justifying its interpretative rule") (internal quotes omitted).

Here, in the July 2007 letter, Under Secretary Raymond wrote to Congressman Peterson that FSIS is "currently determining how best to resolve the broad issue of 'natural' claims on meat and poultry labels."  AR 779-80.  This hardly is a statement of final agency action.  The agency went on:

> The comments submitted to the Agency expressed widely divergent and sometimes conflicting views on what the claim 'natural,' as applied to meat and poultry products, should mean.  Given that fact, FSIS is considering how best to proceed to ensure that the term "natural," as used in meat and poultry labeling, is truthful and not misleading.  While one way to try to achieve this result would be to pursue the actions as we described in the letters you reference, <u>we now believe that a more efficient way would be to pursue the process that the Agency began with the December 5, 2006, notice</u>.  Thus, the Agency is considering further action to narrow the divergence in views, including seeking additional, but more focused, comments on the issue.  More focused comments could help to produce a broad consensus that would help to bring about a timely and successful resolution of the issues surrounding the 'natural' label claim.

*Id.* (emphasis added).  This description is plainly "sufficient to advise the party of the general basis" for the agency's decision to withhold its decision to rescind labels pending the outcome of the rulemaking process.  *See Local 814, Int'l Bhd. of Teamsters, Chauffers, Warehousemen v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976).

4.    **FSIS Reasonably Considered Public Health Concerns in Withholding Decision to Rescind Labels.**

Hormel also complains that the agency erred in considering the public health in deciding to conduct a rulemaking and to leave existing labels on the shelf in the meantime.  Hormel Memo. at 36.  But this has it all sideways.  First, there is nothing wrong with USDA and its Food Safety and Inspection Service considering the issue of food safety.  Second, it has not yet made any final decision on the issue presented by Hormel; all the agency said is that it wanted to hear comment on the issue.  Its December 2006 Notice states:  "In recent years, FSIS has put a great deal of emphasis on improving food safety.  In some ways, however, some definitions of 'natural' could discourage the use of antimicrobials, which are used to reduce and prevent growth of *Listeria monocytogenes* in foods."  AR 644.  And if the point was not clear enough, FSIS continued:  "The Agency seeks comment on how it best determines an appropriate and rational balance between the need to ensure the safety of the food supply and the need to ensure the labels are truthful and not misleading."  *Id.*  There will be time enough for judicial review of the agency's ultimate weighing of these policy issues after it completes its rulemaking.  Hormel is completely off the mark in claiming that the agency somehow erred by having in mind its central public safety mission when it decided to conduct rulemaking on how best to define "natural."

5.    **FSIS's Actions Must Keep with Its Existing Policy of Approving "Natural" Labels for Products Containing Lactates.**

Hormel's effort to force rescission of existing label approvals runs aground for another reason..  FSIS's discretion to retroactively rescind "natural" labels is constrained by its existing policy of approving "natural" labels for meat and poultry products containing lactates – a policy far more established and long-standing than any single letter to a single food company's lawyer.

- 30 -

As stated previously, for years, FSIS approved "natural" claims for product containing lactates –
a policy most recently memorialized in its August 2005 "natural" policy revision. *See* Statement
of Facts § B.  Contrary to Hormel's characterization, the agency's 2005 Policy Memorandum
specifically stating that lactates were permitted in "natural" products was not an "exemption,"
but instead was a memorialization of FSIS's decision that lactates were properly found in
"natural" products.  Derfler Decl. ¶ 19; AR 643.

    The agency, therefore, could not have done as Hormel wishes.  Over the last years, FSIS
has approved numerous "natural" labels. *See* Derfler Decl. ¶ 19; AR 2063-2123.  Based on those
decisions, companies including several Intervenors now have on the market products containing
corn-based lactates that are described as "natural" in labeling submitted to and approved by
FSIS.  It is hard to imagine that the agency would retroactively rescind those prior label approval
decisions at the behest of a single competing food producer without first inviting full public
comment, carefully analyzing Hormel's complaints and all responses supporting about the
agency's policy on "natural" labels for products containing corn-based lactates, and then
providing a reasoned basis for any change.

    That is settled law under the APA.  Not only does FSIS have the discretion to withhold
judgment pending full rulemaking, it could not change policy now even if it wanted to, without
conducting and supplying a "reasoned analysis for the change." *Motor Vehicle Mfrs. Ass'n of
U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 41-42 (1983) ("*State Farm*").  As the
Court held in *State Farm*, "[a] settled course of behavior embodies the agency's informed
judgment that, by pursuing that course, it will carry out policies committed to it by Congress.
There is, then, at least a presumption that those policies will be carried out best if the settled rule
is adhered to." *Id.* at 41-42.  "Accordingly, an agency changing its course by rescinding a rule is

obligated to supply a reasoned analysis for the change beyond that which may be required when

an agency does not act in the first instance." *Id.* Thus, under *State Farm*, USDA can alter its

existing policy only after "examin[ing] the relevant data and articulate[ing] a satisfactory

explanation . . . between the facts found and the choice made" to change policy. *Id.* at 43.

And that is especially so if the agency's decision were to be given retroactive effect by

application to existing labels. Many labels were approved under FSIS's 2005 policy, which

specifically enumerated sodium lactate as always being permissible in "natural" products. Thus,

any rescission of these labels by FSIS would constitute an impermissible substitution of a new

rule for a "reasonably clear" old rule, undermining "settled expectations of those who had relied

on the preexisting rule." *See Epilepsy Found. of Ne. Ohio v. NLRB*, 268 F.3d 1095, 1102-03

(D.C. Cir. 2001). As a result, FSIS's decision to withhold its decision regarding the rescission of

labels is the best course of action, despite Hormel's suggestion otherwise.

If there is APA violation here, it is in the agency's decision to revoke the part of its

"natural" policy that expressly allowed for use of corn-based lactate in "natural" products <u>before</u>

even beginning the notice-and-comment process. *See Paulsen v. Daniels*, 413 F.3d 999, 1004-05

(9th Cir. 2005) (holding that agency could not issue an interim rule that had immediate effect

while it sought notice and comment on that same rule). "[I]t is antithetical to the structure and

purpose of the APA for an agency to implement a rule first, and then seek comment later." *Id.*

"In enacting the APA, Congress made a judgment that notions of fairness and informed

administrative decisionmaking require that agency decisions be made only <u>after</u> affording

interested persons notice and an opportunity to comment." *Id.* (emphasis added); *see also Tenn.

Gas Pipeline Co. v. FERC*, 969 F.2d 1141, 1144 (D.C. Cir. 1992) (striking down as procedurally

improper a rule issued by an agency at the same time it issued a rulemaking notice to change the

same rule).  Intervenors have not challenged this action, secure in the knowledge that they will have ample opportunity to present their views in the coming rulemaking process.

No reversal of policy can be accomplished by the mere stroke of a pen on a single competitor's request – especially that of a company with a strong competitive interest in preventing the use of lactates in the natural products now marketed by many other food producers.  Clearly, there is no APA violation in conducting a rulemaking process <u>before</u> changing policy.

Hormel makes no secret that a threat of litigation accompanied filing of its petition.  Pl.'s Memo. at 2.  The Department responded by subjecting the petition to the rigors of public comment.  The agency learned from the broader perspective of numerous  interested parties that many disagree with Hormel's preference to bar corn-based lactates from "natural" products and also found significant, substantive disagreement on virtually every issue raised by the agency.  *See* Derfler Decl. ¶¶ 35-36.  The basic principles of administrative law do not support rescission of approved labels, and the agency enjoys wide latitude in fashioning interim policies that are the subject of reasoned analysis as the administrative process moves forward.

## II.    The Agency's Approval of "Natural" Labels for Products Containing Lactates Does Not Violate Misbranding Provisions of FMIA or PPIA.

In an effort to justify its "decide first, rulemaking later" approach to APA procedure, Hormel claims there is nothing for the FSIS to decide – no need to await rulemaking, Hormel explains, because the applicable statutes permit only one view of the matter.  But Hormel offers no statute prohibiting use of the word "natural" on products containing lactates or any other specific ingredient, for that matter.  There is none.  Instead, there are statutes stating general standards for food labeling and an agency charged with interpreting and applying them.

- 33 -

### A.  Only Chemical Preservatives and Other Artificial or Synthetic Ingredients are Prohibited; Natural Preservatives Are Not.

Under the FMIA and PPIA, a meat or poultry product is misbranded if the product "contains any artificial flavoring, artificial coloring, or <u>chemical preservative</u>, unless it bears labeling stating that fact."  21 U.S.C. § 601(n); 21 U.S.C. § 453(h) (emphasis added).  That is the statutory language.  We also have the agency's view – a view FSIS has held consistently for 25 years.  Since 1982, FSIS has implemented these FMIA and PPIA misbranding provisions by permitting use of the word "natural" when:  (1) "The product does not contain any artificial flavor or flavoring, coloring ingredient, or <u>chemical preservative</u> (as defined in 21 C.F.R. § 101.22), <u>or any other artificial or synthetic ingredient</u>"; and (2) "[T]he product and its ingredients are not more than minimally processed."  AR 2-3; 9-12 (emphasis added).

The first prong of this agency policy plainly states that only <u>chemical</u> preservatives are prohibited in natural-labeled products, not all preservatives. <u>8</u>/   All matter is made up of chemicals – elements and compounds – but any argument that all preservatives be banned from "natural" meat and poultry products would  read the word "chemical" right out of the standard.  This is plainly impermissible.  *See Negonsott v. Samuels*, 507 U.S. 99, 106 (1993) (holding that courts must give effect to each word in a statute); *see also Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 356 (2000) (interpretation of regulation must not be inconsistent with the text of the regulation).  And the term "chemical preservative" is followed by the phrase "or any <u>other</u>

---

<u>8</u>/       Under FDA regulation, 21 C.F.R. § 101.22(a)(5), "[t]he term chemical preservative means any <u>chemical</u> that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties." (emphasis added).  *See also* 9 C.F.R. § 301.2.

artificial or synthetic ingredient," clearly indicating that to be "chemical preservatives" an

ingredient must be artificial or synthetic.  *See FDA v. Brown & Williamson Tobacco Corp.*, 529

U.S. 120, 132-33 (2000) (internal citations & quotations omitted) (stating that in evaluating a

statutory provision, the meaning of words or phrases "may only become evident when placed in

context.  It is a fundamental canon of statutory construction that the words of a statute must be

read in their context and with a view to their place in the overall statutory scheme"); *S.A. Storer

& Sons Co. v. Sec'y of Labor*, 360 F.3d 1363, 1368-69 (D.C. Cir. 2004) (interpretation of

regulations must "sensibly conform[] to the purpose and wording of the regulation[]") (internal

quotations omitted).

Indeed, this is one point on which there is no dispute.  Since 1982, FSIS's "natural"

policy has stated that "[a]ll products claiming to be natural or a natural food should be

accompanied by a brief statement which explains what is meant by the term natural, i.e., that the

product is a natural food because it contains <u>no artificial ingredients</u> and is only minimally

processed."  AR 2-3; AR 9-10 (emphasis added); *see also* AR 3 (1982 Policy Memorandum

stating "This memo should serve to publicize guidelines which have evolved through this

process while still precluding the use of natural claims on meat and poultry labeling where

methods of preparation and/or processing or the <u>presence of artificial ingredients</u> would result in

a product that is inconsistent with consumer expectations.") (emphasis added).  In fact, the

statement that FSIS requires to appear on food labels to ensure that "natural" is used in a truthful,

non-misleading way focuses on the absence of artificial ingredients; these labels state:  "no

<u>artificial</u> ingredients, no more than minimally processed."  *See* AR 2002, 2029, 2034, 2037,

2039, 2046 (emphasis added).  And even Hormel concedes that "natural" products are those

without "<u>artificial ingredients or synthetic ingredients, including chemical preservatives</u>, and are

- 35 -

no more than minimally processed." Pl.'s Memo. at 6 (emphasis added); *see also id.* at 9 (conceding that "natural preservatives" are "excluded from the definition of "chemical preservative").

Thus, the agency's task in the first instance is to distinguish between those ingredients that are "chemical" in the sense of being "artificial" or "synthetic" and those that are not.

### B.    Lactates Are Natural Ingredients.

The first prong of the USDA's 1982 natural policy requires that a "natural"-labeled product not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative, or any other artificial or synthetic ingredient. By hyper-focusing on the manufacturing process by which lactates are produced from corn and their antimicrobial properties, Hormel contends that lactates are "chemical preservatives," *i.e.*, artificial or synthetic ingredients. Contrary to Hormel's contention and as set forth below, lactates are in fact natural ingredients as defined by USDA's long-standing policy and, therefore, meet the first prong of the policy.

Corn-based lactates are not "chemical preservatives" for the simple reason that they are not synthetic or artificial. To be sure, as set forth *supra*, USDA reasonably found, based on the shelf-life studies it reviewed, that corn-based lactates were not being used as preservatives. 9/ But even setting that aside, only "chemical" preservatives are banned by the agency's policy –

_____

9/    FSIS currently uses shelf-life and expiration date comparisons to determine whether an ingredient is being used as a "preservative." *See* AR 760-76 (In order to verify that an ingredient was not being used as a preservative, FSIS requested from manufacturers' data "showing that the same shelf-life and product dating parameters [*i.e.*, "use-by" dates] apply to products in which lactates have been used as compared to products in which they have not been used."); *see* Derfler Decl. ¶ 33; AR 0790 (FSIS is approving new labels if the manufacturer submits data showing that lactates in the products do not extend shelf-life or expiration date).

chemical in the sense of being unnatural, artificial or synthetic.  That is not so of the lactates at issue here.  Natural ingredients are easily distinguished from synthetic or artificial ingredients based on the materials from which they are derived.  The lactates at issue are made from corn.  PURAC, the world's largest producer of lactates, derives lactate from corn sugar, which is fermented by bacteria to obtain lactic acid.  10/  Zoetemeyer Decl., Ex. 2 to Intervenors' Opp'n, ¶¶ 1, 4.  This lactic acid is then purified, concentrated, and neutralized to form lactates.  11/  *Id.*  The lactate derived through this process is L-lactate, the form of lactate naturally present in foods and the human body, where it is produced in active muscle tissues as a result of the metabolism of glucose.  Zoetemeyer Decl., Ex. 2, ¶ 8.

C.    **Lactates Are "Not More Than Minimally Processed."**

Hormel also contends that corn-based lactates are more than minimally processed because several steps are needed to transform corn into a stable, food grade lactate.  At the outset we note that Hormel did not include this argument before the agency.  Nowhere in its petition or correspondence with USDA prior to late December 2006 did Hormel contend that corn-based lactates are not more than minimally processed.  The issue USDA was asked to consider was simply whether lactates derived from corn is a "chemical preservative," the first-prong of the USDA policy.  Nevertheless, USDA has determined to include the issue in its coming rulemaking, and we present here a summary of the biology involved.

---

10/    Lactic acid is a naturally-occurring organic acid.  Milkowski Decl., Ex. 1, ¶ 22.  Other naturally-occurring organic acids include citric acid (which exists in a large variety of fruits and vegetables), acetic acid (vinegar), and ascorbic acid (Vitamin C).  *Id.*

11/    Sodium and potassium lactate are the sodium and potassium salts of lactic acid.  Milkowski Decl., Ex. 1, ¶ 22.

- 37 -

USDA reasonably determined that corn-derived lactates are not more than "minimally processed." The phrase is undoubtedly imprecise – that is why its interpretation and application should be left to the agency in the first instance, and it is why FSIS has always applied it on a case-by-case basis. 12/ Lactates are not more than minimally processed under USDA policy and practice. Producing lactate primarily involves the fermentation of corn sugar. *See* Zoetemeyer Decl. ¶ 4. Fermentation is a traditional process used to make food edible or safe that is specifically listed by USDA in its natural policy as an example of minimal processing. *See* AR 10. Fermentation of corn sugar yields lactic acid – a scientific term, like acetic acid (vinegar) and sodium chloride (salt), but no less natural a substance. *See* Zoetemeyer Decl., Ex. 2, ¶ 4. The lactic acid is then purified and concentrated by physical processing steps, such as evaporation. 13/ Zoetemeyer Decl., Ex. 2, ¶ 4. The purified lactic acid is then neutralized with sodium hydroxide to form sodium lactate or, with potassium hydroxide, to form potassium lactate. 14/ *Id.* ¶ 5. The addition of food grade hydroxides and other alkali ingredients is a

---

12/      In fact, in the 2006 Notice, USDA questioned whether it was still reasonable to include a minimal processing requirement in the definition of natural, considering the types of food processing methods commonplace today compared versus when the policy was established in 1982. AR 643.

13/      Intervenors take issue with Hormel's description (Pl.'s Memo. at 11-12) and flow chart of the lactate production process (AR 314), which is unnecessarily complicated and misleading because it includes every technique of purification and concentration used in the industry and implies that all of these techniques are used together. Zoetemeyer Decl., Ex. 2, ¶ 7. For example, PURAC uses no esterification, hydrolysis, or crystallization techniques in manufacturing its lactate products for food applications. *Id.* ¶ 4.

14/      Again, Intervenors take issue with Hormel's characterization of lactates and the use of sodium hydroxide. *See* Pl.'s Memo. at 12. Sodium and potassium hydroxide are scientific terms, but perfectly natural substances. *See* Zoetemeyer Decl., Ex. 2, ¶ 6. In their food grade form – the form used to make lactates – sodium and potassium hydroxides are used to cure many

- 38 -

common neutralization step in the manufacturing of food ingredients, particularly those to be used in meat and poultry products, where ingredients with neutral pH are necessary. *Id.* ¶ 5. Importantly, the lactate derived through fermentation from its corn source is not chemically changed during the purification, concentration, and neutralization processes. *Id.*

As noted above, the primary steps in the production of natural lactates involve fermentation, physical separation and isolation steps, and other standard processes that are common in the food manufacturing industry for a variety of food and food ingredients. Such processes are widely accepted as "natural" by USDA. For example:

- Common food grade salt undergoes significant purification to remove other mineral impurities. This can involve chemical treatment to facilitate precipitation of minerals such as calcium, magnesium, and others. In addition, anti-caking agents commonly are added, and common food grade salt is concentrated from its diluted natural source. Milkowski Decl., Ex. 1, ¶ 16.

- Sugar is refined from sugar cane and sugar beets. They are crushed to release a sucrose-rich liquor that is refined through further processing. The crude liquor has large amounts of impurities including cellulosic fiber and soil particles. The crude liquor can be treated with lime and phosphoric acid to remove impurities before evaporation by boiling and/or with vacuum evaporation to ultimately crystallize and concentrate the sugar. Decolorization methods use granular activated carbon, powdered activated carbon, ion exchange resins, and other materials. *Id.* ¶ 17.

- Vinegar is made from the oxidation of ethanol into acetic acid. The ethanol source can be wine, cider, beer, fermented fruit juice, or nearly any other liquid containing alcohol. Commercial vinegar is produced by fermentation using specific organisms, specifically yeast and *Acetobactor*, to first generate alcohol from a sugar source (*e.g*., a grain, such as corn) and then to convert the alcohol into acetic acid. *Id.* ¶ 18.

- Spices are derived from plant materials through various levels of processing and refining from their original source. Many essential oils, used for taste and aroma purposes in foods, are separated from their parent plant material by distillation or mechanical pressing and are concentrated from their dilute natural source. Rosemary spice extracts,

---

types of food, including green table olives, hominy, and pretzels. *Id.* Hormel misleadingly references the <u>industrial</u> grade of sodium hydroxide found in drain openers when stating that sodium hydroxide is used in lactates.

for example, are produced by taking the residue after the essential oils have been distilled or expressed away and extracting it with alcohol and water mixtures. The extracts are then carbon treated and precipitated to produce materials with high antioxidant activity and only some flavor. *Id.* ¶ 19.

- Water is collected from surface water sources or pumped from aquifers and filtered and treated to remove undesirable contaminants through the use of ion exchange resins, activated carbon, and ultra filtration. Water also is commonly treated with chlorine or UV light to kill any residual bacteria and fluoridated for public health benefits. *Id.* ¶ 20.

In reality, there are many ingredients that undergo numerous and substantial processes to transform them from their native state to final forms as ingredients suitable for use in natural products. Just what constitutes "natural" encompasses a broad range of issues and complexities. As reflected in the 2006 Notice, USDA sought feedback on the implications and conflicts that exist with regard to using in the "natural" context current and new food processing methods such as chlorine in poultry chillers, steam pasteurization of carcasses, modified atmospheric packaging, and high pressure processing (HPP). AR 644.

Indeed, HPP bears specific mention, since it is the process Hormel uses in its "natural" meat and poultry products. Considered by USDA to be no more than minimal processing and thus to be a permitted preservative technique permitted in natural foods, HPP achieves its preservative effect by subjecting food to pressures of 80,000 to 100,000 pounds per square inch – approximately 6,000 atmospheres or 10 times the pressure found at the greatest depths of the ocean – resulting in microbial inactivation. Agricultural Marketing Service, USDA, *Nonthermal Food Processing Is Heating Up*, http://www.ars.usda.gov/is/AR/archive/oct06/food1006.pdf (last viewed Apr. 16, 2008); Milkowski Decl., Ex. 1, ¶ 21. In the HPP approach, products containing no air spaces are packaged in flexible containers, placed into a high pressure chamber filled with a type of hydraulic fluid (normally water), and pressurized for several minutes. *See* Ohio State University Extension Fact Sheet, Food Science and Technology, *High Pressure*

- 40 -

*Processing*, http://ohioline.osu.edu/fse-fact/0001.html (last viewed Apr. 16, 2008); Milkowski Decl., Ex. 1, ¶ 21. The uniform pressure exerted through the hydraulic fluid allows the product to maintain its form and sensory and nutritional qualities while microbes are inactivated. Milkowski Decl., Ex. 1, ¶ 21. If a food subjected to pressures almost unheard of in nature is "not more than minimally processed," neither are lactates.

Finally, Hormel contends that lactates are not natural because they are highly purified and concentrated and, thus, present in foods in a form not found in nature. Pl.'s Memo. at 11. There is no basis in the statute or regulations for this quaint but off-base contention. Importantly, there also are no limitations in USDA's natural policy on the purification and concentration of ingredients, provided these processes do not involve more than minimal processing. In fact, nearly every functional ingredient added to food is purified and concentrated from its natural state – that is so of spices, flavors, cultures, enzymes, emulsifiers, formulations aids, sweeteners, stabilizers, processing aids, thickeners, and vitamins and minerals. Milkowski Decl., Ex. 1, ¶ 15. The purification process removes contaminants and other unwanted constituents and is critical for ensuring the safety of ingredients, while the concentration process allows the ingredients to be present in a useable, functional form. *Id.*

In sum, lactates are not "chemical" (artificial or synthetic) preservatives, they are no more than minimally processed, and FSIS has found that they are not used as preservatives under its shelf-life standard. It is therefore perfectly lawful and reasonable for FSIS to adhere to its settled practice of approving "natural" labels for products containing lactates, a practice that is perfectly consistent with the FMIA and PPIA.

- 41 -

## CONCLUSION

With respect, Intervenors submit that this Court should reject Hormel's invitation to make the factual determinations and policy choices it urges. Instead, the Court should leave the task to the agency and conduct its review if a petition is filed after the agency has acted. For the foregoing reasons, Intervenors ask that this Court deny Hormel's Cross Motion for Summary Judgment in its entirety. 15/

Dated: April 25, 2008                              Respectfully submitted,


    /s/  Kirsten Friedel Roddy
Jonathan L. Abram, D.C. Bar No. 389896
    Jlabram@hhlaw.com
Kirsten Friedel Roddy, D.C. Bar No. 467805
    kfroddy@hhlaw.com
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C.  20004–1109
Telephone: (202) 637–5600
Facsimile:  (202) 637–5910

*Attorneys for Putative Defendant-Intervenors:  Farmland Foods, Inc., Kraft Foods Global, Inc., PURAC America, Inc., Sara Lee Corporation, Smithfield Foods, Inc., and Tyson Foods, Inc.*

---

15/      Intervenors also support the Court's dismissal of this action and/or the grant of summary judgment to USDA pursuant to USDA's Motion to Dismiss the Complaint or, in the Alternative, for Summary Judgment.

\\\DC - 028652/000002 - 2717522 v1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HORMEL FOODS CORPORATION, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UNITED STATES DEPARTMENT | ) |
| OF AGRICULTURE, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| FARMLAND FOODS, INC., | ) |
| KRAFT FOODS GLOBAL, INC., | ) |
| PURAC AMERICA, INC., SARA LEE | ) |
| CORPORATION, SMITHFIELD FOODS, | ) |
| INC., AND TYSON FOODS, INC., | ) |
| | ) |
| | ) |
| Putative Defendant-Intervenors. | ) |

Civil Action No.
1:07-CV-01724-RBW

**INTERVENORS' STATEMENT OF DISPUTED MATERIAL FACTS**

Pursuant to Local Rule 7(h), Intervenors Farmland Foods, Inc., Kraft Foods Global,

Inc., PURAC America, Inc., Sara Lee Corporation, Smithfield Foods, Inc., and Tyson

Foods, Inc. submit this Statement of Disputed Material Facts in support of their Opposition

to Plaintiff's Cross Motion for Summary Judgment.  In accordance with Local Rule 7(h),

this Statement of Disputed Material Facts responds to each paragraph of Plaintiff's

Statement of Material Facts as to Which There is No Genuine Issue in Support of

- 1 -

Plaintiff's Motion for Summary Judgment stating whether the statement(s) made are disputed and, if so, on what grounds.

1.       USDA issued Policy Memorandum 055 in 1982.  It prohibits, <u>inter alia,</u> the use of "chemical preservatives (as defined in 21 C.F.R. 101.22)" in products carrying the "natural" label, as well as products and ingredients that are "more than minimally processed."  AR 2-3.

> **RESPONSE:**  Intervenors dispute this statement as it mischaracterizes what the 1982 Policy Memorandum says.  The 1982 Policy Memorandum describes the circumstances in which use of the word "natural" on labels for meat and poultry products is permissible:  if (1) "The product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 C.F.R. § 101.22), or any other artificial or synthetic ingredient"; and (2) "The product and its ingredients are not more than minimally processed."  AR 2-3.

2.       In the definition of "natural," the term "chemical preservative" was defined by reference to the Food and Drug Administration ("FDA") regulation 21 C.F.R. § 101.22, which provides that the term includes:

> any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties.
> **RESPONSE:**  Undisputed.

\\\DC - 028652/000002 - 2717522 v1

3.      In the definition of "natural," the term "minimal processing" was defined as:

(a) those traditional processes used to make food edible or preserve it or make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting; or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

AR 2.

> **RESPONSE:** Intervenors dispute this statement as it mischaracterizes what the 1982
>
> Policy Memorandum says. The 1982 Policy Memorandum does not define the term
>
> "minimal processing" as Plaintiff's state; the 1982 Policy Memorandum instead states:
>
> > [M]inimal processing <u>may include</u>: (a) those traditional processes used to make food edible or preserve it or make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes that do not fundamentally alter the raw product and/or which only separate or a whole intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices. Relatively severe processes, such as solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing."

AR 2 (emphasis added).

4.      USDA issued an update of the Policy Memorandum in May 2003. This

update deleted two sections of the original 1982 policy entitled "Issue" and "Rationale" but

otherwise left the terms of the policy unchanged. AR 4.

> **RESPONSE:** Undisputed.

5.      The antimicrobial properties of lactates when used in meat and poultry

products are well known, as is their ability to inhibit the growth of meat spoilage bacteria.

Both preservative effects, even at low levels, have been well-known for years and are

reflected in numerous documents provided to USDA and included in the Administrative

Record, including U.S. Patents 4,798,729, 4,888,729 and 5,017,391 which provide that

- 3 -

sodium and potassium lactate have antimicrobials effects at levels from 1% to 7% of

product formulation.  AR 127, 128, 142, 148, 151.  The Administrative Record also includes

a submission by Kraft Foods, which demonstrated that lactates have preservatives effects,

even at levels below 2%, and that this is an inherent characteristic that cannot be separated

from the flavoring effect.  AR 806.

> **RESPONSE:**  Intervenors dispute this statement because it implies that lactates, at
>
> any level, will inhibit the growth of meat spoilage bacteria.  Growth inhibition of
>
> meat spoilage bacteria is determined by a variety of factors, including presence of
>
> spoilage organisms, the type of meat/poultry product, moisture content, fat content,
>
> salt content, processing methods, and sanitation.  *See* AR 813.  Further, the
>
> submission by Kraft cited by Hormel, states only that "the <u>antimicrobial</u> and
>
> flavoring functions of lactates are inherent properties of the ingredients and cannot
>
> be readily separated.  There is no threshold, 2% or any other number, under which
>
> the <u>antimicrobial</u> properties of lactate ingredients vanish and over which
>
> antimicrobial efficacy suddenly appears." AR 807 (emphasis added).  There is no
>
> reference in this statement to the inhibition of meat spoilage bacteria.  AR 807.

6.    The Administrative Record also contains multiple peer reviewed scientific

articles in the administrative record.  These studies consistently report and validate the

chemical preservative effect of sodium and potassium lactate at levels below 2%.  For

example, the studies establish that:

- Sodium lactate at concentrations between 1% and 2% has an inhibitory influence on the growth of both meat spoilage bacteria and pathogens such as Salmonella, Listeria monocytogenes, clostridium botulinum and Escherichia coli. Cegielska-Radziejewska, R. and Pikul, J., Sodium Lactate Addition on the Quality and Shelf Life of Refrigerated Sliced Poultry Sausage Packaged in Air or Nitrogen Atmosphere, Journal of Food Protection, 67(3), 601-06 (2004); Shelef, L.A. and

- 4 -

Yang, Q., Growth Suppression of Listeria Monocytogenes by Lactates in Broth, Chicken and Beef, Journal of Food Protection 54(4), 283 – 87 (1991). AR 211 – 215, 258 – 262.

- Sodium lactate was the most effective compound for the "sustained" control over all the bacteria that had been tested. Stillmunkes, A.A. et al., Microbiological Safety of Cooked Beef Roasts Treated with Lactate, Monolaurin or Gluconate, Journal of Food Science 58(5), 953-58 (1993); AR 220 – 225.

- Sodium lactate at concentrations between 1% and 2% extends shelf life of products significantly; Papadopoulis, L.S. et al., Consumer and trained Sensory Comparison of Cooked Beef Top Rounds Treated with Sodium lactate, Journal of Food Science 56 (5), 1141-46, 1153 (1991)("shelf life of ham was doubled by addition of 2% sodium lactate") AR 000200 - 000206; Shelef, L.A. and Yang, Q., Supra; Meyer, J.D., Cerveny, J.G. and Luchansky, J.B., Inhibition of nonproteolytic, psychotropic Clostridia and anaerobic sporeformers by sodium diacetate and sodium lactate in cook-in-bag turkey breast, Journal of Food Protection 66(8), 1474-78 (2003).

Minerich Dec. ¶ 3.

**RESPONSE:** Intervenors dispute these statements. First, these studies do not show any "chemical" preservative effect of sodium and potassium lactate as "chemical" is defined by FSIS's "natural" policy. AR 2-3; AR 9-12 (FSIS policy permitting "natural" labels when meat and poultry products do not contain "chemical preservatives" or "any other artificial or synthetic ingredient"(emphasis added); "[a]ll products claiming to be natural or a natural food should be accompanied by a brief statement which explains what is meant by the term natural, *i.e.*, that the product is a natural food because it contains no artificial ingredients and is only minimally processed." (emphasis added). As set forth fully *infra* in Response to Paragraph 20, under FSIS's "natural" policy, lactates are natural ingredients, not "chemicals." *See* Zoetemeyer Decl., Ex. 2 to Intervenors' Opp'n to Summ. J., ¶¶ 4, 8; Milkowski Decl., Ex. 1 to Intervenors' Opp'n to Summ. J., ¶ 22.

- 5 -

Second, under FSIS's measure of preservative effect, the studies do not validate preservative effect of sodium and potassium lactate at levels below 2%. FSIS currently uses shelf-life and expiration date comparisons to determine whether an ingredient is being used as a preservative. *See* AR 760-776 (In order to verify that an ingredient was not being used as a preservative, FSIS requested from manufacturers' data "showing that the same shelf-life and product dating parameters [*i.e.*, "use-by" dates] apply to products in which lactates have been used as compared to products in which they have not been used."); Derfler Decl., Ex. to Def.'s Mot. for Summ. J., ¶ 29; *see also id.* ¶ 33 (FSIS is approving new labels if the manufacturer submits data showing that lactates in the products do not extend shelf life or expiration date). The studies cited do not establish that lactates extend shelf life or expiration dates of the meat and poultry products tested at levels below 2%. *See* Milkowski Decl. ¶¶ 23-29.

7.    The antimicrobial and flavoring effects are inherent properties of sodium and potassium lactate and cannot be readily separated. There is no threshold, either at 2% or any other number, under which the antimicrobial properties of lactate chemicals vanish and over which antimicrobial efficacy suddenly appears. AR 807.

**RESPONSE:** Intervenors dispute the characterization of lactates as "chemicals." Lactates are natural ingredients, not "chemicals" as defined by FSIS policy, *i.e.*, they are not synthetic or artificial. AR 9-12 (FSIS policy permitting "natural" labels when meat and poultry products do not contain "chemical preservatives" or "any other artificial or synthetic ingredient"(emphasis added); "[a]ll products claiming to be natural or a natural food should be accompanied by a brief statement which explains what is meant by the term natural, i.e., that the product is a natural food because it

- 6 -

contains <u>no artificial ingredients</u> and is only minimally processed." *Id.* (emphasis

added)).  The lactates at issue are not synthetic or artificial; they are made from corn;

corn sugar is fermented by bacteria to obtain lactic acid – a naturally-occurring organic

acid; and lactic acid is purified, concentrated, and neutralized to form lactates.

Zoetemeyer Decl. ¶ 4; Milkowski Decl. ¶ 22.  The lactate derived through this process

is L-lactate, the form of lactate naturally present in foods and the human body, where it

is produced in active muscle tissues as a result of the metabolism of glucose.

Zoetemeyer Decl. ¶ 8; *see also* Milkowski Decl. ¶ 22.

    8.    In August 2005, without providing prior notice or an opportunity for comment,

USDA substantively amended the definition of "natural" to include the following note:

> Note: Sugar, sodium lactate (from a corn source), natural flavorings from
> oleoresins or extractives are acceptable for "all natural" claims.

AR 8.  The text of the Note permitted the inclusion of sodium lactate in products sold under a

"natural" label without imposing any limit on the percentage of lactate that could be included.  *Id.*

    **RESPONSE:**  Intervenors dispute the first sentence of this paragraph.  USDA did not

substantively amend the definition of "natural" in its August 2005 Policy Memorandum;

FSIS memorialized its prior interpretation of the 1982 policy to permit natural labels on

products with corn-based lactate ingredients consistent with the existing "natural"

policy.  AR 7-8; AR 643 (stating that FSIS modified its "natural" guidance in 2005 "to

make it consistent with prevailing policies, to reflect case-by-case decisions made by the

Agency, and to update references to regulations"); Derfler Decl. ¶ 19.

    9.    On October 9, 2006, Hormel filed a petition with USDA arguing that the August

2005 change to Policy Memorandum 055 rendered it internally inconsistent and misleading.

- 7 -

Hormel requested that USDA conduct a rulemaking proceeding to define "natural." Hormel further requested that USDA immediately rescind the August 2005 amendment including the Note that exempted sodium lactate from the scope of the definition. AR 14 – 33. The petition included marketing literature, three Oscar Mayer patents and model results for a proprietary "Opti-Form" sodium lactate solution used for preservative effects. AR 35-53.

> **RESPONSE:** Intervenors do not dispute these statements except that the "Opti-Form" model results referenced in Hormel's statement only reflect the growth of pathogen *Listeria monocytogenes* for a product using 2% lactate. AR 39.

10.    On October 10, 2006, Hormel filed with USDA a second request for relief. The second request sought rescission of label approvals of the three Oscar Mayer products containing potassium lactate that had appeared in the market during the month of September 2006. AR 55–58. The petition cited the presence of potassium lactate as a chemical preservative in the products as per se evidence that the "natural" label was false and misleading. *Id.*

> **RESPONSE:** Undisputed.

11.    On November 7, Hormel's counsel provided a supplemental analysis in support of the October 10, 2006 request for label rescission. This analysis noted that to the extent USDA interpreted its 2005 revised "natural" policy as authorizing the use of potassium lactate (from a corn source) as a chemical preservative exempt from label disclosure in natural products, it had exceeded its authority under the FMIA, the PPIA, and the Administrative Procedure Act by changing a 23-year old labeling policy and standard without notice and comment rulemaking. AR 126–140. This supplemental analysis requested elimination of the "note" from the 2005 Policy and rescission of the illegally approved labels as false and misleading. *Id.*

- 8 -

**RESPONSE**: Undisputed.

12.    On December 6, 2007, Dr. Richard Raymond, USDA Under Secretary for Food

Safety, responded to Hormel's request for label rescissions.  AR 160-61.  Dr. Raymond stated

that:

> lactates are multi-function ingredients, and [the potassium lactate] labels were approved
> based on representations concerning the source and level of the lactate used, and
> information provided by the applicants indicating that the lactate was being used
> exclusively as a flavoring agent. . . if, in fact the lactates are being used to control or
> reduce microorganisms and extend the shelf-life of the treated product, FSIS would not
> permit the use of the term "natural" on the product label under the current labeling policy
> guidelines.
>
> FSIS has … written to the companies with approved meat and poultry product labels
> bearing the "natural" claim and containing lactates at levels of 2 percent or less. These
> companies were advised to provide FSIS with information demonstrating that the use of
> lactates in these products does not provide a preservative effect. In the absence of such
> information, FSIS will institute action to rescind its approval of labels that bear a
> "natural" claim.

*Id.*

**RESPONSE:**  Undisputed.

13.    On December 5, 2006, USDA published in the Federal Register a notice of the

receipt of the Hormel petition for rulemaking and requested public comment.  71 Fed. Reg.

70,503; AR 642 – 644.  In that notice, USDA stated that it was removing the reference to

sodium lactate from the 2005 modification. USDA further stated that:

> As the agency moves through the stages of rulemaking on "natural," "natural" claims for
> foods in which sodium lactate is used will continue to be considered by FSIS on a case-
> by-case basis, in light of factors such as the level used, the claimed technical effect of
> the sodium lactate, and the actual effect that it is having on the product.

AR 643.

**RESPONSE:**  Undisputed.

14.    On November 20, December 1, and December 5, 2006, USDA sent letters to

- 9 -

twenty-four companies that held "natural" labels for lactate-containing products that. AR 611–40; Derfler Decl. ¶ 27. All of the companies were required to submit data showing that for each of the products involved, the lactate ingredients are having only a flavoring effect and are not functioning as a preservative in the product. AR 612, 614, 616 and even numbered pages through 000640. The letters further stated that "a preservative function includes those of an antimicrobial, i.e., reducing microorganisms and extending shelf-life of treated products." AR 611, 613, 615 and odd numbered pages through 639.

> **RESPONSE:** Intervenors do not dispute the substance of the letters Hormel cites in this paragraph, but do dispute Hormel's characterization of USDA's data request. Hormel cites only to the first letter sent to manufacturers, *see* AR 611-40; however, USDA later sent a <u>clarifying</u> letter on January 11-12, 2007, to these same manufacturers, which stated that data "showing that the same shelf-life and product dating parameters apply to products in which lactates have been used as compared to products in which they have not been used" would be sufficient to show that the presence of lactates do not have a preservative effect on the product. AR 760-76. Further, the Administrative Record reflects that USDA sent its first letter to only 15 manufacturers and its second letter to only 15 manufacturers. *See* AR 611-40; 760-76.

15.     Twenty of these companies did not submit data in response to USDA's letter. Derfler Dec. ¶ 30.

> **RESPONSE:** Intervenors dispute this statement as the Administrative Record reflects that five companies submitted data in response to USDA's letter. AR 792-93, 795-805, 820-28, 847-48, 863-69; *see also* Milkowski Decl. ¶¶ 4-12.

16.     Four companies did submit data, but none of this data met the test specified by

USDA in the letters of demonstrating that the lactates were not having a preservative effect in

these specific products at a formulation level below 2%.  AR 847-848, 795-805; 806–828;

863-869.

> **RESPONSE:**  Intervenors dispute the statements made in this paragraph.  The
>
> Administrative Record reflects that five companies submitted data in response to
>
> USDA's letter.  AR 792-93, 795-805, 820-28, 847-48, 863-69; *see also* Milkowski Decl.
>
> ¶¶ 4-12.  As stated previously, Hormel mischaracterizes USDA's data request; USDA
>
> requested data "showing that the same shelf-life and product dating parameters apply to
>
> products in which lactates have been used as compared to products in which they have
>
> not been used."  AR 760-76.  The manufacturers' responses satisfied this request.
>
> Derfler Decl. ¶ 32 (stating that the data received satisfied FSIS's request; s*ee also*
>
> Milkowski Decl. ¶¶ 4-13).

17.     On July 31, 2007 in a letter from Under Secretary Raymond to Chairman

Peterson of the House Agriculture Committee, USDA announced that it had denied Hormel's

request for rescissions of false and misleading labels approved under the now-rescinded global

exemption to the Policy Memorandum 055 for sodium lactate containing products.  The letter

stated that:

> The comments submitted to the Agency expressed widely divergent and sometimes
> conflicting views on what the claim, "natural," as applied to meat and poultry products,
> should mean. Given that fact, FSIS is considering how best to proceed to ensure that the
> term "natural," as used in meat and poultry labeling, is truthful and not misleading.
> While one way to try to achieve this result would be to pursue the actions we described
> in the process that the Agency began with the December 5, 2006 notice, we now believe
> that a more efficient way would be to pursue the process that the Agency began with the
> December 5, 2006, notice.

AR 779-780.  USDA thereby abandoned its decision to re-evaluate the product labels approved

under the 2005 Policy 055 revision authorizing lactates for use in "natural" products on a case-

by-case basis altogether and instead created a de facto rule of general applicability – every label

approved under the illegal policy change could continue on the market indefinitely.  *Id.*

> **RESPONSE:**  Intervenors dispute that USDA announced it had denied Hormel's request
>
> for rescissions or abandoned its decision to re-evaluate the approved product labels in the
>
> July 31, 2007 letter.  AR 779-80.  As the July 31, 2007 letter states, USDA decided to
>
> withhold any decision on the rescission of approved labels pending the outcome of
>
> rulemaking.  *Id.*  Intervenors further dispute that the 2005 policy included an
>
> "exemption" for sodium lactate-containing products.  As stated previously, in the 2005
>
> policy, FSIS memorialized its prior interpretation of the 1982 policy to permit natural
>
> labels on products with a corn-based lactate ingredients consistent with the existing
>
> "natural" policy.  AR 7-8; AR 643 (stating that FSIS modified its "natural" guidance in
>
> 2005 "to make it consistent with prevailing policies, to reflect case-by-case decisions
>
> made by the Agency, and to update references to regulations"); Derfler Decl. ¶ 19.

18.      In the July 31, 2007 letter, in denying Hormel relief, USDA stated that it had

based its decision on the ground that "we now believe that a more efficient way [to ensure that

the term "natural" is used in a truthful and not misleading manner] would be to pursue the

process that the Agency began with the Dec. 5, 2006 notice."  AR 779-780.  In that letter, in

announcing its decision, USDA did not cite any scientific evidence.  *Id.*

> **RESPONSE:**  As stated previously, USDA withheld any decision on the rescission of
>
> approved labels pending the outcome of rulemaking.  AR 779-80.  Further, while
>
> USDA did not cite any specific scientific evidence in this letter, it did cite the divergent

and conflicting comments it had received:  "The comments submitted to the Agency

expressed widely divergent and sometimes conflicting views on what the claim

'natural,' as applied to meat and poultry products, should mean."  AR 779-80.  The

Administrative Record reflects that some of those comments contained scientific

evidence supporting the positions made.  AR 875-1998; *see, e.g.,* AR 1657-88

(Comment from PURAC); AR 1770-1806 (Comment from Kraft).

19.     In reaching this conclusion, USDA did not conduct a product-by-product review

of whether sodium or potassium lactate had a preservative effect in lactate-containing products

held by the 20 companies that did not submit data in response to the USDA letters.  AR 779-780.

**RESPONSE:**  As stated previously, five companies submitted data in response to

USDA's data request.  AR 792-93, 795-805, 820-28, 847-48, 863-69; *see also*

Milkowski Decl. ¶¶ 4-12.  Given these studies, and its own expertise, USDA made a

science-based judgment that the nature of the data and each of the products subject to its

review suggested the absence of a preservative effect as measured by shelf-life and

expiration dates.  Derfler Decl. ¶ 32; *see also* Milkowski Decl. ¶¶ 4-14.

20.     Both sodium lactate and potassium lactate are chemicals that have a

preservative effect in meat and poultry products.  65 Fed. Reg. 3,121 (Jan. 20, 2000).

**RESPONSE:**  Intervenors dispute this statement.  Lactates are natural ingredients,

not "chemicals" as defined by FSIS policy, *i.e.*, they are not synthetic or artificial.

AR 9-12 (FSIS policy permitting "natural" labels when meat and poultry products do

not contain "chemical preservatives" or "any <u>other artificial or synthetic</u>

<u>ingredient</u>"(emphasis added); "[a]ll products claiming to be natural or a natural food

should be accompanied by a brief statement which explains what is meant by the

- 13 -

term natural, i.e., that the product is a natural food because it contains <u>no artificial ingredients</u> and is only minimally processed." *Id.* (emphasis added)). The lactates at issue are not synthetic or artificial; they are made from corn; corn sugar is fermented by bacteria to obtain lactic acid – a naturally-occurring organic acid; and lactic acid is purified, concentrated, and neutralized to form lactates. Zoetemeyer Decl. ¶ 4; Milkowski Decl. ¶ 22. The lactate derived through this process is L-lactate, the form of lactate naturally present in foods and the human body, where it is produced in active muscle tissues as a result of the metabolism of glucose. Zoetemeyer Decl. ¶ 8; *see also* Milkowski Decl. ¶ 22. Further, USDA reasonably found, based on the shelf-life studies it reviewed, that corn-based lactates were not being used as preservatives under its shelf life standard. Derfler Decl. ¶ 32; AR 792-93, 795-805, 820-28, 847-48, 863-69; Milkowski Decl. ¶¶ 4-13. Hormel cites 65 Fed. Reg. 3,121; however, this policy states that sodium and potassium lactate can be used as antimicrobials in meat and poultry products and does not address shelf life or expiration dates.

21.     Neither sodium lactate nor potassium lactate is common salt, sugar, vinegar, spice, or oil extracted from a spice. Herreid Dec. ¶ 8-9.

**RESPONSE:** Undisputed.

22.     Neither sodium lactate nor potassium lactate is a substance added to meat and meat food products by exposure to wood smoke. Herreid Dec. ¶ 8-9.

**RESPONSE:** Undisputed.

23.     Neither sodium lactate nor potassium lactate is a naturally occurring substance in the form in which they are added to food products. Both lactates can occur in nature but not

- 14 -

in the purified, concentrated form sold commercially as food ingredients.  The lactates added to food products are manufactured made through a process involving substantial industrial chemistry.  Herreid Dec. ¶ 8-9.

> **RESPONSE:**  Intervenors dispute these statements.  First, lactates are natural ingredients as set forth in response to paragraph 20.  *See* Zoetemeyer Decl. ¶¶ 4-6, 8 (stating that the lactates at issue are made from corn; corn sugar is fermented by bacteria to obtain lactic acid – a naturally-occurring organic acid; lactic acid is purified, concentrated, and neutralized to form lactates; the lactate derived through this process is L-lactate, the form of lactate naturally present in foods and the human body, where it is produced in active muscle tissues as a result of the metabolism of glucose).
>
> Second, lactates are not made through a process involving substantial industrial chemistry.  Producing lactates primarily involves the fermentation of corn sugar. Zoetemeyer Decl. ¶ 4.  Fermentation is a traditional process used to make food edible or safe that is specifically listed by USDA in its "natural" policy as an example of minimal processing.  AR 9-10.  Fermentation of corn sugar yields lactic acid, and the lactic acid is then purified and concentrated by physical processing steps, such as evaporation. Zoetemyer Decl. ¶ 4  The purified lactic acid is then neutralized with sodium hydroxide to form sodium lactate or with potassium hydroxide to form potassium lactate.  *Id.* ¶ 5. The addition of food grade hydroxides and other alkali ingredients is a common neutralization step in the manufacturing of food ingredients, particularly those to be used in meat and poultry products, where ingredients with neutral pH are necessary.  *Id.* ¶¶ 5-6.  Importantly, the lactate derived through fermentation from its corn source is not chemically changed during the purification, concentration, and neutralization process.  *Id.*

- 15 -

¶ 5.  Further, nearly every functional ingredient added to food is purified and concentrated from its natural state, and there are no limitations in USDA's "natural" policy on the purification and concentration of ingredients, provided these processes do not involve more than minimal processing.  *See* Milkowski Decl. ¶ 15.  The purification process removes contaminants and other unwanted constituents and is critical for ensuring the safety of ingredients, while the concentration process allows the ingredient to be presented in a useable, functional form.  *Id.*  In sum, the primary steps in the production of natural lactates involve fermentation, physical separation and isolation steps, and other standard processes that are common in the food manufacturing industry for a variety of food and food ingredients that are widely accepted as "natural" by USDA.  *See* Zoetemeyer Decl. ¶¶ 4-7; *see also* Milkowski Decl. ¶¶ 16-20.

24.  The biomass of lactates that is fermented from a corn source is processed through several substantial chemical processes before being transformed into the purified and concentrated form of sodium lactate or potassium lactate that is added to foods.  *Id.*

**RESPONSE:**  Intervenors dispute that lactates fermented from a corn source are processed through "several substantial chemical processes" for the reasons stated previously in response to Paragraph 23.  In sum, fermentation of corn sugar yields lactic acid, and the lactic acid is then purified and concentrated by physical processing steps, such as evaporation.  Zoetemeyer Decl. ¶ 4.  The purified lactic acid is then neutralized with sodium hydroxide to form sodium lactate or with potassium hydroxide to form potassium lactate.  *Id.* ¶ 5.  The addition of food grade hydroxides and other alkali ingredients is a common neutralization step in the manufacturing of food ingredients, particularly those to be used in meat and poultry products, where ingredients with neutral

- 16 -

pH are necessary. *Id.* ¶¶ 5-6. Sodium hydroxide and potassium hydroxide are natural substances. *Id.* ¶ 6. In their food grade form – the form used in lactates – these hydroxides are used to cure many types of food, including green table olives, hominy, and pretzels. *Id.*

Further, Hormel cites to the Herreid Decl. ¶ 8-9, which in turn cites AR 314. AR 314 is a flow chart purportedly depicting the manufacturing process for lactic acid, sodium lactate, and potassium lactate. Zoetemeyer Decl. ¶ 7. This chart mischaracterizes the manufacturing process for these ingredients because it lists a variety of purification processes, such as evaporation, esterification, column separation, and hydrolysis that are not necessarily used by any single manufacturer or in this combination in the making of these products. *Id.* For example, no esterification, hydrolysis, or crystallization techniques are used in PURAC's manufacturing process for lactate products for food applications. *Id.* ¶ 4.

Dated: April 25, 2008

Respectfully submitted,

   /s/  Kirsten Friedel Roddy

Jonathan L. Abram, D.C. Bar No. 389896
   Jlabram@hhlaw.com
Kirsten Friedel Roddy, D.C. Bar No. 467805
   kfroddy@hhlaw.com
HOGAN & HARTSON L.L.P.
555 Thirteenth Street, N.W.
Washington, D.C. 20004–1109
Telephone: (202) 637–5600
Facsimile: (202) 637–5910

*Attorneys for Putative Defendant-Intervenors: Farmland Foods, Inc., Kraft Foods Global, Inc., PURAC America, Inc., Sara Lee Corporation, Smithfield Foods, Inc., and Tyson Foods, Inc.*

- 17 -

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 25, 2008 I filed the foregoing with the Clerk of Court via the Electronic Case Filing System (ECF). As a result, a true and correct copy of the foregoing was served on all counsel authorized to receive Notices of Electronic Filing generated by CM/ECF.

<u>/s/ Kirsten Friedel Roddy</u>

1

\\\DC - 028652/000002 - 2717522 v1

**EXHIBIT 1**

**MILKOWSKI DECLARATION**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HORMEL FOODS CORPORATION, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | 1:07-CV-01724-RBW |
| UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| FARMLAND FOODS, INC., | ) | |
| KRAFT FOODS GLOBAL, INC., | ) | |
| PURAC AMERICA, INC., SARA LEE | ) | |
| CORPORATION, SMITHFIELD FOODS, | ) | |
| INC., AND SARA LEE FOODS, INC. | ) | |
| | ) | |
| | ) | |
| Proposed Defendant-Intervenors. | ) | |

## DECLARATION OF ANDREW L. MILKOWSKI

I, Andrew L. Milkowski, declare and state the following:

1.     This declaration is made on personal knowledge based on information contained in the Administrative Record, publicly available information, and other factual matters known to me.

2.     I am currently an Adjunct Professor in the Muscle Biology Laboratory in the department of Animal Sciences at the University of Wisconsin, a position I have held since 2006.

3.     I received a B.S. degree in chemistry from the University of Illinois in Champaign-Urbana in 1972 and a Ph.D. in biochemistry from the University of

Wisconsin in Madison in 1976. I joined the Oscar Mayer Company in 1977 (which is

currently a division of Kraft Foods), where I served from 1980 -1990 as Group Leader for

Applied and Basic Research, from 1990-1998 as Section Manager for Applied Research,

and from 1998-2006 as a Kraft Foods Fellow. In these roles, I was involved in food

chemistry, ingredient technology, sensory evaluation, evaluation of product quality,

measurement of shelf life, nutrition labeling, and food safety. I am a co-inventor on 10

U.S. patents relating to food safety improvements from the use of lactate salts, methods

for preparing low and fat free meat products, and improvements in processing and meat

quality. I am a co-author of two peer-reviewed publications regarding the use of

ingredients, including lactates, to inhibit growth of *Listeria monocytogenes* in ready-to-

eat meat products. I am a member of the American Meat Science Association, the

Institute of Food Technologists, and the American Chemical Society. I also have been

active with the American Meat Institute, for which I have served as Chair of the Sodium

Nitrite Safety Issue Subcommittee of the Scientific Affairs Committee since 1998.

      4.      I have reviewed the five shelf life studies submitted to USDA by Plumrose

(AR 847-848), Kraft Foods (AR 820-828), Fresherized Foods (AR 795-805), Pederson

Natural Farms (AR 863-869), and Sugar Creek Packaging Co. (AR 792-793).

      5.      Strict compliance to AOAC test methods is not an indicator of the validity

of the shelf life studies I reviewed. The test methods outlined by AOAC do serve as

reference test methods, but these are commonly adapted to address specific test

conditions, test products, and outcomes as needed. Manufacturers employ a wide variety

of internal procedures to satisfy their specific process control and quality needs. In fact, a

skilled professional can do valid and often better work via a number of microbiological test methods outside of the AOAC methods.

6.      The Plumrose study evaluated the growth of microbes over an eight week period on similar products, one of which contained sodium lactate and one that did not. The data show that the products had similar growth patterns of microorganisms and neither product had distinguishable signs of microbial degradation, changes in appearance or changes in package integrity.  Based on these data, the company concluded that both products exhibit the same shelf life capabilities and expiration dates.

7.      The Plumrose study did not strictly follow the AOAC method for Petri-film analysis of aerobic plate counts because an incubation temperature of 30C was used instead of the 35C prescribed by the AOAC Official Method 990.12.  The change in incubation temperature likely is due to the company following an internal, validated modified AOAC method for assessing growth of spoilage organisms.  It is appropriate to conduct Petri-film studies at a temperature less than the 35C incubation temperature specified in the AOAC method because the optimal temperature for the growth of most meat spoilage organisms is 25-35C.  For example, three of the most common genera of spoilage bacteria for ready-to-eat meats and their corresponding optimal growth temperatures are: Lactobacillus (30-35C), Leuconostoc (20-30C), and Carnobacterium (30C). *Bergey's Manual of Determinative Bacteriology*.  Ninth Edition.  John G. Holt, Noel R. Krieg, Peter H. A. Sneath, James T. Staley and Stanley T. Williams.  pp 529, 565, 566.  Plumrose likely used its own an internal, validated modified AOAC method for assessing growth of yeast and mold, as well.  As a result, the Plumrose study properly

supports the conclusions drawn by the company that sodium lactate does not affect the microbial characteristics, shelf lives, or expiration dates of the products.

8.      Kraft Foods submitted data from an inoculation shelf life study and an open package study. In the Kraft inoculation shelf life study, bologna, hot dogs, ham, and turkey breast were inoculated with spoilage organisms and assessed for spoilage by measuring total plate count and sensory-related signs of spoilage (*i.e.,* appearance and odor). The conclusion drawn from the study is that "<u>only slightly</u> more growth in the treatment with no antimicrobial ingredients." AR 822 (emphasis added). The mention of only slight differences in growth between samples of products treated with sodium lactate-containing antimicrobial ingredients and those without any antimicrobial ingredients is accurate. For hot dogs and bologna, the difference between the antimicrobial and no antimicrobial treatments was within one log, which is considered in microbial testing to be the typical "noise" level, *i.e.,* an accepted variability in results that reflects no significant difference in measured values. In the case of turkey breast, the samples with no antimicrobial ingredients actually had less growth but were again within the one log accepted error. Although ham did show significantly more growth in the samples with no antimicrobial ingredients, overall, these study results support the conclusion reached by Kraft that "the data reflect little to no difference in spoilage as measured by total plate count or sensory (appearance and odor) spoilage of ready-to-eat processed meat products" when comparing products with no added antimicrobial ingredients and those with antimicrobial ingredients, including sodium lactate. AR 822.

9.      In the Kraft open package study, in which spoilage was evaluated after packages were opened and were inoculated with *Listeria monocytogenes* (*Lm*), the study

did not include a no-antimicrobial control, did not indicate the level of inoculum, or show

what happened during the first week of testing.  The purpose of this study was to assess

the relative growth of *Lm* in opened packages between a lactate antimicrobial system and

a benzoate/propionate antimicrobial system.  As a result, no control without an

antimicrobial is needed, the level of the inoculum is immaterial, and the results from the

last three weeks of the study are of greatest significance.  In sum, the total plate count and

sensory data in this study show "no difference in spoilage of ready-to-eat processed meat

products when using sodium lactate as compared to sodium benzoate and/or sodium

propionate," and no differences between these products when inoculated with *Lm*.  AR

827.

      10.     The Fresherized Foods study evaluated the effects on *Lm* survival and

potential regrowth of high pressure processing (HPP) treatment alone or in combination

with 1% or 1.5% sodium lactate in ready-to-eat beef and chicken strips, respectively.

The study included control samples that contained sodium lactate but were not treated

with HPP, and, although spoilage organisms were not studied, these samples provide

some insight as to the effect of sodium lactate on *Lm* growth.  Given the limited effects of

sodium lactate on *Lm* growth observed by Fresherized Foods, it was reasonable for the

company to conclude that it "would not consider using sodium lactate at the levels tested

as an antimicrobial to control the presence of *Listeria monocytogenes* in our products."

AR 795-796.

      11.     The Pederson Natural Farms studies evaluated the effect of sodium lactate

on the shelf life of natural bacon that is "cured" through the addition of celery juice and a

lactic acid starter culture during the manufacturing process.  The high bacterial counts

measured at the outset of the studies reflect the inherent nature of the bacon tested and do not indicate that the product was already spoiled. Bacon is a raw product for which high microbial counts are neither unusual nor necessarily indicative of spoilage. In addition, the lactic acid starter culture, which does not get killed off completely in the smoking and processing of the bacon, is included as part of the bacterial counts measured in the study. These studies showed there were no appreciable differences in the microbial changes and sensory characteristics over time between the samples containing sodium lactate and those without, demonstrating that sodium lactate had no effect on the shelf life of the product.

12.      The Sugar Creek Packaging Company study evaluated the effect of sodium lactate on the shelf life of natural bacon products. Sodium lactate was added to these products at levels of 0% (control), 0.59%, 0.60%, and 1.18% of the finished products by weight. The products are smoked, chilled, pressed into shape, sliced, and then stored refrigerated for the course of the shelf life. Samples were taken of all of these products at the beginning, middle, and end of slicing runs, and all samples were found to contain similar bacterial counts. Similar shelf lives of around 65 days were found for products with and without sodium lactate. The studies support the company's conclusion that "Our data indicates no advantage in shelf-life or in an antimicrobial effect with the use of these levels of sodium lactate."

13.      Based on these shelf-life studies, it is reasonable to conclude that lactates do not effect the shelf lives of the products tested.

14.    Given these studies, it is reasonable to expect that use of lactates in a similar manner by manufacturers who did not submit data would not result in substantially different effects on shelf life or expiration dates.

15.    Nearly every functional ingredient added to food, including spices, flavors, cultures, enzymes, emulsifiers, formulations aids, sweeteners, vitamins/minerals, stabilizers, thickeners, and processing aids, is purified and concentrated from its natural state. The purification process removes contaminants and other unwanted constituents and is critical for ensuring the safety of ingredients, while the concentration process allows the ingredients to be present in a useable, functional form with more consistent effects.

16.    Common food grade salt undergoes significant purification to remove other mineral impurities. This can involve chemical treatment to facilitate precipitation of minerals such as calcium, magnesium and others. In addition, anti-caking agents commonly are added. Common food grade salt is concentrated from its dilute natural source.

17.    Sugar is refined from sugar cane and sugar beets. They are crushed to release a sucrose-rich liquor that is refined through further processing. The crude liquor has large amounts of impurities including cellulosic fiber and soil particles. The crude liquor can be treated with lime and phosphoric acid to remove impurities by boiling and/or with vacuum evaporation to ultimately crystallize and concentrate the sugar. Decolorization methods use granular activated carbon, powdered activated carbon, ion exchange resins, and other materials.

18.    Vinegar is made from the oxidation of ethanol into acetic acid.  The ethanol source can be wine, cider, beer, fermented fruit juice, or nearly any other liquid containing alcohol.  Commercial vinegar is produced by fermentation using specific organisms, specifically yeast and *Acetobactor*, to first generate alcohol from a sugar source (*e.g.*, a grain, such as corn) and then to convert the alcohol into acetic acid.

19.    Spices are derived from plant materials through various levels of processing and refining from their original source.  Many essential oils, used for taste and aroma purposes in foods, are separated from their parent plant material by distillation or mechanical pressing and are concentrated from their dilute natural source.  In one example, with which I am familiar, rosemary spice extracts are produced by taking the residue after the essential oils have been distilled or expressed away and extracting it with alcohol and water mixtures.  The extracts are then carbon treated and precipitated to produce materials with high antioxidant activity and only some flavor.

20.    Water is collected from surface water sources or pumped from aquifers and  filtered and treated to remove undesirable contaminants through the use of ion exchange resins, activated carbon, and ultra filtration.  Water also is commonly treated with chlorine or UV light to kill any residual bacteria and fluoridated for public health benefits.

21.    HPP achieves its preservative effect by subjecting food to pressures of 80,000 to 100,000 pounds per square inch – approximately 6,000 atmospheres or 10 times the pressure found at the greatest depths of the ocean – resulting in microbial inactivation.  *See* Agricultural Marketing Service, USDA, *Nonthermal Food Processing Is Heating Up*, http://www.ars.usda.gov/is/AR/archive/oct06/food1006.pdf (last viewed

4/2/08).  In the HPP approach, products containing no air spaces are packaged in flexible containers, placed into a high pressure chamber filled with a type of hydraulic fluid (normally water), and pressurized for several minutes.  *See* Ohio State University Extension Fact Sheet, Food Science and Technology, *High Pressure Processing*, http://ohioline.osu.edu/fse-fact/0001.html (last viewed 4/2/08).  The uniform pressure exerted through the hydraulic fluid allows the product to maintain its form and sensory and nutritional qualities while microbes are inactivated.  *Id.*

22.    Sodium lactate and potassium lactate are the sodium and potassium salts of lactic acid, a naturally occurring organic acid..  Other naturally occurring organic acids include citric acid, which exists in a large variety of fruits and vegetables, acetic acid, the characteristic component of vinegar, and ascorbic acid, better known as vitamin C.  Notably, L(+)lactate is normally produced  during metabolism of sugar in humans and most cellular organisms.  The cultures used in the production of lactates from a corn or sugar beet source are of the same type as those used in making fermented meat products and produce L(+) lactic acid by metabolic pathways identical to those in the human body.

23.    I have reviewed the studies at (1) AR 211-215 (Shelef, L.A. and Yang, Q., Growth Suppression of Listeria Monocytogenes by Lactates in Broth, Chicken and Beef, Journal of Food Protection 54(4), 283-87 (1991)); (2) AR 258-262 (Cegielska-Radziejewska, R. and Pikul, J., Sodium Lactate Addition on the Quality and Shelf Life of Refrigerated Sliced Poultry Sausage Packaged in Air or Nitrogen Atmosphere, Journal of Food Protection, 67(3), 601-06 (2004)); (3) AR 220-225 (Stillmunkes, A.A. et al., Microbiological Safety of Cooked Beef Roasts Treated with Lactate, Monolaurin or Gluconate, Journal of Food Science 58(5), 953-58 (1993)); (4) AR 200-206

(Papadopoulos, L.S. et al., Consumer and trained Sensory Comparison of Cooked Beef Top Rounds Treated with Sodium Lactate, Journal of Food Science 56 (5), 1141-46, 1153 (1991)); and (5) Meyer, J.D., Cerveny, J.G. and Luchansky, J.B., Inhibition of Nonproteolytic, Psychotropic Clostridia and Anaerobic Sporeformers by Sodium Diacetate and Sodium Lactate in Cook-in-Bag Turkey Breast, Journal of Food Protection 66(8), 1474-78 (2003) (attached as an Ex. to Minerich Decl, Ex. to Plf.'s Cross Mot. for Summ. J.).

24.    In Cegielska-Radziejewska, R. and Pikul, J. (2004) (AR 258-262), the data show only a modest effect of 2% lactate on shelf life and virtually no effect of 1% lactate on shelf life. *See* Fig. 4. In the United States, products made without lactate commonly achieve a shelf life of 70 days, but this study, conducted in Poland, indicates an overall shelf-life of only 35 days with 2% lactate.

25.    Shelef, L.A. and Yang, Q.(1991) (AR 211-215) focuses on pathogen inhibition; there is no data on spoilage organisms or shelf life. The data measure the effects of lactate on *Listeria monocytogenes* in broth (Fig 1), but broth studies are very poor specific predictors of activity in complex foods such as meat and poultry products. The effect of lactates on *Listeria monocytogenes* in beef and chicken is also studied, but the meat product tests used 2.6% or 4% sodium lactate and data is only shown for the 4% level. (Figs. 2-7).

26.    Stillmunkes, A.A. et al. (1993) (AR 220-225) measures only the effect of lactate, as compared only to glycerol monolaurin and sodium gluconate, on pathogens *Listeria monocytogenes* and *Clostridium sporogenes* in cooked beef roasts. According to the data, cooked beef roasts with 1.5% lactate showed no statistically significant

difference in effect on these two pathogens (*Listeria monocytogenes* and *Clostridium sporogenes*) or on total anaerobic and facultative anaerobic bacterial growth as measured against cooked beef roasts containing no lactate. Regarding spoilage organisms (a shelf-life measure), the article states: "No significant effects of treatments occurred at the concentration used hence those data are not shown. The same was true for anaerobic and facultative anaerobic microbial populations (data not shown)."

27.    In Papadopoulos, L.S. et al. (1991) (AR 200–206), the study used 1.8% lactate, but the focus was on sensory evaluation, not on microbiology. Bacterial measurements were only performed at 0, 42, and 84 days, which is not sufficient time precision possible to make valid conclusions about bacterial growth rates affecting shelf life. The data presented (Table 2) do not permit sufficient statistical analysis to make any conclusions regarding bacterial growth rates.

28.    Meyer, J.D., et al. (2003) (Ex. to Minerich Decl., Ex. to Plf.'s Cross Mot. for Summ. J.) studied a specific and unique strain of a spore-forming bacterium that, under temperature abuse conditions, causes extreme spoilage of uncured turkey breast. Although occasionally found in commercial turkey breast roasts, it is not a common "spoilage organism" and therefore is not a reliable measure of shelf life.

29.    None of the studies discussed in paragraphs 23-28 establish that lactates, at levels below 2%, extend shelf life or expiration dates of the meat and poultry products tested.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 23, 2008.

_Andrew L. Milkowski_
Andrew L. Milkowski, Ph.D.

**EXHIBIT 2**

**ZOETEMEYER DECLARATION**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HORMEL FOODS CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES DEPARTMENT<br>OF AGRICULTURE,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| FARMLAND FOODS, INC.,<br>KRAFT FOODS GLOBAL, INC.,<br>PURAC AMERICA, INC., SARA LEE<br>CORPORATION, SMITHFIELD FOODS,<br>INC., AND SARA LEE FOODS, INC.<br><br>Proposed Defendant-Intervenors. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.
1:07-CV-01724-RBW

## DECLARATION OF ROBERT J. ZOETEMEYER

I, Robert J. Zoetemeyer, declare and state the following:

1.       I am Vice President and a Board member of PURAC.  In my current position I am responsible for global Research & Development.

2.       PURAC is the world's largest producer of natural lactic acid and its derivatives, amongst others lactates.  PURAC America is the U.S. subsidiary of PURAC and develops and sells lactates for use in a variety of foods, including meat and poultry products.  This declaration is made on personal knowledge based on information

contained in PURAC's files, information in the Administrative Record, publicly available information, and other factual matters known to me.

3.    I earned an M.S. degree in Chemical Engineering at the Technical University of Twente (The Netherlands) in 1973 and a Ph.D. degree in Biotechnology at the University of Amsterdam in 1982. I have worked for PURAC for more than 20 years, including 16 years as a Board member.

4.    PURAC manufactures lactates in the USA. These lactates are derived from corn sugar, which is fermented by bacteria to obtain lactic acid. The lactic acid is then purified and concentrated through physical processing steps, such as evaporation. No esterification, hydrolysis, or crystallization techniques are used in PURAC's manufacturing process for lactate products used for food applications.

5.    The purified lactic acid is then neutralized with sodium hydroxide to form sodium lactate or with potassium hydroxide to form potassium lactate. The addition of food grade hydroxides and other alkali ingredients is a common neutralization step in the manufacturing of food ingredients, particularly those to be used in meat and poultry products, where ingredients with neutral pH are necessary. The only difference between sodium and potassium lactate is the sodium or potassium used to form the lactate. Importantly, the lactate derived via fermentation from its corn source is not chemically changed during the purification, concentration and neutralization processes.

6.    Sodium hydroxide and potassium hydroxide also are natural substances. In its food grade form – the form used in lactate manufacturing – these hydroxides, also known as lye, are used to cure many types of food, including green table olives, hominy,

and pretzels. It is a generally accepted principle that a mixture of two natural ingredients can be considered natural.

7.    I have reviewed AR 314, which is a flow chart purportedly depicting the manufacturing process for lactic acid, sodium lactate, and potassium lactate. This chart mischaracterizes the manufacturing process for these ingredients because it lists a variety of purification processes, such as evaporation, esterification, column separation, and hydrolysis that are not necessarily used by any single manufacturer in this combination in the making of these products.

8.    The lactate derived through PURAC's manufacturing process is L-lactate, the form of lactate naturally present in foods and the human body, where, for example, it is produced in active muscle tissues as a result of the metabolism of glucose.

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 18, 2008.

Robert J. Zoetemeyer