**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| HORMEL FOODS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:07-cv-1724 (RBW) |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO
DISMISS/MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM IN
OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

The Court should grant defendant's motion to dismiss or in the alternative, motion for summary judgment, and deny plaintiff's cross-motion for summary judgment. Count one of the Complaint asserts that USDA, by not yet rescinding its approval of the "natural" labels made by Hormel's competitors, has violated both the FMIA and the PPIA. Count I should be dismissed because neither statute provides a private right of action to enforce its provisions. Rather, the FMIA and PPIA grant authority for enforcement of their terms only to the Secretary of Agriculture ("the Secretary"). Plaintiff has in effect conceded that it does not have a claim directly under the FMIA or PPIA and instead tries to recast Count I as a claim under the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* ("APA"). But plaintiff may not recast Count I in this manner.

First of all, plaintiff may not attempt to amend its complaint in its summary judgment

brief.  Thus, Count I should be dismissed because plaintiff did not plead that claim under the

APA.  Even if the Court permitted plaintiff to recast Count I as a claim under the APA, however,

it still fails.  So far as Count I challenges the initial label *approval decisions* at issue (Complaint

¶ 47), those were reasonable, not arbitrary and capricious, based on the information available to

the agency at the time.  So far as Count I separately challenges *the failure to rescind* the labels at

this time, this claim differs in no meaningful respect from Count II and is subject to the same

limitations on APA review: namely that the court lacks jurisdiction because the claims are

committed to agency discretion, and, that plaintiff has no APA claim because there is no final

agency action.

In Counts II and III of the Complaint, plaintiff maintains that by not yet rescinding

approval for its competitors' "natural" labels, USDA has acted arbitrarily and capriciously and

engaged in *de facto* rule making without observing notice and comment procedures, in violation

of the APA.  These claims should be dismissed for numerous reasons.  First, whether to take

enforcement action against companies whose products may not qualify as "natural," by

rescinding approval of labels bearing the "natural" claim, is a decision committed to agency

discretion by law, and as such is not subject to APA review.  Plaintiff has not shown that USDA

intended to establish "binding norms" limiting the agency's enforcement discretion when it wrote

letters to Hormel and its competitors merely stating its then-current intention to initiate rescission

proceedings if those companies did not produce data showing that lactates were not having a

preservative effect on the products in question.  This letter simply states USDA's thinking at the

time, in advance of rulemaking, about how to deal with the possibility of discovering that lactates

in a product labeled "natural" may be found to have a preservative effect, and did not renounce

the agency's authority to change its mind in light of additional evidence received.

Second, even if a decision not to rescind approval for a product label were reviewable, Hormel would not be entitled to the relief it seeks – an order compelling rescission of USDA's approval for the "natural" labels of more than twenty different companies. The APA provides no cause of action to compel agency action unless that action is legally required. The FMIA and the PPIA, however, do not mandate that the Secretary take enforcement action in cases of alleged mislabeling, providing only that he "may" do so. Since plaintiff has not offered any argument whatsoever to the contrary, dismissal is required.

Third, the APA authorizes judicial review only of "final" agency action. Here, however, the agency has not yet taken any final action regarding the "natural" claims made by Hormel's competitors. Rather than having reached a final decision on this issue, the agency has clearly stated that it intends to seek additional public comment on the appropriate standards for processed meat and poultry products bearing the "natural" label. There is clearly no final agency action since the rights of the parties have not been altered in advance of the proposed rulemaking. The companies that wish to use a "natural" label are still required to prove that lactates do not have a preservative effect. USDA has only changed the timing of any remedy it may impose upon failure to provide such a showing until the conclusion of the rulemaking process. Since the agency has not yet completed rulemaking, nor made a final decision as to continued approval of the "natural" claims made by Hormel's competitors, there is no final agency action in this matter. Hence, Counts II and III of the Complaint must be dismissed.

Alternatively, if the Court does not dismiss Counts II and III, summary judgment should be entered in defendant's favor on both claims. Plaintiff's arbitrary and capricious claim fails

because USDA has acted reasonably and well within its discretion by not yet rescinding approval of the labels in question in advance of rulemaking.  Although evidence provided to USDA by Hormel includes claims that sodium lactate may have a preservative effect even when used at two percent or less of formulation, the evidence that Hormel submitted on summary judgment only purports to show flaws in the shelf studies. It does not address the actual products  whose label approvals Hormel wants rescinded. Moreover, Hormel's evidence does not address the numerous comments USDA received reflecting highly diverse and sometimes contradictory guidance over how to proceed to establish a rule for the "natural" label.  In addition, the agency requested and obtained data from the companies at issue indicating, to the contrary, that the presence of sodium lactate at that level may not have a preservative effect in their products. Hormel quibbles with particular aspects of the shelf life studies the companies conducted.  But USDA reasonably concluded that these studies, together with the fact that the companies apply the same expiration dates to both the non-lactate and lactate-containing versions of these products, were sufficiently indicative that lactates were not having a preservative effect in these products to warrant postponement of any action on rescission pending completion of a rulemaking on the issue.

       To the extent plaintiff tries to poke holes in these studies, plaintiff only bolsters the argument that the evidence may be susceptible to varying interpretations and, as a result, no action should be taken in advance of rulemaking. Hence, USDA's Food Safety Inspection Service ("FSIS"), which is responsible for enforcing the FMIA and PPIA, acted reasonably by not rescinding the approvals for these companies' "natural" labels at this time, and instead waiting to receive additional public comments  before taking definitive action with respect to the

"natural" claims made by these companies.   Accordingly, defendant is entitled to summary judgment on Count II.

Defendant is also entitled to judgment as a matter of law on Count III, because USDA has not yet taken any action that could even reasonably be described here as promulgating a final rule, with or without notice and comment.  All the agency has done is to state its current intention not to take action to rescind approval for the "natural" labels of Hormel's competitors, pending consideration of additional public comment on the use of "natural" claims for meat and poultry labels.   Even if the agency's current position could in any respect be portrayed as a "rule," at best it would be an interpretive rule not subject to notice-and-comment requirements.  Thus, Hormel's notice-and-comment claim must also be rejected.

## ARGUMENT

### I.      COUNT I MUST BE DISMISSED BECAUSE PLAINTIFF HAS NO CAUSE OF ACTION UNDER THE FMIA OR THE PPIA, AND COUNT I WOULD FAIL EVEN IF PLED UNDER THE APA.

#### A.      Plaintiff Effectively Concedes That it Has No Right of Action Under the FMIA or PPIA.

Regarding Count I, plaintiff does not have a cause of action under the Federal Meat Inspection Act ("FMIA") or the Poultry Products Inspection Act ("PPIA") and appears to admit as much in its opposition to the motion to dismiss.  Plaintiff no longer claims a cause of action directly under the FMIA and the PPIA.  Rather Hormel attempts to recast its claims under Count I as Administrative Procedure Act ("APA") claims for agency action "contrary to law,"  5 U.S.C. § 706(1).  (Pltff's Mem. in Opp. to Motion to Dismiss at 16).

First of all, plaintiff did not plead Count I under the APA, and may not now amend its complaint by revising its legal theories in its summary judgment brief. It must amend its complaint in accordance with Fed. R. Civ. P. 15(a). *See DSMC, Inc. v. Convera Corp.,* 479 F.Supp.2d 68, 84 (D.D.C.2007) (rejecting plaintiff's attempts to broaden its conspiracy claims in its opposition to defendant's motion for summary judgment because plaintiff failed to amend its complaint); *Shanahan v. City of Chicago,* 82 F.3d 776, 781 (7th Cir.1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). Thus, Count I should be dismissed because plaintiff pleaded Count I under the FMIA and PPIA, which provide no right of action – not the APA.

### B.    Count I Would Fail as a Claim under the APA.

Even if the Court permitted plaintiff to recast Count I as an APA claim, however, it still fails.  So far as Count I challenges the initial label *approval decisions* at issue (Complaint ¶ 47), those were reasonable, not arbitrary and capricious, based on the information available to the agency at the time.  *Worldcom, Inc. v. FCC,* 238 F.3d 449, 457 (D.C. Cir. 2001).   In 1993 when FSIS approved lactates up to two percent of product formulation as flavor enhancers, the evidence before the agency showed that at that level the presence of lactates did not have a preservative effect. First Derfler Decla. ¶ 15; AR 7-8.

In or around late 2003, a company named Applegate Farms requested clarification that sodium and potassium lactates were allowed to be used as a flavoring in products labeled "natural."  A decision was made in early 2004 to allow the use of sodium and potassium lactate in products labeled as "natural" after Applegate Farms produced a letter from the National Organic Program (NOP) stating that sodium and potassium lactates were approved for use in

6

organic products.[1]  Once the labeling staff received that letter, it made a determination that, given

the stringent petition and approval policy at the NOP, and given that lactates could be used in

products labeled as organic, they could also be used in "natural" products.  The labeling staff

continued to believe, based on the evidence previously submitted to it, and the lack of evidence

to the contrary, that  lactates, at the two percent or less level, would not have a preservative effect

and were being added solely as a flavoring agent.[2] Supp. Derfler Decl. ¶ 12.

    The NOP decision that  sodium and potassium lactates were approved for use in organic

products buttressed the decision of FSIS to allow these ingredients in products bearing the

natural label because the evaluation criteria for the NOP are in many ways similar to those used

for "natural" products.  For example, NOP looks at whether the product comes from a natural

source, whether the substance's primary use is as a preservative or to recreate or improve flavors,

and whether the substance is listed as "generally recognized as safe" by the Food and Drug

Administration. Supp. Derfler Decl. ¶ 13.

    Moreover, in regard to the minimal processing requirement, NOP has a definition of

minimal processing that is similar to FSIS' definition.  In the definition of "natural," FSIS has

--------

[1] The NOP was established by regulation pursuant to the Organic Foods Production Act, 7 U.S.C. §§ 6501-6523 enacted by Congress "to establish national standards governing the marketing of certain agricultural products as organically produced." 7 U.S.C. § 6501. In order to be labeled organic, "an agricultural product must be produced and handled without the use of synthetic substances," and in accordance with statutory standards for acceptable organic production practices. See Harvey v. Veneman, 396 F.3d 28, 32 (1st Cir. 2005); see also 7 U.S.C. §§ 6504-6513. The regulations establishing the NOP, see 65 Fed. Reg. 80548 (Dec. 21, 2000) (codified at 7 C.F.R. pt. 205) also contain detailed standards for certification.

[2] See electronic mail message between Robert C. Post and the Labeling and Consumer Protection Staff dated March 17, 2004, at AR 002207.

stated that minimal processing includes "those traditional processes used to make food edible or to preserve it or make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting." Similarly, NOP defines "processing" as limited to "cooking, baking, curing, drying, mixing, grinding, churning, separating, extracting, slaughtering, cutting, fermenting, distilling, eviscerating, preserving, dehydrating, freezing, chilling, or otherwise manufacturing and includes the packaging, canning, jarring, or otherwise enclosing food in a container." 7 C.F.R. § 205.2. Finally, similar to the FSIS' definition of "natural," the NOP eschews severe chemical processes such as ionizing radiation. 7 C.F.R. § 205.105; Supp. Derfler Decl. ¶ 14.

It was not until October 9, 2006, when Hormel submitted a petition to FSIS requesting that FSIS initiate rule making to codify the definition of "natural" for meat and poultry labels that the agency received any evidence indicating that lactates at two percent or less of product formulation might have a preservative, instead of just a flavoring, effect. AR 14-54. Thus, FSIS acted reasonably when, long before receiving this contrary evidence, it initially approved the labels in question.

So far as Count I separately challenges the *failure to rescind* the labels at this time, this claim differs in no meaningful respect from Count II and is subject to the same limitations on APA review, namely that the court lacks jurisdiction because there is no final agency action and because the claims are committed to agency discretion. *See* Points II and III, *infra.* In this respect as well, therefore, Count I must be dismissed.

II.    **THE INTERIM DECISION NOT TO IMMEDIATELY RESCIND ANY
       "NATURAL" LABELS IS NOT A FINAL AGENCY ACTION SUBJECT
       TO JUDICIAL REVIEW UNDER THE APA BECAUSE SUCH DECISION
       DOES NOT CHANGE AGENCY POLICY, AND DOES NOT FINALLY
       DETERMINE THE ISSUES OR RIGHTS TO WHICH IT IS ADDRESSED.**

USDA's determination not to rescind any "natural" labels, at this point, where all the

relevant evidence is not yet gathered, is not a final decision subject to administrative review

under the APA because, contrary to plaintiff's allegation, it does not change USDA policy with

regard to the requirements for "natural" labels, it does not mark the consummation of the

agency's decisionmaking process, and it does not finally determine the rights or obligations of

the parties.  Hence Count II must be dismissed.

"Agency action is final and reviewable when it marks the consummation of the agency's

decision making process and either determines rights or obligations or results in legal

consequences." *Center for Auto Safety v. National Highway Traffic Safety Administration,* 452

F.3d 798, 807 (D.C. Cir. 2006) *quoting Bennett v. Spear,* 520 U.S. 154, 178 (1997) (internal

quotation marks omitted).  Thus, if an agency's action is not "final," plaintiff does not have a

cause of action pursuant to the APA to challenge that action.  *Reliable Automatic Sprinkler Co. v.

Consumer Product Safety Comm'n,* 324 F.3d 726, 731 (D.C. Cir. 2003) ("If there was no final

agency action here, there is no doubt that appellant would lack a cause of action under the

APA").  As plaintiff admits, agency action is not final and subject to judicial review under the

APA until it finally resolves the issue to which it was addressed.  *Croplife v. E.P.A.,* 329 F.3d

876, 881 (D.C. Cir. 2003) (cited at Pltff's Mem. in Opp. to Motion to Dismiss at 28).

Applying these principles, taking no action on rescission at this time does not finally

resolve the issue to which it was addressed because the label approvals for these products may still be rescinded at the conclusion of rulemaking. There simply can be no *final* agency action on rescission prior to a decision on the rulemaking process that will define the substantive criteria on which a final determination about rescission will be made. Here, plaintiff's argument is that it requested *interim* relief, i.e. a decision on rescission pending the completion of final rulemaking and that there was *final* agency action on this request for *interim* relief. In the first place, the record contradicts plaintiff's contention that it requested interim relief of any kind. Plaintiff did not request any type of "interim rescission" pending the decision on rulemaking. Rather, Hormel requested that USDA rescind approval for its competitors' labels outright, regardless of if and when the substantive standards for the use of lactates in "natural" products might later be addressed in rulemaking. AR 138. As to this issue, there is no final agency action as explained below, because the final decision has been postponed until the conclusion of the rulemaking process.

Even if Hormel had requested some sort of "interim rescission" of approval for its competitors' "natural" labels, pending completion of rulemaking, a decision on such a request would have been interlocutory in nature, not a final determination of those companies' legal rights to continue using those labels, and as such would not have constituted final agency action. *Gem County Mosquito Abatement District v. EPA,* 398 F. Supp. 2d 1, 11 (D.D.C. 2005). The agency's decision not to commence rescission actions pending its rulemaking instead "reflects an interim or interlocutory decision to postpone th[at] decisionmaking process [rescission]," until the completion of "a more comprehensive process." *Shawnee Trail Conservancy v. Nicholas,* 343 F. Supp. 2d 687, 701 (S.D. Ill. 2004), and the maintenance of the status quo pending the

outcome of that decisionmaking process cannot itself be considered final agency action. *Fund for Animals v. Williams,* 391 F. Supp. 2d 132, 137-38 (D.D.C. 2005).

There is also no final agency action here because none of the rights or obligations of the parties have been altered in any way at this preliminary stage in the rulemaking process. *Center for Auto Safety,* 452 F.3d at 807. Inquiry into the facts of *Croplife America v. EPA,* 329 F.3d 876 (D.C. Cir. 2003), upon which plaintiff relies, makes plain that the agency here has not issued such a final determination. The *Croplife* Court found that the EPA made an "obvious change in established agency practice," constituting final agency action. In that case, the EPA policy had been on a case-by-case basis to consider data from third-party human studies when evaluating the safety of pesticides. However, EPA "abruptly reversed" its policy when it decided it would no longer consider such studies. *Croplife* at 878. Indeed, EPA's change of policy was referred to as a "moratorium on the use of third-party human pesticide tests." *Croplife* at 880. Here, in distinction to *Croplife,* there has been no change to the agency's policy even though the agency has not yet instituted any rescission action at this time. It was the policy of USDA's Food Safety Inspection Service ("FSIS") – as of the date of Hormel's request for rescission – that lactates may not have a preservative effect on products that bear the "natural" label. And it remains the policy of FSIS to this day that lactates may *not* have a preservative effect in products that bear the natural label. Indeed, this same policy will likely remain until there is a change, if any, at the end of the rulemaking process.

As a consequence of this policy, USDA has required each company to demonstrate that the presence of lactates does not have a preservative effect. These companies are still under an obligation to provide this evidence whether or not USDA chooses to exercise its enforcement

11

discretion at this time. USDA has only stated that in the absence of such evidence of a

preservative effect, USDA will suspend the decision to rescind any labels until the conclusion of

the rulemaking process. This decision, to wait until all the evidence is gathered, is squarely

within USDA's enforcement discretion, as described below, and does not affect the rights of the

parties who are under the same obligations they were under previously, namely, to ensure that the

presence of lactates does not have a preservative effect on these products. Hence, because the

rights and obligations of the parties have not been altered, there is no final agency action at this

time and plaintiff therefore has no actionable claim under the APA at this time.

III.    **NOTHING USDA HAS DONE TO DATE LIMITS ITS
        DISCRETION AS TO WHETHER AND WHEN TO
        RESCIND ANY PARTICULAR LABEL.**

   A.    **USDA Has Not Cabined its Enforcement Discretion by Requesting
         Information Within 60 Days from Each of the 24 Companies as to the
         Possible Preservative Effect of Lactates in Their Products.**

Just as a prosecutor must, of necessity, pick and choose among the many possible

candidates for criminal prosecution, depending on the priorities and resources of his or her office,

so too must USDA pick and choose which possible violations of the law it will pursue. This case

presents no exception to that principle.

The Administrative Procedure Act (APA) is clear that agency action is not reviewable

when it is "committed to agency discretion by law." 5 U.S.C. § 701(a); *see Heckler v. Chaney,*

470 U.S. 821, 828 (1985). In *Citizens to Preserve Overton Park v. Volpe,* the Supreme Court

declared that this exception to the presumption of reviewability applies "in those rare instances

where statutes are drawn in such broad terms that in a given case there is no law to apply." 401

U.S. 402, 410, (1971) (internal quotation marks and citations omitted). As the Court

subsequently explained in *Heckler v. Chaney,* "review is not to be had if the statute is drawn so

that a court would have no meaningful standard against which to judge the agency's exercise of

discretion." 470 U.S. at 830. "In such circumstances, the courts have no legal norms pursuant to

which to evaluate the challenged action, and thus no concrete limitations to impose on the

agency's exercise of discretion." *Drake v. FAA,* 291 F.3d 59, 70 (D.C. Cir. 2002). As the

Supreme Court has explained, "if no judicially manageable standards are available for judging

how and when an agency should exercise its discretion, then it is impossible to evaluate agency

action for 'abuse of discretion.' " *Heckler,* 470 U.S. at 830, 105 S.Ct. at 1655.

 In determining "whether a matter has been committed solely to agency discretion, the

D.C. Circuit considers both the nature of the administrative action at issue and the language and

structure of the statute that supplies the applicable legal standards for reviewing that action."

Drake, 291 F.3d at 70. In *Chaney,* for example, the Court held that agency decisions not to

institute enforcement proceedings are presumptively unreviewable. *See* 470 U.S. at 831, 105

S.Ct. 1649. The D.C. Circuit has found many other decisions also subject to agency discretion.

*See, e.g., Steenholdt v. FAA,* 314 F.3d 633, 634 (D.C. Cir.2003) (holding that the FAA's decision

not to renew an aircraft examiner's authority is nonreviewable); *Baltimore Gas & Elec. Co. v.*

*FERC,* 252 F.3d 456, 459-60 (D.C. Cir.2001) (holding that an agency's decision to reach a

settlement is nonreviewable); *In re Sealed Case,* 131 F.3d 208, 216 (D.C. Cir.1997) (holding that

a federal prosecutor's certification that there is a substantial federal interest in a case, required to

proceed against a juvenile in federal court, "implicates core prosecutorial judgment and

discretion" and thus is normally "not subject to judicial review").

The FMIA and the PPIA do not mandate that the Secretary take enforcement action in cases of alleged mislabeling, providing only that he "may" do so. Regarding enforcement of their respective misbranding provisions, both the FMIA and the PPIA provide, without qualification, that if the Secretary has "reason to believe" that any marking or labeling is false or misleading, then he "*may* direct that such use be withheld unless the marking, labeling, or container is modified in such a manner as he may prescribe so that it will not be false or misleading." 21 U.S.C. §§ 457(d), 607(e) (emphasis added). Thus, pursuant to the FMIA and the PPIA, the enforcement of the mislabeling provisions are *strictly at the discretion of the Secretary*. Plaintiff's argument that USDA has cabined its own discretion here flies in the face of the statute's plain meaning and would turn the FMIA and the PPIA's enforcement provisions on their heads.

The D.C. Circuit has held that an agency's decision not to initiate enforcement proceedings is a matter firmly within its own discretion and not subject to judicial review. *Community Nutrition Institute v. Young,* 818 F.2d 943, 950 (D.C. Cir. 1987). In *Community Nutrition Institute,* the Court did not require the FDA to initiate enforcement proceedings against food producers producing "adulterated" corn by blending adulterated corn with unadulterated corn. FDA was found to have "complete discretion not to employ the enforcement provisions of the FDC Act, and those decisions [were] not subject to judicial review." *Community Nutrition Institute,* 818 F.2d at 950. Plaintiff claims, however, that USDA has cabined its own discretion here by issuing several letters to Hormel and to other manufacturers and to a U.S. Congressman, and that by issuing these letters it has established a "binding norm" from which it may not deviate. This is incorrect.

14

Plaintiff claims (Pltff.'s Mem. at 20-21), that USDA limited its enforcement discretion by use of the mandatory term *will* vs. the nonmandatory term *may,* when Under Secretary Raymond wrote to plaintiff's counsel that in the absence of such information concerning the preservative effect of lactates, "FSIS *will* institute action to rescind its approval of the labels that bear a 'natural' claim." AR 160 (emphasis added).  But plaintiff's arguments do not show that USDA has cabined its own discretion here.

The D.C. Circuit has held that "judicially manageable standards" for review of agency enforcement decisions "may be found in formal and informal policy statements and regulations as well as in statutes."  *Secretary of Labor v. Twentymile Coal Co.,* 456 F.3d 151, 158-59 (D.C. Cir.  2006).  "But in determining whether agency statements create such a standard, the operative question is whether the statements create binding norms."  *Id.* at 159.  "[A]n agency pronouncement is transformed into a binding norm if so intended by the agency," as "ascertained by an examination of the statement's language, the context, and any available extrinsic evidence." *Safe Energy Coalition v. NRC,* 866 F.2d 1473, 1478-79 (D.C. Cir. 1989).

In this case, the agency has already explained that it did not intend in this correspondence to Hormel's counsel to relinquish the enforcement discretion conferred upon it by the FMIA and the PPIA.  It was merely stating its then-current intention to initiate enforcement action in a particular group of cases if the companies in question did not produce data showing that the lactates in their products have no preservative effect.  First Derfler Decl. ¶ 41.  This statement of the agency's tentative intentions did not create a binding norm.  *See Twentymile Coal,* 456 F.3d at 159.  As both the content and the letter's language bear out, the statements Hormel relies on were not published in the Code of Federal Regulations, the Federal Register, or in any USDA

policy manual, as might be expected if the agency meant to issue any sort of "formal or informal policy statements [or] regulations" limiting its discretion in these and future cases. Id. at 158-159. And nowhere do the letters renounce the agency's right to change its mind if in its "informed discretion," *Id.* at 159, it determines (as it in fact determined) that enforcement action is not advisable (at least not at this time).

Indeed, plaintiff does not address the other undefined and wholly discretionary aspects of the letters, *when* these showings must be made to USDA and *when* USDA must respond to such a showing or the absence of any showing.

Here, the administrative record is clear that defendant did not intend to cabin its own enforcement discretion as to *when* the information must be supplied by the companies in question – the Secretary only *requested* this information within 60 days. (AR 612). Similarly, USDA did not cabin itself as to when it must respond either a) to evidence provided by the companies in question that lactates in their products are having a preservative effect or b) to the failure of those companies to provide any evidence at all. (AR 612).

Similarly, defendant's letter to Hormel, dated December 6, 2006, also did not cabin USDA's time frame within which to act on a failure to supply this information. (AR 160). Rather it simply stated that in the absence of such information, FSIS will institute action to rescind its approval of the labels that bear a "natural" claim. (AR 160). However, as with the other letters, USDA did not commit itself as to *when* it would act in the absence of such information. *Id.* As a result, USDA did not cabin its own enforcement discretion and this Court does not have jurisdiction to hear plaintiff's claims since rescission was committed to agency discretion by law.

16

B.     **USDA Has Not Abdicated Its Statutory Responsibilities.**

Plaintiff alleges that USDA has abdicated its statutory responsibilities by not instantly

deciding on whether rescission is warranted for any of the companies at issue (Pltff's Mem. in

Opp. to Motion to Dismiss at 24).  Plaintiff makes this claim on the basis of its erroneous

conclusion that USDA has determined that it will *not* rescind any of the natural labels at issue.

*Id.* The record does not support plaintiff's claim.   The D.C. Circuit has indicated that an agency

cannot be held to have abdicated its statutory responsibilities short of "an agency *consciously and*

*expressly* adopting a 'general policy' of non-enforcement." Safe Energy Coalition, 866 F.2d

1473, 1477 (D.C. Cir. 1989) (emphasis added).  In fact, USDA has made no such conscious or

express decision not to enforce its own policy concerning the presence of lactates, whether as a

matter of general policy or even in the particular cases at issue.  Rather, the agency has clearly

explained that it is in the process of gathering additional information and undertaking rulemaking

so it may carry out its enforcement obligations in a well-considered and responsible manner, and

not just based on the views of a single interested party, i.e. Hormel.  Hence, there was no

abdication of agency responsibilities here and plaintiff's APA claims should be dismissed.

**IV.____COUNTS TWO AND THREE OF THE COMPLAINT MUST BE DISMISSED**
**BECAUSE ONLY ACTION THAT IS LEGALLY *REQUIRED* MAY BE**
**COMPELLED UNDER THE APA.**

Finally, as defendant explained in its initial brief, even if the decision whether to rescind

approval for labels used on meat or poultry products were not a matter committed to the

Secretary's unreviewable discretion, Counts II and III of the Complaint would still have to be

dismissed because only action that is legally *required* may be compelled under the APA.  Under

circumstances where judicial review is available, the APA provides a cause of action to "compel

17

agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). The Supreme

Court explained, however, in *Norton v. So. Utah Wilderness Alliance,* 542 U.S. 55, 63 (2004)

"that the only agency action that can be compelled under the APA is action legally *required."*

*See also Biovail Corp. v. FDA,* 448 F. Supp. 2d 154, 161, 162-63 (D.D.C. 2006). Here, even if

the Secretary has reason to believe that the labeling for a meat or poultry product may be false or

misleading, he is not required in every case to take enforcement action. The FMIA and the PPIA

both state that he "may" do so, not that he "must" or "shall" do so. 21 U.S.C. §§ 457(d), 607(e).

Accordingly, plaintiff has no cause of action under the APA to compel the Secretary to rescind

approval for its competitors' labels because these actions are not legally required. Plaintiff

makes no argument to the contrary. Hence, Counts II and III should be dismissed.

## V.    IN THE ALTERNATIVE, SUMMARY JUDGMENT SHOULD BE GRANTED IN FAVOR OF DEFENDANT AS TO COUNT II, BECAUSE DEFENDANT HAS NOT ACTED ARBITRARILY OR CAPRICIOUSLY, BASED UPON THE AVAILABLE EVIDENCE.

If the Court does not dismiss this action, summary judgment should be granted in favor of

defendant on Count II, and plaintiff's cross-motion for summary judgment should be denied.

Plaintiff claims that defendant acted arbitrarily and capriciously when it postponed the decision

to rescind label approvals until the conclusion of the rulemaking process. Defendant has not

acted arbitrarily or capriciously, however, based upon the information available to it at the time.

"A party seeking to have a court declare an agency action to be arbitrary and capricious carries a

heavy burden indeed." *Wis. Valley Improvement Co. v. FERC,* 236 F.3d 738, 745 (D.C. Cir.

2001). The arbitrary and capricious standard of review is a narrow and deferential standard that

presumes the validity of agency action. *Worldcom, Inc. v. FCC,* 238 F.3d at 457.

When reviewing agency action under this deferential standard, a court "[does] not substitute [its] judgment for that of the agency, but . . . examines only whether there has been a clear error of judgment, whether the agency's policy choice . . . is supported by substantial evidence, and whether there is a rational connection between the facts and the choice made." *Wis. Valley Improvement Co.,* 236 F.3d at 745 (*citing Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416 (1971)) (internal quotation marks omitted).

In turning to plaintiff's claims on summary judgment, the question before this Court is whether the agency's action was reasonable *in light of the evidence that was before the agency* at the time the decision was made. *Wis. Valley Improvement Co.,* 236 F.3d at 745. Thus, the declarations submitted by plaintiff now, but which were not before FSIS at the time it decided to postpone rescission action on the labels challenged by Hormel, cannot form a basis on which to set aside the agency's decision as arbitrary and capricious. Moreover, plaintiff's declarations do not prove that lactates extended the shelf life of the products in question. At best, they only show that reasonable minds might disagree about how much weight to give the studies showing that lactates do not extend shelf life.

The evidence is uncontroverted that, in addition to the four shelf studies in question, there were many highly diverse and often contradictory comments in response to the agency's request for comments on this subject – addressing various aspects of the definition of "natural." Supp. Derfler Decl. ¶ 24. It is precisely because these comments were not uniform, were widely diverse, and could not be read together to reach any one conclusion, because they did not point to any uniform explanation or understanding of what "natural" meant or should mean, that USDA decided to postpone any decision on rescission and wait until the conclusion of the rulemaking

19

process.  Moreover, several of the comments requested that USDA do exactly what it did, not take any action regarding recission until the conclusion of rulemaking in order to take all of the diverse views presented into account.  For example, the National Meat Association suggested delaying any decision on recission until the end of the rulemaking process.  AR 875.  Others wanted additional criteria for the definition of "natural" to be considered.  For instance, Farm Sanctuary urged that the definition of "natural" take the animals' living conditions into consideration.  AR 897-898.  In addition, some commentators urged interagency coordination for any final rule.  *See e.g.* AR 907 (urging FSIS to coordinate its efforts with FDA and others).  The need for rulemaking, therefore, was highlighted by the fact that the comments were so diverse and at times contradictory. Hence, the agency's decision to suspend decision on rescission until after rulemaking is eminently reasonable.

In addition to the comments, the only other direct evidence before the agency at the time, from the companies that responded to the agency's requests for scientific analysis, supports the claim that sodium lactate does *not* appear to extend shelf life *on the particular products in question* at two percent or less of product formulation.  AR 790-874; Derfler Decla. ¶¶ 30-32.  The Supplemental Declaration of Philip Derfler explains that FSIS requested that the companies with products containing lactates bearing the "natural" label show that these products exhibit similar microbiological characteristics, i.e. similar shelf life and "product dating parameters," to products that do not contain lactates.  Supp. Derfler Decl. ¶ 17.

FSIS found the studies sufficient to evaluate the microbiological characteristics of the products in question because no one uniform study protocol was requested and studies that were submitted appeared to follow acceptable protocols.  Supp. Derfler Decl. ¶ 18, 20. FSIS decided

20

on the basis of data that it received in the four studies that the products formulated with lactates did not have an extended shelf life compared to the similar products formulated without lactates because both sets of products exhibited a similar rate of spoilage. *Id.* ¶ 18-20.

      The data submitted by these companies demonstrated that, under identical controlled conditions, the growth of spoilage organisms, such as yeast, mold, and lactic acid bacteria, in meat and poultry products containing was basically the same as the non-sodium lactate containing products. Moreover the two sets of products displayed similar appearance, odor, and package integrity over time. In addition, the labeled expiration dates on products to which sodium lactate had been added were the same as those of products with the same formulation but that did not contain sodium lactate.


Supp. Derfler Decl. at ¶ 18. Since the lactates in these products have not been shown to extend shelf life, based upon the information available to USDA at the time, the lactates have not been shown to have a preservative effect and the products do not appear to have been mislabeled. 21 C.F.R. 101.22.

      In distinction to the shelf-life studies, the Declaration of Phillip L. Minerich, submitted with plaintiff's cross-motion for summary judgment, which purports to present evidence that lactates *do* have a preservative effect, *does not address the products that were the subject of the shelf studies.* In addition, Mr. Minerich does not address the many diverse comments that the agency received about the definition of "natural," as described above and the fact that one uniform approach does not present itself after reading those comments.

      Most importantly, the Minerich Declaration is focused on the claim that lactates have an

inhibitory influence on the growth of bacteria that would cause spoilage.  Minerich Declaration

¶ 3.  The Supplemental Derfler Declaration, ¶ 23,  explains, however, that just because certain

bacteria are inhibited by the presence of lactates does *not* mean that those lactates have extended

the shelf-life of the product, which is all that was at issue in the shelf studies.   Thus, a finding

that lactates may inhibit the growth of certain bacteria is not by any means proof that lactates

extend shelf-life.  Plaintiff's claims to the contrary, that lactates may inhibit the growth of certain

bacteria only shows that the food might be safer to eat –  not that the shelf-life was necessarily

extended.  As the Supplemental Derfler Declaration explains:

> [The shelf studies show] that the sodium lactate was not
> functioning as a preservative because its use did not prevent or
> retard deterioration of the meat or poultry products to which it had
> been added.  Instead, the sodium lactate was functioning as a
> flavoring agent, its intended use, with a possible added benefit
> (shown in data other than those submitted by Fresherized Foods) of
> enhancing food safety by preventing the growth of pathogenic
> bacteria, specifically Lm.  While the use of sodium lactate as a
> preservative in a meat or poultry product would disqualify the
> product from bearing a "natural" claim, its use as a flavoring agent
> or as an antimicrobial to prevent the growth of Lm and other
> pathogens without affecting the outgrowth of spoilage organisms
> or extending the shelf life of the product would not.

Supp. Derfler Decl. ¶ 23.

Hence, a finding, that lactates may inhibit the growth of certain bacteria does not

contradict the shelf studies or the Derfler Declaration.   The Minerich Declaration, therefore,

does not present evidence of any arbitrary or capricious decision by the agency because it does

not present evidence that should have led to an inevitable decision to immediately rescind the

labels in question.

It would make no sense to rescind every label in question (based on, in some cases, not even the suspicion of a preservative effect) where the companies have not provided additional data requested, only to possibly restore those same labels later, upon clarification of the "natural" rule. Suppose that, as here, USDA wrote to multiple companies on this issue, and received only four responses to date. Suppose further that USDA proceeded to pull all the products off the shelves from the companies that failed to respond, i.e. rescinding the labels in question due to the failure to respond, as plaintiff demands in this case. If, at the end of the rulemaking process, it is determined that these products do indeed meet the definition of "natural," then the rescission will have imposed upon the agency, upon the industry, and ultimately, upon the consumer, the additional costs of pulling all of these products off every grocery shelf in America, and then restocking those same shelves with those same products after the conclusion of rulemaking. Moreover, clarification for the public – plaintiff's stated goal – will not be achieved. The public will only be more confused about which products meet the "natural" standard if the same products disappear from the shelves and then later reappear with the same "natural" label and the same ingredients. Removing and restoring these products to the shelves in quick succession is not an effective use of resources, and defendant's approach is a reasonable way of avoiding this scenario.

Based upon the diverse comments received by the agency, and based upon the scientific analyses before the agency at that time, at a minimum, more analysis was required before any decision on rescission can be made. Defendant's approach was reasonable under these circumstances. Hence, summary judgment in favor of defendant is appropriate because the

decision to forego rescission until all the evidence was gathered was not arbitrary or capricious.

*Wis. Valley Improvement Co.,* 236 F.3d at 745;  21 U.S.C. § 610(d) (FMIA); 21 U.S.C. §

458(a)(2) (PPIA).

**VI.      THE COURT SHOULD GRANT SUMMARY JUDGMENT
         IN FAVOR OF DEFENDANT AS TO COUNT THREE
         BECAUSE THE AGENCY'S LETTER TO CONGRESSMAN
         PETERSON DOES NOT CONSTITUTE AGENCY RULE
         MAKING.**

        First and fundamentally, USDA's letter to Congressman Peterson is not a "rule" at all.

The APA defines a "rule" as "an agency statement of general or particular applicability and

future effect designed to implement, interpret, or prescribe law or policy."  5 U.S.C. § 551(4);

*Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1033 (D.C. Cir. 2007).  In determining

whether an agency statement constitutes a "rule" of some kind, a court should look to factors

including "the agency's own characterization of its action, publication or lack thereof in the

Federal Register or the Code of Federal Regulations, and whether the action has a binding effect

on the rights of parties, and on the agency's ability to exercise discretion in the future."

*American Portland Cement Alliance v. EPA*, 101 F.3d 772, 776 (D.C. Cir. 1996).  An

examination of each of these factors highlights the plain reality that the agency's response to a

congressional inquiry about a particular regulatory situation did not constitute a rule.

        First, USDA's characterization of its action, although not dispositive, provides useful

guidance as to whether the action in this case should be considered a rule. *Cement Alliance,* 101

F.3d at 776.  As explained herein and in Mr. Derfler's declarations, USDA merely decided, as

explained in its letter to Congressman Peterson, that it is deferring action on whether to rescind

"natural" label approvals for certain products containing lactates until it has completed a

rulemaking addressing whether and under what circumstances products formulated with lactates may be considered "natural." A stated intent to defer enforcement action pending the development of new standards under which regulation is thereafter to proceed does not itself constitute the announcement of a rule. *See Irritated Residents,* 494 F.3d at 1033-34; *Cement Alliance,* 101 F.3d at 776.

Second (and once more at the risk of underscoring the obvious), the letter to Congressman Peterson was not published in the Code of Federal Regulations or the Federal Register, further buttressing the conclusion that USDA did not announce therein any kind of rule. *Cement Alliance,* 101 F.3d at 776.

Third and finally, the letter has no binding effect on interested parties or the agency. *Id.* Just as USDA's letters to Hormel and its competitors had no binding effect on the agency's discretion to refrain from initiating rescission actions at this time, the letter to Congressman Peterson places no substantive limits on the agency's discretion to take enforcement action -- even prior to completing rulemaking on the meaning of the term "natural" -- if it determines in the meantime that statutory standards governing the labeling of meat and poultry products have been violated. *See Irritated Residents*, 494 F.3d at 1034.[3] The letter itself does not reflect any change in the agency's substantive understanding of the term "natural" or its interpretation of statutory requirements. *See Indep. Equipment Dealers Ass'n v. EPA*, 372 F.3d 420, 426 (D.C. Cir. 2004). At most it could only rise to the level of a policy statement "let[ting] the public know

---

[3] Indeed, as noted in the supplemental Derfler declaration, since December 2006 FSIS has denied "natural" label approval for several products containing sodium lactates, where the manufacturers failed to provide data showing that the lactates do not have a preservative effect on the products. Supp. Derfler Decl., ¶ 8.

[the agency's] current enforcement or adjudicatory approach," *Syncor Int'l Corp. v. Shalala,* 127 F.3d 90, 94 (D.C. Cir. 1997), but even so it would not be subject to the APA's requirements of notice and comment.

Even if the letter to Congressman Peterson could accurately be characterized as a rule, it would not qualify as a legislative rule subject to notice and comment, but could at most could be considered an interpretive rule. To distinguish between legislative and interpretive rules, a court considers whether the rule has "legal effect," as ascertained by asking:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule.

*Truckers United for Safety v. Fed. Hwy. Admin*, 139 F.3d 934, 938-39 (D.C. Cir. 1998) (quoting *American Mining Cong. v. Mine Safety & Health Admin*., 995 F.2d 1106, 1112 (D.C. Cir. 1993)). None of these factors is present here. The letter neither adopts nor imposes any substantive standards on which FSIS would have to rely as a predicate for enforcement action, *see id.* at 939, USDA neither published the letter in the Code of Federal Regulations, nor invoked its legislative rulemaking authority under the FMIA and PPIA, *see id.,* and the letter does not amend any prior legislative rule. *Id.*

Here, the only binding rule is contained in the statute itself. What the agency described as its plan of action in the earlier letter is simply a reflection of the agency's thinking at the time as to a remedy in advance of rulemaking, a position that the agency is free to withdraw or modify in its discretion. The letter is not a legislative rule requiring notice-and-comment procedures.

## CONCLUSION

For the reasons cited above, and previously, and for the reasons stated in the two Derfler declarations, defendant's motion to dismiss or for summary judgment should be granted, and plaintiff's cross-motion for summary judgment should be denied.

Dated: April 25, 2008

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

FELIX V. BAXTER
Director, Federal Programs Branch
Civil Division

 s/ William B. Jaffe (Electronic Filing)
JAMES J. GILLIGAN
Assistant Director
WILLIAM B. JAFFE
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Mailing Address
P.O. Box 883
Washington, DC  20044
Delivery Address
20 Massachusetts Avenue, NW, Room 6110
Washington, DC  20530
(202) 353-7633
Fax: (202) 616-8460
Email: william.jaffe@usdoj.gov

Attorneys for Defendant

## TABLE OF CONTENTS

Page

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    I.      COUNT I MUST BE DISMISSED BECAUSE PLAINTIFF HAS
           NO CAUSE OF ACTION UNDER THE FMIA OR THE PPIA,
           AND COUNT I WOULD FAIL EVEN IF PLED UNDER THE APA.. . . . . . . . . 5

    II.     THE DECISION NOT TO IMMEDIATELY RESCIND ANY
           "NATURAL" LABELS IS NOT A FINAL AGENCY ACTION
           SUBJECT TO JUDICIAL REVIEW UNDER THE APA BECAUSE
           SUCH DECISION DOES NOT CHANGE AGENCY POLICY, AND
           DOES NOT FINALLY DETERMINE THE ISSUES OR RIGHTS TO
           WHICH IT IS ADDRESSED.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

    III.    NOTHING USDA HAS DONE TO DATE LIMITS ITS DISCRETION
           AS TO WHETHER AND WHEN TO RESCIND ANY PARTICULAR
           LABEL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

    IV.    COUNTS TWO AND THREE OF THE COMPLAINT MUST BE
           DISMISSED BECAUSE ONLY ACTION THAT IS LEGALLY
           *REQUIRED* MAY BE COMPELLED UNDER THE APA.. . . . . . . . . . . . . . . . 17

    V.     IN THE ALTERNATIVE, SUMMARY JUDGMENT SHOULD BE
           GRANTED IN FAVOR OF DEFENDANT AS TO COUNT II,
           BECAUSE DEFENDANT HAS NOT ACTED ARBITRARILY OR
           CAPRICIOUSLY, BASED UPON THE AVAILABLE EVIDENCE.. . . . . . . . . 18

    VI.    THE COURT SHOULD GRANT SUMMARY JUDGMENT IN
           FAVOR OF DEFENDANT AS TO COUNT THREE BECAUSE THE
           AGENCY'S LETTER TO CONGRESSMAN PETERSON DOES NOT
           CONSTITUTE AGENCY RULE MAKING.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

i.

## <u>TABLE OF AUTHORITIES</u>

<u>CASES</u>                                                                                       Page(s)

<u>Ass'n of Irritated Residents v. EPA</u>,
        494 F.3d 1027 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

<u>Baltimore Gas & Elec. Co. v. FERC</u>,
        252 F.3d 456 (D.C. Cir.2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>Bennett v. Spear</u>,
        520 U.S. 154 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

<u>Biovail Corp. v. FDA</u>,
        448 F. Supp. 2d 154 (D.D.C. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

<u>Center for Auto Safety v. National Highway Traffic Safety Administration</u>,
        452 F.3d 798 (D.C. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 10

<u>Citizens to Preserve Overton Park, Inc. v. Volpe</u>,
        401 U.S. 402 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

<u>Community Nutrition Institute v. Young</u>,
        818 F.2d 943 (D.C. Cir. 1987). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 23

<u>Croplife v. E.P.A.</u>,
        329 F.3d 876 (D.C. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

<u>Drake v. FAA</u>,
        291 F.3d 59 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>DSMC, Inc. v. Convera Corp.</u>,
        479 F.Supp.2d 68 (D.D.C.2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

<u>Heckler v. Chaney</u>,
        470 U.S. 821 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

<u>In re Sealed Case</u>,
        131 F.3d 208 (D.C. Cir.1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

<u>                                              </u>ii.

<u>Norton v. So. Utah Wilderness Alliance</u>,

542 U.S. 55 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n,
    324 F.3d 726 (D.C. Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Shanahan v. City of Chicago,
    82 F.3d 776 (7th Cir.1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Steenholdt v. FAA,
    314 F.3d 633 (D.C. Cir.2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Wis. Valley Improvement Co. v. FERC,
    236 F.3d 738 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 22
Worldcom, Inc. v. FCC,
    238 F.3d 449 (D.C. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 17

**STATUTES AND REGULATIONS**

5 U.S.C. § 551. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

5 U.S.C. § 553. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

5 U.S.C. § 701(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

5 U.S.C. § 706(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

5 U.S.C. § 706(2)(D). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

21 U.S.C. § 346 (1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

21 U.S.C. § 458(a)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

21 U.S.C. § 610(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

21 U.S.C. §§ 457(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

7 C.F.R. § 205.105. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

7 C.F.R. § 205.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

21 C.F.R. 101.22. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

21 C.F.R. § 109.4 (1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

iii.
**UNITED STATES DISTRICT COURT**

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HORMEL FOODS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:07-cv-1724 (RBW) |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S REPLY MEMORANDUM IN SUPPORT OF ITS MOTION TO DISMISS/MOTION FOR SUMMARY JUDGMENT, AND MEMORANDUM IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT**

**CERTIFICATE OF SERVICE**

I hereby certify that on April 25, 2008, a true and correct copy of the foregoing Reply Memorandum in support of Defendant's Motion for Dismissal/Summary Judgment and in opposition to Plaintiff's Cross-Motion for Summary Judgement was served via ECF upon counsel of record at the address listed below:

John F. Cooney, Esq.
Venable, LLP
575 7th Street, NW
Washington, DC 20004
202-344-4812
jfcooney@venable.com

Kirsten Friedel Roddy, Esq
Hogan & Hartson, LLP
555 13th Street, NW
Washington, DC 20004-1109
202-637-5600
kfroddy@hhlaw.com

Dated: April 25, 2008

                                                    s/ William B. Jaffe
_____      WILLIAM B. JAFFE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| HORMEL FOODS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:07-cv-1724 |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF PHILIP S. DERFLER

I, Philip S. Derfler, declare the following:

1.     I am the Assistant Administrator, Office of Policy and Program Development, of the United States Department of Agriculture ("USDA"), Food Safety and Inspection Service ("FSIS"). I have held this position since 1999. I make the following representations based upon my knowledge, upon facts made known to me in my capacity as an official at FSIS, and upon my review of relevant files at FSIS.

2.     This is a supplemental declaration to explain additions to the Administrative Record and provide further explanation of matters addressed in my previous declaration, dated January 22, 2008.

3.     It has been brought to FSIS' attention that certain documents may have been missing from the Administrative Record. Shortly before the filing of this lawsuit, the labeling staff moved offices. Prior to the move, all of the approved applications for labels were boxed up

and moved to one large room. At the time of the first search for documents for the

Administrative Record, the labeling staff conducted a manual search of at least 200 boxes for

responsive documents. Unfortunately, at the time of this initial search, some documents were

overlooked. These documents included label applications for certain companies, including Oscar

Mayer and Farmland Foods. These documents are now being included as part of the

Administrative Record.

  4.  Specifically, the following label applications are being included:

    a.  Three from Oscar Mayer: Application for smoked uncured beef franks,

      dated May 11, 2006; Application for smoked ham, dated June 22, 2006;

      and, Application for oven roast turkey breast, dated June 22, 2006.

    b.  Four from Farmland Foods: Application for spiral sliced ham, dated

      November 6, 2006; Application for deli style, dated November 20, 2006;

      Application for original ham, dated November 20, 2006; and Application

      for classic ham, dated November 21, 2006.

    c.  Two from Maverick Ranch: Application for bacon dated May 23, 2005;

      Application for bacon dated August 31, 2005..

    d.  Eight from Pederson's Natural Farms: Application for hickory smoked

      bacon dated July 12, 2002; Application for apple smoked bacon dated July

      12, 2002; Application for apple smoked bacon dated September 18, 2002;

      Application for pepper smoked bacon dated September 18, 2002;

      Application for smoked ham shanks dated October 7, 2002; Application

for honey ham dated October 8, 2002; Application for Canadian bacon dated November 20, 2002; and Application for pepper bacon dated March 18, 2003.

e.    One from Yorkshire Farms: Application for cheese hot dogs dated May 16, 2003.

f.    One from Premium Standards Farms: Application for bacon dated October 23, 2006.

g.    One from Saag's Products: Application for smoked chicken sausage dated October 30, 2006.

h.    One from Aidells: Application for smoked chicken and turkey sausage dated October 30, 2006.

i.    One from Coleman Natural: Application for bacon dated October 30, 2006.

j.    One from Riverwood Valley Farms: Application dated Octover 25, 2006.

5.    The Plaintiff asked that several other categories of documents be added to the Administrative Record in this case. The following documents cannot be included for the following reasons: First, with respect to the two form letters sent to companies requesting information on sodium and potassium lactate, not all of the form letters sent to specific companies were found in the labeling division's files. Although these letters were created on a computer, they were each individually printed out on FSIS letterhead, date stamped, and signed by Robert C. Post, the then Director of the Labeling and Policy Staff. These letters cannot

simply be printed off of the computer as they were sent out to the individual companies.

However, I attest that if one were to look at the documents provided, it is easy to determine that

other than a change in address, each of the letters was identical.

6.      Plaintiffs also question why there are not label approvals for at least twenty-four

companies, since letters were sent to that many companies.  There are several reasons why there

are not label approvals for all of the companies that received letters.  First, letters were not only

sent to subsidiaries that made "natural" products, but in some cases, they were also sent to the

parent corporation.  For example, a letter was sent to Smithfield Packing, the parent corporation,

and to its subsidiaries, Farmland Foods and Premium Standards.  Thus, in this instance, there are

label approvals for both Farmland Foods and Premium Standards, but not for Smithfield Packing.

Second, in some cases, letters were sent to contractors or suppliers of the component meat

products, such as West Liberty Foods and Independent Meat Company.  These companies are

part of the manufacturing process, but are not the companies that necessarily obtain the label

approvals.  Third, there were some instances in which companies contacted the labeling staff to

request letters to keep informed of developments in the "natural" policy, and the companies were

sent letters.  This was the case for Olymel SEC/LP, a broker of meat components.  Finally, in

some cases, a letter was sent to a company that has a "natural" single ingredient product or uses a

"natural" component ingredient (however, the total product was not labeled as "natural").  For

example, Swift & Sons has "natural" single ingredient pork products, while Godshall's Quality

Meats uses "natural turkey" as a component in their total product.  Essentially, the labeling staff

4

attempted to cast as wide a net as possible in order to gather the fullest scope of information on the use of sodium and potassium lactates in products labeled "natural."

7.      In addition, Plaintiffs request that several label applications for Farmland "Simply Natural" products be included in the Administrative Record. Where those label applications are relevant to this lawsuit, those documents are now being included.[1] However, there were two labels for "Simply Natural" products that were included as an exhibit to Plaintiff's motion that are not being added to the Administrative Record. Those labels are for Simply Natural Bacon and Simply Natural Sausage. Those label applications are not being included because those products do not include sodium lactate or potassium lactate.

8.      Additionally, Plaintiffs believe that there are label applications subsequent to December 2006 that should be included in the Administrative Record. There has only been one applicable label approved since December 2006 and that label was previously provided in the original Administrative Record. This label was approved after the company, Pederson's Natural Farms, provided FSIS with evidence that the sodium lactate used in its product does not extend the shelf life of the product. Since December 2006, several companies have requested "natural" label approval with sodium or potassium lactate in their ingredient statement. The labeling division has denied the applications for labels where companies have not provided data to show that the potassium or sodium lactate does not have a preservative effect at levels of two percent

---

[1]Those labels are Simply Natural Spiral Sliced Ham, application dated November 6, 2006 (AR 002140); Premium Deli Style Ham, application dated November 20, 2006 (AR 002146); Original Ham, application dated November 20, 2006 (AR 002148); and Classic Ham, application dated November 21, 2006 (AR 002150).

or less. One company, Farmland Foods, has appealed the denial of its label applications. The appeal letter is now being included in the Administrative Record at AR 002248.

9.      In my first declaration I explained the evolution of the "natural" policy with respect to the inclusion of sodium and potassium lactates. I would like to provide further explanation regarding the policy. Beginning in approximately 2000 and 2001, we began receiving requests for the inclusion of potassium and sodium lactates in products with the "natural" label. However, we do not have copies of these requests because they came in the form of label applications. The labeling staff does not keep copies of label applications that are denied; rather, those label applications are returned to the respective applicants.

10.     In 2002, Pederson's Natural Farms sent in a number of applications for label approvals. In the beginning of 2002, the labeling division approved several labels for "natural" products that contained sodium lactate, among other things. In July of that year, a letter was sent to Pederson's Natural Farms rescinding a series of labels, and any similar labels not listed in the letter, which may have included sodium lactate, sodium phosphate, sodium nitrate, spice extracts, or dextrose. This letter is now being included in the Administrative Record at AR 007152. The letter makes clear that, at that time, such substances could not be used in products labeled as "natural." Thereafter, for those products that included lactates, the labeling division clearly marked on those label applications that the products could not be labeled "natural." We are including the modified label applications for those labels in the Administrative Record at AR 002177-002198.

6

11.     There are two approved label applications in 2003 for products labeled as "natural" that have sodium lactate. These labels were for Pederson's Natural Farm and Yorkshire Farms. It appears that these labels were approved in error and that they are anomalies.[2]

12.     In or around late 2003, Applegate Farms requested clarification that sodium and potassium lactates were allowed to be used as a flavoring in products labeled "natural." A decision was made in early 2004 to allow the use of sodium and potassium lactate in products labeled as "natural" after Applegate Farms produced a letter from the National Organic Program (NOP) stating that sodium and potassium lactates were approved for use in organic products. Once the labeling staff received that letter, it made a determination that given the stringent petition and approval policy at the NOP, and given that lactates could be used in products labeled as organic, then they could also be used in "natural" products. The labeling staff assumed that the lactates, at the two percent or less level, would not have a preservative effect and was being added solely as a flavoring agent.[3]

13. The evaluation criteria for the NOP are in many ways similar to those used for "natural" products. For example, NOP looks at whether the product comes from a natural source; whether the substance's primary use is as a preservative or to recreate or improve flavors;

---

[2]We have contacted Pederson's Farm about this label, and the company has assured us that this label is not in use. Yorkshire Farms is no longer a brand name that is used.

[3]See electronic mail message between Robert C. Post and the Labeling and Consumer Protection Staff dated March 17, 2004, at AR 002207.

and whether the substance is listed as generally recognized as safe by the Food and Drug Administration. 7 C.F.R. § 205.601.

14.    With respect to the processing of the product, NOP has a definition that is similar to FSIS' minimal processing definition.  In the definition of "natural," FSIS has stated that minimal processing may include "those traditional processes used to make food edible or to preserve it or make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting."  Similar to that, NOP's definition of "processing" is limited to "cooking, baking, curing, drying, mixing, grinding, churning, separating, extracting, slaughtering, cutting, fermenting, distilling, eviscerating, preserving, dehydrating, freezing, chilling, or otherwise manufacturing and includes the packaging, canning, jarring, or otherwise enclosing food in a container."  7 C.F.R. § 205.2.  Similar to the FSIS' definition of "natural," the NOP eschews severe chemical processes such as ionizing radiation.  7 C.F.R. § 205.105.

15.    As stated above, the labeling staff assumed that sodium and potassium lactates at the two percent or less level acted solely as a flavoring in meat and poultry products because lactates had been approved for flavoring at that level in FSIS regulations contained at 9 C.F.R. 424.21 (see also preamble to regulations contained at 58 Fed. Reg. 4067 (January 13, 1993)). Although the two percent limitation was not written directly into the policy, the purpose of use of each ingredient is always considered when making a determination with respect to a label application.  Since FSIS already had regulations governing the use of sodium and potassium lactates with respect to levels for flavoring, those regulations and whether the formulation for the products fit within that limitation were always considered.  If the sodium or potassium lactate

8

levels did not fit within the flavoring range, then those applications would have been questioned. The labeling staff considers all applicable FSIS regulations when considering each application.

16.    At the time that the Agency promulgated regulations for the use of sodium and potassium lactate as a flavoring in 1993, evidence discussed in response to comments submitted suggested that using lactates at the two percent or less level would not provide a preservative effect, and the Agency was not aware of any evidence to the contrary at the time that the "natural" policy was updated in August 2005.

17.    In order for FSIS to be assured that the labeling of meat and poultry products bearing the claim "natural" in which lactates are used for flavoring is truthful and not misleading, in December of 2006, FSIS requested that manufacturers provide data on whether products containing lactates exhibited similar microbiological characteristics as products formulated without lactates (i.e., there is no significant lethality or suppression of growth in spoilage organisms that would suggest that the use of lactates as flavorings provides manufacturers with the added benefit of an extended shelf life). Because of questions that arose on how manufacturers should demonstrate a lack of preservative effect, in January 2007, FSIS clarified that the data should show that the same shelf-life and product dating parameters were applied to products in which lactates have been used as compared to products in which they have not been used.

18.    Hormel has specifically raised questions about the data submitted to the Agency by Plumrose, Fresherized Foods, and Pederson's Natural Farms. The data submitted by these companies indicated that, under identical controlled conditions, the outgrowth of spoilage

organisms, such as yeast, mold, and lactic acid bacteria, in meat and poultry products containing

similar appearance, odor, and package integrity over time were the same as the non-sodium

lactate containing products.  In addition, the labeled "use by" dates on products to which sodium

lactate had been added were the same as those of products with the same formulation but that did

not contain sodium lactate.

19.    It is important to note that FSIS did not request that manufacturers follow a

specific protocol to evaluate the microbiological characteristics of their products.  The lactates at

issue have already undergone scientific evaluation, and a public rulemaking process, to assess

their safety and suitability as a substance generally recognized as safe for use in food as a

flavoring.  FSIS only requires that manufacturers use ingredients in a manner that demonstrably

is consistent with their intended technical effects.  Thus, when Hormel presented the Agency

with information that suggested that lactates might provide a preservative effect at a level

consistent with that used for flavoring, the Agency felt it was necessary to request documentation

from the companies that were using the lactates for their flavoring effect, at the two percent or

less level, to demonstrate that they were using the lactates for flavoring and not to preserve the

food, and thus to justify that a "natural" label claim is truthful and not misleading.  Thus, in the

January 2007 letter sent to companies, FSIS stated that establishments could show that they were

using the same "use by" date for their products with and without sodium or potassium lactate in

order to provide assurance that they were not taking advantage of any preservative effect.

20.    For this reason, FSIS did not take issue with Plumrose's protocol in which

samples for Anaerobic Plate Count (APC) and lactic acid bacteria were held under incubation at

30°C for 48 hours, and samples for yeast and mold were held under incubation at 30°C for 72

hours instead of an incubation temperature of 35°. This five degree difference was not seen as a

significant flaw since both the products with and without lactates were evaluated under the same

conditions. FSIS believes that this study did show that product formulated with and without

lactates subjected to the same controlled conditions (i.e., incubation temperatures) had similar

microbial growth patterns over their shelf-life. FSIS felt this data, along with Plumrose's use of

the same expiration date (56 days) for products formulated with and without lactates, was

sufficient to show that Plumrose was not benefitting from an extended shelf life from the use of

lactates.

      21.     In regard to Fresherized Foods, its study on the use of lactates at 1 and 1.5 percent

of the product formula concluded that the use of lactates did not significantly reduce or suppress

the growth of *Listeria monocytogenes (Lm),* and thus its use would not be justified for pathogen

control in the production of their ready-to-eat beef and chicken strips. Fresherized, also

responded to FSIS that it applies the same "use by" dates for products formulated with and

without lactates. This lack of evidence of a significant antimicrobial effect, along with the

company's use of the same "use by" dates, was again considered sufficient by the Agency to meet

our data request described above. In regard to Pederson's Natural Farm's data, the microbial

growth rate for products formulated with lactates at 1.5 and 2.0 percent as compared to products

formulated without lactates was similar (i.e., 1.1 logs, 1.6 logs, and 1.5 logs, respectively).

Similar to Plumrose and Fresherized Foods, Pederson's Natural Farms concluded from its data

that the use of lactates did not provide a preservative effect to extend shelf life and informed the

11

Agency that it uses the same code date (65 days) for product treated with and without lactates.

22.    The Agency recognizes that many variables (e.g., a product's initial microbial load, sodium content, pH, and study design) will affect the data that are generated in any microbiological study. However, in each of the cases described above, the Agency found that the data that were submitted along with each manufacturer's use of the same "use by" date for products formulated with and without lactates were reasonable given the Agency's data request and indicative that each use of lactates was consistent with its approved use as a flavoring agent as opposed to the use of lactates for microbial control to achieve an extended shelf-life.

23.    Thus, the data submitted by these companies provide support for their claims that Plumrose, Fresherized Foods, and Pederson's Natural Farms were not using sodium lactate for its preservative effect, i.e. to prevent or retard deterioration of the meat or poultry products to which it had been added. Instead, the data tended to support the companies' claim that the sodium lactate was functioning as a flavoring agent, its intended use, with a possible added benefit (shown in data other than those submitted by Fresherized Foods) of enhancing food safety by preventing the growth of pathogenic bacteria, specifically *Lm*. While the use of sodium lactate as a preservative in a meat or poultry product would disqualify the product from bearing a "natural" claim, its use as a flavoring agent or as an antimicrobial to prevent the growth of *Lm* and other pathogens without affecting the outgrowth of spoilage organisms or extending the shelf life of the product would not.

24.    The documents submitted by these companies are not the only documents being considered by FSIS in developing its policy with respect to meat and poultry products labeled

12

"natural." In addition to the documentation submitted by these companies, FSIS is also considering the comments made at the public meeting held in December 2006, as well as all of the comments received in response to its request for comments. The data, documentation, and views expressed cover a variety of points of view with respect to how the Agency should make determinations with respect to the approval of "natural" labels.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on April 24 , 2008.

Philip S. Derfler

13

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| _____ ) | |
| HORMEL FOODS CORPORATION, ) | |
| ) | |
| Plaintiff, ) | Civil Action No. 1:07-cv-1724 |
| v. ) | |
| ) | |
| UNITED STATES DEPARTMENT ) | |
| OF AGRICULTURE, ) | |
| ) | |
| Defendant. ) | |
| ) | |
| _____) | |

**DEFENDANT'S SUPPLEMENTAL STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to LCvR 7(h) and 56.1, defendant, United States Department of Agriculture, submits this statement of material facts as to which there is no genuine issue in support of Defendant's Motion for Summary Judgment.

1.      It has been brought to FSIS' attention that certain documents may have been missing from the Administrative Record.  Shortly before the filing of this lawsuit, the labeling staff moved offices.  Prior to the move, all of the approved applications for labels were boxed up and moved to one large room.  At the time of the first search for documents for the Administrative Record, the labeling staff conducted a manual search of at least 200 boxes for responsive documents.  Unfortunately, at the time of this initial search, some documents were overlooked.  These documents included label applications for certain companies, including Oscar Mayer and Farmland Foods.  These documents are now being included as part of the Administrative Record. (Supp. Derfler Decl. ¶ 3).

2.      Specifically, the following label applications are being included:

a.    Three from Oscar Mayer:  Application for smoked uncured beef franks, dated May 11, 2006; Application for smoked ham, dated June 22, 2006; and, Application for oven roast turkey breast, dated June 22, 2006.

b.    Four from Farmland Foods:  Application for spiral sliced ham, dated November 6, 2006; Application for deli style, dated November 20, 2006; Application for original ham, dated November 20, 2006; and Application for classic ham, dated November 21, 2006.

c.    Two from Maverick Ranch: Application for bacon dated May 23, 2005; Application for bacon dated August 31, 2005..

d.    Eight from Pederson's Natural Farms: Application for hickory smoked bacon dated July 12, 2002; Application for apple smoked bacon dated July 12, 2002; Application for apple smoked bacon dated September 18, 2002; Application for pepper smoked bacon dated September 18, 2002; Application for smoked ham shanks dated October 7, 2002; Application for honey ham dated October 8, 2002; Application for Canadian bacon dated November 20, 2002; and Application for pepper bacon dated March 18, 2003.

e.    One from Yorkshire Farms: Application for cheese hot dogs dated May 16, 2003.

f.    One from Premium Standards Farms: Application for bacon dated October 23, 2006.

g.    One from Saag's Products: Application for smoked chicken sausage dated

October 30, 2006.

h.      One from Aidells: Application for smoked chicken and turkey sausage dated October 30, 2006.

i.      One from Coleman Natural: Application for bacon dated October 30, 2006.

j.      One from Riverwood Valley Farms: Application dated October 25, 2006.

(Supp. Derfler Decl. ¶ 4).

3.      The Plaintiff asked that several other categories of documents be added to the Administrative Record in this case. The following documents cannot be included for the following reasons: First, with respect to the two form letters sent to companies requesting information on sodium and potassium lactate, not all of the form letters sent to specific companies were found in the labeling division's files. Although these letters were created on a computer, they were each individually printed out on FSIS letterhead, date stamped, and signed by Robert C. Post, the then Director of the Labeling and Policy Staff. These letters cannot simply be printed off of the computer as they were sent out to the individual companies. However, if one were to look at the documents provided, it is easy to determine that other than a change in address, each of the letters was identical. (Supp. Derfler Decl. ¶ 5).

4.      Plaintiffs also question why there are not label approvals for at least twenty-four companies, since letters were sent to that many companies. There are several reasons why there are not label approvals for all of the companies that received letters. First, letters were not only sent to subsidiaries that made "natural" products, but in some cases, they were also sent to the parent corporation. For example, a letter was sent to Smithfield Packing, the parent corporation,

and to its subsidiaries, Farmland Foods and Premium Standards. Thus, in this instance, there are

label approvals for both Farmland Foods and Premium Standards, but not for Smithfield Packing.

Second, in some cases, letters were sent to contractors or suppliers of the component meat

products, such as West Liberty Foods and Independent Meat Company. These companies are

part of the manufacturing process, but are not the companies that necessarily obtain the label

approvals. Third, there were some instances in which companies contacted the labeling staff to

request letters to keep informed of developments in the "natural" policy, and the companies were

sent letters. This was the case for Olymel SEC/LP, a broker of meat components. Finally, in

some cases, a letter was sent to a company that has a "natural" single ingredient product or uses a

"natural" component ingredient (however, the total product was not labeled as "natural"). For

example, Swift & Sons has "natural" single ingredient pork products, while Godshall's Quality

Meats uses "natural turkey" as a component in their total product. Essentially, the labeling staff

attempted to cast as wide a net as possible in order to gather the fullest scope of information on

the use of sodium and potassium lactates in products labeled "natural."  (Supp. Derfler Decl. ¶

6).

     5.     In addition, Plaintiffs request that several label applications for Farmland "Simply

Natural" products be included in the Administrative Record. Where those label applications are

relevant to this lawsuit, those documents are now being included.[1]  However, there were two

labels for "Simply Natural" products that were included as an exhibit to Plaintiff's motion that

---

[1] Those labels are Simply Natural Spiral Sliced Ham, application dated November 6, 2006 (AR 002140); Premium Deli Style Ham, application dated November 20, 2006 (AR 002146); Original Ham, application dated November 20, 2006 (AR 002148); and Classic Ham, application dated November 21, 2006 (AR 002150).

are not being added to the Administrative Record.  Those labels are for Simply Natural Bacon and Simply Natural Sausage.  Those label applications are not being included because those products do not include sodium lactate or potassium lactate. (Supp. Derfler Decl. ¶ 7).

6.      Additionally, Plaintiffs believe that there are label applications subsequent to December 2006 that should be included in the Administrative Record.  There has only been one applicable label approved since December 2006 and that label was previously provided in the original Administrative Record.  This label was approved after the company, Pederson's Natural Farms,  provided FSIS with evidence that the sodium lactate used in its product does not extend the shelf life of the product.  Since December 2006, several companies have requested "natural" label approval with sodium or potassium lactate in their ingredient statement.  The labeling division has denied the applications for labels where companies have not provided data to show that the potassium or sodium lactate does not have a preservative effect at levels of two percent or less.  One company, Farmland Foods, has appealed the denial of its label applications.   The appeal letter is now being included in the Administrative Record at AR 002248. (Supp. Derfler Decl. ¶ 8).

7.      In the first Derfler declaration, Mr. Derfler explained the evolution of the "natural" policy with respect to the inclusion of sodium and potassium lactates.  Further explanation of that policy follows.  Beginning in approximately 2000 and 2001, USDA began receiving requests for the inclusion of potassium and sodium lactates in products with the "natural" label.  However, USDA does not have copies of these requests because they came in the form of label applications.  The labeling staff does not keep copies of label applications that are denied; rather, those label applications are returned to the respective applicants.  (Supp.

Derfler Decl. ¶ 9).

8.      In 2002, Pederson's Natural Farms sent in a number of applications for label

approvals.  In the beginning of 2002, the labeling division approved several labels for "natural"

products that contained sodium lactate, among other things.  In July of that year, a letter was sent

to Pederson's Natural Farms rescinding a series of labels, and any similar labels not listed in the

letter, which may have included sodium lactate, sodium phosphate, sodium nitrate, spice extracts,

or dextrose.  This letter is now being included in the Administrative Record at AR 007152.  The

letter makes clear that, at that time, such substances could not be used in products labeled as

"natural."  Thereafter, for those products that included lactates, the labeling division clearly

marked on those label applications that the products could not be labeled "natural."  Defendant is

including the modified label applications for those labels in the Administrative Record at AR

002177-002198. (Supp. Derfler Decl. ¶ 10).

9.      There are two approved label applications in 2003 for products labeled as

"natural" that have sodium lactate.  These labels were for Pederson's Natural Farm and

Yorkshire Farms.  It appears that these labels were approved in error and that they are

anomalies.[2]  (Supp. Derfler Decl. ¶ 11).

10.     In or around late 2003, Applegate Farms requested clarification that sodium and

potassium lactates were allowed to be used as a flavoring in products labeled "natural."  A

decision was made in early 2004 to allow the use of sodium and potassium lactate in products

labeled as "natural" after Applegate Farms produced a letter from the National Organic Program

---

[2]USDA has contacted Pederson's Farm about this label, and the company has assured
USDA that this label is not in use.  Yorkshire Farms is no longer a brand name that is used.

(NOP) stating that sodium and potassium lactates were approved for use in organic products. Once the labeling staff received that letter, it made a determination that given the stringent petition and approval policy at the NOP, and given that lactates could be used in products labeled as organic, then they could also be used in "natural" products. The labeling staff assumed that the lactates, at the two percent or less level, would not have a preservative effect and was being added solely as a flavoring agent.[3] (Supp. Derfler Decl. ¶ 12).

11.  The evaluation criteria for the NOP are in many ways similar to those used for "natural" products. For example, NOP looks at whether the product comes from a natural source; whether the substance's primary use is as a preservative or to recreate or improve flavors; and whether the substance is listed as generally recognized as safe by the Food and Drug Administration. 7 C.F.R. § 205.601. (Supp. Derfler Decl. ¶ 13).

12.    With respect to the processing of the product, NOP has a definition that is similar to FSIS' minimal processing definition. In the definition of "natural," FSIS has stated that minimal processing may include "those traditional processes used to make food edible or to preserve it or make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting." Similar to that, NOP's definition of "processing" is limited to "cooking, baking, curing, drying, mixing, grinding, churning, separating, extracting, slaughtering, cutting, fermenting, distilling, eviscerating, preserving, dehydrating, freezing, chilling, or otherwise manufacturing and includes the packaging, canning, jarring, or otherwise enclosing food in a container." 7 C.F.R. § 205.2. Similar to the FSIS' definition of "natural," the NOP eschews

---

[3]See electronic mail message between Robert C. Post and the Labeling and Consumer Protection Staff dated March 17, 2004, at AR 002207.

severe chemical processes such as ionizing radiation.  7 C.F.R. § 205.105. (Supp. Derfler Decl. ¶ 14).

13.     As stated above, the labeling staff assumed that sodium and potassium lactates at the two percent or less level acted solely as a flavoring in meat and poultry products because lactates had been approved for flavoring at that level in FSIS regulations contained at 9 C.F.R. 424.21 (see also preamble to regulations contained at 58 Fed. Reg. 4067 (January 13, 1993)). Although the two percent limitation was not written directly into the policy, the purpose of use of each ingredient is always considered when making a determination with respect to a label application.  Since FSIS already had regulations governing the use of sodium and potassium lactates with respect to levels for flavoring, those regulations and whether the formulation for the products fit within that limitation were always considered.  If the sodium or potassium lactate levels did not fit within the flavoring range, then those applications would have been questioned. The labeling staff considers all applicable FSIS regulations when considering each application. (Supp. Derfler Decl. ¶ 15).

14.     At the time that the Agency promulgated regulations for the use of sodium and potassium lactate as a flavoring in 1993, evidence discussed in response to comments submitted suggested that using lactates at the two percent or less level would not provide a preservative effect, and the Agency was not aware of any evidence to the contrary at the time that the "natural" policy was updated in August 2005.  (Supp. Derfler Decl. ¶ 16).

15.     In order for FSIS to be assured that the labeling of meat and poultry products bearing the claim "natural" in which lactates are used for flavoring is truthful and not misleading, in December of 2006, FSIS requested that manufacturers provide data on whether products

containing lactates exhibited similar microbiological characteristics as products formulated

without lactates (i.e., there is no significant lethality or suppression of growth in spoilage

organisms that would suggest that the use of lactates as flavorings provides manufacturers with

the added benefit of an extended shelf life).  Because of questions that arose on how

manufacturers should demonstrate a lack of preservative effect, in January 2007, FSIS clarified

that the data should show that the same shelf-life and product dating parameters were applied to

products in which lactates have been used as compared to products in which they have not been

used.  (Supp. Derfler Decl. ¶ 17).

16.    Hormel has specifically raised questions about the data submitted to the Agency

by Plumrose, Fresherized Foods, and Pederson's Natural Farms.  The data submitted by these

companies indicated that, under identical controlled conditions, the outgrowth of spoilage

organisms, such as yeast, mold, and lactic acid bacteria, in meat and poultry products containing

similar appearance, odor, and package integrity over time were the same as the non-sodium

lactate containing products.  In addition, the labeled "use by" dates on products to which sodium

lactate had been added were the same as those of products with the same formulation but that did

not contain sodium lactate.  (Supp. Derfler Decl. ¶ 18).

17.    It is important to note that FSIS did not request that manufacturers follow a

specific protocol to evaluate the microbiological characteristics of their products.  The lactates at

issue have already undergone scientific evaluation, and a public rulemaking process, to assess

their safety and suitability as a substance generally recognized as safe for use in food as a

flavoring.  FSIS only requires that manufacturers use ingredients in a manner that demonstrably

is consistent with their intended technical effects.  Thus, when Hormel presented FSIS with

information that suggested that lactates might provide a preservative effect at a level consistent

with that used for flavoring, FSIS felt it was necessary to request documentation from the

companies that were using the lactates for their flavoring effect, at the two percent or less level,

to demonstrate that they were using the lactates for flavoring and not to preserve the food, and

thus to justify that a "natural" label claim is truthful and not misleading.  Thus, in the January

2007 letter sent to companies, FSIS stated that establishments could show that they were using

the same "use by" date for their products with and without sodium or potassium lactate in order

to provide assurance that they were not taking advantage of any preservative effect. (Supp.

Derfler Decl. ¶ 19).

18.     For this reason, FSIS did not take issue with Plumrose's protocol in which

samples for Anaerobic Plate Count (APC) and lactic acid bacteria were held under incubation at

30°C for 48 hours, and samples for yeast and mold were held under incubation at 30°C for 72

hours instead of an incubation temperature of 35°.  This five degree difference was not seen as a

significant flaw since both the products with and without lactates were evaluated under the same

conditions.   FSIS believes that this study did show that product formulated with and without

lactates subjected to the same controlled conditions (i.e., incubation temperatures) had similar

microbial growth patterns over their shelf-life.  FSIS felt this data, along with Plumrose's use of

the same expiration date (56 days) for products formulated with and without lactates, was

sufficient to show that Plumrose was not benefitting from an extended shelf life from the use of

lactates.  (Supp. Derfler Decl. ¶ 20).

19.     In regard to Fresherized Foods, its study on the use of lactates at 1 and 1.5 percent

of the product formula concluded that the use of lactates did not significantly reduce or suppress

the growth of *Listeria monocytogenes (Lm),* and thus its use would not be justified for pathogen

control in the production of their ready-to-eat beef and chicken strips. Fresherized, also

responded to FSIS that it applies the same "use by" dates for products formulated with and

without lactates. This lack of evidence of a significant antimicrobial effect, along with the

company's use of the same "use by" dates, was again considered sufficient by the Agency to meet

the Agency's data request described above. In regard to Pederson's Natural Farm's data, the

microbial growth rate for products formulated with lactates at 1.5 and 2.0 percent as compared to

products formulated without lactates was similar (i.e., 1.1 logs, 1.6 logs, and 1.5 logs,

respectively). Similar to Plumrose and Fresherized Foods, Pederson's Natural Farms concluded

from its data that the use of lactates did not provide a preservative effect to extend shelf life and

informed the Agency that it uses the same code date (65 days) for product treated with and

without lactates. (Supp. Derfler Decl. ¶ 21).

20.     The Agency recognizes that many variables (e.g., a product's initial microbial load,

sodium content, pH, and study design) will affect the data that are generated in any

microbiological study. However, in each of the cases described above, the Agency found that the

data that were submitted along with each manufacturer's use of the same "use by" date for

products formulated with and without lactates were reasonable given the Agency's data request

and indicative that each use of lactates was consistent with its approved use as a flavoring agent as

opposed to the use of lactates for microbial control to achieve an extended shelf-life. (Supp.

Derfler Decl. ¶ 22).

21.     Thus, the data submitted by these companies provide support for their claims that

Plumrose, Fresherized Foods, and Pederson's Natural Farms were not using sodium lactate for its

preservative effect, i.e. to prevent or retard deterioration of the meat or poultry products to which it had been added.  Instead, the data tended to support the companies' claim that the sodium lactate was functioning as a flavoring agent, its intended use, with a possible added benefit (shown in data other than those submitted by Fresherized Foods) of enhancing food safety by preventing the growth of pathogenic bacteria, specifically *Lm*.  While the use of sodium lactate as a preservative in a meat or poultry product would disqualify the product from bearing a "natural" claim, its use as a flavoring agent or as an antimicrobial to prevent the growth of *Lm* and other pathogens without affecting the outgrowth of spoilage organisms or extending the shelf life of the product would not.  (Supp. Derfler Decl. ¶ 23).

22.     The documents submitted by these companies are not the only documents being considered by FSIS in developing its policy with respect to meat and poultry products labeled "natural."  In addition to the documentation submitted by these companies, FSIS is also considering the comments made at the public meeting held in December 2006, as well as all of the comments received in response to its request for comments.  The data, documentation, and views expressed cover a variety of points of view with respect to how the Agency should make determinations with respect to the approval of "natural" labels.  (Supp. Derfler Decl. ¶ 24).

Dated: April 25, 2008

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General


JEFFREY A. TAYLOR
United States Attorney

FELIX V. BAXTER
Director, Federal Programs Branch
Civil Division


 s/ William B. Jaffe (Electronic Filing)

JAMES J. GILLIGAN
Assistant Director

WILLIAM B. JAFFE
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Mailing Address

P.O. Box 883

Washington, DC  20044

Delivery Address

20 Massachusetts Avenue, NW, Room 6110

Washington, DC  20530

(202) 353-7633

Fax: (202) 616-8460
Email: william.jaffe@usdoj.gov


Attorneys for Defendant

**CERTIFICATE OF SERVICE**

I  hereby certify that on April 25, 2008, a true and correct copy of the foregoing

supplemental statement of material facts as to which there is no genuine issue in support of

Defendant's Motion for Summary Judgment was served via ECF upon counsel of record at the

address listed below:

John F. Cooney, Esq.

Venable, LLP

575 7th Street, NW

Washington, DC 20004

202-344-4812

jfcooney@venable.com

Kirsten Friedel Roddy, Esq

Hogan & Hartson, LLP

555 13th Street, NW

Washington, DC 20004-1109

202-637-5600

kfroddy@hhlaw.com

Dated: April 25, 2008

_____        s/ William B. Jaffe

                                        WILLIAM B. JAFFE