# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

HORMEL FOODS CORPORATION,    )
                            )
            Plaintiff,       )        Civil Action No. 1:07-cv-1724 (RBW)
    v.                      )
                            )
UNITED STATES DEPARTMENT    )
OF AGRICULTURE,             )
                            )
            Defendant.       )
                            )

## DEFENDANT'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD

### INTRODUCTION

Plaintiff, Hormel Foods Corporation ("plaintiff" or "Hormel") has sued the United States Department of Agriculture ("defendant" or "USDA") over its alleged failure to rescind certain labels of meat and poultry products bearing the "natural" claim.  In the context of filing its motion to dismiss/motion for summary judgment, defendant prepared and filed an Administrative Record.  Plaintiff alleges that the Administrative Record filed in this action is incomplete and must be supplemented.  Except as to the limited additional documents which are being added to the Administrative Record, as described herein, plaintiff's motion should be denied.

In the effort to make sure that the record was complete, defendant did locate several additional documents which are now being added to the Administrative Record and are described herein.  Defendant has explained herein and in the Supplemental Declaration of Philip Derfler, dated April 24, 2008 ("Supplemental Derfler Declaration") that in the initial preparation of the Administrative Record, certain records could not be found due to the fact that defendant moved offices and some of the records were misplaced during the move or were overlooked during the

search for those records.  Those records that have been located since the initial preparation of the

Administrative Record are being added thereto.

Defendant also provides explanations herein and in the Supplemental Derfler Declaration

for various other complaints that plaintiff has raised in its motion to supplement the record.  For

instance, defendant explains that although twenty-four letters were sent to various companies

concerning the need to document the use of lactates, a smaller number of label applications were

included in the administrative record.  Defendant explains, as above, that a certain number of

label applications have now been added. In addition, defendant explains that more letters were

sent to cover all possible bases.  For example, letters were sent not only to the companies that

produced the products in question, but also to parent companies, to suppliers of ingredients that

might be "natural," other companies that may be interested in the topic, and others.  Other

concerns raised by plaintiff are similarly addressed herein and in the Supplemental Derfler

Declaration. For these reasons, plaintiff's motion to supplement the record should be denied

except as to the limited additional documents which are being added to the Administrative

Record, as described herein.


**ARGUMENT**

**PLAINTIFF'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD
SHOULD BE DENIED EXCEPT AS TO THE LIMITED DOCUMENTS WHICH
ARE BEING ADDED TO THE ADMINISTRATIVE RECORD, AS DESCRIBED
HEREIN.**

A reviewing court should base its decision in an action brought pursuant to the

Administrative Procedure Act on the record before the agency at the time the challenged action

occurred. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 419 (1971). For the reasons described herein, plaintiff's motion to supplement the record should be denied except as to the limited additional documents which are being added to the Administrative Record, as described herein.

### A.      Additional Label Applications to be Added to the Administrative Record.

It has been brought to FSIS' attention that certain documents may have been missing from the Administrative Record. Shortly before the filing of this lawsuit, the labeling staff moved offices. Prior to the move, all of the approved applications for labels were boxed up and moved to one large room. At the time of the first search for documents for the Administrative Record, the labeling staff conducted a manual search of at least 200 boxes for responsive documents. Unfortunately, at the time of this initial search, some documents were overlooked. These documents included label applications for certain companies, including Oscar Mayer and Farmland Foods. These documents are now being included as part of the Administrative Record. (Supp. Derfler Decl. ¶ 3).

Specifically, the following label applications are being included:

a.      Three from Oscar Mayer: Application for smoked uncured beef franks, dated May 11, 2006; Application for smoked ham, dated June 22, 2006; and, Application for oven roast turkey breast, dated June 22, 2006.

b.      Four from Farmland Foods: Application for spiral sliced ham, dated November 6, 2006; Application for deli style, dated November 20, 2006; Application for original ham, dated November 20, 2006; and Application for classic ham, dated November 21, 2006.

    c.        Two from Maverick Ranch: Application for bacon dated May 23, 2005; Application for bacon dated August 31, 2005..

    d.        Eight from Pederson's Natural Farms: Application for hickory smoked bacon dated July 12, 2002; Application for apple smoked bacon dated July 12, 2002; Application for apple smoked bacon dated September 18, 2002; Application for pepper smoked bacon dated September 18, 2002; Application for smoked ham shanks dated October 7, 2002; Application for honey ham dated October 8, 2002; Application for Canadian bacon dated November 20, 2002; and Application for pepper bacon dated March 18, 2003.

    e.        One from Yorkshire Farms: Application for cheese hot dogs dated May 16, 2003.

    f.        One from Premium Standards Farms: Application for bacon dated October 23, 2006.

    g.        One from Saag's Products: Application for smoked chicken sausage dated October 30, 2006.

    h.        One from Aidells: Application for smoked chicken and turkey sausage dated October 30, 2006.

    i.        One from Coleman Natural: Application for bacon dated October 30, 2006.

    j.        One from Riverwood Valley Farms: Application dated October 25, 2006.

(Supp. Derfler Decl. ¶ 4).

The Plaintiff asked that several other categories of documents be added to the Administrative Record in this case.  The following documents cannot be included for the following reasons:   First, with respect to the two form letters sent to companies requesting information on sodium and potassium lactate, not all of the form letters sent to specific companies were found in the labeling division's files.  Although these letters were created on a computer, they were each individually printed out on FSIS letterhead, date stamped, and signed by Robert C. Post, the then Director of the Labeling and Policy Staff.  These letters cannot simply be printed off of the computer as they were sent out to the individual companies.  However, if one were to look at the documents provided, it is easy to determine that other than a change in address, each of the letters was identical.  (Supp. Derfler Decl. ¶ 5).

**B.      USDA Sent 24 Letters To Companies Concerning the Need to Document the Use of Lactates in Products Containing the Natural Label but Only Supplied Label Approvals for 14 Companies Because Additional Letters were Sent to Subsidiaries and Suppliers in Addition to the Companies that Actually Were Awarded the Final Labels.**

Plaintiffs also question why there are not label approvals for at least twenty-four companies, since letters were sent to that many companies.  There are several reasons why there are not label approvals for all of the companies that received letters.  First, letters were not only sent to subsidiaries that made "natural" products, but in some cases, they were also sent to the parent corporation.  For example, a letter was sent to Smithfield Packing, the parent corporation, and to its subsidiaries, Farmland Foods and Premium Standards.  Thus, in this instance, there are label approvals for both Farmland Foods and Premium Standards, but not for Smithfield Packing.  Second, in some cases, letters were sent to contractors or suppliers of the component meat products, such as West Liberty Foods and Independent Meat Company.  These companies are

part of the manufacturing process, but are not the companies that necessarily obtain the label approvals. Third, there were some instances in which companies contacted the labeling staff to request letters to keep informed of developments in the "natural" policy, and the companies were sent letters. This was the case for Olymel SEC/LP, a broker of meat components. Finally, in some cases, a letter was sent to a company that has a "natural" single ingredient product or uses a "natural" component ingredient (however, the total product was not labeled as "natural"). For example, Swift & Sons has "natural" single ingredient pork products, while Godshall's Quality Meats uses "natural turkey" as a component in their total product. Essentially, the labeling staff attempted to cast as wide a net as possible in order to gather the fullest scope of information on the use of sodium and potassium lactates in products labeled "natural." (Supp. Derfler Decl. ¶ 6).

### C.    Explanation of Additional Questions Raised by Plaintiff Concerning the Administrative Record.

In addition, Plaintiffs request that several label applications for Farmland "Simply Natural" products be included in the Administrative Record. Where those label applications are relevant to this lawsuit, those documents are now being included.[1] However, there were two labels for "Simply Natural" products that were included as an exhibit to Plaintiff's motion that are not being added to the Administrative Record. Those labels are for Simply Natural Bacon and Simply Natural Sausage. Those label applications are not being included because those products do not include sodium lactate or potassium lactate. (Supp. Derfler Decl. ¶ 7).

---

[1]Those labels are Simply Natural Spiral Sliced Ham, application dated November 6, 2006 (AR 002140); Premium Deli Style Ham, application dated November 20, 2006 (AR 002146); Original Ham, application dated November 20, 2006 (AR 002148); and Classic Ham, application dated November 21, 2006 (AR 002150).

Additionally, Plaintiffs believe that there are label applications subsequent to December 2006 that should be included in the Administrative Record.  There has only been one applicable label approved since December 2006 and that label was previously provided in the original Administrative Record.  This label was approved after the company, Pederson's Natural Farms, provided FSIS with evidence that the sodium lactate used in its product does not extend the shelf life of the product.  Since December 2006, several companies have requested "natural" label approval with sodium or potassium lactate in their ingredient statement.  The labeling division has denied the applications for labels where companies have not provided data to show that the potassium or sodium lactate does not have a preservative effect at levels of two percent or less.  One company, Farmland Foods, has appealed the denial of its label applications.   The appeal letter is now being included in the Administrative Record at AR 002248. (Supp. Derfler Decl. ¶ 8).

Beginning in approximately 2000 and 2001, USDA began receiving requests for the inclusion of potassium and sodium lactates in products with the "natural" label.  However, USDA does not have copies of these requests because they came in the form of label applications.  The labeling staff does not keep copies of label applications that are denied; rather, those label applications are returned to the respective applicants.  (Supp. Derfler Decl. ¶ 9).

In 2002, Pederson's Natural Farms sent in a number of applications for label approvals.  In the beginning of 2002, the labeling division approved several labels for "natural" products that contained sodium lactate, among other things.  In July of that year, a letter was sent  to Pederson's Natural Farms rescinding a series of labels, and any similar labels not listed in the letter, which may have included sodium lactate, sodium phosphate, sodium nitrate, spice extracts,

or dextrose.  This letter is now being included in the Administrative Record at AR 007152.  The

letter makes clear that, at that time, such substances could not be used in products labeled as

"natural."  Thereafter, for those products that included lactates, the labeling division clearly

marked on those label applications that the products could not be labeled "natural."  Defendant is

including the modified label applications for those labels in the Administrative Record at AR

002177-002198. (Supp. Derfler Decl. ¶ 10).

There are two approved label applications in 2003 for products labeled as "natural" that

have sodium lactate.  These labels were for Pederson's Natural Farm and Yorkshire Farms.  It

appears that these labels were approved in error and that they are anomalies.[2]  (Supp. Derfler

Decl. ¶ 11).  Thus, the Administrative Record, as supplemented and described herein, is

complete.

<u>CONCLUSION</u>

For the foregoing reasons, plaintiff's motion to supplement the record should be denied

except as to the limited additional documents which are being added to the Administrative

Record, as described herein.

Dated: April 25, 2008

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

FELIX V. BAXTER
Director, Federal Programs Branch
Civil Division

---

[2]USDA has contacted Pederson's Farm about this label, and the company has assured
USDA that this label is not in use.  Yorkshire Farms is no longer a brand name that is used.

 s/ William B. Jaffe (Electronic Filing)
JAMES J. GILLIGAN
Assistant Director
WILLIAM B. JAFFE
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
Mailing Address
P.O. Box 883
Washington, DC  20044
Delivery Address
20 Massachusetts Avenue, NW, Room 6110
Washington, DC  20530
(202) 353-7633
Fax: (202) 616-8460
Email: william.jaffe@usdoj.gov

Attorneys for Defendant

9

## CERTIFICATE OF SERVICE

I hereby certify that on April 25, 2008, a true and correct copy of the foregoing

Defendant's Memorandum in Opposition to Plaintiff's Motion to Supplement the Administrative

Record was served via ECF upon counsel of record at the address listed below:

John F. Cooney, Esq.
Venable, LLP
575 7th Street, NW
Washington, DC 20004
202-344-4812
jfcooney@venable.com

Kirsten Friedel Roddy, Esq
Hogan & Hartson, LLP
555 13th Street, NW
Washington, DC 20004-1109
202-637-5600
kfroddy@hhlaw.com

Dated: April 25, 2008

s/ William B. Jaffe
WILLIAM B. JAFFE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

HORMEL FOODS CORPORATION,    )
                             )
           Plaintiff,        )          Civil Action No. 1:07-cv-1724
                             )
    v.                       )
                             )
UNITED STATES DEPARTMENT     )
OF AGRICULTURE,              )
                             )
           Defendant.        )
                             )

## DECLARATION OF PHILIP S. DERFLER

I, Philip S. Derfler, declare the following:

1.      I am the Assistant Administrator, Office of Policy and Program Development, of

the United States Department of Agriculture ("USDA"), Food Safety and Inspection Service

("FSIS"). I have held this position since 1999. I make the following representations based upon

my knowledge, upon facts made known to me in my capacity as an official at FSIS, and upon my

review of relevant files at FSIS.

2.      This is a supplemental declaration to explain additions to the Administrative

Record and provide further explanation of matters addressed in my previous declaration, dated

January 22, 2008.

3.      It has been brought to FSIS' attention that certain documents may have been

missing from the Administrative Record. Shortly before the filing of this lawsuit, the labeling

staff moved offices. Prior to the move, all of the approved applications for labels were boxed up

and moved to one large room. At the time of the first search for documents for the

Administrative Record, the labeling staff conducted a manual search of at least 200 boxes for

responsive documents. Unfortunately, at the time of this initial search, some documents were

overlooked. These documents included label applications for certain companies, including Oscar

Mayer and Farmland Foods. These documents are now being included as part of the

Administrative Record.

4. Specifically, the following label applications are being included:

a. Three from Oscar Mayer: Application for smoked uncured beef franks, dated May 11, 2006; Application for smoked ham, dated June 22, 2006; and, Application for oven roast turkey breast, dated June 22, 2006.

b. Four from Farmland Foods: Application for spiral sliced ham, dated November 6, 2006; Application for deli style, dated November 20, 2006; Application for original ham, dated November 20, 2006; and Application for classic ham, dated November 21, 2006.

c. Two from Maverick Ranch: Application for bacon dated May 23, 2005; Application for bacon dated August 31, 2005..

d. Eight from Pederson's Natural Farms: Application for hickory smoked bacon dated July 12, 2002; Application for apple smoked bacon dated July 12, 2002; Application for apple smoked bacon dated September 18, 2002; Application for pepper smoked bacon dated September 18, 2002; Application for smoked ham shanks dated October 7, 2002; Application

2

for honey ham dated October 8, 2002; Application for Canadian bacon dated November 20, 2002; and Application for pepper bacon dated March 18, 2003.

e.     One from Yorkshire Farms: Application for cheese hot dogs dated May 16, 2003.

f.     One from Premium Standards Farms: Application for bacon dated October 23, 2006.

g.     One from Saag's Products: Application for smoked chicken sausage dated October 30, 2006.

h.     One from Aidells: Application for smoked chicken and turkey sausage dated October 30, 2006.

i.     One from Coleman Natural: Application for bacon dated October 30, 2006.

j.     One from Riverwood Valley Farms: Application dated Octover 25, 2006.

5.     The Plaintiff asked that several other categories of documents be added to the Administrative Record in this case. The following documents cannot be included for the following reasons: First, with respect to the two form letters sent to companies requesting information on sodium and potassium lactate, not all of the form letters sent to specific companies were found in the labeling division's files. Although these letters were created on a computer, they were each individually printed out on FSIS letterhead, date stamped, and signed by Robert C. Post, the then Director of the Labeling and Policy Staff. These letters cannot

3

simply be printed off of the computer as they were sent out to the individual companies. However, I attest that if one were to look at the documents provided, it is easy to determine that other than a change in address, each of the letters was identical.

6.  Plaintiffs also question why there are not label approvals for at least twenty-four companies, since letters were sent to that many companies. There are several reasons why there are not label approvals for all of the companies that received letters. First, letters were not only sent to subsidiaries that made "natural" products, but in some cases, they were also sent to the parent corporation. For example, a letter was sent to Smithfield Packing, the parent corporation, and to its subsidiaries, Farmland Foods and Premium Standards. Thus, in this instance, there are label approvals for both Farmland Foods and Premium Standards, but not for Smithfield Packing. Second, in some cases, letters were sent to contractors or suppliers of the component meat products, such as West Liberty Foods and Independent Meat Company. These companies are part of the manufacturing process, but are not the companies that necessarily obtain the label approvals. Third, there were some instances in which companies contacted the labeling staff to request letters to keep informed of developments in the "natural" policy, and the companies were sent letters. This was the case for Olymel SEC/LP, a broker of meat components. Finally, in some cases, a letter was sent to a company that has a "natural" single ingredient product or uses a "natural" component ingredient (however, the total product was not labeled as "natural"). For example, Swift & Sons has "natural" single ingredient pork products, while Godshall's Quality Meats uses "natural turkey" as a component in their total product. Essentially, the labeling staff

4

attempted to cast as wide a net as possible in order to gather the fullest scope of information on the use of sodium and potassium lactates in products labeled "natural."

7.    In addition, Plaintiffs request that several label applications for Farmland "Simply Natural" products be included in the Administrative Record. Where those label applications are relevant to this lawsuit, those documents are now being included.[1] However, there were two labels for "Simply Natural" products that were included as an exhibit to Plaintiff's motion that are not being added to the Administrative Record. Those labels are for Simply Natural Bacon and Simply Natural Sausage. Those label applications are not being included because those products do not include sodium lactate or potassium lactate.

8.    Additionally, Plaintiffs believe that there are label applications subsequent to December 2006 that should be included in the Administrative Record. There has only been one applicable label approved since December 2006 and that label was previously provided in the original Administrative Record. This label was approved after the company, Pederson's Natural Farms, provided FSIS with evidence that the sodium lactate used in its product does not extend the shelf life of the product. Since December 2006, several companies have requested "natural" label approval with sodium or potassium lactate in their ingredient statement. The labeling division has denied the applications for labels where companies have not provided data to show that the potassium or sodium lactate does not have a preservative effect at levels of two percent

---

[1]Those labels are Simply Natural Spiral Sliced Ham, application dated November 6, 2006 (AR 002140); Premium Deli Style Ham, application dated November 20, 2006 (AR 002146); Original Ham, application dated November 20, 2006 (AR 002148); and Classic Ham, application dated November 21, 2006 (AR 002150).

or less. One company, Farmland Foods, has appealed the denial of its label applications. The appeal letter is now being included in the Administrative Record at AR 002248.

9.      In my first declaration I explained the evolution of the "natural" policy with respect to the inclusion of sodium and potassium lactates. I would like to provide further explanation regarding the policy. Beginning in approximately 2000 and 2001, we began receiving requests for the inclusion of potassium and sodium lactates in products with the "natural" label. However, we do not have copies of these requests because they came in the form of label applications. The labeling staff does not keep copies of label applications that are denied; rather, those label applications are returned to the respective applicants.

10.      In 2002, Pederson's Natural Farms sent in a number of applications for label approvals. In the beginning of 2002, the labeling division approved several labels for "natural" products that contained sodium lactate, among other things. In July of that year, a letter was sent to Pederson's Natural Farms rescinding a series of labels, and any similar labels not listed in the letter, which may have included sodium lactate, sodium phosphate, sodium nitrate, spice extracts, or dextrose. This letter is now being included in the Administrative Record at AR 007152. The letter makes clear that, at that time, such substances could not be used in products labeled as "natural." Thereafter, for those products that included lactates, the labeling division clearly marked on those label applications that the products could not be labeled "natural." We are including the modified label applications for those labels in the Administrative Record at AR 002177-002198.

6

11.     There are two approved label applications in 2003 for products labeled as "natural" that have sodium lactate.  These labels were for Pederson's Natural Farm and Yorkshire Farms.  It appears that these labels were approved in error and that they are anomalies.[2]

12.     In or around late 2003, Applegate Farms requested clarification that sodium and potassium lactates were allowed to be used as a flavoring in products labeled "natural."  A decision was made in early 2004 to allow the use of sodium and potassium lactate in products labeled as "natural" after Applegate Farms produced a letter from the National Organic Program (NOP) stating that sodium and potassium lactates were approved for use in organic products.  Once the labeling staff received that letter, it made a determination that given the stringent petition and approval policy at the NOP, and given that lactates could be used in products labeled as organic, then they could also be used in "natural" products.  The labeling staff assumed that the lactates, at the two percent or less level, would not have a preservative effect and was being added solely as a flavoring agent.[3]

13.  The evaluation criteria for the NOP are in many ways similar to those used for "natural" products.  For example, NOP looks at whether the product comes from a natural source; whether the substance's primary use is as a preservative or to recreate or improve flavors;

_____

[2]We have contacted Pederson's Farm about this label, and the company has assured us that this label is not in use.  Yorkshire Farms is no longer a brand name that is used.

[3]See electronic mail message between Robert C. Post and the Labeling and Consumer Protection Staff dated March 17, 2004, at AR 002207.

and whether the substance is listed as generally recognized as safe by the Food and Drug

Administration. 7 C.F.R. § 205.601.

14.    With respect to the processing of the product, NOP has a definition that is similar

to FSIS' minimal processing definition.  In the definition of "natural," FSIS has stated that

minimal processing may include "those traditional processes used to make food edible or to

preserve it or make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and

fermenting."  Similar to that, NOP's definition of "processing" is limited to "cooking, baking,

curing, drying, mixing, grinding, churning, separating, extracting, slaughtering, cutting,

fermenting, distilling, eviscerating, preserving, dehydrating, freezing, chilling, or otherwise

manufacturing and includes the packaging, canning, jarring, or otherwise enclosing food in a

container."  7 C.F.R. § 205.2.  Similar to the FSIS' definition of "natural," the NOP eschews

severe chemical processes such as ionizing radiation.  7 C.F.R. § 205.105.

15.    As stated above, the labeling staff assumed that sodium and potassium lactates at

the two percent or less level acted solely as a flavoring in meat and poultry products because

lactates had been approved for flavoring at that level in FSIS regulations contained at 9 C.F.R.

424.21 (see also preamble to regulations contained at 58 Fed. Reg. 4067 (January 13, 1993)).

Although the two percent limitation was not written directly into the policy, the purpose of use of

each ingredient is always considered when making a determination with respect to a label

application.  Since FSIS already had regulations governing the use of sodium and potassium

lactates with respect to levels for flavoring, those regulations and whether the formulation for the

products fit within that limitation were always considered.  If the sodium or potassium lactate

levels did not fit within the flavoring range, then those applications would have been questioned. The labeling staff considers all applicable FSIS regulations when considering each application.

16.    At the time that the Agency promulgated regulations for the use of sodium and potassium lactate as a flavoring in 1993, evidence discussed in response to comments submitted suggested that using lactates at the two percent or less level would not provide a preservative effect, and the Agency was not aware of any evidence to the contrary at the time that the "natural" policy was updated in August 2005.

17.    In order for FSIS to be assured that the labeling of meat and poultry products bearing the claim "natural" in which lactates are used for flavoring is truthful and not misleading, in December of 2006, FSIS requested that manufacturers provide data on whether products containing lactates exhibited similar microbiological characteristics as products formulated without lactates (i.e., there is no significant lethality or suppression of growth in spoilage organisms that would suggest that the use of lactates as flavorings provides manufacturers with the added benefit of an extended shelf life). Because of questions that arose on how manufacturers should demonstrate a lack of preservative effect, in January 2007, FSIS clarified that the data should show that the same shelf-life and product dating parameters were applied to products in which lactates have been used as compared to products in which they have not been used.

18.    Hormel has specifically raised questions about the data submitted to the Agency by Plumrose, Fresherized Foods, and Pederson's Natural Farms. The data submitted by these companies indicated that, under identical controlled conditions, the outgrowth of spoilage

organisms, such as yeast, mold, and lactic acid bacteria, in meat and poultry products containing similar appearance, odor, and package integrity over time were the same as the non-sodium lactate containing products. In addition, the labeled "use by" dates on products to which sodium lactate had been added were the same as those of products with the same formulation but that did not contain sodium lactate.

19.     It is important to note that FSIS did not request that manufacturers follow a specific protocol to evaluate the microbiological characteristics of their products. The lactates at issue have already undergone scientific evaluation, and a public rulemaking process, to assess their safety and suitability as a substance generally recognized as safe for use in food as a flavoring. FSIS only requires that manufacturers use ingredients in a manner that demonstrably is consistent with their intended technical effects. Thus, when Hormel presented the Agency with information that suggested that lactates might provide a preservative effect at a level consistent with that used for flavoring, the Agency felt it was necessary to request documentation from the companies that were using the lactates for their flavoring effect, at the two percent or less level, to demonstrate that they were using the lactates for flavoring and not to preserve the food, and thus to justify that a "natural" label claim is truthful and not misleading. Thus, in the January 2007 letter sent to companies, FSIS stated that establishments could show that they were using the same "use by" date for their products with and without sodium or potassium lactate in order to provide assurance that they were not taking advantage of any preservative effect.

20.     For this reason, FSIS did not take issue with Plumrose's protocol in which samples for Anaerobic Plate Count (APC) and lactic acid bacteria were held under incubation at

10

30°C for 48 hours, and samples for yeast and mold were held under incubation at 30°C for 72 hours instead of an incubation temperature of 35°. This five degree difference was not seen as a significant flaw since both the products with and without lactates were evaluated under the same conditions. FSIS believes that this study did show that product formulated with and without lactates subjected to the same controlled conditions (i.e., incubation temperatures) had similar microbial growth patterns over their shelf-life. FSIS felt this data, along with Plumrose's use of the same expiration date (56 days) for products formulated with and without lactates, was sufficient to show that Plumrose was not benefitting from an extended shelf life from the use of lactates.

21.     In regard to Fresherized Foods, its study on the use of lactates at 1 and 1.5 percent of the product formula concluded that the use of lactates did not significantly reduce or suppress the growth of *Listeria monocytogenes (Lm),* and thus its use would not be justified for pathogen control in the production of their ready-to-eat beef and chicken strips. Fresherized, also responded to FSIS that it applies the same "use by" dates for products formulated with and without lactates. This lack of evidence of a significant antimicrobial effect, along with the company's use of the same "use by" dates, was again considered sufficient by the Agency to meet our data request described above. In regard to Pederson's Natural Farm's data, the microbial growth rate for products formulated with lactates at 1.5 and 2.0 percent as compared to products formulated without lactates was similar (i.e., 1.1 logs, 1.6 logs, and 1.5 logs, respectively). Similar to Plumrose and Fresherized Foods, Pederson's Natural Farms concluded from its data that the use of lactates did not provide a preservative effect to extend shelf life and informed the

11

Agency that it uses the same code date (65 days) for product treated with and without lactates.

22.    The Agency recognizes that many variables (e.g., a product's initial microbial load, sodium content, pH, and study design) will affect the data that are generated in any microbiological study. However, in each of the cases described above, the Agency found that the data that were submitted along with each manufacturer's use of the same "use by" date for products formulated with and without lactates were reasonable given the Agency's data request and indicative that each use of lactates was consistent with its approved use as a flavoring agent as opposed to the use of lactates for microbial control to achieve an extended shelf-life.

23.    Thus, the data submitted by these companies provide support for their claims that Plumrose, Fresherized Foods, and Pederson's Natural Farms were not using sodium lactate for its preservative effect, i.e. to prevent or retard deterioration of the meat or poultry products to which it had been added. Instead, the data tended to support the companies' claim that the sodium lactate was functioning as a flavoring agent, its intended use, with a possible added benefit (shown in data other than those submitted by Fresherized Foods) of enhancing food safety by preventing the growth of pathogenic bacteria, specifically *Lm*. While the use of sodium lactate as a preservative in a meat or poultry product would disqualify the product from bearing a "natural" claim, its use as a flavoring agent or as an antimicrobial to prevent the growth of *Lm* and other pathogens without affecting the outgrowth of spoilage organisms or extending the shelf life of the product would not.

24.    The documents submitted by these companies are not the only documents being considered by FSIS in developing its policy with respect to meat and poultry products labeled

12

"natural." In addition to the documentation submitted by these companies, FSIS is also considering the comments made at the public meeting held in December 2006, as well as all of the comments received in response to its request for comments. The data, documentation, and views expressed cover a variety of points of view with respect to how the Agency should make determinations with respect to the approval of "natural" labels.

I declare under penalty of perjury that the foregoing is true and correct.
Executed on April 24, 2008.

Philip S. Derfler