# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HORMEL FOODS CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:07-cv-1724 (RBW) |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT | ) | |
| OF AGRICULTURE, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DEFENDANT'S SUPPLEMENT TO THE ADMINISTRATIVE RECORD (REDACTED)**

Dated: April 25, 2008

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JEFFREY A. TAYLOR
United States Attorney

 s/ William B. Jaffe (Electronic Filing)
JAMES J. GILLIGAN
Assistant Director
WILLIAM B. JAFFE
Trial Attorney

United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, NW, Room 6110
Washington, DC  20530
(202) 353-7633
Fax: (202) 616-8460
Email: william.jaffe@usdoj.gov

Attorneys for Defendant

EXHIBIT L

Page 3 of

**DEPARTMENT OF AGRICULTURE**
SAFETY AND INSPECTION SERVICE

**APPLICATION FOR APPROVAL OF LABELS, MARKING OR DEVICE**

FSIS has determined that information provided on items 5, 6, and 10 is exempt from mandatory disclosure under the Freedom of Information Act 5 U.S.C 552 (b)(4)

APPLICANT: See Page 2 for instructions.

1. AGENT NAME, ADDRESS, TELEPHONE NO. (If using an Agent, complete this block, otherwise complete block 2.)

**JON ELLIS & ASSOCIATES**
497 North Owen Street
Alexandria, VA 22304-2248

2. FOR USDA USE ONLY

APPROVED SUBJECT TO COMPLIANCE WITH FMIA & PPIA & REGULATIONS

MAY 11 2006

FSIS
U.S. DEPT OF AGRICULTURE

3. FOR USDA USE ONLY
DEPT. OF AGRIC.

2 493646

4. ESTABLISHMENT NO. / FOREIGN COUNTRY (If applicable)

1041

| 5a. NAME OF PRODUCT | 5b. HACCP PROCESS CATEGORY |
|---|---|
| Uncured Beef Frank | Fully Cooked, Not Shelf Stable |

6a. TYPE OF APPROVAL REQUESTED
☐ SKETCH    ☐ TEMPORARY
☐ EXTENSION OF TEMPORARY

6b. WAS THE LABEL PREVIOUSLY APPROVED?
☐ Yes    ☐ No

Prior approval number:
Number of labels on hand: _____
Number of days requested: _____

7a. AREA OF PRINCIPAL DISPLAY PANEL (Square inches):

7b. TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE (Sq. in.)

| 8. PRODUCT FORMULA | ☐ PCT. ☒ WEIGHT (No Fractions) | 9. PROCESSING PROCEDURES (Approval of the sketch does not convey approval of the processing procedures) |
|---|---|---|

REDACTED

D002125

# UNCURED BEEF FRANKS
## NO NITRATES OR NITRITES ADDED
### EXCEPT NATURALLY OCCURING NITRITES IN SEA SALT and Celery Powder
### NOT PRESERVED - KEEP FROZEN AT ALL TIMES

INGREDIENTS: Beef, Water, Contains less than 2% of Sea Salt, Potassium Lactate, Evaporated Cane Juice, Celery Powder, Flavor, Lactic Acid Starter Culture.

Contains: 12 - 14 oz. Pkgs.

U.S.
INSPECTED
AND PASSED BY
DEPARTMENT OF
AGRICULTURE
EST. 104 I

DIST. BY: KOHR'S PACKING COMPANY, DAVENPORT, IA 52802 U.S.A.

D002126

USDA FSIS



According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0583-0092. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This form has been approved by OMB for web distribution.

PAGE 1 of 3

| U.S. DEPARTMENT OF AGRICULTURE FOOD SAFETY AND INSPECTION SERVICE | 1. AGENT NAME, ADDRESS, TELELPHONE NO. (Please type or complete this block, otherwise leave blank) | 2. FOR USDA USE ONLY | 3. FOR USDA USE ONLY | 4. ESTABLISHMENT NO./ FOREIGN COUNTRY (If applicable) |
|---|---|---|---|---|
| USDA-FSIS(30) MANUAL | | SKETCH APPROVED SUBJECT TO COMPLIANCE WITH FMIA & PPIA & REGULATIONS ★ JUN 22 2006 ★ FSIS U.S. DEPT. OF AGRICULTURE | 2 4 9 0 0 2 8 | 537C |
| 60489811 | | | | Item # 3102 |
| APPLICANT: See Page 2 for instructions. | | | | |

| 5a NAME OF PRODUCT | APPROVED AS MODIFIED | 5b HACCP PROCESS CATEGORY (vii) Fully cooked – not shelf stable |
|---|---|---|

Natural Smoked Ham          Applicant# 4456

| 6a TYPE OF APPROVAL REQUESTED | 6b WAS THE LABEL PREVIOUSLY APPROVED? | | 7a. AREA OF PRINCIPAL DISPLAY PANEL (Square inches): |
|---|---|---|---|
| ☒ SKETCH  ☐ TEMPORARY ☐ EXTENSION OF TEMPORARY | ☐ YES → ☒ NO | Date of approval: Prior approval number. Number of labels on hand. Number of days requested: | 45 sq. in. 7b. TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE (Square inches): 90 sq. in. |

| 8. PRODUCT FORMULA | ☐ PCT  ☒ WEIGHT (No Fractions) | 9. PROCESSING PROCEDURES (Approval of the sketch does not convey approval of the processing procedures) |
|---|---|---|

REDACTED





D002129

## Nutrition Facts

Serving Size 2 slices (56g)
Servings Per Container 4

**Amount Per Serving**

Calories 60    Calories from Fat 15

| | % Daily Value* |
|---|---|
| Total Fat 2g | 3% |
| Saturated Fat 0.5g | 3% |
| Cholesterol 25mg | 8% |
| Sodium 680mg | 28% |
| Total Carbohydrate 0g | 0% |
| Dietary Fiber 0g | 0% |
| Sugars 0g | |
| Protein 9g | |

| Vitamin A 0% | • | Vitamin C 0% |
|---|---|---|
| Calcium 0% | • | Iron 4% |

*Percent Daily Values are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs.

| | Calories | 2,000 | 2,500 |
|---|---|---|---|
| Total Fat | Less than | 65g | 80g |
| Saturated Fat | Less than | 20g | 25g |
| Cholesterol | Less than | 300mg | 300mg |
| Sodium | Less than | 2,400mg | 2,400mg |
| Total Carbohydrate | | 300g | 375g |
| Dietary Fiber | | 25g | 30g |

Calories per gram
Fat 9 • Carbohydrate 4 • Protein 4

## Natural Ham

6/14/2006

INGREDIENTS: Ham, Water, Sea Salt, Potassium Lactate, Evaporated Cane Juice, Celery Juice Powder, Lactic Acid Starter Culture. DISTRIBUTED BY KRAFT FOODS GLOBAL, INC. NORTHFIELD, IL 60093-2753 USA

D002130

REDACTED

D002131

REDACTED

D002132

REDACTED

D002133

Attention to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0583-0052. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This form had been approved by OMB for wed distribution.

PAGE 1 of 3

| U.S. DEPARTMENT OF AGRICULTURE | 2. AGENT NAME, ADDRESS, PHONE NO. (if using an Agent) | 2. FOR USDA USE ONLY | 3. FOR USDA USE ONLY | 4. ESTABLISHMENT NO / FOREIGN COUNTRY (if applicable) |
|---|---|---|---|---|
| USDA-FSIS (30) MANUAL | | | 8196029 | P-2310 |
| 60489812 | SKETCH APPROVED SUBJECT TO COMPLIANCE WITH FMIA & PPIA & REGULATIONS ★ JUN 22 2006 ★ FSIS U.S. DEPT OF AGRICULTURE | | | Item # 3103 |

Information Act 5 U.S.C. 552(b)(4)

APPLICANT See Page 2 for Instructions

| 5a. NAME OF PRODUCT | | 5b. HACCP PROCESS CATEGORY (v6) Fully cooked – not shelf stable |
|---|---|---|
| Natural Oven Roasted Turkey Breast | Applicant# 4457 | |

| 6a. TYPE OF APPROVAL REQUESTED | 6b. WAS THE LABEL PREVIOUSLY APPROVED? | | 7a. AREA OF PRINCIPAL DISPLAY PANEL (Square inches) |
|---|---|---|---|
| ☒ SKETCH   ☐ TEMPORARY | ☐ YES → | Date of approval ___ | 45 sq. in. |
| ☐ EXTENSION OF TEMPORARY | ☒ NO | Prior approval number ___ Number of labels on hand ___ Number of days remained ___ | 7b. TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE (Square inches) 90 sq. in. |

| 8. PRODUCT FORMULA | ☐ PCT ☒ WEIGHT (No Fractions) | 9. PROCESSING PROCEDURES (Approval of the sketch does not convey approval of the processing procedures) |
|---|---|---|

APPROVED IS NOTED

REDACTED

REDACTED



D002136

## Nutrition Facts

Serving Size 2 slices (56g)
Servings Per Container 4

Amount Per Serving

**Calories** 50    Calories from Fat 10

| | % Daily Value* |
|---|---|
| **Total Fat** 1g | 2% |
| Saturated Fat 0g | 0% |
| **Cholesterol** 20mg | 7% |
| **Sodium** 620mg | 26% |
| **Total Carbohydrate** 2g | 1% |
| Dietary Fiber 0g | 0% |
| Sugars 0g | |
| **Protein** 9g | |

| Vitamin A 0% | • | Vitamin C 0% |
|---|---|---|
| Calcium 0% | • | Iron 4% |

*Percent Daily Values are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs.

| | Calories | 2,000 | 2,500 |
|---|---|---|---|
| Total Fat | Less than | 65g | 80g |
| Saturated Fat | Less than | 20g | 25g |
| Cholesterol | Less than | 300mg | 300mg |
| Sodium | Less than | 2,400mg | 2,400mg |
| Total Carbohydrate | | 300g | 375g |
| Dietary Fiber | | 25g | 30g |

Calories per gram
Fat 9  •  Carbohydrate 4  •  Protein 4

## Natural Turkey
6/14/2006

INGREDIENTS: Turkey Breast, Water, Sea Salt, Potassium Lactate, Tapioca Starch, Evaporated Cane Juice, Celery Juice Powder, Lactic Acid Starter Culture. DISTRIBUTED BY KRAFT FOODS GLOBAL, INC. NORTHFIELD, IL 60093-2753 USA

D002137

REDACTED

D002138

REDACTED

D002139

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0583-0092. This time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This form has been approved by OMB for web distribution.

PAGE _____ of _____

| U.S. DEPARTMENT OF AGRICULTURE<br>FOOD SAFETY AND INSPECTION SERVICE<br>**APPLICATION FOR**<br><br>IA  FSIS (30)  MANUAL<br><br>60504137 | 1  AGENT NAME, ADDRESS,<br>TELEPHONE NO (If using an Agent,<br>complete this block, otherwise leave<br>blank )<br>**ime Label Consultants, Inc**<br>536 Seventh Street SE<br>PO Box 15240<br>Washington, DC  20003-0240<br>(202) 546-3333<br>FAX (202) 543-4337 | 2. FOR USDA USE ONLY<br><br>SKETCH APPROVED<br>SUBJECT TO COMPLIANCE WITH<br>FMIA & PPIA & REGULATIONS<br>%  NOV 0 6 2006  %<br>FSIS<br>U.S. DEPT OF AGRICULTURE | 3. FOR USDA USE ONLY<br><br>..022155 | 4  ESTABLISHMENT NO / FOREIGN<br>COUNTRY (if applicable)<br><br>1935 |

| 5a  NAME OF PRODUCT   FL ALL NATURAL SPIRAL SLICED HICKORY SMOKED HAM, WHOLE, HALF & QUARTER.<br>CATCH WT. | 5b  HACCP PROCESS CATEGORY<br>Fully cooked--not shelf stable |

| 6a  TYPE OF APPROVAL REQUESTED<br>[X] SKETCH    [ ] TEMPORARY<br>[ ] EXTENSION OF TEMPORARY | 6b  WAS THE<br>LABEL<br>PREVIOUSLY<br>APPROVED?  [ ] YES<br>[X] NO | Date of approval:<br>Prior approval number:<br>Number of labels on hand:<br>Number of days requested? | 7a  AREA OF PRINCIPAL DISPLAY PANEL (Square inches)<br>≤ 100<br><br>7b  TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE (Square inches)<br>> 40 |

| 8.  PRODUCT FORMULA | [ ] PCT [X] WEIGHT<br>(No Fractions) | 9.  PROCESSING PROCEDURES<br>(Approval of the sketch does not convey approval of the processing procedures) |

REDACTED

TOTAL  (Percent must total 100%)

Printed from EL Form(im) v2006.200

| 10  NAME AND ADDRESS OF FIRM (Below and between dots)<br><br>FARMLAND FOODS, INC.<br>27 S. PERRY STREET<br>NEW RIEGEL, OH  44853 | 11  SIGNATURE OF APPLICANT OR AGENT  *(signature)*  DATE  10/31/06<br>Farmland Foods<br>12  CONDITIONS APPLYING TO USE OF LABELS OR DEVICE  (FOR USDA USE ONLY)<br>APPROVED WITH THE UNDERSTANDING INSPECTOR CAN BE<br>ASSURED AS TO SOURCE OF THE PRODUCT. |

FSIS FORM 7234-1 (10/03/2002)          REPLACES FSIS FORM 7234-1 (11/87), WHICH IS OBSOLETE          Designed in FormFlow software

5

Est. 1935
Sketch Scale is 1.1

FL ALL NATURAL SPIRAL SLICED HICKORY
SMOKED HAM. WHOLE, HALF & QUARTER. CATCH WT.

October 31, 2006
PRINCIPAL Display Panel



SPIRAL SLICED HICKORY SMOKED
HAM

NO NITRATE OR NITRITE ADDED
except those that naturally occur
in Sea Salt and Celery Powder.

Ingredients: HAM, WATER, SEA SALT, PURE CANE
SUGAR, POTASSIUM LACTATE (FROM CORN),
NATURAL FLAVORS, LACTIC ACID STARTER CULTURE
(NATURAL FERMENTING AGENT).

| Nutrition Facts | Amount/Serving | %DV* | Amount/Serving | %DV* |
|---|---|---|---|---|
| Serv Size 3 oz (84g) Servings varied | Total Fat 6g | 10% | Total Carb 5g | 2% |
| | Sat Fat 2.5g | 11% | Fiber 0g | 0% |
| | Trans Fat 0g | | Sugars 4g | |
| Calories 160 Fat Cal 60 | Cholest 65mg | 21% | Protein 18g | |
| | Sodium 780mg | 32% | | |
| * Percent Daily Values (DV) are based on a 2,000 calorie diet. | Vitamin A 0% | • | Vitamin C 0% | |
| | Calcium 0% | • | Iron 4% | |

1935

Farmland

ALL NATURAL

0000000

SPIRAL SLICED
HAM

HICKORY SMOKED

$3.00

ORIGINAL

Printed at 3.30 p.m. on 31-Oct-06

EZ Form(tm) v2006.20

D002141



Front

D002142

REDACTED

D002143

REDACTED

D002144

REDACTED

D002145

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0583-0092. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This form has been approved by OMB for web distribution.

PAGE ____ of ____

| U.S. DEPARTMENT OF AGRICULTURE FOOD SAFETY AND INSPECTION SERVICE | 1. AGENT NAME, ADDRESS, TELEPHONE NO. (If using an Agent, complete this block, otherwise leave blank.) | 2. FOR USDA USE ONLY | 3. FOR USDA USE ONLY | 4. ESTABLISHMENT NO. (FOREIGN COUNTRY (if applicable) |
|---|---|---|---|---|
| **APPLICATION FOR APPROVAL OF LABELS, MARKING OR DEVICE** FSIS has determined that information provided in items 8, 9, and 10 is exempt from mandatory disclosure under the Freedom of Information Act 5 U.S.C. 552(b)(4). *APPLICANT: See Page 2 for Instructions.* | Prime Label Consultants, Inc. 536 Seventh Street SE PO Box 15240 Washington, DC 20003-0240 (202) 546-3333 FAX (202) 543-4337 | | | 717 |

| 5a. NAME OF PRODUCT  FL PURE & NATURAL, SMOKED PREMIUM DELI STYLE HAM, AFTER COOKING CONTAINS UP TO 10% OF A SOLUTION. CATCH WT. | 5b. HACCP PROCESS CATEGORY Fully cooked--not shelf stable |
|---|---|

| 6a. TYPE OF APPROVAL REQUESTED | 6b. WAS THE LABEL PREVIOUSLY APPROVED? | 7a. AREA OF PRINCIPAL DISPLAY PANEL *(Square inches)*. |
|---|---|---|
| [X] SKETCH  [ ] TEMPORARY  [ ] EXTENSION OF TEMPORARY | [ ] YES → Date of approval: _____  Prior approval number: _____  [X] NO  Number of labels on hand: _____  Number of days requested: _____ | ≤ 100 |
| | | 7b. TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE *(Square inches)*: > 40 |

8. PRODUCT FORMULA          [ ] PCT [X] WEIGHT          9. PROCESSING PROCEDURES

<div style="text-align:center">REDACTED</div>

| 10. NAME AND ADDRESS OF FIRM *(Include zip code)* | 11. SIGNATURE OF APPLICANT OR AGENT | DATE 11-10-06 |
|---|---|---|
| FARMLAND FOODS INC. P O BOX 403 | 12. CONDITIONS APPLYING TO USE OF LABELS OR DEVICE   (FOR USDA USE ONLY) | |

D002146



SMOKED • BONELESS

# PREMIUM
# DELI STYLE
# HAM

**AFTER COOKING, CONTAINS UP TO 10% OF A SOLUTION‡**

**NO NITRATE OR NITRITE ADDED††**

††Except those that occur naturally in sea salt and celery powder

**Nutrition Facts**
Serving Size 2 oz. (56 g)
Servings Per Container Varied

Amount Per Serving

Calories 100   Calories from Fat 20

|  | % Daily Value* |
|---|---|
| Total Fat 2.5g | 4% |
| Saturated Fat 1g | 4% |
| Trans Fat 0g | |
| Cholesterol 35mg | 11% |
| Sodium 810mg | 34% |
| Total Carbohydrate 2g | 1% |
| Dietary Fiber 0g | 0% |
| Sugars 2g | |
| Protein 17g | |

Vitamin A 0% • Vitamin C 0%
Calcium 0% • Iron 4%

*Percent Daily Values are based on a 2,000 calorie diet.

‡Solution Ingredients: WATER, DEXTROSE, SEA SALT, POTASSIUM LACTATE (FROM CORN), NATURAL FLAVORS, CARRAGEENAN, LACTIC ACID STARTER CULTURE (NATURAL FERMENTING AGENT).

*Great Taste Naturally*

*Minimally Processed*
*No Artificial Ingredients*
*No Added Hormones***
*Vegetarian Fed†††*

†††With the exception of milk and eggs
**Federal regulations prohibit the use of hormones in pork.

**FARMLAND FOODS, INC, KANSAS CITY, MO 64195**
Questions or comments?
Save this package and call 1-888-FARMLAND
(327-6526), M-F from 9 am to 4:30 pm CST.
www.farmlandfoods.com

D002147

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0583-0092. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This form has been approved by OMB for web distribution.

PAGE ____ of ____

| U.S. DEPARTMENT OF AGRICULTURE FOOD SAFETY AND INSPECTION SERVICE | 1. AGENT NAME, ADDRESS, TELEPHONE NO. *(if using an Agent, complete this block, otherwise leave blank.)* | 2. FOR USDA USE ONLY | 3. FOR USDA USE ONLY | 4. ESTABLISHMENT NO. / FOREIGN COUNTRY *(if applicable)* |
|---|---|---|---|---|
| **APPLICATION FOR APPROVAL OF LABELS, MARKING OR DEVICE** | Prime Label Consultants, Inc. 536 Seventh Street SE PO Box 15240 Washington, DC 20003-0240 (202) 546-3333 FAX (202) 543-4337 | NOV __ 2006 | | 717 |
| FSIS has determined that information provided in items 8, 9, and 10 is exempt from mandatory disclosure under the Freedom of Information Act 5 U.S.C. 552(b)(4). APPLICANT: *See Page 2 for instructions.* | | | | |

| 5a. NAME OF PRODUCT | 5b. HACCP PROCESS CATEGORY |
|---|---|
| FL PURE & NATURAL HICKORY SMOKED ORGINAL HAM, AFTER COOKING CONTAINS UP TO 10% OF A SOLUTION. CATCH WT. | Fully cooked--not shelf stable |

| 6a. TYPE OF APPROVAL REQUESTED | 6b. WAS THE LABEL PREVIOUSLY APPROVED? | | 7a. AREA OF PRINCIPAL DISPLAY PANEL *(Square inches):* |
|---|---|---|---|
| [X] SKETCH    [ ] TEMPORARY | [ ] YES → Date of approval: | | ≤ 100 |
| [ ] EXTENSION OF TEMPORARY | [X] NO   Prior approval number: _____ Number of labels on hand: _____ Number of days requested: _____ | | 7b. TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE *(Square inches):*  > 40 |

| 8. PRODUCT FORMULA | [ ] PCT [X] WEIGHT *(No Function)* | 9. PROCESSING PROCEDURES *(Approval of the sketch does not constitute approval of the processing procedures)* |
|---|---|---|

REDACTED

| 10. NAME AND ADDRESS OF FIRM *(Below and between dots)* | 11. SIGNATURE OF APPLICANT OR AGENT |
|---|---|
| FARMLAND FOODS INC. P.O. BOX 403 DENISON, IA 51442 | *Jesse Wally*   11-10-06 |
| | 12. CONDITIONS APPLYING TO USE OF LABELS OR DEVICE   (FOR USDA USE ONLY) |

FSIS FORM 7234-1 (10/03/2002)   REPLACES FSIS FORM 7234-1 (11/87), WHICH IS OBSOLETE   *Designed in FormFlow software*

1402B262810

p.4

Mar 31 08 02:54p   FAIM

D002148



**FARMLAND** Original Ham

**Nutrition Facts**
Serving Size 3 oz (84g)
Servings Per Container Varied

| Amount Per Serving | |
|---|---|
| Calories 110 | Calories from Fat 30 |

| | % Daily Value* |
|---|---|
| Total Fat 3.5g | 5% |
| Saturated Fat 1g | 6% |
| Trans Fat 0g | |
| Cholesterol 55mg | 18% |
| Sodium 770mg | 32% |
| Total Carbohydrate 2g | 1% |
| Sugars 2g | |
| Protein 18g | |

SMOKED · BONELESS · PRESLICED
**ORIGINAL HAM**
AFTER COOKING CONTAINS UP TO 10% OF A SOLUTION‡
NO NITRATE OR NITRITE ADDED†

**Great Taste Naturally**
*Minimally Processed
No Artificial Ingredients
No Added Hormones**
Vegetarian Fed***

No ANTIBIOTICS EVER

FULLY COOKED

KEEP REFRIGERATED

FARMLAND FOODS, INC
Kansas City, MO 64195

---

 Front Label

Simply


SMOKED · BONELESS
**ORIGINAL HAM**
*Great Taste Naturally*

No ANTIBIOTICS EVER

Must be visible

AFTER COOKING, CONTAINS UP TO 10% OF A SOLUTION**

NO NITRATE OR NITRITE ADDED
except those that naturally occur
in Sea Salt and Celery Powder.

Back Label

**Nutrition Facts**
Serving Size 3 oz (84g)
Servings Per Container varied

| Amount Per Serving | |
|---|---|
| Calories 110 | Calories from Fat 30 |

| | % Daily Value* |
|---|---|
| Total Fat 3.5g | 5% |
| Saturated Fat 1g | 6% |
| Trans Fat 0g | |
| Cholesterol 55mg | 18% |
| Sodium 770mg | 32% |
| Total Carbohydrate 2g | 1% |
| Dietary Fiber 0g | 0% |
| Sugars 2g | |
| Protein 18g | |

| | | | |
|---|---|---|---|
| Vitamin A 0% | • | Vitamin C 0% | |
| Calcium 0% | • | Iron 4% | |

* Percent Daily Values are based on a 2,000 calorie diet.

** Solution Ingredients: WATER, SEA SALT, NATURAL SUGAR, POTASSIUM LACTATE (FROM CORN), NATURAL FLAVORS, CARRAGEENAN, LACTIC ACID STARTER CULTURE (NATURAL FERMENTING AGENT).

KEEP REFRIGERATED

 U.S. INSPECTED AND PASSED BY DEPARTMENT OF AGRICULTURE EST.717

FARMLAND FOODS, INC
KANSAS CITY, MO 64195

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0583-0092. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This form has been approved by OMB for web distribution.

PAGE _____ of _____

| U.S DEPARTMENT OF AGRICULTURE<br>FOOD SAFETY AND INSPECTION SERVICE<br>**APPLICATION FOR**<br>USDA-FSIS (30) MANUAL<br>60509711 | 1 AGENT NAME, ADDRESS,<br>TELEPHONE NO (If using an Agent,<br>complete this block, otherwise leave<br>blank.)<br><br>Prime Label Consultants, Inc.<br>536 Seventh Street SE<br>PO Box 15240<br>Washington, DC 20003-0240<br>(202) 546-3333<br>FAX (202) 543-4337 | 2. FOR USDA USE ONLY | 3. FOR USDA USE ONLY<br><br>C  NOV 2 1 2006  C<br><br>FSIS<br>U.S. DEPT. OF AGRICULTURE | 4. ESTABLISHMENT NO / FOREIGN<br>COUNTRY (if applicable)<br><br>717 |
|---|---|---|---|---|

| 5a NAME OF PRODUCT  FL PURE & NATURAL HICKORY SMOKED CLASSIC HAM WATER ADDED CONTAINS UP<br>TO 10% OF A SOLUTION. CATCH WT. | 5b. HACCP PROCESS CATEGORY<br>Fully cooked--not shelf stable |
|---|---|

| 6a. TYPE OF APPROVAL REQUESTED<br>[X] SKETCH    [ ] TEMPORARY<br>[ ] EXTENSION OF TEMPORARY | 6b WAS THE<br>LABEL<br>PREVIOUSLY<br>APPROVED?    [ ] YES<br>[X] NO | Date of approval _____<br>Prior approval number _____<br>Number of labels on hand _____<br>Number of days requested. _____ | 7a. AREA OF PRINCIPAL DISPLAY PANEL (Square inches)<br>≤ 100<br>7b. TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE (Square inches)<br>> 40 |
|---|---|---|---|

| 6.  PRODUCT FORMULA    [ ] PCT [X] WEIGHT<br>(By fraction) | 9.  PROCESSING PROCEDURES<br>(Approval of the sketch does not convey approval of the processing procedures) |
|---|---|

REDACTED

| TOTAL (Percent must total 100%) | | |
|---|---|---|

| 10. NAME AND ADDRESS OF FIRM (Below and inside data)<br><br>FARMLAND FOODS INC.<br>P.O. BOX 403<br>DENISON, IA 51442 | 11. SIGNATURE OF APPLICANT OR AGENT<br><br>_Jesse Waller_ | DATE<br>11-10-06 |
|---|---|---|
| | 12. CONDITIONS APPLYING TO USE OF LABELS OR DEVICE  (FOR USDA USE ONLY)<br><br>APPROVED WITH THE UNDERSTANDING INSPECTOR CAN BE<br>ASSURED AS TO SOURCE OF THE PRODUCT. | |

FSIS FORM 7234-1 (10/03/2002)          REPLACES FSIS FORM 7234-1 (11/87), WHICH IS OBSOLETE          Designed in FormFlow software

D002150



*Simply* (handwritten)

KEEP
Refrigerated (handwritten)

SMOKED • BONELESS
**CLASSIC HAM**
*Great Taste Naturally*

Front Label (handwritten)

must be visible (handwritten)

AFTER COOKING, CONTAINS UP TO 10% OF A SOLUTION**

Back Label (handwritten)

**Nutrition Facts**
Serving Size 3 oz (84g)
Servings Per Container varied

**Amount Per Serving**

**Calories** 100  Calories from Fat 20

| | % Daily Value* |
|---|---|
| **Total Fat** 2.5g | **4%** |
| Saturated Fat 1g | **4%** |
| Trans Fat 0g | |
| **Cholesterol** 55mg | **18%** |
| **Sodium** 810mg | **34%** |
| **Total Carbohydrate** 2g | **1%** |
| Dietary Fiber 0g | **0%** |
| Sugars 2g | |
| **Protein** 17g | |
| Vitamin A 0% • Vitamin C 0% | |
| Calcium 0% • Iron 4% | |

* Percent Daily Values are based on a 2,000 calorie diet.

** Solution Ingredients: WATER, DEXTROSE, SEA SALT, POTASSIUM LACTATE (FROM CORN), NATURAL FLAVORS, CARRAGEENAN, LACTIC ACID STARTER CULTURE (NATURAL FERMENTING AGENT).

NO NITRATE OR NITRITE ADDED except those that naturally occur in Sea Salt and Celery Powder.

KEEP
REFRIGERATED

FARMLAND FOODS, INC.
KANSAS CITY, MO 64195



| United States | Food Safety | Office of Policy, Program | Washington, D.C. |
| Department of | and Inspection | Development and | 20250/3700 |
| Agriculture | Service | Evaluation | |

Pederson's Natural Farms
Route 3 Box 168T
Hamilton, TX  76531

**JUL 2 2 2002**

Dear Sirs:

It has recently come to our attention that the labels for Apple Smoked Bacon, Black Forest Pepper Ham, Uncured Apple Smoke Bacon, Uncured Smoked Pepper Bacon, Uncured Bacon, Hickory Smoked Pepper Bacon, Uncured Smoked Ham Shank, Sweet German Brand Smoked Sausage, Apple Smoked Canadian Style Bacon, Uncured Canadian Style Bacon, Smoked Ham Shanks, Uncured Bone-In Ham, Uncured Honey Ham, Smoked Bone-In Ham, Apple Smoked Boneless Pork Loin, Uncured Black Forest Ham and Pederson's Black Forest Ham were approved in error.

According to Policy Memo 055 on Natural Claims (available at the "policies" link on the website (www.usda.fsis.gov/oppde/larc)), products bearing the claim "natural" are no more than minimally processed and contain no artificial ingredients or preservatives.  The products above contain sodium phosphate, sodium nitrite, spice extractives, dextrose, sodium lactate and other ingredients that are not derived from natural sources and are synthesized.  Because of the use of such ingredients, the claim "natural" must be removed from the labeling of these products.

By means of this letter, labels with the following label approval numbers are rescinded: 2342441, 2345154, 2342444, 2342440, 2342439, 2342442, 2345153, 2342443, 342407, 2342404, 2342406, 2345160, 2345158, 2345157, 2345156, 2342403, 2345155 and 2345159. Any other products whose labeling bears the claim "natural," which contain similar ingredients that are more than minimally processed or not derived from natural sources, are also rescinded. The Federal Inspector at Establishment 19617 will receive a copy of this letter.

If you have any questions on this matter, please do not hesitate to contact Ms. Tammie Myrick, Food Technologist, at Area Code (202) 205-0623.

Sincerely,

Robert C. Post, Ph.D., Director
Labeling and Consumer Protection Staff

D002152



DEPARTMENT OF AGRICULTURE

APPLICATION FOR APPROVAL OF
LABELS MARKING OR DEVICE

60212307

FORM APPROVED

APPROVED:
FSIS    0
U.S. DEPT. OF AGRIC.

T 98 01 2 3 6 3 7 8 1

FSIS
U.S. DEPT. OF AGRICULTURE

19617

NAME OF PRODUCT

Uncured Bacon
(Hickory Smoked)

USDA - FSIS (30) MANUAL

APPROVED AS MODIFIED

Was label previously approved as a sketch? ☐ Yes ☐ No
If sketch, date of sketch _____

☐ TEMPORARY    ☐ REQUEST FOR EXTENSION
Prior approval number _____
Number of labels on hand _____
Number of days requested _____

AREA OF PRINCIPAL
DISPLAY PANEL

30 IN.

| 6. PRODUCT FORMULA | ☐ PCT ☐ WEIGHT (No Fraction) | 8. PROCESSING PROCEDURES |
|---|---|---|
| | | |

REDACTED

| | TOTAL (Percent must total 100%) | X | |

10. NAME AND ADDRESS OF FIRM (Street and number)

Pederson's Natural Farms
1207 S. Rice
Hamilton, TX 76531

11. SIGNATURE OF APPLICANT OR AGENT

DATE
7-1-02

12. SIGNATURE OF INSPECTOR

DATE

13. CONDITIONS APPLYING TO USE OF LABELS OF...

COOKING YIELD NO MORE
THAN 40%

FSIS FORM 7234 (11/87)    REPLACES FSIS FORM 7234 (3/83) WHICH MAY BE USED UNTIL EXHAUSTED.

File Name -- BlkHSUCBcN.ai

Colored with Beet Powder

½ size of the "Largest Letter"

50

10

140

3 SPOT COLORS:
PMS 327 TEAL

INGREDIENTS: PORK, REVERSE OSMOSIS PURIFIED WATER, BROWN SUGAR, SALT, SODIUM LACTATE (FROM CORN SOURCE)

BLACK

UNCURED BACON -- INGREDIENTS: PORK, ~~REVERSE OSMOSIS PURIFIED~~ WATER, BROWN SUGAR, SALT, SODIUM LACTATE (FROM CORN SOURCE), BEET POWDER.

UNCURED BACON -- INGREDIENTS:  PORK, REVERSE OSMOSIS PURIFIED
WATER, BROWN SUGAR, SALT, SODIUM LACTATE (FROM CORN SOURCE),
BEET POWDER.



with Beet Powder

D002155



D002156

APPLICATION FOR APPROVAL OF LABELS, MARKING OR DEVICE

FORM APPROVED OMB NO

19617

FSIS
U.S. DEPT. OF AGRIC.

9 6 0 1 2 3 6 3 7 8 8    Uncured Apple Smoked Bacon

FSIS
U.S. DEPT. OF AGRICULTURE

[ ] FINAL
Was label previously approved as a sketch? [ ] Yes [ ] No
If sketch, date of sketch _____

[ ] TEMPORARY        [ ] REQUEST FOR EXTENSION
Prior approval number _____
Number of labels on hand _____
Number of days requested _____

REDACTED

Pederson's Natural Farms
1207 S. Rice
Hamilton, TX 76531

13. SIGNATURE OF INSPECTOR                    DATE

13. CONDITIONS APPLYING TO USE OF LABELS OR DEVICE

COOKING YIELD NO MORE
THAN 40%

D002157







Colored with Beet Powder



Pedersons
NATURAL
FARMS

**Our Promise to You.**

**The Pedersons Way...**
Our farms use... environmentally sound and proudly produce "all natural pork products" for you and your family to enjoy.

KEEP REFRIGERATED

www.healthypork.com

**COOKING SUGGESTIONS**
BROIL AND PAN FRY IN THE CONVENTIONAL MANNER.

MICROWAVE: PLACE SLICED BACON BETWEEN PAPER TOWELS IN A BAKING DISH. COOK APPROXIMATELY ... PER INDIVIDUAL UNITS
NOTE: HEATING TIMES MAY VARY ACCORDING TO INDIVIDUAL UNITS.

**Nutrition Facts**

*Percent Daily Values are based on a 2,000 calorie diet.

Not a significant source of dietary fiber, sugars, vitamin A, vitamin, calcium and iron.



APPLE SMOKED BACON -- INGREDIENTS: PORK, WATER, BROWN SUGAR, SALT, ALL NATURAL APPLE ...DIUM LACTATE (FROM CORN SOURCE), BEET POWDER.

D002159



APPLE SMOKED BACON -- INGREDIENTS: PORK, ~~████~~ ~~████~~ WATER, BROWN SUGAR, SALT, ALL NATURAL APPLE ~~█~~ODIUM LACTATE (FROM CORN SOURCE), BEET POWDER.

Not a significant source of dietary fiber, sugars, vitamin A, vitamin, calcium and iron.

*Percent Daily Values are based on a 2,000 calorie diet.



D002160



NET WT. 12 OZ. (340.2g)

MSG FREE

*All Natural
Pork Raised Without the Use of Antibiotics or Growth Stimulants—EVER!

NO NITRITES OR NITRATES ADDED

## Pederson's NATURAL FARMS

### Southwestern Bacon and Egg Casserole

A updated company casserole with the spicy flavors of Texas!

1 package (12 ounces) Pederson's Natural Farms Uncured Apple Smoked Bacon, cooked and crumbled
6 eggs
1½ cups shredded Colby-Jack cheese, divided (reserve ½ cup for topping)
1 cup non fat milk
1 cup fat free sour cream
½ cup prepared picante sauce
1 can (4 ounces) chopped green chilies, drained
2 flour tortillas (8-inch), torn into bite sized pieces

Preheat oven to 350 degrees.
Mix crumbled bacon, eggs, 1 cup cheese, milk, sour cream, picante sauce, chilies. Spray a 9 by 13 inch baking dish with cooking spray. Place tortilla pieces in the bottom of the pan. Pour bacon-egg mixture over tortillas. Sprinkle reserved ½ cup cheese over top. Bake for 25-30 minutes or until eggs are set and edges are browned. Serve with additional picante sauce and warmed tortillas.
Serves: 4-6

### Our Promise to You.

No antibiotics or growth hormones have EVER been used in this ALL NATURAL pork product. At Pederson's Natural Farms our demanding process requires we use only inspected select grain fed pork. No artificial chemicals or preservatives are EVER used. We invite you to sample all of our quality pork products. You'll discover the pure, wholesome flavor with your first bite! Serve Pederson's today...it's the "natural choice."

www.healthypork.com

### COOKING SUGGESTIONS
BROIL AND PAN FRY IN THE CONVENTIONAL MANNER.
...VE, PLACE SLICED BACON BETWEEN PAPER TOWELS IN A BAKING DISH. COOK APPROXIMATELY ONE MINUTE PER SLICE.
NOTE: HEATING TIMES MAY VARY ACCORDING TO INDIVIDUAL UNITS.

D002161

REDACTED

D002162

REDACTED

D002163

REDACTED

REDACTED

D002165

REDACTED

.

D002166

REDACTED

D002167

REDACTED

D002168

REDACTED

D002169

REDACTED

REDACTED

D002171

REDACTED

D002172

REDACTED

D002173

REDACTED

REDACTED

D002175

REDACTED

D002176

US DEPARTMENT OF AGRICULTURE
Food Safety and Inspection Service
APPLICATION FOR APPROVAL OF
LABELS, MARKING OR DEVICE
60215126

USDA-FSIS(30)MANUAL

☑ SKETCH
☐ FINAL
Was label previously approved as a sketch? ☐ Yes ☐ No
If sketch, date of sketch _____

SKETCH APPROVED
SUBJECT TO COMPLIANCE WITH
TWPS OF FINAL REGULATIONS
★ SEP 18 2002 26 ★

RECEIVED:
FSIS          9
DEPT. OF AGRIC.
012368350

U.S. DEPT. OF AGRICULTURE
☐ TEMPORARY          ☐ REQUEST FOR EXTENSION
Prior approval number _____
Number of labels on hand _____
Number of days requested _____

19617
NAME OF PRODUCT
Uncured Apple
Smoked Bacon

AREA OF PRINCIPAL
DISPLAY PANEL

50 in.

7 PRODUCT FORMULA          8 PROCESSING PROCEDURES

01/26/2002          991.45          254-386

REDACTED

10 NAME AND ADDRESS OF FIRM (Street and ZIP Code)

Pederson's Natural Farms
1207 S. Rice
Hamilton, TX 76531

11. SIGNATURE OF APPLICANT OR AGENT          DATE 8-1-02
12. SIGNATURE OF INSPECTOR          DATE
13. CONDITIONS APPLYING TO USE OF LABELS OR DEVICE

FSIS FORM 7234-1 (11/02)          REPLACES FSIS FORM 7423-1 (2/94) WHICH MAY BE USED UNTIL EXHAUSTED

PAGE 02

D002177



D002178

REDACTED

REDACTED

D002180

REDACTED

D002181

REDACTED

D002182

REDACTED

U.S. DEPARTMENT OF AGRICULTURE
Food Safety and Inspection Service

APPLICATION FOR APPROVAL OF
LABELS, MARKING OR DEVICE

FSIS has deter...

60215127

USDA-FSIS (30) MANUAL

[ ] FINAL
Was label previously approved as a sketch? [ ] Yes [ ] No
If sketch, date of sketch _____

FSIS
U.S. DEPT. OF AGRICULTURE

LABEL APPROVED
U.S. IS IN TO COMPLIANCE WITH
THE APPLICABLE REGULATIONS

SEP 18 2002

[ ] TEMPORARY APPROVAL     REQUEST FOR EXTENSION
Prior approval number _____
Number of labels on hand _____
Number of days requested _____

FSIS          O
DEPT. OF AGRIC.
01 2 3 6 8 3 5 1

19617

Uncured Pepper
Bacon

8/26/2002   18:07

254-386-

8. PRODUCT FORMULA     [ ] PCT [ ] WEIGHT
(No Fractions)     9. PROCESSING PROCEDURES

REDACTED

Pederson's Natural Farms
1207 S. Rice
Hamilton, TX 76531



11. SIGNATURE OF APPLICANT OR AGENT     DATE 8-1-02

12. SIGNATURE OF INSPECTOR     DATE

13. CONDITIONS APPLYING TO USE OF LABELS OR DEVICE

PAGE 82

FSIS FORM 7234-1 (11/87)     REPLACES FSIS FORM 7423-1 (3/83) WHICH MAY BE USED UNTIL EXHAUSTED

D002184



D002185

08/26/2002  10:07    254-386-4794    PEDERSON NATURAL FAR    PAGE  09



REDACTED

D002187

REDACTED

D002188

REDACTED

D002189

FSIS uses this information to determine whether the applicant meets requirements for label approval (9 CFR 317.4)     FORM APPROVED · OMB NO.

U.S. DEPARTMENT OF AGRICULTURE
Food Safety and Inspection Service

**APPLICATION FOR APPROVAL OF**

|||||| 6021/879

USDA-FSIS (30) MANUAL

SKETCH APPROVED
SUBJECT TO COMPLIANCE WITH
FSIS LABELING REGULATIONS

OCT 7 2002

U.S. DEPT. OF AGRIC.

FSIS     0
2 8 012369762

ESTABLISHMENT OR PLANT NO.
UNDER FORM OF ENTRY

**19617**

NAME OF PRODUCT

Uncured Smoked
Ham Shanks

AREA OF PRINCIPAL
DISPLAY PANEL

**ACTION REQUESTED BY USDA FOR APPROVAL**

☑ SKETCH
☐ FINAL
Was label previously approved as a sketch? ☐ Yes ☐ No
If sketch, date of sketch _____

☐ TEMPORARY     ☐ REQUEST FOR EXTENSION
Prior approval number _____
Number of labels on hand _____
Number of days requested _____

SQ. IN.

8. PRODUCT FORMULA          ☐ PCT  ☑ WEIGHT          9. PROCESSING PROCEDURES
                              (No Fractions)

REDACTED

*Pederson's Natural Farms*
*120 / S. Rice*
*Hamilton, TX 76531*

12. SIGNATURE OF INSPECTOR          Cody Lane          DATE  10/1/02

13. CONDITIONS APPLYING TO USE OF LABELS OR DEVICE

*Sodium Lactate Not "All Natural"
much more
minimally processed*

FSIS FORM 7234.1 (11/87)     REPLACES FSIS FORM 6921.1 (6/83) WHICH MAY BE USED UNTIL EXHAUSTED.

D002190

REDACTED

D002191

File Name: UncShanks3-02



INGREDIENTS: HAM SHANKS, REVERSE OSMOSIS PURIFIED WATER, BROWN SUGAR, SALT, SODIUM LACTATE (FROM CORN SOURCE), SPICE EXTRACTIVES.
Pederson's Natural Farms, Inc., Hamilton, TX 76531
Visit us at our web site: www.healthypork.com



## Uncured Smoked Ham Shanks

# Our Promise to You.

*No antibiotics or growth stimulants have EVER been used in this Pederson's Natural Farms pork product.*

At Pederson's Natural Farms our demanding process requires we use only inspected select grain fed pork. *No artificial ingredients or preservatives are EVER used.*

We invite you to sample all of our quality pork products. You'll discover the pure, wholesome flavor with your first bite! THANK YOU for inviting Pederson's Natural Farms to your table.

Pederson's Natural Farms, Inc., Hamilton, TX 76531
Write us with your comments or suggestions or visit us at our web site:
www.healthypork.com

PMS BLACK

D002192

10/03/2002  12:50    2°

REDACTED

USDA  FSIS 1301 MANUAL

U.S. DEPT. OF AGRICULTURE

OCT 8 2002

REQUEST FOR EXTENSION

Uncured Honey Ham

16. NAME AND ADDRESS OF FIRM (Enter zip and county code)

Pederson's Natural Farms
1207 S. Rice
Hamilton, TX 76531

17. SIGNATURE OF APPLICANT OR AGENT

DATE  10/3/02

18. CONDITIONS AFFIXING TO USE OF LABELS OR DEVICE

SIGNATURE OF INSPECTOR

DATE

D002193

File Name: UncHny3-02

POOR QUALITY



**This statement must be on label**

**This is not an All Natural Product**

**must be ½ size of**

## Pederson's NATURAL FARMS™
### Uncured Honey Ham

## Our Promise to You.

*No antibiotics or growth stimulants have EVER been used in this Pederson's Natural Farms pork product.*

At Pederson's Natural Farms our demanding process requires we use only inspected select grain fed pork. *No artificial ingredients or preservatives are EVER used.*

We invite you to sample all of our quality pork products. You'll discover the pure, wholesome flavor with your first bite! THANK YOU for inviting Pederson's Natural Farms to your table.

Pederson's Natural Farms, Inc., Hamilton, TX 76531

Write us with your comments or suggestions or visit us at our web site: www.healthypork.com

INGREDIENTS: PORK, ~~RAW WHOLESOME~~ ~~CULTURED~~ WATER, POTASSIUM LACTATE (From corn source) ~~████~~, HONEY, SALT, BEET POWDER, SEASONINGS (RAW SUGAR AND SPICES)

D002194

REDACTED

D002195





REDACTED

D002196

File Name: UncCanaBco.eps

6 SPOT COLORS
- PMS 872 GOLD
- PMS 327 TEAL
- PMS 431 GRAY
- PMS BLACK
- PMS 154 BROWN
- PROCESS YELLOW

PEDERSON NATURAL FAR    254-386-4794    89:88    11/19/2002    PAGE    26



*Pederson's* NATURAL FARMS™
Uncured Canadian Bacon

Pork Raised Without the Use of Antibiotics or Growth Stimulants-EVER!
No Preservatives! No Artificial Ingredients!

MSG FREE

NET WT. 6 OZ. (170g)

Nutrition Facts

*(handwritten)* Not legible

*(handwritten)* must be 1/2 size of product name

INGREDIENTS: PORK, *(illegible)* WATER, POTASSIUM LACTATE (FROM CORN SOURCE), BROWN SUGAR, SALT, *(illegible)* SEASONINGS (RAW SUGAR AND SPICES)
Pederson's Natural Farms, Inc., Hamilton, TX 76531
Visit us at our web site: www.healthypork.com

*(handwritten)* Ingredients will correspond to application

*(handwritten, circled at top)* This statement must be on the label

*(handwritten, circled)* NOT AN ALL NATURAL PRODUCT

*Pederson's* NATURAL FARMS
Uncured Canadian Bacon

## Our Promise to You.

No antibiotics or growth stimulants have EVER been used in this *Pederson's Natural Farms* pork product.

At Pederson's Natural Farms our demanding process requires we use only inspected select grain fed pork. No artificial ingredients or preservatives are EVER used.

We invite you to sample all of our quality pork products. You'll discover the pure, wholesome flavor with your first bite! THANK YOU for inviting Pederson's Natural Farms to your table.

Pederson's Natural Farms, Inc., Hamilton, TX 76531

Write us with your comments or suggestions or visit us at our web site: www.healthypork.com

BACK PRINTS BLACK FOR BOTH LABELS

D002197

REDACTED

D002198

FSIS uses this information to determine whether the applicant meets requirements to grant label approval (9 CFR 312.4)

FORM APPROVED · OMB NO. 0583-____    Page ___

U.S. DEPARTMENT OF AGRICULTURE

60331130

USDA-FSIS (30) MANUAL

APPLICANT  See cover for instructions

4. ESTABLISHMENT OR PLANT NO AND/OR PORTS OF ENTRY

19617

FSIS    0
U.S. DEPT. OF AGRIC.
0790123 82225

W    MAR 18 2003

6. NAME OF PRODUCT

Uncured Pepper Bacon

5. ACTION REQUESTED BY USDA FOR APPROVAL

☑ SKETCH
☐ FINAL
Was label previously approved as a sketch? ☐ Yes ☐ No
If sketch, date of sketch _____

☐ TEMPORARY    ☐ REQUEST FOR EXTENSION
Prior approval number _____
Number of labels on hand _____
Number of days requested _____

7. AREA OF PRINCIPAL DISPLAY PANEL

SQ. IN.

8. PRODUCT FORMULA    ☐ PCT ☑ WEIGHT    9. PROCESSING PROCEDURES

REDACTED

10. NAME AND ADDRESS OF FIRM (Below and between dots)

Pederson's Natural Forms
1207 S Rice
Hamilton, TX 76531

11. SIGNATURE OF APPLICANT OR AGENT    DATE 2-25-03

12. SIGNATURE OF INSPECTOR    DATE

13. CONDITIONS APPLYING TO USE OF LABELS OR DEVICE

FSIS FORM 7234-1 (11/07)    REPLACES FSIS FORM 6821-1 (6/91) WHICH MAY BE USED UNTIL EXHAUSTED

D002199

Pederson's Uncured Pepper Bacon
**File name: UnPepBcnA.EPS**

7 SPOT COLORS:
PMS 872 GOLD
PMS 327 TEAL
PMS 431 GRAY
PMS BLACK
PMS 4871S Brown
PMS 376 GREEN
PROCESS YELLOW

POOR QUALITY ORIGINAL

INGREDIENTS. PORK, REVERSE OSMOSIS PURIFIED WATER, BROWN SUGAR, SALT, SODIUM LACTATE (FROM CORN SOURCE), PEPPER, BEET POWDER.

UPC# 6 41227 31101

ALL NATURAL*
Pork Raised Without the use of Antibiotics or Growth Stimulants -EVER!
*Minimally Processed
*No Artificial Ingredients
MSG FREE
Pederson's NATURAL FARMS
Uncured Pepper Bacon
Our Promise to You
Visit us at our web site: www.healthypork.com
Nutrition Facts
Pederson's NATURAL FARMS
Uncured Pepper Bacon
Colored With Beet Powder
NO NITRITE OR NITRATE ADDED • NOT PRESERVED • KEEP REFRIGERATED BELOW 40° F AT ALL TIMES
Hickory Smoked
NET WT. 12 OZ. (340.5g)
KEEP REFRIGERATED

UPC# 6 41227 31101

Pederson's Uncured Pepper Bacon
File name: UnPepBcnA.EPS

**ALL NATURAL***
*Pork Raised Without
the use of Antibiotics
or Growth Stimulants
-EVER!*
***Minimally Processed**
***No Artificial Ingredients**

**MSG FREE**

NET WT 12 OZ (340.5g)

**Pederson's**
NATURAL
FARMS™

Uncured Pepper Bacon

Hickory Smoked

KEEP REFRIGERATED

ALL UNCURED MEAT PRODUCTS SHOULD BE USED OR FROZEN FROM THE PACKAGE

**Pederson's**
NATURAL
FARMS™

Uncured Pepper Bacon

**Our Promise to You**

No antibiotics or growth hormones have EVER been
used in this Pederson's Natural Farms pork product.
At Pederson's Natural Farms, our demanding process
requires we use only inspected select grain fed pork.
No artificial ingredients or preservatives are EVER used.
We invite you to sample all of our quality pork products.
You'll discover the difference that a name you trust
can make. We at Pederson's Natural Farms.
THANK YOU for trying Pederson's Natural Farms to your table.

Pedersons Natural Farms, Inc. Hamilton, TX 76531
Visit us at our web site www.healthypork.com

**Nutrition Facts**   Serv. Sizing Instructions

NOTE:
ALL UNCURED MEAT PRODUCTS SHOULD BE USED
OR FROZEN WITHIN 5 DAYS AFTER OPENING.
KEEP REFRIGERATED.

**COOKING SUGGESTIONS**
BROIL AND PAN FRY IN THE CONVENTIONAL MANNER.
MICROWAVE: PLACE SLICED BACON BETWEEN PAPER TOWELS IN A BAKING DISH. COOK APPROXIMATELY
ONE MINUTE PER SLICE. NOTE: HEATING TIMES MAY VARY ACCORDING TO INDIVIDUAL UNITS.

INGREDIENTS: PORK, REVERSE OSMOSIS PURIFIED
WATER, BROWN SUGAR, SEA SALT, SODIUM LACTATE
(FROM CORN SOURCE), CELERY POWDER, PEPPER.

REDACTED

D002202



60341253

USDA-FSIS(30)MANUAL

1

CROSS REF. APPROVED / 208952049753

U. S. DEPT OF AGRIC./FSIS

DON ELLIS
& ASSOCIATES
North Owen Street
...ndria, VA 22304

2.

SKETCH APPROVED SUBJECT TO COMPLIANCE WITH FMIA & PPIA & REGULATIONS

MAY 16 2003

FSIS
U.S. DEPT. OF AGRICULTURE

3.

APPROVED
U.S. DEPT. OF AGRIC.
...7376

4. ESTABLISHMENT OR PLANT NO.
8888

5 NAME OF PRODUCT

uncured
Cheese Hotdog

6. ACTION REQUESTED

☐ SKETCH

■ FINAL

Was label previously approved as a sketch? ☐ Yes ■ No

If sketch, date of sketch ______

☐ TEMPORARY

Prior approval number ______

Number of labels on hand ______

Number of days requested ______

☐ REQUEST FOR EXTENSION

7 AREA OF PRINCIPAL DISPLAY PANEL
20
SQ IN

8 PRODUCT FORMULATION ☐ PCT ■ WEIGHT

9 PROCESSING PROCEDURE

REDACTED

TOTAL

10 NAME AND ADDRESS OF FIRM

13 CONDITIONS APPLYING TO USE OF LABELS OR DEVICE

D002203



ALL NATURAL*
* Pork & Beef Raised Without
Antibiotics & Growth Promoting
Hormones

DISTRIBUTED BY: YORKSHIRE FARMS
9 STUYVESANT DRIVE
SWEDESBORO, NJ 08085
www.yorkshirefarms.com

UNCURED
CHEDDAR CHEESE
HOTDOG

NO NITRITE OR NITRATE ADDED / NOT PRESERVED.
KEEP REFRIGERATED BELOW 40°F AT ALL TIMES.
*NO ARTIFICIAL INGREDIENTS *MINIMALLY PROCESSED

NET WT.
16 OZ.
(1 LB.)

**Nutrition Facts**
Serving Size  1 Frank (56g)
Servings Per Container  8
Calories 110   Fat Calories 80
* Percent Daily Values (DV) are
based on a 2,000 calorie diet

| Amount/Serving | %DV* | Amount/Serving | %DV* |
|---|---|---|---|
| Total Fat 9g | 14% | Total Carb. 0g | 0% |
| Sat. Fat 3.5g | 18% | Fiber 0g | 0% |
| Cholest. 30mg | 10% | Iron | 6% |
| Sodium 300mg | 12% | Protein 9g | |

Not a significant source of Dietary Fiber, Sugars,
Vitamin A, Vitamin C, and Calcium

U.S.
INSPECTED
AND PASSED BY
DEPARTMENT OF
AGRICULTURE
EST.8888

INGREDIENTS: Pork, Beef, Water, Cheddar Cheese (Pasteurized Part
Skim Milk, Salt, Enzymes, Cheese Cultures, Annatto), Raw Sugar,
Sodium Lactate, (derived from beets), Sea Salt, Spices, Onion Powder.

POOR QUALITY ORIGINAL

D002204

REDACTED

D002205

REDACTED

D002206

**From:** Post, Robert
**Sent:** Wednesday, March 17, 2004 8:38 AM
**To:** Jones, Sally; Myrick, Tammie; Budak, Catherine; Wheeler, Mark; Duncan, Tawana; Murphy-Jenkins, Rosalyn; White, Patricia; Jones, Bill; Uhler, Sandra; Canavan, Jeff; Barr, Marqueta
**Subject:** RE: Sodium Lactate (from a natural source)

Let's not turn a non-public health issue into a major issue. The definition for "natural" is on the brink of failing the "hee-haw" test as it is. FDA has no policy on "natural." With BSE concerns, people believe that the term means more than it does. Let whomever wants to use the term come to us in compliance with PM 055 and if they want to make the case for an ingredient being consistent with "natural" have them check out the NOP's National List. If the substance is not an antimicrobial/shelf-life extension agent and is on the list, let them have it.

Robert C. Post, Ph.D.
Director, Labeling and Consumer Protection Staff
Food Safety and Inspection Service, USDA
1400 Independence Ave, SW  Suite 602, Annex
Washington, DC  20250
Ph:  202-205-0279
Fax:  202-205-3625
Email:  Robert.Post@usda.gov
Labeling and Additives Policy Website:  www.fsis.usda.gov/oppde/larc
*This e-mail message is intended for the exclusive use of the > recipient(s) named above. It may contain information that is > protected, privileged, or confidential, and it should not be > disseminated, distributed, or copied to persons not authorized to > receive such information. If you are not the intended recipient, any > dissemination, distribution or copying is strictly prohibited. If you think you have received this e-mail message in error, please e-mail > the sender immediately.*

-----Original Message-----
**From:** Jones, Sally
**Sent:** Wednesday, March 17, 2004 8:24 AM
**To:** Post, Robert; Myrick, Tammie; Budak, Catherine; Wheeler, Mark; Duncan, Tawana; Murphy-Jenkins, Rosalyn; White, Patricia; Jones, Bill; Uhler, Sandra; Canavan, Jeff; Barr, Marqueta
**Cc:** Jones, Sally
**Subject:** RE: Sodium Lactate (from a natural source)

I don't have a problem with that policy, but I think we need to document it so that if Burt, et.al., comes asking for sodium erythorbate (from sugar) to be considered natural since the processing is no more intense than sodium lactate, we can fall back on the position that we are accepting NOSB "Organic" ingredients for "Natural," even if the processing may be somewhat rigorous.

Sally Jones

-----Original Message-----
**From:** Post, Robert
**Sent:** Wednesday, March 17, 2004 7:17 AM
**To:** Jones, Sally; Myrick, Tammie; Budak, Catherine; Wheeler, Mark; Duncan, Tawana; Murphy-Jenkins, Rosalyn; White, Patricia; Jones, Bill; Uhler, Sandra; Canavan, Jeff; Barr, Marqueta
**Subject:** RE: Sodium Lactate (from a natural source)

If the substances pass the scrutiny of the NOSB and make it onto the National List, that test of something being "organic" is a lot harder than one we could ever apply. As I said, to go to the extent of finding non-bioengineered corn is a feat in and of itself. I would expect that the lactate that makes it as "organic" and that would be "natural" if used at 2% or less, would have to be from non-bioengineered corn. I would pit Kathryn DiMatteo from the Organic Trade Assn against Burt Schweemer any day.

D002207

Robert C. Post, Ph.D.
Director, Labeling and Consumer Protection Staff
Food Safety and Inspection Service, USDA
1400 Independence Ave, SW  Suite 602, Annex
Washington, DC  20250
Ph:  202-205-0279
Fax:  202-205-3625
Email:  Robert.Post@usda.gov
Labeling and Additives Policy Website:  www.fsis.usda.gov/oppde/larc

*This e-mail message is intended for the exclusive use of the > recipient(s) named above.  It may contain information that is > protected, privileged, or confidential, and it should not be > disseminated, distributed, or copied to persons not authorized to > receive such information.  If you are not the intended recipient, any > dissemination, distribution or copying is strictly prohibited.  If you think you have received this e-mail message in error, please e-mail > the sender immediately.*

-----Original Message-----
**From:** Jones, Sally
**Sent:** Wednesday, March 17, 2004 7:06 AM
**To:** Post, Robert; Myrick, Tammie; Budak, Catherine; Wheeler, Mark; Duncan, Tawana; Murphy-Jenkins, Rosalyn; White, Patricia; Jones, Bill; Uhler, Sandra; Canavan, Jeff; Barr, Marqueta
**Cc:** Jones, Sally
**Subject:** RE: Sodium Lactate (from a natural source)

Kathy and I used to get out the chemistry books and review the processes it took to convert products into the "natrual" ingredient (or reviewed information provided by the manufacturer).  I just hate to see Hibbert/Schwimmer etc get this information and review the chemistry behind the processes needed to turn corn into sodium lactate and decide that all of these (potential) processes are now deemed to be "natural."

Sally

     -----Original Message-----
     **From:** Post, Robert
     **Sent:** Wednesday, March 17, 2004 7:02 AM
     **To:** Jones, Sally; Myrick, Tammie; Budak, Catherine; Wheeler, Mark; Duncan, Tawana; Murphy-Jenkins, Rosalyn; White, Patricia; Jones, Bill; Uhler, Sandra; Canavan, Jeff; Barr, Marqueta
     **Subject:** RE: Sodium Lactate (from a natural source)

     The organic criteria are rigorous....no bioengineering, no irradiation.  Realize that 80% of the corn in this country is from bioengineered seed.  So, when they say lactate "from corn" and can assure us they meet the organic standard, how can we not agree that "natural" applies?  I also doubt that there are FEMA GRAS reaction flavors and artificial flavors on the National List.  Out of curiosity, Tammie could check that out.

     If the use of lactate is over the regulated 2% for flavoring, regardless if it is on the National NOP List, the purpose of use is no longer for flavoring (it is into the microbial reduction use level) and therefore the lactate cannot be in a "natural" product.

     Boy, you'll are tough.

D002208

Robert C. Post, Ph.D.
Director, Labeling and Consumer Protection Staff
Food Safety and Inspection Service, USDA
1400 Independence Ave, SW  Suite 602, Annex
Washington, DC  20250
Ph:  202-205-0279
Fax:  202-205-3625
Email:  Robert.Post@usda.gov
Labeling and Additives Policy Website:  www.fsis.usda.gov/oppde/larc
*This e-mail message is intended for the exclusive use of the > recipient(s) named above.  It may contain information that is > protected, privileged, or confidential, and it should not be > disseminated, distributed, or copied to persons not authorized to > receive such information.  If you are not the intended recipient, any > dissemination, distribution or copying is strictly prohibited.  If you think you have received this e-mail message in error, please e-mail > the sender immediately.*

-----Original Message-----
**From:** Jones, Sally
**Sent:** Wednesday, March 17, 2004 6:53 AM
**To:** Post, Robert; Myrick, Tammie; Budak, Catherine; Wheeler, Mark; Duncan, Tawana; Murphy-Jenkins, Rosalyn; White, Patricia; Jones, Bill; Uhler, Sandra; Canavan, Jeff; Barr, Marqueta
**Subject:** RE: Sodium Lactate (from a natural source)

I don't really care, BUT, Tammie or someone of the group responsible for "Natural" needs to keep records documenting WHY new ingredients have been added so that when additional requests are made for new ingredients, they can go back to the documentation and identify WHY various substances were approved and why others have been turned down so that LCPS can be consistent.  Are there other ingredients listed on the NOP list for flavoring that we would not deem "Natural?"  If so, then the rationale below is a week one.

Sally

-----Original Message-----
**From:** Post, Robert
**Sent:** Wednesday, March 17, 2004 6:47 AM
**To:** Jones, Sally; Myrick, Tammie; Budak, Catherine; Wheeler, Mark; Duncan, Tawana; Murphy-Jenkins, Rosalyn; White, Patricia; Jones, Bill; Uhler, Sandra; Canavan, Jeff; Barr, Marqueta
**Subject:** RE: Sodium Lactate (from a natural source)

I think because sodium lactate is on the National List (NOP) of substances and because it is being used at the level *regulated for the purpose of flavoring*, we would accept it in a "natural" product.  I think the National List helps us here.  Extracting lactic acid and making a sodium salt from it might not be too rigorous and obviously does not involve synthetic chemicals in the process or it would not be deemed "organic."  Perhaps we should also say that we expect the sodium lactate in a natural product to be consistent with lactate that can be certified as organic.

Robert C. Post, Ph.D.
Director, Labeling and Consumer Protection Staff

D002209

Food Safety and Inspection Service, USDA
1400 Independence Ave, SW  Suite 602, Annex
Washington, DC  20250
Ph:  202-205-0279
Fax:  202-205-3625
Email:  Robert.Post@usda.gov
Labeling and Additives Policy Website:
www.fsis.usda.gov/oppde/larc
*This e-mail message is intended for the exclusive use of the > recipient(s) named above.  It may contain information that is > protected, privileged, or confidential, and it should not be > disseminated, distributed, or copied to persons not authorized to > receive such information.  If you are not the intended recipient, any > dissemination, distribution or copying is strictly prohibited.  If you think you have received this e-mail message in error, please e-mail > the sender immediately.*


-----Original Message-----
**From:** Jones, Sally
**Sent:** Wednesday, March 17, 2004 6:14 AM
**To:** Myrick, Tammie; Budak, Catherine; Wheeler, Mark; Duncan, Tawana; Murphy-Jenkins, Rosalyn; White, Patricia; Jones, Bill; Uhler, Sandra; Canavan, Jeff; Barr, Marqueta
**Cc:** Post, Robert
**Subject:** RE: Sodium Lactate (from a natural source)

My concern is the processing needed to derive the sodium lactate from the corn, is that more than minimal processing??? Just because it comes from a natural source, if it takes more than minimal processing to derive the product, it does NOT meet our definition of natural.  Can I take corn and make sodium lactate from it in my kitchen?

Sally Jones

-----Original Message-----
**From:** Myrick, Tammie
**Sent:** Tuesday, March 16, 2004 4:28 PM
**To:** Budak, Catherine; Wheeler, Mark; Duncan, Tawana; Murphy-Jenkins, Rosalyn; White, Patricia; Jones, Bill; Jones, Sally; Uhler, Sandra; Canavan, Jeff; Barr, Marqueta
**Cc:** Post, Robert
**Subject:** Sodium Lactate (from a natural source)

After doing some research, checking previously approved labels and talking with Robert, we have approved labels with the claim "All Natural" that have included sodium lactate in their formulation.  The basis for approval; when the amount of sodium lactate is 2% or lower this would be considered a flavoring and not a preservative.  Any amount above 2%, i.e. 4.8% would be considered a preservative.  Also, the sodium lactate has to be from a natural source e.g. (sodium lactate from corn source).

Tammie M. Myrick, Food Technologist
Labeling and Consumer Protection Staff
USDA, FSIS, OPPED, LCPS
1400 Independence Ave. SW
Room 614 Annex Building

D002210

Washington, DC 20250-3700
Phone: (202) 205-0623
Fax: (202) 205-0145 or (202) 205-0271
Email: FSIS.Labeling@fsis.usda.gov

D002211

| U.S. DEPARTMENT OF AGRICULTURE FOOD SAFETY AND INSPECTION SERVICE<br><br>APPLICATION FOR APPROVAL OF LABELS, MARKING OR DEVICE<br><br>FSIS has determined that information provided in items 1, 2 and 10 is exempt from disclosure under the Freedom of Information Act 5 U.S.C. 552(b)(4)<br><br>*APPLICANT  See Page 2 for instructions* | 1. AGENT NAME, ADDRESS, TELEPHONE NO. (if using an Agent complete the block information below) | FOR USDA USE ONLY<br>SKETCH APPROVED<br>SUBJECT TO COMPLIANCE WITH FMIA & PPIA REGULATIONS<br><br>MAY 25 2007<br>FSIS<br>U.S. DEPT. OF AGRICULTURE | 3. FOR USDA USE ONLY<br><br>2 0 0 7 0 0 7 | 4. ESTABLISHMENT NO(S). OR PLANT NUMBER, (if applicable)<br><br>5390 |
|---|---|---|---|---|

| 5a. NAME OF PRODUCT<br><br>Maverick Ranch Natural Bacon | 5b. HACCP PROCESS CATEGORY<br><br>Raw product--not ground |
|---|---|

| 6a. TYPE OF APPROVAL REQUESTED<br>[X] SKETCH  [ ] TEMPORARY<br>[ ] EXTENSION OF TEMPORARY | 6b. WAS THE LABEL PREVIOUSLY APPROVED?  [ ] YES  [X] NO<br>Date of approval ____<br>Prior approval number ____<br>Number of labels on hand ____<br>Number of days requested ____ | 7a. AREA OF PRINCIPAL DISPLAY PANEL (Square inches)<br>21.00<br>7b. TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE (Square inches)<br>21.00 |
|---|---|---|

| 8. PRODUCT FORMULA | [X] PCT  [ ] WEIGHT (No Fractions) | 9. PROCESSING PROCEDURES (Approval of the sketch does not convey approval of the processing procedures) |
|---|---|---|

REDACTED

D002212



D002213

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0583-0092. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This form has been approved by OMB for web distribution.

PAGE ____ of ____

| U.S. DEPARTMENT OF AGRICULTURE FOOD SAFETY AND INSPECTION SERVICE **APPLICATION FOR APPROVAL OF LABELS, MARKING OR DEVICE** FSIS has determined that information provided in items 8, 9, and 10 is exempt from mandatory disclosure under the Freedom of Information Act 5 U.S.C. 552(b)(4) *APPLICANT: See Page 2 for instructions* | 1. AGENT NAME, ADDRESS, TELEPHONE NO. *(If using an Agent complete this block, otherwise leave blank.)* | 2. FOR USDA USE ONLY AUG 31 2005 | 3. FOR USDA USE ONLY | 4. ESTABLISHMENT NO. / FOREIGN COUNTRY *(If applicable)* 19617 |

| 5a. NAME OF PRODUCT | | | 5b. HACCP PROCESS CATEGORY |
|---|---|---|---|
| Maverick Ranch Apple Smoked Bacon | | | Raw product--not ground |

| 6a. TYPE OF APPROVAL REQUESTED | 6b. WAS THE LABEL PREVIOUSLY APPROVED? | 7a. AREA OF PRINCIPAL DISPLAY PANEL *(Square inches)* 75.00 |
|---|---|---|
| [X] SKETCH  [ ] TEMPORARY  [ ] EXTENSION OF TEMPORARY | [ ] YES  [X] NO  ⇒ Date of approval _____ Prior approval number _____ Number of labels on hand _____ Number of days requested _____ | 7b. TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE *(Square inches)* 100.00 |

| 8. PRODUCT FORMULA | [X] PCT [ ] WEIGHT *(By fractions)* | 9. PROCESSING PROCEDURES *Disposition of the sketch does not cause approval of the processing procedures* |
|---|---|---|

REDACTED

D002214



KEEP REFRIGERATED BELOW 40°F AT ALL TIMES. • NET WT. 12 OZ. (340.5g)

NO NITRATES OR NITRITES ADDED* • NOT PRESERVED

UNCURED

MAVERICK RANCH
NATURAL*
BACON

There's no better way to start your morning than with Maverick Ranch Natural* Bacon, the very same bacon that's served daily at all three U.S. Olympic Training Centers. Our bacon is made from our famous fresh Natural* pork, which is vegetarian fed and always raised without the use of antibiotics, pesticides or growth stimulants (hormones**). And of course, no artificial ingredients or preservatives* of any kind are added. The farms that raise our hogs do so in a manner affording ample space and special care that's not unlike the individual attention given to livestock at state fairs. That's why our bacon bears the Certified Humane Raised & Handled mark. To learn more, go to www.certifiedhumane.com.

**SAFE HANDLING INSTRUCTIONS:** This product was prepared from inspected and passed meat and/or poultry. Some food products may contain bacteria that could cause illness if the product is mishandled or cooked improperly. For your protection, follow these safe handling instructions.

Keep refrigerated or frozen. Thaw in refrigerator or microwave.

Keep raw meat separate from other foods. Wash working surfaces (including cutting boards), utensils and hands after touching raw meat.

Cook thoroughly.

Keep hot foods hot. Refrigerate leftovers immediately or discard.

INGREDIENTS: PORK, WATER, BROWN SUGAR, SALT, SODIUM LACTATE (FROM CORN SOURCE), CELERY JUICE CONCENTRATE, LACTIC ACID STARTER CULTURE.

*NATURAL: MINIMALLY PROCESSED, NO ARTIFICIAL INGREDIENTS OR PRESERVATIVES. USDA DOES NOT PERMIT PRESERVATIVES IN THIS PRODUCT. **FEDERAL REGULATIONS DO NOT PERMIT THE USE OF GROWTH HORMONES IN PORK.

MAVERICK RANCH NATURAL* MEATS
5360 N. FRANKLIN ST, DENVER, CO 80216

## Nutrition Facts

Serving Size 2 Cooked Slices (15g)
Servings Per Container About 8

| Amount Per Serving | |
|---|---|
| Calories 70 | Calories from Fat 50 |

| | % Daily Value* |
|---|---|
| Total Fat 6g | 10% |
| Saturated Fat 2g | 10% |
| Trans Fat 0g | |
| Cholesterol 10mg | 4% |
| Sodium 130mg | 6% |
| Total Carbohydrate 0g | 0% |
| Dietary Fiber 0g | 0% |
| Sugars 0g | |
| Protein 3g | |

| | | | |
|---|---|---|---|
| Calcium 0% | • | Iron 0% | |

Not a significant source of vitamin A and vitamin C.
*% DV are based on a 2,000 calorie diet.

MAVERICK
RANCH

NATURAL*
MEATS

6 15409 45540 7

For free coupons and tasty recipes, become a Maverick Ranch Preferred Customer! To sign up simply write, call toll-free visit us online:
**1-800-497-2624 • www.maverickranch.com**

**COOKING INSTRUCTIONS:** Preferred Methods: Bake, broil or pan-fry. To microwave, place a paper towel in a baking dish. Separate bacon slices and lay flat. Cover with another paper towel and cook 1 to 2 minutes per slice, depending on your microwave's wattage.
NOTE: All uncured meat products should be used or frozen within 5 days after opening.

D002215

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0583-0092. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This form has been approved by OMB for web distribution on _____.

| U.S. DEPARTMENT OR AGRICULTURE FOOD SAFETY AND INSPECTION SERVICE | 1. AGENT NAME, ADDRESS, TELEPHONE NO. (If using an Agent, complete this block, otherwise leave blank.) | SUB 2. FOR USDA USE ONLY | 3. FOR USDA USE ONLY | 4. ESTABLISHMENT NO. / FOREIGN COUNTRY (If applicable) |
|---|---|---|---|---|
| **APPLICATION FOR APPROVAL OF LABELS, MARKING OR DEVICE** FSIS has determined that information provided in items 8, 9, and 10 is exempt from mandatory disclosure under the Freedom of Information Act 5 U.S.C. 552(b)(4). APPLICANT: See Page 2 for instructions. | International Meat Inspection Consultants, Inc. 10201 Gov. .... Cl .. .tgomery Vil..... MD 2..... 202-963-2608 | OCT 23 2006  '319 U.S. DEPT. OF AGRICULTURE | 2520247 | 413 |

| 5a. NAME OF PRODUCT | 5b. HACCP PROCESS CATEGORY |
|---|---|
| *Bacon, Natural Excellence All Natural 12 oz* | HeatTreated, Not Fully Cooked -Not Shelf Stable |

| 6a. TYPE OF APPROVAL REQUESTED | 6b. WAS THE LABEL PREVIOUSLY APPROVED ? | 7a. AREA OF PRINCIPAL DISPLAY PANEL (Square Inches): |
|---|---|---|
| [ ] SKETCH  [X] TEMPORARY [ ] EXTENSION OF TEMPORARY | [X] YES → Date of approval: May 10, 2005 Prior approval number: 2458734 Number of labels on hand: 36,000 Number of days requested: 180 [ ] NO | 22.5 |
| | | 7b. TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE (Square Inches) 77.5 |

| 8. PRODUCT FORMULA | [ ] PCT [X] WEIGHT (No Fractions) | 9. PROCESSING PROCEDURES (Approval of the sketch does not convey approval of the processing procedures) |
|---|---|---|

REDACTED

| 10. NAME AND ADDRESS OF FIRM (Below and between dots) | 11. SIGNATURE OF APPLICANT OR AGENT | DATE |
|---|---|---|
| *Premium Standard Farms, Inc* P.O. Box 49 424 East Railroad St. Clinton, NC 28329-0049 Attention: Jack Harstine | *Jack Harstine* Tammie Myrick | 10/13/06 |
| | 12. CONDITIONS APPLYING TO USE OF THE LABELS OR DEVICE (FOR USDA USE ONLY) QC FR 317. 17 Uncured Bacon (All Statements Revised should be adjacent to Na...... labels should Sea salt, celery powder | |

FSIS FORM 7234-1 (10/03/2002)    REPLACES FSIS FORM 7234-1 (11/87), WHICH IS OBSOLETE    Designed in FormFlow software

D002216

REDACTED

D002217

If you are not completely satisfied, send original packaging and purchase receipt to: Premium Standard Farms, 805 Pennsylvania, Suite 200, Kansas City, MO 64105, for a full refund.

PREMIUM STANDARD FARMS, INC.® • KANSAS CITY, MO 64105
© 2005 Premium Standard Farms, Inc.

0  75042 71619  6

KEEP FROZEN. DO NOT REFRIGERATE OR DISCARD.
KEEP FOODS HOT
COOK THOROUGHLY.

**SAFE HANDLING INSTRUCTIONS**
THIS PRODUCT WAS PREPARED FROM INSPECTED AND PASSED MEAT AND/OR POULTRY. SOME FOOD PRODUCTS MAY CONTAIN BACTERIA THAT COULD CAUSE ILLNESS IF THE PRODUCT IS MISHANDLED OR COOKED IMPROPERLY. FOR YOUR PROTECTION, FOLLOW THESE SAFE HANDLING INSTRUCTIONS.
KEEP REFRIGERATED OR FROZEN. THAW IN REFRIGERATOR OR MICROWAVE. KEEP RAW MEAT AND POULTRY SEPARATE FROM OTHER FOODS. WASH WORKING SURFACES (INCLUDING CUTTING BOARDS), UTENSILS, AND HANDS AFTER TOUCHING RAW MEAT OR POULTRY.

No Nitrates Or Nitrites Added.
Pork Raised Without The Use Of Antibiotics, Ever!

**ALL NATURAL***
**UNCURED BACON**

**INGREDIENTS:** PORK, WATER, SEA SALT, SODIUM LACTATE (A NATURALLY OCCURRING SALT DERIVED FROM CORN), EVAPORATED CANE JUICE, CELERY JUICE CONCENTRATE, LACTIC ACID STARTER CULTURE.

**COOKING INSTRUCTIONS**
**PAN FRY** – Place slices in cold skillet over moderate heat. Cook until desired crispness, turning once. Drain on paper towel.
**MICROWAVE** – For 1 to 6 slices, microwave on high setting 3/4 to 1 minute per slice. Cooking time may vary depending on microwave oven.

**PREMIUM FARMS®**

| Nutrition Facts | | |
|---|---|---|
| Serving Size 2 pan fried slices (15g) | | |
| Servings Per Container about 8 | | |
| **Amount Per Serving** | | |
| **Calories** 70 | Calories from Fat 50 | |
| | | **% Daily Value\*** |
| **Total Fat** 6g | | 9% |
| Saturated Fat 2g | | 10% |
| Trans Fat 0g | | |
| **Cholesterol** 15mg | | 5% |
| **Sodium** 260mg | | 12% |
| **Total Carbohydrate** 0g | | 0% |
| Dietary Fiber 0g | | 0% |
| Sugars 0g | | |
| **Protein** 9g | | |
| Vitamin A 0% • Vitamin C 0% | | |
| Calcium 0% • Iron 0% | | |
| \*Percent Daily values are based on a 2000 calorie diet. | | |

NET WT. 12 OZ. (340g)

**PREMIUM FARMS®**

**ALL NATURAL***
**UNCURED BACON**

**No Nitrates Or Nitrites Added.**

**Naturally Hickory Smoked**

\*Minimally Processed.
No Artificial Ingredients. Not Preserved.
Keep Refrigerated Below 40°F. At All Times.

• **Pork Raised Without The Use Of Antibiotics, Ever!**
• **No Growth Hormones Added\*\***

\*\*(Federal Regulations Do Not Permit The Use Of Growth Hormones In Pork.)

U.S. INSPECTED AND PASSED BY DEPARTMENT OF AGRICULTURE EST. 413

REDACTED

D002219

REDACTED

D002220

POLICY MEMO 055

To:    Branch Chiefs, SLD

' NOV 22 1982

From:    Robert G. Hibbert, Director, SLD

Subject:    Natural Claims

ISSUE:  Appropriate policy for the approval or denial of labeling for meat products and poultry products bearing the term "natural."

POLICY:  The term "natural" may be used on labeling for meat products and poultry products, provided the applicant for such labeling demonstrates that:



1) The product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic ingredient; and 2) the product and its ingredients are not more than minimally processed. For the purposes of this memorandum, minimal processing may include:  (a) those traditional processes used to make food edible or preserve it or make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting; or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

Relatively severe processes, such as solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing.  Thus, the use of a natural flavor or flavoring in compliance with 21 CFR 101.22 which has undergone more than minimal processing would place a product in which it is used outside the scope of these guidelines.  However, the presence of an ingredient which has been more than minimally processed would not necessarily preclude the product from being promoted as natural.



Exceptions of this type may be granted on a case by case basis if it can be demonstrated that the use of such an ingredient would not significantly change the character of the product to the point that it could no longer be considered a natural product.  In such cases the natural claim must be qualified to clearly and conspicuously identify the ingredient, e.g., contains refined sugar.

FSIS 2630-5(12/78)                    Page 87

D002221

Branch Chiefs, SLD                                                        2

All products claiming to be natural or a natural food should be accompanied by a brief statement which explains what is meant by the term natural, i.e., that the product is a natural food because it contains no artificial ingredients and is only minimally processed. This statement should appear directly beneath or beside all natural claims or, if elsewhere on the principal display panel,'an asterisk should be used to tie the explanation to the claim.

The decision to approve or deny the use of a natural claim may be affected by the specific context in which the claim is made. For example, claims indicating that a product is a natural food, e.g., "Natural chili" or "chili - a natural product" would be unacceptable for a product containing beet powder which artificially colors the finished product. However, "all natural ingredients" might be an acceptable claim for such a product.

RATIONALE: A variety of sources, including the Federal Trade Commission's (FTC) rulemaking record on this subject, substantiates the contention that natural terminology, if used indiscriminately, may be misleading to consumers who believe that foods so labeled are intrinsically safer or nutritionally superior to their "unnatural" counterparts. At one time, this agency took the position that such claims were inherently misleading and should never be allowed. While the general concerns regarding consumer confusion in this area were appropriate, the scope of a general prohibition seems excessive, and this position has been modified through consideration of specific labeling applications. This memo should serve to publicize guidelines which have evolved through this process while still precluding the use of natural claims on meat and poultry labeling where methods of preparation and/or processing or the presence of artificial ingredients would result in a product that is inconsistent with consumer expectations of a natural product as characterized by the FTC's extensive record.

D002222

REDACTED

D002223

REDACTED

D002224

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0583-0092. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This form had been approved by OMB for web distribution.

PAGE ___ of ___

| U.S. DEPARTMENT OR AGRICULTURE FOOD SAFETY AND INSPECTION SERVICE | 1. AGENT NAME, ADDRESS, TELEPHONE NO. *(If using an Agent, complete this block, otherwise leave blank.)* | 2. FOR USDA USE ONLY | 3. FOR USDA USE ONLY | 4. ESTABLISHMENT NO. / FOREIGN COUNTRY *(If applicable)* |
|---|---|---|---|---|
| **APPLICATION FOR APPROVAL OF LABELS, MARKING OR DEVICE** FSIS has determined that information provided in items 8, 9, and 10 is exempt from mandatory disclosure under the Freedom of Information Act 5 U.S.C. 552(b)(4). **APPLICANT: See Page 2 for instructions.** | | | JK 35205599 | 413 |

| 5a. NAME OF PRODUCT | | | 5b. HACCP PROCESS CATEGORY |
|---|---|---|---|
| *Bacon. All Natural Uncured Riverwood Valley Farms Free Range 12 oz* | | | Heat Treated, Not Fully Cooked -Not Shelf Stable |

| 6a. TYPE OF APPROVAL REQUESTED | 6b. WAS THE LABEL PREVIOUSLY APPROVED? | 7a. AREA OF PRINCIPAL DISPLAY PANEL *(Square inches)* |
|---|---|---|
| [X] SKETCH   [ ] TEMPORARY  [ ] EXTENSION OF TEMPORARY | [ ] YES  → Date of approval: Prior approval number: Number of labels on hand: [ ] NO  Number of days requested: | 22.5 |
| | | 7b. TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE *(Square inches)* 77.5 |

REDACTED

APPROVED

FSIS FORM 7234-1 (10/03/2002)     REPLACES FSIS FORM 7234-1 (11/87), WHICH IS OBSOLETE     Designed in FormFlow software



Naturally Hickory Smoked

# ALL NATURAL
# UNCURED BACON

*No Nitrates Or Nitrites Added.*

Except for naturally occurring nitrites in sea salt and celery powder.

- No antibiotics, ever!
- Free range – Never confined to feedlot.
- No added hormones or growth promotants.

- Vegetarian Fed –
  No animal by-products in feed.

NET WT. 12 OZ (340g)

EST. 419

CERTIFIED HUMANE
RAISED & HANDLED

## RIVERWOOD VALLEY FARMS
Free-Range All Natural Pork

---

## ALL NATURAL UNCURED BACON

Minimally Processed. No Artificial Ingredients. – Not Preserved—Keep Refrigerated Below 40°F At All Times.

### No Nitrates Or Nitrites Added.

Except for naturally occurring nitrites in sea salt and celery powder.

- No antibiotics, ever!
- Vegetarian Fed – No animal by-products in feed.
- Free range – Never confined to feedlot.

### COOKING INSTRUCTIONS

**PAN FRY** – Place slices in cold skillet over moderate heat. Cook until desired crispness, turning once. Drain on paper towel.

**MICROWAVE** – For 1 to 6 slices microwave on high setting. 45–60 seconds per slice. Cooking time may vary depending on microwave oven.

### Nutrition Facts
Serving Size 2 pan fried slices (15g)
Servings Per Container about 8

| Amount Per Serving | |
|---|---|
| Calories 70 | Calories from Fat 50 |

| | % Daily Value* |
|---|---|
| **Total Fat** 6g | 9% |
| Saturated Fat 2g | 10% |
| Trans Fat 0g | |
| **Cholesterol** 15mg | 5% |
| **Sodium** 280mg | 12% |
| **Total Carbohydrate** 0g | 0% |
| Dietary Fiber 0g | 0% |
| Sugars 0g | |
| **Protein** 5g | |

| | | |
|---|---|---|
| Vitamin A 0% | • | Vitamin C 0% |
| Calcium 0% | • | Iron 1% |

*Percent Daily Values are based on a 2,000 calorie diet.

### SAFE HANDLING INSTRUCTIONS



SOME FOOD PRODUCTS MAY CONTAIN BACTERIA THAT COULD CAUSE ILLNESS IF THE PRODUCT IS MISHANDLED OR COOKED IMPROPERLY. FOR YOUR PROTECTION, FOLLOW THESE SAFE HANDLING INSTRUCTIONS.

KEEP REFRIGERATED OR FROZEN. THAW IN REFRIGERATOR OR MICROWAVE.

KEEP RAW MEAT AND POULTRY SEPARATE FROM OTHER FOODS. WASH WORKING SURFACES (INCLUDING CUTTING BOARDS), UTENSILS, AND HANDS AFTER TOUCHING RAW MEAT OR POULTRY.

COOK THOROUGHLY.

KEEP HOT FOODS HOT. REFRIGERATE LEFTOVERS IMMEDIATELY OR DISCARD.

**PREMIUM STANDARD FARMS, INC.™** • KANSAS CITY, MO 64105

© 2005 Premium Standard Farms, Inc.

**INGREDIENTS:** PORK, WATER, SEA SALT, SODIUM LACTATE (A NATURALLY OCCURRING SALT DERIVED FROM CORN), EVAPORATED CANE JUICE, CELERY POWDER, LACTIC ACID STARTER CULTURE.

CERTIFIED HUMANE
RAISED & HANDLED

If you are not completely satisfied, send original packaging and purchase receipt to: **Premium Standard Farms, 805 Pennsylvania, Suite 200, Kansas City, MO 64105,** for a full refund.

D002226

REDACTED

D002227

REDACTED

D002228

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0583-0092. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed and completing and reviewing the collection of information. This form has been approved by OMB for web distribution.

PAGE _____ of _____

| U S DEPARTMENT OF AGRICULTURE FOOD SAFETY AND INSPECTION SERVICE | 1. AGENT NAME, ADDRESS, TELEPHONE NO (If using an Agent, complete this block, otherwise leave blank.) | 2. FOR USDA USE ONLY | 3. FOR USDA USE ONLY | 4 ESTABLISHMENT NO / FOREIGN COUNTRY (If applicable) |
|---|---|---|---|---|

USDA-FSIS(30)MANUAL

60501565

P-6092

**APPLICANT: See Page 2 for Instructions.**

| 5a NAME OF PRODUCT | 5b. HACCP PROCESS CATEGORY |
|---|---|
| NATURAL SMOKED CHICKEN MANGO HABANERO SAUSAGE | Fully Cooked-Not Shelf Stable |

| 6a TYPE OF APPROVAL REQUESTED | 6b WAS THE LABEL PREVIOUSLY APPROVED? | | 7a. AREA OF PRINCIPAL DISPLAY PANEL (Square inches) |
|---|---|---|---|
| [✓] SKETCH    [ ] TEMPORARY | [ ] YES → Date of approval _____ | | < 20 |
| [ ] EXTENSION OF TEMPORARY | [ ] NO   Prior approval number: _____ | | 7b. TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE (Square inches) |
| | Number of labels on hand _____ | | < 40 |
| | Number of days requested _____ | | |

REDACTED

| 10 NAME AND ADDRESS OF FIRM (Below and between dots) | 12. CONDITIONS APPLYING TO USE OF LABELS OR DEVICE (FOR USDA USE ONLY) |
|---|---|
| SAAG'S PRODUCTS. INC 1799 FACTOR AVENUE SAN LEANDRO, CA 94577 | |

FSIS FORM 7234-1 (10/03/2002)

D002229

# Saag's
### NATURAL

Smoked Chicken Sausage

## MANGO + HABANERO

**FULLY COOKED**

No pork or pork casing.

• Made with poultry raised on a natural grain and vegetable diet with no added hormones, or antibiotics

This product is a natural food because it contains no artificial ingredients and is minimally processed. Federal regulations prohibit the use of Artificial Hormones or Growth Hormones in Poultry.

**NET. WT. 12 OZ. (340 g.)** • **KEEP REFRIGERATED**

## Saag's
### NATURAL

## MANGO + HABANERO
Smoked Chicken Sausage

**EST. 1933**

---

## Nutrition Facts
Serving Size: One Link (85g)
Servings Per Container: 4

**Amount Per Serving**

**Calories 150**   Calories from Fat 80

| | % Daily Value* |
|---|---|
| **Total Fat** 8g | 13% |
| Saturated Fat 2.5g | 13% |
| Trans Fat 0g | |
| **Cholesterol** 70 mg | 23% |
| **Sodium** 620mg | 26% |
| **Total Carbohydrate** 5g | 2% |
| Dietary Fiber less than 1g | 3% |
| Sugars 3g | |
| **Protein** 14g | |

| Vitamin A 15% | • | Vitamin C 4% |
|---|---|---|
| Calcium 0% | • | Iron 6% |

*Percent Daily Values are based on a 2,000 calorie diet.

INGREDIENTS: CHICKEN, DRIED MANGO, PAPRIKA, BROWN SUGAR, SODIUM LACTATE (FROM BEETS), SEA SALT, DRIED CILANTRO, SPICES, DRIED HABANERO PEPPER, GARLIC. IN NATURAL SHEEP CASING.

## TASTE IS EVERYTHING

Nature ingredients and attention to detail are our hallmarks when we started as a small butcher shop in 1933, and they are still behind our superior sausages today. When we say, "made by Saag's" on our labels, that's exactly what we mean - crafted in our own sausage kitchen with a personal touch. By creating all of our own products, we combine traditional and contemporary tastes.

Only the highest quality and freshest ingredients go into every sausage, from No added hormone poultry to hand-blended herbs and spices. By making these extra efforts, we know we will always satisfy our customers and continue to provide sausages that have the Saag's mark of perfection.

Our sausages are ideal on the grill, mixed with pasta, folded into wraps, topping pizzas, skewered on a kebob, simply sautéed with potatoes and vegetables or served with sauerkraut. Let your imagination run wild. Why don't you share your favorite sausage recipes with us at www.saags.com.





MADE BY SAAG'S, SAN LEANDRO, CA 94577

0 30354 12210 3

REDACTED

D002231



**SPECIALTY MEATS**

October 16, 2006

USDA, FSIS,
Labeling & Consumer Protection Staff
1400 Independence Ave., S.W.
Room 614, Annex
Washington, D.C. 20250-3700

Dear Sir/Madam:

Will you kindly review the attached label transmittal to verify that it is in compliance with the labeling requirements? Document to substantiate the claim of no added antibiotics, no added hormones, in the poultry is enclosed.

This label is applied to an immediate container that has no written, printed and graphic material.

Your assistance in approval of these label transmittals is greatly appreciated.

Sincerely,

John Ling

John Ling
Quality Control Manager

Enclosures

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0583-0092. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This form has been approved by OMB for web-distribution.

PAGE ____ of ____

| U.S. DEPARTMENT OF AGRICULTURE FOOD SAFETY AND INSPECTION SERVICE **APPLICATION FOR APPROVAL OF LABELS, MARKING OR DEVICE** | 1. AGENT NAME, ADDRESS, TELEPHONE NO. *(If using an Agent, complete this block, otherwise leave blank.)* | 2. FOR USDA USE ONLY | 3. FOR USDA USE ONLY | 4. ESTABLISHMENT NO. / FOREIGN COUNTRY *(If applicable)* |
|---|---|---|---|---|
| FSIS has determined that information provided in items 8, 9, and 10 is exempt from mandatory disclosure under the Freedom of Information Act 5 U.S.C. 552(b)(4) *APPLICANT: See Page 2 for instructions.* | AMERICAN LABEL COURIERS, INC 8504 Summershade Drive Odenton, MD 21113 (410) 695 2515 Fax (410) 695 2516 | | 95 71003 | 6024 |

| 5a. NAME OF PRODUCT **All Natural, No Antibiotic Used Smoked Chicken & Turkey sausage with Roasted Red Pepper and Corn** | 5b. HACCP PROCESS CATEGORY Fully cooked--not shelf stable |
|---|---|

| 6a. TYPE OF APPROVAL REQUESTED [X] SKETCH  [ ] TEMPORARY  [ ] EXTENSION OF TEMPORARY | 6b. WAS THE LABEL PREVIOUSLY APPROVED? [ ] YES  [X] NO | Date of approval: _____ Prior approval number: _____ Number of labels on hand: _____ Number of days requested: _____ | 7a. AREA OF PRINCIPAL DISPLAY PANEL *(Square inches)* ≤ 100 |
|---|---|---|---|
| | | | 7b. TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE *(Square inches)* 25.00 |

REDACTED

D002233

REDACTED

D002234

REDACTED

D002235

REDACTED

D002236

REDACTED

D002237

REDACTED

D002238

REDACTED

D002239

REDACTED

D002240

REDACTED

D002241

REDACTED





SAMPLE NO. 060780R1

SAMPLE NO. 060780R1

**ALL NATURAL**
3 LBS.
**ROASTED RED PEPPER & CORN**

20 years ago in the San Francisco Bay Area, CHEF BRUCE AIDELLS began his quest to combine the flavors of the world in a new way. He carefully handcrafted links from chunks of succulent CHICKEN & TURKEY, FRESH FRUITS & VEGETABLES, blended with herbs & lively spices – REAL INGREDIENTS that you can actually see and taste. He shared his new discoveries with other chefs and soon folks everywhere clamored for CHEF BRUCE'S special sausages.

Our unique and GREAT TASTING sausages, full of ROBUST FLAVORS, offer a great way to share this Bay Area Tradition with the people you love.

Good Eats, Aidells

CALL US WITH YOUR QUESTIONS OR COMMENTS. 1-800-546-5795

**ROASTED RED PEPPER SAUSAGE WRAPS**

**DIRECTIONS:**

**INGREDIENTS:**

FOR ADDITIONAL RECIPES VISIT: WWW.AIDELLS.COM

THE POULTRY USED IN THIS PRODUCT HAS BEEN RAISED WITH NO ANTIBIOTICS EVER

CHEF BRUCE
**aidells**

**ROASTED RED PEPPER & CORN**
Smoked Chicken & Turkey Sausage

MINIMALLY PROCESSED • NO ARTIFICIAL INGREDIENTS
NO NITRITES ADDED • NO GLUTEN • NO MSG
MADE WITH POULTRY RAISED WITHOUT HORMONES

KEEP REFRIGERATED • NET WT. 48 OZ. (3 LBS.)

OUR SAUSAGES ARE FULLY COOKED
JUST BRAISE, SAUTE OR GRILL FOR 8-10 MINUTES OVER MEDIUM HEAT

**ALL NATURAL**
**ROASTED RED PEPPER & CORN**

**ALL NATURAL**
3 LBS.
**ROASTED RED PEPPER & CORN**

D002243

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0583-0092. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This form had been approved by OMB for web distribution.

| U.S. DEPARTMENT OF AGRICULTURE FOOD SAFETY AND INSPECTION SERVICE **APPLICATION FOR APPROVAL OF LABELS, MARKING OR DEVICE** FSIS has determined that information provided in items 8, 9, and 10 is exempt mandatory disclosure under the Freedom of Information Act 5 U.S.C. 552(b)(4) **APPLICANT: See Page 2 for instructions.** | • Nancy Moyer Label Cons. 5711 Park Drive Bowie, MD 20715 301-805-6725 | 2. USDA USE ONLY | 3. FOR USDA USE ONLY 2521017 | 4. ESTABLISHMENT NO. / FOREIGN COUNTRY *(If applicable)* 1841A PAGE ___ of ___ |
|---|---|---|---|---|

| 5a. NAME OF PRODUCT | | 5b. HACCP PROCESS CATEGORY |
|---|---|---|
| Colman Natural Uncured Hickory Smoked Bacon | | |

| 6a. TYPE OF APPROVAL REQUESTED | 6b. WAS THE LABEL PREVIOUSLY APPROVED? | 7a. AREA OF PRINCIPAL DISPLAY PANEL *(Square inches)* |
|---|---|---|
| [✓] SKETCH  [ ] TEMPORARY  [ ] EXTENSION OF TEMPORARY | [ ] YES ➡ Date of approval _____ Prior approval number _____ [✓] NO Number of labels on hand _____ Number of days requested _____ | 7b. TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE *(Square inches)* |

| 8. PRODUCT FORMULA | [✓] PCT [ ] WEIGHT *(No Fractions)* | 9. PROCESSING PROCEDURES *(Approval of the sketch does not convey approval of the processing procedures)* See Page 3 |
|---|---|---|

REDACTED

| **TOTAL** *(Percent must total 100%)* | |
|---|---|
| *(Below and between dots)* ● | |

| 11. SIGNATURE OF APPLICANT OR AGENT | DATE |
|---|---|
| | |

12. CONDITIONS APPLYING TO USE OF LABELS OR DEVICE • **(FOR USDA USE ONLY)**

D002244

REDACTED

D002245

NET WT. 12 OZ. (340.5g)

Except Naturally Occurring Celery Powder and Sea Salt. Not Preserved – Keep Refrigerated Below 40° at All Times **TASTE GUARANTEED**

NO NITRATES OR NITRITES ADDED

**UNCURED HICKORY SMOKED BACON**

*Pork raised with*
*No Antibiotics, No Added Hormones...EVER! Always Vegetarian Fed*

# COLEMAN
## NATURAL
Since 1875

*Contains no artificial ingredients. Minimally processed.*
*Federal regulations do not permit the use of hormones in pork.*
*Federal regulations do not permit the use of preservatives in pork.*

---

# COLEMAN
## NATURAL
*Since 1875*

Pork raised with
**Antibiotics, No Added Hormones...EVER! Always**

### UNCURED HICKORY SMOKED BACON

NO NITRATES OR NITRITES ADDED

Except Naturally Occurring    Celery Powder and Sea Salt
Not Preserved – Keep Refrigerated Below 40° at All Times

*Contains no artificial ingredients. Minimally processed.*
*Federal regulations do not permit the use of hormones in pork.*
*Federal regulations do not permit the use of preservatives in pork.*

**Nutrition Facts**
Serving Size 2 Pan Fried Slices (15g)
Servings Per Container About 8

Amount Per Serving
**Calories** 70    Calories from Fat 50

% Daily Value*
**Total Fat** 6g — 10%
 Saturated Fat 2g — 10%
 Trans Fat 0g
**Cholesterol** 10mg — 4%
**Sodium** 140mg — 6%
**Total Carbohydrates** 0g — 0%
 Dietary Fiber 0g — 0%
 Sugars 0g
**Protein** 3g

Vitamin A 0% • Vitamin C 0%
Calcium 0% • Iron 0%

*Percent Daily Values are based on a 2,000 calorie diet.



**SAFE HANDLING INSTRUCTIONS**
THIS PRODUCT WAS PREPARED FROM INSPECTED AND RAISED MEAT AND/OR POULTRY. SOME FOOD PRODUCTS MAY CONTAIN BACTERIA THAT COULD CAUSE ILLNESS IF THE PRODUCT IS MISHANDLED OR COOKED IMPROPERLY. FOR YOUR PROTECTION, FOLLOW THESE SAFE HANDLING INSTRUCTIONS.

KEEP REFRIGERATED OR FROZEN. THAW IN REFRIGERATOR OR MICROWAVE.

KEEP RAW MEAT AND POULTRY SEPARATE FROM OTHER FOODS. WASH WORKING SURFACES (INCLUDING CUTTING BOARDS), UTENSILS, AND HANDS AFTER TOUCHING RAW MEAT OR POULTRY.

COOK THOROUGHLY.

KEEP HOT FOODS HOT. REFRIGERATE LEFTOVERS IMMEDIATELY OR DISCARD.

INGREDIENTS: PORK, WATER, BROWN SUGAR, SEA SALT, SODIUM LACTATE, CELERY POWDER, LACTIC ACID STARTER CULTURE



0 51611 16589 3

Distributed by: BC Natural Foods L.L.C., Golden, CO 80401, 800.442.8666, www.colemannatural.com



*Proud Sponsor of*
AMERICANFORESTS

# Nutrition Facts

Serving Size 2 Pan Fried Slices (15g)
Servings Per Container About 8

**Amount Per Serving**

**Calories** 70    Calories from Fat 50

% Daily Value*

| | |
|---|---|
| **Total Fat** 6g | **10%** |
| Saturated Fat 2g | **10%** |
| *Trans* Fat 0g | |
| **Cholesterol** 10mg | **4%** |
| **Sodium** 140mg | **6%** |
| **Total Carbohydrates** 0g | **0%** |
| Dietary Fiber 0g | **0%** |
| Sugars 0g | |
| **Protein** 3g | |

| | | |
|---|---|---|
| Vitamin A 0% | • | Vitamin C 0% |
| Calcium 0% | • | Iron 0% |

*Percent Daily Values are based on a 2,000 calorie diet.

## SAFE HANDLING INSTRUCTIONS

THIS PRODUCT WAS PREPARED FROM INSPECTED AND PASSED MEAT AND/OR POULTRY. SOME FOOD PRODUCTS MAY CONTAIN BACTERIA THAT COULD CAUSE ILLNESS IF THE PRODUCT IS MISHANDLED OR COOKED IMPROPERLY. FOR YOUR PROTECTION, FOLLOW THESE SAFE HANDLING INSTRUCTIONS.

 KEEP REFRIGERATED OR FROZEN. THAW IN REFRIGERATOR OR MICROWAVE.

 KEEP RAW MEAT AND POULTRY SEPARATE FROM OTHER FOODS. WASH WORKING SURFACES (INCLUDING CUTTING BOARDS), UTENSILS, AND HANDS AFTER TOUCHING RAW MEAT OR POULTRY.

 COOK THOROUGHLY.

 KEEP HOT FOODS HOT. REFRIGERATE LEFTOVERS IMMEDIATELY OR DISCARD.

INGREDIENTS: PORK, WATER, BROWN SUGAR, SEA SALT, SODIUM LACTATE, CELERY POWDER, LACTIC ACID STARTER CULTURE



0  51611 16589  3

D002247

## Murphy-Jenkins, Rosalyn

| | |
|---|---|
| **From:** | Gioglio, Charles |
| **Sent:** | Tuesday, August 21, 2007 12:31 PM |
| **To:** | Canavan, Jeff; Murphy-Jenkins, Rosalyn; Myrick, Tammie |
| **Subject:** | FW: Farmland Sketch Approval Appeal |

**Attachments:** Farmland Appeal Letter.PDF

An appeal regarding use of lactate. It will take us some time to sort through this one.
Review, then we need to meet and discuss.

*Charles L. Gioglio*, Director
Labeling and Program Delivery Division
Office of Policy, Program, and Employee Development, FSIS
Telephone: (202) 205-0279

**From:** ROWinters@HHLAW.com [mailto:ROWinters@HHLAW.com]
**Sent:** Monday, August 20, 2007 4:11 PM
**To:** Gioglio, Charles
**Cc:** SBSteinborn@HHLAW.com
**Subject:** Farmland Sketch Approval Appeal

Mr. Gioglio:

On behalf of our client, Farmland Foods, Inc., we are submitting the attached appeal of the Labeling and
Consumer Protection Staff's (the Staff) denial of an application for sketch approval for their product, All Natural
Shaved Turkey Breast and White Meat Turkey Meat. We attempted to deliver the original copy of this appeal
letter to you via messenger this afternoon, but the messenger was only able to reach your office's voice mail when
he arrived. We will have a messenger attempt again to deliver the original copy to you tomorrow morning.

As we describe in the attached letter, it is our understanding the sketch approval was denied because the product
contains a lactate ingredient, which was viewed by the Staff as being in conflict with the Agency's "natural" policy.
For the various reasons detailed in our letter, we believe this decision was made in error and request its reversal.

In the course of reviewing our request, please let us know if you need additional information. We look forward to
your decision.

Regards,
--Robb

<<Farmland Appeal Letter.PDF>>
Robb Winters, ATTORNEY AT LAW
HOGAN & HARTSON LLP
Columbia Square, 555 Thirteenth Street, NW, Washington, DC 20004
direct +1.202.637.5710 | tel +1.202.637.5600 | fax +1.202.637.5910
rowinters@hhlaw.com | http://www.hhlaw.com

This electronic message transmission contains information from this law firm which m

If you have received this electronic transmission in error, please notify us by tele

# HOGAN & HARTSON

Hogan & Hartson LLP
Columbia Square
555 Thirteenth Street, NW
Washington, DC 20004
+1.202.637.5600 Tel
+1.202.637.5910 Fax

**www.hhlaw.com**

August 20, 2007

Steven B. Steinborn
202.637.5969
sbsteinborn@hhlaw.com

Charles Gioglio, Director
Labeling and Program Delivery Division
Office of Policy, Program and Employee Development
FSIS, USDA, Room 2925, South Building
1400 Independence Avenue, S.W.
Washington, D.C. 20250

**Re: Appeal of Sketch Approval Denial; "All Natural Shaved Turkey Breast and White Meat Turkey Meat"**

Dear Mr. Gioglio:

On behalf of Farmland Foods, Inc., (Farmland), we hereby provide the basis for appeal of the decision by the Labeling and Consumer Protection Staff (LCPS or the Staff) to deny the approval of "All Natural Shaved Turkey Breast and White Meat Turkey Meat" (the Product) on the basis that the use of a lactate ingredient is in conflict with the "natural" claim. It is our understanding that the denial is premised on the November 2006 Notice issued by the Food Safety and Inspection Service (FSIS) whereby the agency, citing the need for rulemaking, reversed long-standing labeling policy in advance of a deliberative process. 1/

The Staff notation on the rejected application for sketch-approval states: "Can't approve for natural yet still evaluating data," in reference to the lactate ingredient. 2/ Farmland, of course, is barred from marketing the Product absent agency approval. We, therefore, respectfully request that the initial Staff determination be reversed.

## I.    BACKGROUND AND OVERVIEW

Farmland's "natural" products include lactate ingredients, utilized for their flavor and antimicrobial properties. The agency has previously reviewed and approved many Farmland label applications for "natural" products. Consistent with FSIS policy, practice and prior label

---

1/    *See* "Product Labeling: Definition of the Term "Natural,'" 71 Fed. Reg. 70503 (Dec. 5, 2006).

2/    *See* Attachment A.

\\\DC - 029204/000001 - 2574400 v5

D002249

HOGAN & HARTSON LLP

Charles Gioglio, Director
August 20, 2007
Page 2

approvals, Farmland markets approximately 40 meat and poultry products under its "Simple Natural" claim and nearly three times that number under an "all natural" claim. Numerous other similarly formulated "natural" meat and poultry products remain on the market from dozens of other companies.

For many years, FSIS has approved "natural" claims for products containing lactate ingredients. The agency's recent change in policy stems from three recent actions or events. First, on or about November 30, 2006, FSIS reversed its longstanding policy and revoked an established feature of its policy that long allowed the use of lactate ingredients (that function as a flavor and an antimicrobial) in products sold under the claim "natural". 3/ Second, in a December 5, 2006 Notice (the Notice), FSIS announced plans to initiate rulemaking on the subject. Citing "significant disagreement" over its longstanding express policy allowing sodium lactate in natural/products (memorialized most recently in its August 2005 "natural" policy revision), the Agency stated that even before the rulemaking process begins, it "has removed the reference to sodium lactate from the 2005 modification." 4/ Third, Farmland received a January 12, 2007 letter from Dr. Post requesting data "to show for each product that bears a 'natural' claim and that contains lactates, that these ingredients are being used only for a flavoring effect (i.e., at a level permitted for flavoring), and are not being used as a preservative in the product."

It is troubling that FSIS implemented this sweeping change in its "natural" policy ahead of planned rulemaking in response to a single firm's petition. While perhaps not evident in November 2006, it is apparent that the petitioner has pursued a course of action that in effect would have FSIS bar the established and appropriate use of lactate ingredients in natural products. Unquestionably, the sequence of events reveals a fundamental change in the "natural" policy as memorialized in the August 2005 "natural" policy. For centuries, food producers have used a variety of natural processes to enhance meat quality, making it more flavorful and safe for consumption. One of these methods is the use of sodium chloride (i.e., salt), a natural ingredient valued for its flavoring effect and its preservative qualities. Sodium lactate and potassium lactate are common lactate salts derived from lactic acid, a natural substance. Because lactates are natural substances, they have long been considered natural ingredients. FSIS's longstanding policy has recognized this and has allowed the use of lactates in products bearing the "natural" label. Like that of sodium chloride, the dual quality of lactates – the flavoring and preservative functions – has been recognized for years.5/

We urge the Staff to promptly reconsider its initial denial of Farmland's label application approve the Product label, and allow for the planned introduction of other similarly formulated "all natural" Farmland products that contain lactate ingredients. Farmland has long worked cooperatively with the agency on a range of issues. Respectfully, the Staff erred in its refusal to

---

3/      U.S. Department of Agriculture, Food Safety and Inspection Service, "Natural Claims" in *Food Standards and Labeling Policy Book* (Nov. 2006). *See* Attachment B.

4/      71 Fed. Reg. at 70504.

5/      See Attachment C.

\\\WDC - 029204/000001 - 2574400 v5

  
HOGAN & HARTSON LLP

Charles Gioglio, Director
August 20, 2007
Page 3

grant the sketch-approval. The label fully comports with applicable labeling policy and meets
consumer expectations for a safe, wholesome, "natural" product.

## II.    PRODUCT FORMULATION CONSISTENT WITH LONG-STANDING FSIS "NATURAL" POLICY    REDACTED

The Product's formulation ● ● lactate, which, by its inherent
nature, has both flavoring and antimicrobial properties. The value of lactate ingredients in
controlling pathogen growth is well-established regardless of whether there is an effect on shelf-
life. 6/ Since 1982, the agency has relied upon its two-prong definition for "natural" – the
absence of any artificial flavor, coloring ingredient, or chemical preservative or any other
artificial or synthetic ingredient and, the food cannot be more than minimally processed. 7/ Both
prongs of this standard are met by products that contain sodium lactate (from corn), a fact
confirmed by the many prior label approvals issued by LCPS.

Potassium lactate, sodium lactate and similar lactate ingredients derived from corn fully
satisfy the agency's "natural" policy. The agency has consistently viewed sodium lactate from
corn as "minimally processed" and this finding remains undisputed. In addition, the plain
meaning of its "natural" policy and a host of other factors fully support the continued use of
lactate ingredients in "natural" products. This conclusion is further bolstered by the
administrative record reflected in comments responding to the Notice.

The request for data and other actions taken by FSIS since November 2006 has produced
a significant departure from the agency's "natural" policy (even as currently framed). The policy
as applied by the agency in denying sketch-approval is substantively flawed and violates basic
tenets of administrative law and other important checks on agency power.

## III.    FSIS ACTED IMPROPERLY IN REVERSING POLICY WITHOUT EXPLANATION OR BASIS FOR DOING SO

### A. FSIS Is Required to Act in a Reasoned Fashion

Before changing an established policy, FSIS is required to supply a reasoned analysis for
the change. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 41-42

---

6/    As requested, Farmland's May 4, 2007 letter furnished data and other information
relating to the use of lactate ingredients and the shelf-life of our finished "natural" products.
Nevertheless, such shelf-life data alone is not determinative on the issue of compliance with the
FSIS "natural" policy. Quite simply, lactates have known antimicrobial properties, yet this
attribute should not automatically disqualify these ingredients in a product that bears a "natural"
claim.

7/    "Natural Claims" in *Food Standards and Labeling Policy Book* (Nov. 2006), *supra* note
3.

D002251

HOGAN & HARTSON LLP

Charles Gioglio, Director
August 20, 2007
Page 4

(1983) ("*State Farm*"). In *State Farm*, the Supreme Court rejected the National Highway Traffic
Safety Administration's (NTSA) rescission of crash protection requirements, holding:

> A settled course of behavior embodies the agency's informed
> judgment that, by pursuing that course, it will carry out policies
> committed to it by Congress. There is, then at least a presumption
> that those policies will be carried out best if the settled rule is
> adhered to. Accordingly, an agency changing its course by
> rescinding a rule is obligated to supply a reasoned analysis for the
> change beyond that which may be required when an agency does
> not act in the first instance. 8/

FSIS must meet a very specific burden before it can change an established labeling policy

The Court stated that changes in policy must be "justified" by the record whereby "the
agency must examine the relevant data and articulate a satisfactory explanation between the facts
found and the choice made." 9/ The Court continued:

> Normally, an agency rule would be arbitrary and capricious if the
> agency has relied on factors which Congress has not intended to
> consider, entirely failed to consider an important aspect of the
> problem, offered an explanation for its decision that runs counter
> to the evidence before the agency, or is so implausible that it could
> not be ascribed to a difference in view or the product of agency
> expertise. 10/

Under this standard, the Court held that the rescission of a longstanding agency policy was
arbitrary and capricious, finding that the reasoning articulated by the agency could not be
accepted as a reasoned analysis.

With respect to the denial of Farmland's label application, FSIS did not adhere to a
reasoned analysis when it reversed established policy and practice, as reflected by the three-fold
actions noted above. The denial of the label application and other actions, including insistence
that lactate ingredients are only permitted if there is no proven effect on shelf-life (presumably as
a way to assess the preservative effect), similarly demonstrate that the agency's position is not
based on a reasoned analysis.

---

8/    *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29 at 41-42.
(citation omitted). In so holding the Court did recognize that "regulatory agencies do not
establish rules of conduct to last forever" and that "an agency must be given ample latitude to
adapt their rules and policies to the demands of changing circumstances." *Id.* at 42. (citations
omitted).

9/    *Id.* at 43 (citation omitted).

10/    *Id.* at 43.

D002252

HOGAN & HARTSON LLP

Charles Gioglio, Director
August 20, 2007
Page 5

### B. FSIS Has Failed to Articulate a Reasoned Justification for A New Policy on Lactate Ingredients

#### 1. Denial Is at Odds with Plain Meaning of Policy

Since 1982, FSIS has barred only "chemical preservatives," not all substances that have a preservative effect. To apply, for the first time, the "natural" policy as barring all preservatives reads the word "chemical" out of the long-standing policy entirely. 11/ From our perspective, all ingredients are technically "chemical" in nature. FSIS cannot reasonably bar lactate ingredients from "natural" products by characterizing them as "chemical" preservatives. Rather, the meaning of "chemical preservative" is evident from the context in which it is used - - in conjunction with the phrase "or any other artificial or synthetic ingredient." Chemical preservatives are reasonably understood to mean those ingredients that are artificial or synthetic. By failing to give ordinary meaning to its "natural" policy, the agency's interpretation is not owed deference by a reviewing court. 12/

The reasonableness of our view as to the plain meaning of the first prong of the "natural" policy is further supported by the agency's own interpretation and practice. Indeed, the Notice itself states that "FSIS modified the guidance on occasion to make it consistent with prevailing policies, to reflect case-by-case decisions made by the Agency ...." 13/ That is, for some number of years the agency specifically approved "natural" claims for products containing sodium lactate. The August 2005 modification, according to FSIS, merely memorialized an established policy. Against this backdrop, a reasoned analysis requires more than FSIS simply advising in a public Notice that it has "changed its mind." That is especially so given the Agency's acknowledged intention to conduct a formal rulemaking process on the subject -

---

11/    In *Food and Drug Admin. v. Brown & Williamson Tobacco*, 529 U.S. 120, 132-33 (2000), the Supreme Court stated that in evaluating a statutory provision, the meaning of certain words or phrases "may only become evident when placed in context. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Id.* (rejecting FDA's interpretation of statute).

12/    Although, generally, an agency's construction of its own regulations is entitled to "substantial deference" and receives "controlling weight," such an interpretation will not receive such deference if it is "plainly erroneous or inconsistent with the regulation"; it must "sensibly conform to the purpose and wording of the regulation." *S.A. Storer and Sons Co. v. Sec. of Labor*, 360 F.3d 1363, 1368-1369 (D.C. Cir. 2004) (holding that Secretary of the Department of Labor's interpretation of OSHA regulation "does not sensibly conform to the purpose and wording of the regulation" (citation omitted)); *see also Norfolk Southern Railway Co. v. Shanklin*, 529 U.S. 344 (2000) (stating that substantial deference was not warranted because the agency's interpretation was inconsistent with the text of the regulation and contradicted its own previous construction of the regulation).

13/    71 Fed. Reg. at 70504.

D002253

HOGAN & HARTSON LLP

Charles Gioglio, Director
August 20, 2007
Page 6

plainly, the Agency has not yet undertaken the review needed to support a decision to change a
policy and practice of such long standing as this one.

### 2. Preservative Function Does Not Conflict with "Natural Policy"

Inexplicably, even before undertaking its planned rulemaking, FSIS has effectively added
a third prong to its "natural" policy – apparently now, all ingredients are barred from "natural"
products if they effect any lengthening of shelf-life or have any antimicrobial properties at all. It
is troubling that FSIS did not amend its "natural" policy to affirmatively set forth this material
modification. There has certainly been no rationale or justification for the new prohibition of
preservative ingredients in natural products.

In what appears to be a post-decision justification, the following explanation is included
in the new "natural" policy.

> The note regarding sodium lactate (from a corn source) was
> added to the "natural" entry in recognition that
> manufacturers could show that the ingredient was from a
> natural source (i.e., from corn), was no more than
> minimally processed, and provided a flavoring effect, *not
> an antimicrobial effect,* at levels consistent with those
> regulated for the purpose of flavoring (i.e., less than 2
> percent of a formulation). Thus, the Agency considered
> such uses to be consistent with the meaning of
> "natural." 14/

The "natural" policy, in 1982 and at present, makes no reference to an antimicrobial effect as a
disqualifying criterion for "natural."

FSIS purports to justify its newly-minted policy on the basis of the dual function of
lactate ingredients as flavoring and preservative. LCPS has suggested that past approvals were
premised on the understanding that the lactate ingredients were used solely as a flavoring.
Requests to Farmland and others to establish that there is no preservative effect (via
measurement of shelf-life) underscores the focus on function. What is left unexplained is why an
ingredient is any more or less "natural" based on whether it serves a flavor or antimicrobial
purpose. It defies logic to say that the same ingredient is "natural" if it functions as a flavor, but
not "natural" if it also has antimicrobial effects. The same "natural" substance cannot become
unnatural -- synthetic, artificial, or "chemical" -- just because it has a preservative effect.
Obviously, there are numerous dual- or multi-use ingredients that comply with the fundamental
requirements of the "natural" policy yet possess preservative properties: salt, vinegar, rosemary,
and citric acid, to name a few.

---

14/ "Natural Claims" in *Food Standards and Labeling Policy Book* (Nov. 2006), *supra* note 1
(emphasis added).

HOGAN & HARTSON LLP

Charles Gioglio, Director
August 20, 2007
Page 7


The apparent reasoning relied upon by the agency produces an irrational and unintended consequence. The national manufacture, distribution and sale of "natural" products are not possible without some form of preservation. At the same time, concern about post-processing pathogen growth and other food safety risks have dominated government food safety policy that also contemplates preservation. By interpreting its policy to exclude any ingredient that has a preservative effect (or, put differently, to deem lactate ingredients derived from corn as a "chemical" preservative), the agency effectively eliminates a national or regional market for "natural" products. This outcome does not appear to have been intended by FSIS nor has the Agency undertaken the type of critical, transparent analysis required to justify such an extreme result. 15/

### 3. Petition Did Not Include Any New Information – FSIS Long-Aware of Antimicrobial Properties

There is no new information available to FSIS that would justify the significant change in policy that precludes the use of sodium lactate in the Product. The Notice states: "The agency has received information that raises questions about when, and if, a food to which sodium lactate has been added would be fairly characterized as 'natural.'" 16/ The "natural" policy, amended in advance of a request for public comment, states that such information indicates that lactate ingredients "provide an antimicrobial effect at levels that have been regulated by providing a flavoring effect." 17/ FSIS offers no explanation as to why this is considered "new" information or why such information warrants a change in policy. The Notice states how the "natural" policy has changed, but FSIS never explains why.

Our comment and others reflect the long-standing knowledge at FSIS that lactate ingredients have antimicrobial benefits. 18/ Moreover, while the Notice makes general reference to the petition (presumably to support the assertion of a significant disagreement), FSIS does not question, evaluate or critically examine the petition. Nor has the agency made any findings of fact or offered any explanation as to why "natural" labels it has been approving for years for products with lactate ingredients have suddenly and inexplicably come now to mislead rather

---

15/    FSIS could possibly determine that consumers are misled when a "natural" product is formulated with preservative ingredients and effectively relegate such foods to the local butcher shop. The agency has made no effort to justify such an outcome nor explain that such an outcome is necessary to advance food safety and/or truthful labeling.

16/    71 Fed. Reg. at 70504.

17/    See "Natural Claims" in *Food Standards and Labeling Policy Book* (Nov. 2006), *supra* note 3; 71 Fed. Reg. at 70504.

18/    For example, FSIS has long been aware of the antimicrobial properties, even when sodium lactate was first approved as a flavor. The agency also approved sodium lactate at levels up to 4.6 percent but without any lower limit and without considering the antimicrobial properties at various levels.

D002255

HOGAN & HARTSON LLP

Charles Gioglio, Director
August 20, 2007
Page 8

than inform consumers merely because of the purportedly "new fact" that, like salt or citric acid, such ingredients have a preservative effect.

### 4. Policy Shift Undermines Important Food Safety Mission of Agency

The prohibition of natural preservative ingredients from "natural" products produces, for the first time, a tension between "natural" products and optimum food safety. Under the FSIS's longstanding policy, only "chemical preservatives" were barred, so a wide range of natural preservatives, including lactate ingredients from corn, have been routinely employed for many years. The new "natural" policy prevents food processors from fully utilizing an important food safety measure (lactate and similar ingredients used for their preservative effect) that are effective, affordable and entirely "natural." FSIS, acting in advance of a deliberate, open policy review has undermined important food safety policies without any apparent off-setting consumer protection benefit.

Indeed, the Agency itself has identified the food safety concern and reserved judgment pending public comment and agency deliberation. In the Notice's Question #4, FSIS notes: "In recent years, FSIS has put a great deal of emphasis on improving food safety. In some ways, however, some definitions of 'natural' could discourage the use of antimicrobials, which are used to reduce and prevent the growth of Listeria monocytogenes in foods." 19/ Far from reaching a reasoned decision justifying the trade-off, it is apparent that this critical issue is unsettled. As if to confirm the point, the Notice states: "The Agency seeks comment on how it best determines an appropriate and rational balance between the need to ensure the safety of the food supply and the need to ensure the labels are truthful and not misleading." 20/

The agency does not address this issue. We appreciate the value of FSIS seeking comments on this critical issue, as FSIS must always account for the effect labeling decisions have on food safety. Even a superficial review of the issue and the agency's own Notice show a failure by FSIS to fully consider food safety in advance of revoking the August 2005 policy. Respectfully, a policy outcome with little (or no) consideration of food safety cannot be reasonably defended as the product of a reasoned decision-making process.

### 5. FSIS Reasoning is Itself Contradictory

FSIS has prematurely implemented a policy that even it agrees remains to be addressed in rulemaking. Questioning the use of flavors with antimicrobial properties, the newly changed "natural" policy states: "Whether there should ever be a blanket acceptance of any ingredient that has multiple functions, including an antimicrobial or preservation function, in products labeled 'natural' is a complicated issue that is best addressed through notice and comment rulemaking." Accepting this statement on its face, FSIS does not follow a reasoned analysis:

---

19/   71 Fed. Reg. at 70505.

20/   *Id.*

HOGAN & HARTSON LLP

Charles Gioglio, Director
August 20, 2007
Page 9

when it reverses existing labeling policy in advance of the open, deliberative rulemaking process the agency concludes is necessary. This is precisely the type of agency conduct, no matter how well-intentioned, that courts have readily invalidated under the reasoned analysis standard.

### C. FSIS Must Approve Farmland's Label or Face Judicial Reversal

By statutory delegation, the Secretary is entitled to adopt and apply regulations and policies necessary to effectuate the purpose of the Federal Meat Inspection Act and the Poultry Products Inspection Act. FSIS enjoys broad discretion in how it employs its authority but is constrained by principles of administrative law as to the manner in which such policies are established. In the present case, the reversal of a policy allowing for lactates derived from corn in "natural" products cannot be accomplished by the mere stroke of a pen.

The Notice reflects a genuine effort by FSIS to establish a road-map to address these issues in a transparent, deliberative manner. However, this effort is compromised and invalidated when a significant shift in policy is adopted in advance of a public hearing, consideration of comments, or commencement of rulemaking. By whatever means the agency reviews its "natural" policy, it must approve the label application for our product and continue to apply its existing policy unless and until it proceeds with the rulemaking process it has determined is needed and thereafter reaches a reasoned conclusion that a change in policy is required.

We recognize that the entire "natural" issue is under review. We firmly believe that the agency should return to the status quo – allowing use of the label in question – until the entire matter is addressed. Irrespective of how or what FSIS ultimately determines, its denial of the label application for our Product cannot be defended as a product of reasoned analysis. To the contrary, a rational, consistent application of its long-standing "natural" policy requires that FSIS approve the application for sketch approval as it has done consistently for similar products in past years.

### IV.    ADMINISTRATIVE PROCEDURE REQUIRES COMPLETION OF RULEMAKING **BEFORE** IMPLEMENTATION OF POLICY CHANGE

FSIS has reserved to rulemaking the very issues it has decided and implemented pursuant to the three-fold actions noted above. The fact that rulemaking is necessary should come as no surprise – FSIS has acknowledged just that. 21/ The law is crystal clear: an agency cannot implement a change in policy first and then invite comments later.

Leaving aside whether rulemaking is necessary, if FSIS determines that it is obliged to resolve the matter via rulemaking, it is compelled to reach the end of the process before arriving at a decision and enforcing that decision via the refusal to approve our label. We believe that

---

21/    *See* 71 Fed. Reg. at 70504 (stating that the question of whether sodium lactate can be included in "natural" products "is best resolved through a rulemaking process").

\\\DC - 029204/000001 - 2574400 v5

HOGAN & HARTSON LLP

Charles Gioglio, Director
August 20, 2007
Page 10

after considering comments on the proposed policy change, the agency will reaffirm the appropriateness of using lactate ingredients derived from corn. If FSIS has determined that rulemaking is necessary, there is no doubt that the Administrative Procedure Act's (APA) statutory notice-and-comment process is required before the agency can make that decision. 22/

In response, and apparent acquiescence, to a single petition – by a company with a strong competitive interest in preventing the use of sodium lactate in "natural" products – FSIS unilaterally decided to change the long-standing "natural" policy and threatened to revoke previously-approved labels. The Notice states that the question of whether sodium lactate can be included in "natural" products "is best resolved through a rulemaking process," and yet it goes on to report that FSIS "has removed the reference to sodium lactate from the 2005 modification [making explicit that sodium lactate can be included in "natural" products]." 23/ In other words, before even beginning the notice-and-comment process it decided to undertake, FSIS revoked the portion of its "natural" policy that expressly allowed for use of sodium lactate in "natural" products. In turn, Farmland (and presumably other firms) are now told that FSIS will no longer approve new labels formulated in the precise fashion as many "natural" lactate-containing products widely available on supermarket shelves.

Conclusions in advance of the promised policy review reflects a procedure that the federal courts have held to violate the APA. In *Paulsen v. Daniels*, the Ninth Circuit held that the Bureau of Prisons could not issue an interim rule that had immediate effect while it sought notice and comment on the same rule. 24/ "[I]t is antithetical to the structure and purpose of the APA for an agency to implement a rule first and then seek comment later." 25/ Further, the DC Circuit similarly struck down as procedurally improper a rule issued by an agency at the same time it issued a rulemaking notice to change that same rule. 26/ From the outset of the

---

22/     *See General Electric Co. v EPA*, 290 F.3d 377, 382 (D.C. Cir. 2002), which states "If a document expresses a change in substantive law or policy (that is not an interpretation) which the agency intends to make binding, or administers with binding effect, the agency may not rely upon the statutory exception for policy statements, but must observe the APA's legislative rulemaking procedures."

23/     71 Fed. Reg. at 70504.

24/     *Paulson v. Daniels*, 413 F.3d 999, 1004-05 (9th Cir. 2005).

25/     *Id.* at 1005 (holding that agency violated the APA by implementing interim rule without going through the notice and comment process: "In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decision making require that agency decisions be made only *after* affording interested persons notice and an opportunity to comment." (emphasis added) (citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979))).

26/     *Tennessee Gas Pipeline Co. v. F.E.R.C.*, 696 F.2d 1141, 1144 (D.C. Cir. 1992) (stating that good cause exception to the APA's notice-and-comment requirement was to be "narrowly construed," "only reluctantly countenanced," and "limited to emergency situations")

D002258

HOGAN & HARTSON LLP

Charles Gioglio, Director
August 20, 2007
Page 11

rulemaking process, FSIS had already decided – without any public comment – to single out
sodium lactate for exclusion from the universe of ingredients that may be used in foods labeled
"natural." FSIS effectively granted significant portions of the action requested the petitioner.
even before the rulemaking process begins. This is plainly improper.

## V.     DENIAL OF NATURAL LABEL ABRIDGES FIRST AMENDMENT

As explained more fully in our comment, FSIS's refusal to allow lactate ingredients in
"natural" products conflicts with the First Amendment. Under existing First Amendment
jurisprudence, regulation of lawful and non-misleading commercial speech is constitutional only
if: (1) the government interest justifying the restriction on commercial speech is substantial; (2)
the government regulation directly advances the governmental interest asserted; and (3) the
government regulation is no more extensive than necessary to serve the proffered interest. 27

While we do not provide the complete constitutional analysis undertaken by a reviewing
court, it is apparent that prohibiting commercial speech that is not false further underscores the
flaws of the denial of our application for sketch-approval. The framework that is applied to
governmental restrictions on commercial speech would not support the rash prohibition of the
term "natural."

*     *     *

The prior label approval process gives FSIS direct control over the economic activity of
marketers who seek to compete openly in the sale of "natural" meat and poultry products. The
agency's denial of Farmland's ability to market the Product (and others not already approved)
imposes significant lost opportunity costs. More generally, the disruptive impact on our business
and many others similarly situated arises as the inevitable consequence of the agency's three-fold
actions. The course of action requested by the petitioner, and granted a few months later, from
our perspective is telling, given the consequences now faced by Farmland and, we suspect, many
others similarly situated.

In light of the foregoing, we ask the agency to return to the *status quo* for sodium lactate
in "natural" products. We appreciate your prompt attention to this appeal and look forward to a
timely, favorable result.

Sincerely,

*Steven B. Steinborn /ROW*

Steven B. Steinborn
Counsel to Farmland Foods, Inc.

---

27/     *Central Hudson Gas & Electric Corp. v. Public Service* Commission, 447 U.S. 557
(1980).

## ATTACHMENT A

D002260

According to the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number. The valid OMB control number for this information collection is 0583-0052. The time required to complete this information collection is estimated to average 15 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. This form has been approved by OMB for web distribution.

| USDA-FSIS (30) MANUAL | AGENT NAME, ADDRESS, TELEPHONE NO. (If using an Agent complete this block, otherwise leave blank.) | 2. FOR USDA USE ONLY | 3. FOR USDA USE ONLY | 4 ESTABLISHMENT NO. / FOREIGN COUNTRY (if applicable) |
|---|---|---|---|---|
| ‖‖‖‖‖ 60529373 | The Label Consultants, Inc. 536 Seventh Street SE PO Box 15240 Washington, DC 20003-0240 (202) 546-3333 FAX (202) 543-4337 | | | P-2122 PAGE ___ of ___ |

mandatory disclosure under the Freedom of Information Act 5 U.S.C. 552(b)(4)

APPLICANT: See Page 2 for Instructions.

| 5a. NAME OF PRODUCT | FARMLAND ALL NATURAL SHAVED TURKEY BREAST & WHITE TURKEY MEAT, 98%FF, #70247-82000, Net Wt. 10 oz. (284g). | 5b. HACCP PROCESS CATEGORY Fully cooked--not shelf stable |
|---|---|---|

| 8a. TYPE OF APPROVAL REQUESTED | 6b. WAS THE LABEL PREVIOUSLY APPROVED? | | 7a AREA OF PRINCIPAL DISPLAY PANEL (Square inches) ≤ 100 |
|---|---|---|---|
| [X] SKETCH   [ ] TEMPORARY [ ] EXTENSION OF TEMPORARY | [ ] YES [X] NO | Date of approval. _____ Prior approval number _____ Number of labels on hand _____ Number of days requested. _____ | 7b TOTAL AVAILABLE LABELING SPACE FOR ENTIRE PACKAGE (Square inches) > 40 |

REDACTED

| 10 NAME AND ADDRESS OF FIRM (Below and between lines) FARMLAND FOODS, INC P. O. BOX 13277 WICHITA KS 67211 | 11 SIGNATURE OF APPLICANT OR AGENT  Wendy Medina 12 CONDITIONS OF USE | DATE 6-12-07 THE ADDRESS OF THE UNDERSTANDING THAT LABELING WILL NOT BE ASSURED AS TO SOURCE OF THE PRODUCT. |
|---|---|---|

FSIS FORM 7234-1 (09/03/2002)

REPLACES FSIS FORM 7234 (1/96) WHICH IS OBSOLETE

D002261

REDACTED

D002262

REDACTED

D002263

REDACTED

REDACTED

D002265

REDACTED

D002266

REDACTED

D002267

**ATTACHMENT B**

D002268

## NACHO STYLE, NACHO FLAVOR, AND SIMILAR TERMS:

Acceptable terminology for products possessing the commonly expected flavor characteristics associated with "Nachos," a Mexican hors d'oeurve. The characterizing flavor components generally include, but are not limited to, cheese (Cheddar or Monterey Jack), tomato (tomato solids, tomato powder), spices, or other natural seasonings and flavorings (usually garlic and onion), and chili peppers (mild or hot). Romano and Parmesan cheese are also often present. However, these cheeses may not be used to satisfy the above cheese requirement.

## NATURAL CLAIMS:

The term "natural" may be used on labeling for meat products and poultry products, provided the applicant for such labeling demonstrates that:

(1) the product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic ingredient; and (2) the product and its ingredients are not more than minimally processed. Minimal processing may include: (a) those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

Relatively severe processes, e.g., solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing. Thus, the use of a natural flavor or flavoring in compliance with 21 CFR 101.22 which has undergone more than minimal processing would place a product in which it is used outside the scope of these guidelines. However, the presence of an ingredient which has been more than minimally processed would not necessarily preclude the product from being promoted as natural. Exceptions of this type may be granted on a case-by-case basis if it can be demonstrated that the use of such an ingredient would not significantly change the character of the product to the point that it could no longer be considered a natural product. In such cases, the natural claim must be qualified to clearly and conspicuously identify the ingredient, e.g., .all natural or all natural ingredients except dextrose, modified food starch, etc."

All products claiming to be natural or a natural food should be accompanied by a brief statement which explains what is meant by the term natural, i.e., that the product is a natural food because it contains no artificial ingredients and is only minimally processed. This statement should appear directly beneath or beside all natural claims or, if elsewhere on the principal display panel; an asterisk should be used to tie the explanation to the claim.

The decision to approve or deny the use of a natural claim may be affected by the specific context in which the claim is made. For example, claims indicating that a product is

D002269

natural food, e.g., "Natural chili" or "chili - a natural product" would be unacceptable for a product containing beet powder which artificially colors the finished product. However, "all natural ingredients" might be an acceptable claim for such a product.

**Correction**:  In the August 2005 edition of the Policy Book, a "Note" was added to the entry on "natural claims" indicating that "Sugar, sodium lactate (from a corn source), and natural flavorings from oleoresins or extractives are acceptable for "all natural" claims. The Note was followed by other new text that stated "This entry cancels Policy Memo 055 dated November 22, 1982. See: 7 CFR NOP Final Report, Part 205.601 through 205.606 for acceptable ingredients allowed for all natural claims."  This "Note" is now revised to read as follows:

Note:  Sugar and natural flavorings from oleoresins or extractives are acceptable for "all natural" claims.  The other text, including the reference to "sodium lactate (from a corn source)" has been removed from the guidance on "natural claims" for the reasons explained below.

The note regarding sodium lactate (from a corn source) was added to the "natural" entry in recognition that manufacturers could show that the ingredient was from a natural source (i.e., from corn), was no more than minimally processed, and provided a flavoring effect, not an antimicrobial effect, at levels consistent with those regulated for the purpose of flavoring (i.e., less than 2 percent of a formulation).  Thus, the Agency considered such uses to be consistent with the meaning of "natural."  However, recent information provided to FSIS raises questions about this judgment.  This information indicates that sodium lactate, potassium lactate, and calcium lactate provide an antimicrobial effect at levels that have been regulated as providing a flavoring effect. Therefore, regardless of whether it can be shown that any form of lactate is from a natural source and is not more than minimally processed, the use of lactate (sodium, potassium, and calcium) may conflict with the meaning of "natural" because it may be having a preservative effect at levels of use associated with flavoring.  Thus, listing "sodium lactate (from a corn source)" in the previous entry may have been in error, at least without qualifying the listing by stating that the use of this ingredient or any ingredient known to have multiple technical effects needs to be judged on a case-by-case basis at the time of label approval to assess that the intended use, level of use, and technical function are consistent with the 1982 policy.  Whether there should ever be a blanket acceptance of any ingredient that has multiple functions, including an antimicrobial or preservative function, in products labeled "natural" is a complicated issue that is best addressed through notice and comment rulemaking.  Therefore, FSIS has removed the reference to sodium lactate from this guidance but will judge claims that foods to which a lactate has been added can be characterized as "natural" on a case-by-case basis, pending the outcome of a rulemaking on the use of "natural" that the Agency intends to initiate in the near future.

This correction also removes the statement in the entry on "Natural Claims," "See:  7 CFR NOP Final Report, Part 205.601 through 205.606 for acceptable ingredients allowed for all natural claims."  This statement was intended to help manufacturers locate a source to support the claims that ingredients they use in "natural" products are not more

than minimally processed, are not artificial or synthetic, and do not act to preserve products. The Agency has removed this text because it was confusing users of the policy guidance who thought that any ingredient that is "organic" could be used in a "natural" product, which is not the case.

## NATURAL SMOKED COLOR:

Approval can be properly granted to labels with this statement when the products involved are "Smoked" and not artificially colored. The results of the use of artificial smoke materials can, by means of a number of processing operations, result in a color characteristic being acquired by the frankfurters, bologna, and the like. The term "Natural Smoked Color" can be used to properly identify this point.

## NAVARIN:

Navarin is a stew containing lamb or mutton and vegetables and considered a national dish of France. It must meet the meat stew standard of 25 percent meat. Show true product name, e.g., "Navarin-Lamb Stew."

## NEGATIVE LABELING:

(1)    Negative labeling is allowed if it is unclear from the product name that the ingredient is not present. For example, the use of the term "no beef" on the label of "turkey pastrami" would further clarify that the product does not contain beef.

(2)    Negative labeling is allowed if the statement is beneficial for health, religious preference, or other similar reasons. For example, highlighting the absence of salt in a product would be helpful to those persons on sodium-restricted diets.

(3)    Negative labeling is allowed if the claims are directly linked to the product packaging, as opposed to the product itself. For example, flexible retortable pouches could bear the statement "no preservatives, refrigeration or freezing needed with this new packaging method."

(4)    Negative labeling is allowed if such claims call attention to the absence of ingredients because they are prohibited in a product by regulation or policy. The statement must clearly and prominently indicate this fact, so as not to mislead or create false impressions. For example, "USDA regulations prohibit the use of preservatives in this product" would be an acceptable statement for ground beef.

(5)    Negative labeling is allowed to indicate that absence of an ingredient when that ingredient is expected or permitted by regulation or policy. This could also apply to ingredients which are not expected or permitted by regulation or policy if the ingredients could find their way into the product through a component. For example, the use of "no preservatives" on the label of "spaghetti with meat and sauce" (where regulations do not permit the direct addition of preservatives)

D002271

**ATTACHMENT C**

D002272



March 5, 2007

Docket Clerk
United States Department of Agriculture
Food Safety and Inspection Service
300 12ᵗʰ Street S.W., Room 102 Cotton Annex
Washington DC, 20250

Re:    Comment to FSIS Notice of Hormel Petition and Public Meeting on the Definition
       of the Term "Natural" (Docket No. FSIS 2006-0040E)

Dear Sir or Madam:

Farmland Foods, Inc. ("Farmland") respectfully submits this comment in response to the Food
Safety and Inspection Service's ("FSIS" or "agency") notice of petition and request for comments
on "Product Labeling: Definition of the Term 'Natural,'" published in the *Federal Register* of
December 5, 2006,[1] and Hormel Foods Corporation's ("Petitioner") October 9, 2006 petition
("Petition") requesting a change in the United States Department of Agriculture's ("USDA") agency
policy.[2]

Farmland is one of the nation's largest food manufacturers.  Now a part of the Smithfield Foods
family, the Farmland business began in 1959 as part of a farmer-owned cooperative.  Farmland
maintains a proud heritage of producing quality meat products for today's demanding consumers.
As a livestock purchaser, food processor and seller in domestic and international markets, the
company is honored to be a part of our nation's agricultural system.

For many years, Farmland has maintained a productive working relationship with the USDA and
FSIS and is currently an active participant in the rapidly growing market for natural products.  We
are deeply concerned, however, with recent agency activity that threatens to reverse longstanding
agency policy and alter the regulatory landscape in a way that harms both consumers and businesses.

---

[1] 71 Fed. Reg. 70503 (December 5, 2006); 72 Fed. Reg. 2257 (January 18, 2007).

[2] Hormel Foods Corporation, *Petition for the Issuance of a Rule Regarding Natural Label Claims*, (October 9, 2006), found at
http://www.fsis.usda.gov/Regulations_&_Policies/Petition_Natural_Label_Claims/index.asp

D002273

March 5, 2007
Page 2

This activity, both in the substance of its reasoning and in the procedures it has employed, merits careful review. Because this is a matter of some urgency, we respectfully request that the agency promptly and carefully consider the following:

- We request that the agency maintain its policy of allowing potassium lactate, a natural substance derived from corn, to be used as an ingredient in meat products sold under the "natural" label, and

- We request that the agency refrain from taking steps that would change policy without fair and open discussion among those affected by the proposed changes.

Granting these requests would preserve the agency's long-standing practice of responsible, flexible rulemaking and further its mission of promoting food safety and safeguarding the public trust.

1.    **Summary**

This matter involves unilateral changes to longstanding agency policy on the labeling of natural products. The changes contemplated, if allowed to proceed, would provide a significant economic advantage to one competitor in the natural products market. They would deny many others a legitimate and accepted method of production. These changes are not in the public interest, nor in the interests of the manufacturers and producers of natural products and ingredients.

For centuries, food producers have used a variety of natural processes to enhance meat quality, making it more flavorful and safe for consumption. One of these methods is the use of salt, a natural ingredient valued for its flavoring effect and its preservative qualities. Lactate is a common salt derived from lactic acid, a natural product. Because lactates are natural substances, they have long been considered natural ingredients. FSIS' longstanding policy has recognized this and has allowed the use of lactates in products bearing the "natural" label. The dual quality of lactates - the flavoring and preservative functions - have been recognized for years. The agency has consistently taken both functions into account as it has developed regulatory policy and practice.

The policy for the use of the word "natural" in labeling has developed through the normal course of agency decision-making. It has served the markets well in providing consumers a variety of choices in natural products. Farmland and many other food manufacturers have relied upon this natural policy. Farmland, for example, uses potassium lactate at the flavoring levels established by the agency. Many companies, Farmland included, have created product lines and adopted manufacturing processes based on the policy. They have also made significant commitments to suppliers and customers. Many have product in inventory carrying or intended to carry labels approved under the policy. Recent proposed policy changes and the threatened action of rescinding current label authorizations would therefore have a severe adverse economic impact on these companies - costs can easily exceed $1 million for one product line alone. Moreover, withdrawing

D002274

March 5, 2007
Page 3

or rescinding current labeling authorizations would foreclose the ability of these competitors to develop current and future product lines in the emerging natural market. This would deny manufacturers using natural ingredients a crucial opportunity to serve their market. It would cause irreparable harm to existing and prospective customer relationships.

Petitioner uses a different technology to produce natural products: a sophisticated, high-pressure processing system that utilizes multi-million dollar equipment to apply 87,000 pounds of pressure per square inch to Petitioner's products. This high-pressure process does not use the traditional technique of adding natural ingredients to achieve enhanced flavor and longer shelf life. In a word, the Petition appears to be an attempt to restrict the ability of Hormel's competitors to produce and market natural products.

The FSIS, apparently yielding to Petitioner's argument, has unilaterally changed its longstanding policy and taken steps to disallow the use of lactate in products labeled "natural." The FSIS has sent letters to various companies, including Farmland, that have existing label approvals for natural products containing lactate. These letters threatened to revoke the approvals unless the companies established that the lactate used has no microbial effect on the finished product or any impact on shelf life or use-by dating.

These actions by FSIS could provide Petitioner with a significant economic advantage in the market for all natural products and are not justified under FSIS' longstanding natural policy. Under FSIS and Food and Drug Administration ("FDA") regulations, lactate is a natural flavor that FSIS recognized as also having a preservative function but is not a "chemical preservative" prohibited by the FSIS natural policy. In addition, there is no evidence whatsoever that consumers are misled by a natural label on a product containing lactate.

Farmland understands that the FSIS may need to examine current regulations and seek to establish additional guidelines regarding use of the word "natural." It is clear that as food processing technologies develop, new considerations come into play. Advances in food production, processing, and ingredients will always raise new issues related to selecting which food products should be eligible for the "natural" label. Changes in the current regulatory framework, however, should be made with deliberation, and with notice and comment rulemaking. Farmland strongly opposes *ad hoc* efforts to make changes in labeling policy.

Farmland believes that the recent change to the August 2005 natural policy is ill advised. Moreover, when coupled with the demand letters, FSIS policy changes have effectively established a new mandatory standard. These actions are arbitrary and capricious, and constitute rulemaking subject to the notice and comment requirements of the Administrative Procedures Act ("APA"). In addition, this change may well be a "significant guidance document," requiring the approval of the Office of Information and Regulatory Affairs ("OIRA") in the Office of Management and Budget ("OMB"), and the opportunity for public comment under Executive Order 12866. Finally, Farmland believes

D002275

March 5, 2007
Page 4

that FSIS' restrictions on truthful and non-misleading natural claims unfairly restrict commercial free speech.

## II.    Background

### A.    FSIS Natural Policy

FSIS approves labels for meat and poultry products under its jurisdiction.[3] As part of this regulatory regime, FSIS publishes the "Food Standards and Labeling Policy Book" ("Policy Book"), which serves as guidance to help manufacturers prepare product labels that are truthful and non-misleading.[4] Among other things, this Policy Book contains guidance on when the term "natural" can be appropriately used on the labels of meat and poultry products.

The original natural policy, which was issued over 23 years ago on November 22, 1982, stated that the term "natural" may be used on labeling for meat and poultry products provided that: (1) the product does not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined in 21 CFR § 101.22), or any other artificial or synthetic ingredient; and (2) the product and its ingredients are not more than minimally processed.[5]

In August 2005, FSIS updated the text of the 1982 natural policy to, among other things, explicitly permit the use of sodium lactate in products bearing natural claims.[6] More specifically, the 2005 text

---

[3] 9 CFR Part 317.

[4] FSIS Office of Policy, Program and Employee Development, *Food Standards and Labeling Policy Book*, at 2 (August 2005 *as amended* December 2006), found at http://www.fsis.usda.gov/Regulations_&_Policies/Labeling_Policies/index.asp. At the December 12, 2006 public meeting on "Product Labeling: Definition of the Term 'Natural,'" FSIS stated that "policy guidance would provide a helpful and transparent way for the Agency to set up factors that the Agency considers in making judgments about whether particular types of labeling are truthful and non-misleading. Usually we develop a policy guide when we see a trend developing in the marketing of products with certain labeling features, statements or claims that have not been explicitly addressed by the Agency in its regulations. The guidance is intended to set out how the statutory provisions and the regulations on labeling apply to the developing trend and to provide consistent and timely advice to help manufacturers develop labeling that could be improved by the Agency." Transcript of December 12, 2006 Public Meeting on *Product Labeling: Definition of the Term 'Natural*,'" Statement of Dr. Robert C. Post, at 20.

[5] 71 Fed. Reg. at 70503. Minimal processing may include: (a) Those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, *e.g.*, smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes that do not fundamentally alter the raw product or that only separate a whole, intact food into component parts, *e.g.*, grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices. Relatively severe processes, *e.g.*, solvent extraction, acid hydrolysis, and chemical bleaching, would clearly be considered more than minimal processing. *Id.*

[6] 71 Fed. Reg at 70504.

D002276

March 5, 2007
Page 5

read: "[n]ote . . . sodium lactate (from a corn source) . . . [is] acceptable for 'all natural' claims."[7] Please note that FSIS interpreted this reference to sodium lactate as also encompassing potassium lactate. In practice, the agency systematically approved the natural labeling of products containing sodium lactate or potassium lactate at levels under 2 percent. The August 2005 natural policy did not explicitly prohibit or even discuss antimicrobial effects at this level.

It has been recognized that the August 2005 natural policy revision was not policy change; rather, it was a reflection of FSIS' long-standing interpretation of its original 1982 natural policy and its numerous prior label approval decisions which permitted sodium, calcium, and potassium lactate as flavors in products labeled "natural." FSIS itself has indicated that:

> [s]ince 1982, FSIS has modified the . . . [1982 natural policy] on occasion to make it consistent with prevailing policies, to reflect case-by-case decisions made by the Agency, and to update references to the regulations. In August 2005, FSIS modified the guidance by acknowledging that sugar, sodium lactate from a foreign source, and natural flavorings from oleoresins or extractives could be acceptable for products bearing natural claims. These modifications were simply intended to record decisions about these ingredients that the Agency has made over several years in improving labels bearing natural on a case-by-case basis.[8]

Moreover, unlike FSIS' recent unilateral change to the August 2005 natural policy, which we understand followed non-public discussions, the August 2005 revision was not the result of a petition or other similar effort by manufacturers or users of sodium lactate or potassium lactate – rather, it was an agency-driven effort aimed at clarifying to the public its historical interpretation of the 1982 natural policy.

**B.     The Hormel Petition**

On October 9, 2006, Petitioner submitted a petition to FSIS requesting the agency to initiate rulemaking procedures to amend 9 CFR § 317 and 9 CFR § 381.129 to codify the definition of "natural" and clarify the circumstances under which it may be used on the label of meat or poultry products. The Petition reiterates that a meat or poultry product should not bear a natural label unless: (1) it does not contain artificial flavorings, artificial coloring ingredients, other artificial or synthetic ingredients, or chemical preservatives, and (2) it is not more than minimally processed. In addition, unlike the current FSIS natural policy that only prohibits "chemical preservatives," the

---

[7] FSIS *Food Standards and Labeling Policy Book*, at 117.

[8] Transcript of December 12, 2006 Public Meeting on *Product Labeling: Definition of the Term "Natural,"* Statement of Dr. Robert C. Post, at 24-25 (emphasis added).

D002277

March 5, 2007
Page 6

Petition seeks to prohibit "any substance, either <u>natural</u> or chemical, which serves to retard product deterioration as a result of microbial action."[9]

The Petition explicitly opposes the August 2005 natural policy and the use of sodium lactate in natural products. Petitioner argues that this allowance is inconsistent with the prohibition on chemical preservatives and that it creates inconsistencies that confuse and misinform consumers.[10] Citing the likely length of any potential rulemaking process, the Petition requested that FSIS issue interim guidance and unilaterally revise the August 2005 natural policy to prohibit sodium lactate in products labeled "natural."[11] In addition to filing the Petition, we understand the Petitioner actively lobbied officials to encourage them to adopt the Petition.

We note that the Petition does not present evidence of consumer confusion or concern regarding the use of potassium lactate in a product bearing the natural label. In this regard, it would appear that the Petition is aimed at gaining a competitive advantage in the natural market by seeking an exclusive right to use the word "natural" for product processed under its "high-pressure" technology.[12]

C.    FSIS Response to Hormel Petition and Current Status of the Natural Claim

In response to the Petition, FSIS: (1) published a December 5, 2006 notice and request for comments on the Hormel petition; (2) held a public hearing on December 12, 2006 to discuss the natural issue; and (3) stated that it would initiate rulemaking on the definition of "natural."[13]

FSIS, however, inappropriately and unilaterally revised the August 2005 natural policy in December 2006 (without clearance from OMB or any opportunity for public input) out of concern that the use of sodium, calcium, and potassium lactate may conflict with the meaning of natural if they have a preservative effect at the levels of use associated with flavoring. The revised policy now notes that the reference to sodium lactate (from a corn source) has been removed from the guidance on natural claims because the agency has "recent[ly]" been provided with information indicating "that sodium

---

[9] Hormel Petition, at 13 (emphasis added)

[10] Hormel Petition, at 10.

[11] Hormel Petition, at 14.

[12] Carole Sugarman, "Natural" Definition For Meat and Poultry Causes Confusion, 48 Food Chemical News at 23-24 (Dec. 18, 2006). See also, Kiger, Post-Bulletin, December 13, 2006; McClatchy, Washington Bureau, December 5, 2006; Adamy, Wall Street Journal, February 17, 2005.

[13] 71 Fed. Reg. at 70503.

March 5, 2007
Page 7

lactate, potassium lactate, and calcium lactate provide an antimicrobial effect at levels that have been regulated as providing a flavoring effect."[14]

In addition, FSIS also sent letters to various companies (including Farmland) that have existing label approvals for natural products containing sodium lactate or potassium lactate as flavoring agents. In these letters, FSIS threatened to revoke the approvals unless the companies established that the sodium lactate and/or potassium lactate have no microbial effect on the finished product nor any impact on shelf life or use-by dating. The letters convey a sixty-day deadline for processors to demonstrate no microbial affect or shelf life extension. FSIS subsequently sent letters indicating that it was not necessary to present data on the microbial effect of potassium lactate, if companies presented data demonstrating that the shelf life or use-by date for products containing potassium lactate was the same as the shelf life or use-by date for products that did not contain potassium lactate.

## III.    Sodium Lactate and Potassium Lactate Are Appropriately Permitted in Food Products Labeled "Natural"

Farmland believes sodium lactate and potassium lactate are natural ingredients and should qualify as "natural flavors," particularly when used at levels under 2 percent. FSIS regulations regard flavoring as the primary function of potassium and sodium lactate at levels under 2 percent, and the agency should not disregard this regulatory framework when evaluating these issues. That a natural flavor has both flavoring and preservative functions should not preclude its use in natural products. Moreover, sodium and potassium lactates should not be deemed "chemical preservatives" under the terms of the FSIS natural policy.

### A.    Lactates are Natural Ingredients

Sodium lactate and potassium lactate, the sodium and potassium salts of lactic acid,[15] are natural ingredients. Lactic acid is produced naturally in foods such as cheese, pepperoni, sour dough bread and many others by the action of lactic acid starter cultures on the sugars that are naturally present in the food products.[16] The production of the lactic acid increases the acidity of the product, flavoring the product and protecting the product from early spoilage. This same lactic acid and the lactate

---

[14] FSIS *Food Standards and Labeling Policy Book*, at 117.

[15] 52 Fed. Reg. 10884 (April 6, 1987).

[16] Applegate Farms, *What is Sodium Lactate?*, found at http://www.applegatefarms.com/A556B4/NutrInfo.nsf/81647a0fea1a2f0485256a12005d283d/be281aa647749352f85f5 6a12006626c8OpenDocument. *See also*, *The Physiology and Biochemistry of Muscle as a Food*, 2 (E.J. Briskey, R.G. Cassens, and B.B. Marsh eds., U. Wisc. Press 1970).

D002279

March 5, 2007
Page 8

salts of lactic acid naturally occur in all animal and human tissues.[17] Sodium and potassium lactate also occur naturally in the metabolic functions of mammalian species.[18]

Sodium lactate is produced by the natural fermentation of the sugars from corn or beets. These sugars are fermented with lactic acid starter culture, similar to those used for cheese or yogurt production. The fermented solution is mixed with caustic soda to form sodium lactate in the same way soymilk is mixed with calcium sulfate to form tofu.[19] Potassium lactate is produced in the same general manner and has the same properties as sodium lactate, but starts with potassium instead of a sodium base. Potassium lactate is often used in reduced sodium or sodium-free products. A substance may have an antimicrobial effect but still remain natural. Salt, sugar, vinegar and spices are all additive ingredients, yet they certainly do not automatically render the foods to which they are added unnatural.

> **B.    FSIS Should Adhere to its Policy of Allowing the Use of Sodium Lactate and Potassium Lactate As Natural Flavors in Natural Products in Levels Up to 2 Percent**

FSIS and FDA extensively regulate sodium and potassium lactate and have permitted their use as flavor enhancers or flavoring agents in food products. FSIS explicitly permits the use of sodium lactate and potassium lactate in various meat and poultry products as: (1) flavor enhancers and flavoring agents in meat and poultry products at levels not to exceed 2 percent; and as (2) antimicrobials in meat and poultry products at levels up to 4.8 percent.[20] The FSIS regulation establishing the 4.8 percent antimicrobial level does not explicitly or implicitly affect the classification of potassium lactate and sodium lactate as flavoring agents or flavor enhancers if they are used at up to the 2 percent level.

Sodium lactate and potassium lactate are generally recognized as safe ("GRAS") by FDA for use as emulsifiers, flavor enhancers, flavoring agents, adjuvants, humectants, and pH control agents at levels not to exceed current good manufacturing practice.[21]

---

[17] *Id. See also* L. Styer, *Biochemistry* (2nd ed., W.H. Freeman and Co. 1981).

[18] 52 Fed. Reg. at 10884.

[19] Applegate Farms, *What is Sodium Lactate?*, found at http://www.applegatefarms.com/A556B4/NutrInfo.nsf/81647a0fea1a2f0485256a12005d283d/be281aa647749352f5c56a12006626cfOpenDocument.

[20] 9 CFR § 424.21(c) (emphasis added).

[21] 21 CFR § 184.1768, 21 CFR § 184.1639 (emphasis added).

March 5, 2007
Page 9

Sodium lactate and potassium lactate are not artificial or synthetic ingredients, but are minimally processed natural flavors. Both FSIS and FDA define natural flavor as:

> [t]he essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any product or roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or any other edible portion of a plant, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose primary function in food is flavoring rather than nutritional.[22]

Sodium lactate and potassium lactate from corn fall squarely within the definition of natural flavor since they are essentially salts derived through fermentation from a natural ingredient - corn. In addition, fermentation is considered "minimal processing" and expressly allowed by FSIS' natural policy. Accordingly, sodium and potassium lactates are appropriately used as natural flavors in products labeled "natural."

## C. FSIS Has Classified Flavoring As the Primary Function of Sodium Lactate and Potassium Lactate at Less Than 2 Percent, While Recognizing That They Have Both a Flavor and Preservative Effect

FSIS first approved sodium lactate and potassium lactate in 1993 for their flavoring capabilities (when used at up to a 2 percent level),[23] and only subsequently approved sodium lactate and potassium lactate in 2000 for their antimicrobial capabilities (when used at up to a 4.8 percent level).[24] In so doing, FSIS has created a regulatory framework for evaluating the primary and secondary effects of the lactates. Specifically, the agency considers flavoring to be the primary function of sodium lactate and potassium lactate when used at up to 2 percent, and the primary function of sodium lactate and potassium lactate when used between a 2 to 4.8 percent level to be an antimicrobial.

---

[22] 9 CFR § 317.2(f)(1)(i)(B); 21 CFR § 101.22(a)(3).

[23] 58 Fed. Reg. 4067 (January 13, 1993). In the FSIS rulemaking establishing the 2 percent flavoring level, commenters recognized how "the flavoring enhancing properties of sodium lactate add significantly to the flavor of meat and poultry products." The petitioner who requested FSIS to allow the use of potassium lactate and sodium lactate as flavor enhancers and flavoring agents in cooked meat and poultry products submitted data clearly demonstrating that "sodium lactate has the technical effect of a flavoring by contributing to the salty taste of products." 58 Fed. Reg. at 4068. Although the petitioner did not present figures on the levels of use necessary to achieve saltiness of potassium lactate, it estimated that it would be the same as sodium lactate. FSIS explicitly agreed with this estimate concerning potassium lactate "due to FDA's . . . affirm[ation] that sodium and potassium salts of lactic acid will perform the technical effects of flavor enhancer and flavoring agent." Id.

[24] 65 Fed. Reg. 3121 (January 20, 2000).

March 5, 2007
Page 10

In fact, when establishing the 2 percent flavoring standard, FSIS acknowledged that "[p]otassium lactate and sodium lactate may be considered as having 'antimicrobial' properties," but noted that the FSIS "allows the use of certain substances with antimicrobial properties but classifies them by their primary functions."[25] This discussion clearly establishes that FSIS in fact: (1) considers the primary function of sodium lactate and potassium lactate used in meat and poultry products at levels up to 2 percent to be flavoring; and that (2) any antimicrobial effect that impacts shelf life under the 2 percent level to be a secondary function.

FSIS' newly formed disregard of its primary classification of sodium lactate and potassium lactate as flavoring agents and flavor enhancers is arbitrary and capricious. If FSIS considers flavoring to be the primary function of sodium lactate and potassium lactate at the 2 percent level, then FSIS cannot override this conclusion in the context of its natural policy. In so doing, FSIS is implicitly amending the existing regulation and making decisions regarding the characterization of ingredients (and consequently processes) by their primary and secondary effects in an *ad-hoc* manner. Given the established agency position that flavoring is the primary function of sodium lactate at up to 2 percent, it is arbitrary and capricious and an abuse of discretion for the agency to disregard this position when evaluating the appropriateness of sodium lactate and potassium lactate at the agency established flavoring levels in products that carry a "natural" label.

Moreover, although there has been an assertion that the FSIS was not aware of the antimicrobial effects of potassium lactate and sodium lactate at levels that have been regulated as providing a flavoring effect, the regulatory history of the rulemakings authorizing sodium lactate and potassium lactate for use as flavoring agents suggests otherwise. FSIS' December 2006 revision to the natural policy in response to the Hormel Petition states, in pertinent part, that:

> recent information provided to FSIS . . . indicates that sodium lactate, potassium lactate, and calcium lactate provide an antimicrobial effect at levels that have been regulated as providing a flavoring effect. Therefore, regardless of whether it can be shown that any form of lactate is from a natural source and is not more than minimally processed, the use of lactate (sodium, potassium, and calcium) may conflict with the meaning of "natural" because it may be having a preservative effect at levels of use associated with flavoring. Thus, listing "sodium lactate (from a corn source)" in the previous entry may have been in error . . .[26]

The agency, however, has been aware of the antimicrobial effects of sodium lactate and potassium lactate as far back as 1993. As noted above, the 1993 rulemaking that established the use of 2 percent sodium lactate and potassium lactate as flavors is characterized by an active dialogue about

---

[25] 58 Fed. Reg. at 4069.

[26] FSIS *Food Standards and Labeling Policy Book*, at 117 (emphasis added).

March 5, 2007
Page 11

the various effects and purposes of these ingredients. For example, one commentator opposed the proposed rule because it believed that the purpose of "lactate salts" was for food safety through microbiological control, with a secondary effect on flavor, while another argued that FSIS should either withdraw the rulemaking or revise it "to recognize that lactates are being used for their preservative characteristics . . . "[27] As noted above, the agency rejected these comments, noting that it classifies substances according to their primary function, and proceeded to codify the primary use of up to 2 percent sodium lactate and potassium lactate for flavor.

Given this active discussion as far back as 1993, the assertion that the agency was unaware of the secondary effects of sodium lactate and potassium lactate when it issued the August 2005 policy change is not persuasive.

In any event, any preservative effect resulting from the use of this natural ingredient at the flavoring level should not preclude its use in natural products, particularly since the agency has long been aware of this dual function.

### D.    The Dual Functionality or Secondary Preservative Effect Does Not Preclude the Use of Lactates in Natural Products

Since its inception, the FSIS policy for natural claims has allowed the use of ingredients and minimal processing activities that affect the shelf life of a product. The two principal tenets of the FSIS natural claim not changed since 1982: (1) the product may not contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative (as defined by 21 CFR § 101.22), or any other artificial or synthetic ingredient; and (2) the product and its ingredients may not be more than minimally processed.

Numerous natural ingredients have an impact on shelf life. As noted above, salt, for example, is added to products and extends shelf life. Vinegar also extends shelf live. Certain essential oils or antioxidants that are natural ingredients may also affect shelf life. The natural policy also expressly allows "those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting."[28]

Substances that have an effect on the shelf life of a product are not categorically ineligible for inclusion in a natural product. It is indisputable that virtually anything that impacts the condition of the product will have an impact on its shelf life. The mere fact that potassium and sodium lactates have a dual function or secondary antimicrobial effect does not justify their exclusion from the natural policy.

---

[27] 58 Fed. Reg. at 4069.

[28] FSIS *Food Standards and Labeling Policy Book*, at 116 (emphasis added).

D002283

March 5, 2007
Page 12

E.    Sodium Lactate and Potassium Lactate Are Not "Chemical Preservatives"

Lactates are not "chemical preservatives" as defined in FDA regulations (21 CFR § 101.22), which defines a chemical preservative to mean:

> any chemical that, when added to food, tends to prevent or retard deterioration thereof, but does not include common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties.

Based upon this definition, FDA regulations do not classify sodium lactate or potassium lactate as "chemical preservatives" or any other type of food preservatives. As noted above, FDA has generally recognized as safe sodium lactate and potassium lactate for use only as emulsifiers, flavor enhancers, flavoring agents, adjuvants, humectants, and pH control agents at levels not to exceed current good manufacturing practice. Even the FDA Investigations Operations Manual's ("IOM") Food Additive Status List fails to classify potassium lactate and sodium lactate as chemical preservatives.[29] In short, nowhere in FDA regulations is potassium lactate listed as a chemical preservative.

Moreover, FSIS itself has acknowledged that "potassium lactate and sodium lactate are not classified as 'preservatives'" by the Food and Drug Administration."[30] That conclusion holds true to this day. Since FSIS recognized that FDA has not classified potassium and sodium lactate as preservatives, and FDA has not in fact classified potassium and sodium lactate as "chemical preservatives," it is difficult to see how FSIS can reverse course and change its longstanding policy allowing the use of lactates in all natural products by claiming that they are "chemical preservatives."

The conclusion that sodium lactate and potassium lactate are not "chemical preservatives" under 21 CFR § 101.22 for purposes of the natural labeling policy is supported by the underlying terms of the policy itself and by FSIS regulations. The language in FSIS' natural policy is intended for artificial or synthetic ingredients - not ingredients that are simply "chemical." In the broadest sense, all matter has a chemical nature. To apply the term "chemical preservative" to any ingredients that have a preservative effect, including natural ingredients that have been used for thousands of years, is

---

[29] FDA Center for Food Safety and Applied Nutrition, Office of Food Additive Safety, *Food Additive Status List*, (July, 2006), found at http://www.cfsan.fda.gov/~dms/opa-appa.html#fnP. The Food Additive Status List organizes additives found in many parts of 21 CFR into one alphabetized list that includes use limitations and permitted tolerances for each additive.

[30] 58 Fed. Reg. at 4069 (emphasis added). The Food Chemical Codex similarly lists the functions of sodium lactate and potassium lactate as emulsifiers, flavor enhancers, flavoring agents, adjuvants, humectants, and pH control agents. The Food Chemicals Codex has never formally listed sodium lactate or potassium lactate as chemical preservatives.

D002284

March 5, 2007
Page 13

nonsensical. Lactates, which are members of the salt family, are natural ingredients, perfectly appropriate for use in a natural product.

The Petition implicitly recognizes this distinction by suggesting that additional language should be added to the natural policy. Specifically, the Hormel Petition suggests that the natural policy be revised to state:

> [b]eyond the definition of "chemical preservative" found in 21 CFR 101.22, it is intended that any substance, __either natural or chemical__, which serves to retard product deterioration as a result of microbial action would not be allowed in products which carry an all natural claim.[31]

We believe it is fair to say that by "chemical preservative," it was intended that ingredients of an artificial or synthetic nature be barred.

The revision proposed by Hormel would effectively prohibit the use of any natural ingredients (including salt, vinegar, and spices) that may also have preservative effects in products labeled "natural," and deny manufacturers the option of using natural ingredients to promote food safety.

## IV.    Change in the August 2005 Natural Policy is Arbitrary and Capricious And Is Regulatory Action That Must Occur Through Notice and Comment Rulemaking

If the agency is going to establish a policy that ingredients or minimal processing cannot have a secondary effect on shelf life, or to define what the limit of that effect can be, then FSIS must take this action via notice and comment rulemaking in which the full range of ingredients and practices are evaluated and the public is provided a full and fair opportunity to comment.

The agency's recent change to its August 2005 natural policy is arbitrary and capricious and an abuse of discretion. Moreover, when coupled with its demand letters, the agency's actions constitute rulemaking subject to the notice and comment requirements of the APA. Under the agency's longstanding policy, sodium lactate and potassium lactate were approved for use at the agency established flavoring levels in products labeled "natural." Under its recent unilateral revision to this policy, FSIS effectively established a new mandatory requirement. Food manufacturers cannot use potassium lactate if the food products carrying a natural label have a sell-by or shelf life date that is not the same as a product that does not have this ingredient.

The FSIS rationale for reversing its longstanding agency policy does not appear to be well-formed. The agency has published regulations establishing that flavoring is the primary effect of potassium lactate at levels up to 2 percent, a regulation that is effectively or implicitly amended by the recent

---

[31] Hormel Petition, at 13 (emphasis added).

D002285

March 5, 2007
Page 14

change in the natural policy. The agency also claims that the Hormel Petition presents new information and that the agency was unaware that the lactates have a preservative effect at the flavoring levels, when in fact a review of the agency's regulatory history makes plain that the agency has been aware of such effects since the time that it established standards allowing the use of lactates as a flavor.

FSIS has fundamentally changed the rules under which a product can be labeled "natural," and its actions go well beyond a general statement of agency policy. The revised policy, coupled with the demand letters, make clear that the agency is imposing a new standard that will be applied to all existing and future products, and that the agency does not retain any discretion to allow products to bear the natural label if they contain certain ingredients that have the dual or secondary effect of prolonging shelf life or use-by dates beyond that of a product that does not contain the ingredients.

We note that the FSIS-initiated August 2005 natural policy revision did not require rulemaking because it was not a policy change; rather, it was a reflection of FSIS' long-standing interpretation of its original 1982 natural policy and its numerous prior label approval decisions permitting sodium, calcium, and potassium lactate as flavors in products labeled "natural." FSIS' recent unilateral change to this August 2005 natural policy, however, is a dramatic departure from existing agency practice and prior approval decisions. That this was done without public input and at the request of a competitor with a unique position in the market is a very real concern.

The August 2005 natural policy revision did not establish a new and binding norm with which companies must comply, nor did it require any labeling changes by a regulated entity. In contrast, the recent December 2006 unilateral change abruptly reverses the existing policy upon which Farmland and others have reasonably relied, fundamentally changes the rules under which a product can be labeled "natural," and requires immediate and costly changes in established processes. FSIS is effectively mandating that Farmland, for example, relabel all products currently bearing an FSIS-approved natural label if the products containing lactate have a shelf life or use-by date that is different from products that do not contain lactate. This direct and immediate impact on Farmland's rights and obligations evidences that FSIS is in fact establishing new and binding norms. Product that had previously been allowed to carry a natural label would now be considered mislabeled.

Farmland believes FSIS' actions are not based on protecting the public from false or misleading labeling but rather is an economic regulation that effectively distorts the market and provides the Petitioner with a competitive advantage. In essence, FSIS would allow products with lactate for flavor to be labeled "natural," so long as they are not sold beyond the shelf life of products that do not contain lactate. There is either something inherently wrong with selling as "natural" a product that has the lactates, or there is not. It is arbitrary and capricious for FSIS to conclude otherwise.

FSIS should therefore immediately reinstate the August 2005 natural policy until it has had a chance to more fully deliberate on the issue.

D002286

March 5, 2007
Page 15

### V.    FSIS Should Maintain a Level Playing Field Pending Rulemaking

Although FSIS itself recognizes that rulemaking may be the proper forum for resolving issues
related to its natural policy, it nevertheless made changes to the policy without full opportunity for
public debate and comment.  In its December, 2006 notice regarding the Petition in which it
announced a public meeting on the natural issue, FSIS stated that:

> The Agency has come to recognize, based on the controversy that has arisen about
> "natural" in recent months, that there is significant disagreement about aspects of
> the August 2005 policy modification, particularly the recognition of sodium lactate as
> an ingredient that could be included in products that bear a "natural" claim.  The
> Agency has received information that raises questions about when, and if, a food to
> which sodium lactate has been added would be fairly characterized as "natural."  The
> Agency has come to believe that this question, like numerous others alluded to in
> this document, is best resolved through a rulemaking process.[32]

Farmland appreciates that there may be new questions that warrant rulemaking.  As noted above as
new technologies emerge, new issues arise.  For example, some consumers might find Petitioner's
high pressure processing to be more than minimally processed and unnatural.  High-pressure
processing involves:

> [U]sing extremely high pressure, up to 87,000 pounds per square inch, to kill bacteria
> in the food.  It is similar to the conditions at the bottom of the deepest part of the
> ocean, magnified five-fold, Dr. James Marsden, a food scientist at Kansas State
> University and science liaison of the North American Meat Processors Association,
> Reston, Va., explains.  "The pressure is so great down there that few living things can
> survive."  The pressure of 87,000 psi is approximately equal to three full-grown
> elephants standing on a beam with the weight of the beam centered on the face of a
> dime.[33]

Like sodium lactate, Petitioner's high-pressure processing helps to extend shelf life.  As with sodium
lactate, FSIS has permitted products that have undergone high-pressure processing to bear the
natural label.  A notice and comment rulemaking process would provide an opportunity to explore
such issues and to make a well-reasoned decision on the proper use of the natural claim.

---

[32] 71 Fed. Reg. at 70504.

[33] Harris, Chris, *The Big Squeeze*, Meat Processing Magazine (February, 2006), found at
http://www.meatnews.com/mp/northamerican/dsp_article_mp.cfm?artNum=444.

D002287

March 5, 2007
Page 16

The FSIS action related to the recent change in the rule book and issuance of the letter did not follow any public process or open discussion of the issues, nor was it the result of public criticism by consumers who felt misled by all natural labels on products treated with lactates. Rather, it appears the revision of the August 2005 natural policy was done solely in response to the Petition.

FSIS' unilateral change to the August 2005 policy has immediately created an unfair business environment and established a competitive advantage for one company. The change will have a significant economic impact on Farmland and other affected companies. Unlike the unilateral change to FSIS' natural policy in response to the Hormel Petition, the August 2005 natural policy update allowing the use of sodium lactate in natural products codified decisions that had been made over several years. Farmland and many other manufacturers and companies have relied on those decisions, the subsequent August 2005 natural policy, and existing label approvals. They have not only created product lines and manufacturing processes based on that policy, but they have also entered into contracts with suppliers and customers and have product in inventory that carry labels approved under that policy.

Given the complexity of the issues and the interests at stake, FSIS must retain the August 2005 natural policy while it conducts notice and comment rulemaking on the scope of the natural label claim and the standards that will be used to evaluate whether technologies and ingredients are natural. In this rulemaking, Farmland would note that, prior to the unilateral revision of the August 2005 policy, the agency decision-making process for allowing all natural claims had worked for the agency, the regulated community, and consumers, with all parties having confidence in the flexible, case-by-case decision making of the agency. Farmland would encourage the agency to retain such flexibility, while providing clarity and certainty for manufacturers, producers, and consumers.

## VI.    The Change in the August 2005 Natural Policy is a Significant Guidance Document That Requires Review by OMB and Opportunity for Public Comment

The agency's new "natural" definition is a significant guidance document that requires review by OIRA at OMB.

The FSIS policy for natural label claims is contained in the FSIS Food Standards and Labeling Policy Book. The Policy Book expressly states that it "is intended to be guidance to help manufacturers and prepare product labels that are truthful and not misleading."[34] When FSIS issued the new natural policy, FSIS republished the entire Food Standards and Labeling Policy Book. Since the book applies to the entire meat and poultry industry, it has an annual economic impact of well-over $100 million, the threshold for an economically significant guidance document under OMB's recent

---

[34] FSIS *Food Standards and Labeling Policy Book*, at 2.

D002288

March 5, 2007
Page 17

Final Bulletin for Agency Good Guidance Practices.[35] It is also a significant guidance document that requires OMB review under Executive Order 12866.

Even if viewed separate from the entire Food Standards and Labeling Policy Book, FSIS' creation of a new labeling definition for natural claims is a significant guidance document under Executive Order 12866. The new definition of a natural claim under FSIS jurisdiction "may be reasonably anticipated to . . . adversely affect in a material way a sector of the economy, productivity, [and] competition."[36] The new FSIS policy "may [also] be reasonably anticipated to [c]reate serious inconsistency . . . with an action planned by another agency" and "[r]aise novel legal or policy issues . . ."[37]

The consumer market for natural foods is rapidly growing and carries a price premium. The definition, scope, and integrity of this market are important to the overall food industry. As noted above, companies have invested millions to develop, produce, and market natural products in reliance on prior decisions by FSIS and the August 2005 natural definition. Radically revising that definition to preclude the ability of those companies to label their products as natural will adversely affect a sector of the economy and its productivity. In addition, because the new FSIS definition appears to be in response to the petition of one competitor that uses an alternative technology, and would restrict competitors while allowing the alternative technology, the new definition adversely and materially affects competition.

As FSIS noted in its rulemaking establishing lactates as flavoring agents, FDA has not determined sodium lactate or potassium lactate to be preservatives. FSIS is now, however, asserting that sodium lactate and potassium lactate (used for flavoring purposes) are "chemical preservatives" under FDA regulations. This is a fundamental inconsistency between two Federal agencies that may warrant OMB intervention in order to ensure consistent Federal policy regarding natural label claims. Moreover, as noted below, FSIS actions may also run afoul the First Amendment by restricting truthful and non-misleading commercial speech.

With respect to OMB jurisdiction and authority to review significant guidance documents, it should be noted that the recent revisions to Executive Order 12866 by Executive Order 13422 of January 18, 2007, in which OMB is giving express authority to review significant agency guidance, merely

---

[35] Office of Mgmt. & Budget, Executive Office of the President, OMB Bull. No. 07-02, *Final Bulletin for Agency Good Guidance Practices*, *reprinted in* 72 Fed. Reg. 3432, 3435 (Jan. 25, 2007).

[36] Exec. Order No. 12866, 58 Fed. Reg. 51735 (Oct. 4, 1993), *as amended by* Exec. Order No. 13258, 67 Fed. Reg. 9385 (Feb. 28, 2002) & Exec. Order No. 13422, 72 Fed. Reg. 2763 (Jan. 23, 2007) (*see* Sec. 3(f)(1)).

[37] *Id.*, at Sec. 3(f)(2), (f)(4).

March 5, 2007
Page 18

codified a long-standing practice.[38] Farmland believes that OMB has consistently claimed and exercised jurisdiction to review significant guidance documents issued by Federal agencies, including USDA agencies. The fact that this authority was only recently codified in Executive Order 12866 does not relieve USDA of its obligation to submit significant guidance documents to OMB for review.

It should also be noted that one of the authorities for OMB jurisdiction over agency guidance is the Information Quality Act.[39] In this regard, FSIS has arguably violated the Information Quality Act by making decisions on the basis of incomplete data. That is, FSIS is acting solely in response to information received in a petition from a competitor. In so doing, FSIS has reversed longstanding policy, ignored it its own regulatory history, and has deprived the public of the opportunity to explore these issues in an open and transparent manner. The proper determination of when products and processes that have multifunctional effects on food should be allowed to carry a natural label is a complex question. While the agency recognizes this complexity, it would appear the agency acted without fully weighing all of the evidence in an open and transparent forum.

## VII.    FSIS Actions Implicate the First Amendment and Commercial Free Speech

FSIS' change to the August 2005 natural policy also unfairly restricts commercial free speech. FSIS authority with respect to food labels is limited to protecting against any labeling that is false or misleading in any particular. Since sodium lactate and potassium lactate are natural flavors that are minimally processed and being used at the levels established for flavoring, a natural label on a product that has been treated with up to 2 percent sodium lactate or potassium lactate is not false or misleading. There is very strong consumer interest in natural products and the natural label claim is commercial speech protected by the First Amendment.

Under existing First Amendment jurisprudence, regulation of lawful and non-misleading commercial speech is constitutional only if: (1) the government interest justifying the restriction on commercial speech is substantial; (2) the government regulation directly advances the governmental interest asserted; and (3) the government regulation is no more extensive than necessary to serve the proffered interest.[40]

By prohibiting the use of the natural claim on the label of a product containing sodium lactate or potassium lactate for flavoring purposes, FSIS is effectively banning truthful and non-misleading commercial speech through its mandatory pre-market label approval process. Even if there is some

---

[38] Exec. Order No. 12866, 58 Fed. Reg. 51735 (Oct. 4, 1993), *as amended by* Exec. Order No. 13422, 72 Fed. Reg. 2763 (Jan. 23, 2007)(*see* Sec. 9).

[39] 44 USC §§ 3504(d)(1), 3516.

[40] *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557 (1980).

D002290

March 5, 2007
Page 19

basis to address the use of the "natural" claim on such products, FSIS' position and policy in this matter are more restrictive than necessary to address any perceived or potential governmental interest and constitute a prior restraint on lawful, truthful, and non-misleading commercial speech by Farmland to its customers.

There have been many developments in recent years regarding the application of the First Amendment to commercial speech, including in the labeling and health and safety context. If necessary, Farmland stands ready to elaborate fully upon the underlying constitutional analysis to support its conclusion.

## VIII.    Conclusion

We maintain that it is not in the public interest that food manufacturers be barred from using natural ingredients solely because these ingredients enhance food safety. Nor is it appropriate that long standing policies be changed based on the sole input of one competitor, particularly when the changes would give that competitor a unique advantage in the market. When these policy changes appear to be unsupported by legal or factual bases, it becomes compelling that the agency should examine its process and reconsider its course of action.

In light of the above, Farmland respectfully requests that: (1) FSIS maintain its August 2005 natural policy, including the allowance of the natural label on products containing sodium lactate and potassium lactate; and (2) any FSIS rulemaking on the definition of "natural" allow products containing lactate at levels up to 2 percent of formulation to be labeled "natural."

Sincerely,

FARMLAND FOODS, INC.

By:    Marc L. Kuemmerlein
       Vice President and General Counsel

cc:    Steven D. Aitken, Acting Administrator, OIRA

D002291

D002292



PURAC America, Inc
111 Barclay Boulevard
Lincolnshire Corporate Cente
Lincolnshire, IL 60069 U.S.A.

Phone  +1 (847) 634-6330
Fax      +1 (847) 634-1992
E-mail  pam@purac.com
http://www.purac.com

RECEIVED
FSIS DOCKET ROOM

07 MAR -1  AM 10: 45

February 26, 2007

**45**

2006-0040
2006-0040-45
Gerrit Vreeman

FSIS Docket Room
Docket Clerk
U.S. Department of Agriculture
Food Safety and Inspection Service
300 12th Street SW, Room 102 Cotton Annex
Washington, DC 20250

RE:    Comments from Purac America, Inc. to FSIS Regarding the Definition
of "Natural"; Docket No. FSIS 2006-0040

Dear Sir or Madam:

PURAC appreciates the opportunity to submit comments to the Food
Safety and Inspection Service (FSIS) regarding the definition and use of the term
"natural" to describe meat and poultry products on food labels. As a supplier of
lactate ingredients for numerous meat and poultry products, PURAC is greatly
concerned with any suggestion that sodium lactate from corn is incompatible with a
"natural" claim. FSIS has allowed and should continue to permit the use of sodium
lactate in "natural" products. Sodium lactate is not a chemical preservative and is
derived by no more than minimal processing from a natural, renewable source.
There is no legal or factual basis to exclude sodium lactate and other ingredients
that enhance the safety and quality of numerous "natural" meat and poultry
products.

PURAC America is the U.S. subsidiary of PURAC, headquartered in
Holland, and has been providing sales and expert technical support to customers in
this country since 1983. PURAC is the world's largest producer of natural lactic
acid, lactates, gluconates, lactitol, lactides and polylactides. PURAC is a subsidiary
of CSM, a global leader engaged in the development, production, sale and
distribution of bakery supplies and food ingredients. We are proud of the role it has
played working with numerous meat and poultry processor in the U.S. to pioneer,
refine and achieve practical applications for sodium lactate as a valuable food safety
tool resulting in a safer food supply for the nation.

PURAC America is part of the
PURAC division, Manufacturer
of natural lactic acid, lactates
and gluconates

D002293

# TABLE OF CONTENTS

SUMMARY OF COMMENT ........................................................... 1
I.   SODIUM LACTATE IN MEAT AND POULTRY PRODUCTS IS
     CONSISTENT WITH A "NATURAL" CLAIM ........................... 3
     A.   Sodium Lactate is Neither a Synthetic Nor an Artificial
          Ingredient and it is Not a Chemical Preservative ................ 3
          1.   Sodium lactate is a natural ingredient comparable to
               many other ingredients commonly found in "natural"
               products... ............................................................... 3
          2.   Synthetic, artificial ingredients are readily
               identifiable and properly excluded from use in
               "natural" foods ......................................................... 6
          3.   Sodium lactate is not a chemical preservative ............. 7
          4.   The "chemical preservative" exclusion cannot be
               rationally interpreted to bar all preservatives .............. 8
          5.   Lactates have a long history of use as a natural food
               preservative, confirming the appropriateness of its
               use in natural meat and poultry products ..................... 9
     B.   PURAC's Sodium Lactate is Not More Than Minimally
          Processed ......................................................................... 11
II.  FSIS SHOULD NOT COMPROMISE THE SAFETY OF
     "NATURAL" PRODUCTS ..................................................... 12
     A.   Food Safety is Paramount to Any FSIS Regulatory Policy ........... 12
     B.   Sodium Lactate has Established Food Safety Benefits ................. 13
III. LONG-STANDING "NATURAL" POLICY HAS PROVEN
     FLEXIBLE AND EFFECTIVE - - RULEMAKING IS
     UNNECESSARY AND WOULD PROVE UNSUCCESSFUL ................. 15
     A.   FSIS "Natural" Policy is Effective Because it Allows for a
          Flexible Context-Specific Approach .................................. 15
          1.   FSIS policy must recognize that natural has various
               meanings and protect consumer expectations
               accordingly ............................................................. 15
          2.   Prior rulemaking efforts failed precisely because a
               single uniform definition is not practicable ................. 17
          3.   There are substantial disadvantages of a static
               regulation ................................................................ 19
     B.   Abrupt Shift in Policy in Response to Petition Lacks
          Rational Basis ................................................................. 20
          1.   Petition fails to establish consumer confusion as basis
               for new regulation ................................................... 20
          2.   Petition would not create consistent "natural" policy
               nor is such perfect consistency desirable or necessary ........ 22
IV.  FSIS LACKS BASIS FOR SIGNIFICANT SHIFT IN NATURAL
     POLICY ............................................................................. 24

\\\DC - 028652/000001 - 2418087 v7

D002294

A.     FSIS Has Failed to Articulate Justification for Policy
       Reversal ............................................................................24
B.     FSIS Has Not Been Presented with Any New Information
       that Warrants Change in Allowance of Sodium Lactate in
       "Natural Products" ...........................................................25
V.     ECONOMIC IMPACT OF THE PETITION ............................................26
A.     The Petition Limits Affordable Options for Pathogen Control
       and Preservation ................................................................27
B.     Petition Would Impose Significant Costs on All Parties
       Involved .............................................................................28
VI.    CONCLUSION...............................................................................28

D002295

# SUMMARY OF COMMENT

PURAC views the recent actions of the agency, reflected in its December 5, 2006 *Federal Register* Notice (the Notice), 1/ as premature and ill-considered. The FSIS's long-standing "natural" policy, developed in 1982 and updated over the years, has never served as a bar to the use of sodium lactate and other natural preservatives, nor should it. We have carefully reviewed the Hormel Petition (the Petition) 2/ referenced in the Notice and respectfully find that it fails to provide a sufficient basis for the requested action. PURAC also is deeply troubled by the procedural approach FSIS has adopted.

This comment sets forth the following.

- Sodium lactate derived from corn via fermentation complies fully with the longstanding "natural" regulatory policy in that it is neither a chemical preservative nor a synthetic ingredient and it is not more than minimally processed. 3/

- Sodium lactate from corn is not a chemical preservative. Similar to common salt, sugars, vinegars, spices, and wood smoke, sodium lactate is a natural preservative used predominantly to control pathogen growth and offers food processors a valuable tool to address a range of other technical effects.

- There is no legal or scientific basis for preventing sodium lactate or other antimicrobial or preservative ingredients in foods characterized as "natural." Preservatives that are themselves natural should be continued to be used in "natural" products.

- Barring sodium lactate and other natural preservatives lessens the food safety tools vital to the development of safe, wholesome "natural" products. FSIS should resist regulatory policies that contract rather than expand the food safety tools available to processors.

- In order to encompass or allow for the varied, appropriate meanings "natural" conveys to consumers, a flexible policy allowing for the case-by-case

1/    "Product Labeling: Definition of the Term 'Natural,'" 71 Fed. Reg. 70503 (Dec. 5, 2006).
2/    Hormel Foods Corp., "Petition for the Issuance of a Rule Regarding Natural Label Claims" (Oct. 9, 2006, revised Oct. 25, 2006) available at: http://www.fsis.usda.gov/Regulations_&_Policies/Petition_Natural_Label_Claims/index.asp.
3/    Throughout this document, any reference to "sodium lactate" or lactates generally should be considered to include potassium lactate. Also, any reference to "sodium lactate (from corn)" is intended to encompass lactates derived from any natural, renewable resource (*e.g.*, corn, beets, sugar cane).

1

D002296

assessment of the term now in place should continue.  The appropriateness of a claim will necessarily depend on the food, product category, and context. These considerations cannot be captured in a static regulation that over time will surely become outdated and prove unduly restrictive.

- Finally, the process followed by the agency in response to the Petition raises distinct concerns.  Overall, neither consumers nor industry would be well served by an attempt at rulemaking that we believe is ill-suited to ensuring that "natural" claims inform and not mislead consumers.  Rather, FSIS should resume its context-specific evaluation of "natural" claims through the prior label approval system.

\\\DC · 028652/000001 · 2418087 v7

D002297

I.    SODIUM LACTATE IN MEAT AND POULTRY PRODUCTS IS
      CONSISTENT WITH A "NATURAL" CLAIM

        The FSIS "natural" policy authorizes a "natural" claim if: (1) the
product does not contain any artificial flavor or flavoring, coloring ingredient, or
chemical preservative or any other artificial or synthetic ingredient; and (2) the
product and its ingredients are not more than minimally processed. 4/ Sodium
lactate satisfies this policy and has been used in numerous FSIS-regulated products
for which label approvals have been granted.

        A.    Sodium Lactate is Neither a Synthetic Nor an Artificial Ingredient and
              it is Not a Chemical Preservative

              1.    Sodium lactate is a natural ingredient comparable to many other
                    ingredients commonly found in "natural" products

        Synthetic or artificial ingredients are often easily distinguished based
on the materials from which they are derived. Sodium lactate is the sodium salt of
lactic acid, an organic acid. Through a proprietary manufacturing process,
PURAC's sodium lactate is derived from corn sugar via fermentation. The process
is designed to yield the L form of lactate, which is identical to lactate naturally
present in foods and in the human body. Corn sugar is fermented by bacteria to
obtain lactic acid, which is then filtered, evaporated, and purified. (As previously
noted, corn is one of several renewable source materials that can be used to produce
sodium lactate; sugar beet and sugar cane are others.) The lactic acid is then
neutralized to form sodium or potassium lactate for use in meat products.

        In contrast to synthetic, artificial and chemical preservatives, lactates
are naturally present in our body and the foods we eat. Lactate is a natural
constituent of all active skeletal muscle tissues, resulting from the anaerobic
glycolysis, or metabolism, of glucose. In the Krebs cycle, which generates energy for
active tissues using oxygen, the end products of glycolysis – pyruvate and L lactate
– are further metabolized to carbon dioxide and water. Under limited oxygen
conditions, pyruvate is converted to L lactate in order to regenerate certain cellular
chemicals that are needed for the citric acid to continue to produce energy. 5/
L lactates and/or L lactic acid are, therefore, natural constituents of human muscle

---

4/    U.S. Department of Agriculture, Food Safety and Inspection Service,
"Natural Claims" in *Food Standards and Labeling Policy Book* (Nov. 2006).
5/    Lactate is essentially a" metabolite, which must be converted back to
pyruvate before it can be further metabolized, and all tissues have significant levels
of the enzyme lactate dehydrogenase to facilitate the conversion. Most muscles,
including animal muscles used as food, contain a certain low level of lactate in the
living tissue. *See* L. Stryer, *Biochemistry* (2nd ed., W.H.. Freeman and Co. 1981).

\\\DC - 028652/000001 - 2418087 v7

D002298

tissue, with elevated levels present after strenuous exercise. 6/ A substance found in, and produced by, humans and animals conveys the natural status of PURAC's sodium lactate.

Consumers also regularly encounter lactate naturally occurring in many commonly consumed muscle foods. In the biological conversion of muscle to meat, muscles cells continue post mortem metabolism of glycogen to produce glucose and then produce L lactic acid via glycolysis, as mentioned above. 7/ Measurements of lactic acid in meat have been reported in numerous meat science publications, and the lactate concentrations naturally present in various foods include pork (1-1.2%, expressed as sodium lactate), salmon (0.6% expressed as lactic acid or 0.8-0.9% expressed as sodium lactate), hamburger (0.7% expressed as lactic acid), sausage (0.8% expressed as sodium lactate), bacon (0.6% expressed as sodium lactate), and frankfurters (0.8% expressed as sodium lactate). 8/ Sodium lactate, whether naturally occurring or added, is not synthetic or foreign to our bodies and the many foods we eat.

The natural status of sodium lactate is reinforced by its similarity to other food ingredients commonly viewed as natural.

- Common food grade salt undergoes significant purification to remove other mineral impurities. This can involve chemical treatment to facilitate precipitation of minerals such as calcium, magnesium and others. Anti-caking agents, such as tricalcium phosphate, calcium or magnesium carbonates, fatty acid salts (acid salts), magnesium oxide, silicon dioxide, sodium alumino-silicate, and alumino-calcium silicate, are added.

---

6/     *See* N. McCartney *et al.*, "Muscle power and metabolism in maximal intermittent exercise," *J. Appl. Physiol.* 60: 1164-9 (1986); H. Rothstein, *General Physiology: The Cellular Molecular Basis* 516 (Ginn and Co. 1971).

7/     The level of glycogen in muscle of a food animal will vary depending on nutritional status of the animal prior to slaughter. It can be as high as 1% of the weight of the tissue and essentially will be completely converted to lactic acid. Post mortem glycolysis that produces lactic acid results in the decrease in pH of muscle from the initial physiological value of 7.4. The pH of meat usually ranges from to 5.4 to 6.4 and more commonly is 5.8 to 6.0, reflecting the L lactic acid that is produced from post mortem glycolysis. The muscle then buffers this to a higher pH and the lactic acid is converted to a neutral salt, such as calcium, potassium or sodium lactate.

8/     Unpublished sampling data conducted by PURAC (2002-2006). *See also, The Physiology and Biochemistry of Muscle as a Food*, 2 (E.J. Briskey, R.G. Cassens, and B.B. Marsh eds., U. Wisc. Press 1970).

4

D002299

- Sugar is refined from sugar cane and sugar beets. They are crushed to release a sucrose-rich liquor that is refined through further processing. The crude liquor has large amounts of impurities including cellulosic fiber and soil particles. The crude liquor can be treated with lime and phosphoric acid to remove impurities before evaporation by boiling and/or with vacuum evaporation to ultimately crystallize the sugar. Decolorization methods use granular activated carbon, powdered activated carbon, ion exchange resins, and other materials.

- Vinegar is made from the oxidation of ethanol into acetic acid. The ethanol source can be wine, cider, beer, fermented fruit juice, or nearly any other liquid containing alcohol. Commercial vinegar is produced by fermentation using specific organisms, specifically yeast and *Acetobactor*, to first generate alcohol from a sugar source (*e.g.*, a grain, such as corn) and then to convert the alcohol into acetic acid.

- Spices are derived from plant materials, derived from various levels of processing and refining from their original source. Although these ingredients possess useful antimicrobial properties, this class of ingredients are not considered chemical preservatives, synthetic, or artificial ingredients.

Each of these examples illustrate the processing of a food ingredient starting with natural, renewable raw materials. These processing and treatment steps have not been viewed by FSIS as evidence that these ingredients are in some fashion synthetic, artificial, or chemical preservatives or more than minimally processed. There is no scientific or factual basis to single-out sodium lactate from these and other comparable natural ingredients.

Regulatory classification of natural and artificial flavors further reinforces the natural status of sodium lactate. FSIS define "natural flavor" as:

> The term "natural flavor," "natural flavoring," "flavor," or "flavoring" means the essential oil, oleoresin, essence or extractive, protein hydrolysate, distillate, or any other product of roasting, heating or enzymolysis, which contains the flavoring constituents derived from a spice, fruit or fruit juice, vegetable or vegetable juice, edible yeast, herb, bark, bud, root, leaf or any other edible portion of a plant, meat, seafood, poultry, eggs, dairy products, or fermentation products thereof, whose primary

5

D002300

function in food is flavoring rather than
nutritional. 9/

In the context of flavors, FSIS has identified the type of materials and processing
steps consistent with use of the term "natural". Starting from various raw
materials, a natural flavor can be derived by employing extraction, enzymolysis and
fermentation, among other processes. FDA devised a similar definition of a
"natural" flavor, which allows for comparable flexibility. 10/

The distinction drawn by the agencies between "natural" and
"artificial" ingredients is apparent and instructive. The source of the ingredient -
the raw material from which it is derived – is the primary focus for determining its
general qualities, attributes, and naming convention. This concept is a useful
parallel in understanding how FSIS and FDA have employed their respective
"natural" policies to ensure that such claims are used in a truthful, non-misleading
fashion.

    2.   Synthetic, artificial ingredients are readily identifiable and
        properly excluded from use in "natural" foods

FSIS readily distinguishes synthetic, artificial ingredients from
naturally-sourced ingredients in applying its "natural" policy. There are broad
categories of safe and suitable food ingredients that are not natural. We offer a few
examples of chemical preservatives that illustrate the marked contrast to sodium
lactate and other natural ingredients.

Butylated hydroxyanisole (BHA) is an antioxidant that is a mixture of
two isomeric organic compounds, (2-*tert*-butyl-4-hydroxyanisole and 3-*tert*-butyl-4-
hydroxyanisole) prepared from petrochemical-derived 4-methoxyphenol and
isobutylene. Another antioxidant, butylated hydroxytoluene (BHT), is also
produced from petrochemicals either by the alkylation of p-cresol with isobutylene
or by the dibutylation of m,p-cresol mixtures and separation of the resulting
butylates, both notably synthetic processes. A third antioxidant, *tert*-
butylhydroquinone (TBHQ), is also synthetically-derived from petrochemicals.

In contrast to PURAC's naturally-sourced sodium lactate, there are
synthetic forms of sodium lactate. The starting raw materials for synthetic lactic

---

9/    9 CFR § 317.2(f)(1)(i)(B). Note that FSIS has advised that commonly used
acids (*e.g.*, ascorbic, citric, lactic, etc.) must be designated by their specific name and
not by a collective term (*e.g.*, "flavors). This guidance pertains, of course, to the
appropriate terminology in connection with the naming conventions used in the
ingredient statement.

10/    21 C.F.R. § 101.22(a)(3).

6

D002301

acid are petrochemical in origin. 11/ Artificial flavors represents another class of ingredients that are reasonably understood as derived from non-natural source materials and thus are not permitted in natural products. For example, artificial vanillin is made through a two-step process from the petrochemical precursors guaiacol and glyoxylic acid.

       3.   Sodium lactate is not a chemical preservative

      Until very recently, FSIS categorically deemed sodium lactate (derived from corn) permissible in a "natural" product. The Notice confirms that the express allowance of sodium lactate was a product of the agency's long-standing practice of modifying this guidance "to reflect case-by-case decisions made by the Agency" and to "make it consistent with prevailing policies." 12/ It now appears that FSIS has inexplicably reversed course and views the antimicrobial characteristics of sodium lactate to conflict with the policy. As noted above, FSIS has yet to clearly articulate why sodium lactate is now considered at odds with a "natural" claim.

      In apparent response to the Petition, FSIS advised: "The Agency has come to recognize, based on the controversy that has arisen about 'natural' in recent months, that there is significant disagreement about aspects of the August 2005 policy modification, particularly the recognition of sodium lactate as an ingredient that could be included in products that bear a 'natural' claim." 13/ Reference is made to information received "that raises questions about when, and if, a food to which sodium lactate has been added would be fairly characterized as natural." 14/ The Petition, addressed below, offers that sodium lactate in a "natural" product "is inconsistent with the Policy's initial prohibition on chemical preservatives." 15/

      PURAC is greatly troubled by the apparent acquiescence to the Petitioner's views on sodium lactate. Even before the public hearing was held, FSIS revoked the portion of its "natural" policy that expressly allowed for the use of sodium lactate in "natural" products. Equally disturbing is a decision by FSIS to

---

11/    The side-by-side availability of naturally-sourced and synthetically produced sodium lactate is itself instructive. It is our understanding that FSIS, in making case-by-case determinations on "natural" ingredients, evaluates the source and commercial availability of comparable ingredients.

12/    71 Fed. Reg. at 70504.

13/    *Id.*

14/    *Id.*

15/    Petition at 10. The Petitioner argues that FSIS has adopted the FDA definition for chemical preservative which has long been referenced in the FSIS policy. FDA has defined a "chemical preservative" to include "any chemical that, when added to food, tends to prevent or retard deterioration thereof." The Petition suggests: "sodium lactate 'tends to prevent or retard deterioration' of food products to which it is added – it is a chemical preservative.

\\\DC · 028652/000001 · 2418087 v7

D002302

revoke existing label approvals for "natural" products containing sodium lactate    It is our understanding that such letters advise firms that if sodium lactate is used for its antimicrobial benefits that the label approval will be revoked. It appears that antimicrobial ingredients and other preservatives are, for the first time, deemed in conflict with a "natural" claim. 16/ It is puzzling how an ingredient is "natural" as a flavor but somehow becomes a synthetic, artificial, chemical preservative if added for its antimicrobial benefits.

The FSIS "natural" policy has not, and should not, be applied in a manner that prohibits the use of sodium lactate (or any other natural preservative) because of its useful antimicrobial/preservative properties. To view all such ingredients as "chemical preservatives" distorts the plain meaning of the "natural" policy and will effectively bar the use of traditional and newer antimicrobial preservative ingredients that otherwise fully comply with the two-prong "natural" policy.

> 4.   The "chemical preservative" exclusion cannot be rationally interpreted to bar all preservatives

On its face, the meaning of "chemical preservative" is so broad as to render the term largely meaningless for setting limits on the use of a "natural" claim. All things found in nature are chemicals. Moreover, a literal application of FDA's definition of "chemical preservative" would bar any ingredient or processing method that "tends to prevent or retard deterioration." 17/ Virtually any form of preservation, dating back thousands of years, would be prohibited from bearing a "natural" claim if FSIS follows this path. A policy that bars sodium lactate and other antimicrobial/preservative ingredients would effectively "read-out" the term "chemical" from the prohibition whereby all preservatives and forms of preservation would disqualify use of the "natural" claim. 18/

The meaning of "chemical preservative" is most appropriately determined in the context of the policy. Of course, "preservative" is tied to and limited by "chemical" such that not all preservatives are precluded from use in

---

16/    As discussed later in our comments, we find this position surprising given that the antimicrobial properties of sodium lactate have been well known to the agency and the food industry for years.

17/    "Deterioration" in the food context can relate to a myriad of issues, including microbial growth, spoilage, or lack of pathogen control; loss of appropriate color, flavor or taste profiles; or reduction of nutritional value.

18/    Literally applying the FDA definition of "chemical preservative" arguably takes the term out of context. While it may have seemed reasonable to include this cross-reference in 1982, FSIS must determine what constitutes a "chemical preservative" in a manner that is reasonable and appropriate in the context of a "natural" claim.

8

D002303

"natural" products. Moreover, "chemical preservative" is followed by the phrase "or any other artificial or synthetic ingredient." A chemical preservative barred by the policy are those ingredients that are akin to "other artificial or synthetic" ingredients. The FSIS policy cannot be construed to bar all preservatives.

     5.    **Lactates have a long history of use as a natural food preservative, confirming the appropriateness of its use in natural meat and poultry products**

Beyond the regulatory parameters for "chemical preservative," the natural characteristics of sodium lactate are underscored by comparing sodium lactate to many other commonly used ingredients that satisfy the two-prong "natural" policy and exert known antimicrobial and other preservative affects on meat and poultry products.

Lactate salts and lactic acid, as products of fermentation, have been used for food preservation and flavoring purposes for thousands of years. Fermented foods likely were among the first foods consumed by humans because fermentation was inevitable when raw food materials were not consumed prior to the development of substantial microbial growth. For example, when milk was collected, it had to be consumed in a matter of hours or else it would sour and curdle. However, controlled fermentation of milk or fractions could preserve the milk in the form of cheese and yoghurt. It likely was recognized that fermented foods were less perishable and safer to consume than their raw ingredients from which they were made. [19] The salting of meat, of course, allowed for long sea voyages and provided a form of preservation that enabled Europeans to reach America.

In the 19th century, Pasteur recognized that microorganisms were responsible for the fermentation of milk and other foods. This discovery gave rise to the development of the modern day fermented foods. Lactic acid bacteria are among the most frequently used microorganisms in fermented foods, used for preservation of cheese, milk, yogurt, sausages, pickles, olives, and sauerkraut. Lactic acid can be present at 1-1.5% in these products. [20] As both a preservative and a flavor, lactic acid also is added to acidified foods, such as pickles, dairy, salads, dressings, and beverages, while lactate salts are used in foods with near neutral pH, such as meat and poultry products.

Modern food fermentations involve formulation of the products with an added sugar as an ingredient and addition of a starter culture inoculum. The material is held under conditions that facilitate growth of the organism during

---

[19]    R.W. Hutkins, *Microbiology and Technology of Fermented Foods*, (Blackwell Publishing 2006).

[20]    B. Ray and M. Daeschel, *Food Biopreservatives of Microbial Origin*. (CRC Press 1992).

9

D002304

which time it anaerobically metabolizes the sugar to support its growth. The products of metabolism include a number of preservative compounds, including organic acids, amino acids, esters, fatty acids, and nucleotides.

The particular acid produced by the fermentation is dominated by the selection of the culture organism but is also significantly influenced by the added sugar and conditions of production. The acid production can have an important influence on the texture of the product by gradually denaturing proteins during the fermentation process. Acetic, lactic, and propionic acids are produced in abundance as by-products of the fermentation and are major characteristics of the products. Acetic acid fermentations are used to produce vinegars and pickles. Lactic acid fermentations are significant for fermented sausages, yoghurt and some pickles. Propionic acid fermentations are important for some cheeses most notably Swiss cheese. Notably, the yeast used in producing bread generates carbon dioxide which provides the leavening activity but also can produce measurable quantities of lactic and acetic acids in sourdough products. Fermented beverages typically employ yeast to produce alcohol.

The capacity of lactic acid bacteria to produce large amounts of lactic acid is one of the factors contributing to their ecological success. Lactic acid and lactates inhibit the growth of non-lactic acid bacteria, specifically the outgrowth of pathogens and spoilage bacteria. The suggested mechanisms of antimicrobial action of lactic acid and lactates include feedback inhibition, intracellular acidulation, interference with proton transfer across cell membranes, and reduced water activity, with the undissociated and dissociated forms contributing a combined effect. 21/ In comparison to salt, both reduce water activity, act to suppress pathogen growth, and serve as flavor enhancers through surface, injection, or emulsion applications. Herbs and spices can have some antioxidant and antimicrobial properties. Such properties have been ascribed to mustard, cinnamon, cloves, hops, rosemary, and garlic.

Prohibiting an ingredient solely because it exerts an antimicrobial or any other preservative effect in the food in which it is incorporated is nonsensical. There are numerous dual- or multi-use ingredients that comply with the fundamental requirements of the "natural" policy and possess preservative properties in addition to other functions (*e.g.*, flavors, nutrients, binders, humectants, stabilizers). For example, few consumers would question the use of salt, vinegar, or rosemary, or citric acid in a "natural" product, yet their preservative properties would appear to be at odds with the policy proposed by the Petitioner. FSIS has further complicated matters by calling-out only the use of sodium lactate as a preservative without questioning the many other ingredients that possess similar characteristics. In PURAC's view, all of these ingredients are

---

21/    R.G. Cassens, *Meat Preservation: Preventing Losses and Assuring Safety*, 91 (Food & Nutrition Press, Inc. 1994).

D002305

appropriate for use in a "natural" product because they are consistent with the agency's two-prong policy.

     B.    PURAC's Sodium Lactate is Not More Than Minimally Processed

     FSIS has already determined that sodium lactate from corn is not more than minimally processed. In its Notice, letters to individual companies, and in other statements by agency officials there has been no indication that the agency would, for the first time, consider sodium lactate (derived from corn or other agricultural commodity) as more than minimally processed. Indeed, there is no rational basis upon which the agency could support such a finding.

     In August 2005, FSIS updated the "natural" policy "by acknowledging that sugar, sodium lactate (from a corn source), and natural flavorings from oleoresins or extractives could be acceptable for products bearing 'natural' claims." 22/ The Notice in turn reflects the agency's new-found concern that sodium lactate is not appropriate for use in "natural" products due to its antimicrobial properties. On an interim basis, the Notice advises of a case-by-case approach where the agency will examine factors "such as the level used, the claimed technical effect of the sodium lactate, and the actual effect that it is having on the product." 23/ The recent agency letters questioning label approvals for "natural" products containing sodium lactate similarly focus on the antimicrobial properties of the ingredient.

     PURAC's sodium lactate is not more than minimally processed. The primary processing step of PURAC's sodium lactate is the fermentation of corn sugar to create L lactic acid, which is then filtered, evaporated, and purified. The L lactic acid is then neutralized to form a lactate salt for use in meat products. The fermentation is specifically listed as a traditional process that is no more than minimal processed. Aside from fermentation, the other primary steps involve physical separation and isolation steps that are common in the food manufacturing industry for a variety of food and food ingredients that are widely accepted as "natural."

     The reasonableness of finding sodium lactate (from corn) as not more than minimally processed is underscored by past agency decisions finding other ingredients to be no more than minimally processed. For example, the agency has determined that sea salt, "native" corn starch, and a variety of dried spices, including celery powder, meet this criterion. Moreover, minerals, such as potassium chloride, that are mined from the earth and processed by physical means are consistent with the minimal processing requirement.

---

22/    71 Fed. Reg. at 70504.

23/    *Id.*

\\\DC - 028663/000001 - 2415087 v7

D002306

## II.    FSIS SHOULD NOT COMPROMISE THE SAFETY OF "NATURAL" PRODUCTS

There is no question that FSIS has embarked upon a path that will force food processors to abandon proven, valuable food safety tools in order to qualify for a "natural" claim. It is alarming that FSIS has already taken concrete steps to weaken valuable barriers to potential food safety problems. Consumers should not be forced to choose between "natural" products and safety.

FSIS and food manufacturers have made great strides to control the presence and growth of pathogens and spoilage organisms in all types of meat and poultry products. The optimal use of various natural preservatives depends on a host of factors unique to a given product. Sodium lactate and other ingredients offer an effective food safety-related tool that is vital to the vast majority of the food industry. It is unreasonable that FSIS has notified nearly 30 companies that the intentional use of natural ingredients as antimicrobials prohibits the use of "natural" on food labels.

### A.    Food Safety is Paramount to Any FSIS Regulatory Policy

Over time, manufacturers of meat and poultry products have promoted a multiple hurdle approach to microbial control. This approach, developed by Felix Leistner of the German Meat Research Institute, focuses on the concept that small, individual barriers to microbial contamination and growth would cumulatively promote food safety more effectively than a single large control measure. Prime examples of the barriers used in the multiple hurdle approach to microbial control include adequate sanitation and quality of raw materials, minimizing the risk of recontamination, formulation of the product to prevent growth of pathogens, refrigeration during distribution, and sanitary packaging measures.

During the last decade, a number of critical ingredients, including sodium and potassium lactate, sodium diacetate, and sodium acetate, have been approved for use in meat and poultry products as effective secondary barriers for control of pathogens and other microbes. 24/ Appropriately, the collective rule authorizing these ingredients was adopted by the agency as an interim final rule to speed their availability and use by food processors.

Food manufacturers have achieved an unprecedented level of food safety through the development and use of tools that inhibit growth of pathogens

---

24/    See e.g., "Food Additives for Use in Meat and Poultry Products: Sodium Diacetate, Sodium Acetate, Sodium Lactate and Potassium Lactate," 65 Fed. Reg. 3121 (Jan. 20, 2000).

12

D002307

and other microorganisms. 25/ In particular, the multiple hurdle approach and the *Lm* regulations, discussed below, represent flexible means for controlling pathogens and spoilage organisms that can incorporate a variety of ingredients, methodologies, and innovative technologies. An effective "natural" policy will provide manufacturers of "natural" products with the flexibility necessary to achieve food safety in any manner consistent with the two fundamental requirements of the policy.

 B.    Sodium Lactate has Established Food Safety Benefits

 The food safety benefits of sodium lactate are well-established scientifically and by regulation. It is a valuable secondary barrier for pathogen control that has been adopted widely throughout the food manufacturing industry. Sodium and potassium lactate were introduced as processed meat ingredients to improve safety of products in the mid 1980's. Initially the applications were in uncured poultry and roast beef products and the applications were for an added barrier against potential botulism in cook-in-the-bag (*i.e.* package) uncured roasts. Packaging film technology had progressed at this point to permit production of many cook-in-the-bag products in plastic films rather than metal cans. These products had great consumer and food service industry appeal and a long shelf-life because they were effectively pasteurized to eliminate spoilage organisms and there was no potential for recontamination until the package was opened by the customer.

 However, packaging film technology did not directly address the risk from *Clostridium botulinum* (*C. botulinum*) spores that would naturally be in raw meat. Many meat processors embraced the use of sodium and potassium lactate in these products for the purpose of increasing their food safety profile. 26/ This and other steps are deemed prudent as the industry strives to develop ever-improved means to minimize the potential of food safety risk.

---

25/    In 1999, the Center for Disease Control (CDC) estimated foodborne related illness to afflict as many as 76 million people annually in the United States with Listeria being in the top three as a cause of up to 5000 annual deaths. *See* P.S. Mead *et al*., "Food-related illness and death in the United States," *Emerging Infect. Dis.* 5: 607-625 (1999). This sparked intense public and governmental pressure on the entire food industry to improve food safety which continues today. Tremendous improvements have been made as reported by the CDC in 2006. *See* CDC, "Preliminary FoodNet data on the incidence of infection with pathogens transmitted commonly through food – 10 states, United States, 2005," *Morbidity and Mortality Wkly Rep.* (*MMWR*) 55: 392-395 (Apr. 14, 2006). Lactate ingredients, including sodium lactate, have made a significant contribution in equipping food processors with a vital tool for maximizing ready-to-eat meat and poultry products.
26/    *See* M.R. Maas, *et al.* "Sodium lactate delays toxin production by Clostridium botulinum in cook-in-bag turkey products," *Appl. Environ. Microbiol.* 55: 2226-2229 (1989).

13

D002308

Further research into the effects of lactate revealed that it also had antimicrobial activity against some other pathogens, most notably *Listeria monocytogenes* (*Lm*). The effect was very dramatic in cured processed meats (nitrite added products) though less so in uncured items. However, it was not widely applied to products until after the large 1998 Listeriosis outbreak that was traced to consumption of cured sliced luncheon meats and hot dogs. 27/

Additional research subsequent to the outbreak confirmed the benefit to public health of using lactate and another synergistically active ingredient, sodium diacetate, in cured processed meats to suppress the potential of *Listeria* growth in processed meats if the product was inadvertently contaminated by this zero-tolerance pathogen. The processed meat industry initiated formula conversions in 2001-2002 after the research had been validated. 28/ Large Listeriosis outbreaks such as the one in 1998, noted above, have been limited since 2002, in part by use of lactate in a significant proportion of processed meat products. Total cases of Listeriosis also have declined and are approaching the 2010 public health goals established by the Clinton Administration. 29/

The dramatic food safety benefit attributed to the use of lactate and diacetate and the intense activity of the meat industry to reduce the risk of *Listeria* contamination in processed meat products led to the Lm regulations. 30/ During the comment period following the issuance of this interim final rule, FSIS publicly stated that the agency considered the use of lactate/diacetate technology as an

---

27/    CDC, "Multistate outbreak of Listeriosis – United States," *Morbidity and Mortality Wkly Rep.* (*MMWR*) 47: 1085-86 (1998).

28/    Although lactate could by itself suppress *Listeria* growth when used at high levels, diacetate was added to the antimicrobial technology to take advantage of synergies between the ingredients. Thus, the combination was employed based on models that were developed and extensively validated. *See* J.R. Sabah, *et al.* "Effect of spices and organic acids on the growth of Clostridium perfringens during cooling of cooked ground beef," *J. Food Prot.* 67: 1840-1847 (2004); J.D. Legan, *et al.* "Modeling the growth boundary of Listeria monocytogenes in ready-to-eat cooked meat products as a function of the product salt, moisture, potassium lactate, and sodium diacetate concentrations," *J. Food Prot.* 67: 2195-2204 (2004); F. Leroi, *et al.* "Effect of salt and smoke on the microbiological quality of cold-smoked salmon during storage at 5°C as estimated by the factorial design method," *J. Food Prot.* 63: 502-508 (2000); and J.H. Schlyter, *et al.* "The effects of diacetate with nitrite, lactate, or pediocin on the viability of Listeria monocytogenes in turkey slurries," *Int'l. J. Food Microbiol.* 19: 271-281 (1993).

29/    *See* CDC, *MMWR, supra* note 25.

30/    *See* 68 Fed. Reg. 34207 (June 6, 2003).

14

D002309

example of an Alternative 2 compliance by processors to address the requirements for *Listeria* risk control. 31/

As recently as May 2006, FSIS explicitly discussed lactate in a compliance guidance document and included a selective literature summary. Notably, publications demonstrating inhibition of Listeria growth at less than 2% usage levels, which are considered flavoring applications, are included in the appendix. 32/

As discussed above, barring ingredients that are employed for their antimicrobial properties will affect far more than just sodium lactate. Indeed, it remains uncertain what food safety tools would be available for use in natural products if sodium lactate and other natural preservatives are barred from use in "natural" products.

III. LONG-STANDING "NATURAL" POLICY HAS PROVEN FLEXIBLE AND EFFECTIVE -- RULEMAKING IS UNNECESSARY AND WOULD PROVE UNSUCCESSFUL

A. FSIS "Natural" Policy is Effective Because it Allows for a Flexible Context-Specific Approach

1. FSIS policy must recognize that natural has various meanings and protect consumer expectations accordingly

PURAC is pleased and readily agrees with the agency's observation in the Notice that regulation of "natural" is only possible by considering the context in which the term appears on the food label. The Notice states:

According to the 1982 policy, the decision of the Agency to approve or deny the use of a "natural"

---

31/ *See generally*, M. Pierson, "Food safety policy at USDA: the road from an ambitious vision to tangible results," Remarks Prepared for the International Association for Food Protection's 91st Annual Meeting (Aug. 10, 2004), *available at* http://www.fsis.usda.gov/News_&_Events/Speech_081004_Pierson/index.asp.

32/ U.S. Department of Agriculture, Food Safety and Inspection Service, "Compliance guidelines to control Listeria monocytogenes in post-lethality exposed ready-to-eat meat and poultry products," 96-97 (May 2006) *available at* www.fsis.usda.gov/oppde/rdad/FRPubs/97-013F/LM_Rule_Compliance_Guidelines_May_2006.pdf, citing B.K. Bedie, *et al.* "Antimicrobials in the formulation to control *Listeria monocytogenes* postprocessing contamination on frankfurters stored at 4° C in vacuum packages." *J. Food Protect.* 64: 1949-1955 (2001); J.G.K. Samelis, *et al.* "Control of *Listeria monocytogenes* with combined antimicrobials after post-process contamination and extended storage of frankfurters at 4°C in vacuum packages." *J. Food Protect.* 65: 299-307 (2002).

15

D002310

> claim may be affected by the specific context in which the claim is made. For example, claims indicating that a product is "natural" food, e.g., "natural" chili or "chili—a 'natural' product" would be unacceptable for a product containing beet powder which artificially colors the finished product. However, "all natural ingredients" might be an acceptable claim for such a product. 33/

Context is so critical to regulation of this specific claim due to its varied meanings across diverse categories of food products.

Any definition for "natural" that is adopted by FSIS through policy or regulation must be consistent with consumer expectations for the use of the term. 34/ The common or ordinary meaning of words is often established by the definition in a dictionary. 35/ A typical definition for "natural" is "present in or produced by nature," a broad, generic definition that is likely to have different implications depending on the context in which it is used. 36/ "Natural" terminology is not unfamiliar to consumers. Originating in "health food stores" and other niche markets, "natural" foods are becoming more mainstream as the youthful generation of baby-boomers join the ranks of seasoned consumers with interests in diet, health, and a return to the wholesomeness of foods now featured in several natural and organic retail formats as well as established supermarkets and other retailers.

Aside from the broad definition for "natural," a variety of other dictionary definitions exist for the term "natural" that could apply in food-related contexts. For example, "natural" could mean "of, relating to, or concerning nature," "having a particular character by nature," "free from pretense or artificiality," "not treated, altered, or disguised," "faithfully representing life or nature," or "being a primitive or unregenerate state." 37/ The variety of "natural" products in the marketplace today reflects this reality. The term "natural" is used on meat and poultry products, soaps and cosmetics, produce, dairy products, and breads. Even a well-known beer bears this term.

FSIS has a long standing policy that provides for a context-specific approach to defining and applying the term "natural." The government should not,

---

33/  71 Fed. Reg. at 70504.
34/  *See* 9 CFR § 317.2(c)(1); *see also* 21 CFR §§ 101.3(b) and 102.5(a).
35/  *See United States v. General Foods Corp.*, 446 F.Supp. 740, 744 (1978); *United States v. 44 Cases*, 101 F.Supp. 658, 664 (1951).
36/  Entry for "natural" in *Webster's II New College Dictionary* (Houghton Mifflin Co. 1995) at 729.
37/  *Id.*

16

D002311

and ultimately cannot, try to either capture nor dictate consumer understanding of a term that decidedly does not lend itself to a one-size-fits-all definition.

>    2.    Prior rulemaking efforts failed precisely because a single uniform definition is not practicable

The need for a flexible definition of "natural," such as that found in FSIS's current policy, has been recognized over the past 30 years through the attempts by FSIS, FDA and FTC to define the term by regulation. On each occasion the agency found a uniform, one-size-fits-all definition to be unobtainable notwithstanding persistent efforts to achieve this ultimately unachievable goal.

The FTC was the first agency to attempt rulemaking to define "natural." The agency issued a proposed rule in 1974 to address a variety of food advertising issues, including use of the term natural. In documents associated with the proposed rule, FTC staff recommended the term "natural" should be prohibited, although ancillary factual statements, such as "does not contain any artificial preservatives," should be allowed. 38/ The staff proposal was not adopted by the agency. In 1975, a notice of proposed rulemaking for food advertising issues was reissued, 39/ and FTC initiated a series of extensive public hearings on certain claims, including "natural" the following year. 40/

The FTC hearings led to the November 1978 publication of the Bureau of Consumer Protection's "Staff Report and Recommendations." In reference to the growing administrative record before it, the Staff noted that it was "abundantly clear that there is no generally accepted definition, either regulatory or scientific, which delimits the appropriate use of the term natural as applied to food." 41/ The report further stated "the scope of the problem can be illustrated simply by reference to Webster's Third International Dictionary, which lists 33 definitions for the word 'natural,' at least six of which are applicable to food." 42/ Although it was noted that "a natural food is generally recognized as not containing artificial additives or other artificial ingredients," it was recognized that "the major limitation of the regulatory approach ...is the difficulty in formulating the applicable standards." 43/

---

38/    *See* "Proposed Trade Regulation Rule; Explanation of Proceeding and Analysis; Statement of Issues; Opportunity to Submit Data, Views or Arguments," 39 Fed. Reg. 39842 (Nov. 11, 1974).

39/    *See* 40 Fed. Reg. 23086 (May 28, 1975).

40/    *See* 41 Fed. Reg. 8980 (Mar. 2, 1976).

41/    "Staff Report and Recommendation, Proposed Trade Regulation Rule on Food Advertising," 16 CFR Part 437, Phase I (Sept. 25, 1978) at 209.

42/    *Id.* at 210.

43/    *Id.* at 226.

\\\DC - 028653/000001 - 2418087 v7

D002312

Following a decade of rulemaking, the conclusions reached by the FTC are telling. The effort was terminated in 1983, with then-FTC Chairman, James C. Miller III, noting the difficulty of defining the term because "the context in which 'natural' is used determines its meaning." 44/ He further explained: "It is unlikely that consumers expect the same thing from a natural apple as they do from natural ice cream.

The proposed rule assumes, without any evidence, that natural means the same thing in every context." 45/ By extension, recognition that "natural" doesn't mean the same thing in every context dictates the need for, and explains the longstanding regulatory approach, which places a premium on case-by-case review in place of a mandatory, inflexible regulation.

USDA and FDA learned similar lessons when it joined the FTC in holding public hearings in 1978 intended to settle (among other issues) the definition of natural. Public hearings, testimony and a full deliberation produced no call for a formal regulation or further rulemaking. Rather, the following year FDA and USDA announced different approaches to use of the term. FDA stated that it will "not attempt to restrict such claims because it believes that the development and enforcement of standards in this area would be difficult ...." 46/ FSIS opted to review "natural" claims under its pre-market label review program, affording precisely the context-specific review that the agency Notice underscores is of paramount importance. 47/

FDA solicited comments on the use of the term "natural" in the early 1990s as part of the proceedings to implement the Nutrition Labeling and Education Act of 1990 (NLEA). Notwithstanding this interest to once again revisit the possibility of a "natural" regulation, the agency found that "none of the comments provided FDA with a specific direction to follow for developing a

---

44/    "Termination of Proposed Trade Regulation: Rule on Food Advertising," 48 Fed. Reg. 23270 (May 24, 1983).

45/    *Id.*

46/    "Food Labeling: Tentative Positions of Agencies," 44 Fed. Reg. 75990, 76012 (Dec. 21, 1979). FDA's decision is not surprising. In supporting documentation, the agency noted its attempts in the early 1970s to develop policy definitions for the use of "natural," which "never progressed enough even for internal guidance, because FDA was unable to arrive at clear cut definitions." FDA, "Food Labeling Background Papers" at 120.

47/    *See id.* This practice, initially memorialized in 1982 in Policy Memorandum 055, continues to this day. U.S. Department of Agriculture, Food Safety and Inspection Service, "Policy Memorandum 055: Natural Claims," (Nov. 22, 1982).

18

D002313

D002314

definition ..." 48/ This conclusion has been reaffirmed as recently as 2005 when the agency denied consideration of a citizen petition to define "natural." In its response letter to the petitioner, FDA stated: "You have not provided us with any information that wasn't considered in issuing our final rule in 1993 that would assist us in developing a definition regarding the use of the term 'natural,' thereby allowing us to move away from our current policy." 49/

Thirty years of regulatory interest and effort has not produced a regulation because the term has a variety of meanings depending on the context in which it was used and because a flexible policy approach provided ample guidance on how the term should be used. FSIS should heed the lessons learned from these past failures to adopt one-size-fits-all formal regulation and continue to apply the term "natural" via its time-tested, flexible, and effective policy approach.

3.    There are substantial disadvantages of a static regulation

There are significant drawbacks to FSIS's decision to define "natural" by regulation. The definition of a regulated term commonly proves to be unworkable because the definition does not provide for the flexibility to accommodate new developments associated with the term. Of primary concern, the definition cannot be effectively amended as needs permit because of the inherent time-consuming nature of the rulemaking process. Notice and comment rulemaking typically takes 18 to 24 months to complete under the best of circumstances. It is unlikely that FSIS could devote (nor should it devote) the resources necessary to keep a "natural" regulation current.

Food labeling claims also create economic incentives to manufacturers for their use. In short, manufacturers try to readily develop products that meet consumer demands. The policy approach for use of the term "natural" adopted by both FSIS and FDA provides for the context-specific analysis of its use and has allowed for the development of an increasing number of "natural" products in the marketplace over the last 25 years as consumer interest in these products has increased. Confining "natural" within a static regulatory definition would unduly restrict the development of meat and poultry products able to bear a "natural" claim, thereby severely curtailing the economic incentives to develop new food products sought by consumers.

---

48/    "Food Labeling: Nutrient Content claims, General Principles, Petitions, Definition of Terms; Definitions of Nutrient Content Claims for the Fat, Fatty Acid and Cholesterol Content of Food," 58 Fed. Reg. 2302, 2407 (Jan. 6, 1993).

49/    Letter from Margaret O'K. Glavin, Associate Commissioner for Regulatory Affairs, FDA, to Antonio Zamora (Dec. 12, 2005).

19

D002315

B.     Abrupt Shift in Policy in Response to Petition Lacks Rational Basis

The Petitioner makes two assertions in support of its request to FSIS to define "natural" by regulations and alter the August 2005 "natural" policy in the interim: (1) consumers are confused by current usage of the term "natural" and want it defined by regulation, and (2) a regulatory definition for "natural" would provide consistency for its use. Neither of these assertions are true or supported by the Petition. Even before public comment was requested, FSIS unwisely acted in a manner that has effectively granted significant portions of the action requested by the Petition.

1.     Petition fails to establish consumer confusion as basis for new regulation

Throughout the Petition, the Petitioner contends consumers are confused by the use of the term "natural." The Petitioner states: "Consumers are confused as to the specific meaning [of natural] ...;" 50/ but no evidence is presented to support this statement. The Petitioner then quotes FDA stating "that uses of 'natural' claims are confusing and misleading to consumers and frequently breach the public's legitimate expectations about their meaning." 51/ However, this statement was made by FDA in its 1991 proposed rulemaking on "natural," which in turn relies upon statements about consumer confusion made by the staff of the FTC in the late 1970s and early 1980s. 52/ The dated nature of this statement and lack of any additional evidence regarding consumer understanding of "natural" do not suggest that today's consumers are confused about the meaning of the term.

The Petitioner states: "On the other side of this interest in food labeling, however, is continued consumer confusion regarding the meaning of 'natural.'" 53/ The citation for this statement is an article that discusses the term "organic" and offers no support to the claim that consumers are confused by the meaning of "natural." The Petitioner further notes: "Consumer research continues to report confusion among consumers as to the meaning of 'natural' ...." 54/ The Petitioner appears to attribute this statement to a 2002 survey conducted by the National Consumers League (NCL), but the survey merely reflects that consumers view the term "natural" differently depending on the context in which it is used. Finally, the Petitioner states: "Consumers are confused and mistrustful." 55/ Once again, no evidence is proffered in support of this statement.

---

50/     Petition at 4.
51/     *Id.* at 5.
52/     *See* Petition at 5; 56 Fed. Reg. 60421, 60466 (Nov. 27, 1991).
53/     Petition at 6.
54/     *Id.* at 7.
55/     *Id.* at 12.

20

D002316

Moreover, the Petitioner asserts that consumers seek greater federal regulation of the term "natural" and that they want the federal agencies to engage in formal rulemaking on the subject.  For instance, the Petitioner notes

> Survey results cited by the National Consumers League state focus group participants "unanimously agreed that there was a need for greater regulation of the 'natural' products regarding labeling, advertising, and industry standards." Consumers report interest in regulation that would define "natural" and develop standards to control the presence of preservatives, chemicals, additives and the degree of processing. 56/

The Petitioner also references a consumer survey in a petition submitted to FDA by the Sugar Association, which requested that agency to adopt the FSIS "natural" policy in place of its own.  The Petitioner states "That survey concluded 83% of respondents thought the agencies should implement rules governing 'natural' label claims." 57/

It is difficult to fully evaluate these statements and characterizations as the NCL study is not included with the petition nor is it otherwise publicly available.  It is possible that the survey asked only "if" there was a need for federal oversight of "natural" and not "how" such oversight should take place or in what fashion a policy or regulation should be maintained.  The resulting data fail to explain the extent of consumer knowledge regarding the current role the agencies play in regulating use of the "natural" claim, and it is not clear what government involvement is sought by respondents.  The Sugar Association survey similarly asks consumers if there should be government oversight, not whether there is a compelling need or in what way the term "natural" should be regulated.

While the Petition frames the need for government rulemaking in terms of consumer protection, the Petition fails to establish an empirical basis for the requested action.  FSIS has, as a result, unwittingly made significant changes to its "natural" policy without a basis for doing so.  Moreover, the questions properly considered by the agency relate to the "how" not "if" of "natural" claims regulation.  Against the backdrop of a context-specific approach, and the failure of previous attempts at rulemaking, FSIS should remain mindful of what works and what does not.

---

56/    *Id.* at 7.
57/    *Id.* at 8.

21

\\\DC - 028652/000001 - 2418087 v7

D002317

2.  Petition would not create consistent "natural" policy nor is such perfect consistency desirable or necessary

The Petitioner alleges "The August 2005 change to the ... Natural Policy renders the policy's guidance internally inconsistent and creates confusion ..." and "the interests of consumer protection and confidence require clarity and certainty in the use of the word 'natural' on product labeling." 58/ In fact, the August 2005 policy is consistent with the "natural" policy as it has been applied in practice by FSIS for years – a policy in which ingredients were considered on a case-by-case basis when appropriate. Critical of the current context-specific approach long in place, the Petition recommends an approach riddled with inconsistency. Furthermore, the Petitioner's criticism of the so-called "inconsistencies" in the August 2005 policy falls flat because the proposed framework for defining "natural" contains numerous contradictions and inconsistencies, as well.

The Petitioner takes issue with the two modifications FSIS makes in the 2005 "natural" policy that explicitly provide for the use of sodium lactate (from corn) and ingredients on the National Organic Program's National List in products bearing a "natural" claim. The Petitioner alleges that these provisions "create inconsistency within the Policy and, consequently, the potential for consumer confusion and erosion of the significance of the natural claim." 59/ Specifically, the Petitioner argues that the use of sodium lactate, which has antimicrobial properties at any use level, contradicts the policy's prohibition on chemical preservatives, while the use of any ingredient on the National List, which includes a limited variety of synthetic ingredients, is at odds with the policy's prohibition of such substances.

However, the two modifications to the policy noted by the Petitioner do neither significantly change the 1982 policy it replaces nor add new inconsistencies. In fact, the August 2005 policy revision only serves to memorialize FSIS's application of the policy prior to this date. We reiterate the agency's explanation:

> FSIS modified the guidance on occasion to make it consistent with prevailing policies, to reflect case-by-case decisions made by the Agency, and to update references to regulations. In August 2005, FSIS modified the guidance by acknowledging that sugar, sodium lactate (from a corn source), and natural flavorings from oleoresins or extractives

---

58/    *Id.* at 1.
59/    *Id.* at 3.

22

D002318

could be acceptable for products bearing 'natural' claims. 60/

In addition, the 1982 policy had a variety of exceptions to the two fundamental requirements for a "natural" claim. These include the allowance, on a case-by-case basis, of ingredients in a "natural" product that are more than minimally processed but do not significantly change the character of the product and the recognition that the decision to approve or deny the use of a "natural" claim is context-specific.

The Petitioner seeks to propose a rigid framework for defining "natural," but the proposal includes a variety of exceptions and inconsistencies, as well. First, throughout its discussion of the issues and it proposed policy, the Petitioner never defines the terms "chemical preservative," "natural preservative," "preservative," and "antimicrobial" and uses them as synonyms on the one hand and to delineate differences between ingredients on the other. Second, the Petitioner's proposed policy contains not only the prohibition on chemical preservatives that is part of the existing policy but also states "Beyond the definition of 'chemical preservative' … it is intended that any substance, either natural or chemical, which serves to retard product deterioration as a result of microbial action would not be allowed in products which carry an all natural claim." 61/ While sodium lactate specifically is called out as possessing such antimicrobial properties, this language used by the Petitioner would seemingly indict all natural preservatives, whether or not they are exempted from the FDA's definition of "chemical preservative," which is incorporated by reference in FSIS's "natural" policy.

Third, a categorical exemption is written into the Petitioner's policy that provides for the use "of otherwise natural ingredients which contain unavoidable incidental additives or processing aids (as defined in 21 CFR 101.100(a)(3)) which may not themselves be considered as natural." 62/ Stated examples of such ingredients are (but not limited to) calcium silicate, magnesium oxide, calcium carbonate, dimethylpolysiloxane, and sodium aluminosilicate. The apparent rationale for this categorical exemption includes the assertion that "[p]rocessing aids, such as anticaking or antifoaming agents, have functions in foods that are considered to be physical rather than chemical," 63/ a distinction that is not found in the existing policy and whose basis is unclear.

Finally, the Petitioner appears to support the minimal processing requirement of FSIS's long-standing "natural" policy, but positions the Petition to allow for "any technological means of qualifying foods for use of the claim. This

---

60/   71 Fed. Reg. at 70504.
61/   Petition at 13-14.
62/   *Id.* at 14.
63/   *Id.*

23

D002319

allows for the use of new technologies, especially advances in minimal processing, to create maximum flexibility." 64/ We find it intriguing – and notably inconsistent – that the Petitioner seeks "to create maximum flexibility" with regard to the minimal process requirement of the "natural" policy while seeking a rigid restriction against ingredients that possess antimicrobial properties, regardless of whether they are "natural or chemical." 65/

In summary, there are no compelling reasons for FSIS to deviate from its current "natural" policy and approach to regulating the use of such claims. No issues of product safety have arisen through use of the policy. There is no indication of contemporary consumer confusion regarding products bearing a "natural" claim. There is no evidence that consumers are suffering from economic fraud when purchasing "natural" products. Thus, moving from the existing policy approach to a "natural" term defined by regulation is not justified.

## IV.    FSIS LACKS BASIS FOR SIGNIFICANT SHIFT IN NATURAL POLICY

### A.    FSIS Has Failed to Articulate Justification for Policy Reversal

As noted previously, FSIS has failed to adequately explain why sodium lactate is at odds with its long-standing "natural" policy and why it has chosen to rescind its 2005 policy modification that explicitly allowed sodium lactate (from corn) in products bearing this claim pending the completion of rulemaking. FSIS states "the Agency has received information that raises questions about when, and if, a food to which sodium lactate has been added would be fairly characterized as 'natural.'" 66/ The agency adds "The value and integrity of the 1982 policy is challenged ... by new uses of ingredients that have previously been used for flavoring purposes, for example, as antimicrobial agents. While the food safety purpose of using antimicrobial agents is important, their effects raise questions as to whether they can be used in products labeled 'natural.'" 67/ No further explanation of the agency's action is offered.

This abrupt change in the "natural" policy comes as an unwelcome surprise to PURAC and other companies in the food ingredient and manufacturing industry. Many companies in the industry have significant investments in "natural" product lines and rely heavily on the policy FSIS followed with respect to this term up to its recent reversal. Threatened revocation of label approvals and

---

64/    Petition Exhibit A at 1.

65/    Please recognize that PURAC is not commenting on the substantive merits of the Petitioner's proposal regarding minimal processing. Instead, we disagree with the Petitioner's call for rulemaking in order to achieve consistency in defining "natural" because a one-size-fits-all approach to this term is not possible.

66/    71 Fed. Reg. at 70504.

67/    *Id.*

24

D002320

the premature shift in policy has inflicted needless injury and uncertainty for these firms.

The actions undertaken by FSIS even before the rulemaking process was announced underscores the danger of government action ahead of input from all stakeholders. The industry values the open exchanges it has with FSIS prior to the agency taking action that would severely affect its business and/or manufacturing practices. The fact that the agency did not engage the industry in dialogue prior to making this change calls into question the manner in which FSIS has addressed the sodium lactate issue to date and frustrates the desire of industry stakeholders to furnish meaningful comments to the agency. Regardless of whether rulemaking is undertaken, FSIS should not revoke label approvals or take any other action contrary to its 2005 "natural" policy.

**B.    FSIS Has Not Been Presented with Any New Information that Warrants Change in Allowance of Sodium Lactate in "Natural Products"**

Respectfully, there is no information not previously known to FSIS that warrants or justifies the decisions reflected in the Notice. The information purportedly received by FSIS – "that sodium, potassium, and calcium lactate salts provide an antimicrobial effect at levels that have been regulated as providing a flavor effect" (*i.e.*, up to 2.0 percent of a product formulation) 68/ – has, in fact, been known by the agency for over 14 years and is in the public record created by its past rulemakings.

FSIS first approved sodium lactate and potassium lactate in 1993. In the final rule implementing this regulation, FSIS provided for the use of sodium lactate and potassium lactate as flavor enhancers and flavoring agents at levels not to exceed 2.0 percent in various meat and poultry products. 69/ As reflected by the comments on the proposed rule outlined in the preamble, a number of parties criticized the agency for limiting the regulation of lactates to its flavor attributes and questioned why its antimicrobial properties were not addressed.

A processor who opposed the proposed rule "believes that the primary purpose of using lactate salts is to improve food safety by retarding growth of common spoilage bacteria. This processor stated that the secondary effects are as a flavor enhancer or flavoring agent." 70/ A trade group "objects to the proposed use of these substances as flavor enhancers and flavoring agents in meat and poultry

---

68/    U.S. Department of Agriculture, Food Safety and Inspection Service, "Natural Claims," *supra* note 4.

69/    "Use of Potassium Lactate and Sodium Lactate as Flavoring Agents in Various Meat and Poultry Products," 58 Fed. Reg. 4067 (Jan. 13, 1993).

70/    *Id.* at 4069.

25

D002321

products and requests that the proposed regulation either be modified to recognize that lactates are being used for their preservative characteristics or be withdrawn." 71/

A university provided a summary of research data documenting the flavoring enhancing characteristics of sodium lactate. "These research data also document the use of sodium lactate in limiting microbial growth in cooked, whole muscle beef top round roast. This university strongly supports either the incorporation of the 'antimicrobial' benefits into the current ruling or the drafting of a second proposed rule which documents the use of potassium lactate and sodium lactate as a means of controlling microbial growth." 72/ And finally, among the concerns noted by three food ingredient companies opposing the rule were: "(1) The primary intended effect of sodium lactate is extended shelf life, even possible storage without refrigeration; ...[and] (4) the proposed rule does not recognize the most common use of lactates which is as an antimicrobial agent to reduce undesirable microorganism growth ...." 73/

Leaving aside that FSIS elected not to substantially change the scope of the final rule based on these comments, it is clear that the antimicrobial properties and benefits of sodium lactate at levels below two percent are widely known. The value of the antimicrobial attributes of these ingredients was affirmed in subsequent rulemaking expressly approving these ingredients at higher levels to maximize effectiveness as antimicrobials in certain applications. Indeed, the regulation is framed as allowing "up to" 4.8 percent of these ingredients, meaning, of course, that any amount below this level (including below two percent) is permitted and recognized to have an antimicrobial affect.

It is disingenuous for FSIS to state it was unaware of the antimicrobial attributes of lactates at levels below two percent. More importantly, as explained above, sodium lactate fully complies with the two-prong natural policy and, therefore, the agency acted without a rational basis in recently switching its position. On substantive and procedural grounds, FSIS has acted with disregard to the value of its established "natural" policy in protecting consumer expectations that arise depending upon the context of a "natural" claim.

## V.    ECONOMIC IMPACT OF THE PETITION

By prohibiting the use of sodium lactate in "natural" products and appearing to limit the options for pathogen control and preservation to high pressure processing (HPP) or other expensive processing techniques, the policy

---

71/    *Id.*
72/    *Id.*
73/    *Id.*

26

\\\DC - 028552/000001 - 2418087 v7

D002322

proposed by the Petition would result in significant economic impacts on meat and poultry product manufacturers, ingredient suppliers, and consumers.

A.    The Petition Limits Affordable Options for Pathogen Control and Preservation

The Petition is drafted in a manner that prohibits the use of sodium lactate and other relatively inexpensive dual or multi-use ingredients that exert antimicrobial properties and appears to favor HPP technology. Thus, in limiting the food safety tools for "natural" products, this high cost option may be one of the few available to food processors.

HPP is a technology-intensive method of food processing where food is subjected to pressures greater than 80,000 pounds per square inch – or approximately 6,000 atmospheres – to achieve microbial inactivation. Products containing no air spaces are packaged in flexible containers, placed into a high pressure chamber filled with a type of hydraulic fluid (normally water), and pressurized for several minutes. The uniform pressure exerted through the hydraulic fluid allows the product to maintain its form and sensory and nutritional qualities while vegetative bacteria are inactivated. 74/

The capital cost of HPP ranges from $500,000 to $2.5 million or more, depending on capacity, extent of automation, and other infrastructure changes necessary to accommodate this heavy equipment. The high cost of this technology presents a formidable economic barrier for food manufacturers, particularly small or mid-sized companies, to obtain this means of microbial control.

HPP is also a relatively new technology. Its full benefits and limitations are not as fully understood as existing food safety tools that are commonly employed using sodium lactate and many other natural ingredients that act as antimicrobials/preservatives. High pressure processing does not kill *Clostridium botulinum* spores unless high temperatures are also employed. 75/ High pressure resistant strains of *Listeria monocytogenes* have also been found, and their existence needs to be carefully considered in applications of this technology. 76/

---

74/    *See* Ohio State University Extension Fact Sheet, Food Science and Technology, "High Pressure Processing," available at http://ohioline.osu.edu/fse-fact/001.html (accessed on Dec. 18, 2006).

75/    D. Margosch, *et al.* "Comparison of pressure and heat resistance of *Clostridium botulinum* and other endospores in mashed carrots," *J. Food Prot.* 67: 2530-7 (2004). Erratum in: *J. Food Prot.* 68: 2502 (2005).

76/    A. Tay, *et al.* "Pressure death and tailing behavior of Listeria monocytogenes strains having different barotolerances," *J. Food Prot.* 66: 2057-61 (2003).

\\\DC - 028652/000001 - 2418087 v7

D002323

B.    Petition Would Impose Significant Costs on All Parties Involved

The Petitioner asserts that the rescission of the wholesale exemption for sodium lactate "will avoid adverse economic impacts to manufacturers that use the exemption to gain a market niche, only to have their 'natural' status revoked when a new rule is promulgated." 77/ Such statements completely ignore the fact that these adverse impacts, as described below, actually will occur now if the interim policy proposed by the Petitioner is adopted and not when a final rule is issued.

For product manufacturers, significant economic impacts would be associated with the rescission of existing label approvals. Existing label stock would have to be discarded and new labels printed, affected products would have to be reformulated, and the investment made in "natural" products under development would be lost. In addition, the need for capital investment for new processing techniques, such as HPP, would have to be considered if reformulation was not possible. For example, the estimated cost to use sodium lactate is 1.7-2.5 cents per pound of finished product, lemon juice/vinegar is 3.5-5 cents, HPP is 10-25 cents, and thermal post pasteurization is 12-20 cents. 78/ These additional costs will be passed along to customers unnecessarily and may result in some segments of the population being unable to afford "natural" products.

For ingredient suppliers, there are significant costs associated with losing lines of ingredients that are currently marketed or under development for use in "natural" products that complied with the 2005 policy. The economic impacts are much more significant if it is recognized that the "natural" foods market is poised to maintain double-digit growth over the next few years, and lactates figured to be a critical food safety ingredient in a large proposition of these new products.

Finally, for all segments of the food manufacturing industry, the uncertainty inherent in any interim policy FSIS will apply from now until the rulemaking process is concluded will stifle product development and associated capital investment.

VI.    CONCLUSION

FSIS has allowed and should continue to permit the use of sodium lactate in "natural" products via its long-standing, flexible policy that provides for the case-by-case assessment of the term. Sodium lactate is not a chemical preservative and is derived by no more than minimal processing from a natural, renewable source. Sodium lactate and other natural preservatives are vital and

---

77/    Petition at 16.
78/    Ohio State University Extension Fact Sheet, Food Science and Technology, "High Pressure Processing," *supra* note 74.

\\\DC · 025652/000001 · 2418087 v7

D002324

effective food-safety tools, particularly for the control of pathogens. There is no legal or factual basis to exclude these ingredients that enhance the safety and quality of numerous "natural" meat and poultry products.

The recent actions taken by the agency to prohibit the use of sodium lactate and other natural preservatives in "natural" products are premature and ill considered. The Petition referenced by FSIS falls well short of providing even a colorable basis for the action requested and provides no new information to FSIS. FSIS has failed to adequately explain why these ingredients conflict with its long standing "natural" policy and why it has rescinded, pending the completion of rulemaking, the explicit allowance of sodium lactate (from corn) in products bearing this claim.

The variable, context-specific meaning of "natural" has and will again doom attempts to establish a single, one-size-fits-all regulation. Procedurally, FSIS unwittingly proceeded prematurely in taking the actions requested by the Petitioner. The result – effectively removing sodium lactate as a proven, valued food safety tool – runs contrary to the agency's food safety mission.

PURAC urges FSIS to return to its well-received August 2005 policy and continue to protect consumers from misleading "natural" claims via its prior approval process. The quality of the agency's decision-making is tied to the input of all interested parties. Upon review of the administrative record created in response to the Notice, we urge FSIS to consider the need for rulemaking and any other changes in an open, transparent fashion.


Respectfully submitted,
PURAC America, Inc.


Gerrit Vreeman
President

\\\DC - 028652/000001 - 2418087 v7

D002325