# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

HORMEL FOODS CORPORATION,

                             Plaintiff,

    v.

UNITED STATES DEPARTMENT
  OF AGRICULTURE,

                          Defendant.

Civil Action No. 1:07-cv-1724

---

## PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF
## ITS CROSS-MOTION FOR SUMMARY JUDGMENT

NANCY S. BRYSON
(D.C. Bar No. 913673)
The Bryson Group PLLC
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4731


May 16, 2008

JOHN F. COONEY
(D.C. Bar No. 936336)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812

Counsel for Plaintiff
Hormel Foods Corporation

**Table of Contents**

Table of Contents ................................................................................................... i

Table of Authorities ............................................................................................... ii

I.    INTRODUCTION AND SUMMARY ....................................................... 1

II.   HORMEL IS ENTITLED TO SUMMARY JUDGMENT ...................................... 3

      A. USDA Has Consistently Defined Antimicrobial Effects as Preservative Effects
      and As An Essential Component of Shelf-Life......................................................... 6

      B. The Four Shelf-Life Studies Do Not Provide a Rational Basis for USDA's New
      Rule That Lactates Do Not Prevent or Retard the Growth of Food Spoilage
      Bacteria ................................................................................................................. 8

      C. Disagreement in the Comments on USDA's Rulemaking Initiative Do Not
      Justify its *De Facto* Reinstatement of the 2005 Exemption ................................. 12

      D. Lactates Are Not Essential to the Food Safety of "Natural" Products............. 12

      E. The Acceptability of Lactates in Organic Products Does Not Establish that
      They Are Permissible for Use in "Natural" Products ............................................ 13

      F. Hormel is Entitled to Summary Judgment on All Counts of its Complaint ..... 15

III.  THE COURT HAS AUTHORITY TO RESOLVE HORMEL'S CLAIMS......... 17

      A. USDA's Decisions Are Reviewable under 5 U.S.C. § 706(2)......................... 17

      B. USDA's December 2006 Decision Cabined its Discretion and Established
      "Law To Apply" with respect to Label Rescissions ............................................ 19

      C. Hormel Does Not Seek To Have the Court Preempt a USDA Rulemaking or
      To Adopt a New Standard that Will Govern During the Rulemaking; USDA Itself
      Has Adopted without Notice and Comment a New Rule that Already Has Been
      Applied and Will Be Applied in the Future ......................................................... 21

Conclusion .......................................................................................................... 25

# Table of Authorities

## Cases

*Abbott Laboratories v. Gardner,* 387 U.S. 136 (1967)....................................................... 23

*American Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027 (D.C. Cir. 2008).................... 23

*American Mining Congress v. MSHA*, 995 F.2d 1106 (D.C. Cir. 1993) ......................... 17

*American Paper Inst., Inc. v. EPA*, 996 F.2d 346 (D.C. Cir. 1993) ................................. 23

*Ass'n of National Advertisers, Inc. v. FTC*, 626 F.2d 1151 (D.C. Cir. 1979)................... 23

*Ass'n of Pacific Fisheries v. EPA,,* 615 F.2d 794 (D.C. Cir. 1980) ..................................... 6

*Bennett v. Spear*, 520 U.S. 154 (1997) ............................................................................ 21

*Bi-Metallic Investment Co. v. State Bd. of Equalization*, 239 U.S. 441 (1915)............... 23

*Ciba-Geigy Corp. v. EPA*, 801 F.2d 430 (D.C. Cir. 1986)................................................. 22

*Dow Chemical Co. v. EPA*, 635 F. Supp. 126 (M.D. La. 1986) ......................................... 18

*EDF v. Costle*, 657 F.2d 275 (D.C. Cir. 1981) ................................................................... 6

*Edison Electric Inst. v. EPA*, 996 F.2d 326 (D.C. Cir. 1993) ............................................ 20

*Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093 (D.C. Cir. 1970) .............. 22

*Esch v. Yeutter*, 876 F.2d 976 (D.C. Cir. 1989)................................................................ 6

*General Electric Co. v. EPA*, 290 F.3d 377 (D.C. Cir. 2002) ............................. 17, 20, 23

*Heckler v. Chaney*, 470 U.S. 821 (1985) .......................................................................... 20

*HRI, Inc v. EPA*, 198 F.3d. 1224 (10th Cir. 2000).......................................................... 23

*John Doe, Inc. v. DEA*, 484 F.3d 561 (D.C. Cir. 2007)..................................................... 22

*Molycorp, Inc. v. EPA*, 197 F.3d 543 (D.C. Cir. 1999) .................................................... 17

*\*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1984).. 17, 19

*Northwest Environmental Defense Center v. Bonneville Power Adm'n*, 477 F.3d. 668 (9th
Cir. 2007)................................................................................................................... 18

*Norton v. So. Utah Wilderness Alliance*, 542 U.S. 55 (2004)........................................... 18

*SEC v. Chenery Corp.,*, 318 U.S. 80 (1943) ....................................................................... 14

*Shell Oil Co. v. EPA*, 950 F.2d 741 (D.C. Cir. 1991) ................................................. 19, 20

*Sierra Club. v. Thomas*, 828 F.2d 783 (D.C. Cir. 1987).................................................... 22

**Statutes**

5 U.S.C. § 702 ............................................................................................ 18

5 U.S.C. § 706(1) ................................................................................... 17, 18

*5 U.S.C. § 706(2) .................................................................................. *passim*

7 U.S.C. § 6517(a) ..................................................................................... 13

**Regulations**

7 C.F.R. § 205.2 ........................................................................................ 14

7 C.F.R. § 205.601 .................................................................................... 13

7 C.F.R. § 205.605(a)-(b) .......................................................................... 14

9 C.F.R. § 381.132 .................................................................................... 22

9 C.F.R. § 430.1 (2008) ............................................................................... 7

21 C.F.R. § 101.22 ................................................................................. 7, 14

71 Fed. Reg. 70,503 (December 5, 2006) .................................................. 22

**Other Authorities**

*Compliance Guidelines to Control Listeria Monocytogenes in Post-Lethality Exposed Ready-To-Eat Meat and Poultry Products ("Listeria Guidelines")*, FSIS, USDA, May 2006 ......................................................................................................... 7

## I. INTRODUCTION AND SUMMARY

USDA has taken and abandoned a series of changing positions in attempting to justify why it permits lactate-containing products to bear a "natural" label. In its Reply, USDA has shifted again and defends its actions on a novel ground, not presented in its motion for summary judgment or its supporting Declaration. USDA now claims that the well-known chemical effect of lactates in inhibiting the growth of pathogenic bacteria, such as *Listeria monocytogenes*, can be ignored in determining what is a "natural" product. According to its Supplemental Declaration, USDA is applying a new "shelf-life" rule:

> While the use of sodium lactate as a preservative in a meat or poultry product would disqualify the product from bearing a "natural" claim, its use as a flavoring agent *or as an antimicrobial* to prevent the grown of [*Listeria monocytogenes*] and other pathogens without affecting the outgrowth of spoilage organisms or extending the shelf-life of the product would not.

Supp. Dec. of Philip S. Derfler, ¶ 23 (emphasis added). *See* USDA Rep. Mem. at 22.

The agency cannot defend its actions on a rationale introduced for the first time in a Reply Brief. In any event, by ignoring the undisputed inhibitory effect of lactates on human pathogens, USDA has violated its obligations to consumers under the Federal Meat Inspection Act ("FMIA") and the Poultry Products Inspection Act ("PPIA").

The Administrative Record shows that the new "shelf-life" rule is radically different from the Natural Policy USDA followed prior to the 2005 amendment and subsequently reinstated in 2006. In December 2006, USDA expressly stated to all the manufacturers that the Natural Policy does not permit the use of chemical substances having an antimicrobial effect because that would constitute a preservative function. E.g., AR 611. It informed all the manufacturers that a disqualifying antimicrobial effect

included an effect either on pathogenic bacteria or on spoilage bacteria.  "If lactates are used [in products] bearing the claim "natural" at levels less than 2 percent to increase shelf-life, improve food safety, and control pathogens, the use of the ingredients is contrary to the meaning of 'natural'" under USDA's policy.  E.g., AR 612.

The new "shelf-life" rule now allows sale of a product under a "natural" label even though it contains chemicals that admittedly will have an inhibitory effect on pathogenic bacteria, which is a preservative function.  This difference has concrete and material impacts on the legal rights and obligations of users of the "natural" label, as well as on consumers' interest in labels that are not false and misleading.  And USDA has again adopted a new rule without notice and comment, applying it to justify not rescinding previously approved labels and the approval of at least one new label.

Hormel, therefore, is entitled to summary judgment on its claims that:  (1) the "natural" labels approved under the invalid 2005 amendment to the Natural Policy are illegal and should be set aside (Count I); (2) the new "shelf-life" test is an arbitrary, capricious and an unexplained departure from USDA's enforcement policy announced after the December 2006 revocation of the exception for sodium lactate, entitling Hormel to relief in the form of label rescission under the enforcement policy that USDA established in 2006 (Count II); and (3) the new test establishes a rule of future effect and general applicability that is arbitrary, capricious, and contrary to law and that was issued without complying with the notice and comment procedures of the Administrative Procedure Act ("APA"), and therefore should be set aside (Count III).

The Court has full authority to resolve Hormel's claims and grant the relief requested.  USDA's decisions are agency actions, fully reviewable under the arbitrary

and capricious standard of 5 U.S.C. § 706(2)(A). Its actions are plainly "final" because it has made a conclusive decision having obvious legal consequences for previously-approved labels <u>and</u> applications for new approvals. This decision is effective for the indefinite future while the possibility of rulemaking is pending. The new standard also veers sharply from the agency's previously announced enforcement policy, which prescribed specific and objective triggering conditions for rescinding approvals of the use of the "natural" label. That policy is binding on USDA unless and until superseded by a new policy that is rational and supported by an adequate explanation for the change. Finally, USDA's adoption of the new, relaxed "shelf-life" rule for label approval is invalid under 5 U.S.C. § 706(2)(A) as agency action promulgating a *de facto* rule of general applicability inconsistent with the requirements of the APA.

## II. HORMEL IS ENTITLED TO SUMMARY JUDGMENT.

USDA either admits or does not effectively dispute the material facts that support summary judgment in Hormel's favor. The Administrative Record shows that: (1) lactates are chemicals, (2) lactates have an antimicrobial effect against both spoilage bacteria and pathogenic bacteria, such as *Listeria monocytogenes*, (3) the antimicrobial effect occurs at levels below 2%, (4) the antimicrobial effect has no known threshold below which lactates act only as flavoring agents, and (5) these lactates are the products of a highly industrialized manufacturing process and thus are not minimally processed.[1]

---

[1] USDA's Response to Hormel's Statement of Material Facts As to Which There Is No Genuine Issue purports to dispute some of these facts on the spurious ground that the properties and effects of lactates are the putative subject of the agency's potential future rulemaking. Doc. 31, ¶¶ 5-7, 16, 21-24. This response does not raise a genuine dispute of material fact. In this record review case under the APA, if USDA disagreed with Hormel's characterization of the Administrative Record evidence with respect to the scientific properties of lactates, it was USDA's burden, at the minimum, to show that there is specific controverting evidence in the Record. Other than the dubious inferences the agency appears to draw from the fundamentally flawed shelf-life "studies," USDA makes no such effort. Accordingly, there is no genuine dispute that lactates have the properties set forth by Hormel, based on that Record.

It is also uncontested that for, 23 years, USDA's Natural Policy barred the use of chemical preservatives in products bearing the "natural" label and that USDA rejected "natural" label applications for products containing lactates because lactates are chemical preservatives barred by the Natural Policy. Supp. Derfler Dec. ¶¶ 9-11. In 2005, USDA illegally amended the Natural Policy to create a categorical exception for sodium lactate from a corn source. Further, when Hormel challenged its illegal conduct, USDA, in December 2006, reinstated the policy prevailing prior to the 2005 amendment and announced an enforcement policy squarely based on the previously prevailing functional test for identifying a "chemical preservative," i.e., whether the substance tends to prevent or retard deterioration of a food product. Finally, USDA admits that in early 2007, the agency again modified the policy to allow continued use of lactates if such use did not prolong shelf-life by action against spoilage bacteria, and then at some point in 2007, to permit such continued use even where there was a antimicrobial effect on pathogenic bacteria. In truth, instead of implementing the announced correction of its illegal 2005 amendment to the Natural Policy, USDA has, in effect, sanctioned the same continued unlawful use of lactates under the imprimatur of its new rule.

Accordingly, these undisputed facts demonstrate that: (1) the original approvals were arbitrary, capricious, and contrary to law, (2) continued use of a "natural" label for lactate-containing products is arbitrary, capricious, and contrary to both the law and the 2006 enforcement policy and is currently occurring under an arbitrary and capricious change in enforcement policy, and (3) approval of new "natural" labels for lactate-containing products is permitted by an illegally-adopted, *de facto* rule. Hormel is therefore entitled to summary judgment on all counts of its Complaint.

USDA seeks to avoid this outcome by shifting its defense to rely on its unprecedented and irrational new policy that the antimicrobial effect of a chemical substance on pathogenic bacteria is immaterial to deciding what is "natural." Thus, as noted in the Supplemental Derfler Declaration (¶ 23), the "shelf-life" rule provides:

> While the use of sodium lactate as a preservative in a meat or poultry product would disqualify the product from bearing a "natural" claim, its use as a flavoring agent *or as an antimicrobial to prevent the growth of [Listeria monocytogenes] and other pathogens* without affecting the outgrowth of spoilage organisms or extending the shelf-life of the product would not. (Emphasis added).

USDA asserts that this extraordinary reversal of its prior position is "reasonable *in light of the evidence that was before the agency* at the time the decision was made." USDA Rep. Mem. at 19 (emphasis in original). This defense fails because, as shown below, the linchpin of its new rule, that antimicrobial effects against pathogenic bacteria and spoilage bacteria should be treated differently, is irreconcilable with the scientific evidence in the Administrative Record and USDA's own regulatory history. Further, the shelf-life studies submitted by four of the 24 manufacturers are so flawed that they can provide no rational basis for USDA's new rule. One study, submitted by putative Intervenor Kraft Foods, and completely ignored by USDA, actually contradicts the assumptions upon which the agency has based its new rule.

USDA attempts to defend its actions on the ground that, except for the evidence in Hormel's declarations, the Record fails to contain evidence that the lactates were functioning as preservatives in these products. USDA argues: "the declarations submitted by plaintiff now, but which were not before USDA at the time . . . cannot form a basis on which to set aside the agency's decision as arbitrary and capricious . . . plaintiff's declarations do not prove that lactates extended the shelf-life of the products in

question.  At best, they only show that reasonable minds might disagree about how much weight to give the studies showing that lactates do not extend shelf-life." *Id.*

Hormel's declarations are not, however, new evidence.  They reference and marshal the Administrative Record evidence demonstrating the inextricable linkage between the action of lactates in inhibition of both pathogenic and food spoilage bacteria. That evidence was placed before the agency at least as early as 2002.  AR 811-12. USDA's position is particularly self-serving given that the agency provided no notice or opportunity to comment to the public or Hormel when adopting the 2005 amendment and the most recent 2007 change.

It is well established that parties challenging agency action may rely on evidence and information not part of the Administrative Record to demonstrate how the agency has failed to consider a significant factor or to provide a missing explanation of complex and technical matters.  *See Esch v. Yeutter*, 876 F.2d 976, 991-992 (D.C. Cir. 1989); *EDF v. Costle*, 657 F.2d 275, 284-286 (D.C. Cir. 1981), citing *Ass'n of Pacific Fisheries v. EPA*, 615 F.2d 794, 812 (9th Cir. 1980).  This principle should apply with even greater force where the administrative process was not conducted through public notice and comment procedures.  Indeed, USDA makes no attempt to answer the numerous methodological flaws and false inferences drawn from the studies, explained in Dr. Christianson's declaration.  USDA simply ignores this evidence.

A.    **USDA Has Consistently Defined Antimicrobial Effects as Preservative Effects and As An Essential Component of Shelf-Life.**

Under the 1982 Natural Policy, meat and poultry products may not be labeled as "natural" if they contain "any artificial flavor or flavoring coloring ingredient, or chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic

ingredient." A "chemical preservative," as defined in 21 C.F.R. § 101.22, is "[a]ny chemical that, when added to a food product, tends to prevent or retard deterioration thereof." The rule thus adopts a purely functional test – does the substance "prevent or retard deterioration" of the food product to which it is added?

The Administrative Record demonstrates that the market value of lactates is based on their power to inhibit the microbial growth that causes food to spoil or to become unsafe.[2] Peer-reviewed scientific evidence in the record demonstrates that lactates are equally effective against bacterial pathogens and food spoilage bacteria. USDA does not cite record evidence to dispute this; it is therefore admitted. Hormel Statement of Undisputed Material Facts, ¶ 5.

USDA's regulatory definition of an "antimicrobial agent" includes an inhibitory effect on pathogenic bacteria but draws within its ambit any substance "*that has the effect of reducing or eliminating a microorganism....*" 9 C.F.R. § 430.1 (the "*Listeria* Rule") (emphasis added). USDA Listeria Compliance Guidelines define "shelf-life" as "the amount of time the product can be stored under specified conditions and still remain *safe* with acceptable quality."[3] Thus, "shelf-life" is defined as having a clear and objective safety component, based on effectiveness of *Listeria* control, as well as an organoleptic component, based on control of food spoilage bacteria.

---

[2] AR 292-313 (patents); AR 14-54 (Hormel petition); AR 39 (OptiForm Model Listeria Control Results, Exhibit C to Petition); AR 811-813 (comments of Kraft Foods).

[3] *Compliance Guidelines to Control Listeria Monocytogenes in Post-Lethality Exposed Ready-To-Eat Meat and Poultry Products ("Listeria Guidelines")*, USDA, USDA, May 2006 at 11 (emphasis added), available at www.fsis.usda.gov/oppde/drad/frpubs/97-013f/lm_rule_compliance_guidelines_may_2006.pdf.

Therefore, until now, USDA has always regarded the antimicrobial effects of lactates against all bacteria as having a preservative effect.[4]  This fact was expressly affirmed by USDA in its letters to producers of lactate-containing products having a "natural" label.  The agency stated that "[a] preservative function includes those of an antimicrobial, i.e., reducing microorganisms and extending shelf-life of treated products," and "[if] lactates are used [in products] bearing the claim "natural" at levels less than 2 percent to increase shelf-life, improve food safety, and control pathogens, the use of the ingredients is contrary to the meaning of 'natural'" in the Natural Policy.  AR 611–640.

The materials with which USDA has now supplemented the Administrative Record also show, contrary to its earlier claims, that the antimicrobial effect was so well understood as a preservative effect that "natural" claims for lactate-containing products were simply not allowed by USDA.  Supp. Derfler Dec. ¶¶ 9, 10, 11.  This was true both before and after the issuance of its regulation in 2000 setting a 4.8% concentration limit on lactates added to meat or poultry for their antimicrobial effect against bacteria.

Under the FMIA and PPIA, the presence of a lactate having a preservative effect must be disclosed on the label.  USDA's new assertion to the contrary conclusively demonstrates the agency acted illegally by adopting a new rule of general applicability.

**B.**      **The Four Shelf-Life Studies Do Not Provide a Rational Basis for USDA's New Rule That Lactates Do Not Prevent or Retard the <u>Growth of Food Spoilage Bacteria</u>.**

As described in the Declaration of Dr. Phillip Minerich, the Administrative Record contains robust peer-reviewed scientific evidence that lactates inhibit the growth of both *Listeria* and food spoilage bacteria at the same time.  Minerich Dec. ¶¶ 2, 3.  This

---

[4] Intervenors also consistently describe antimicrobial effects as preservative effects ("the primary purpose of these ingredients is to reduce microbial growth").  AR 811.  Kraft also has objected to "no preservative" claims by its competitors for products containing sodium lactates at less than 2%.  AR 812.

information was available to USDA at the time it made the decisions challenged in this case. The agency simply disregarded it, and proceeded to eliminate from its preservative effect test any requirement for evidence of <u>all</u> the microbiological characteristics of lactate-containing products. Instead, the agency required only shelf-life studies and concluded that the information it received from four producers validated an assumption that "sodium lactate does *not* appear to extend shelf-life *on the particular products in question* at two percent or less of product formulation." USDA Rep. Mem. at 13 (emphasis in original). These obviously flawed studies do not, however, provide a rational basis for disregarding the gold standard, peer-reviewed scientific evidence that lactates have a preservative effect, as shown in the Memorandum in Support of Summary Judgment (pp. 36-40) and in the discussion that follows.

The four studies were submitted by Kraft, Fresherized Foods, Plumrose and Peterson Farms. Only three (Kraft, Fresherized Foods, and Peterson Farms) provide actual data; the Plumrose submission is simply a letter reporting selected information.[5]

The Kraft study, which is completely ignored in the Supplemental Derfler Declaration, is a food spoilage study. It shows that the lactates in the products *did* inhibit the growth of the food spoilage bacteria and therefore had a preservative effect in the product under USDA's new test. AR 822 ("more growth in the treatment with no

---

[5] Intervenors assert that there is a fifth shelf-life study submitted by Sugar Creek. Int. Mem. at 26-27. The Administrative Record contains a letter from Sugar Creek (AR 792–793), but USDA does not rely on it. Like the Plumrose letter, it reports on but does not provide data. The conclusion offered is that all products contained "similar bacterial counts" – i.e. counts greater than 30,000 cfu/gram. AR 792-793. In order to compare products, one must know when these counts were reached and what the counts actually are. To say that the shelf-life is the same because all counts were greater than 30,000 cfu/gram is like saying that two people who have more than $30,000 dollars have the similar amounts of money, although one may have $31,000 and the other $3,000,000.

antimicrobial ingredients"). This study thus belies the proposition that lactates can be used with no effect on shelf-life. See Declaration of Richard J. Christianson, ¶ 11.

Moreover, the Kraft study could not support USDA's novel view that effects on pathogenic bacteria are immaterial to whether a product is "natural" or that those effects can be meaningfully separated from effects on spoilage bacteria. And that could have been no surprise to USDA since Kraft has repeatedly informed it of those basic scientific facts. AR 811-813.

The Fresherized Foods study likewise fails to support USDA's new rule. It measures only the antimicrobial effect on pathogenic bacteria and lacks any data whatsoever concerning effects on food spoilage bacteria. AR 796-805.

The Plumrose letter only summarizes certain conclusions about an undocumented study, although it was the primary shelf-life study relied upon in the first Derfler Declaration (¶ 31). One cannot tell what the concentration of sodium lactate was in the product, what the differences were between "2 similar products" that were evaluated in the test, what the respective microbial growth patterns were and what effect any distinctions had on shelf-life. AR 847-848. It is clear, however, that the study was conducted at temperatures well below those established in the standard AOAC methodology for the test performed, the Petri-film analysis. AR 847-848.[6] Further, as noted by Plumrose (AR 848), "use by" and "sell by" dates are no indication of microbiological characteristics because they are primarily set by marketing considerations:

---

[6] Official USDA guidance provides that shelf-life studies should be conducted under conditions of slight temperature abuse (i.e. higher temperatures) to provide accurate results because bacterial growth is inhibited by low temperatures. *Listeria Guidelines* at 94. See Christianson Decl. ¶ 8.

the specific date code format that is applied to products are personalized to the requirements of the purchasing customers. The specified and anticipated expiration date (36 days) is the same number of days from production for both [products], regardless of the date format actually applied to packaging.

The last shelf-life study from Pederson Farms fares no better. It evaluates products with spoilage bacteria counts that, at the outset of the study, rendered the products spoiled, and therefore already beyond their shelf-life. USDA does not dispute this fact and therefore is deemed to have admitted it.[7]

The inescapable conclusion is that none of these studies supports USDA's claims that lactates can be used with no effect on shelf-life or that the effects on spoilage bacteria and pathogenic bacteria can be separated. And they provide no basis for generalizing to a rule that effects on pathogenic bacteria are immaterial to the determination whether a product is "natural." USDA defends its acceptance of these defective studies on the ground that no better information was available at the time, and chides Hormel for providing only after-the-fact critiques of the studies. USDA Rep. Mem. at 4. It also faults Hormel for not producing studies of the shelf lives of the very same products under review to demonstrate the existence of a preservative effect. *Id.*

The purported lack of adequate information, however, was self-inflicted. USDA simply cannot have it both ways. Having failed to give the public and Hormel notice or opportunity to comment when adopting either the 2005 amendment or this most recent change in 2007, USDA cannot now seek protection for its decisions in the limited nature of the information it received. Moreover, it was not Hormel's burden to discharge either the agency's responsibility to engage in rational decision making or the other

---

[7] Intervenors attempt to rehabilitate the study by asserting facts not in the Administrative Record – that the bacterial count exceeded typical spoilage standard at the outset because of intentionally added bacteria in a starter culture. Milkowski Dec. ¶ 11; Int. Mem. at 26. Even if true, that fact would prove only that the true effect of the lactates on spoilage bacteria cannot be determined from this study.

manufacturers' burden to produce the necessary information about their products, even assuming anyone without access to each manufacturer's proprietary information could possibly do so. Indeed, since USDA had now excused any producer holding a "natural" label for a lactate-containing product from submitting the required information, it is disingenuous to rely on the limited and highly unreliable information in these four studies.

**C.     Disagreement in the Comments on USDA's Rulemaking Initiative Do Not Justify its _De Facto_ Reinstatement of the 2005 Exemption.**

USDA also rests its defense on the fact there were "highly diverse and often contradictory comments" filed in response to the agency's December 5, 2006 Notice in the Federal Register to conduct rulemaking. USDA Rep. Mem. at 18. It is generally the case, however, that rulemaking proposals elicit strong and different opinions from the public. Indeed, the purpose of the APA requirement for notice and comment is to provide an informed basis for reasoned decision making by the agency. The existence of such strong and different opinions, however, provides no basis for changing the rule before the rulemaking is complete – or, as is the case here, before it has been initiated. No amount of _post hoc_ rationalization can justify that outcome.

**D.     Lactates Are Not Essential to the Food Safety of "Natural" Products.**

USDA and the Intervenors seek to cloak the acceptability of lactates in "natural" products with a public health, food safety rationale. They argue that lactate use should be accepted for "natural" products, despite their antimicrobial effects, because they make foods safer. USDA Rep. Mem. at 22; Supp. Derfler Dec. ¶ 23; Int. Mem. at 30.

This argument ignores the fact that "natural" is a voluntary marketing claim, and has no food safety-based function in the agency's regulatory program. All manufacturers

are required to produce food that is safe for human consumption, and there are many different ways by which they can enhance food safety. The FMIA and the PPIA require that if food safety is to be accomplished by inclusion of lactates that have an antimicrobial effect, the presence of those ingredients must be disclosed to consumers on the product label as chemical preservatives. Accordingly, the safety rationale advanced by USDA and the Intervenors is not a legitimate excuse for failing to uphold the requirements of the Natural Policy.

### E. The Acceptability of Lactates in Organic Products Does Not Establish that They Are Permissible for Use in "Natural" Products.

USDA suggests it reasonably relied upon the National Organic Program's ("NOP") acceptance of lactates in organic products. In its Reply Memorandum, USDA asserts that Supplemental Record information now conclusively dates its change in policy to the time in 2004 when it was told by Applegate Farms that the NOP had accepted lactates for use in organic products. The Supplemental Derfler Declaration and the Reply Memorandum erroneously represent that the NOP prohibits the use of synthetic ingredients and provides a "processing" definition similar to the Natural Policy "minimal processing" standard. USDA Rep. Mem. at 6-8; Supp. Derfler Dec. at ¶¶ 12-15.

The NOP expressly allows the use of <u>synthetic</u> ingredients so long as they have been reviewed and added to the "National List" by the National Organic Standards Board. 7 U.S.C. § 6517(a); 7 C.F.R. § 205.601. Lactates themselves are not on the National List. *Id.* While Applegate Farms did file a petition requesting approval of the use of lactates for control of pathogens in organic meat products (not as a flavoring),[8] the

---

[8] Petition for Inclusion of Sodium and Potassium Lactate into the National Organic Program Materials List, submitted by Applegate Farms, Inc. (Jan. 2004), available at www.ams.usda.gov/AMSv1.0/getfile?dDocName=STELPRD5057551.

NOP short-circuited that process and permitted substances made by combining listed substances.

The components of lactates (lactic acid and potassium hydroxide) do appear on the National List. While lactic acid is listed as a nonsynthetic agent, potassium hydroxide is listed as a synthetic agent. 7 C.F.R. § 205.605(a)-(b). A "synthetic agent" is defined as:

> A substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources . . . .

7 C.F.R. § 205.2. Synthetic ingredients, however, are expressly prohibited under the Natural Policy. AR 2, 4, 7. Accordingly, the NOP operates on fundamentally different premises that preclude any analogy to the requirements of the Natural Policy.[9]

Finally, as is apparent from the foregoing discussion and the uncontradicted information in the Administrative Record, lactates are more than minimally processed. Consequently, even if there were merit to USDA's new position that lactates can be used where their antimicrobial effect is limited to pathogenic bacteria, their use could not be approved for the independent reason that such use would not meet the minimal processing requirement of the Natural Policy. USDA completely fails to address this point, and therefore must be deemed to have conceded that the use of "natural" labels for lactate-containing products is inconsistent with the Natural Policy for this reason.[10]

---

[9] Intervenors also contend that lactates are not "chemical" preservatives, but "natural" preservatives. Int. Mem. 34-36. USDA's decision, however, can be defended only on the grounds articulated by the agency, and USDA has never adopted this rationale. *See SEC v. Chenery Corp.* 318 U.S. 80, 95 (1943). In any event, this contention cannot be reconciled with the express language of the relevant definition of "chemical preservative." *See* 21 C.F.R. § 101.22.

[10] Again, while not denied by USDA, Intervenors challenge the evidence in the Record demonstrating the more than minimally processed nature of lactates. Intervenors assert the process flow diagram in the record "mischaracterizes the manufacturing process for these ingredients because it lists a variety of purification processes, such as evaporation, esterification, column separation, and hydrolysis that are *not necessarily*

**F. <u>Hormel is Entitled to Summary Judgment on All Counts of its Complaint</u>.**

USDA and Intervenors utterly fail to rebut the facts and conclusions that establish the agency's decision making was arbitrary, capricious, and contrary to law and must be set aside as provided in 5 U.S.C. § 706(2)(A). Through its recently adopted "shelf-life" only test, USDA has changed the 1982 Natural Policy in a fundamental respect and has significantly relaxed the requirements of the Natural Policy in force prior to the 2005 amendment and as reinstated in 2006. It has instead maintained the illegally-adopted blanket approval of lactates. The change applies not only to previously-approved labels but also to new applications for approvals and therefore impacts in a concrete and material way the legal rights and obligations of users of the "natural" label as well as the consumers' interest in labels that are not false and misleading. As demonstrated in Hormel's Memorandum in Support of Summary Judgment, this action was taken in violation of the FMIA, the PPIA, and is fundamentally inconsistent with numerous prior USDA determinations. Moreover, USDA was required to conduct rulemaking under the APA before it could apply this new rule, including public notice and an opportunity to comment by any and all interested parties.

USDA tries to paper over this manifest departure from previous policy with the extraordinary statement that "[i]t was the policy of [USDA] – as of the date of Hormel's request for rescission – that lactates may not have a preservative effect on products that bear the 'natural' label. And it remains the policy of USDA to this day that lactates may *not* have a preservative effect in products that bear the natural label." USDA Rep. Mem.

---

*used by any single manufacturer in this combination in the making of these products.*" Zoetemeyer Dec. ¶¶ 6–8 (emphasis added). Cutting through the circumlocution, the fact is the diagram is essentially uncontradicted and some number of these processes are actually used, consistent with the determination and listing by the NOP of potassium lactate as a synthetic ingredient.

at 11 (emphasis in original). It is undeniable, however, that it was only in 2007 that the agency decided that the antimicrobial effect against pathogenic bacteria in "natural" products is immaterial and to establish a new regulatory distinction that the effects on the two types of bacteria may be treated separately, in effect redefining "preservative" to exclude effects on pathogenic bacteria. The new test, as articulated in the Supplemental Derfler Declaration, shifts the criterion to an assessment of effects on spoilage bacteria only and accepts that a preservative effect is not the intended use if shelf-life is not extended. It thus is a marked and significant change in policy.

For these reasons, Hormel is entitled to summary judgment on Count I because USDA's approval of "natural" labels for products containing lactates was contrary to law, i.e., the FMIA's and PPIA's ban on undisclosed use of a chemical preservative and the Natural Policy's ban on the use of chemical preservatives as defined by the FDA for products labeled "natural." Thus, the approvals were arbitrary, capricious, and contrary to law, and must be set aside under 5 U.S.C. § 706(2)(A).

Hormel is entitled to summary judgment on Count II because USDA's decision not to rescind previously approved labels was arbitrary, capricious, and contrary to law. As shown above, as part of its correction of the illegal 2005 amendment, USDA put in place in 2006 a clear enforcement policy, consistent with the FMIA, the PPIA, and the restored Natural Policy that prescribed specific and objective triggering conditions for rescinding approvals of the use of the "natural" label. This policy bound USDA unless and until superseded by a lawful and adequately justified change in policy. The agency then abandoned that policy. It substituted a new policy premised on the new regulatory standard, which is contrary to law and has no rational basis, thereby denying Hormel's

request for rescission. Accordingly, USDA's action to abandon its previous policy and to base its rescission decision on this new test must be set aside under 5 U.S.C. § 706(2)(A) as a substantive matter and as a procedural matter because the agency failed to provide a reasoned explanation for its abrupt change in policy. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 41 (1984). Hormel is therefore entitled to relief setting aside the change in enforcement policy and denial of Hormel's petition to rescind, and requiring USDA to implement its previous policy.

Hormel also is entitled to summary judgment on Count III because USDA established its new regulatory standard without satisfying the rulemaking requirements of the APA. The agency's action set in place a class-wide standard of general applicability that imposed obligations on regulated parties with respect to continued use of the "natural" label and affected the rights of consumers.[11]

## III. THE COURT HAS AUTHORITY TO RESOLVE HORMEL'S CLAIMS.

### A. USDA's Decisions Are Reviewable under 5 U.S.C. § 706(2).

USDA argues that Counts II and III must be dismissed because Hormel seeks to compel a discretionary action, the rescission of false and misleading labels, for which there is no cause of action under 5 U.S.C. § 706(1). USDA Rep. Mem. at 17-18. *See*

---

[11] USDA's adoption of the new "shelf-life" test was not merely an interpretive rule. USDA Rep. Mem. at 26-27. The agency's adoption of the new "shelf-life" test established a binding *de facto* rule of industry-wide applicability that allows all manufacturers of lactate-containing products to retain their "natural" labels and to obtain new ones if they satisfy that new test. The record is clear that the agency is applying the test as "binding as a practical matter" because "private parties can rely on it as a norm or safe harbor by which to shape their actions." *General Electric Co. v. EPA*, 290 F.3d 377, 383 (D.C. Cir. 2002) (internal citation omitted). The new rule therefore is legislative in nature and invalid for the agency's failure to provide notice and opportunity to comment prior to its promulgation.

*American Mining Congress v. MSHA*, 995 F.2d 1106, 1112 (D.C. Cir. 1993), does not impose a different test for what constitutes a legislative rule. "The ultimate focus of the [*American Mining Congress*] inquiry is whether the agency action partakes of the fundamental characteristic of a regulation, i.e., that it has the force of law." *Molycorp, Inc. v. EPA*, 197 F.3d 543, 545 (D.C. Cir. 1999).

*Norton v. So. Utah Wilderness Alliance*, 542 U.S. 55, 63 (2004). Hormel, however, brought this suit under 5 U.S.C. § 706(2), not Section 706(1). The authority of the Court under Section 706(2) is far broader than under Section 706(1) and permits it to adjudicate these two Counts.[12]

Section 706(2) provides that the Court shall "hold unlawful and set aside agency action, findings, and conclusions found to be -- (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." In *Northwest Environmental Defense Center v. Bonneville Power Administration*, 477 F.3d 668, 680-81 (9th Cir. 2007), the Ninth Circuit explained the differences between Sections 706(1) and 706(2):

> When a party seeks redress because an agency has failed to act, a court may only require the agency to perform non-discretionary actions that the agency is required by law to undertake. *Norton* is distinguishable from the instant case because *Norton* dealt with the power of courts to "compel agency action unlawfully withheld" under 5 U.S.C. § 706(1). The petitioners here do not seek redress for agency inaction under § 706(1), but rather challenge a final agency action under § 706(2) and the Northwest Power Act.

Here, Hormel does not seek redress for "agency action unlawfully withheld," but asserts that USDA acted arbitrarily, capriciously, and contrary to law in violation of Section 706(2). Two of the Counts challenge affirmative agency actions that bear no relationship whatsoever to an arguable exercise of enforcement discretion. Count I challenges USDA's original approval of "natural" labels for lactate-containing products. Count III challenges USDA's issuance of a *de facto* regulation without the required notice

---

[12] USDA attacks Count I only on the ground that Hormel improperly seeks to "recast" that Count as a claim under the APA. USDA Rep. Mem. at 2, 6-7. That claim is baseless. The Complaint alleged that the Court has authority to consider the case under 5 U.S.C. § 702 (¶ 3), and Count I alleged that USDA had violated the substantive provisions of the FMIA and the PPIA in approving "natural" labels for lactate-containing products (¶¶ 46-48). These paragraphs provided USDA with full information about the basis of the substantive rights to be adjudicated in the case. *See Dow Chemical Co. v. EPA*, 635 F. Supp. 126 (M.D. La. 1986). As the Complaint stated, Count I will be resolved under the substantive standards established by the FMIA and the PPIA. The APA provides only the generic cause of action under which the Court is authorized to consider this challenge. Accordingly, Count I is properly pleaded.

and comment that changed the criteria by which a manufacturer can use the "natural" label for products containing lactates.

Similarly, Count II does not seek to have the agency perform a ministerial act it is required by law to take. Rather, it challenges the agency's abandonment, on grounds that were arbitrary, capricious, and contrary to law, of a standard it previously had established to define when it would exercise its discretion to revoke "natural" labels previously approved and its consequent denial of Hormel's petition for rescission of labels. USDA would have the Court ignore the legal effect of its December 2006 letters establishing specific and objective triggering conditions for rescission. USDA's subsequent decision to abandon that standard on a class-wide basis therefore is properly reviewed under the normal "arbitrary, capricious or contrary to law" standard that applies to agency reversal of prior decisions, rather than by the more deferential standard that applies to agency decisions whether to utilize its enforcement authority in an individual case. *See State Farm*, 463 U.S. at 41, 52 (review of change in agency position); *Shell Oil Co. v. EPA*, 950 F.2d 741, 764 (D.C. Cir. 1991) (courts may review an agency decision "that it will not take enforcement actions in a whole class of cases.") Hormel's challenge to this reversal of position must be resolved under the *State Farm* standard, under which USDA "is obligated to supply a reasoned analysis for the change beyond that which may be required when an agency does not act in the first instance." 463 U.S. at 41.

### B. USDA's December 2006 Decision Cabined its Discretion and Established "Law to Apply" with Respect to Label Rescissions.

USDA also makes the related argument that its December 2006 decision did not cabin its enforcement discretion and did not establish "law to apply" in considering the

validity of its subsequent actions in determining whether to initiate label rescission proceedings. USDA Rep. Mem. at 12-16. This argument fails for several reasons.

First, USDA has not challenged Hormel's showing that the limitation on review of enforcement decisions articulated in *Heckler v. Chaney*, 470 U.S. 821 (1985), does not apply to an agency decision not to take enforcement actions in a whole class of cases. Hormel Opp. to Motion to Dismiss at 24. *See Edison Electric Inst. v. EPA*, 996 F.2d 326, 333 (D.C. Cir. 1993); *Shell Oil Co.*, 950 F.2d at 764.

Second, there was nothing "tentative" about USDA's statement of its intentions in December 2006. The agency sent letters to 24 manufacturers that held "natural" labels for lactate-containing products and required them to submit the required data to the agency within 60 days or USDA "will" initiate label rescission proceedings. USDA Rep. Mem. at 15. *See* AR 612-640 (even numbered pages). Further, USDA cites no authority (and there is none) for the proposition that its discretion is unfettered because the December 2006 letters did not specify a precise date by which the recipient must submit data to the agency or by which the agency must act. USDA Rep. Mem. at 16. Although articulated as a "request," this directive was in fact an order, as is evidenced by USDA's use of the term "no later than" and its explicit statement that it "will rescind its approval" if the product data submitted shows that the lactates have a preservative effect.

Third, there is no merit to USDA's claim that it did not limit its discretion with respect to label rescissions for entities that refused to submit the required information, because it did not "commit itself as to *when* it would act" to remedy this failure to comply. *Id.* If accepted, this argument would produce the absurd result that a company

which complied with the agency's demand for information could have its label rescinded, while an entity that refused to submit information would avoid a rescission action.

### C. Hormel Does Not Seek To Have the Court Preempt a USDA Rulemaking or To Adopt a New Standard that Will Govern During the Rulemaking; USDA Itself Has Adopted Without Notice and Comment a New Rule that <u>Already Has Been Applied and Will Be Applied in the Future.</u>

USDA argues that Count II should be dismissed because "[t]here simply can be no *final* agency action on rescission prior to a decision on the rulemaking process that will define the substantive criteria on which a final determination about rescission will be made."    USDA Rep. Mem. at 10.   Putative Intervenors argue Hormel seeks to preempt the outcome of the rulemaking and to have the Court adopt a new rule that will govern label rescission decisions.   Int. Mem. at 14-15.   Both arguments fail because they ignore the clear ramifications of what USDA already has done.

Hormel seeks only to have USDA follow the principles that applied prior to August 2005 and that USDA reinstated in December 2006 by rescinding the categorical exemption for sodium lactate.   As the Supplemental Derfler Declaration makes clear, since announcing that it would some day initiate a rulemaking on its "natural" policy, USDA already has adopted without notice and comment an interim rule that redefines "natural" in a manner that was never previously adopted or applied by the agency between 1982 and sometime in 2007.   Under these circumstances, the case law clearly establishes that the Court may review Hormel's claims at this time.

The finality criteria of *Bennett v. Spear*, 520 U.S. 154, 178 (1997), are satisfied here.   USDA's July 30, 2007 letter informed House Chairman Peterson that it had definitively determined not to institute label rescission proceedings pursuant to the

standards set forth in its December 2006 decisions.[13]  USDA does not assert otherwise in its Reply.  That agency decision determined the rights or obligations of the companies that hold these labels and of Hormel; the manufacturers may continue to sell their lactate-containing products indefinitely under a "natural" label.[14]

Moreover, the agency may not avoid judicial review of a decision that is in reality "final" by asserting that that it is merely deferring action indefinitely while it considers promulgating a new definition of "natural" in a rulemaking.[15]  The agency's argument improperly conflates a possible, but uncertain, action that might modify its policies prospectively (starting from the end of the rulemaking) with Hormel's current challenge to an agency action that was completed in 2007 and that is in effect now and will be until the end of the rulemaking.  It is this current, *de facto* rule, improperly adopted by the agency in 2007 – and not a rule that might result from any future rulemaking that is at issue in this lawsuit.  Hormel seeks rescission of the "natural" labels under the standards that USDA itself followed prior to August 2005 and reinstated in its December 2006 decision and invalidation of the new standard as to new applications for the indefinite interim period.  "The object of the rule making proceeding is the implementation or

---

[13] Putative Intervenors' assertion that USDA announced its December 5, 2006 decisions "in correspondence to Hormel's counsel" (Int. Mem. at 15) does not require a different conclusion.  The agency made the same announcement in the letters to 24 companies with an approved "natural" label and in the Federal Register Notice.  AR 612; 71 Fed. Reg. 70,503 (December 5, 2006).  In any event, letter rulings that resolve informal adjudications may constitute "final agency action" subject to judicial review, where, as here, the letters state the agency's position definitively and have a direct and immediate effect on the day-to-day businesses of the parties challenging the action.  *See John Doe, Inc. v. DEA*, 484 F.3d 561, 566 (D.C. Cir. 2007); *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 436 (D.C. Cir. 1986).

[14] USDA objects that rescission could impose significant costs if USDA were to require removal of products improperly labeled "natural" from store shelves.  USDA Rep. Mem. at 23.  It has authority, however, to bar prospective use of the label but allow existing product to be sold if certain conditions are met.  9 C.F.R. § 381.132.

[15] The case law provides that the deferral of relief over an extended period of time is tantamount to a denial.  *Sierra Club v. Thomas*, 828 F.2d 783, 793 (D.C. Cir. 1987) (quoting *Environmental Defense Fund, Inc. v. Hardin*, 428 F.2d 1093, 1099 (D.C. Cir. 1970)).

prescription of law or policy for the future, rather than the evaluation of . . . past conduct"

on a case-by-case basis. *Ass'n of National Advertisers, Inc. v. FTC*, 626 F.2d 1151, 1160

(D.C. Cir. 1979); *see Bi-Metallic Investment Co. v. State Bd. of Equalization*, 239 U.S.

441 (1915). Since an agency may not compel a company to participate in a rulemaking

or force it to submit particular types of data, the rulemaking (if it ever is instituted) does

not provide a mechanism for resolving whether lactates in particular products sold by

these 24 manufacturers are illegal under current law, as of May 2008.

Although USDA characterized its objection as a "finality" argument, in reality it

is a ripeness objection. This Circuit has held that a rulemaking which could moot a

challenged agency decision does not make an immediate lawsuit unripe, as the court has

"no way of knowing whether [the agency] might change its mind down the road (or be

required to do so)."[16] As the court stated in *General Electric*, 290 F.3d at 380:

> The fact that a law may be altered in the future has nothing to do with whether it
> is subject to judicial review at the moment. If the possibility ... of future revision
> in fact could make agency action non-final as a matter of law, then it would be
> hard to imagine when any agency rule . . . would ever be final as a matter of law.

Finally, USDA asserts that its decision not to initiate label rescission proceedings

for lactate-containing products "does not change USDA policy with regard to the

requirements for 'natural' labels." USDA Rep. Mem. at 9. Putative Intervenors also

argue that Hormel seeks to have the Court define "natural" before USDA has the chance

to conduct the rulemaking and that deference is due the agency's alleged effort "to

maintain the status quo" pending the rulemaking. Int. Mem. at 14. They have it exactly

---

[16] *American Paper Inst., Inc. v. EPA*, 996 F.2d 346, 355 n.8 (D.C. Cir. 1993) (citing *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-50 (1967)); *American Bird Conservancy, Inc. v. FCC*, 516 F.3d 1027, 1031 n.1 (D.C. Cir. 2008)("agencies cannot avoid judicial review of their final actions merely because they have opened another docket that may address some related matters."). *See also HRI, Inc v. EPA*, 198 F.3d 1224, 1236 (10th Cir. 2000) (an agency decision that affected legal rights was final even though it was only part of a broader, ongoing agency process, because the decision "represents the consummation of one decision-making process" despite the existence of other processes).

backwards.   The Supplemental Derfler Declaration shows that USDA has already changed the *status quo* by adopting a *de facto* interim rule that amends the definition of "natural" in a fundamental and unprecedented manner.

The new Derfler Declaration shows that USDA departed from the December 2006 decision in January 2007, when it wrote the companies that they could "demonstrate a lack of preservative effect" under the truncated test of measurement of shelf-life of products "in which lactates have been used as compared to products in which they have not been used."  Supp. Derfler Dec. ¶ 17.  Thereafter, generalizing from the limited and highly unreliable data it received, the agency adopted a new, global principle that the use of a lactate "as an antimicrobial to prevent the growth of *Lm* and other pathogens without affecting the outgrowth of spoilage organisms or extending the shelf-life of the product" does not constitute a preservative use based on the spurious notion that preservative effects on pathogenic bacteria are immaterial to a determination of what is "natural" and can be separated from effects on spoilage bacteria in a meaningful way. *Id. at* ¶ 23.

This change in the definition of "natural" – to eliminate from consideration the antimicrobial effect of lactates against human pathogens – is generally applicable to an entire industry and thus constitutes a *de facto* rule, adopted without notice and comment. USDA already has applied this principle in deciding not to institute label rescission proceedings against any manufacturer, including those that did not submit data, and in granting approval to at least one new application.   Further, the agency will continue applying this principle indefinitely.

Nowhere in its pleadings does USDA suggest that it followed this "shelf-life" rule between 1982 and August 2005, and the agency certainly did not do so in its December

2006 decisions.  It is also undeniable that the new "shelf-life" rule is now the applicable standard.  Accordingly, USDA and Intervenors are simply incorrect when they assert that Hormel is seeking to disrupt the *status quo* or to have the Court impose a change in the governing rules.  USDA already has accomplished that result quite effectively by itself.

**Conclusion**

For the reasons set forth above and in its Opening Memorandum, Hormel's Cross-Motion for Summary Judgment should be granted.

Respectfully submitted,

  /s/ Nancy S. Bryson                        /s/ John F. Cooney
NANCY S. BRYSON                       JOHN F. COONEY
(D.C. Bar No. 913673)               (D.C. Bar No. 936336)
Bryson Law Group PLLC             Venable LLP
575 7th Street, N.W.                 575 7th Street, N.W.
Washington, D.C. 20004            Washington, D.C. 20004
(202) 344-4731                     (202) 344-4812

                                        Counsel for Plaintiff
May 16, 2008                       Hormel Foods Corporation

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of May 2008, copies of *Plaintiff's*

*Reply Memorandum in Support of its Cross-Motion for Summary Judgment* was served

by the Court's ECF filing system on the following:

> William B. Jaffe, Esquire
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> 20 Massachusetts Avenue, N.W.
> Washington, D.C. 20530


> Kristin F. Roddy, Esquire
> Hogan & Hartson
> 555 Thirteenth Street, N.W.
> Washington, D.C. 20004


> _/s/ John F. Cooney_
> John F. Cooney