UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HORMEL FOODS CORPORATION, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>UNITED STATES DEPARTMENT )<br>OF AGRICULTURE, )<br>)<br>Defendant. ) | Civil Action No.<br>1:07-cv-1724 (RBW) |

PLAINTIFF'S SUPPLEMENTAL STATEMENT
OF MATERIAL FACTS THAT ARE IN DISPUTE

Pursuant to LCvR 7(h), in Opposition to the Motion for Summary Judgment submitted by defendant U.S. Department of Agriculture ("USDA"), plaintiff Hormel Foods Corporation ("Hormel") submits this Supplemental Statement of Material Facts that Are in Dispute in response to the Supplemental Statement of Material Facts as to Which There Is No Genuine Dispute submitted by USDA.

This document recites each paragraph of the Supplemental Statement of allegedly undisputed facts presented by USDA in support of its Motion for Summary Judgment and then states for each paragraph when the asserted fact is disputed and, if so, on what grounds.

    1. It has been brought to FSIS' attention that certain documents may have been missing from the Administrative Record. Shortly before the filing of this lawsuit, the labeling staff moved offices. Prior to the move, all of the approved applications for labels were boxed up and moved to one large room. At the time of the first search for documents for the Administrative Record, the labeling staff conducted a manual search of at least 200 boxes for responsive documents. Unfortunately, at the time of this initial search, some documents were overlooked. These documents included label applications for certain companies, including Oscar Mayer and Farmland Foods. These documents are now being included as part of the Administrative Record. (Supp. Derfler Decl. ¶ 3).

    Response: Undisputed.

2. Specifically, the following label applications are being included:

a. Three from Oscar Mayer: Application for smoked uncured beef franks, dated May 11, 2006; Application for smoked ham, dated June 22, 2006; and, Application for oven roast turkey breast, dated June 22, 2006.

b. Four from Farmland Foods: Application for spiral sliced ham, dated November 6, 2006; Application for deli style, dated November 20, 2006; Application for original ham, dated November 20, 2006; and Application for classic ham, dated November 21, 2006.

c. Two from Maverick Ranch: Application for bacon dated May 23, 2005; Application for bacon dated August 31, 2005.

d. Eight from Pederson's Natural Farms: Application for hickory smoked bacon dated July 12, 2002; Application for apple smoked bacon dated July 12, 2002; Application for apple smoked bacon dated September 18, 2002; Application for pepper smoked bacon dated September 18, 2002; Application for smoked ham shanks dated October 7, 2002; Application for honey ham dated October 8, 2002; Application for Canadian bacon dated November 20, 2002; and Application for pepper bacon dated March 18, 2003.

e. One from Yorkshire Farms: Application for cheese hot dogs dated May 16, 2003.

f. One from Premium Standards Farms: Application for bacon dated October 23, 2006.

g. One from Saag's Products: Application for smoked chicken sausage dated October 30, 2006.

h. One from Aidells: Application for smoked chicken and turkey sausage dated October 30, 2006.

i. One from Coleman Natural: Application for bacon dated October 30, 2006.

j. One from Riverwood Valley Farms: Application dated October 25, 2006. (Supp. Derfler Decl. ¶ 4).

Response:  Undisputed.

3. The Plaintiff asked that several other categories of documents be added to the Administrative Record in this case. The following documents cannot be included for the

2

following reasons: First, with respect to the two form letters sent to companies requesting information on sodium and potassium lactate, not all of the form letters sent to specific companies were found in the labeling division's files. Although these letters were created on a computer, they were each individually printed out on FSIS letterhead, date stamped, and signed by Robert C. Post, the then Director of the Labeling and Policy Staff. These letters cannot simply be printed off of the computer as they were sent out to the individual companies. However, if one were to look at the documents provided, it is easy to determine that other than a change in address, each of the letters was identical. (Supp. Derfler Decl. ¶ 5).

 Response: Undisputed.

 4. Plaintiffs also question why there are not label approvals for at least twenty-four companies, since letters were sent to that many companies. There are several reasons why there are not label approvals for all of the companies that received letters. First, letters were not only sent to subsidiaries that made "natural" products, but in some cases, they were also sent to the parent corporation. For example, a letter was sent to Smithfield Packing, the parent corporation, and to its subsidiaries, Farmland Foods and Premium Standards. Thus, in this instance, there are label approvals for both Farmland Foods and Premium Standards, but not for Smithfield Packing.

 Second, in some cases, letters were sent to contractors or suppliers of the component meat products, such as West Liberty Foods and Independent Meat Company. These companies are part of the manufacturing process, but are not the companies that necessarily obtain the label approvals. Third, there were some instances in which companies contacted the labeling staff to request letters to keep informed of developments in the "natural" policy, and the companies were sent letters. This was the case for Olymel SEC/LP, a broker of meat components. Finally, in some cases, a letter was sent to a company that has a "natural" single ingredient product or uses a "natural" component ingredient (however, the total product was not labeled as "natural"). For example, Swift & Sons has "natural" single ingredient pork products, while Godshall's Quality Meats uses "natural turkey" as a component in their total product. Essentially, the labeling staff attempted to cast as wide a net as possible in order to gather the fullest scope of information on the use of sodium and potassium lactates in products labeled "natural." (Supp. Derfler Decl. ¶ 6).

 Response: Disputed. USDA's explanation accounts for only six letters to entities related to the entity whose application was approved. Four letters are not accounted for.

 5. In addition, Plaintiffs request that several label applications for Farmland "Simply Natural" products be included in the Administrative Record. Where those label applications are relevant to this lawsuit, those documents are now being included.[1]

---

[1] Those labels are Simply Natural Spiral Sliced Ham, application dated November 6, 2006 (AR 002140); Premium Deli Style Ham, application dated November 20, 2006 (AR

However, there were two labels for "Simply Natural" products that were included as an exhibit to Plaintiff's motion that are not being added to the Administrative Record. Those labels are for Simply Natural Bacon and Simply Natural Sausage. Those label applications are not being included because those products do not include sodium lactate or potassium lactate. (Supp. Derfler Decl. ¶ 7).

    Response: Undisputed.

    6. Additionally, Plaintiffs believe that there are label applications subsequent to December 2006 that should be included in the Administrative Record. There has only been one applicable label approved since December 2006 and that label was previously provided in the original Administrative Record. This label was approved after the company, Pederson's Natural Farms, provided FSIS with evidence that the sodium lactate used in its product does not extend the shelf life of the product. Since December 2006, several companies have requested "natural" label approval with sodium or potassium lactate in their ingredient statement. The labeling division has denied the applications for labels where companies have not provided data to show that the potassium or sodium lactate does not have a preservative effect at levels of two percent or less. One company, Farmland Foods, has appealed the denial of its label applications. The appeal letter is now being included in the Administrative Record at AR 002248. (Supp. Derfler Decl. ¶ 8).

    Response: The statements in the first two sentences are undisputed. The statement in the third sentence is disputed to this extent: the information provided by Pederson's Natural Farms does not show that the sodium lactate used in its product does not extend the shelf life of the product because the study has fundamental flaws such as to make it unreliable. The remainder is undisputed.

    7. In the first Derfler declaration, Mr. Derfler explained the evolution of the "natural" policy with respect to the inclusion of sodium and potassium lactates. Further explanation of that policy follows. Beginning in approximately 2000 and 2001, USDA began receiving requests for the inclusion of potassium and sodium lactates in products with the "natural" label. However, USDA does not have copies of these requests because they came in the form of label applications. The labeling staff does not keep copies of label applications that are denied; rather, those label applications are returned to the respective applicants. (Supp. Derfler Decl. ¶ 9).

    Response: Disputed. USDA's assertions concerning the "evolution" of the Natural Policy in ¶¶ 7-14 of its Supplemental Statement of Undisputed Facts is

---

002146); Original Ham, application dated November 20, 2006 (AR 002148); and Classic Ham, application dated November 21, 2006 (AR 002150).

4

incomplete in several respects, including: (1) USDA has not included documents supporting its assertions, as the agency concedes in ¶ 7 itself; and (2) USDA's explanation ignores completely the documents in the Administrative Record which demonstrate that both before and after August 2005, it approved "natural" labels for products in which lactate levels exceeded 2%. *See* Mem. in Support of Hormel's Motion for Summary Judgment at 43.

    8. In 2002, Pederson's Natural Farms sent in a number of applications for label approvals. In the beginning of 2002, the labeling division approved several labels for "natural" products that contained sodium lactate, among other things. In July of that year, a letter was sent to Pederson's Natural Farms rescinding a series of labels, and any similar labels not listed in the letter, which may have included sodium lactate, sodium phosphate, sodium nitrate, spice extracts, or dextrose. This letter is now being included in the Administrative Record at AR 007152. The letter makes clear that, at that time, such substances could not be used in products labeled as "natural." Thereafter, for those products that included lactates, the labeling division clearly marked on those label applications that the products could not be labeled "natural." Defendant is including the modified label applications for those labels in the Administrative Record at AR 002177-002198. (Supp. Derfler Decl. ¶ 10).

    Response: Undisputed except that there is no page 007152 in the administrative record. A copy of a July 22, 2002, letter to Pederson's Natural Farms does appear at page 002152.

    9. There are two approved label applications in 2003 for products labeled as "natural" that have sodium lactate. These labels were for Pederson's Natural Farm and Yorkshire Farms. It appears that these labels were approved in error and that they are anomalies.[2] (Supp. Derfler Decl. ¶ 11).

    Response: Undisputed.

    10. In or around late 2003, Applegate Farms requested clarification that sodium and potassium lactates were allowed to be used as a flavoring in products labeled "natural." A decision was made in early 2004 to allow the use of sodium and potassium lactate in products labeled as "natural" after Applegate Farms produced a letter from the

---

[2] USDA has contacted Pederson's Farm about this label, and the company has assured USDA that this label is not in use. Yorkshire Farms is no longer a brand name that is used.

National Organic Program (NOP) stating that sodium and potassium lactates were approved for use in organic products. Once the labeling staff received that letter, it made a determination that given the stringent petition and approval policy at the NOP, and given that lactates could be used in products labeled as organic, then they could also be used in "natural" products. The labeling staff assumed that the lactates, at the two percent or less level, would not have a preservative effect and was being added solely as a flavoring agent.[3] (Supp. Derfler Decl. ¶ 12).

Response: Disputed in part. The first two sentences are undisputed. The third and fourth sentences are disputed. The labeling staff had no data to support its "assumption" that sodium and potassium lactates at the two percent or less level acted solely as a flavoring in meat and poultry products. The referenced email exchanges document a dialogue about NOP criteria and the flavoring and preservative effect of lactates. The ultimate test as set out by the Director of the Labeling and Consumer Protection Staff, Dr. Robert Post, however, required applicants to "make the case" under the Natural Policy that the substance, even if listed on the National List, is not an "antimicrobial/shelf-life extension agent . . . ." AR 2207.

11. The evaluation criteria for the NOP are in many ways similar to those used for "natural" products. For example, NOP looks at whether the product comes from a natural source; whether the substance's primary use is as a preservative or to recreate or improve flavors; and whether the substance is listed as generally recognized as safe by the Food and Drug Administration. 7 C.F.R. § 205.601. (Supp. Derfler Decl. ¶ 13).

Response: Disputed. The Natural Policy expressly excludes products containing ". . . any other artificial or synthetic ingredient . . . ." AR 7. The NOP expressly allows the use of <u>synthetic</u> ingredients so long as they have been reviewed and added to the "National List" by the National Organic Standards Board. 7 U.S.C. § 6517(a); 7 C.F.R. §§ 205.600, 205.601. The Natural Policy bars only artificial flavor or flavoring. AR 7. The NOP bars use of a substance used "to recreate or improve flavors . . . lost during

---

[3] See electronic mail message between Robert C. Post and the Labeling and Consumer Protection Staff dated March 17, 2004, at AR 002207.

6

processing . . .," regardless of whether the flavoring is artificial or not. 7 C.F.R. § 205.600(b)(5).

    12. With respect to the processing of the product, NOP has a definition that is similar to FSIS' minimal processing definition. In the definition of "natural," FSIS has stated that minimal processing may include "those traditional processes used to make food edible or to preserve it or make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting." Similar to that, NOP's definition of "processing" is limited to "cooking, baking, curing, drying, mixing, grinding, churning, separating, extracting, slaughtering, cutting, fermenting, distilling, eviscerating, preserving, dehydrating, freezing, chilling, or otherwise manufacturing and includes the packaging, canning, jarring, or otherwise enclosing food in a container." 7 C.F.R. § 205.2. Similar to the FSIS' definition of "natural," the NOP eschews severe chemical processes such as ionizing radiation. 7 C.F.R. § 205.105. (Supp. Derfler Decl. ¶ 14).

    Response: Disputed. The Natural Policy requires an affirmative demonstration that "the product and its ingredients are not more than minimally processed." AR 7. The NOP provides examples of permitted "[m]echanical or biological methods . . . used to process an organically produced agricultural product for the purpose of retarding spoilage or otherwise preparing the agricultural product for market" but does not expressly require that processing be no more than minimal. 7 C.F.R. § 205.270(a).

    13. As stated above, the labeling staff assumed that sodium and potassium lactates at the two percent or less level acted solely as a flavoring in meat and poultry products because lactates had been approved for flavoring at that level in FSIS regulations contained at 9 C.F.R. 424.21 (see also preamble to regulations contained at 58 Fed. Reg. 4067 (January 13, 1993)). Although the two percent limitation was not written directly into the policy, the purpose of use of each ingredient is always considered when making a determination with respect to a label application. Since FSIS already had regulations governing the use of sodium and potassium lactates with respect to levels for flavoring, those regulations and whether the formulation for the products fit within that limitation were always considered. If the sodium or potassium lactate levels did not fit within the flavoring range, then those applications would have been questioned. The labeling staff considers all applicable FSIS regulations when considering each application. (Supp. Derfler Decl. ¶ 15).

    Response: Disputed.

7

(1) The labeling staff had no data to support its "assumption" that sodium and potassium lactates at the two percent or less level acted solely as a flavoring in meat and poultry products. The 1993 USDA rule dealt exclusively with the safety issues associated with inclusion of sodium and potassium lactates in foods and determined that foods were safe for human consumption with lactates up to that maximum level. Neither the rule nor its preamble addressed the entirely separate question of the labeling of "natural" products at any percentage of lactates in product formulation. 58 Fed. Reg. 4067 (January 13, 1993).

(2) The Administrative Record shows that USDA did not follow a policy of approving sodium or potassium lactates in foods subject to a two percent limit of product formulation, which the agency claims to have derived from the 1993 agency rule determining that it was safe to include lactates in foods up to that level. USDA never included a two percent limitation in the written definition of "natural." Both before and after it created a global exception for sodium lactate in August 2005, USDA approved "natural" labels for products that contained lactates at levels in excess of two percent. The original version of the Record produced by USDA contained at least three such labels (Hormel Mem. in Support of Motion for Summary Judgment at 43), and the supplemental material submitted as part of the Administrative Record contain at least one more such label. AR 2434.

14. At the time that the Agency promulgated regulations for the use of sodium and potassium lactate as a flavoring in 1993, evidence discussed in response to comments submitted suggested that using lactates at the two percent or less level would not provide a preservative effect, and the Agency was not aware of any evidence to the contrary at the time that the "natural" policy was updated in August 2005. (Supp. Derfler Decl. ¶ 16).

Response: Disputed.

(1) The 1993 USDA rule dealt exclusively with the safety issues associated with inclusion of sodium and potassium lactates in foods. Neither the rule nor its preamble addressed the entirely separate question of the labeling of "natural" products at any percentage of lactates in product formulation. 58 Fed. Reg. 4067 (January 13, 1993). The preamble to the rule expressly noted that there were indications that lactates had a preservative effect against human pathogens and stated that USDA would conduct a subsequent rulemaking on that issue. 58 Fed. Reg. 4069. That subsequent rulemaking was completed in 2000 and established only a maximum upper limit on the amount of sodium or potassium lactate that could be included in a food, consistent with safety concerns. 65 Fed. Reg. 3121 (December 20, 2000).

(2) USDA has not included the comments on the 1993 rule in the Administrative Record. The preamble asserted that "nor do data support that a product containing potassium lactate or sodium lactate could be stored at *room temperature* without resulting in a spoiled product," but does not specifically discuss whether a 2% level is a threshold for preservative effects. (Emphasis added)

(3) The Administrative Record demonstrates that USDA had information prior to August 2005 that sodium or potassium lactate had a preservative effect at levels of two percent or less. In particular, the Record shows that that putative Intervenor Kraft made many submissions to USDA between November 15, 2002 and May 2006 about the preservative effect of lactates at the two percent level or lower. AR 811-12. These submissions included a November 15, 2002 presentation of data on use of lactate salts as a preservative to limit growth of *Listeria* (AR 811-12); a February 2003 submission of a published scientific article regarding another study demonstrating a similar preservative

9

effect at a 1.5% potassium lactate concentration (AR 812); a March 2003 submission on the antimicrobial properties of lactates (*id.*); and a July 15, 2005 submission of the Purac patents to USDA which claimed an antimicrobial effect at levels well below two percent (*id.*).

      15. In order for FSIS to be assured that the labeling of meat and poultry products bearing the claim "natural" in which lactates are used for flavoring is truthful and not misleading, in December of 2006, FSIS requested that manufacturers provide data on whether products containing lactates exhibited similar microbiological characteristics as products formulated without lactates (i.e., there is no significant lethality or suppression of growth in spoilage organisms that would suggest that the use of lactates as flavorings provides manufacturers with the added benefit of an extended shelf life). Because of questions that arose on how manufacturers should demonstrate a lack of preservative effect, in January 2007, FSIS clarified that the data should show that the same shelf-life and product dating parameters were applied to products in which lactates have been used as compared to products in which they have not been used. (Supp. Derfler Decl. ¶ 17).

    Response: Disputed.

    (1) USDA misstates the contents of its letters to manufacturers in December 2006. USDA required each manufacturer to demonstrate that the lactate ingredient had no preservative effect in its product and stated that "[a] preservative function includes those of an antimicrobial, i.e. reducing microorganisms and extending shelf-life . . . ." AR 611. USDA also stated that if lactates are used in products bearing the claim "natural" at levels less than two percent "to increase product shelf-life, improve food safety, and control pathogens, the use of the ingredients is contrary to the meaning of "natural . . . ." AR 612. USDA also stated that if it were to find that the effect of using lactates at two percent or less is that of an antimicrobial, the agency will rescind its approval of the labels for these products.

    In addition, USDA did not state that manufacturers were to provide data on whether products containing lactates exhibited "similar" microbiological characteristics.

The letters required data showing "the same" microbiological characteristics. AR 612. The letters also did not state that data on microbiological characteristics referred to whether there is "significant lethality or suppression of growth in spoilage organisms that would suggest that the use of lactates as flavorings provides manufacturers with the added benefit of an extended shelf life." This "i.e.," statement was added by USDA in the course of defending this litigation. The agency decision cannot be defended on the basis of this added, *post hoc* characterization. AR 612.

USDA later changed its position in January 2007, when it informed manufacturers that they could ignore the established antimicrobial effect of lactates in inhibiting the growth of pathogens and need show only that the shelf-life and product dating parameters of the product were not affected by the inclusion of lactates. AR 760.

(2) The term "antimicrobial" is defined as "[d]estroying or suppressing the growth of microorganisms." Webster's II *New College* Dictionary 52 (3rd ed. 2005). USDA defines an "antimicrobial agent" as any substance "that has the effect of reducing or eliminating a microorganism . . . ." 9 C.F.R. § 430.1. Under this definition, the scientific literature demonstrates that lactates have an "antimicrobial" effect against human pathogens. The January 2007 USDA letter to manufacturers instructed manufacturers that they could ignore this antimicrobial effect of lactates.

    16. Hormel has specifically raised questions about the data submitted to the Agency by Plumrose, Fresherized Foods, and Pederson's Natural Farms. The data submitted by these companies indicated that, under identical controlled conditions, the outgrowth of spoilage organisms, such as yeast, mold, and lactic acid bacteria, in meat and poultry products containing similar appearance, odor, and package integrity over time were the same as the non-sodium lactate containing products. In addition, the labeled "use by" dates on products to which sodium lactate had been added were the same as those of products with the same formulation but that did not contain sodium lactate. (Supp. Derfler Decl. ¶ 18).

Response: Disputed.

(1) The term "antimicrobial" is defined as "[d]estroying or suppressing the growth of microorganisms." Webster's II *New College* Dictionary 52 (3rd ed. 2005). USDA defines an "antimicrobial agent" as any substance "that has the effect of reducing or eliminating a microorganism . . . ." 9 C.F.R. § 430.1. Under this definition, the scientific literature demonstrates that lactates have an "antimicrobial" effect against human pathogens by inhibiting their growth. The January 2007 USDA letter to manufacturers instructed manufacturers that they could ignore this antimicrobial effect of lactates.

(2) The shelf life studies submitted by the only four manufacturers contain scientific defects or contradicted USDA's conclusions and therefore failed to provide a basis for concluding that the growth of spoilage organisms in products containing lactates were the same as for products not containing lactates.

(a) The Kraft study is a food spoilage study that actually shows that the lactates in the products did inhibit the growth of the food spoilage bacteria and thus had a preservative effect in the product under USDA's new test. AR 821-828 ("more growth in the treatment with no antimicrobial ingredients"); Declaration of Richard J. Christianson, ¶ 11.

(b) The Fresherized Foods study measures only the antimicrobial effect on pathogenic bacteria and lacks any data whatsoever concerning effects on food spoilage bacteria. AR 796-805.

(c) The Plumrose study was conducted at temperatures well below those established in the standard AOAC methodology for the test performed, the Petri-film analysis. AR 847-848. Official USDA guidance provides that shelf-life studies should

be conducted under conditions of slight temperature abuse (i.e. higher temperatures) to provide accurate results because bacterial growth is inhibited by low temperatures. *Compliance Guidelines to Control Listeria Monocytogenes in Post-Lethality Exposed Ready-To-Eat Meat and Poultry Products* ("Listeria Guidelines"), USDA, USDA, May 2006 at 94, available at www.fsis.gov/regulations_+_policies/compliance_guides_index/index.app. See Christianson Decl. ¶ 8.

(d) The Pederson Farms study evaluates products with spoilage bacteria counts at the outset of the study that rendered the products spoiled, and therefore already beyond their shelf-life. AR 864-869. Christianson Decl. ¶ 13.

17. It is important to note that FSIS did not request that manufacturers follow a specific protocol to evaluate the microbiological characteristics of their products. The lactates at issue have already undergone scientific evaluation, and a public rulemaking process, to assess their safety and suitability as a substance generally recognized as safe for use in food as a flavoring. FSIS only requires that manufacturers use ingredients in a manner that demonstrably is consistent with their intended technical effects. Thus, when Hormel presented FSIS with information that suggested that lactates might provide a preservative effect at a level consistent with that used for flavoring, FSIS felt it was necessary to request documentation from the companies that were using the lactates for their flavoring effect, at the two percent or less level, to demonstrate that they were using the lactates for flavoring and not to preserve the food, and thus to justify that a "natural" label claim is truthful and not misleading. Thus, in the January 2007 letter sent to companies, FSIS stated that establishments could show that they were using the same "use by" date for their products with and without sodium or potassium lactate in order to provide assurance that they were not taking advantage of any preservative effect. (Supp. Derfler Decl. ¶ 19).

Response: Disputed.

(1) Whether USDA has approved an ingredient as safe for use in food does not determine whether the same ingredient may be used in a product that is labeled "natural." Under the 1982 "natural" policy, meat and poultry products may not be labeled as "natural" if they contain "any artificial flavor or flavoring coloring ingredient, or

chemical preservative (as defined in 21 CFR 101.22), or any other artificial or synthetic ingredient." A "chemical preservative," as defined by the Food and Drug Administration in 21 C.F.R. § 101.22, is "[a]ny chemical that, when added to a food product, tends to prevent or retard deterioration thereof." The "natural" policy thus incorporates an FDA rule thus applies a purely functional test – does the substance "prevent or retard deterioration"?

(2) The term "antimicrobial" is defined as "[d]estroying or suppressing the growth of microorganisms." Webster's II *New College* Dictionary 52 (3rd ed. 2005). USDA defines an "antimicrobial agent" as any substance "that has the effect of reducing or eliminating a microorganism . . . ." 9 C.F.R. § 430.1. Under this definition, the scientific literature demonstrates that lactates have an "antimicrobial" effect against human pathogens by inhibiting their growth. The January 2007 USDA letter to manufacturers instructed manufacturers that they could ignore this antimicrobial effect of lactates.

(3) USDA improperly changed its position in January 2007, when it informed manufacturers that they could ignore the established antimicrobial effect of lactates in inhibiting the growth of pathogens and need show only that the shelf-life and product dating parameters of the product were not affected by the inclusion of lactates. AR 760.

18. For this reason, FSIS did not take issue with Plumrose's protocol in which samples for Anaerobic Plate Count (APC) and lactic acid bacteria were held under incubation at 30°C for 48 hours, and samples for yeast and mold were held under incubation at 30°C for 72 hours instead of an incubation temperature of 35°. This five degree difference was not seen as a significant flaw since both the products with and without lactates were evaluated under the same conditions. FSIS believes that this study did show that product formulated with and without lactates subjected to the same controlled conditions (i.e., incubation temperatures) had similar microbial growth patterns over their shelf-life. FSIS felt this data, along with Plumrose's use of the same expiration date (56 days) for products formulated with and without lactates, was sufficient to show that Plumrose was not benefitting from an extended shelf life from the use of lactates. (Supp. Derfler Decl. ¶ 20).

Response: Disputed.

(1) The scientific literature demonstrates that lactates have an "antimicrobial" effect against human pathogens by inhibiting their growth. USDA acted improperly in January 2007, when it informed manufacturers that they could ignore the established antimicrobial effect of lactates in inhibiting the growth of pathogens and need show only the that the shelf-life and product dating parameters of the product were not affected by the inclusion of lactates. AR 760.

(2) The Plumrose study was conducted at temperatures well below those established in the standard AOAC methodology for the test performed, the Petri-film analysis. AR 847-848. Official USDA guidance provides that shelf-life studies should be conducted under conditions of slight temperature abuse (i.e. higher temperatures) to provide accurate results because bacterial growth is inhibited by low temperatures. *Listeria Guidelines* at 94. *See* Christianson Dec. ¶ 8.

19. In regard to Fresherized Foods, its study on the use of lactates at 1 and 1.5 percent of the product formula concluded that the use of lactates did not significantly reduce or suppress the growth of *Listeria monocytogenes (Lm)*, and thus its use would not be justified for pathogen control in the production of their ready-to-eat beef and chicken strips. Fresherized, also responded to FSIS that it applies the same "use by" dates for products formulated with and without lactates. This lack of evidence of a significant antimicrobial effect, along with the company's use of the same "use by" dates, was again considered sufficient by the Agency to meet the Agency's data request described above. In regard to Pederson's Natural Farm's data, the microbial growth rate for products formulated with lactates at 1.5 and 2.0 percent as compared to products formulated without lactates was similar (i.e., 1.1 logs, 1.6 logs, and 1.5 logs, respectively). Similar to Plumrose and Fresherized Foods, Pederson's Natural Farms concluded from its data that the use of lactates did not provide a preservative effect to extend shelf life and informed the Agency that it uses the same code date (65 days) for product treated with and without lactates. (Supp. Derfler Decl. ¶ 21).

Response: Disputed.

(1) The scientific literature demonstrates that lactates have an "antimicrobial" effect against human pathogens by inhibiting their growth. USDA acted improperly in January 2007, when it informed manufacturers that they could ignore the established antimicrobial effect of lactates in inhibiting the growth of pathogens and need show only that the shelf-life and product dating parameters of the product were not affected by the inclusion of lactates.

(2) The Fresherized Foods study actually demonstrates a clear antimicrobial effect at both 1% and 1.5% sodium lactate solutions. AR 795-805; Christianson Decl. ¶ 10. Further, this study measures only the antimicrobial effect on pathogenic bacteria and lacks any data whatsoever concerning effects on food spoilage bacteria. AR 796-805. This study provides no basis for the conclusion that the product with lactates did not extend shelf-life by affecting the outgrowth of spoilage bacteria. The study also provides no basis for assuming that results measured for antimicrobial effect on pathogenic bacteria will be the same or similar to results for antimicrobial effect on spoilage bacteria.

(3) The Pederson Farms study evaluates products with spoilage bacteria counts at the outset of the study that rendered the products spoiled, and therefore already beyond their shelf-life. AR 864-869. Christianson Dec. ¶ 13.

20. The Agency recognizes that many variables (e.g., a product's initial microbial load, sodium content, pH, and study design) will affect the data that are generated in any microbiological study. However, in each of the cases described above, the Agency found that the data that were submitted along with each manufacturer's use of the same "use by" date for products formulated with and without lactates were reasonable given the Agency's data request and indicative that each use of lactates was consistent with its approved use as a flavoring agent as opposed to the use of lactates for microbial control to achieve an extended shelf-life. (Supp. Derfler Decl. ¶ 22).

Response: Disputed. The scientific literature demonstrates that lactates have an "antimicrobial" effect against human pathogens by inhibiting their growth. USDA acted

improperly in January 2007, when it informed manufacturers that they could ignore the established antimicrobial effect of lactates in inhibiting the growth of pathogens and need show only that the shelf-life and product dating parameters of the product were not affected by the inclusion of lactates. AR 760. As noted in responses to ¶¶ 16-19, the shelf life studies submitted by the four manufacturers contain scientific defects or contradict USDA's conclusions and therefore failed to provide a basis for concluding that the growth of spoilage organisms in products containing lactates were the same as for products not containing lactates.

    21. Thus, the data submitted by these companies provide support for their claims that Plumrose, Fresherized Foods, and Pederson's Natural Farms were not using sodium lactate for its preservative effect, i.e. to prevent or retard deterioration of the meat or poultry products to which it had been added. Instead, the data tended to support the companies' claim that the sodium lactate was functioning as a flavoring agent, its intended use, with a possible added benefit (shown in data other than those submitted by Fresherized Foods) of enhancing food safety by preventing the growth of pathogenic bacteria, specifically *Lm*. While the use of sodium lactate as a preservative in a meat or poultry product would disqualify the product from bearing a "natural" claim, its use as a flavoring agent or as an antimicrobial to prevent the growth of *Lm* and other pathogens without affecting the outgrowth of spoilage organisms or extending the shelf life of the product would not. (Supp. Derfler Decl. ¶ 23).

    Response: Disputed.

    (1) The scientific literature demonstrates that lactates have an "antimicrobial" effect against human pathogens by inhibiting their growth. USDA acted improperly in January 2007, when it informed manufacturers that they could ignore the established antimicrobial effect of lactates in inhibiting the growth of pathogens and need show only that the shelf-life and product dating parameters of the product were not affected by the inclusion of lactates. AR 760.

    (2) As noted in responses to ¶¶ 16-19, the shelf life studies submitted by the four manufacturers contain scientific defects or contradict USDA's conclusions and therefore

failed to provide a basis for concluding that the growth of spoilage organisms in products containing lactates were the same as for products not containing lactates.

(3) The Fresherized Foods study actually demonstrates a clear antimicrobial effect at both 1% and 1.5% sodium lactate solutions. AR 795-805; Christianson Decl. ¶ 10.

(4) In ¶ 23 of the Supplemental Derfler Declaration, USDA announces for the first time a new regulatory standard, i.e., that the effect of chemical lactates on pathogenic bacteria, such as *Listeria monocytogenes*, is immaterial to deciding whether a product containing such substances can be labeled "natural." This new test is contrary to the Natural Policy in force from 1982 to 2005, and as reinstated in 2006. The shelf-life studies submitted by the four manufacturers provide no rational basis for USDA's new, generally applicable rule that effects on pathogenic bacteria can be disregarded.

22. The documents submitted by these companies are not the only documents being considered by FSIS in developing its policy with respect to meat and poultry products labeled "natural." In addition to the documentation submitted by these companies, FSIS is also considering the comments made at the public meeting held in December 2006, as well as all of the comments received in response to its request for comments. The data, documentation, and views expressed cover a variety of points of view with respect to how the Agency should make determinations with respect to the approval of "natural" labels. (Supp. Derfler Decl. ¶ 24).

Response: Undisputed.

Respectfully submitted,

/s/ Nancy S. Bryson
NANCY S. BRYSON
(D.C. Bar No. 913673)
Bryson Law Group PLLC
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4731

/s/ John F. Cooney
JOHN F. COONEY
(D.C. Bar No. 936336)
Venable LLP
575 7th Street, N.W.
Washington, D.C. 20004
(202) 344-4812
jfcooney@venable.com

Counsel for Plaintiff
Hormel Foods Corporation

May 16, 2008

19

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 16th day of May 2008, copies of Plaintiff's Supplemental Statement of Material Facts that Are in Dispute were served by the Court's ECF filing system on the following:

>William B. Jaffe, Esquire
>U.S. Department of Justice
>Civil Division, Federal Programs Branch
>20 Massachusetts Avenue, N.W.
>Washington, D.C. 20530
>
>
>Kristin F. Roddy, Esquire
>Hogan & Hartson
>555 Thirteenth Street, N.W.
>Washington, D.C. 20004

>        /s/ John F. Cooney
>        John F. Cooney