**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                             )

HORMEL FOODS CORPORATION,    )

        Plaintiff,                     )

        v.                              )

UNITED STATES DEPARTMENT OF    )
AGRICULTURE,                    )

        Defendant,              )    Civil Action No. 07-1724 (RBW)

FARMLAND FOODS, INC.,         )
KRAFT FOODS GLOBAL, INC.,     )
PURAC AMERICA, INC., SARA LEE  )
CORPORATION, SMITHFIELD FOODS, )
INC., AND TYSON FOODS, INC.,      )

        Defendant-Intervenors.    )
_____)

**MEMORANDUM OPINION**

       Hormel Foods Corporation, the plaintiff in this civil lawsuit, seeks declaratory and injunctive relief against the United States Department of Agriculture ("USDA") under the Federal Meat Inspection Act, 21 U.S.C. § 601 (2006), the Poultry Products Inspection Act, 21 U.S.C. §§ 453, 458 (2006), and the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 (2006), for the "substantial harm," Complaint ("Compl.") ¶ 32, it claims to have suffered from the alleged failure of the USDA to rescind labels for certain meat and poultry products, Compl. at 1.  Currently before the Court is the defendant's motion to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), or, in the alternative, for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Def.'s Mot."), as well as the plaintiff's cross-motion for summary judgment ("Pl.'s Mot.").  After carefully considering the Complaint, each party's

motions, their attachments, and the filings submitted in support of these motions,[1] the Court concludes for the following reasons that it must grant the defendant's motion to dismiss the complaint, and deny as moot the plaintiff's cross-motion for summary judgment.

## I. BACKGROUND

A. <u>Statutory and Regulatory Framework</u>

Finding it "essential [to] the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged," Congress passed the Federal Meat Inspection Act ("FMIA") "to prevent and eliminate burdens upon [interstate or foreign] commerce, to effectively regulate such commerce, and to protect the health and welfare of consumers."  21 U.S.C. § 602 (2006).  The FMIA, among other things, forbids "any act . . . intended to cause or [having] the effect of causing [articles from meat or meat products capable of use as a human food] to be adulterated or misbranded" while these products "are being transported in commerce or held for sale after such transportation."  <u>Id.</u> § 610(d).  The relevant definitions of the term "misbranded" provided by the statute apply to "any carcass, part thereof, meat or meat food product under one or more of the following circumstances:" (1) "if its labeling is false or misleading in any particular," <u>id.</u> § 601(n)(1); (2) "[i]f it bears or contains any . . . chemical preservative[s], unless it bears labeling stating that fact," provided that "the Secretary [of Agriculture]" has not "promulgated "regulations" exempting "compliance with the requirements of this [particular] subparagraph . . . " based on it being impracticable to do so, <u>id.</u>

---

[1] In addition to the record documents already cited, the Court considered the following filings and attachments thereto in rendering its decision: (1) the Plaintiff's Memorandum in Opposition to Motion to Dismiss or, in the Alternative, Motion for Summary Judgment ("Pl.'s Opp'n"); (2) the Opposition by Putative Intervenors to Plaintiff's Cross Motion for Summary Judgment; (3) the Defendants' [sic] Response to Plaintiff's Statement of Material Facts in Support of its Motion for Summary Judgment; (4) the Defendant's Reply Memorandum in Support of its Motion to Dismiss/Motion for Summary Judgment, and Memorandum in Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Def.'s Reply"); (5) the Plaintiff's Reply Memorandum in Support of its Cross-Motion for Summary Judgment; and (6) the Plaintiff's Supplemental Statement of Material Facts that are in Dispute.

§ 601(n)(11); and (3) "[i]f it fails to bear . . . the inspection legend and . . . such other information as the Secretary [of Agriculture] may require . . . to assure that it will not have false or misleading labeling and that the public will be informed of the manner of handling required to maintain the article in a wholesome condition," id. § 601(n)(12).

Similarly, Congress has declared its "policy . . . to provide for the inspection of poultry and poultry products and otherwise regulate the processing and distribution of such articles" through the Poultry Products Inspection Act ("PPIA"). 21 U.S.C. § 452. Like the FMIA, the PPIA forbids "any act . . . intended to cause or [having] the effect of causing [poultry products capable of use as human food] to be adulterated or misbranded" while those products "are being transported in commerce or held for sale after such transportation." 21 U.S.C. § 458(a)(3). And, again, like the FMIA, the PPIA defines the term "misbranded" to include the three definitions listed above with respect to meat or meat products. See id. § 453(h)(1), (11)-(12) (setting forth the same definitions of the term "misbranded" as those set forth in the analogous sub-parts of § 601(n)).

To implement these statutory provisions, the Food Safety and Inspection Service ("FSIS"), a component of the USDA, has issued a series of regulations concerning the appropriate methods for labeling meat and poultry products. One such regulation provides that "[c]ontainers of other product packed in, bearing, or containing any chemical preservative shall bear a label stating that fact." 9 C.F.R. § 317.2(j)(12) (2007). Another FSIS regulation provides:

> No product or any of its wrappers, packaging, or other containers shall bear any false or misleading marking, label, or other labeling and no statement, word, picture, design, or device which conveys any false impression or gives any false indication of origin or quality or is otherwise false or misleading shall appear in any marking or other labeling. No product shall be wholly or partly enclosed in any wrapper, packaging, or other container that is so made, formed, or filled as to be misleading.

3

Id. § 317.8(a).

One labeling issue of concern to the FSIS is the use of the term "natural" on the labels of food products. According to the plaintiff, "'natural' products have become of increasing interest to many health-conscious consumers" over the last twenty-five years, as many consumers "seek to avoid ingestion of chemical preservatives, artificial flavorings and ingredients, and highly processed foods." Compl. ¶ 20. In 1982, the FSIS issued an internal policy guidance, the Food Standards and Labeling Policy Book ("Policy Book"), "that set forth the standards by which it would decide whether meat and poultry products could carry the term 'Natural' on their labels without being false and misleading, and thus without triggering the misbranding provisions of the FMIA or the PPIA." Id. ¶ 21. As written in 1982, the Policy Book designated two criteria for approval of a "Natural" product label: (1) the product could not "contain any artificial flavor or flavoring, coloring ingredient, or chemical preservative" within the meaning of 21 C.F.R. § 101.22, and (2) "the product and its ingredients" could not be "more than minimally processed." Compl. ¶ 22.

"[The] FSIS chose not to devise its own, novel definition of the term 'chemical preservative'" for use in the Policy Book. Id. ¶ 23. Instead, it adopted the definition provided in 21 C.F.R. § 101.22, which defines the term as "any chemical that, when added to food, tends to prevent or retard deterioration thereof [other than] common salt, sugars, vinegars, spices, or oils extracted from spices, substances added to food by direct exposure thereof to wood smoke, or chemicals applied for their insecticidal or herbicidal properties." 21 C.F.R. § 101.22(a)(5). The FSIS did, however, provide its own definition of the term "minimally processed," limiting it to the "traditional processes used to make food edible or preserve it or make it safe for human consumption" such as "smoking, roasting, freezing, drying, and fermenting," or "those physical

4

processes which do not fundamentally alter the raw product and/or which separate a whole, intact food into component parts" such as "grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices."  Compl. ¶ 24.

"In August 2005, the FSIS revised [the 1982 Policy Book] concerning the 'Natural' label claim."  Id. ¶ 28.  The revision adopted the same criteria for determining whether a "natural" label can be carried on meat and poultry products without being misleading, but added an exception to this criteria for "[s]ugar, sodium lactate (from a corn source)[,] natural flavorings from oleoresins[,] or extractives," which the FSIS deemed "acceptable for 'all natural' claims."  Id.  "This exception did not impose any limit upon the amount of sodium lactate that could be added to a food product and still have the product qualify for a 'Natural' label."  Id.  Since the revision, the FSIS has allegedly approved the sale of certain food products marketed with a "natural" label "without label disclosure of the fact that the products contain[ed] the added chemical potassium lactate and that this chemical has a preservative effect on the food."  Id. ¶ 31.

B.  The Plaintiff's Interest in Natural Labels

The plaintiff "is a Delaware corporation . . . [that] manufactures and sells to consumers in all [fifty] States prepackaged meat and poultry products, including ham and turkey."  Id. ¶ 1.  In accordance with the 1982 criteria set forth in the Policy Book for conditions under which a product may bear a "natural" label, "[the plaintiff] successfully developed a method for use of a high-pressure pasteurization process designed to inactivate micro-organisms that may be present in the product, and thus maintain the quality and flavor of its foods[] without having to add chemical preservatives to them."  Id. ¶ 26.  "In mid-2005"—before the FSIS amended its criteria for using labels bearing the word "natural" for meat and poultry products containing sodium lactate and approved individual applications to use the word "natural" on meat and poultry

5

products containing potassium lactate—"[the plaintiff] received FSIS pre-marketing approval to sell and distribute under the 'Natural' label its Natural Choice® deli meats, which are produced through this high-pressure pasteurization process and without [the] addition of chemical preservatives." Id. This technology is used "in the manufacture of various deli meats, including ham, turkey[,] and roast beef." Id.

The plaintiff contends that it "suffers substantial harm from the [defendant's subsequent] approval of labels allowing its competitors to sell" meat and poultry products bearing the label "natural" even though those products contain sodium or potassium lactate, id. ¶ 32, because "[i]t is significantly less costly for a manufacturer to use a chemical preservative such as sodium or potassium lactate to produce a pre-packaged deli meat with a given shelf life than it is for [the plaintiff] to use its high-pressure pasteurization process to produce the same product," id. ¶ 27.

C.  The plaintiff's requests to the USDA and the USDA's response

"On October 9, 2006, [the plaintiff] petitioned the [defendant] to conduct a rulemaking regarding 'Natural' claims," on the grounds that (1) "the exemption for sodium lactate created by the [2005 revision to the Policy Book] permitted [the] sale under a 'Natural' label of meat and poultry products that contained chemical preservatives and synthetic ingredients and that were more than minimally processed," and (2) "that the exemption for sodium lactate rendered the definition of 'Natural' internally inconsistent . . . with the general requirement" that a meat or poultry product bearing a "natural" label not contain any chemical preservatives as defined by 21 C.F.R. § 101.22. Id. ¶ 34.

The very next day, October 10, 2006, "[the plaintiff] requested that [the] FSIS rescind as false and misleading the 'Natural' labels under which a competitor sold three meat or poultry

products . . . because the products contained the added chemical preservative potassium lactate[] without disclosing that fact to consumers." Id. ¶ 35. The plaintiff supplemented this latter request with "further information and legal arguments" in support of its position on November 7, 2006.[2] Id. ¶ 36.

On December 6, 2006, then-Under Secretary of Agriculture Richard A. Raymond sent a letter to the plaintiff addressing the plaintiff's requests. Id., Exhibit ("Ex.") 1 (December 6, 2006 Letter from Under Secretary Raymond to Nancy S. Bryson ("December 6, 2006 Letter")) at 1-2.[3] Under Secretary Raymond represented to the plaintiff that the "FSIS ha[d] initiated several steps to address [the issue of lactates being used as preservatives.]" Id., Ex. 1 (December 6, 2006 Letter) at 1. He explained:

> First, [FSIS has] written to the companies with approved meat and poultry product labels bearing the "natural" claim and containing lactates at levels of 2 percent or less. These companies were advised to provide FSIS with information demonstrating that the use of lactates in these products does not provide a preservative effect. In the absence of such information, FSIS will institute action to rescind its approval of the labels that bear a "natural" claim. Secondly, FSIS has removed the August, 2005[] modifications to the [Policy Book] relating to sodium lactate . . . . Finally, FSIS has prepared and published in the Federal Register a notice informing the public of the receipt of the petition from Hormel Foods and requesting comments on the petition. . . . FSIS . . . will continue to review and evaluate ["natural"] claims for products containing lactates or similar ingredients on a case-by-case basis, focusing on the purpose for which the ingredient is used, the level of the ingredient used in the product, and the function and technical effect of the ingredient.

---

[2]   The plaintiff has since clarified that its request for rescission of "natural" labels is the only one of its requests to the USDA at issue in this lawsuit. Pl.'s Opp'n at 26.

[3]   "In determining whether a complaint fails to state a claim, [a court] may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which [a court] may take judicial notice." EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 625 (D.C. Cir. 1997). Here, because the letters on which the plaintiff bases its claims were attached as exhibits to the plaintiff's complaint, they may be considered by the Court in resolving the pending motions.

Id., Ex. 1 (December 6, 2006 letter) at 1-2.  The plaintiff has attached to its Complaint an example of one of the letters referenced by Under Secretary Raymond that was sent by the USDA to companies manufacturing products bearing the "natural" label and containing lactates.[4]

Slightly over six months later, on June 28, 2007, Congressman Collin C. Peterson, then-Chair of the United States House of Representatives Committee on Agriculture, wrote then-Secretary of Agriculture Michael O. Johanns asking for a "status report" on the first representation made by Under Secretary Raymond in the December 6, 2006 Letter—namely, the FSIS's request to companies selling meat or poultry products bearing the "natural" label and containing lactates at levels of two percent or less to demonstrate that these lactates had no preservative effect or face rescission of the FSIS's approval of "natural" labels for those products. Id., Ex. 3 (June 28, 2007 Letter from Rep. Peterson to Secretary Johanns ("June 28, 2007 Letter") at 1.  In his July 31, 2007 response to Chairman Peterson, Under Secretary Raymond wrote:

> FSIS is currently determining how best to resolve the broad issue of "natural" claims on meat and poultry labels.  The [USDA] published a Federal Register notice on December 5, 2006 to seek public comment on the definition of "natural." . . . The comments submitted to the [USDA] expressed widely divergent and sometimes conflicting views on what the claim "natural," as applied to meat and poultry products, should mean.  Given that fact, FSIS is considering

---

[4]    In pertinent part, this letter reads:

> If lactates are used in your company's products bearing the claim "natural" at levels less than 2 perecent to increase product shelf-life, improve food safety, and control pathogens, the use of the ingredients is contrary to the meaning of "natural" [as stated in federal regulations].  Moreover, such products would be misbranded and the labels would be subject to being rescinded.  In order to be assured that the labels of the products bearing the claim "natural" in which lactates are used are truthful and not misleading, and in compliance with the [Policy Book], I am requesting that you provide data that show, for each product that bears a "natural" claim and that contains lactates, that these ingredients are having only a flavoring effect and are not functioning as a preservative in the product. . . .  I am requesting that you submit these data no later than 60 days from the date of this letter.  On receipt of the data, FSIS will evaluate them, and if the [USDA] were to find based on this evaluation that the effect of using lactates at 2 percent or less in formulations of "natural" meat and poultry products is that of an antimicrobial, the [USDA] will rescind its approval of the labels for these products.

Compl., Ex. 2 (December 5, 2006 Letter from Robert C. Post, Director, Labeling and Consumer Protection Staff, to Saag's Product's Inc.) at 2.

>how best to proceed to ensure that the term "natural," as used in meat and poultry labeling, is truthful and not misleading. While one way to try and achieve this result would be to pursue the actions we described in the letters you reference, we now believe that a more efficient way would be to pursue the process that the [USDA] began with the December 5, 2006 [n]otice. Thus, the [USDA] is considering further action to narrow the divergence in views, including seeking additional, but more focused, comments on the issue.

Id., Ex. 4 (July 31, 2007 Letter from Under Secretary Raymond to Chairman Peterson ("July 31, 2007 Letter")) at 1. The plaintiff characterizes this letter as "inform[ing] the Chairman that the [FSIS] had decided not to rescind any of the 'Natural' labels that had been issued for meat and poultry products that contained sodium or potassium lactates." Id. ¶ 41.

The plaintiff maintains that "[a]s a result of the [FSIS's] failure to take actions consistent with the conclusions it reached and the statements it made in its December 2006 letters, meat and poultry products containing the chemical preservatives sodium lactate and potassium lactate are continuing to be sold under 'Natural' labels in violation of the misbranding provisions of the FMIA and PPIA." Id. ¶ 44. The plaintiff further contends that "the [defendant's] failure to take actions consistent with its prior conclusions and statements has . . . permit[ed] [the] sale of meat and poultry products . . . which are misbranded, . . . adversely affecting [the plaintiff's] ability to sell . . . meat and poultry products that bear the 'Natural' label and that do not contain added chemical preservatives." Id. ¶ 45.

D.  The plaintiff's claims in this litigation

The plaintiff filed its Complaint with this Court on September 26, 2007. It asserts three causes of action. Count One claims that "[t]he [defendant] violated the FMIA and the PPIA . . . by its decisions to approve the sale of meat and poultry products that are misbranded," id. ¶ 47, and by failing "to rescind the 'Natural' label approvals that it had granted to meat and poultry products that contain the added chemical sodium lactate or potassium lactate," id. ¶ 48. Count

9

Two alleges that the defendant acted "arbitrarily, capriciously, or contrary to law," in violation of the APA when it decided "that it would not rescind the 'Natural' label approvals that it had granted to meat and poultry products that contain the added chemicals sodium lactate or potassium lactate under an exception" to its own labeling criteria, even though "that [exception] has since been rescinded." Id. ¶ 50. The third is a separate claim against the defendant under the APA for engaging in this conduct without "first conduct[ing] a notice and comment rulemaking." Id. ¶ 52. In addition to declaratory relief, id. at 22-23 ¶¶ 1-3, the plaintiff seeks the entry of an order "permanently enjoining the [defendant] from approving the sale and marketing under a 'Natural' label of meat and poultry products that contain the added chemicals potassium lactate or sodium lactate having a preservative effect[] unless it bears labeling stating that fact." Id. at 23 ¶ 4. The plaintiff also requests an order "directing the [defendant] to rescind its approval of each label for the marketing of a meat or poultry product that makes a 'Natural' claim and in which the chemicals sodium lactate [or] potassium [lactate] have been added and are having a preservative effect," provided that "the label does not state that fact," id. at 24 ¶ 5.

The defendant filed a motion to dismiss or for summary judgment on January 22, 2008. The plaintiff filed a cross-motion for summary judgment on March 7, 2008. In a motion filed on December 3, 2007, six of Hormel's competitors, Farmland Foods, Inc., Kraft Foods Global, Inc., PURAC America, Inc., Sara Lee Corporation, Smithfield Foods, Inc., and Tyson Foods, Inc., sought to intervene as defendants under Federal Rule of Civil Procedure 24. The Court granted intervention on March 3, 2009, and granted the Defendant-Intervenors' Motion for Joinder in the Defendant's Motion to Dismiss or for Summary Judgment on March 31, 2010.

The defendant asserts two principal arguments in support of its contention that the plaintiff's claims must be dismissed. First, the defendant argues that its determination not to

rescind any "natural" labels before making a final determination as to the definition of "natural" is not "final agency action" subject to judicial review under the APA. Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss the Complaint or, in the Alternative, for Summary Judgment ("Def.'s Mem.") at 23. Second, the defendant claims that whether to take enforcement action against companies whose products may not qualify as "natural," is a decision committed to agency discretion by law, and therefore not subject to review under the APA. Id. at 19. Because the Court concludes that the agency action in this case does not constitute final agency action and is therefore not subject to judicial review, the defendant's second argument concerning agency discretion need not be addressed.

## II. STANDARD OF REVIEW

"Although the final agency action requirement has been considered jurisdictional because, without it, the court cannot reach the merits of the dispute, the APA grants a cause of action rather than subject matter jurisdiction." Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt., 460 F.3d 13, 18 n.4 (D.C. Cir. 2006) (internal quotation marks, citation, and alteration omitted); see also Trudeau v. FTC, 456 F.3d 178, 183 (D.C. Cir. 2006) ("The APA . . . is not a jurisdiction-conferring statute."). Similarly, "[b]ecause the APA does not apply to agency action committed to agency discretion by law, a plaintiff who challenges such an action cannot state a claim under the APA." Oryszak v. Sullivan, 576 F.3d 522, 525 (D.C. Cir. 2009). Consequently, a motion to dismiss claims asserted under the APA on the grounds that there is no final agency action or that the challenged action is committed to agency discretion is appropriately brought by a defendant under Federal Rule of Civil Procedure 12(b)(6) and analyzed by the Court in accordance with cases applying that Rule.

In evaluating a Rule 12(b)(6) motion, the Court must "liberally construe" the complaint "in favor of the plaintiff, who must be granted the benefit of all inferences that can be derived from the facts alleged." Schuler v. United States, 617 F.2d 605, 608 (D.C. Cir. 1979) (internal quotation marks and citations omitted).  Moreover, the Court "may consider only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint[,] and matters of which [the Court] may take judicial notice." St. Francis Xavier Parochial Sch., 117 F.3d at 624 (footnote omitted).  Although the Court must accept the plaintiff's factual allegations as true, the Court is "not bound to accept as true a legal conclusion couched as a factual allegation," Papasan v. Allain, 478 U.S. 265, 286 (1986), and even those allegations pleaded with factual support need only be accepted to the extent that "they plausibly give rise to an entitlement to relief," Ashcroft v. Iqbal, __ U.S. __, __, 129 S. Ct. 1937, 1950 (2009).

### III.  LEGAL ANALYSIS

The APA entitles "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action . . . to judicial review thereof."  5 U.S.C. § 702.  It is clear that the right to judicial review under the APA is limited to a "final agency action for which there is no other adequate remedy in a court." 5 U.S.C § 704; see also Reliable Automatic Sprinkler Co. v. Consumer Product Safety Comm'n, 324 F.3d 726, 731 (D.C. Cir. 2003) ("If there was no final agency action here, there is no doubt that appellant would lack a cause of action under the APA.").  In other words, finality is a "threshold question" that determines whether judicial review is available. Fund for Animals, Inc., 460 F.3d at 18.  The Supreme Court has explained that, "[a]s a general matter, two conditions must be satisfied for agency action to be final: First, the action must mark the consummation of the agency's decisionmaking process," Bennett v. Spear, 520 U.S. 154, 177-78 (1997) (quotation marks and citations omitted), and second, "the


action must be one by which rights or obligations have been determined, or from which legal consequences will flow," id. at 178 (quotation marks and citations omitted).  Thus, "[a]gency action is considered final to the extent that it imposes an obligation, denies a right, or fixes some legal relationship."  Reliable Automatic Sprinkler Co., 324 F.3d at 731 (citing Role Models Am., Inc. v. White, 317 F.3d 327, 331-32 (D.C. Cir. 2003).

The plaintiff alleges that the defendant's July 31, 2007 letter represents the USDA's final decision not to rescind the "natural" labels that had been issued under the 2005 revision to the Policy Book.  Pl.'s Opp'n at 28-29.  The plaintiff further maintains that the USDA's December 5, 2006 letter established a policy and created a defined legal framework within which the USDA would determine whether individual labels were illegal under the FMIA and PPIA.  Id. at 26.  The plaintiff argues that the defendant's "abandonment of its December 2006 decision and its denial of [the plaintiff's] request for relief through rescission of illegal labels" constitutes final agency action as to those issues.  Id. at 26-27.

The defendant, on the other hand, argues that the July 31, 2007 letter does not constitute final agency action, Def.'s Mem. at 23, and that "[a]lthough [the] plaintiff alleges that [the] defendant has already decided not to rescind the 'natural' labels for the twenty-four companies at issue, the fact of the matter is that [the] defendant has not come to any such conclusion," id. at 23-24.  The defendant further asserts that the

> USDA's determination not to rescind any 'natural' labels, at this point, where all the relevant evidence is not yet gathered, is not a final decision . . . because, contrary to [the] plaintiff's allegation[s], it does not change USDA policy with regard to the requirements for 'natural' labels, it does not mark the consummation of the agency's decisionmaking process, and it does not finally determine the rights or obligations of the parties.

Def.'s Reply at 9.  As explained below, the Court agrees with the defendant.

There is an abundance of authority in this Circuit analyzing when final agency action occurs.  Two such cases, <u>Reliable Automatic Sprinkler Co. v. Consumer Product Safety Commission</u>, 324 F.3d 726 (D.C. Cir. 2003), and <u>Ciba-Geigy Corp. v. EPA</u>, 801 F.2d 430 (D.C. Cir. 1986), provide a more than adequate backdrop against which the Court can adjudicate the motions pending in this case.  In <u>Reliable Sprinkler Automatic Sprinkle Co.</u> the District of Columbia Circuit faced the question of whether the district court erred when it found there had been no final agency action.  324 F.3d at 729.  There, in 1999, the Consumer Product Safety Commission ("Commission") initiated an investigation into sprinkler heads manufactured by Reliable to determine whether they presented a substantial product hazard.  <u>Id.</u> at 730.  The following year, the Commission sent a letter to Reliable indicating that the Commission had decided "to make the preliminary determination that [Reliable's] sprinklers present a substantial product hazard."  <u>Id.</u> (citing the joint appendix from the record below).  Prior to making that preliminary determination, however, the Commission requested that Reliable take voluntary corrective action as provided for in the applicable federal regulations.  <u>Id.</u>  Reliable then brought suit seeking a declaratory judgment that the sprinkler heads at issue were not consumer products as defined by the act granting the Commission investigatory authority.  <u>Id.</u>  Reliable argued that, because it challenged the Commission's statutory authority to regulate rather than the substance of any substantial hazard determination, "the [Commission's] pre-enforcement actions [were] sufficiently final to warrant judicial review."  <u>Id.</u> at 731.  The Circuit rejected that argument, <u>id.</u>, reasoning that "the agency has not yet made any determination or issued any order imposing any obligation on Reliable, denying any right of Reliable, or fixing any legal relationship," <u>id.</u> at 732.  The Circuit therefore concluded that "the agency ha[d] not yet taken the steps required under the statutory and regulatory scheme for its actions to have any legal consequences."  <u>Id.</u>; <u>see also</u> <u>id.</u>

14

("To be sure, there may be practical consequences, namely the choice Reliable faces between voluntary compliance with the agency's request for corrective action and the prospect of having to defend itself in an administrative hearing. . . . But the request for voluntary compliance clearly has no legally binding effect."); id. at 734 ("[T]here has been no unequivocal statement of the agency's position on the meaning of 'consumer product' or on the agency's jurisdiction over Reliable's sprinklers."). In completing its analysis, the Circuit observed that "[i]t conserves both judicial and administrative resources to allow the required agency deliberative process to take place before judicial review is undertaken." Id. at 733.

In Ciba-Geigy, by contrast, the Circuit determined that the EPA had stated its position in a series of letters with sufficient finality to subject that position to judicial review as final agency action. 801 F.2d at 437. After being directed by Congress to reregister certain pesticides, the EPA promulgated a registration standard for a pesticide manufactured and sold by Ciba-Geigy, simazine, in which it set forth its evaluation of available data and its position regarding the steps necessary to bring simazine into compliance with the reregistration criteria. Id. at 432. The registration standard set a deadline of December 31, 1984, for, among other things, Ciba-Geigy to change the product's label to indicate its restricted use. Id. The EPA then sent a follow-up notice to twenty simazine registrants stating that the agency intended to institute cancellation proceedings for products not bearing the required labeling changes by December 31, 1984. Id. The EPA later extended that deadline to January 30, 1985, after which it warned registrants that if revised labels were not submitted, it would take steps to cancel the registrations. Id. at 432-33. In January 1985, Ciba-Geigy's counsel wrote to the EPA expressing its position that the labeling changes were unwarranted and seeking clarification from the EPA concerning the procedure by which the agency intended to enforce the labeling changes. Id. at 433. In March 1985, the EPA

15

responded that it was the agency's position that any simazine products not bearing the required statement of restricted use were misbranded and would be subject to appropriate enforcement action for misbranded products.  Id.  The EPA further indicated that it did not agree with the position advanced by Ciba-Geigy's counsel in the January 1985 letter.  Id.  The Circuit concluded that "[b]oth the criteria of definitiveness and direct and immediate effect suggest that the EPA's position is final," id. at 436 (internal quotation marks omitted), reasoning that the March 1985 letter "unequivocally stated [the] EPA's position on the question whether registrants were entitled to a cancellation hearing before labeling changes could be required," id.  The Circuit found that "[n]ot only did the statement of position admit of no ambiguity, but it gave no indication that it was subject to further agency consideration or possible modification."  Id. at 436.

Here, because the challenged agency action—the July 31, 2007 letter that the plaintiff argues denied its request for the rescission of "natural" labels[5]—more closely resembles the circumstances in Reliable Sprinkler Automatic Sprinkler Co., as compared to what occurred in Ciba-Geigy, the challenged action fails to meet the criteria necessary for this Court to deem it final agency action and to thus exercise judicial review under the APA.  The July 31, 2007 letter, rather than containing "criteria of definitiveness" or indications of "direct and immediate effect suggest[ing] that the" USDA's position is final, Ciba-Geigy, 801 F.2d at 436, makes clear that "the agency has not yet made any determination or issued any order imposing any obligation . . . , denying any right . . . , or fixing any legal relationship," Reliable Sprinkler Automatic Sprinkler

---

[5] Although the section of the plaintiff's opposition that addresses the final agency action question also references the USDA's December 6, 2006 letter, the Court finds that the plaintiff has identified only the July 31, 2007 letter as constituting a challenged final agency action.  The plaintiff argues that in the December 6, 2006 letter the USDA "took action to establish a policy and to create a defined legal framework within which it would determine whether individual labels were illegal under the FMIA and the PPIA.  Eight months later, the agency informed Chairman Peterson that it had decided not to rescind any of the labels."  Pl.'s Opp'n at 26.  The plaintiff then clarifies what it is challenging, stating "[i]t is this specific action—the abandonment of its December 2006 decision and its denial of Hormel's request for relief through rescission of illegal—that Hormel challenges in this case."  Id.

16

Co., 324 F.3d at 732. The letter states that in light of the "widely divergent and sometimes conflicting views on what the claim 'natural' . . . should mean, . . . FSIS is considering how best to proceed to ensure that the term 'natural,' as used in meat and poultry labeling, is truthful and not misleading." Compl., Ex. 4 (July 31, 2007 Letter) at 1 (emphasis added). The USDA acknowledged to Chairman Peterson that "[w]hile one way to try and achieve this result would be to pursue the actions we described in the [December 6, 2006 Letter] you reference, we now believe that a more efficient way would be to pursue the process that the Agency began with the December 5, 2006 [Federal Register] Notice." Id., Ex. 4 (July 31, 2007 Letter) at 1. The defendant does not, therefore, definitively indicate that the "natural" labels will not be rescinded; rather, it states that it has chosen to pursue a different process. Although the defendant does not explicitly state this, it stands to reason that the ultimate conclusion of the "process that the Agency began with the December 5, 2006 notice," id., Ex. 4 (July 31, 2007 Letter) at 1, could still result in the rescission of the "natural" labels at issue. The July 31, 2007 letter thus seems to indicate that the USDA has decided to approach the "broad issue of 'natural' claims," id., Ex. 4 (July 31, 2007 Letter) at 1, on a larger scale rather than engage in piecemeal rescission. Unlike the EPA's actions in Ciba-Geigy, the USDA here has not unequivocally stated its position or expressed that its position is not subject to further agency consideration. Indeed, the USDA makes clear that it is still "considering how best to proceed," id., Ex. 4 (July 31, 2007 Letter) at 1, and that it is "currently determining how to best resolve the broad issue of 'natural' claims on meat and poultry labels," id., Ex. 4 (July 31, 2007 Letter) at 1. It would therefore defy the plain language of the letter to conclude that the letter marks "the consummation of the agency's decisionmaking process." Bennett, 520 U.S. at 177-78.

Furthermore, the July 31, 2007 letter is not an agency action "by which rights or obligations have been determined, or from which legal consequences will flow." Id. at 178. In Croplife America v. EPA, 329 F.3d 876 (D.C. Cir. 2003), a case cited by the plaintiff as presenting circumstances analogous to those here, the EPA had previously "made [a] case-by-case practice clear to the regulated community. Then, however, the agency abruptly reversed its position" when it indicated that it would no longer consider or rely on certain studies in its regulatory decisionmaking. Id. at 878. The Circuit held that this "clear and unequivocal language [reflected] an obvious change in established agency practice, [and] create[d] a binding norm that [was] finally determinative of the issues or rights to which it is addressed." Id. at 881 (internal quotation marks and citations omitted). Here, however, the Court finds that the July 31, 2007 letter expresses no change of USDA practice, nor does it establish binding norms. It is noteworthy that the plaintiff's opposition is largely silent on how the July 31, 2007 letter determined obligations or set forth legal consequences, stating only that

> [a]s a practical matter, [the] USDA's decision not to rescind labels for the lactate-containing "natural" products it approved under the illegal exemption for sodium lactate determines the legal rights of Hormel, its competitors, and the public. The twenty-four manufacturers will be able to continue selling their products indefinitely. Hormel's request for relief from the unfair competition presented by these misbranded products has been denied. Consumers have also lost their right to truthful product labeling and accurate disclosure of the presence of chemical preservatives.

Pl.'s Opp'n at 29-30. While the plaintiff has pointed to practical implications—that, for the present, the products still bear the "natural" label—the court in Reliable Sprinkler made clear that there is a difference between practical consequences and legally binding effect. See Reliable Sprinkler, 324 F.3d at 732 ("To be sure, there may be practical consequences, namely the choice Reliable faces between voluntary compliance with the agency's request for corrective action and the prospect of having to defend itself in an administrative hearing. . . . But the request for

18

voluntary compliance clearly has no legally binding effect."). Far from determining the legal rights of Hormel, its competitors, or the public, the July 31, 2007 letter merely indicates that the USDA is in the process of evaluating "natural" claims, a process that, when culminated, may determine legal rights, but does not now do so.

## IV.  CONCLUSION

Because the plaintiff has failed to allege facts that demonstrate that the July 31, 2007 letter is a final agency action, the plaintiff has failed state a claim for relief under the APA. Accordingly, the plaintiff's Complaint against the USDA must be dismissed.[6]

**SO ORDERED** this 8th day of September, 2011.

REGGIE B. WALTON  
United States District Judge

---

[6] The Court will contemporaneously issue an Order consistent with this Opinion.